**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED  6|10|11
```

-----------------------------------------x
                                 :

SECURITIES AND EXCHANGE COMMISSION,   :

                     Plaintiff,   :

                                 : 10 Civ. 3229(BSJ)(MHD)

            v.                   :

                                 : **Memorandum and Order**

GOLDMAN SACHS & CO. and FABRICE TOURRE, :

                   Defendants.   :

                                 :
-----------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

This case involves civil allegations of securities fraud in the wake of Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010). The Securities and Exchange Commission ("SEC") alleges Defendant Fabrice Tourre violated Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a)(1)–(3), violated Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and aided and abetted violations of Section 10(b) and Rule 10b-5 of the Exchange Act. Tourre moves to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).[1] For the reasons provided below, Tourre's Motion to Dismiss is DENIED in part and GRANTED in part.

---

[1] The Court heard oral argument on Tourre's motion on February 14, 2011.

## BACKGROUND

The SEC filed its original complaint against Goldman Sachs & Co. ("Goldman") and Tourre in April 2010. (Dkt. 1.)  In July 2010, Goldman, without admitting or denying liability, settled for $550 million. (Dkt. 25.)  Tourre subsequently moved for judgment on the pleadings on the basis the complaint failed to state a claim because it did not allege a securities transaction took place in the United States. (Dkt. 30.)  Tourre's argument was based on Morrison. (Dkt. 31.)  Because the complaint was filed before Morrison was decided, the Court granted the SEC's request for leave to file an amended complaint. (Dkt. 42.)

The SEC filed its Amended Complaint on November 22, 2010. (Dkt. 44.)  It alleges the following:

### A. Origins of ABACUS

In early 2007, U.S.-based Goldman structured and marketed a synthetic collateralized debt obligation ("CDO"), ABACUS 2007-AC1 ("ABACUS"), that was tied to the performance of subprime residential mortgage-backed securities ("RMBS").[2]  (Am. Compl.

---

[2] CDOs are debt securities collateralized by debt obligations, including RMBSs. (Am. Compl. ¶ 14.)  These securities are packaged and generally held by a special purpose vehicle that issues notes entitling their holders to payments derived from the underlying assets. (Id.)  In a synthetic CDO, the special purpose vehicle does not own a portfolio of fixed income assets, but enters into credit default swaps ("CDS") that reference the performance of a portfolio. (Id.)

A CDS is an over-the-counter derivative contract under which a protection buyer makes periodic premium payments and the protection seller makes a contingent payment if a reference obligation experiences a credit event. (Id. ¶ 12.)

2

¶¶ 1, 9.)   At the time, Tourre, who was the Goldman employee
principally responsible for the structuring and marketing of
ABACUS, worked as a Vice President in the structured product
correlation trading desk at Goldman's headquarters in New York
City.   (Id. ¶ 10.)

In 2006, Paulson & Co. Inc. ("Paulson"), a hedge fund
located in New York City, developed an investment strategy based
on the view that certain mid-and-subprime RMBSs, rated "Triple
B" by Moody's, would experience credit events.[3]   (Id. ¶¶ 12–13.)
Examples of credit events include failure to pay, restructuring,
and bankruptcy.   After analyzing various Triple B-rated RMBSs,
Paulson asked Goldman to help it buy protection, through the use
of CDSs, on RMBSs it believed would experience credit events.
(Id. ¶ 16.)   The SEC claims Paulson and Goldman discussed
creating a CDO that would allow Paulson to participate in
selecting a portfolio of reference obligations and then to short
the portfolio by entering into a CDS with Goldman to buy
protection on specific layers of the synthetic CDO's capital
structure.   (Id. ¶ 17.)

Goldman and Tourre knew, according to the SEC, that it
would be hard to market and sell the liabilities of a synthetic
CDO if they disclosed that a short investor (i.e., Paulson)

---

[3] The Triple B tranche is the lowest investment grade RMBS and, after equity,
is the first part of the capital structure to experience losses associated
with a deterioration of the underlying mortgage loan portfolio.   (Am. Compl.
¶ 13.)

played a significant role in selecting the portfolio.  (Id.
¶ 20.)  But Goldman and Tourre also knew, the SEC alleges, that
identifying an experienced and independent third-party
collateral manager as having selected the portfolio would
facilitate placement of the CDO liabilities.  (Id.)  The task of
placing CDO liabilities was complicated by the fact that the
market for CDOs backed by subprime RMBSs was beginning to show
signs of distress—a fact, the SEC claims, Tourre and Goldman
were aware of.[4]  (Id.)  Accordingly, in or about January 2007,
Goldman allegedly approached ACA Management LLC ("ACA") and
proposed it serve as the "Portfolio Selection Agent" for a CDO
transaction sponsored by Paulson.  (Id. ¶ 23.)

On January 8, Tourre attended a meeting with
representatives from Paulson and ACA at Paulson's New York City
office to discuss the proposed transaction.  (Id. ¶ 27.)  The
SEC claims that over the next two months, through a series of
emails and meetings, Paulson and ACA agreed, with the help of
Goldman and Tourre, on a reference portfolio of 90 RMBSs for
ABACUS.  (Id. ¶¶ 28-36.)  Throughout this time, ACA was in the
dark, the SEC alleges, about Paulson's intention to short the
portfolio that it helped select by entering into a CDS with

---

[4] The SEC points to an email Tourre sent a friend on January 23, 2007,
stating, among other things, "More and more leverage in the system, The whole
building is about to collapse anytime now."  (Am. Compl. ¶ 19.)  The SEC also
cites a February 11 email to Tourre from the head of Goldman's structured
product correlation trading desk, stating, in part, "the cdo biz is dead we
don't have a lot of time left."  (Id.)

Goldman to buy protection on specific layers of the synthetic CDO's capital structure. (Id. ¶ 33.) According to the SEC, Goldman and Tourre misled ACA into believing Paulson was investing in the equity of ABACUS and thus shared a long interest with CDO investors. (Id. ¶ 45.)

On January 10, Tourre emailed ACA a "Transaction Summary" that described Paulson as the "Transaction Sponsor." (Id. ¶ 48.) The email also referenced a "Contemplated Capital Structure" with a "[0]% - [9]%: pre-committed first loss" as part of the deal structure. (Id.) The description of this tranche at the bottom of the capital structure was consistent with the description of an equity tranche, according to the SEC, which ACA reasonably believed to be the case. (Id.)

On January 12, Tourre spoke by telephone with ACA about the proposed transaction. (Id. ¶ 49.) The SEC makes no allegation regarding what was said during this conversation. Following the conversation, however, on January 14, ACA sent an email to a Goldman sales representative that raised questions about the proposed transaction and Paulson's equity interest. The email stated, in part, "the structure looks difficult from a debt investor perspective. I can understand Paulson's equity perspective but for us to put our name on something, we have to be sure it enhances our reputation." (Id.) Although Tourre was not one of the original recipients of the email, the SEC claims

5

a Goldman sales representative forwarded it to Tourre on January 16.  (Id. ¶ 50.)  As of that date, the SEC alleges, Tourre knew or was reckless in not knowing ACA had been misled into believing Paulson intended to invest in the equity of ABACUS. (Id. ¶ 51.)

