# ALLEN & OVERY



**BY HAND DELIVERY**

Hon. Katherine B. Forrest
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

Tel           212 610 6300
Fax           212 610 6399
Direct line   212 756 1125
Pamela.Chepiga@allenovery.com

October 11, 2012

Re:   SEC v. Fabrice Tourre, Case No. 10-cv-3229 (KBF)

Dear Judge Forrest:

We represent Defendant Fabrice Tourre in the above-referenced litigation.

As discussed at oral argument this morning, we are enclosing for Your Honor's reference the SEC's August 31, 2010 Report of Investigation of Moody's Investors Service, Inc., which was attached as Exhibit E to the Reply Affirmation in support of Mr. Tourre's Motion for Judgment on the Pleadings filed September 29, 2010 (*see* D.E. No. 41), and which was referenced on page 11 of Mr. Tourre's Reply Memorandum of Law (*see* D.E. No. 39).

Also enclosed is the SEC's October 25, 2010 Study on Extraterritorial Private Rights of Action, referenced on page 19 of Mr. Tourre's Memorandum of Law in Support of his Motion to Dismiss the SEC's Amended Complaint, filed December 9, 2010 (*see* D.E. 52, at 19 n.18).

Respectfully submitted,

Pamela Rogers Chepiga / BOO

Pamela Rogers Chepiga

Enclosures.

Copy via email:   Matthew Martens, SEC
                  Richard Simpson, SEC
                  Christian Schultz, SEC

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.



Home | Previous Page

U.S. Securities and Exchange Commission

SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 62802 / August 31, 2010

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: Moody's Investors Service, Inc.

## I. Introduction

The Division of Enforcement has investigated whether Moody's Investors Service, Inc. ("MIS"), the credit rating business segment of Moody's Corporation ("Moody's"), violated the nationally recognized statistical rating organization ("NRSRO") registration provisions or the antifraud provisions of the federal securities laws.

In early 2007, an MIS rating committee meeting in Europe determined not to take rating action with respect to credit ratings that MIS previously had issued for certain constant proportion debt obligation ("CPDO") notes. Those ratings had been determined based in part on output from a model that contained an inadvertent coding error, the impact of which was 1.5 to 3.5 notches upward. The European rating committee refrained from taking responsive rating action in part because of concerns that doing so would negatively impact MIS's business reputation. In June 2007, MIS applied to be registered with the Commission as an NRSRO, pursuant to Section 15E (a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 17g-1(a). Accordingly, MIS furnished an NRSRO registration application that contained requisite information concerning the procedures and methodologies it used to determine credit ratings. The European rating committee's self-serving consideration of non-credit related factors in support of the decision to maintain the credit ratings constituted conduct that was contrary to MIS's procedures and policies used to determine credit ratings, described in the MIS application.

The Commission deems it appropriate and in the public interest to issue this Report of Investigation ("Report") pursuant to Section 21(a) of the Exchange Act.[1] This Report cautions NRSROs that deceptive conduct in connection with the issuance of credit ratings may violate the antifraud provisions of the federal securities laws. Further, recent legislative provisions expressly provide that federal district courts have jurisdiction over Commission enforcement actions alleging antifraud violations when conduct includes significant steps within the United States or has a foreseeable substantial effect within the United States. The Report also cautions NRSROs that they should take reasonable steps to assure themselves that statements made in their applications and reports submitted to the Commission are accurate and complete and that they are required to establish, maintain, and enforce effective internal controls over their procedures and methodologies for determining credit ratings.

## II. Facts

A. Coding Error

In the summer of 2006, MIS began developing a methodology for rating notes issued by a newly created CPDO. CPDO issuers are special purpose vehicles that sell unfunded credit default swaps on corporate debt indices such as the iTraxx index in Europe and the CDX index in the United States. CPDO issuers use the proceeds of notes they sell to investors to purchase highly liquid instruments which, upon the occurrence of a contractually defined credit event, can be sold to pay the CPDO issuers' obligations under the unfunded credit default swaps. The indices referenced by the credit default swaps typically are re-balanced every six months to remove any issuers that have been downgraded below investment grade and replace them with investment grade issuers. Consequently, the unfunded credit default swaps typically are closed out and new transactions are entered into (i.e., the portfolio of credit default swaps is "rolled over") when the indices are rebalanced. When the unfunded credit default swaps are rolled over, the difference in the spread from the last roll over is multiplied by the amount of the CPDO issuer's leverage and is either a gain or a loss for the note holders. The structure relevant here was designed to pay a high fixed return over a ten-year lifespan, paying out a two percentage point spread above London Interbank Offered Rate or the purported risk-free rate.

