UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
:
SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                                 :
                                  Plaintiff,       :
                                 :
                -v-            :
                                 :
FABRICE TOURRE,                  :
                                 :
                                Defendant.       :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 1 9 2012

10 Civ. 3229 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      On June 10, 2011, this Court[1] granted in part and denied in part defendant Fabrice Tourre's motion to dismiss the Securities and Exchange Commission's ("SEC") Amended Complaint. See SEC v. Tourre, 790 F. Supp. 2d 147 (S.D.N.Y. 2011) (the "June 10 Order"). As part of that Order, the Court dismissed the claim against Tourre brought under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")--and Rule 10b-5 promulgated thereunder--relating to the IKB note purchases on behalf of two Loreley Financing (Jersey) investment vehicles ("Loreley").[2] Id. at 158-60.

      The SEC now moves pursuant to Fed. R. Civ. P. 54(b) for partial relief from the June 10 Order. Specifically, the SEC argues that the Second Circuit's decision in Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012),

---

[1] This action was transferred from the Hon. Barbara S. Jones to the undersigned on October 3, 2012. (ECF No. 150.)

[2] Proper names and defined/understood terms used herein have the same meaning as in the June 10 Order.

1

requires reinstatement of the section 10(b) and Rule 10b-5 claim against Tourre for the IKB note purchases.

In Absolute Activist, the Second Circuit established that a transaction's domestic transfer of title is sufficient to survive a motion to dismiss under Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010). According to the SEC, because the Amended Complaint pleads that title to the ABACUS notes transferred to Goldman Sachs & Co. ("Goldman") in the U.S. and because such transfer was the first step in--and therefore, was "in connection with"--the ultimate fraudulent transaction with IKB/Loreley, the SEC may assert liability under section 10(b) and Rule 10b-5 against Tourre for the IKB note purchases. This Court disagrees.

For the reasons stated below, the SEC's motion for partial relief from the June 10 Order is DENIED.

I. BACKGROUND

A. Factual Background

The factual background underlying this action is set forth in the June 10 Order. See Tourre, 790 F. Supp. 2d at 149-54. Familiarity with that decision is assumed.

Certain facts relating to the IKB note purchases, however, are relevant to the instant motion and warrant recounting. Goldman, which employed Tourre, structured and marketed the collateralized debt obligation ("CDO") at the center of this action--ABACUS 2007-AC1 ("ABACUS").

IKB, a German commercial bank, recommended purchase of the ABACUS notes to certain of its clients, including Loreley.  On April 10, 2007, IKB purchased $150 million worth of ABACUS notes--$50 million worth of Class A-1 Notes and $100 million of Class A-2 notes--for Loreley.  (Am. Compl. ¶¶ 53, 61; see also Decl. of Pamela Rogers Chepiga Supp. Def.'s Mot. Dismiss Am. Compl. (ECF No. 53) ("Chepiga MTD Decl.") Exs. G, H (trade confirms).)

On April 26, 2007, the ABACUS deal closed at One Battery Park Plaza in New York, New York.  (Am. Compl. ¶¶ 61-62.)  At that time, Goldman acquired title to the notes from the ABACUS Trustee through the Depository Trust Company ("DTC") book-entry facilities in New York.  (Id. ¶ 61.)  Upon acquiring title to the $150 million of notes purchased by IKB, Goldman delivered $150 million (i.e., the purchase price of the notes) by federal funds wire transfer to LaSalle Bank National Association (headquartered in Chicago, Illinois), as trustee for ABACUS (id. ¶ 63), and then transferred the notes themselves from the DTC to Goldman's Euroclear account (Decl. of Trevor Williams ("Williams Decl.") (ECF No. 144-1) ¶ 5).[3]  The notes were subsequently transferred from Goldman's Euroclear account to Goldman Sachs, Inc.'s ("GSI") Euroclear account, and finally to Loreley's Euroclear account. (Williams Decl. ¶ 5).

