**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x
                            :

SECURITIES AND EXCHANGE    :
COMMISSION,                   :

            Plaintiff,      :

                            :

          v.              :

                            :

FABRICE TOURRE,           :

                            :

            Defendant.   :
——————————————————————— x

Civil Action
No.: 10-cv-3229 (KBF)

<u>ELECTRONICALLY FILED</u>

**MEMORANDUM OF LAW OF FABRICE TOURRE IN SUPPORT**
**OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pamela Rogers Chepiga
David C. Esseks
Andrew Rhys Davies
Brandon D. O'Neil

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

Dated:  March 1, 2013
       New York, New York

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL BACKGROUND............................................................................... 3

FACTUAL BACKGROUND ...................................................................................... 6

I.     COLLATERALIZED DEBT OBLIGATIONS AND MARKET CONDITIONS IN 2006-2007 ........................................................................................... 6

    A.     The Subprime Market Was Weakening In Late 2006 And Early 2007, But Economists And Investors Disagreed Over How RMBS And CDOs Would Ultimately Perform .................................................................. 6

    B.     Synthetic CDOs Such As ABACUS 2007-AC1 Allowed Investors With Divergent Viewpoints To Express Their Investment Theories............................... 7

II.     THE ABACUS 2007-AC1 TRANSACTION ................................................. 10

    A.     Paulson Seeks To Make Short Investments In Subprime RMBS ......................... 10

    B.     Investment Banks And Investors Generally Had Input Into ACA's Reference Portfolio Selection Process ................................................................. 12

    C.     Paulson, ACA And Goldman Discuss The ABACUS 2007-AC1 Transaction........................................................................................................ 14

    D.     ACA Reviews And Approves The ABACUS 2007-AC1 Marketing Materials ............................................................................................................ 17

    E.     ACA Discusses Another Potential CDO Transaction Involving Paulson ............ 18

    F.     In Early 2007, It Is Publicly Reported That Paulson Has Made A "Killing" On Its Short Subprime Strategy ........................................................................ 18

    G.     Goldman's Management Approves The ABACUS 2007-AC1 Transaction ......... 19

    H.     ABACUS 2007-AC1 Closes On April 26, 2007 ................................................. 20

    I.     Investments In The ABACUS 2007-AC1 Super-Senior Tranche ........................ 22

STANDARD OF LAW................................................................................................ 24

i

ARGUMENT ..................................................................................................24

I.   THE SEC CANNOT SUSTAIN ITS CLAIMS BASED ON "OFFERS"
     ALLEGEDLY MADE TO IKB AND ABN AMRO .........................................26

     A.   The "Offer" Claims Pertaining To The Alleged IKB And ABN Amro
          Transactions Are Legally Unsustainable Under *Morrison* ...................26

     B.   Even If The June 10, 2011 Order Were Legally Sustainable, There Is No
          Evidentiary Basis For The SEC's Claims That Mr. Tourre Made Domestic
          Offers To IKB And ABN Amro ........................................................32

II.  THE SEC CANNOT SUSTAIN ITS CLAIM BASED ON "OFFERS"
     PURPORTEDLY MADE TO UNIDENTIFIED DOMESTIC INVESTORS .................34

     CONCLUSION...........................................................................................37

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)..............................................................................4, 28

*Absolute Activist Value Master Fund Ltd. v. Homm*,
    No. 09 CV 08862 (GBD), 2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010)........................28

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................24

*Hester v. Navigators Ins. Co.*,
    --- F. Supp. 2d ---, No. 12 Civ. 4033 (KBF),
    2013 WL 264807 (S.D.N.Y. Jan. 23, 2013) .....................................................24

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)......................................................................24

*In re Smart Techs. Inc., Sec. Litig.*,
    --- F.R.D. ---, No. 11 Civ. 7673 (KBF),
    2013 WL 139559 (S.D.N.Y. Jan. 11, 2013) ....................................................27

*Morrison v. Nat'l Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010)...................................................................... passim

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)........................................................28, 29

*Rivers v. Roadway Exp., Inc.*,
    511 U.S. 298 (1994)..............................................................................33

*SEC v. Goldman Sachs & Co.*,
    790 F. Supp. 2d 147 (S.D.N.Y. 2011)............................................4, 25, 29, 35

*SEC v. Nat'l Secs., Inc.*,
    393 U.S. 453 (1969)..............................................................................29

*Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*,
    No. 10 Civ. 4933 (ALC) (GWG),
    2013 WL 81263 (S.D.N.Y. Jan. 8, 2013) ...................................24, 32, 35, 36

*United States v. Sumeru*,
    449 F. Appx. 617 (9th Cir. 2011)....................................................................31

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000).........................................................................35

**Statutes & Rules**

15 U.S.C. § 77b(a) ..............................................................................................29

15 U.S.C. § 77o(b) ..............................................................................................33

15 U.S.C. § 77q(a) ...........................................................................................1, 4

17 C.F.R. § 230 ...................................................................................................27

17 C.F.R. § 230.901 ............................................................................................27

17 C.F.R. § 230.902(h) .......................................................................................27

17 C.F.R. § 230.903(a).......................................................................................27

Dodd-Frank Act, Pub. L. 111-203 (2010)........................................................33

Fed. R. Civ. P. 9(b) ............................................................................................34

Fed. R. Civ. P. 56................................................................................................1, 24

Pub. L. No. 83-577, Title I, § 1 (Aug. 10, 1954) .........................................30

**Other Authorities**

Arthur H. Dean, *Twenty-Five Years of Federal Securities Regulation by the Securities and Exchange Commission,* 59 Colum. L. Rev. 697 (1959)............................................30

Ralph H. Demmler and J. Sinclair Armstrong, *The Federal Securities Laws: The Scope and Effect of the New Amendments*, 41 A.B.A. J. 133 (1955) .................................30, 31

Morris L. Forer, *A Comment on the Amendments to the Federal Securities Act*, 103 U. Pa. L. Rev. 1020 (1955) ........................................................................31

H.R. Rep. No. 1542 (1954), *reprinted in* 2 United States Code Congressional and Administrative News (1954)...........................................................................30, 31

Offshore Offers & Sales, Securities Act Release No. 33-6863, 1990 WL 311658 (Apr. 24, 1990) ..........................................................................27, 28

SEC Study on Extraterritorial Private Rights of Action, Exchange Act Release No. 63174, 2010 WL 4196006 (Oct. 25, 2010)........................................................................5

Defendant Fabrice Tourre respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment to the extent the SEC's Amended Complaint dated November 22, 2010 purports to assert claims under Section 17(a) of the 1933 Securities Act (the "Securities Act"), 15 U.S.C. § 77q(a), as to "offers" allegedly made to German bank IKB Deutsche Industriebank AG ("IKB"), to the London branch of Dutch bank ABN Amro Bank NV ("ABN Amro"), and to unidentified domestic investors.

## PRELIMINARY STATEMENT

Despite its multi-year investigation and more than two years of civil discovery in this action, the SEC has failed utterly to substantiate with evidence its allegation that the ABACUS 2007-AC1 synthetic collateralized debt obligation ("CDO") transaction, structured by Goldman, Sachs & Co. ("Goldman") in early 2007, constituted a fraud on investors.

Attempting to divorce the ABACUS 2007-AC1 transaction from the basic economic realities of synthetic CDO transactions and from market practices and norms that the sophisticated entities that participated in this market well understood, the SEC claims that the ABACUS 2007-AC1 offering documents were misleading because they represented that the reference portfolio of subprime residential mortgage-backed securities ("RMBS") had been selected by ACA Management, LLC (together with affiliated entities, "ACA"), without also disclosing that hedge fund Paulson & Co. Inc. ("Paulson") had input into the reference portfolio and took a short position on the transaction.  *See* ECF No. 44 (Amended Complaint dated Nov. 22, 2010 ("Am. Compl.")) ¶ 2.

Wholly at odds with the SEC's case theory, every single ACA witness who has testified in this matter has affirmed strongly and without hesitation that ACA did, in fact, select the ABACUS 2007-AC1 reference portfolio, as the offering documents represented.  Moreover, discovery has shown that the allegedly defrauded investors in ABACUS 2007-AC1—ACA and IKB—understood fully that short investors are an essential part of synthetic CDOs, and that short

parties routinely had input into reference portfolio selection, including in 2006-2007, when the economy and housing market were showing signs of weakness and investors had divergent views as to future performance.

In its June 10, 2011 order, the Court concluded correctly that the alleged IKB note purchase on April 26, 2007, and the credit default swap contract entered into by the London branch of Dutch bank ABN Amro on May 31, 2007, *see* Am. Compl. ¶¶ 53-73, were unambiguously foreign transactions. Pursuant to *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), therefore, the Court dismissed all claims as to those alleged "purchases" and "sales." Taking a position not briefed or argued by the parties, however, the Court declined at the motion to dismiss stage to dismiss the Section 17(a) claims as to the "offers" allegedly made to those entities, and allowed those claims to proceed to discovery. Acknowledging that the viability of bifurcating completed foreign transactions into foreign "sales" and domestic "offers" raised an "issue of first impression," the Court recognized that it would need to re-visit the sustainability of these "offer" claims at the summary judgment stage.

Mr. Tourre now moves for summary judgment as to the "offers" allegedly made to IKB and ABN Amro. To the extent the prior holding contemplated the possibility of a domestic "offer" to enter into a non-domestic transaction, it is clearly contrary to *Morrison* and the legislative history of the Securities Act, and is not supported by the cases on which the Court relied. Further, discovery has only underscored that there was no domestic "offer" to either IKB or ABN Amro, as required by *Morrison*, and, moreover, that Mr. Tourre is not responsible for any offer made to these European institutions.

Summary judgment should also be granted on the SEC's generic, unadorned assertion that offers were made to unidentified domestic investors by Goldman's New York-based syndicate desk—a desk of which Mr. Tourre was not a member. *See* Am. Compl. ¶ 66. Despite the SEC's representation to the Court at oral argument on the motion to dismiss more than two years ago that it intended to use the discovery process to put some "meat on that bone," the SEC has taken no depositions or served any subpoenas to satisfy its burden of proof to

develop an evidentiary record to support this allegation, nor has it identified any witness who can testify to these supposed offers.