On February 12, ACA's Commitments Committee approved ACA's participation as Portfolio Selection Agent in ABACUS.  (Id. ¶ 52.)  According to the SEC, had ACA known Paulson was taking a short position, it is unlikely it would have served as the Portfolio Selection Agent.  (Id. ¶ 46.)  ACA and Paulson ultimately agreed upon the reference portfolio of 90 RMBSs for ABACUS on or about February 26.  (Id. ¶ 36.)

In addition to misleading ACA about Paulson's equity interest, the SEC alleges Goldman's marketing materials for ABACUS were false and misleading because they failed to make any mention of Paulson's role in selecting the reference portfolio. (Id. ¶ 37.)  The SEC points to, among other things, a term sheet and flip book Goldman finalized for ABACUS on or about February 26.  (Id. ¶¶ 38-39.)  Both indicate ACA selected the reference portfolio of RMBSs with no mention of Paulson.  (Id. ¶¶ 38-39.) Tourre, according to the SEC, had primary responsibility for preparing the term sheet and flip book.  (Id. ¶ 40.)

The SEC alleges additionally that Goldman finalized an offering memorandum for ABACUS on approximately April 26,

portions of which Tourre also allegedly reviewed. (Id. ¶¶ 42–
43.) Like the term sheet and flip book, the offering memorandum
represented that ACA selected the RMBS reference portfolio and
failed to mention Paulson. (Id. ¶ 42.) Although none of the
ABCAUS marketing materials referenced Paulson, Goldman's
internal communications clearly acknowledged Paulson, its
economic interests, and its role in the transaction, according
to the SEC.[5] (Id. ¶ 44.)

### B. ABACUS Investors

#### 1. IKB

The SEC alleges that in late 2006, IKB, a German commercial
bank, informed Goldman and Tourre it was no longer comfortable
investing in the liabilities of CDOs that did not utilize a
collateral manager——i.e., an independent third-party with
knowledge and expertise in analyzing RMBS CDOs backed by U.S.
mid-and-subprime mortgages. (Id. ¶¶ 53–54.) Goldman and Tourre
knew, the SEC claims, IKB would likely accept ACA as a
collateral manager. (Id. ¶ 54.)

Between February and April 2007, Goldman allegedly sent IKB
copies of the ABACUS term sheet, flip book, and offering
memorandum. (Id. ¶¶ 56–60.) Because these materials referenced
ACA but not Paulson, the SEC alleges these representations and

---

[5] The SEC cites, as an example, a March 12 memorandum by Goldman's Mortgage
Capital Committee stating, "Goldman is effectively working an order for
Paulson to buy protection on specific layers of the" ABACUS capital
structure. (Am. Compl. ¶ 44.)

omissions were materially false and misleading. (Id.) The SEC also claims neither Goldman nor Tourre informed IKB, independent of the marketing materials, about Paulson's role in selecting the reference portfolio and its adverse economic interests. (Id.)

In addition to the marketing materials, the SEC alleges Tourre communicated directly with IKB. (Id. ¶¶ 59-60.) On March 6, for example, Tourre sent an email to IKB stating, among other things, "This is a portfolio selected by ACA." (Id. ¶ 59.) In internal Goldman communications, however, Tourre subsequently described the portfolio as being "selected by ACA/Paulson." (Id.) Later, on March 19, an IKB representative sent an email to Tourre and others, asking, "what [is] your plan for the ACA deal[?]" (Id.) On March 27, after IKB indicated it intended to recommend purchase of ABACUS notes, Tourre sent an email to IKB promising to send updated documents and stating, "thanks for getting your approval so quickly on this."[6] (Id.)

---

[6] After oral argument, Tourre provided the Court with a copy of this complete email chain. (Tourre Letter, Feb. 15, 2011, Ex. B.) While the SEC correctly quotes Tourre's response, it omits an earlier email in the chain by Jörg Zimmermann, the Head of Correlation Products and Senior Vice President for IKB Credit Asset Management GmbH. See In re Citigroup, Inc., No. 08 Civ. 3095(LTS), 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011) (explaining that courts may consider documents not attached to a complaint if the documents were "'possessed by [and] known to the plaintiff'" and if the plaintiff relied upon them "'in bringing the suit'") (citation omitted). Zimmermann states, "IKB Credit Asset Management GmbH in its role as investment adviser decided to recommend to the Directors of the relevant Loreley Financing (Jersey) Limited, a purchasing company of Rhineland Funding Capital Corporation, the investment" of ABACUS notes "subject to" certain conditions. (Tourre Letter, Feb. 15, 2011, Ex. B.) Zimmerman also states, "[t]his email

Tourre continued communicating directly with IKB into April, according to the SEC. (Id. ¶ 60.) On April 2, the SEC claims Tourre sent an email to IKB attaching black-lined and clean copies of the ABACUS offering circular. (Id.) Three days later, Tourre sent a follow-up email to IKB, stating, "as discussed please let me know if you have any issue with the preliminary offering circular, we can discuss on Monday or Tuesday of next week." (Id.)

ABACUS closed on or about April 26. (Id. ¶ 61.) IKB bought $50 million worth of Class A-1 notes and $100 million worth of Class A-2 notes, both at face value. (Id.) According to the ABACUS offering memorandum, the notes would be "ready for delivery in book-entry form only in New York" and were offered by Goldman "in the United States." (Id. ¶ 62.) The offering memorandum also stated U.S.-based Goldman was "offering" and "selling" the notes. (Id.) The closing occurred at One Battery Park Plaza in New York. (Id.) Goldman purchased the notes initially, receiving them through the book-entry facilities of the Depository Trust Company ("DTC") in New York City, and then delivered the notes through the book-entry facilities of DTC to a New York-based bank for further delivery. (Id.) At the closing, Goldman allegedly delivered $150 million, representing the purchase price of the notes, by federal funds wire transfer

---

is . . . non-binding and . . . [i]t does not constitute a commitment by IKB Credit Asset Management GmbH or any of the above mentioned parties." (Id.)

to LaSalle Bank National Association, which is headquartered in Chicago, as trustee for ABACUS. (Id. ¶ 63.) The SEC does not allege that IKB, ABN, or ACA was present for or otherwise involved with the closing.