Because CPDO notes were new instruments, MIS had no existing model for use in rating them. MIS created a model and in September 2006 gave the notes issued by the newly created CPDO issuer an Aaa credit rating. By the end of 2006, MIS had issued credit ratings for notes issued by an additional eleven CPDO issuers. The notes of all twelve CPDO issuers were marketed in Europe.

In January 2007, an MIS analyst in New York, assisting on a CPDO deal with a United States investment bank, was asked to determine why the MIS CPDO model was not generating the same output as the investment bank's model. Upon examination, the analyst discovered a coding error in the MIS model. The coding error upwardly impacted by 1.5 to 3.5 notches the model output used to determine MIS credit ratings for notes issued by eleven CPDO issuers. (The twelfth CPDO issuer was structured in such a way that the coding error did not affect the credit rating of its notes.) The CPDO notes with affected credit ratings had a combined notional value of just under $1 billion.

B. Rating Committee Conduct

MIS subsequently held several internal rating committee meetings in France and the United Kingdom to address the coding error. MIS corrected the coding error on February 12, 2007, but made no changes to the outstanding credit ratings for CPDO notes at that time. Internal e-mails show that committee members were concerned about the impact on MIS's reputation if it revealed an error in the rating model. A January 24, 2007, e-mail from a rating committee member to the Team Managing Director chairing the committee stated:

> In this particular case we seem to face an important reputation risk issue. To be fully honest this latter issue is so important

>that I would feel inclined at this stage to minimize ratings
>impact and accept unstressed parameters that are within
>possible ranges rather than even allow for the possibility of a
>hint that the model has a bug.

On April 27, 2007, after additional analysis, the rating committee voted not to downgrade the affected credit ratings for the CPDO notes. The committee members felt that because the CPDO notes were generally performing well there would be no ostensible justification for downgrading the credit ratings, absent announcing the coding error. In declining to downgrade the credit ratings, the committee considered the following inappropriate non-credit related factors: (i) that downgrades could negatively affect Moody's reputation in light of ongoing negative media focus in Europe on Moody's Joint Default Analysis; (ii) that downgrades could impact investors who relied on the original ratings; and (iii) the desire not to validate the criticisms of Moody's ratings of CPDOs that had been made by a competitor and covered in the local media. The committee was comprised of senior level staff, including two Team Managing Directors, two Vice President-Senior Credit Officers, and a Vice President-Senior Analyst.

C. MIS Application

On September 29, 2006, the Credit Rating Agency Reform Act of 2006 was enacted. That Act, in relevant part, created Section 15E and amended Section 17 of the Exchange Act. Pursuant to Section 15E(a)(1), a credit rating agency that elects to be treated as an NRSRO "shall furnish to the Commission an application for registration . . . containing . . . the procedures and methodologies that the applicant uses in determining credit ratings." Exchange Act Rule l7g 1(a) requires an applicant to "furnish the Commission with an initial application on Form NRSRO . . . that follows all applicable instructions for the Form." Form NRSRO instructs an applicant to include an Exhibit 2, which must be "[a] description of the procedures and methodologies used in determining credit ratings."

Accordingly, Exhibit 2 to the MIS application provided the procedures and methodologies used by MIS to determine credit ratings and, among other things, stated therein that the "Relevant Credit Rating Process Policies" included the MIS "Core Principles for the Conduct of Rating Committees." The actions of the rating committee that evaluated the affected credit ratings for the CPDO notes did not comply with these Core Principles. Most notably, the Core Principles stated that "Moody's will not forbear or refrain from taking a rating action based on the potential effect (economic, political or otherwise) of the action on Moody's, an issuer, an investor, or any other market participant." The Core Principles also stated that "[i]n arriving at a Credit Rating, the [rating committee] will only consider analytical factors relevant to the rating opinion." Because the committee allowed concerns regarding the potential reputational impact on Moody's to influence decisions not to downgrade the affected CPDOs, the process did not comply with the procedures listed in the MIS application.

When MIS submitted its NRSRO application, the MIS Executive Vice President, Global Regulatory Affairs & Compliance certified the application, representing that "the information and statements in [the] Form . . . are accurate in all significant respects." At the time, the Executive Vice President was not aware of the European rating committee conduct that

was contrary to the credit rating procedures listed in the MIS application.

On September 24, 2007, the Commission issued an Order granting registration of MIS as an NRSRO. Shortly thereafter, MIS made its Form NRSRO publicly available on its Web site.