---

[3] As discussed at the October 11, 2012, oral argument, the Court takes the facts recounted in the Williams Declaration only for the purpose of adding the specifics of the transfer of title for the IKB/Loreley note purchases to the Amended Complaint's allegation regarding the closing. (Oral Arg. Tr. 43:1117, 72:5-19 (Oct. 11, 2012), ECF No. 159.) Since the transfers were known and relied upon by the SEC in drafting its complaint, the Court may refer to them. See Cortec Indus., Inc. v. Sum Holdings L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

3

IKB's ABACUS trade settled in Europe (through Loreley's Euroclear account) on April 26, 2007--the date of the ABACUS closing in the U.S. (Chepiga MTD Decl. Exs. G, H.) It is undisputed, however, that Loreley did not acquire irrevocable liability to purchase the ABACUS notes in the United States. (See Chepiga MTD Decl. Exs. G, H (showing transfer from GSI in London to Loreley in Jersey); Williams Decl. ¶ 5; see also SEC v. Tourre, 790 F. Supp. 2d at 158.)

B.  Procedural Background

On April 16, 2010, the SEC commenced this action against Goldman and Tourre, alleging violations of section 10(b), and Rule 10b-5, as well as of section 17(a) of the Securities Act of 1933.[4]

On June 24, 2010, the Supreme Court decided Morrison, in which it repudiated the "conduct" and "effects" tests applied by the Second Circuit (and others) and held that section 10(b) does not apply extraterritorially. Under Morrison, the Court made clear that section 10(b) and Rule 10b-5 apply only to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." Id. at 2884; see also id. at 2881.

On September 29, 2010, although the parties had begun discovery, based upon Morrison, Tourre moved for judgment on the pleadings as to all claims against him. In response to that motion, the SEC requested--and the Court granted--leave to amend the complaint. After the SEC filed the Amended Complaint, Tourre moved to dismiss it in its entirety, including on Morrison grounds.

---

[4] Goldman was dismissed from the action pursuant to a consent decree with the SEC. (ECF No. 25.)

In opposition to the motion to dismiss, the SEC (having tacitly conceded that no "irrevocable liability" transferred to IKB in the United States, SEC v. Tourre, 790 F. Supp. 2d at 158)[5] made two arguments in support of the existence of a domestic transaction.  First, the SEC argued that if the Court considered the "entire selling process," it would find sufficient domestic connection to sustain the section 10(b)/Rule 10b-5 claims.  Id.  The Court rejected that argument: "Morrison was clear that Section 10(b) 'punishes not all acts of deception' (i.e., the selling process), 'but only such acts "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."'"  Id. (quoting Morrison, 130 S. Ct. at 2887).  In other words, the "entire selling process" was an "invitation" to "return to the 'conduct' and 'effects' tests," which Morrison had explicitly repudiated.  Id.

Second, the Court found that "to the extent the SEC alleges and relies upon the [New York-based] ABACUS closing" to establish a sufficient domestic connection,[6] "the closing, absent a purchase or sale . . . made in the United States is

---

[5] In the June 10 Order, the Court, finding that Morrison Court provided "little guidance. . . regarding how lower courts should determine whether a 'purchase or sale is made in the United States," referred to Judge Koeltl's decision in Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753 F. Supp. 2d 166 (S.D.N.Y. 2010), which explained "that 'purchase,' for the purposes of the Exchange Act, has been interpreted 'to make an individual a 'purchaser' when he or she 'incurred an irrevocable liability to take and pay for the stock.'"  SEC v. Tourre, 790 F. Supp. 2d at 157 (quoting Plumbers' Union, 753 F. Supp. at 177).

[6] At the February 14, 2011, oral argument on the motion to dismiss, the SEC stated that the closing alone was insufficient to provide a "domestic" hook for purposes of Morrison.  See SEC v. Tourre, 790 F. Supp. 2d at 158.  (See also Oral Arg. Tr. 28:24-29:2 (Feb. 14, 2011) ("MR. REISNER [for the SEC]: "[I]f we were relying solely on the closing that took place in New York to establish the sale of securities, that doesn't sound like a winning argument to me.") Decl. of Pamela Rogers Chepiga in Opp'n to the SEC's Mot. (ECF No. 146) Ex. C.)  The SEC argues that this concession is of no moment because it was a concession as to the IKB/Loreley note purchases whereas the transaction at issue on

5

not determinative." Id. at 158-59 (citing Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada, 732 F. Supp. 2d 1345, 1350 (S.D. Fla. 2010))[7] (quotation marks and citations omitted).

Thus, the Court dismissed the section 10(b) and Rule 10b-5 claim as it related to the IKB securities transaction because the IKB/Loreley note purchases were not domestic. SEC v. Tourre, 790 F. Supp. 2d at 158-60.

Tourre moved for reconsideration of the June 10 Order, as well as for a certificate of appealability on that Order--both of which the Court denied. The parties continued with discovery.