## PROCEDURAL BACKGROUND

The SEC's original Complaint, filed on April 16, 2010, identified only <u>one</u> alleged purchaser of ABACUS 2007-AC1 notes, namely, German bank IKB.  The SEC also alleged that on May 31, 2007, more than a month after the note offering, European bank ABN Amro entered into a credit default swap ("CDS") referencing the ABACUS 2007-AC1 portfolio. *See* ECF No. 1 (Complaint dated Apr. 16, 2010).

On June 24, 2010, the U.S. Supreme Court ruled in *Morrison*, 130 S. Ct. 2869, that the federal securities laws are geographically limited in application to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.* at 2884.  As the alleged IKB and ABN Amro transactions are unambiguously foreign, Mr. Tourre moved for judgment on the pleadings.  *See* ECF No. 31 (Mr. Tourre's Mem. of Law in Support of Mot. for Judgment on the Pleadings).  The SEC insisted that those transactions were "domestic" for *Morrison* purposes, but, in a tacit concession of the Complaint's deficiencies, sought leave to file an amended Complaint to try to plead around *Morrison*.  *See* ECF No. 35 (SEC's Mem. of Law in Opp. to Mr. Tourre's Mot. for Judgment on the Pleadings), at 3, 12.  The Court granted the SEC's request, *see* ECF No. 42 (Order dated Nov. 1, 2010), and the SEC filed its Amended Complaint on November 22, 2010.

Far from fixing the deficiencies in the original Complaint, the SEC attempted an end run around *Morrison* by peppering the Amended Complaint with references to New York-based conduct.  The SEC also added another purchaser of ABACUS 2007-AC1 notes—ACA itself—and a generic allegation that "offers" of securities were made to domestic investors, though the SEC did not identify any such investors.  *See* Am. Compl. ¶ 66.

Mr. Tourre moved to dismiss the Amended Complaint under *Morrison* as to the alleged IKB and ABN Amro transactions, because it failed to plead a plausible claim that ACA

had been defrauded, and because it failed to plead with specificity that any offers had been made to other domestic investors.  *See* ECF No. 52.  On June 10, 2011, the Court partially granted Mr. Tourre's motion, dismissing the SEC's claims related to the IKB and ABN Amro transactions under Section 10(b) and Rule 10b-5 of the 1934 Exchange Act (the "Exchange Act"), and claims related to "sale" under Section 17(a) of the Securities Act.  However, the Court, in an unprecedented decision, declined to dismiss at the pleadings stage claims related to "offers" under the Securities Act, relying on pre-*Morrison* cases and the broad statutory definition of "offer."  *See SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 164-65 (S.D.N.Y. 2011).

Mr. Tourre moved the Court to reconsider its decision not to dismiss the claims arising from "offers" to IKB and ABN Amro, because *Morrison* makes clear that the federal securities laws apply only to "parties or prospective parties" to domestic securities transactions.  *See* ECF No. 96 (Mem. of Law in Support of Mr. Tourre's Mot. for Limited Reconsid.), at 1 (quoting *Morrison*, 130 S. Ct. at 2884) (emphasis added).  Ruling that it had not made a clear error of law, the Court denied Mr. Tourre's motion.  *See* ECF No. 101 (Order dated Aug. 22, 2011).

Mr. Tourre then moved the Court to certify an interlocutory appeal on whether a single securities transaction can be bifurcated into a domestic "offer" and a foreign "sale" for *Morrison* purposes.  *See* ECF No. 103 (Mem. of Law in Support of Mot. for Certification of Interlocutory Appeal).  The Court denied this motion, but, recognizing that this was an "issue of first impression," acknowledged that it would need to re-visit at the summary judgment stage the sustainability of the SEC's remaining Section 17(a) claims.  *See* ECF No. 116 (Order dated Oct. 17, 2011).

In June 2012, the SEC sought to re-litigate the dismissal of the Section 10(b) and Rule 10b-5 claims as to the alleged IKB transaction (although it did not seek to re-litigate the dismissal of the same claims as to the ABN Amro transaction).  *See* ECF No. 144 (SEC's Mem. of Law in Support of its Motion for Partial Relief).  On the pretext that the Second Circuit's decision in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), had

changed the controlling law, the SEC argued that its statutory authority is so broad that it can bring claims related to a foreign securities transaction so long as that transaction is arguably "in connection with" some other, non-fraudulent domestic securities transaction, no matter how attenuated.  *Id.* at 6.

Following oral argument on the SEC's motion, the Court requested the parties to submit supplemental briefing.  *See* ECF No. 155 (Order dated Oct. 15, 2012).  The SEC continued to assert, without any basis, that an SEC enforcement action can be brought against a fraudulent foreign transaction so long as it has an arguable connection to "any" non-fraudulent domestic purchase or sale of securities.  *See* ECF No. 162 (SEC's Mem. of Law in Response to the Court's Questions), at 2.   Mr. Tourre demonstrated that the *Morrison* court considered, and rejected, the SEC's argument that Section 10(b) should apply more broadly to the SEC than to private litigants, and further demonstrated that the SEC has recognized elsewhere that *Morrison* "significantly limited the extraterritorial scope of Section 10(b)."  *See* ECF No. 161 (Mr. Tourre's Mem. of Law in Response to Questions Posed by the Court), at 13-15 (citing, *inter alia*, SEC Study on Extraterritorial Private Rights of Action, Exchange Act Release No. 63174, 2010 WL 4196006, at *1 (Oct. 25, 2010)).

In its Order dated November 19, 2012, *see* ECF No. 164, the Court concluded that the SEC's position is "simply not the law," and recognized that the SEC's position would, in effect, rewrite *Morrison*.  *Id.* at 13.  The Court denied the SEC's motion to re-instate the Section 10(b) and Rule 10b-5 claims related to IKB.

5

**FACTUAL BACKGROUND**

I.   **COLLATERALIZED DEBT OBLIGATIONS AND MARKET
     CONDITIONS IN 2006-2007**

   A.   **The Subprime Market Was Weakening In Late 2006 And Early 2007,
        But Economists And Investors Disagreed Over How RMBS And
        CDOs Would Ultimately Perform**

   In 2006 and 2007, there were "mixed signals concerning the state of the U.S.
economy and the housing market." *See* Mr. Tourre's Statement of Undisputed Material Facts
Pursuant to Local Rule 56.1 dated March 1, 2013 ("SUF"), ¶ 1.  Economists had different views
as to whether the economy faced a threat of recession.  *Id.*  There was, however, ample evidence
of developing problems in subprime mortgages, including increased delinquencies and defaults.
SUF ¶ 2.

   The ultra-sophisticated entities that operated in the CDO market were fully aware
of these publicly-reported developments.  IKB, which was one of the largest, most sophisticated
investors in the CDO market, *see* SUF ¶ 3, expressed concern as early as October 2005 that there
was a U.S. housing bubble, *see* SUF ¶ 4.  ACA, too, acknowledged these concerns on its
December 7, 2006 earnings call with investors, during which CEO Alan Roseman discussed the
"weakening performance of the subprime residential mortgage market," and expressed the view
that "[w]hether that is indicative of significant future underperformance has yet to be
determined."  SUF ¶ 5.

   As reflected by Mr. Roseman's comments, there was no consensus as to how
market conditions would ultimately play out.  Investment bank Merrill Lynch issued a report on
January 5, 2007 summarizing the "heavily divided" opinions in the market, and noting that
market outcomes would be very different depending on which opinion turned out to be correct.
Predictions ranged in severity from only "idiosyncratic" defaults all the way through to a
"systemic shock to subprime."  SUF ¶ 6.

   Not surprisingly, in light of the mixed economic data, investors held divergent
views.  Many believed that the decline in housing prices and the subprime losses were only

temporary, *see* SUF ¶ 7,[1] while other investors reacted to the same publicly-available data by establishing short positions on mortgage-related securities, *i.e.*, positions that would pay off if the value of the securities declined. *Id.* Indeed, as early as 2005, Andrew Davidson, whom the SEC proffers as one of its expert witnesses in this case, took short positions on the subprime mortgage market that earned his firm millions of dollars, advised his clients to take short positions, and testified that any investor could have arrived at the same investment thesis based on publicly-available information. SUF ¶ 10.

      **B.**     **Synthetic CDOs Such As ABACUS 2007-AC1 Allowed Investors With Divergent Viewpoints To Express Their Investment Theories**

      A synthetic CDO such as ABACUS 2007-AC1 is an investment vehicle whose returns are linked to the performance of a pool of assets, such as subprime RMBS.[2] Such investments provide investors with differing viewpoints the ability to express their investment theories, because, by definition, synthetic CDOs require both investors who believe the value of the CDO will go up, referred to as "long" investors or "protection sellers," and investors who believe the value of the CDO will go down, referred to as "short" investors or "protection buyers."[3] Matched "long" and "short" investors are structurally essential to a synthetic CDO because what makes a synthetic CDO "synthetic" is that it does not purchase any actual interest-bearing securities. *See* SUF ¶ 12. Instead, the CDO references a portfolio of securities, such as

---

[1]   *See also*, *e.g.*, SUF ¶ 8 (Barclays Capital Research report dated March 21, 2007, opining that "while stresses in sub-prime lending are real, there has been significant hype that has not been driven by fundamental factors," and recommending investing in subprime securities); SUF ¶ 9 (ACA CEO Alan Roseman stated on ACA's February 15, 2007 earnings call that although ACA was focusing on "negative development[s]" in 2006 vintage subprime RMBS, it believed that 2007 CDO market conditions were "exceptionally strong").

[2]   For a detailed description of synthetic CDOs, see Declaration of Pamela Rogers Chepiga dated March 1, 2013 ("Chepiga Decl."), Ex. 10 (Expert report of Mukesh Bajaj dated December 20, 2012), ¶¶ 14-29.