Within months of the closing, the ABACUS notes IKB purchased were worthless. (Id. ¶ 65.) IKB allegedly lost almost all of its $150 million investment. (Id.) The SEC claims most of this money ultimately went to Paulson by virtue of a CDS a Paulson affiliate entered into with a Goldman affiliate. (Id.) Pursuant to the CDS, Paulson purchased protection on the layers of ABACUS's capital structure that corresponded with the Class A-1 and A-2 notes. (Id.) IKB would not have invested in ABACUS, the SEC claims, if it knew Paulson played a significant role in selecting the portfolio while taking a short position against ABACUS. (Id. ¶ 64.)

In addition to the CDS Goldman offered and sold to Paulson, the SEC alleges Goldman marketed securities or security-based swap agreements relating to ABACUS to other investors through Goldman's structured product syndicate desk in New York. (Id. ¶ 66.) The desk, among other things, emailed a new issue announcement of the transaction to a number of institutional investors, inviting them to contact any one of seven Goldman sales representatives in New York, according to the SEC. (Id.)

### 2. **ACA Capital and ABN AMRO**

On or about April 26, the SEC alleges, ACA Capital
Holdings, Inc. ("ACA Capital"), ACA's U.S.-based parent company,
purchased $42 million worth of ABACUS Class A-2 notes at face
value.  (Id. ¶ 71.)  Goldman offered and sold the ABACUS notes
ACA Capital purchased, according to the SEC, and Tourre played a
principal role in the offer and sale of these securities.  (Id.)
Within months, the SEC claims, the notes were worthless.  (Id.)

Later, on or about May 31, ACA Capital, the SEC alleges,
sold protection on or "wrapped" a $909 million super senior
tranche of ABACUS.[7]  (Id. ¶ 67.)  At approximately the same time,
according to the SEC, a Paulson affiliate entered into a CDS
with a Goldman affiliate.  (Id.)  Pursuant to this CDS, Paulson
allegedly purchased protection on the super senior tranche of
ABACUS.  (Id.)  The SEC claims these CDSs were security-based
swap agreements offered and sold by Goldman and that Tourre
played a principal role in the offer and sale of these CDSs.
(Id.)

ACA Capital, like ACA, was unaware Paulson was taking a
short position on ABACUS, according to the SEC.  (Id. ¶ 68.)
The SEC alleges it is unlikely ACA Capital would have written

---

[7] In other words, ACA Capital assumed the credit risk associated with that
portion of the capital structure via a CDS in exchange for premium yearly
payments.  (Am. Compl. ¶ 67.)

protection on the super senior tranche if it knew Paulson was
taking a short position.  (Id.)

The super senior transaction with ACA Capital was
intermediated by ABN AMRO Bank N.V. ("ABN"), a European bank.
(Id. ¶ 69.)  In other words, through a series of CDSs between
ABN and a Goldman affiliate and between ABN and ACA Capital, ABN
assumed the credit risk associated with the $909 million super
senior portion of ABACUS's capital structure in the situation
ACA Capital became unable to pay.  (Id.)  The SEC claims the
CDSs ABN and ACA Capital entered into were security-based swap
agreements offered and sold by Goldman.  (Id.)  In addition to
an email by Tourre soliciting ABN's participation in a
"supersenior swap trade . . . selected by ACA[,]" Goldman also
sent the ABACUS term sheet, flip book, and offering memorandum
to ABN.  (Id. ¶¶ 69-70.)  As explained above, the SEC alleges
these marketing materials were materially false and misleading
because they mentioned ACA without referencing Paulson and its
adverse economic interests.  (Id. ¶ 70.)

### C. Counts

Based on the allegations described above, the Amended
Complaint charges Tourre with three counts of civil securities
fraud.  The first count alleges Tourre violated Section 17(a) of
the Securities Act by: (1) knowingly, recklessly, or negligently
misrepresenting, in the marketing, offering, and sale of ABACUS

securities and security-based swap agreements (including through the term sheet, flip book, and offering memorandum), that ACA selected the reference portfolio without disclosing Paulson's significant involvement in the selection process; and (2) knowingly, recklessly, or negligently misleading ACA into believing Paulson was investing in the equity of ABACUS, when, in fact, it was taking a short position. (Id. ¶¶ 74-77.) The second count alleges Tourre violated Section 10(b) and Rule 10b-5 of the Exchange Act by: (1) knowingly or recklessly misrepresenting, in connection with the purchase and sale of ABACUS securities and security-based swap agreements (including through the term sheet, flip book, and offering memorandum), that ACA selected the reference portfolio without disclosing Paulson's significant role in the selection process; and (2) knowingly or recklessly misleading ACA into believing Paulson was investing in the equity of ABACUS without disclosing it was actually taking a short position. (Id. ¶¶ 78-81.) The last count alleges Tourre aided and abetted Goldman's violations of Section 10(b) and Rule 10b-5 based on the allegations described in the second count. (Id. ¶¶ 82-83.)

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. "In ruling on a motion

to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true . . . ." Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991) (citation omitted). The Court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. See Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (explaining that in deciding a motion to dismiss, a court "consider[s] the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor") (citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and internal quotation marks omitted). A plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1940 (2009) (citation omitted).

14

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Although intent may be alleged generally, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (citations omitted).

## DISCUSSION

### I. Exchange Act Counts

Section 10(b) of the Exchange Act makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance . . . .

15 U.S.C. § 78j(b). Rule 10b-5, which was promulgated under Section 10(b), makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

(b)   To make any untrue statement of a material fact
      or to omit to state a material fact necessary in
      order to make the statements made, in light of
      the circumstances under which they were made, not
      misleading, or

(c)   To engage in any act, practice, or course of
      business which operates or would operate as a
      fraud or deceit upon any person, in connection
      with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Beginning in the late 1960s, the Second Circuit embarked on
a path that extended Section 10(b)'s reach beyond domestic
securities transactions.  See Schoenbaum v. Firstbrook, 405 F.2d
200 (2d Cir. 1968) (holding Section 10(b) has extraterritorial
application where the transaction has some effect on American
securities markets or investors); see also Leasco Data
Processing Equip. Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972)
(holding Section 10(b) has extraterritorial application where a
transaction involves significant conduct in the United States).
The "north star" of the Second Circuit's Section 10(b)
jurisprudence became known as the "conduct" and "effects" tests.
These tests required courts to look at two factors to determine
whether Section 10(b) should be given extraterritorial
application: "(1) whether the wrongful conduct occurred in the
United States, and (2) whether the wrongful conduct had a
substantial effect in the United States or upon United States

16

citizens." See S.E.C. v. Berger, 322 F.3d 187, 192-93 (2d Cir. 2003) (citations omitted).