D. Subsequent Actions

In January 2008, the European rating committee finally voted to begin downgrading the affected CPDO note credit ratings, citing factors such as widening spread movements and volatility of the iTraxx and CDX indices. By citing conditions that arose subsequent to its failure to downgrade the credit ratings, the committee effectively concealed its prior failure to downgrade. The committee did not reference or disclose the coding error.

Late in the day on May 20, 2008, the *Financial Times* published on its Web site an article that disclosed the coding error, citing internal Moody's documents that showed the error had been discovered by MIS almost a year earlier, and alleged that MIS had incorrectly awarded Aaa credit ratings to CPDO notes because of the error. When Moody's was contacted by reporters gathering information for the story, the company began an internal investigation into the coding error and the CPDO rating committee conduct. On July 1, 2008, a year and a half after the coding error had been discovered, and over a year after the European rating committee had declined to downgrade the credit ratings, Moody's issued a press release discussing the investigation results and stating that "some committee members considered factors inappropriate to the rating process when reviewing CPDO ratings following the discovery of the model error." Thereafter, MIS took personnel action with respect to management of the CPDO group and members of the committee, including termination of the Group Managing Director and two Team Managing Directors.

### III. Discussion

The rating committee responsible for the credit ratings of the CPDO notes met in France and the United Kingdom. The CPDO notes were arranged by European banks and marketed in Europe. Members of the rating committee involved in the monitoring of CPDO ratings allowed concerns regarding Moody's reputation and other non-credit related considerations to influence decisions not to downgrade the affected CPDOs. The Commission cautions NRSROs that deceptive ratings conduct is unlawful under the antifraud provisions of the federal securities laws. Because of uncertainty regarding a jurisdictional nexus to the United States in this matter, the Commission declined to pursue a fraud enforcement action. The Commission notes that, in recently enacted legislation, Congress has provided expressly that federal district courts have jurisdiction over Commission enforcement actions alleging violations of the antifraud provisions of the Securities Act of 1933 or the Exchange Act involving "conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors" or "conduct occurring outside the United States that has a foreseeable substantial effect within the United States." Dodd-Frank Wall Street Reform and Consumer Protection (Dodd-Frank) Act, Pub. L. No 111-203, § 929P(b)(1), (2) (2010) (to be codified at 15 U.S.C. §§ 77v(c), 78aa(b)). NRSROs should expect that the Commission, where appropriate, will

pursue antifraud enforcement actions, including pursuant to such jurisdiction.

Further, we conclude that, in early 2007, members of the European rating committee believed they could violate MIS's procedures without detection, and in fact the conduct did not come to light until the *Financial Times* contacted MIS about the error in the CPDO model and an investigation ensued. The Commission notes that recently enacted legislation amended the Exchange Act to require NRSROs to "establish, maintain, enforce, and document an effective internal control structure governing the implementation of and adherence to policies, procedures, and methodologies for determining credit ratings." Dodd-Frank Act, § 932(a)(2)(B) (to be codified at 15 U.S.C. § 78o-7(c)(3)). The legislation also provides that the Board of Directors of an NRSRO "shall oversee," among other things, "the establishment, maintenance, and enforcement of policies and procedures for determining credit ratings" and "the effectiveness of the internal control system with respect to policies and procedures for determining credit ratings." Dodd-Frank Act, § 932(a)(8) (to be codified at 15 U.S.C. § 78o-7(t)(3)).[2] The Commission further cautions NRSROs that they must implement and follow appropriate internal controls and procedures governing their determination of credit ratings, and must also take reasonable steps to ensure the accuracy of statements in applications or reports submitted to the Commission.

## IV. Conclusion

This report serves to caution NRSROs that, where appropriate, the Commission will utilize recent legislative provisions granting jurisdiction for enforcement actions alleging otherwise extraterritorial fraudulent misconduct that involves significant steps or foreseeable effects within the United States. The Commission also cautions NRSROs that they should implement sufficient and requisite internal controls over policies, procedures, and methodologies used to determine credit ratings.

By the Commission.

### Endnotes

[1] Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, "to publish information concerning any such violations." This Report does not constitute an adjudication of any fact or issue addressed herein.

[2] The Commission also notes that the legislation requires an annual examination by the Commission staff, which shall include a review, among other things, of whether an NRSRO "conducts business in accordance with [its] policies, procedures, and rating methodologies." Dodd-Frank Act, § 932(a)(8) (to be codified at 15 U.S.C. § 78o-7(p)(3)). Moreover, the legislation directs the Commission to require, by rule, that each NRSRO "include an attestation with any credit rating it issues affirming," among other things, "that the rating was based solely on the merits of the instruments being rated." Dodd-Frank Act, § 932(a)(8) (to be codified at 15

U.S.C. § 78o-7(q)(2)(F)).