On March 1, 2012,[8] the Second Circuit issued its opinion in Absolute Activist, holding, among other things, that for purposes of section 10(b), "a sale of securities can be understood to take place at the location in which title is transferred." Absolute Activist, 677 F.3d at 68. Accordingly, it found that in addition to pleading facts "suggesting that irrevocable liability was incurred . . . within the United States," "in order to survive a motion to dismiss premised on Morrison, it is sufficient for the plaintiff to allege that title to the shares was transferred within the United States." Id. (citing Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada, 645 F.3d 1307, 1310-11 (11th Cir. 2011)). The Second Circuit

---

this motion is the New York-based transfer of title to Goldman from the ABACUS Trustee. (SEC's Reply Mem. Supp. Mot. Partial Relief (ECF No. 148) ("SEC Reply") at 8.)

[7] The Eleventh Circuit subsequently reversed the district court's holding in Quail Cruises, finding that allegations of a transfer of title to shares within the United States were sufficient to withstand Morrison on a motion to dismiss. Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada, 645 F.3d 1307, 1310-11 (11th Cir. 2011). As discussed below, in Absolute Activist, the Second Circuit relied on the Eleventh Circuit's holding in Quail Cruises.

[8] The Second Circuit amended the original decision on April 13, 2012.

6

ultimately found that the amended complaint in Absolute Activist did not allege adequately that fraudulent transactions took place in the United States. Id. at 70.

On June 15, 2012, the SEC filed the instant motion, seeking relief from the June 10 Order in the form of reinstatement of the section 10(b) claim relating to the IKB transaction. (ECF No. 143.) The SEC argues that under Absolute Activist, the New York closing, which resulted in the transfer of title to the ABACUS notes from the ABACUS Trustee to Goldman, is a "domestic transaction" made "in connection with" the IKB note purchases. Put another way, the SEC asserts that the U.S. transfer of title to Goldman is sufficiently "in connection with" the foreign IKB transaction to support a claim for liability against Tourre under section 10(b) and Rule 10b-5 for the IKB transaction.

The SEC's motion was fully submitted as of June 29, 2012. As discussed in note 1, supra, this action was transferred to the undersigned on October 3, 2012. The Court heard oral argument on the instant motion on October 11, 2012. Per the Court's request, after the oral argument, the parties submitted supplemental briefing on specific questions raised at the argument on October 26, 2012.

II.   DISCUSSION[9]

A.   <u>Legal Standard</u>

Rule 54(b) provides, in pertinent part, "[A]ny order or other decision . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

The Court's broad discretion to revisit prior orders must be balanced against the benefits of certainty in litigation as reflected in the "law of the case" doctrine. There is substantial case law supporting that prior "law of the case" should only be revisited in the face of "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." <u>Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP</u>, 322 F.3d 147, 167 (2d Cir. 2003) (quotation marks omitted).

Although this Court would not decline to revisit an erroneous decision simply due to the "law of the case," that is not the situation here.

B.   <u>Analysis</u>

Section 10(b) imposes civil liability on any person who uses "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale" of any security. 15 U.S.C. § 78j(b). Rule 10b-5, in pertinent part, makes it

---

[9] At oral argument, the SEC's arguments indicated to the Court that the SEC may have believed that <u>Morrison</u> does not apply to SEC enforcement actions for pre-2009 conduct--indeed, so much so that the Court requested post-argument briefing on the issue. (<u>See</u> ECF No. 155.) The SEC does take the position that the 2009 Dodd-Frank Act has repealed <u>Morrison</u>'s applicability to the SEC, but only for conduct occurring after Dodd-Frank's enactment. In its supplemental submission, however, the SEC clarified, "the SEC believes that the more conservative approach is to read these authorities to say that <u>Morrison</u>'s application to SEC enforcement actions allows the Commission to bring enforcement actions 'in additional circumstances' such as those presented here." (SEC's Supp. Mem. Law Further Supp. Mot. Partial Relief (ECF No. 162) at 9.)

8

unlawful for "any person . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. In Morrison, the Supreme Court held that the purchase or sale upon which a 10(b) claim is predicated must be domestic. Morrison, 130 S. Ct. at 2884 ("only transactions in securities listed on domestic exchanges, and domestic transactions in other securities" (emphases added)).