[3]   In addition to CDOs, investors in 2006 and 2007 could also take long or short positions on the ABX Index, a "synthetic tradeable index referencing a basket of 20 subprime mortgage-backed securities," which "allows investors to accurately gauge market sentiment around the asset-class, and to take short or long positions accordingly." SUF ¶ 11.

RMBS, referred to as a "reference portfolio," through the use of credit default swaps ("CDS"), which replicate the cash flows of the securities included in the reference portfolio. Long investors receive periodic interest payments from the short investors so long as the reference portfolio assets perform, but in the event of losses or default the long investor must pay the short investor an amount commensurate with the losses incurred by the reference portfolio assets. Without <u>both</u> long and short investors who make opposite investments in identical dollar amounts, there are no cash flows, and, thus, no synthetic CDO can exist.[4]

Like RMBS, CDOs are structured into different classes, or "tranches," that have different risk-return profiles and different credit ratings,[5] and are prioritized to pay returns to the senior-most tranche first, followed by more junior subordinate tranches, and lastly the "first loss" or "equity" tranche. This priority is reversed if the reference portfolio incurs losses, such that the equity tranche is affected first, followed by more senior tranches.

In 2006-2007, CDO market participants, including those involved with the ABACUS 2007-AC1 transaction, understood that both long and short investors were structurally indispensable to a synthetic CDO, and that both long and short investors provided input into transactions, including as to the content of reference portfolios.[6] For example, ACA served as

---

[4]    *See* Chepiga Decl., Ex. 11 (Dep. Tr. of Sihan Shu dated Mar. 24, 2011), at 104:18-105:19 (stating that it is "not possible" to have a synthetic CDO without both long and short investors, and that long investors in synthetic CDOs receive their investment income from payments made by the short investors); Chepiga Decl., Ex. 12 (Dep. Tr. of Michael Nartey dated Nov. 7, 2011), at 196:8-198:16 ("for every CDO . . . there has to be a long and a short. Someone has got to want to take the risk. Someone has got to want to sell the risk.").

[5]    In 2006 and 2007, both CDO and RMBS tranches received ratings from the independent rating agencies (such as Standard & Poor's, Moody's and Fitch), based on their perceived risk and level of seniority in the capital structure.

[6]    *See, e.g.*, Chepiga Decl., Ex. 21 (Dep. Tr. of Paolo Pellegrini dated March 14-15, 2011), at 236:15-237:22 (testifying that CDOs referencing RMBS were an investment vehicle in which both long and short investors could express their views); Chepiga Decl., Ex. 24 (Dep. Tr. of David Gerst dated February 9, 2011), at 58:15-59:13 (stating that collateral managers responsible for selecting reference portfolios are "not necessarily looking to just choose the safest names," but "have to sort of think of the economics of the transaction"); Chepiga Decl., Ex .13 (Dep. Tr. of Mukesh Bajaj dated February 7, 2013), at 228:15-229:2 (stating that independent portfolio selection agents must pick a "reference portfolio that provides an efficient means for long and short investors to . . . take positions consistent with their investment thesis through [the reference] portfolio.").

Collateral Manager for a transaction entitled Aquarius 2006-1, Ltd. ("Aquarius"), which closed in September 2006 and was structured and underwritten by the global investment bank UBS AG ("UBS").  The Aquarius transaction was "generated as a reverse inquiry" from the Chicago-based hedge fund Magnetar Capital LLC ("Magnetar"), which committed in writing to purchase the equity tranche, and which also informed Laura Schwartz, head of ACA's CDO business, and Keith Gorman, ACA's Portfolio Manager, that it was putting on a "core short" position of BBB-rated ABS CDOs, and that it wanted to take a short position on certain securities in the Aquarius reference portfolio.  SUF ¶¶ 13-16.  Ms. Schwartz told Magnetar that "it would really help" if Magnetar was an "interested buyer of protection," *i.e.*, a "short" investor, since the "ABS CDO synthetic market has not been as liquid/widely traded as the RMBS."  SUF ¶ 16.

IKB was also aware that short investors needed to have input into synthetic CDO reference portfolios, including CDOs involving a collateral manager.  In 2006, Goldman Sachs was discussing with IKB a series of transactions that would be "managed . . . by a fiduciary Portfolio Advisor mutually selected by IKB and Goldman" in which the Portfolio Advisor would "be responsible for . . . [s]electing the initial reference portfolio (<u>subject to consent by IKB and Goldman</u>)," and the "[i]nitial reference portfolio for each transaction" would be "mutually agreed-upon by IKB, Goldman and the Portfolio Advisor."  SUF ¶ 17 (emphasis added).  Goldman Sachs' written proposal to IKB set forth that one of Goldman's roles would be as protection buyer, *i.e.*, a "short" investor, and that Goldman would be free to sell its short position to other market participants.  *Id.*  As Goldman and IKB discussed, Goldman's input as protection buyer was structurally essential so that Goldman could "source" the reference portfolio securities, *i.e.*, find short investors, at appropriate prices in order to satisfy IKB's income objectives.  SUF ¶ 18.

## II.   THE ABACUS 2007-AC1 TRANSACTION

### A.   Paulson Seeks To Make Short Investments In Subprime RMBS

As noted above, some investors, including the SEC's expert witness Mr.

Davidson, reacted to the publicly-available market information by taking short positions on

subprime RMBS and CDOs.  Using only publicly available data, the Paulson hedge fund came to

the view in 2005-2006 that "there was a huge bubble in the housing market," and that "double-

digit growth every year" in home prices, as had been the case for several years, was "not

sustainable."  SUF ¶ 19.  In fact, the SEC's expert Mr. Davidson shared a "common view" with

Paulson, agreed with Paulson's short subprime strategy, held meetings with the Paulson firm in

late 2006 and early 2007 to explore their shared market outlook and strategy, and even provided

Paulson with access to proprietary models to help Paulson "participate in the sub-prime market."

SUF ¶ 20.

At the time, the Paulson firm was not an experienced investor in mortgage-related

securities and, in fact, many other investors dismissed Paulson as a "tourist" investor who did not

understand the mortgage markets.  SUF ¶ 21.  Nonetheless, Paulson established in September

2006 the Paulson Credit Opportunities Fund, which, according to contemporaneous press reports,

"will be short credit on the U.S. sub-prime residential market," and "aimed specifically at

profiting on subprime defaults."  SUF ¶¶ 22-23.  The SEC's expert Mr. Davidson testified that

Paulson's strategy and market view was no secret, and that the Paulson firm held an event in

2006 to attract investors and raise money for Paulson's short strategy fund.  SUF ¶ 24.

As it implemented its investment thesis in 2006-2007, Paulson took short

positions in several different mortgage-related securities, including the ABX indices, individual

RMBS (referred to as "single-name" RMBS), and seven to ten synthetic CDOs.  SUF ¶ 25.  In

August and September 2006, Paulson took some short positions on reference portfolios of

subprime RMBS through Goldman Sachs' Structured Product Correlation Desk (the "Correlation

Desk").  SUF ¶ 26.  The reference portfolios in these transactions were constructed by Goldman

employees providing to Paulson a list of RMBS that met certain criteria, such as a certain rating,

percentage of adjustable rate mortgages, and other factors, and Paulson then removing certain RMBS and providing Goldman with a final list.  SUF ¶ 27.

At the time, in addition to Mr. Tourre, the Goldman Correlation Desk members included senior member Jonathan Egol, plus Geoff Williams, Darren Thomas, Jordan Kaufman and David Gerst, an attorney who had been recruited by Mr. Tourre and others so that there would be "somebody with a legal background on the desk."  SUF ¶¶ 28, 32.  Mr. Tourre, who held the job title of associate until December 2006 when he was promoted to vice president, typically focused on the "risk and economics" of transactions.  SUF ¶¶ 29-30.  Mr. Gerst, who was also promoted to vice president in late 2006, was the Correlation Desk's liaison with Goldman's internal legal and compliance departments, as well as with Goldman's outside legal counsel, McKee Nelson LLP, where he had previously been employed as external deal counsel to Goldman on ABACUS transactions.  SUF ¶¶ 31-33.

In late 2006, Paulson expressed interest in taking additional short positions on subprime RMBS.  Goldman updated a list of potential subprime RMBS it had identified based on Paulson's criteria, and Paulson then provided Goldman with a list of RMBS on which Paulson wished to buy protection.  SUF ¶¶ 34-35.  In response to this client inquiry, the Goldman Correlation Desk and sales force approached several collateral managers to discuss their interest in participating in the potential transaction, including ACA.

ACA was a publicly-traded company, that, in addition to operating an asset management business,[7] in which ACA served, for a fee, as a "collateral manager" or "portfolio selection agent" for CDOs and similar transactions with responsibility for selecting a CDO's reference portfolio, and, in the case of a managed CDO, actively managing the composition of the reference portfolio, SUF ¶ 36, operated a "Structured Credit" business.  ACA's structured credit business model depended upon its affiliated insurance company taking exclusively long

---

[7]   As of May 2007, ACA's asset management business had originated almost 30 CDOs with a combined notional value of at least $16.7 billion.  SUF ¶ 37.

positions on "super senior" tranches of CDOs,[8] by issuing financial guaranty insurance policies on the credit quality of the reference portfolio.[9]  ACA's business model did not encompass taking short positions.  SUF ¶ 39.

### B.    Investment Banks And Investors Generally Had Input Into ACA's Reference Portfolio Selection Process

In 2006-2007, ACA's Credit Department was responsible for analyzing securities to be included in the reference portfolios of ACA transactions.  SUF ¶ 41.  On an ongoing basis, the Credit Department reviewed securities, such as RMBS, as they were issued in the market, and analyzed them using numerous "stresses" and its own specialized proprietary models, as well as industry-standard tools.  SUF ¶ 42.  If a particular security passed the various tests, the Credit Department presented a written assessment to the ACA Collateral Committee, which met daily to discuss, debate and vote on the securities.  SUF ¶ 43.  If the Collateral Committee approved a security, it became eligible to be included in an ACA CDO, and was entered into a proprietary database that ACA used to monitor all approved securities on a monthly basis.  SUF ¶ 44.