Morrison repudiated the "conduct" and "effects" tests.  In addition to being "complex in formulation and unpredictable in application[,]" the "conduct" and "effects" tests——and a host of others they spawned——lacked, the Supreme Court explained, "a textual or even extratextual basis."  Morrison, 130 S. Ct. at 2878, 2879 (citations omitted).  The tests (and their progeny) also disregarded the "presumption against extraterritoriality." Id. at 2878-79; see id. at 2877, 2883 (explaining that "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions[,]'" and finding that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially") (citation omitted).  Another factor that weighed heavily into the Supreme Court's decision was "[t]he probability of incompatibility with the applicable laws of other countries."  Id. at 2885.  Numerous foreign countries and international organizations filed amicus briefs "complain[ing] of the interference with foreign securities regulation that application of § 10(b) abroad would produce."  Id. at 2886.

For all of these reasons, the Supreme Court held Section 10(b) of the Exchange Act does not apply extraterritorially.[8] Instead, it applies only to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." Id. at 2884. Explaining that some activities or contacts in the United States would not be sufficient to satisfy its new "transactional test," the Supreme Court noted that while "it is a rare case . . . that lacks all contact with the territory of the United States[,] the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." Id. (emphasis in original). The focus of the Exchange Act, the Supreme Court added, "is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." Id.

In adopting "a clear . . . transactional test"—namely, "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange"—the Supreme Court rejected a test proposed by the Solicitor General: "[A] transnational securities fraud violates [§] 10(b) when the fraud involves significant conduct in the United States that is material to the fraud's success." Id. at 2886 (alteration in

---

[8] Since Rule 10b-5 extends no further than Section 10(b), the Supreme Court also held, "if § 10(b) is not extraterritorial, neither is Rule 10b-5." Morrison, 130 S. Ct. at 2881.

18

original).  One of the arguments the Solicitor General pressed

in support of this test was the fact that the SEC "adopted an

interpretation similar to the 'significant and material conduct'

test, and that [the Supreme Court] should defer to that."  Id.

at 2887.  Because the SEC's interpretation "relied on cases"

that "ignored or discarded the presumption against

extraterritoriality" and that the Supreme Court rejected, the

Supreme Court found it owed the SEC's interpretation "no

deference."  Id. at 2887-88.

     Although firm in its holding, the securities at issue in

Morrison were traded only on foreign exchanges.  Id. at 2875.

As a result, Morrison was largely silent regarding how lower

courts should determine whether a "purchase or sale is made in

the United States."  Id. at 2886.  Here, because the SEC has not

alleged any ABACUS securities were traded on a domestic

exchange, the issue before the Court, with respect to the

Section 10(b) and Rule 10b-5 claims, is whether the SEC

adequately alleges facts that demonstrate that any of the ABACUS

securities transactions constitute a "purchase or sale . . .

made in the United States."  Id.

     With little guidance in Morrison regarding how lower courts

should determine whether a "purchase or sale is made in the

United States[,]" id., the Court begins by looking at the

statutory definitions of "purchase" and "sale."  The Exchange

Act defines a "purchase" to "include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). A sale is defined to "include any contract to sell or otherwise dispose of."[9] Id. § 78c(a)(14).

In Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Company, a post-Morrison Section 10(b) case, Judge Koeltl explained that "purchase," for purposes of the Exchange Act, has been interpreted "to make an individual a 'purchaser' when he or she 'incurred an irrevocable liability to take and pay for the stock.'" 753 F. Supp. 2d 166, 177 (S.D.N.Y. 2010) (emphasis added) (citations omitted); see also DiLorenzo v. Murphy, 443 F.3d 224, 229 (2d Cir. 2006) (finding that Exchange Act "purchase" occurs when a purchaser "fully and irrevocably pa[ys]" for the securities at issue) (emphasis added); Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd., No. 08-cv-01381-MSK-CBS, 2011 WL 1211511, at *7 (D. Colo. Mar. 31, 2011) (finding that a transaction was not completed, for a post-Morrison Exchange Act case, "until [the seller] finally accepted an application").

Here, the SEC alleges solely that there was a "sale" without discussing the "purchase" component of the alleged

---

[9] In SEC v. National Securities, Inc., the Supreme Court quipped, "[t]he relevant definitional sections of the [Exchange] Act are for the most part unhelpful; they only declare generally that the terms 'purchase' and 'sale' shall include contracts to purchase or sell." 393 U.S. 453, 466 (1969) (citations omitted).

transactions.  At oral argument, the SEC was unable to provide
any basis for separating or distinguishing the "sale" from the
"purchase" of any of the transactions alleged in the Amended
Complaint.  Without deciding whether a "sale" can be separated
or distinguished from any "purchase" at issue here, the
principal concept the Court takes from Plumbers' Union is the
notion of "'irrevocable liability[,]'" 753 F. Supp. 2d at 177,
which is at the core of both a "sale" and a "purchase."  To be
sure, in the same way a "purchaser[,]" at some moment in time,
incurs "'irrevocable liability to take and pay for'" a security,
id., a "seller," at some moment in time, incurs "'irrevocable
liability to'" deliver a security.

### 1. IKB

     The SEC alleges three sets of ABACUS securities
transactions.  The first involves two note purchases by IKB.[10]
(Am. Compl. ¶¶ 53-66.)  The SEC describes several instances of
U.S.-based conduct by Tourre that allegedly establish that the
IKB note purchases were domestic transactions.  The SEC refers,
for example, to false and misleading ABACUS marketing materials
that were transmitted to IKB that, the SEC claims, Tourre had
primary responsibility for preparing and/or reviewing.  (Id.
¶¶ 56-58.)  The SEC also cites a series of email communications

---

[10] As explained above, the SEC alleges IKB purchased $50 million of Class A-1
ABACUS notes and $100 million of Class A-2 ABACUS notes.  (Am. Compl. ¶¶ 53,
61.)

from Tourre (and others at Goldman) to IKB, encouraging them to purchase ABACUS securities.  (Id. ¶¶ 59-60.)  Some of the emails reference direct conversations between Tourre and IKB.  (Id. ¶¶ 58, 60.)

    The shortcoming of all of this U.S.-based conduct is precisely that——it is just conduct.  Morrison was clear that domestic conduct is not the test for determining Section 10(b) liability.  130 S. Ct. at 2884 (explaining "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States" and that "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered'").

    Tacitly conceding that none of the U.S.-based conduct it describes alleges that any party incurred "'irrevocable liability'" in the United States, see Plumbers' Union, 753 F. Supp. 2d at 177, the SEC argues the Court must consider "the entire selling process."  This argument, based on United States v. Naftalin, 441 U.S. 768 (1979), does not pass muster.  In Naftalin, the defendant was charged with violating Section 17(a) of the Securities Act by defrauding and financially injuring several brokers.  Id. at 770-71.  The defendant argued he could not be held liable under Section 17(a) because the statute

22

"applies solely to frauds directed against investors, and not to those against brokers." Id. at 772.  The Supreme Court rejected this argument, finding that the statutory definitions of "offer" and "sale" "are expansive enough to encompass the entire selling process, including the seller/agent transaction." Id. at 772–73.