*http://www.sec.gov/litigation/investreport/34-62802.htm*

Home | Previous Page                                    Modified: 08/31/2010

Westlaw.

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)

Page 1

C

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)

S.E.C. Release No.
Securities Exchange Act of 1934

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

STUDY ON EXTRATERRITORIAL PRIVATE RIGHTS OF ACTION

File No. 4-617

October 25, 2010

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Request for Comments.

**SUMMARY:** Section 929Y of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") directs the Securities and Exchange Commission (the "Commission") to solicit public comment and thereafter conduct a study to determine the extent to which private rights of action under the antifraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") should be extended to cover transnational securities fraud. The Commission is soliciting comment on this question and on related questions.

**DATES:** The Commission will accept comments regarding issues related to the study on or before February 18, 2011.

**ADDRESSES:** Comments may be submitted by any of the following methods:

Electronic Comments:
- Use the Commission's Internet comment form (http://www.sec.gov/rules/other.shtml); or
- Send an e-mail to rule-comments@sec.gov. Please include File Number 4-617 on the subject line.

Paper Comments:
- Send paper comments in triplicate to Elizabeth M. Murphy, Secretary, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-1090.

All submissions should refer to File Number 4-617. This file number should be included on the subject line if e-mail is used. To help us process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's Internet Web site (http://www.sec.gov). Comments are also available for website viewing and printing in the Commission's Public Reference Room, 100 F Street, NE, Washington, DC 20549, on official business days between the hours of 10:00 a.m. and 3:00 p.m. All comments received will be posted without change; we do not edit personal identifying information from submissions. You should submit only information that you wish to make available publicly.

**FOR FURTHER INFORMATION CONTACT:** John W. Avery, Office of the General Counsel, at (202)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)

Page 2

551-5107, or Robert Peterson, Office of International Affairs, at (202) 551-6696, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:**

**I. Introduction**
In a recent decision in *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), the Supreme Court significantly limited the extraterritorial scope of Section 10(b) of the Exchange Act. In the Dodd-Frank Act, Congress restored the ability of the Commission and the United States to bring actions under Section 10(b) in cases involving transnational securities fraud. Congress further directed the Commission to conduct a study to determine whether, and to what extent, private plaintiffs should also be able to bring such actions. Consideration of the *Morrison* decision and of extending the extraterritorial scope of the antifraud provisions of the Exchange Act to private actions raises important questions touching on the Commission's mandate to protect investors, to maintain fair, orderly and efficient markets, and to facilitate capital formation. It also raises issues regarding international comity and the respect that governments afford each other regarding their decisions on regulation of their home markets. Exploration of these issues will also help inform how the Commission can best protect investors and the integrity of U.S. markets in an environment in which a significant volume of securities transactions are conducted across borders.

**II. Background**
*2 In *Morrison*, the Supreme Court considered "whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges."The text of the Exchange Act had been silent as to the transnational reach of Section 10(b). In a decision issued on June 24, 2010, the Supreme Court said: "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 130 S. Ct. at 2878. "[T]here is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," the Court found, "and we therefore conclude that it does not." *Id.* at 2883.Thus, the Court concluded, "it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." *Id.* at 2884 (footnote omitted). The Court summarized the test as follows:
> Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.

*Id.* at 2888.

The *Morrison* decision rejected long-standing precedents in most federal courts of appeals that applied some variation or combination of an "effects" test and a "conduct" test to determine the extraterritorial reach of Section 10(b) of the Exchange Act. See, e.g., *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991); *Itoba Ltd v. LEP Group PLC*, 54 F.3d 118, 121-22 (2d Cir. 1995). The effects test centered its inquiry on whether domestic investors or markets were affected as a result of actions occurring outside the United States. *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998). See also *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983). By contrast, the conduct test focused "on the nature of [the] conduct within the United States as it relates to carrying out the alleged fraudulent scheme." *Psimenos*, 722 F.2d at 1045.

On July 21, 2010, less than a month after the decision in *Morrison*, President Obama signed the Dodd-Frank Act. Section 929P of the Dodd-Frank Act amended the Exchange Act to provide that the United States district

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)         Page 3

courts shall have jurisdiction over an action brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of the Exchange Act involving:

*3 (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or

(2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States. [FN1]

Under section 929Y of the Dodd-Frank Act, the Commission is required to conduct a study to determine whether *private* rights of action should be similarly extended. The report of the study must be submitted and recommendations made to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House not later than January 21, 2012.