There is no question that the SEC alleges a domestic purchase of securities--i.e., the transfer of title from the ABACUS Trustee to Goldman at the New York-based closing. (Am. Compl. ¶¶ 61-62.) The SEC explicitly concedes that it seeks to use that domestic transaction as the hook for Tourre's 10(b) liability for the IKB note transaction. (See SEC's Reply Mem. Supp. Mot. Partial Relief (ECF No. 148) ("SEC Reply") at 8 ("The argument here is that the allegation of a New York-based closing is enough, after Absolute Activist, to render the GS & Co. purchase a domestic securities transaction." (emphasis in original)).) According to the SEC, the broad interpretation of section 10(b)'s "in connection with" language provides the necessary link between the Goldman transfer of title and the IKB/Loreley note purchase to establish 10(b) liability. (SEC Mem. Law Supp. Mot. Partial Relief (ECF No. 144) ("SEC Mem.") at 7-8.) The Court finds, however, that the "in connection with" language modifies how close the fraud and the offending domestic transaction must be--not whether the domestic transaction can sit between the fraud and a purely foreign transaction, thereby itself providing the "connection."

9

The problem with the SEC's position starts with the language of the statute itself. Cf. FAA v. Cooper, 132 S. Ct. 1441, 1457 (2012) ("In a statutory construction case, the beginning point must be the language of the statute itself, and when a statute speaks with clarity to an issue judiciary inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." (quotation marks omitted)). Section 10(b) reads, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (emphasis added). Rule 10b-5 interprets that language to proscribe the "employ[ment] [of] any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security." 17 C.F.R. § 250.10b-5(a) (2009). By its plain terms, then, section 10(b) and Rule 10b-5 prohibit the use of "any manipulative or deceptive device or contrivance" (i.e., fraud) "in connection with the purchase or sale of any security." With Morrison, the Supreme Court made clear that the "purchase or sale of [a] security" that provides the basis for a section 10(b) and Rule 10b-5 claim must be a domestic one. Morrison, 130 S. Ct. at 2884. Reading the statute (and rule) in conjunction with Morrison, it is clear that section 10(b) is meant to redress fraud perpetrated "in connection with" a "domestic purchase or sale of [a] security." See id. at 2887 ("Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of

10

the statute."). Put simply, the domestic securities transaction (the "purchase or sale") must be the fraudulent one for section 10(b) and Rule 10b-5 to apply. See id. at 2884 ("[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the [domestic] purchase or sale of any security registered on a national securities exchange or any security not so registered." (quotation marks omitted)).

It is true that the "in connection with" language has been given a "broad interpretation," Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 85 (2006), to mean "touching [a] sale of securities," Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971), "coincid[ing] with the sales themselves," SEC v. Zandford, 535 U.S. 813, 819-20 (2002),[10] and "intertwined" with a securities transaction, Romano v. Kazacos, 609 F.3d 512, 524 (2d Cir. 2010). Those cases (and others) all make clear, however, that the alleged fraud--even if attenuated (temporally or otherwise)--must be "in connection with" the particular securities transaction for which redress is sought.[11] The SEC's argument that the

---

[10] See also Dabit, 547 U.S. at 85 ("[I]t is enough that the fraud alleged 'coincide' with a securities transaction.").

[11] See Dabit, 547 U.S. at 74 (Merrill Lynch brokers sued Merrill Lynch for dissemination of misleading research upon which the brokers relied in purchasing (and holding) securities themselves and in advising their clients to purchase (and hold) securities); U.S. v. O'Hagan, 521 U.S. 642, 656 (1997) ("[T]he fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus coincide." (emphasis added)); Zandford, 535 U.S. at 820 ("This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather, respondent's fraud coincided with the sales themselves." (emphasis added)); Bankers Life & Cas. Co., 404 U.S. at 7-8, 10 & n.1 (Bankers Life & Casualty Co. agreed to sell Manhattan Casualty Co. to an individual (one of

11

domestic, non-fraudulent Trustee-to-Goldman transfer of title was "in connection with" the fraudulent IKB note purchases sufficient to confer 10(b) liability does not meet that requirement.