Throughout its rigorous reference portfolio selection process, ACA worked with the investment banks it was partnering with on transactions.  SUF ¶ 45.  ACA's "normal practice" was also to permit investors to "discuss" and "offer opinions" on the reference portfolios.  SUF ¶ 46.  The head of ACA's asset management business, Ms. Schwartz, testified under oath that ACA "selected" the portfolios in all of its transactions because ACA reviewed and approved all securities in the reference portfolios, and the fact that other transaction participants had input did not mean that ACA did not select the reference portfolios.  SUF ¶ 47.

For example, in the Aquarius transaction described above, the Magnetar hedge fund, which as noted above had a "core short" position, worked "from day one . . . with [ACA]

---

[8]   A "super-senior" tranche is the highest part of the capital structure in a CDO and is the last tranche to incur any losses.

[9]   *See* SUF ¶¶ 38-39.  By December 2006, ACA Structured Credit had provided financial guaranty insurance credit protection on more than 150 individual transactions with 28 different counterparties, with a total notional value of almost $40 billion.  SUF ¶ 40.

on putting the portfolio together," *see* SUF ¶ 48, and entered into a tripartite agreement with ACA and UBS pursuant to which Magnetar had the contractual right to veto any security that ACA proposed to include.  SUF ¶ 49.  Consistent with the testimony of Ms. Schwartz in this matter, the Aquarius offering documents represented that ACA "will select" the Aquarius reference portfolio.  SUF ¶ 51.[10]

Similarly, in January and February 2007, ACA's senior officers unanimously approved ACA's participation as Investment Advisor in two CLO transactions, ACA CLO 2007-2 and ACA Euro CLO 2007-2.[11]  ACA's written proposals to its internal approvals committee stated that, in each case, a global investment bank had approached ACA with a large "seed portfolio" in leveraged loans that the bank held on its balance sheet.  SUF ¶¶ 53-54.  In both cases, ACA "agreed to keep the fact of [ACA] getting a seed portfolio confidential."  *Id.* Consistent with market practices, Ms. Schwartz, the head of ACA's asset management business, testified under oath that ACA "selected" these reference portfolios because ACA had reviewed and approved the "seed portfolio" and all the other reference portfolio securities, and ACA represented to investors that it "selected" these reference portfolios.  SUF ¶ 56.[12]

Notably, the "seed portfolio" ACA received in the ACA CLO 2007-2 transaction was provided by the investment bank Bear Stearns & Co, Inc. ("Bear Stearns").  At the time, the head of Bear Stearns' CLO and CDO group was Ira Wagner, whom the SEC has proffered as an expert witness in this matter.  Bear Stearns employees working under Mr. Wagner's supervision negotiated with ACA an engagement letter under which Bear Stearns would commit to provide

---

[10]  Ms. Schwartz and Mr. Gorman of ACA believed that ACA "selected" the Aquarius reference portfolio because ACA and its Collateral Committee reviewed and approved every security, and the fact that UBS, Magnetar and others all had input did not mean that ACA did not "select" the portfolio.  SUF ¶ 50.

[11]  A CLO is "similar to a CDO, but the reference obligations or the cash securities are leveraged loans," instead of RMBS.  *See* SUF ¶ 52.

[12]  In addition, in January 2007, ACA served as Investment Advisor for a transaction in which a hedge fund was "actively involved in the portfolio composition, pricing of the underlying assets, and fee negotiation," and the hedge fund had "asked that their name/involvement remain confidential."  SUF ¶ 58.

fully half of the transaction's portfolio, which would be "subject to ACA's approval."  SUF ¶ 55.
Again consistent with the testimony of Ms. Schwartz, Mr. Wagner testified that so long as ACA
conducted its internal analysis and approved all of the securities in the reference portfolio, then it
would be accurate to disclose that ACA "selected" the portfolio.  SUF ¶ 57.

### C.    Paulson, ACA And Goldman Discuss The ABACUS 2007-AC1 Transaction

#### 1.    ACA and Goldman Initially Discuss The Transaction In December 2006

ACA first had discussions with Goldman about the transaction that ultimately
became ABACUS 2007-AC1 on December 20, 2006, when Gail Kreitman, a Managing Director
at Goldman, organized a luncheon meeting between ACA and Goldman to discuss potential
areas of business between the two firms.  SUF ¶ 59.  Mr. Tourre did not attend this meeting.
SUF ¶ 60.  Mr. Gorman of ACA recalled that ACA and Goldman had an initial discussion of the
transaction with Paulson at this meeting.  SUF ¶ 59.

#### 2.    ACA Rejects More Than Half Of The Securities Initially Proposed By Paulson

On January 8, 2007, Paolo Pellegrini and Sihan Shu of Paulson, Laura Schwartz
and Keith Gorman of ACA, and Fabrice Tourre of Goldman attended a meeting at Paulson's
offices, at which Mr. Pellegrini discussed Paulson's view of the market and its opinion that
RMBS performance was deteriorating.  SUF ¶¶ 61-62.  Mr. Pellegrini believed that he explained
at that meeting Paulson's "approach to shorting a slice of the market."  SUF ¶ 63.

The next day, January 9, Ms. Kreitman of Goldman sent to Ms. Schwartz of ACA
the Paulson-identified list of 123 Baa2-rated, 2006 vintage subprime RMBS, stating that Paulson
was "trying to get a sense . . . for the level of the capital structure of these transactions that ACA
has been comfortable investing [in] in the past."  SUF ¶ 64.  After having her team conduct an
"overlap analysis" to determine which of the RMBS ACA's Collateral Committee had
previously analyzed and approved for inclusion in other ACA CDOs, Ms. Schwartz rejected 68

of the securities for inclusion in the reference portfolio, noting that ACA would include "only 55" because, as to the 68 RMBS rejected, ACA "did not like them" and some names had "lower rated tranches already on negative watch."  SUF ¶ 65.  Mr. Pellegrini thought that ACA was "pretty aggressive" in rejecting so many of the RMBS proposed by Paulson, and was "surprised because we had expressed an interest in . . . trying to price protection on a slice of the market . . . [a]nd then all of a sudden there was the very extensive cherry picking of the, quote, unquote, market."  SUF ¶ 66.

### 3.   The Parties Continue To Discuss The Evolving Potential Transaction

During January and February 2007, the parties continued to discuss the evolving transaction via phone calls, emails and in-person meetings.  For example, on January 11, 2007, Mr. Gerst of Goldman sent to Ms. Schwartz of ACA a draft ABACUS 2007-AC1 preliminary termsheet which indicated that the "Initial Issued Amount" of the "First Loss" tranche was "NA," while the "Initial Issued Amount" of the Class A, B and C tranches was listed as "[   ]."  SUF ¶ 67.  Ms. Schwartz and others at ACA received at least two additional draft preliminary termsheets, on February 8 and 13, 2007, both of which also indicated that the "Initial Issued Amount" of the "First Loss" tranche was "NA," while the "Initial Issued Amount" of the Class A, B and C tranches was listed as "[   ]."  SUF ¶ 68.

On Saturday, January 26, 2007, Ms. Schwartz and Mr. Pellegrini were both in Jackson Hole, Wyoming, where they arranged a meeting to discuss the reference portfolio in the lobby bar of the Snake River Lodge.   SUF ¶ 69.  No one else attended the meeting, which lasted approximately forty-five minutes to one hour.  SUF ¶ 70.

Mr. Pellegrini and Ms. Schwartz discussed why ACA had accepted "only 55 [RMBS] names from the first list" that Paulson had proposed, SUF ¶ 71, and also discussed the super senior tranche of the ABACUS 2007-AC1 transaction. Ms. Schwartz told Mr. Pellegrini that ACA, which, as noted above, took only long positions on such transactions, "would definitely look at it if Goldman planned on placing it."  SUF ¶ 72.  Mr. Pellegrini told Ms.

15

Schwartz that he wanted a two-year "auction call" on the super-senior transaction, which would give Paulson the ability to cancel the transaction after two years, because Paulson "didn't want to pay the cost of protection beyond the two years if there wasn't a deterioration in the reference portfolio." SUF ¶ 73. Ms. Schwartz subsequently discussed Paulson's interest in the super senior tranche with ACA's senior management. SUF ¶ 74.

After returning from Wyoming, Mr. Pellegrini and Ms. Schwartz arranged a meeting at ACA's offices on February 2, 2007, attended by Messrs. Pellegrini and Shu from Paulson, Mr. Tourre from Goldman, and Ms. Schwartz, Mr. Roseman and another employee from ACA. SUF ¶ 75. Following the meeting, Ms. Schwartz made clear that ACA was "not willing" to include certain RMBS proposed by Paulson. SUF ¶ 76.

Mr. Pellegrini testified that it "stretches credulity" that, following his meetings with Ms. Schwartz, ACA would not have known Paulson was taking a short position. SUF ¶ 77. Mr. Tourre's testimony confirms Mr. Pellegrini's recollection. SUF ¶ 78.

ACA's internal approvals committee approved its participation as Portfolio Selection Agent in ABACUS 2007-AC1, pursuant to a proposal written by Ms. Schwartz and Mr. Gorman, which indicated that ACA had been working with Paulson to "construct a portfolio that meets their needs as well as ours," and that ACA's "requirements" were that every reference portfolio security had been reviewed and approved by ACA's Collateral Committee, and that all securities were performing within expectations. SUF ¶ 79. According to the proposal, the ABACUS 2007-AC1 capitalization structure included an "Unfunded super senior" tranche of 35-100% of the capital structure, and a "0-9.5%" "Equity" tranche. *Id.* The proposal indicated that the Paulson "hedge fund is taking the 0-9% tranche," which was an assumption ACA made based on the fact that other hedge funds were buying equity in ACA CDOs at the time. SUF ¶ 80. As with Magnetar's investment in ACA's Aquarius CDO, many of those hedge funds were implementing a "long-short" strategy, in which they bought equity and used the income to fund larger short positions. SUF ¶ 81.