Nowhere in Naftalin does the Supreme Court state that the location of a transaction can be determined by looking at "the entire selling process." And, even if it did, this certainly is not the test after Morrison. Morrison was clear that Section 10(b) "punishes not all acts of deception" (i.e., the selling process), "but only such acts 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'" 130 S. Ct. at 2887.  In reality, the SEC's "entire selling process" argument is an invitation for this Court to disregard Morrison and return to the "conduct" and "effects" tests.

To the extent the SEC alleges and relies upon the ABACUS closing (Am. Compl. ¶¶ 61-63), the SEC conceded, at oral argument, that the closing, by itself, is not sufficient to make the IKB note purchases domestic transactions for purposes of Morrison.  (Mot. to Dismiss Hr'g Tr. 28–29.)  Indeed, under Morrison's "transactional test," the closing, absent "a purchase or sale . . . made in the United States," 130 S. Ct. at 2886, is

23

not determinative. See Quail Cruises Ship Mgmt. Ltd. v. Agencia De Viagens CVC Tur Limitada, 732 F. Supp. 2d 1345, 1350 (S.D. Fla. 2010) (holding that even if the transaction closed in Miami, "the relevant conduct, . . . the purchase or sale of foreign securities[,] . . . occurred abroad and therefore is not governed by federal law").

In view of the fact that none of the conduct or activities alleged by the SEC, including the closing, constitute facts that demonstrate where any party to the IKB note purchases incurred "'irrevocable liability[,]'" Plumbers' Union, 753 F. Supp. 2d at 177, the SEC fails to provide sufficient facts that allow the Court to draw the reasonable inference that the IKB note "purchase[s] or sale[s were] made in the United States." Morrison, 130 S. Ct. at 2886.

Although the SEC bears the burden of alleging the IKB note purchases were domestic transactions, in an effort to show the IKB note purchases were foreign transactions, Tourre, for his part, cites the trade confirmations for both IKB note purchases.[11] (See Chepiga Decl. Exs. G, H.) In both confirmations, Goldman Sachs International, located in London, was listed as the seller and Loreley Financing (Jersey), IKB's

---

[11] Although the trade confirmations were not attached to the Amended Complaint, the Court considers these documents because they were "'possessed by [and] known to the plaintiff'" and because the SEC relied upon them "'in bringing the suit.'" See In re Citigroup, Inc., 2011 WL 744745, at *5 (citation omitted).

affiliate based on the island of Jersey, a British Crown

Dependency, was listed as the purchaser.  (See id.)  At oral

argument, Tourre's counsel represented that the trade

confirmation "is generated at the moment the trade happens."

(Mot. to Dismiss Hr'g Tr. 7:19-20, Feb. 14, 2011.)  In response,

at oral argument, the SEC argued that U.S. companies should not

be allowed to skirt U.S. federal securities laws by using

foreign affiliates to complete securities transactions.  (Id. at

20-21.)  Justice Stevens voiced similar concerns in a concurring

opinion in Morrison.[12]  130 S. Ct. at 2895 (Stevens, J.,

concurring).

The Court need not address the SEC's argument in view of

the SEC's failure to allege that any party to the IKB note

purchases incurred "'irrevocable liability'" in the United

States.  See Plumbers' Union, 753 F. Supp. 2d at 177.  Because

the SEC does not sufficiently allege the IKB note purchases were

"domestic transactions[,]" Morrison, 130 S. Ct. at 2884, the

---

[12] Justice Stevens provided the following example:

> Imagine, for example, an American investor who buys shares in a
> company listed only on an overseas exchange.  That company has a
> major American subsidiary with executives based in New York City;
> and it was in New York City that executives masterminded and
> implemented a massive deception which artificially inflated the
> stock price—and which will, upon its disclosure, cause the price
> to plummet.  Or, imagine that those same executives go knocking
> on doors in Manhattan and convince an unsophisticated retiree, on
> the basis of material misrepresentations, to invest her life
> savings in the company's doomed securities.  Both of these
> investors would, under the Court's new test, be barred from
> seeking relief under § 10(b).

Morrison, 130 S. Ct. at 2895 (Stevens, J., concurring).

Court also makes no finding regarding whether trade confirmations are sufficient to establish the territorial location of a "purchase" or "sale."[13]

For the reasons provided above, the SEC fails to state a claim that Tourre violated Section 10(b) and Rule 10b-5 with respect to the alleged IKB securities transactions. Accordingly, the second and third counts are DISMISSED as to IKB.

### 2. ABN

The second alleged ABACUS securities transaction involves ABN. (Am. Compl. ¶¶ 69-70.) According to the SEC, through a series of CDSs between ABN and a Goldman affiliate and between ABN and ACA Capital, ABN assumed the credit risk associated with the super senior tranche of ABACUS in the situation ACA Capital became unable to pay. (Id. ¶ 69.) The SEC alleges the CDSs ABN and ACA Capital entered into were sold by Goldman. (Id.)

Although he has no burden, Tourre argues the ABN CDS transaction was a foreign transaction for purposes of Morrison. Tourre claims that ABN, acting through its London branch, entered into an English-law governed swap with U.K.-based

---

[13] Both parties also discuss, at length, the implications of Regulation S, 17 C.F.R. §§ 230.901-230.905, for this case. Regulation S, however, by its own terms, "relate[s] solely to the application of Section 5 of the Securities Act . . . and not to antifraud or other provisions of the federal securities laws." 17 C.F.R. § 230, Reg. S (Preliminary Note ¶ 1). In view of the fact that this case involves claims under Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act, Regulation S does not apply to this case.

Goldman Sachs International on May 31, 2007.[14]  (See Chepiga
Decl. Exs. I, J.)  The swap, according to Tourre, was executed
pursuant to a Master Agreement entered into in 1996 by ABN and
Goldman Sachs International.[15]  (See Chepiga Decl. Exs. K, L.)

In addition to alleging Tourre directly and indirectly
marketed ABACUS to ABN (Am. Compl. ¶¶ 69-70),[16] the SEC argued,
at oral argument, that "it's clear[] Goldman Sachs International
was acting as Goldman Sachs & Co.'s agent."  (Mot. to Dismiss
Hr'g Tr. 23:14-15, Feb. 14, 2011.)  Goldman's "use . . . of an
offshore affiliated agent to effectuate the transaction does
not[,]" the SEC added, "diminish the role of Goldman Sachs in
controlling the offer and sale of the swap."  (Id. 23:23-24:1.)

The SEC fails to allege the ABN CDS transaction constitutes
a "domestic transaction" under Morrison for the same reasons as
the IKB note purchases.  Absent a "purchase or sale . . . made
in the United States," Morrison, 130 S. Ct. at 2886, Tourre's
alleged marketing efforts are insufficient to make him liable
under Section 10(b).  See id. at 2884 ("Section 10(b) does not

---

[14] The CDS confirmation states the transaction is between "Goldman Sachs
International" and "ABN AMRO BANK NV LONDON BRANCH."  (Chepiga Decl. Ex. I
(emphasis in original).)