### III. Request for Comments

Section 929Y(a) of the Dodd-Frank Act directs the Commission to solicit public comment on whether the scope of the antifraud provisions of the Exchange Act in cases of transnational securities fraud should be extended to private rights of action to the same extent as that provided to the Commission by Section 929P, or to some other extent. [FN2] Section 929Y(b) directs that the study shall consider and analyze, among other things—

(1) the scope of such a private right of action, including whether it should extend to all private actors or whether it should be more limited to extend just to institutional investors or otherwise;

(2) what implications such a private right of action would have on international comity;

(3) the economic costs and benefits of extending a private right of action for transnational securities frauds; and

(4) whether a narrower extraterritorial standard should be adopted.

Accordingly, we request comment on these issues and questions. We also encourage commenters to:

• Propose the circumstances, if any, in which a private plaintiff should be allowed to pursue claims under the antifraud provisions of the Exchange Act with respect to a particular security where the plaintiff has purchased or sold the security outside the United States. Does it make a difference whether the security was issued by a U.S. company or by a non-U.S. company? Does it make a difference whether the security was purchased or sold on a foreign stock exchange or whether it was purchased or sold on a non-exchange trading platform or other alternative trading system outside of the United States? Does it make a difference whether the company's securities are traded exclusively outside of the United States?

• If you disagree with extending the test set forth in Section 929P to private plaintiffs, what other test would you propose?

• Should there be an effects test, a conduct test, a combination of the two, or another test?

• Address whether any such test should be limited only to certain types of private plaintiffs, such as United States citizens or residents, or such as institutional investors. How would such investors be defined?

*4 • Identify any cases that have been dismissed as a result of *Morrison* or pending cases in which a challenge based on *Morrison* has been filed. Describe the facts of the case.

• Identify any cases brought prior to *Morrison* that likely could not have been brought or maintained after *Morrison*. Describe the facts of the case.

• In *Morrison,* the Supreme Court held that in the case of securities that are not listed on an American stock exchange, Section 10(b) only reaches the use of a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security *in the United States.* Address the criteria for determining where a purchase or sale can be said to take place in various transnational securities transactions. Discuss the degree to which investors know, when they place a securities purchase or sale order, whether the order

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)

Page 4

will take place on a foreign stock exchange or on a non-exchange trading platform or other alternative trading system outside of the United States.
• What would be the implications on international comity and international relations of allowing private plaintiffs to pursue claims under the antifraud provisions of the Exchange Act in cases of transnational securities fraud? Identify any studies that purport to show the effect that the extraterritorial application of domestic laws have on international comity or international relations.
• Discuss the cost and benefits of allowing private plaintiffs to pursue claims under the antifraud provisions of the Exchange Act in cases of transnational securities fraud, including the costs and benefits to domestic and international financial systems and securities markets. Identify any studies that have been conducted that purport to show the positive or negative implications that such a private right of action would have.
• What remedies outside of the United States would be available to U.S. investors who purchase or sell shares on a foreign stock exchange, or on a non-exchange trading platform or other alternative trading system outside of the United States, if their securities fraud claims cannot be brought in U.S. courts?
• What impact would the extraterritorial application of the private right of action have on the protection of investors? On the maintenance of fair, orderly and efficient markets in the United States? On the facilitation of capital formation?
• Address any other considerations commenters would like to comment on to assist the Commission in determining whether to recommend changes to the extraterritorial scope of the antifraud private rights of action under the Exchange Act.

By the Commission.

Elizabeth M. Murphy
Secretary

FN1. With respect to U.S. Government and Commission actions, the Dodd-Frank Act largely codified the long-standing appellate court interpretation of the law that had existed prior to the Supreme Court's decision in *Morrison* by setting forth an expansive conducts and effects test, and providing that the inquiry is one of subject matter jurisdiction. The Dodd-Frank Act made similar changes to the Securities Act of 1933 and the Investment Advisers Act of 1940.

FN2. Section 929Y(a) of the Dodd-Frank Act provides that the Commission "shall solicit public comment and thereafter conduct a study to determine the extent to which private rights of action under the antifraud provisions of the Securities Exchange Act of 1934 (15 U.S.C. 78u-4) should be extended to cover: conduct within the United States that constitutes a significant step in the furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; and conduct occurring outside the United States that has a foreseeable substantial effect within the United States."

Release No. 63174, Release No. 34-63174, 99 S.E.C. Docket 2249, 2010 WL 4196006 (S.E.C. Release No.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.