The Amended Complaint alleges that Tourre engaged in fraudulent conduct that led to a foreign purchase of securities by IKB (for Loreley). It is alleged that the technical passing of title between the non-defrauded Goldman and the ABACUS Trustee in the United States set the wheels in motion for the ultimate IKB/Loreley transaction. The only U.S.-based securities transaction here was that transfer of title. But, as stated, the SEC seeks to impose liability for a fraud purportedly perpetrated on IKB/Loreley--<u>not</u> on Goldman. The New York-based transfer of title to Goldman was a "lawful transaction" after which--down the chain--a transaction occurred where a purchaser upon whom a fraud had allegedly been perpetrated obtained title to the notes. See <u>Zandford</u>, 535 U.S. at 820. That is not the type of "coinciding" the Supreme Court contemplated. See <u>id.</u> Predicating 10(b) liability for the IKB transaction on the Goldman transfer of title would take the "in connection with" requirement far from where it has heretofore been: it would allow for a 10(b) claim any time a foreign fraudulent transaction had any connection (no matter how

---

Manhattan's officers) who conspired with outsiders to pay for Manhattan's stock with Manhattan's own assets without Manhattan's knowledge; Manhattan sold its U.S. Treasury bonds based upon a misrepresentation that the proceeds of that sale would be exchanged for a certificate of deposit of equal value; "Manhattan was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities."); <u>Romano</u>, 609 F.3d at 515-16, 524 (upon allegedly fraudulent advice by Morgan Stanley investment advisors, the plaintiffs elected to take lump sum retirement benefits which they then invested (eighteen months after the election) in various securities through Morgan Stanley; despite the eighteen-month lapse between the retirement election and the purchase of securities, the investment advisors' misrepresentations were "in connection with" the alleged fraud for purposes of the Securities Litigation Uniform Standards Act because the two were part of "a string of events that were all intertwined").

attenuated) to a lawful U.S.-based securities transaction. That is simply not the law. See Morrison, 130 S. Ct. at 2884 ("[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States.").

The SEC's interpretation rewrites Morrison from stating, in essence, "the fraud must be in connection with (or 'touching' or 'coinciding') a domestic purchase or sale of securities" to "the fraud must at least be touching or coinciding with a (non-fraudulent) domestic purchase or sale that can then lead to a fraudulent foreign purchase or sale." That position misconstrues the "connection" the statute intends: that the fraud and the "domestic purchase or sale" constitute the alleged offending transaction. Accordingly, the Amended Complaint does not allege the existence of a fraudulent domestic transaction in connection with the IKB note purchase upon which 10(b) liability may be predicated.

The Second Circuit's dismissal of the amended complaint in Absolute Activist comports with this Court's decision. In Absolute Activist, the Second Circuit considered "whether foreign funds' purchases and sales of securities issued by U.S. companies brokered through a U.S. broker-dealer constitute 'domestic transactions' pursuant to Morrison . . . ." Absolute Activist, 677 F.3d at 62. There, the amended complaint alleged that the defendants caused the plaintiffs (nine Cayman Islands hedge funds, the "Funds") to purchase shares of U.S.-based companies in private investment in public equity ("PIPE") transactions. Id. at 63. The amended complaint, however, did not contain any specific allegations that those PIPE

13

transactions were domestic--or that title to the shares was transferred in the United States. With respect to the argument that the amended complaint "allege[d] that investors subscribed to the Funds by wiring money to a bank located in New York," the Second Circuit found that "this allegation, even if true, is inapposite as the case before us was brought by the Funds themselves and is based on the Funds' purchases and sales of U.S. Penny Stocks rather than individual investors' subscriptions to the Funds." Id. at 70. That observation makes clear that the securities transaction that the fraud must be "in connection with" is the allegedly fraudulent transaction itself--not one connected to it in some other way.

Here, because the ABACUS Trustee-to-Goldman transfer of title is, as admitted by all parties, the only domestic transaction that occurred, and because the fraud was perpetrated upon IKB/Loreley--not on Goldman, there is no fraudulent U.S.-based transfer of title "in connection with" the IKB note purchase sufficient to sustain a section 10(b) and Rule 10b-5 claim against Tourre for the IKB transaction. Accordingly, the Court will not reinstate the section 10(b) and Rule 10b-5 claim against Tourre for the IKB transaction.

III. CONCLUSION

For the reasons stated above, the SEC's motion for partial relief from the June 10, 2011, Order pursuant to Fed. R. Civ. P. 54(b) is DENIED.

15

The Clerk of the Court is directed to terminate the motion at Docket No. 143.

SO ORDERED:

Dated:   New York, New York
         November 19, 2012

_____
KATHERINE B. FORREST
United States District Judge