16

On February 15, 2007, ACA's General Counsel Nora Dahlman executed an engagement letter with Goldman.  Consistent with the market practices described above, the letter provides that "[i]n its capacity as Portfolio Selection Agent, ACA will select the Reference Portfolio (subject to the consent of the Protection Buyer)," *i.e.*, Goldman, and that the "Reference Portfolio selected may be modified prior to the Closing Date of the CDO upon the mutual agreement of Goldman and [ACA]."  SUF ¶ 82.

**D.    ACA Reviews And Approves The ABACUS 2007-AC1 Marketing Materials**

In its role as Portfolio Selection Agent, ACA reviewed and approved the ABACUS 2007-AC1 marketing materials, including the termsheet and marketing "flipbook."  As noted above, ACA received at least three drafts of the preliminary termsheet (on January 11, February 8 and February 13, 2007), all of which indicated that the "Initial Issued Amount" of the "First Loss" tranche was "NA," while the "Initial Issued Amount" for the Class A, B, C and D tranches was listed as "[   ]."  SUF ¶¶ 67-68.  This document was reviewed by ACA's "counsel and business sides," including Ms. Schwartz and ACA in-house attorney Gloria Gonzalez.  ACA did not raise any questions or make any comments to those portions of the termsheet.  SUF ¶ 83.

ACA also reviewed and approved the ABACUS 2007-AC1 marketing "flipbook."  ACA received at least two drafts of the flipbook, on February 15 and February 23, 2007, both of which indicated that the first loss tranche was "Not Offered," and that the only ABACUS 2007-AC1 tranches being offered were those "from the super senior tranche to the 'A2/A'-rated tranche."  SUF ¶¶ 84-85.  Again, ACA did not suggest any comments to or raise any questions about these disclosures.  SUF ¶ 86.

ACA also reviewed and approved the ABACUS 2007-AC1 offering circular, and took "sole responsibility" for the accuracy and completeness of a section in the offering circular entitled "The Portfolio Selection Agent," which provides that ACA "will, pursuant to the terms of the Portfolio Selection Agreement . . . select the Initial Reference Portfolio."  SUF ¶ 87.

### E.   ACA Discusses Another Potential CDO Transaction Involving Paulson

Around the same time that it was discussing the ABACUS 2007-AC1 transaction, ACA was hoping to undertake another transaction with Paulson, which would involve Paulson providing an initial list of RMBS to UBS, which would work with ACA in selecting a final reference portfolio of approximately 100 RMBS.  SUF ¶ 88.  Indeed, Paulson sent to UBS its list of 123 subprime Baa2-rated RMBS that it originally suggested for the ABACUS 2007-AC1 reference portfolio.  SUF ¶ 89.  Lirenn Tsai, a senior banker in UBS' CDO group, discussed the potential transaction with Mr. Gorman of ACA.  SUF ¶ 90.  UBS proposed to Paulson that ACA be considered as one of four potential collateral managers for the transaction, but Paulson responded that ACA was "off the list" because Paulson and ACA were already working together on the ABACUS 2007-AC1 transaction.  SUF ¶ 91.

### F.   In Early 2007, It Is Publicly Reported That Paulson Has Made A "Killing" On Its Short Subprime Strategy

In late February 2007, the subprime mortgage market suffered a dramatic drop in value, which Ms. Schwartz referred to at the time as an "insane sell off."  SUF ¶¶ 92-93.  The very large drop in value of subprime securities meant that investors with short positions, such as Paulson, made significant gains.  Throughout March 2007, the *New York Times*, the *Wall Street Journal*, the *Financial Times* and a variety of trade publications—including at least one article circulated at ACA—all reported that Paulson had made a "killing" on its "strong belief that the subprime market would fall apart," SUF ¶ 95, had "benefited" from "aggressively shorting US sub-prime mortgage bonds," SUF ¶ 94, had "hit paydirt" by "focus[ing] exclusively on short opportunities," SUF ¶¶ 96-97, was the "biggest winner" in the "collapse of the subprime market," SUF ¶ 98, had posted "record gains" by taking short positions "in mortgage-backed bonds in every strategy it employs," SUF ¶ 99, was "[a]mong the winners" with its "$100 million short subprime Credit Opportunities Fund," SUF ¶ 100, and had made profits from its "dedicated short subprime fund," SUF ¶ 101.

ACA representatives were well aware of these developments.  On Sunday, March 4, 2007, Ms. Schwartz, who regularly read the *New York Times*, and also read the *Wall Street Journal* and *Financial Times*, SUF ¶ 102, asked Mr. Tsai at UBS his opinion on the market movements.  SUF ¶ 103.  Mr. Tsai replied that "underfunds such as Paulson are up huge," while other hedge funds had gotten "hurt" on a "long only" strategy.  *Id.* (emphasis added).

Mr. Gorman of ACA testified that even though ACA saw the numerous press articles relating to Paulson's massive short positions, ACA continued to assume that Paulson could be taking a long equity position in ABACUS 2007-AC1, because other hedge funds that ACA was dealing with typically took long equity positions.  SUF ¶ 104.  Although ACA had repeated direct communications with Paulson, Mr. Gorman did not recall anyone at ACA asking anyone at Paulson whether ACA's assumption was, in fact, warranted.  SUF ¶ 105.

### G. Goldman's Management Approves The ABACUS 2007-AC1 Transaction

On March 12, 2007, senior managers on Goldman's Mortgage Capital Committee ("MCC") approved the ABACUS 2007-AC1 transaction, pursuant to a memo written by seven Goldman employees.  SUF ¶ 106.  The MCC was chaired by Dan Sparks, a Partner/Managing Director and head of Goldman's Mortgage Department, and included representatives from Goldman's Legal and Compliance departments, as well as various other departments.  SUF ¶ 107.  The MCC held a meeting at which it discussed the transaction, which was attended by Messrs. Egol and Gerst from the Correlation Desk.  SUF ¶ 108.  Mr. Tourre did not attend the MCC meeting.  *Id.*

After approving the transaction, the MCC sent a memorandum to Goldman's Firmwide Capital Committee, describing the transaction and noting that it had been approved. SUF ¶ 109.

### H.   ABACUS 2007-AC1 Closes On April 26, 2007

ABACUS 2007-AC1 closed on April 26, 2007.  SUF ¶ 110.  As the SEC's expert Dr. Dwight Jaffee recognized,[13] the offering circular discloses that no equity has been issued or sold in the transaction.  SUF ¶ 111.  On the same day, ACA's General Counsel Nora Dahlman signed a formal legal opinion stating that $192 million of notes were issued in the ABACUS 2007-AC1 transaction, *i.e.*, $142 million of Class A-2 notes and $50 million of Class A-1 notes. SUF ¶ 112.  Ms. Dahlman's legal opinion does not state that any equity is being issued.  *Id.*[14]

Every ACA representative to testify under oath in this matter has stated strongly and without hesitation that ACA did, in fact, select the ABACUS 2007-AC1 reference portfolio.[15]  SUF ¶ 114.  Indeed, ACA representatives have testified that ACA's work as Portfolio Selection Agent on ABACUS 2007-AC1 was similar to "every other" CDO that ACA was involved with during 2006-2007, and that ACA used the "standard process" that it used for all of its other transactions.  SUF ¶ 115.  This meant that every security in the ABACUS 2007-AC1 reference portfolio had been reviewed and approved by ACA's Collateral Committee, and that each security had undergone a full analysis, including testing under ACA's various stress scenarios.  *Id.*  In fact, ACA's CEO Alan Roseman directed his employees to make the ABACUS 2007-AC1 reference portfolio "bulletproof," and those employees testified that they fully endeavored to comply with his instruction.  SUF ¶ 116.

#### 1.   ACA Purchases $42 Million Of Class A-2 Notes

In ultimate testament to its belief in the strength of the reference portfolio it had selected, ACA put its money where its mouth was and invested its own money in the deal,

---

[13]   *See* Chepiga Decl., Ex. 69 (Jaffee Report), ¶ 33 (noting that the first loss tranche was not offered).

[14]   Similarly, ACA reported in its Form 10-Q for the quarter ended June 30, 2007 that the "Notional Deal Size" of the ABACUS 2007-AC1 transaction was $192 million, *i.e.*, $142 million of Class A-2 notes and $50 million of Class A-1 notes and no equity.  SUF ¶ 113.

[15]   The ABACUS 2007-AC1 offering circular contains a section entitled "The Portfolio Selection Agent," and ACA took "sole responsibility" for the accuracy and completeness of the information in that section, which provides that ACA "will, pursuant to the terms of the Portfolio Selection Agreement . . . select the Initial Reference Portfolio."  SUF ¶ 87.

purchasing $42 million of ABACUS 2007-AC1 Class A-2 notes.  SUF ¶ 117.  ACA's representatives testified that ACA decided to purchase the notes because it was comfortable with the reference portfolio it had selected, which compared favorably with other transactions in the market at the time.  SUF ¶ 118.  ACA paid for these notes upon the closing of the transaction on April 26, 2007.  SUF ¶ 119.

### 2. Loreley Financing Purchases $150 Million Of ABACUS 2007-AC1 Notes From London-Based Goldman Sachs International

Contrary to the Amended Complaint, *see* Am. Compl. ¶¶ 53-66, IKB did <u>not</u> purchase ABACUS 2007-AC1 notes.  Other than ACA, the only other purchasers of ABACUS 2007-AC1 notes were two British Channel Islands-based companies, Loreley Financing (Jersey) No. 29 Ltd. ("Loreley No. 29") and Loreley Financing (Jersey) No. 30 Ltd. ("Loreley No. 30," and, collectively with Loreley No. 29, the "Loreley Companies").  SUF ¶¶ 120-121.  The Loreley Companies are independent companies, incorporated and located on the island of Jersey in the English Channel, and are not affiliated with IKB.  SUF ¶¶ 122-123.  The Loreley Companies' decisions to invest in ABACUS 2007-AC1 securities were made solely by the Loreley Companies themselves.  SUF ¶ 124.  In making investment decisions, the Loreley Companies were advised by investment committees composed of four members, only one of whom was from IKB, and three of whom were from other well-known financial institutions.  SUF ¶ 125.