[15] Although none of these documents, nor the ones referenced in the prior
sentence, were attached to the Amended Complaint, the Court considers them
because they were "'possessed by [and] known to the plaintiff'" and because
the SEC relied upon them "'in bringing the suit.'"  See In re Citigroup,
Inc., 2011 WL 744745, at *5 (citation omitted).

[16] All of the marketing examples the SEC provides in the Amended Complaint
were made via email.  (Am. Compl. ¶¶ 69-70.)  Unlike some of the IKB
solicitation emails, none of the ABN solicitation emails reference any direct
conversations between Tourre and ABN.  (Id.)

punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'") (citations omitted). While the SEC alleges Goldman "sold" the CDSs ABN and ACA Capital entered into, it provides no facts from which the Court can draw the reasonable inference that any party to the ABN CDS transaction incurred "'irrevocable liability'" in the United States. See Plumbers' Union, 753 F. Supp. 2d at 177. In addition, because the SEC does not sufficiently allege that any party to the ABN CDS transaction incurred "'irrevocable liability'" in the United States, see id., the Court makes no finding regarding any of the trade documents Tourre cites or the SEC's argument regarding liability through foreign agents.

For the reasons provided above, the second and third counts are DISMISSED as to ABN.

### 3. ACA Capital

#### a. Background

The last set of alleged ABACUS securities transactions involve the security-based swap agreement ACA Capital entered into that was sold by Goldman and the $42 million worth of ABACUS Class A-2 notes ACA Capital purchased from Goldman. (Am. Compl. ¶¶ 67, 71.) According to the SEC, Goldman and Tourre misled ACA and ACA Capital into believing Paulson was a long

28

equity investor, when, in reality, Paulson was a short investor. (Mot. to Dismiss Hr'g Tr. 36:18-20.)

Tourre caused this misunderstanding, the SEC alleges, by, among other things, emailing a "Transaction Summary" to ACA on January 10, suggesting Paulson was pre-committed to ABACUS's equity tranche. (Am. Compl. ¶ 48.) The SEC claims Tourre contributed further to this misunderstanding during a January 12 call with ACA. (Id. ¶ 49.) The SEC identifies no statement Tourre made during the call, but cites an ACA email that was forwarded to Tourre on January 16, with the subject line, "Call with Fabrice [Tourre] on Friday," stating that ACA "underst[ood] Paulson's equity perspective." (Id.) As of that date, the SEC alleges, Tourre knew or was reckless in not knowing ACA had been misled into believing Paulson was a long equity investor. (Id. ¶ 50.)

The SEC further alleges that through "continuing communications with Tourre and others at" Goldman, ACA believed, throughout the transaction, that Paulson would be an equity investor. (Id. ¶¶ 49-52, 67-68, 71.) The only direct "continuing communication" the SEC alleges Tourre had with ACA, however, was a February 2 meeting with Paulson and ACA at ACA's New York office. (Id. ¶ 33.) The SEC claims Tourre sent an email to another Goldman employee during the February 2 meeting, stating, "I am at this aca paulson meeting, this is surreal[,]"

29

but does not allege Tourre said or did anything at the meeting itself that contributed to ACA's misunderstanding.  (Id.)  ACA's Commitments Committee approved ACA's participation in ABACUS as the Portfolio Selection Agent on February 12.  (Id. ¶ 52.)

The SEC's allegations regarding ACA do not pick up again until two and a half months later, on April 26, when ACA Capital purchased the ABACUS Class A-2 notes.  Despite previously representing to ACA that Paulson would take a long equity stake, the SEC alleges neither Goldman nor Tourre informed ACA Capital that Paulson was taking a short position with respect to ABACUS.[17]  (Id. ¶¶ 45-48, 51, 68.)  ACA Capital allegedly purchased $42 million worth of ABACUS Class A-2 notes on April 26.  (Id. ¶ 71.)  Later, on May 31, ACA Capital entered into a security-based swap agreement sold by Goldman, pursuant to which ACA Capital assumed the credit risk associated with ABACUS's $909 million super senior tranche.  (Id. ¶ 67.)  If ACA Capital knew Paulson was taking a short position, the SEC claims, it is unlikely it would have written protection on the super senior tranche.  (Id. ¶ 68.)

---

[17] The SEC never expressly alleges that Goldman or Tourre represented to ACA Capital that Paulson was a long equity investor.  Instead, the SEC extends all of the alleged misrepresentations Goldman and Tourre made to ACA about Paulson being a long investor as though they were made—or at least apply with equal force—to ACA Capital.  (See Am. Compl. ¶ 68.)  Tourre does not take issue with this aspect of the SEC's allegations.

### b. Analysis

In order for the SEC to state a claim under Section 10(b) and Rule 10b-5, it must allege Tourre: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."[18] See, e.g., S.E.C. v. Tecumseh Holdings Corp., No. 03 Civ. 5490(SAS), 2011 WL 147725, at *3 nn.40-41 (S.D.N.Y. Jan. 18, 2011) (emphasis in original) (citations and internal quotation marks omitted).   The Court notes, in addition, that "unlike a private plaintiff, the SEC need not allege or prove reliance, causation, or damages in an action under Section 10(b) or Rule 10b-5."   See, e.g., S.E.C. v. Kelly, No. 08 Civ. 4612(CM)(GWG), 2011 WL 135845, at *16 (S.D.N.Y. Jan. 7, 2011) (citation omitted).

The SEC adequately pleads all of the elements of a Section 10(b) and Rule 10b-5 violation with respect to the ACA transactions.   Tourre's January 10 email to ACA, which included a "Transaction Summary" describing Paulson as the "Transaction Sponsor" with a pre-committed position to ABACUS's equity tranche, sufficiently alleges a material misrepresentation

---

[18] In contrast to the IKB note purchases and the ABN CDS transaction, Tourre does not argue—at least at this stage—the ACA Capital ABACUS securities purchase and swap agreement are not domestic securities transactions under Morrison.   In a footnote, however, Tourre states he reserves the right to demonstrate that ACA Capital's investment fails to meet Morrison's "transactional test."

regarding Paulson's investment interest.  See, e.g., Tecumseh

Holdings Corp., 2011 WL 147725, at *3 & n.42 ("A statement or

omission is material if there is a substantial likelihood that a

reasonable shareholder would consider it important or, in other

words, there [is] a substantial likelihood that the disclosure

of the omitted fact would have been viewed by the reasonable

shareholder as having significantly altered the total mix of

information available.") (alteration in original) (citations and

internal quotation marks omitted).