Loreley No. 29 purchased $50 million of ABACUS 2007-AC1 Class A-1 Notes, and Loreley No. 30 purchased $100 million of Class A-2 Notes.  SUF ¶¶ 120-121.  The Loreley Companies purchased the notes pursuant to SEC Regulation S from London-based Goldman Sachs International ("GSI"), which is located at Peterborough Court, 133 Fleet Street, London, and is "Authorized and Regulated by the Financial Services Authority," the British securities regulator.  SUF ¶¶ 120-121, 127-128.  No one at the Loreley Companies ever met or communicated with Mr. Tourre.  SUF ¶ 126.

The record is bereft of any evidence as to what advice was provided to the Loreley Companies by three of the four members of the investment committee.  IKB provided to the Loreley Companies an analysis of the ABACUS 2007-AC1 transaction that addressed ACA under the heading "Threats," and which described ACA as lacking prudence and as being sub-par with respect to other relevant competencies.  IKB nonetheless recommended an investment in the ABACUS 2007-AC1 notes based on the tranche level of the notes in the ABACUS 2007-AC1 capital structure, the expected interest payments on the notes, and the quality of the reference portfolio.  SUF ¶ 129.  IKB also projected that losses on the ABACUS 2007-AC1 reference portfolio would be 6.80%, more than three times below the tranche level of 21% at which IKB recommended investing.  SUF ¶ 130.

### 3. Paulson Purchases Protection On The ABACUS 2007-AC1 Reference Portfolio

Consistent with the disclosure in the offering circular,[16] on April 26, 2007, Paulson entered into CDS transactions to purchase short positions on the same tranches and amounts of ABACUS 2007-AC1 notes purchased by ACA and the Loreley Companies, effectively buying from Goldman the initial short position created by the transaction.  SUF ¶ 132.

### I. Investments In The ABACUS 2007-AC1 Super-Senior Tranche

### 1. On May 31, 2007, The London Branch Of ABN Amro Enters Into A Credit Default Swap Transaction With London-Based Goldman Sachs International

On May 31, 2007, more than a month after the closing of the ABACUS 2007-AC1 note offering, the London branch of Dutch bank ABN Amro ("ABN Amro") entered into an English law-governed swap contract to sell protection to London-based GSI on the 50-100%

---

[16] *See* SUF ¶ 133 (The ABACUS 2007-AC1 offering circular dated Apr. 26, 2007 provides that the initial "Protection Buyer," a Goldman Sachs affiliate, "may hold long or short positions with respect to Reference Obligations . . . and may enter into credit derivative or other derivative transactions with other parties pursuant to which it sells or buys credit protection with respect to one or more related Reference Entities and/or Reference Obligations.").

super-senior tranche of the ABACUS 2007-AC1 reference portfolio.  SUF ¶ 134.  This swap

transaction was executed pursuant to a Master Agreement entered into between these two

European entities in 1996.  SUF ¶ 135.

   Contrary to the allegation in the Amended Complaint, *see* Am. Compl. ¶ 70, no

one at ABN Amro received any of the ABACUS 2007-AC1 offering documents.  SUF ¶ 136.

Michael Nartey, head of the United Kingdom sales team at GSI in London, supervised the

business relationship with the London branch of ABN Amro, while another London-based GSI

salesman, Charlie Remnant, "covered" ABN Amro on a day-to-day basis, and was "the sales

person who did the trade."  SUF ¶¶ 137-139.

### 2. On May 31, 2007, ACA Structured Credit Issues A Financial Guaranty Insurance Policy For The Super-Senior Tranche

   As noted above, ACA's structured credit business model depended upon its

affiliated insurance company taking long positions on "super senior" tranches of CDOs.  On May

31, 2007, in further testament to its belief in the strength of the ABACUS 2007-AC1 reference

portfolio it selected, ACA Structured Credit issued a financial guaranty insurance policy to ABN

Amro for the approximately $900 million 50-100% tranche of ABACUS 2007-AC1.  SUF ¶ 140.

ACA had considered making this investment throughout February, March, April and May 2007,

undertook numerous analyses of the transaction and reference portfolio, and concluded that

ACA's investment would not suffer any losses.  SUF ¶ 141.  ACA approved the transaction on

May 15, 2007, but was not committed to it until the actual transaction date of May 31, 2007.

SUF ¶ 142.

### 3. Paulson Purchases Protection On The Super Senior Tranche

   Also on May 31, 2007, Paulson entered an additional CDS transaction with GSI

to purchase protection on the 45-100% tranche of the ABACUS 2007-AC1 reference portfolio.

SUF ¶ 143.  Because GSI sold protection to Paulson on the 45-100% tranche but purchased

protection from ABN Amro on the 50-100% tranche, GSI held a long position on the 45-50%

tranche.  SUF ¶ 144.

## STANDARD OF LAW

Summary judgment is appropriate where the movant demonstrates, "based on admissible evidence in the record placed before the court, 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hester v. Navigators Ins. Co.*, --- F. Supp. 2d ---, 12 Civ. 4033 (KBF), 2013 WL 264807, at * 4 (S.D.N.Y. Jan. 23, 2013) (quoting Fed. R. Civ. P. 56(a)).  When the other party bears the burden of proof, the movant may discharge its "burden by demonstrating to the Court there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 10 Civ. 4933 (ALC) (GWG), 2013 WL 81263, at *2 (S.D.N.Y. Jan. 8, 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant "has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial." *Hester*, 2013 WL 264807, at *4 (internal citations omitted).  Conclusory allegations and denials "cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted). Nor is the "mere existence of a scintilla of evidence" sufficient to defeat summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  Rather, "[t]o avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor." *Spanski*, 2013 WL 81263, at *3 (citation omitted).

## ARGUMENT

The parties have briefed and argued on several occasions the impact on the SEC's claims of the Supreme Court's decision in *Morrison*.  In his motion to dismiss the Amended Complaint, Mr. Tourre demonstrated that the IKB and ABN Amro transactions alleged in the Amended Complaint were unambiguously foreign transactions not subject to the federal securities laws. *See* ECF No. 52 at 12-15.  In its June 10, 2011 Order partially granting Mr.

Tourre's motion, the Court agreed that the SEC had pled no facts that would permit a finding that these were "domestic transactions," as required by *Morrison*, and dismissed claims related to Section 10(b) and Rule 10b-5 of the Exchange Act, and also dismissed claims related to "sales" under Section 17(a) of the Securities Act.  *See Goldman Sachs*, 790 F. Supp. 2d at 166.

However, the Court, relying on pre-*Morrison* cases and the broad statutory definition of "offer," declined to dismiss the Section 17(a) claims related to "offers" to IKB and ABN Amro, despite the Court's conclusion that the IKB and ABN Amro transactions are unambiguously foreign.  As neither party had briefed, argued or supported this bifurcation, Mr. Tourre moved the Court to reconsider its order, which was denied, after which Mr. Tourre moved the Court for certification of an interlocutory appeal on the bifurcation of one transaction into component parts for *Morrison* purposes.  *See* ECF Nos. 96, 101, 103.  The Court denied Mr. Tourre's motion, but recognized that, as this was an "issue of first impression," it would have to re-consider on summary judgment the viability of the bifurcated "offer" claim.  *See* ECF No. 116 (Order dated Oct. 17, 2011).

Discovery in this matter has now closed, and it is clear that the SEC cannot demonstrate that domestic "offers" were made to IKB and ABN Amro, as required by *Morrison*. Indeed, the SEC has never been able to explain how, under *Morrison*, domestic "offers" can be made to enter into wholly foreign transactions, such as those at issue here.  Further, the SEC has failed to adduce any evidence in discovery that provides any basis for holding Mr. Tourre primarily liable for "offers" to IKB and ABN Amro.  Mr. Tourre should now be granted summary judgment on these claims.

The Court should also grant summary judgment on the SEC's claim that Mr. Tourre is responsible for alleged offers made by Goldman's New York-based syndicate desk to unnamed domestic investors.  *See* Am. Compl. ¶ 66.  This allegation is, and has always been, a contrivance, slipped in to the SEC's Amended Complaint following Mr. Tourre's original motion for judgment on the pleadings, in an attempt to avoid dismissal pursuant to *Morrison*.  Despite the SEC's representation to the Court at oral argument on Mr. Tourre's motion to dismiss that it

would put some "meat on that bone" by taking discovery into these supposed offers, the SEC has not done so.

## I.     THE SEC CANNOT SUSTAIN ITS CLAIMS BASED ON "OFFERS" ALLEGEDLY MADE TO IKB AND ABN AMRO

### A.     The "Offer" Claims Pertaining To The Alleged IKB And ABN Amro Transactions Are Legally Unsustainable Under *Morrison*

#### 1.     The Federal Securities Laws Apply Only To "Parties" Or "Prospective Parties" To Domestic Securities Transactions

The June 10, 2011 Order erroneously extended the antifraud provisions of the Securities Act to offers allegedly made to prospective parties to *foreign* transactions, *i.e.*, to what the Amended Complaint alleged were offers made to IKB and to ABN Amro.  That ruling cannot be reconciled with *Morrison*, which established a transactional test that limits the applicability of the federal securities laws to "parties or prospective parties" to "purchases and sales of securities in the United States."  *See Morrison*, 130 S. Ct. at 2884 (emphasis added).  The *Morrison* court determined that domestic transactions are the "objects" of the "solicitude" of the securities laws, "[i]t is those transactions that the statute seeks to regulate," and the federal securities laws thus apply "only" to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.* (citations omitted).[17]

As the Court is aware from prior briefing by the parties in this matter,[18] the Supreme Court considered, and rejected, the SEC's argument that the securities laws should have broader geographical scope in SEC actions than they have in private lawsuits.  Instead, the Supreme Court made clear that it was resting its disposition of the case on the scope of the

---

[17]  The Supreme Court made clear that domestic, pre-transactional conduct is not sufficient to make a transaction "domestic" for purposes of the transactional test:  "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Morrison*, 130 S. Ct. at 2884 (emphasis in original).