After Tourre misrepresented Paulson's investment interest,

he had a duty, the SEC claims, to disclose Paulson's short

position.  Tourre argues, in response, that neither he nor

Goldman had any legal duty to disclose Paulson's short interest

to ACA.  In support of this argument, Tourre quotes the

following sentence from Plumbers' Union:  "An omission is

actionable under federal securities laws 'only when the

[defendant] is subject to a duty to disclose the omitted

facts.'"  753 F. Supp. 2d at 180 (alteration in original)

(citation omitted).  Tourre omits the following sentence,

however, which states:  "Even though Rule 10b-5 imposes no duty

to disclose all material, nonpublic information, once a party

chooses to speak, it has a 'duty to be both accurate and

complete.'"  Id. (citation omitted).

32

Here, having allegedly affirmatively represented Paulson had a particular investment interest in ABACUS—that it was long—in order "'to be both accurate and complete[,]'" see id. (citation omitted), Goldman and Tourre had a duty to disclose Paulson had a different investment interest—that it was short. See Caiola v. Citibank, N.A., New York, 295 F.3d 312, 330-31 (2d Cir. 2002) (explaining that once the defendant "chose to discuss its hedging strategy, it had a duty to be both accurate and complete"). Indeed, the crux of the SEC's allegation is that rather than being financially interested in ABACUS's success, as the SEC alleges Tourre represented to ACA (Am. Compl. ¶ 45), Paulson, in fact, had financial interests and expectations that were diametrically opposed to ABACUS's success. Assuming the SEC can prove its allegations, if Goldman and Tourre represented that Paulson was investing in ABACUS's equity, the fact that Paulson was, in reality, taking a short position is a fact "that, if disclosed, would significantly alter the 'total mix' of available information." See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1987(HB), 2009 WL 3380621, at *9 (S.D.N.Y. Oct. 19, 2009) (explaining that "a defendant has a duty to disclose material facts, i.e. facts that, if disclosed, would significantly alter the 'total mix of available information'") (citations omitted). Accordingly, the SEC sufficiently alleges

Tourre made a material omission regarding an issue as to which
he had a duty to speak.

With respect to the second and third elements of a Section
10(b) and Rule 10b-5 violation, the Court finds the SEC
adequately alleges Tourre made the material misrepresentations
and omissions discussed above with scienter and in connection
with the purchase or sale of a security.

For the reasons provided above, the SEC sufficiently
alleges Tourre violated Section 10(b) and Rule 10b-5 with
respect to the ACA Capital securities transactions.
Accordingly, Tourre's Motion to Dismiss as to the ACA Capital
securities transactions in the second and third counts is
DENIED.

## II.  Securities Act Count

The SEC's first count is that Tourre violated Section
17(a)(1), (2), and (3) of the Securities Act.  (Am. Compl.
¶¶ 74-77.)  Section 17(a) of the Securities Act makes it:

> unlawful for any person in the offer or sale of any
> securities or any security-based swap agreement . . .
> by the use of any means or instruments of
> transportation or communication in interstate commerce
> or by use of the mails, directly or indirectly
>
> (1)  to employ any device, scheme, or artifice to
>      defraud, or
>
> (2)  to obtain money or property by means of any
>      untrue statement of a material fact or any
>      omission to state a material fact necessary in
>      order to make the statements made, in light of

34

> the circumstances under which they were made, not
> misleading; or
>
> (3) to engage in any transaction, practice, or course
> of business which operates or would operate as a
> fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

The SEC alleges Tourre knowingly, recklessly, or
negligently misrepresented (to IKB, ABN, and other institutional
investors) in the marketing, offering, and sale of ABACUS, that
the reference portfolio was selected by ACA without disclosing
Paulson's involvement. (Am. Compl. ¶ 77.) The SEC also alleges
Tourre violated Section 17(a) by knowingly, recklessly or
negligently misleading ACA into believing Paulson invested in
ABACUS's equity, implicitly indicating Paulson's interests were
closely aligned with ACA's, when, in reality, Paulson's
interests conflicted sharply with ACA's. (Id.)

## 1. IKB and ABN

Tourre argues the SEC's first count, with respect to IKB
and ABN, should be dismissed because Morrison applies to Section
17(a). In a footnote in his motion to dismiss, he claims that
the Securities Act, like the Exchange Act, contains no
indication of any extraterritorial application and that the
anti-fraud provisions of the Securities Act have no greater
geographical reach than those of the Exchange Act. Although
Morrison did not involve or consider Section 17(a) of the

35

Securities Act, and although neither party cites any cases that apply Morrison to Section 17(a),[19] the Court agrees that Morrison applies to Section 17(a) of the Securities Act. At least one post-Morrison court in this district has held the Securities Act does not apply to "sales that occur outside the United States."[20] See In re Royal Bank of Scotland Grp. PLC Sec. Litig., No. 09 Civ. 300(DAB), 2011 WL 167749, at *9 (S.D.N.Y. Jan. 11, 2011) (citing Morrison, 130 S. Ct. at 2885). Indeed, Morrison itself expressly states that the Exchange Act and the Securities Act share "[t]he same focus on domestic transactions." 130 S. Ct. at 2885 (citation omitted).

To the extent Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act both apply to "sales," after Morrison, the Court agrees that Section 17(a) of the Securities Act does not apply to "sales that occur outside the United States."[21] See In re Royal Bank of Scotland Grp. PLC Sec. Litig., 2011 WL 167749, at *9. Accordingly, for the reasons provided above with respect to the Section 10(b) and Rule 10b-5

---

[19] The Court is, independently, unaware of any such cases.

[20] In re Royal Bank of Scotland Grp. PLC Sec. Litig. applied Morrison to Sections 11, 12, and 15 of the Securities Act, but not to Section 17(a) because Section 17(a) was not at issue. 2011 WL 167749, at *5.

[21] To be sure, the definition of "sale" under the Securities Act is virtually identical to the definition of "sale" under the Exchange Act. Compare 15 U.S.C. § 77b(a)(3) (defining "sale" to "include every contract of sale or disposition of a security or interest in a security, for value"), with 15 U.S.C. § 78c(a)(14) (defining "sale" to "include any contract to sell or otherwise dispose of").

claims pertaining to IKB and ABN, the Section 17(a) "sale" prong claims are DISMISSED as to IKB and ABN.