[18]  *See* ECF No. 161 (Mr. Tourre's Mem. of Law in Response to the Court's Questions dated Oct. 26, 2012), at 8-15.

statute's substantive prohibition.  *See Morrison*, 130 S. Ct. at 2883 ("In short, there is no affirmative indication in the Exchange Act that §10(b) applies extraterritorially, and we therefore conclude that it does not."); *see also id.* at 2884 (determining what were the "transactions . . . to which §10(b) applies.").

Although the specific facts at issue in *Morrison* concerned Section 10(b) of the Exchange Act, the court recognized that the Securities Act and the Exchange Act share the "same focus on domestic transactions."  *Morrison*, 130 S. Ct. at 2885.  Relying in part on SEC Regulation S, 17 CFR § 230.901 *et seq.* ("Reg. S"), the court noted that the Securities Act and the Exchange Act were "enacted by the same Congress" and "form[] part of the same comprehensive regulation of securities trading."  *Id.* (citations omitted).  As this Court held in *In re Smart Techs. Inc., Securities Litigation*, No. --- F.R.D. ---, 11 Civ. 7673 (KBF), 2013 WL 139559 (S.D.N.Y. Jan. 11, 2013), "[c]ourts in this District uniformly concur that *Morrison*'s prohibition on extraterritoriality applies to Securities Act claims."  *Id.* at *4 (collecting cases).

Reg. S, issued by the SEC and effective May 2, 1990, exempts "offers and sales that occur outside the United States" from the Securities Act's registration requirements.  17 C.F.R. § 230.901.  As the Preliminary Notes to Reg. S make clear, "Regulation S is available only for offers and sales of securities outside the United States."  *See* 17 C.F.R. § 230 (Preliminary Note, ¶ 6).  In its Release accompanying the promulgation of Reg. S, the SEC confirmed that domestic issuers may initiate "sales communications to non-U.S. persons <u>from</u> the United States" without violating Reg. S.  *See* Offshore Offers & Sales, Securities Act Release No. 33-6863, 1990 WL 311658, at *n.65 (Apr. 24, 1990) (emphasis added).  Indeed, Reg. S provides that an "offer" of securities "shall be deemed to occur outside the United States" in an "offshore transaction" where the "offer is <u>not made to a person in the United States</u>."  *See* 17 C.F.R. §§ 230.903(a), 230.902(h) (emphasis added).

Further, the SEC explained that it was not extending Reg. S to the antifraud provisions of the securities laws only because the courts had held that those provisions had extraterritorial effect under the now-discredited conduct and effects tests.[19]

The same policy concerns that animated the *Morrison* decision—international comity and the wish to avoid exposing participants in the global securities industry to overlapping and potentially conflicting regulatory requirements—also motivated the SEC's approach to "offers" and "sales" in Reg. S. *See* Offshore Offers & Sales, 1990 WL 311658 at *5; *Morrison*, 130 S. Ct. at 2885-86.[20]

Post-*Morrison* courts have confirmed the soundness of this approach. As the district court noted in *Absolute Activist Value Master Fund Ltd. v. Homm*, No. 09 CV 08862 (GBD), 2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010), *aff'd in part, rev'd in part on other grounds and remanded*, 677 F.3d 60, it would be "illogical, and inconsistent with *Morrison*" to extend the federal securities laws to foreign investors who deliberately "avoid the regulations imposed by federal securities laws that apply to domestic market transactions." *Id.* at *5. Similarly, the Honorable John G. Koeltl held in *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166 (S.D.N.Y. 2010), that applying Section 10(b)

---

[19] *See* Offshore Offers & Sales, Securities Act Release No. 33-6863, 1990 WL 311658, at *5 (Apr. 24, 1990) ("While it may not be necessary for securities sold in a transaction that occurs outside the United States, but touching this country through conduct or effects, to be registered under United States securities laws, such conduct or effects have been held to provide a basis for jurisdiction under the antifraud provisions of the United States securities laws.") (emphasis added), *abrogated by Morrison*, 130 S. Ct. at 2877-81.

[20] In its Release accompanying the adoption of Reg. S, the SEC explained that a "territorial approach" to the registration provisions was appropriate because "[p]rinciples of comity and the reasonable expectations of participants in the global markets justify reliance on laws applicable in jurisdictions outside the United States to define requirements for transactions effected offshore." Offshore Offers & Sales, 1990 WL 311658 at *5. Similarly, in *Morrison*, the Supreme Court observed that other countries regulate securities transactions within their territorial jurisdictions, that regulatory approaches often differ from country to country, and that its "transactional test" was calculated to avoid the "interference with foreign securities regulation that application of § 10(b) abroad would produce." *See Morrison*, 130 S. Ct. at 2885-86.

whenever a U.S. purchaser places a buy order from the United States would "produce the regulatory multiplicity that the Supreme Court has directed courts to avoid." *Id.* at 177.

> **2.     The Bifurcation Of A Transaction Into A Domestic "Offer"**
> **And Foreign "Sale" Is Not Supported By The Cases Cited In**
> **The June 10, 2011 Decision, And Contradicts The Legislative**
> **History**

The Court's suggestion in its June 10, 2011 order that the IKB and ABN Amro transactions could be bifurcated into domestic "offers" and foreign "sales," *see Goldman Sachs*, 790 F. Supp. 2d at 164-65, is inconsistent with *Morrison*.  The "offer" claims should have been dismissed as a matter of law at the pleading stage, and they remain legally unsustainable now.

The Court permitted the "offer" claims to proceed to discovery based on the broad definition of "offer" in the Securities Act, *see* 15 U.S.C. § 77b(a)(3), as well as on pre-*Morrison*, out of circuit cases.  *See Goldman Sachs*, 790 F. Supp. 2d at 164-65.   As Mr. Tourre showed in his motion for reconsideration, when the statutory definition of "offer" is applied in context, as the statute requires, *see* 15 U.S.C. § 77b(a), it is clear that it cannot, for *Morrison* purposes, include offers to enter into consummated, foreign transactions.[21]  Indeed, post-*Morrison* courts reading the definitions in context have determined that a broad reading is unsupportable.  In *Plumbers' Union*, Judge Koeltl held, in applying *Morrison*, "purchase" could not have the expansive definition set forth in the Exchange Act, because that would make a transaction domestic simply because the purchaser placed a buy order from the United States, which would be contrary to *Morrison*.  *Plumbers' Union*, 753 F. Supp. 2d at 177.[22]

Further, none of the cases cited by the Court supports the Court's conclusion.  All of these cases pre-date *Morrison*, *see Goldman Sachs*, 790 F. Supp. 2d at 164-65, and either did

---

[21]  *See* ECF No. 96 (Mr. Tourre's Mem. of Law. in Support of his Mot. for Limited Reconsideration), at 3-4.

[22]  The Supreme Court has noted how imprecise and circular the definitions included in the federal securities laws are.  *See SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 466 (1969) ("The relevant definitional sections of the 1934 Act are for the most part unhelpful; they only declare generally that the terms 'purchase' and 'sale' shall include contracts to purchase or sell.").

not involve completed transactions such as those at issue here, or did not address Section 17(a) at all.  *See* ECF No. 96 (Mr. Tourre's Mem. of Law. in Support of his Mot. for Limited Reconsideration), at 6-7.

The June 10, 2011 Order is also contrary to the legislative history of the Securities Act.[23]  As originally enacted in 1933, the statute did not regulate "offers" separately from "sales"—Section 17 prohibited fraud only in relation to "sales."  Indeed, "sale" was defined to include offers to sell, making clear that "offers" were not intended to be divisible from "sales."  *See* H.R. Rep. No. 1542 (1954), *reprinted in* 2 United States Code Congressional and Administrative News, 1954, at 2979-82 (1954).

In 1954, in a "highly technical" amendment, Congress amended the Securities Act in order to encourage the use of preliminary prospectuses, a practice which would create a period of time in the market during which sales of securities were prohibited but offers could be made.  Congress added the word "offer" to Section 17(a) to cover this period during which sales were not permitted.  *See id.* at 2993; Arthur H. Dean, *Twenty-Five Years of Federal Securities Regulation by the Securities and Exchange Commission*, 59 Colum. L. Rev. 697, 714-15 (1959).[24]

As then-SEC Chairman Ralph H. Demmler and Commissioner J. Sinclair Armstrong explained, this amendment did "not work any fundamental change" to the Securities Act.  *See* Ralph H. Demmler and J. Sinclair Armstrong, *The Federal Securities Laws:  The Scope and Effect of the New Amendments*, 41 A.B.A. J. 133, 135 (1955).[25]  Rather, these amendments

---

[23]   *See* ECF Nos. 96 (Mr. Tourre's Mem. of Law. in Support of his Mot. for Limited Reconsideration), at 5-6; 100 (Mr. Tourre's Reply Mem. of Law in Further Support of his Mot. for Limited Reconsideration), at 6-8.

[24]   Specifically, in the 1954 amendment, "sale" was redefined to include "every contract of sale or disposition of a security or interest in a security, for value," and "offer" was given a separate definition as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  *See* Pub. L. No. 83-577, Title I, § 1 (Aug. 10, 1954).

[25]   As the Demmler and Armstrong article is not readily available on standard legal research databases, Mr. Tourre has attached it as Exhibit 89 to the Chepiga Declaration.

permitted "written offers to sell and solicitation of offers to buy during the waiting period by means of a preliminary prospectus," a period during which a registration statement was not yet effective and the conclusion of any sales was thus prohibited.  *See id.* at 134-35.[26]

Congress added the word "offer" to Section 17(a) purely to ensure its consistency with the amendments made to other sections of the Securities Act.  *See* H.R. Rep. No. 1542 (1954), *reprinted in* 2 United States Code Congressional and Administrative News, 1954, at 2999 (1954) (listing as one of the "[t]echnical changes" in the 1954 amendments the addition of "the word 'offer' to sections 12, 17 and 22 of the Securities Act in order to make clear that the civil and penal liabilities and sanctions imposed by the statute shall remain unchanged.").