The Court's analysis as to IKB and ABN is not complete, however, as Section 17(a), unlike Section 10(b), applies not only to the "sale" but also to the "offer . . . of any securities or any security-based swap agreement." 15 U.S.C. § 77q(a) (emphasis added). Because Section 17(a) applies to "offer[s] or sale[s,]" id. § 77q(a), "actual sales [are] not essential" for a Section 17(a) claim. See S.E.C. v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1366 (10th Cir. 1976); see also S.E.C. v. Tambone, 550 F.3d 106, 122 (1st Cir. 2008) (noting that "because section 17(a) applies to both sales and offers to sell securities, the SEC need not base its claim of liability on any completed transaction at all") (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733-34 & n.6 (1975) (contrasting the text of Section 17(a) with the text of Rule 10b-5, and explaining that "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly[,]" as evidenced by the "italicized portion" of Section 17(a): "'It shall be unlawful for any person in the offer or sale of any securities'")), vacated en banc 573 F.3d 54 (1st Cir. 2009), and reinstated with respect to the Section 17(a) count, 597 F.3d 436, 450 (1st Cir. 2010) (en banc).

In another footnote in his motion to dismiss, Tourre argues that the SEC's allegation that Goldman offered ABACUS securities to IKB from the United States is irrelevant because IKB is based in Germany.  In effect, Tourre's argument is that an "offer," even if made in the United States, is not domestic if it is made to a foreign party.[22]  Nothing in the definition of "offer," however, indicates that the focus of that term, for purposes of Section 17(a) liability, is on the recipient.  To the contrary, the Securities Act defines an "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  This definition leaves no doubt that the focus of "offer," under the Securities Act, is on the person or entity "attempt[ing] or offer[ing] to dispose of" or "solicit[ing] . . . an offer to buy" securities or security-based swaps.  Id.

In order for an "offer" to be domestic, a person or entity must (1) "attempt or offer[,]" in the United States, "to dispose of" securities or security-based swaps or (2) "solicit[,]" in the United States, "an offer to buy" securities or security-

---

[22] To the extent Tourre argues the "offer" to IKB cannot be considered "domestic" because the "offer" was made pursuant to Regulation S, see Chepiga Decl. Ex. A (ABACUS Offering Circular, dated April 26, 2007, which, although not attached to the Amended Complaint, the Court considers because the Offering Circular was "'possessed by [and] known to the plaintiff'" and because the SEC relied upon it "'in bringing the suit[,]'" see In re Citigroup, Inc., 2011 WL 744745, at *5 (citation omitted)), Regulation S does not apply to the Section 17(a) claim.  As explained above, Regulation S, by its own terms, "relate[s] solely to the application of Section 5 of the Securities Act . . . and not to antifraud or other provisions of the federal securities laws."  17 C.F.R. § 230, Reg. S (Preliminary Note ¶ 1).

based swaps.  See Morrison, 130 S. Ct. at 2886 (explaining that
the "clear test," for Section 10(b), is "whether the purchase or
sale is made in the United States"); see also 15 U.S.C.
§§ 77b(a)(3), 77q(a).  Here, the SEC alleges Tourre, acting in
and from New York City, offered ABACUS notes to IKB and
solicited ABN's participation in an ABACUS CDS via direct and
indirect communications.  (Am. Compl. ¶¶ 8–9, 56–60, 69–70.)
These communications included phone calls Tourre participated in
from New York City and/or emails he sent from New York City to
IKB and ABN regarding ABACUS and constituted domestic "offers"
of securities or security-based swaps.[23]  (Id.)  In these
communications, the SEC alleges, Tourre knowingly, recklessly,
or negligently failed to disclose Paulson's involvement in the
portfolio selection process.  (Id. ¶¶ 56–60, 69-70).  In view of
these allegations, the SEC sufficiently alleges Tourre violated
Section 17(a) with respect to IKB and ABN.  Accordingly,
Tourre's Motion to Dismiss the Section 17(a) "offer" prong of
the first count as to IKB and ABN is DENIED.

### 2. ACA Capital

With respect to ACA Capital, the Court finds the SEC
sufficiently alleges Goldman and Tourre—"in the offer" and
"sale" of ABACUS securities and security-based swaps—knowingly,
recklessly, or negligently misled ACA Capital into believing

---

[23] These emails included ABACUS marketing materials.  (Am. Compl. ¶¶ 56-60,
69-70.)

Paulson was a long investor, when it was really a short investor. See 15 U.S.C. § 77q(a). Tourre does not argue that Morrison bars the Section 17(a) "offer" and "sale" claims as to ACA Capital.

### 3. Other Institutional Investors

Lastly, with respect to the SEC's allegation regarding other institutional investors, in a letter dated February 15, 2011, the SEC provided the Court with two emails, both dated February 27, 2007, Goldman allegedly sent to potential investors regarding ABACUS. See In re Citigroup, Inc., 2011 WL 744745, at *5 (explaining that courts may consider documents not attached to a complaint if the documents were "'possessed by [and] known to the plaintiff'" and if the plaintiff relied upon them "'in bringing the suit'") (citation omitted). Both emails describe ABACUS's terms and include marketing materials. One of the emails fails to disclose its recipients (the email from Curtis Willing), but the other indicates it was sent to a subscriber list. Although the SEC claims it needs to depose individuals at Goldman to determine the precise identities of all of the entities and individuals who received the emails, the SEC alleges U.S. financial firms, including Greenwich Street Capital, received the emails. The SEC does not allege any sale occurred as a result of either of these emails and, thus, only alleges a claim as to the "offer" prong of Section 17(a) with

respect to these investors.  Because the SEC furnished the

emails and provided information regarding their recipients,

Tourre is on "'fair notice of the [SEC's] claim and the factual

ground upon which it is based.'"  See Novak v. Kasaks, 216 F.3d

300, 314 (2d Cir. 2000) (citation omitted).

The Court finds that by virtue of alleging Tourre was

principally responsible for ABACUS and its marketing materials

(Am. Compl. ¶ 4), the SEC sufficiently alleges Tourre violated

Section 17(a) when Goldman's structured product syndicate desk

invited institutional investors to contact Goldman's sales

representatives in New York regarding ABACUS (id. ¶ 66).  See

Tambone, 550 F.3d at 122 (explaining that "because section 17(a)

applies to both sales and offers to sell securities, the SEC

need not base its claim of liability on any completed

transaction at all").

## CONCLUSION

For the reasons provided above, Defendant Fabrice Tourre's

Motion to Dismiss the Amended Complaint is DENIED as to the

Section 17(a) Securities Act allegations pertaining to "offers"

to IKB and ABN (first count), GRANTED as to the Section 17(a)

allegations pertaining to "sales" to IKB and ABN (first count),

DENIED as to the Section 17(a) allegations pertaining to

"offers" and "sales" to ACA Capital (first count), DENIED as to

the Section 17(a) allegations pertaining to "offers" to other

institutional investors (first count), GRANTED with respect to

the Section 10(b) and Rule 10b-5 Exchange Act allegations

pertaining to IKB and ABN (second and third counts), and DENIED

as to the Section 10(b) and Rule 10b-5 allegations pertaining to

ACA Capital (second and third counts).

SO ORDERED:

_____
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          June 10, 2011