As the legislative history demonstrates, the term "offer" was added to Section 17(a) for the sole purpose of ensuring that, after the 1954 amendments, offers made during the waiting period (when sales still could not be consummated) would remain subject to the antifraud provisions of Section 17(a).  Nothing in the legislative history supports the idea that Congress intended to create two separately-actionable claims under Section 17(a) with respect to a single consummated transaction, nor is there any support for the bifurcation of a single consummated transaction into a domestic "offer" and a foreign "sale" for *Morrison* purposes.

Indeed, post-*Morrison* courts considering Section 17(a) claims have sustained "offer" claims where there is evidence that offers have been made to *domestic* investors to enter into *domestic* transactions.  *See*, *e.g.*, *United States v. Sumeru*, 449 Fed. Appx. 617, 621 (9th Cir. 2011) (concluding that defendants solicited potential investors located in the United States).

---

[26] *See also* Morris L. Forer, *A Comment on the Amendments to the Federal Securities Act*, 103 U. Pa. L. Rev. 1020, 1028 (1955) (noting that the 1954 amendments sought only to "remove[e] the difficult concept of the pre-October, 1954 practice:  that it was permissive (and even obligatory under [SEC] administration) for an issuer or underwriter to disseminate information during the waiting period but that it was illegal to offer or solicit offers").

**B.** **Even If The June 10, 2011 Order Were Legally Sustainable, There Is No Evidentiary Basis For The SEC's Claims That Mr. Tourre Made Domestic Offers To IKB And ABN Amro**

**1.** **The SEC Cannot Sustain Its Claim That Mr. Tourre Made A Domestic Offer To IKB**

Mr. Tourre should be granted summary judgment as to the claim that he made a fraudulent "offer" to IKB because the SEC cannot identify any evidence that would permit a jury to return a verdict in its favor on that claim. *See Spanski*, 2013 WL 81263, at *2.

Discovery has shown the Amended Complaint's repeated allegations that IKB "bought" $150 million of ABACUS 2007-AC1 securities and "invested in the transaction," *see* Am. Compl. ¶¶ 61, 64, to be utterly false. Rather, the securities at issue were purchased by the Loreley Companies, a fact conceded by the SEC in recent motion papers.[27] *See* SUF ¶¶ 120-121. The Loreley Companies are independent entities, incorporated and located on the island of Jersey in the English Channel, and are <u>not</u> affiliates of IKB. *See* SUF ¶¶ 122-123. The Loreley Companies' decision to invest in ABACUS 2007-AC1 securities was made solely by the Loreley Companies themselves. SUF ¶ 124.

Far from being an investor in ABACUS 2007-AC1 securities, IKB was just one of four investment advisors to the Loreley Companies, and there is no evidence in the record as to what recommendations the Loreley Companies' three other investment advisors made. SUF ¶ 125.

Moreover, IKB's relationship with Goldman Sachs International was managed by London-based GSI employee Michael Nartey, who testified that it was his responsibility to communicate with Germany-based IKB. *See* SUF ¶ 131. Consistent with the European-based nature of the parties, the Loreley Companies purchased the ABACUS 2007-AC1 securities from London-based GSI, a company located on Fleet Street, London, and which is "Authorized and Regulated by the Financial Services Authority," the British securities regulator. *See* SUF ¶¶

---

[27] *See* ECF No. 144 (SEC's Mem. of Law in Support of its Mot. For Partial Relief, dated June 15, 2012), at 2 n.2.

120-121, 127-128.  As recognized in the Amended Complaint, Mr. Tourre was not an employee of Goldman Sachs International in London, but rather was an employee of New York-based Goldman, Sachs & Co., and the desk on which Mr. Tourre worked was "located in New York City."  *See* Am. Compl. ¶¶ 1, 11.

Indeed, the director of the Loreley Companies testified that no one at the Loreley Companies ever met or communicated with Mr. Tourre.  SUF ¶ 126.  The SEC has not developed any facts in discovery that would explain how Mr. Tourre could have offered securities to an investor he never met or spoke with.  The SEC has not asserted any claims for aiding and abetting the Section 17(a) "offer," and it can not do so, because aiding and abetting liability was added to the Securities Act only in July 2010 by Section 929M of the Dodd-Frank Act, Pub. L. 111-203,[28] and the relevant section is not retroactive.  *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 307 (1994) (a federal statute is presumed to be prospective unless there is a "clear expression of congressional intent to reach cases that arose before its enactment.").

Under all these circumstances, the SEC cannot sustain its burden of proof with respect to the alleged "offer" to IKB, so the Court should grant summary judgment in favor of Mr. Tourre.

**2.      The SEC Cannot Sustain Its Claim That Mr. Tourre Made A Domestic Offer To ABN Amro**

In the same way, the Court should grant Mr. Tourre summary judgment on the SEC's claim that he made a fraudulent domestic offer to ABN Amro.  The SEC has failed to develop any facts in discovery that demonstrate how Mr. Tourre could have made any "offer"— much less a "domestic" offer—to the London branch of Dutch bank ABN Amro to enter into its English-law governed contractual swap agreement with London-based Goldman Sachs International, pursuant to a Master Agreement entered into by these two European entities in 1996.  *See* SUF ¶¶ 134-135.

---

[28]  Section 929M of the Dodd-Frank Act is codified at 15 U.S.C. § 77o(b).

Although the Amended Complaint alleges that Goldman "sent ABN [Amro] copies of the ABACUS 2007-AC1 term sheet, flip book and offering memorandum," *see* Am. Compl. ¶ 70, the SEC is simply wrong.  The senior ABN Amro banker testified that ABN Amro did <u>not</u> receive any of those documents.  SUF ¶ 136.

Further, as with IKB, it was London-based GSI employees who managed the business relationship with the London branch of ABN Amro.  Mr. Nartey, head of United Kingdom sales at GSI, testified that he supervised the GSI-ABN Amro relationship, and another London-based GSI employee, Charlie Remnant, "covered" ABN Amro and was "the sales person who did the trade" with ABN Amro.  *See* SUF ¶¶ 137-139.

As with IKB, the SEC has failed to adduce any evidence that ABN Amro was in any respect a "part[y] or prospective part[y]" to "purchases and sales of securities in the United States," *Morrison*, 130 S. Ct. at 2884, so summary judgment should be granted on this claim.

## II. THE SEC CANNOT SUSTAIN ITS CLAIM BASED ON "OFFERS" PURPORTEDLY MADE TO UNIDENTIFIED DOMESTIC INVESTORS

In its opposition to Mr. Tourre's September 2010 motion for judgment on the pleadings, the SEC, facing dismissal of its complaint pursuant to *Morrison*, promised the Court that, if granted leave to amend its complaint, it could plead that ABACUS 2007-AC1 notes were offered to specific investors in the United States.  *See* ECF No. 35, at 3, 12-13.  When it actually filed its Amended Complaint in November 2010, however, the SEC was unable to make good on this bold promise.  Instead of pleading that Mr. Tourre made specific domestic offers, the SEC included only a generic, unadorned allegation that "[s]ecurities or security-based swap agreements relating to ABACUS 2007-AC1 were marketed to additional investors through [Goldman's] structured products syndicate desk located in New York."  *See* Am. Compl. ¶ 66.

Mr. Tourre moved to dismiss this wholly inadequate assertion for failure to meet the pleading specificity requirements of Federal Rule of Civil Procedure 9(b).  *See* ECF No. 52. At oral argument, the deputy director of the SEC's Division of Enforcement begged the Court for an opportunity to develop evidence to support this claim, stating that "[t]o be candid, your

Honor, I think we're going to have to wait for discovery to put a little bit more meat on that bone." *See* Chepiga Decl., Ex. 88 (Tr. dated Feb. 14, 2011), at 44. The SEC stated that the Goldman Sachs syndicate desk in New York—of which Mr. Tourre was <u>not</u> a member—sent out an "e-mail blast to a number of financial institutions, domestic and foreign, promoting the [ABACUS 2007-]AC1 transaction," and the SEC represented to the Court that it intended to conduct discovery in order to determine what "meetings, conversations, etc., took place" following the email sent by the syndicate desk. *Id.*

Based on the SEC's promise to substantiate its allegation during discovery, the Court declined to dismiss the claim at the motion to dismiss stage. *See Goldman Sachs*, 790 F. Supp. 2d at 165-66. The SEC has, however, failed to develop evidence that would permit a jury to decide this claim in its favor. Domestic discovery closed in this matter on May 31, 2011, and the SEC has never put any "meat on that bone," nor has it ever identified any witness who can testify to any of these supposed "offers," much less adduced any evidence to support its attempt to make Mr. Tourre responsible for these alleged offers that purportedly were made by other people.

Indeed, despite its representations to the Court, the SEC has failed to take any depositions, serve any document subpoenas, or develop any facts about any "meetings" or "conversations" that took place with prospective investors as a result of these alleged emails, and the parties (and the Court) know nothing more about these supposed "offers" of securities than was known when the SEC filed its Amended Complaint. The single fact that has been established about Goldman's syndicate desk is that it did <u>not</u> interact with clients, but was a "conduit for information" between Goldman Sachs' product desks, such as the one on which Mr. Tourre worked, and the Goldman Sachs sales force. *See* SUF ¶ 145.

In light of the complete failure of proof, the Court should grant Mr. Tourre summary judgment on this claim. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (affirming the dismissal of claims on summary judgment, noting that, at the summary judgment stage, it is time for the plaintiff to "put up or shut up") (citations omitted); *Spanski*,

2013 WL 81263, at *2 (movant's summary judgment burden is met by demonstrating "an absence of evidence to support the non-moving party's case on which that party would have the burden of proof.").

**CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court grant his motion for partial summary judgment, and dismiss the Amended Complaint dated November 22, 2010 insofar as it purports to assert claims under Section 17(a) of the 1933 Securities Act as to "offers" allegedly made to IKB Deutsche Industriebank AG, to ABN Amro Bank NV, and to unidentified domestic investors.

Dated:  March 1, 2013
New York, New York

Respectfully submitted,

/s/ Pamela Rogers Chepiga
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
David C. Esseks
(david.esseks@allenovery.com)
Andrew Rhys Davies
(andrew.rhys.davies@allenovery.com)
Brandon D. O'Neil
(brandon.o'neil@allenovery.com)

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*