**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No.: 10-cv-3229 (KBF) |
| Plaintiff, | |
| v. | ELECTRONICALLY FILED |
| FABRICE TOURRE, | |
| Defendant. | |

## MEMORANDUM OF LAW OF FABRICE TOURRE IN SUPPORT OF HIS DAUBERT MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF IRA WAGNER

Pamela Rogers Chepiga
David C. Esseks
Andrew Rhys Davies
Brandon D. O'Neil

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

Dated:  March 8, 2013
New York, New York

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................3

    A.    Ira Wagner's Background .........................................................................3

    B.    Wagner's Undisclosed Pre-Formed Negative Opinions About The
        ABACUS 2007-AC1 Transaction And His Positive Views Of ACA ....................3

    C.    Wagner's Opinions ...................................................................................7

        1.    The ABACUS 2007-AC1 Offering Documents Were Materially
               Misleading, Because They Failed To Disclose Paulson's
               "Atypical" Role In Portfolio Selection ......................................................7

        2.    It Is "Unlikely" That The ABACUS 2007-AC1 Transaction Would
               Have Been Completed If Paulson's Role Had Been Disclosed
               Because ACA Reasonably Believed That Paulson Was An Equity
               Investor, And ACA Would Not Have Served As Portfolio
               Selection Agent If Paulson's Purely Short Interest Had Been
               Disclosed.................................................................................................7

        3.    It Is "Unlikely" That IKB Would Have Invested In ABACUS If
               Paulson's "Atypical" Involvement Had Been Disclosed............................9

        4.    Paulson's "Atypical" Involvement "Compromised" ACA's
               Independent Portfolio Selection Process ...................................................9

        5.    Mr. Tourre Was "Primarily Responsible" For The ABACUS
               Transaction...........................................................................................11

        6.    The Comparative Analyses Conducted By Mr. Tourre's Expert
               Witnesses Are "Flawed," But Wagner Has Not Conducted The
               Kind Of Analysis He Says Would Be "More Relevant" ..........................11

STANDARD OF LAW...............................................................................................12

ARGUMENT.............................................................................................................13

i

I.    WAGNER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE,
      CONTRARY TO THE REPRESENTATIONS IN HIS REPORT, HE FORMED
      HIS OPINIONS BASED ON INADMISSIBLE EVIDENCE BEFORE HE
      REVIEWED THE EVIDENCE IN THIS MATTER .......................................................13

II.   WAGNER'S OPINIONS ARE INADMISSIBLE BECAUSE THEY CONSIST
      LARGELY OF THE NARRATION OF FACT EVIDENCE AND
      CONCLUSIONS AS TO THE ULTIMATE LEGAL ISSUES IN THIS CASE .............16

      A.    Wagner Usurps The Jury's Role By Narrating And Commenting Upon
            Factual Evidence ...............................................................................................16

      B.    Wagner Usurps The Jury's Role By Opining On The Ultimate Legal
            Issues In The Case ..............................................................................................18

      C.    Wagner Should Not Be Permitted To Testify About The List Of CDOs
            Attached To His Rebuttal Report Because It Is Neither Helpful To The
            Jury Nor Reliable ...............................................................................................19

CONCLUSION.......................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989) ................................................................17

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) ................................................................13

*Daubert v. Merrell Down Pharms., Inc.*,
  509 U.S. 579 (1993) .............................................................12, 19

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ................................16

*Island Intellectual Prop. LLC v. Deutsche Bank AG*,
  No. 09 Civ. 2675, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2013) ............16

*Koppell v. N.Y. State Bd of Elections*,
  97 F. Supp. 2d 477 (S.D.N.Y. 2000) ................................14

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................12

*Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*,
  873 F.2d 502 (2d Cir. 1989) ................................14

*In re Rezulin Products Liability Litigation*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................1, 13, 14, 17

*Snyder v. Wells Fargo Bank, N.A.*,
  No 11 Civ. 4496, 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ............16

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ................................ passim

*United States v. Onumonu*,
  967 F.2d 782 (2d Cir 1992) ................................14

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987) ................................13

## RULES AND STATUTES

Fed. R. Civ. P 26(a)(2)(B) ................................14

Fed. R. Civ. P. 37(c)(1) ........................................................................................................14

Fed. R. Evid. 403 ..................................................................................................................14

Fed. R. Evid. 702 .........................................................................................................12, 14, 19

Fed. R. Evid. 703 .................................................................................................................9, 14

Defendant Fabrice Tourre respectfully submits this memorandum of law in support of his *Daubert* motion, pursuant to Federal Rules of Evidence 403, 702 and 703, and Federal Rules of Civil Procedure 26 and 37, for exclusion of the proposed expert testimony of Ira Wagner in its entirety.

## PRELIMINARY STATEMENT

The fact that the SEC lacks any credible fact witnesses to support its case theory does not justify the proffer of a purported expert whose proposed testimony does nothing more than marshal and narrate the SEC's version of the facts and present ultimate legal conclusions under the guise of industry expertise.  Wagner, one of three expert witnesses the SEC has proffered in this case, is a classic advocate masquerading as an expert—someone whose role, as the Honorable Lewis A. Kaplan put it in *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)—"is more to argue the client's case from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit."  *Id.* at 538.

Wagner's opinions, which merely narrate factual evidence and opine on the ultimate legal issues, are inadmissible under the familiar *Daubert* standards because they would usurp the jury's role in assessing factual evidence and applying the evidence to the law as instructed by the Court.  More fundamentally than that, however, Wagner should be disqualified because—although he did not disclose this in his report—he formed the opinions he intends to offer in this case before he was retained as an expert in 2010, and before he reviewed any of the evidence in this matter.

Although none of this was disclosed in his reports, discovery and counsel's independent investigation revealed that, in 2006 or 2007, in his role as head of the global CDO group at failed investment bank Bear Stearns, Wagner met with the Paulson firm and formed strong negative opinions about the ABACUS 2007-AC1 transaction—a transaction that Wagner assumes to be the same as a transaction Paulson asked Wagner's group at Bear Stearns to

undertake before it approached Goldman Sachs.  Having formed those opinions based on his own interactions with Paulson, in 2010, before he reviewed any of the evidence in this case, Wagner testified to the Financial Crisis Inquiry Commission, and provided to the FCIC the core negative opinions about the ABACUS 2007-AC1 transaction that he now seeks to offer to the jury in this case.

But for the fact that Mr. Tourre's counsel uncovered Wagner's undisclosed personal involvement and pre-formed views through independent research, the Court and the jury would have been misled by Wagner's materially misleading representation that "[a]ll opinions and conclusions stated in this report are based on my training and expertise described below and analysis of the documents listed in Exhibit 1."  Wagner Report at 4.  Moreover, as a result of Wagner's undisclosed personal involvement and pre-formed opinions, to cross-examine Wagner, Mr. Tourre would need to introduce significant amounts of otherwise inadmissible, irrelevant, and prejudicial evidence.

Not only that, but Wagner and his group at Bear Stearns had a long-standing—but again, undisclosed—relationship with ACA, the purported victim of the fraud alleged in this case.  Wagner and his group at Bear Stearns marketed ACA's services to clients using marketing materials that bore the names of both firms, did transactions with them, and treated them to dinners at some of New York's most expensive restaurants.  In the course of that close relationship, Wagner developed positive views of the ACA witnesses in this case, whose testimony he now credits in support of his opinions.

As Wagner's reports fail utterly to accomplish any task permissible for an expert, and because Wagner reached his opinions based on his own interactions with Paulson and with ACA, while misrepresenting that his opinions were based on the record in this case, Wagner's proposed testimony should be excluded in its entirety to avoid needlessly complicating and prejudicing the trial of this action.

## BACKGROUND

### A.     Ira Wagner's Background

The SEC proffers Ira Wagner as a CDO industry expert, a role for which he purports to be qualified by virtue of his position, from 2004 until 2008, as head of the global CDO group at Bear, Stearns & Co., the investment bank that the government rescued from failure via a sale to JP Morgan Chase & Co. in the spring of 2008.  Davies Ex. 1 (Wagner Report ¶¶ 89-90, Ex. 3).[1]  The Court will recall being asked to move the trial date to accommodate the academic commitments of an SEC expert, on the basis that he was in a "graduate program with limited residency," pursuing an "additional degree."  *See* Davies Ex. 4 (Tr. of Telephonic Conference dated Oct. 22, 2012, at 4-5).  At his deposition, Mr. Wagner explained that it is a course in photography that caused his conflict, photography being a "personal interest" that he has been "studying extensively," alongside his litigation consulting work, since the demise of Bear Stearns.  Davies Ex. 3 (Wagner Dep. Tr. at 174-75).

### B.     Wagner's Undisclosed Pre-Formed Negative Opinions About The ABACUS 2007-AC1 Transaction And His Positive Views Of ACA

#### 1.     Wagner's Pre-Formed Negative Opinions About The ABACUS 2007-AC1 Transaction Based On His Own Interactions With The Paulson Firm

Wagner claims to be qualified to testify to the opinions in his reports based on his knowledge and experience and on his review of the evidence in this case.  *See* Wagner Report ¶ 88.  Wholly absent from his reports, however, is any disclosure that, before the SEC retained him in this matter, in May or June 2010, and before he reviewed the evidence in this case, which he did beginning in the fall of 2010, *see* Wagner Dep. Tr. at 29-30, he had formed strong negative opinions about the ABACUS 2007-AC1 transaction, which "negative bias" he tried to

---

[1] The exhibits to the Declaration of Andrew Rhys Davies dated March 8, 2013 in Support of Mr. Tourre's *Daubert* Motion to Exclude the Proposed Expert Testimony of Ira Wagner are cited in the format "Davies Ex. __."

put out of his mind when evaluating the evidence and formulating the opinions that he now
intends to offer to the jury in this case.  *Id.* at 139-40.

On April 20, 2010, Wagner testified before the Federal Crisis Inquiry
Commission ("FCIC") about the ABACUS 2007-AC1 transaction.  *Id.* at 53-54, 60-61; Davies
Ex. 7 (Wagner Ex. 5).  As Wagner told the FCIC, before Paulson approached Goldman with the
proposal for the ABACUS 2007-AC1 transaction, Paulson asked Wagner's team at Bear Stearns
to do what he believes was the same transaction, and Bear Stearns rejected it.  Davies Ex. 7
(Wagner Ex. 5, at 193).  As Wagner acknowledged at his deposition, his FCIC testimony took
place just a few days after the filing of this case, at which point the financial press was covering
little else.  Wagner Dep. Tr. at 54.

The FCIC Report reflects that, on April 20, 2010, Wagner expressed to the
Commission his opinions that:  (1) it is "ridiculous" to argue that Paulson's role in selection of
the ABACUS 2007-AC1 portfolio was immaterial because the collateral was disclosed and
because Paulson was not then well known; (2) the ABACUS 2007-AC1 structure "encouraged
Paulson to pick the worst assets"; and (3) having a short investor involved in portfolio selection
was a "serious conflict," which was why Bear Sterns rejected the transaction.  Davies Ex. 7
(Wagner Ex. 5, at 193).  Wagner confirmed at his deposition that he held those opinions on April
20, 2010.  Wagner Dep. Tr. at 60-62.

At his deposition, Wagner confirmed that these were opinions he had formed
based on his own interactions with Paulson while at Bear Stearns.  Wagner recalled attending a
meeting at which Mr. Pellegrini of the Paulson firm told Wagner and others from Bear Stearns
that he "wanted to create a CDO where they were going to short and choose the shorts for an
entire portfolio."  *Id.* at 56.  Although Mr. Wagner's recollection is now hazy as to what exactly
Mr. Pellegrini said about the specifics of the proposed transaction, *id.* at 57-58, Wagner recalls
forming the view that allowing a short investor like Paulson to be involved in portfolio selection
"was a conflict of interest that needed to be disclosed," and he thought that it "would be very
unlikely that—with that disclosure that someone would purchase it."  *Id.* at 58-59.  Wagner also

4

held the view that the transaction that Paulson was proposing raised "reputational" issues for Bear Stearns.  *Id.*  Wagner never raised or discussed his concerns with anyone in Bear Stearns' legal and compliance department.  *Id.* at 71.

### 2.    Wagner's Extensive Dealings And Pre-Formed Positive Opinions Of ACA

Also absent from Wagner's reports is any disclosure of his and Bear Stearns' extensive and close business dealings with ACA, *i.e.*, the purported victim of the fraud alleged in this case, and of the positive views he developed through those dealings of Laura Schwartz and the other ACA witnesses whose testimony he credits in forming his opinions in this matter.

Bear Stearns was a significant shareholder in ACA, holding an equity stake in excess of $100 million.  Wagner Dep. Tr. at 73-74.  The CDO group at Bear Stearns that Wagner headed introduced investors to ACA, and prepared marketing materials bearing the logos of both firms that were used to market ACA's capabilities to investors.  *Id.* at 79-86; Davies Ex. 9 (Wagner Ex. 11).  Laura Schwartz, head of ACA's CDO business, listed Wagner personally as a reference in marketing ACA's business to clients.  Davies Ex. 8 (Wagner Ex. 9, at 11).  Bear Stearns itself also did a number of transactions with ACA as the collateral manager.  Wagner Dep. Tr. at 71-72.  Bear Stearns invited ACA to celebrate the closings of those transactions at dinners held at some of New York's most exclusive and expensive restaurants.  *Id.* at 86-88.

In the course of this relationship, Wagner met and developed a positive view of Laura Schwartz, whose testimony Wagner credits in his reports, finding her to be "very professional," "serious," and "a credible person."  *Id.* at 156-57.  He also developed positive opinions of the other ACA witnesses in this case, including Alan Roseman and Keith Gorman. *Id*. at 157-58.

Moreover, in at least two transactions that Wagner's group at Bear Stearns did with ACA as collateral manager, investors were informed that ACA had selected the reference portfolio, even though Bear Stearns had significant undisclosed input into the portfolio selection. *Id.* at 102-122.

In ACA CLO 2007-2, Bear Stearns provided ACA with a "seed portfolio" of loans that, "subject to ACA's approval, shall" form part of the reference portfolio. *Id.* at 103-106.  At his deposition, Wagner testified that it would be accurate to disclose to investors that ACA selected the ACA CLO 2007-1 reference portfolio if ACA "went through their process and approved it," *id.* at 109, and that it would not be misleading to omit disclosure of Bear Stearns' role in portfolio selection, *id.* at 111-12.

In ACA ABS 2007-3, the offering materials represented to investors that ACA had selected the reference portfolio, even though Bear Stearns had the right to veto securities proposed by ACA.  *Id.* at 117-21. Again, Mr. Wagner testified that it was accurate to disclose that ACA selected the reference portfolio, and to omit reference to Bear Stearns' role.  *Id.* at 121-22.

Wagner is no doubt correct that, based on market practices in 2007, the disclosures in the ACA CLO 2007-2 and ACA ABS 2007-3 offering materials were accurate. Wagner argues, however, that the ACA CLO 2007-1 and ACA ABS 2007-3 transactions are different from ABACUS 2007-AC1,[2] so that the disclosures that ACA selected the reference portfolio for the Bear Stearns transactions are accurate, while the same disclosure with respect to ABACUS 2007-AC1 is misleading.  *See id.* at 103, 122.  That is certainly a convenient result for Wagner, as it exonerates the transactions done by his group at Bear Stearns, while castigating the transaction at issue in this lawsuit in which he is serving as the SEC's expert.

---

[2] Consistent with his pattern of not disclosing his personal involvement and biases, Wagner argued in his rebuttal report that the ACA CLO 2007-2 was different from ABACUS 2007-AC1, *see* Davies Ex. 2 (Wagner Rebuttal ¶ 27), without disclosing that the ACA CLO 2007-2 deal was done by his group at Bear Stearns.

C.    **Wagner's Opinions**

1.    **The ABACUS 2007-AC1 Offering Documents Were Materially Misleading, Because They Failed To Disclose Paulson's "Atypical" Role In Portfolio Selection**

Addressing squarely the core, ultimate legal issue in this case, Wagner opines that the representation in the ABACUS 2007-AC1 offering materials "that the portfolio had been 'selected by ACA' without including a description of the role that Paulson played omits an important fact and is a misleading and incomplete description of the portfolio selection process." Wagner Report, ¶ 76.  According to Wagner, a "reasonable CDO market participant" would not have expected Paulson's "atypical" involvement in the portfolio selection process,[3] "unless such involvement was disclosed in the related marketing materials and offering documents."  Wagner Report, at 8-9 ¶ (h), ¶¶ 71-72.   In Wagner's opinion, the non-disclosure of Paulson's "atypical" involvement rendered "misleading the disclosure of ACA as the Portfolio Selection Agent" Davies Ex. 2 (Wagner Rebuttal, ¶ 1), and "the ABACUS marketing documents would have misled a reasonable CDO market participant,"  Wagner Report, at 8 ¶ (h).[4]

2.    **It Is "Unlikely" That The ABACUS 2007-AC1 Transaction Would Have Been Completed If Paulson's Role Had Been Disclosed Because ACA Reasonably Believed That Paulson Was An Equity Investor, And ACA Would Not Have Served As Portfolio Selection Agent If Paulson's Purely Short Interest Had Been Disclosed**

In support of his facially speculative opinion that it is "unlikely" that the ABACUS 2007-AC1 transaction would have been completed under certain hypothetical circumstances, Wagner states that it was "difficult" to market transactions like ABACUS "absent the involvement of a Collateral Manager."  Wagner Report, at 9 ¶ (i).  Wagner then undertakes to

---

[3] Wagner's assignment, as framed by the SEC, presupposed that Paulson's involvement was "atypical." *See* Wagner Report, at 2 ¶ e; Wagner Dep. Tr. at 135-36 ("Q: You say it was put to you that Paulson's involvement was atypical?  A: The question was asked this way.").

[4] *See also* Wagner Dep. Tr. at 99 ("Q: You have opined that the disclosure in the Abacus 2007-AC1 transaction that ACA selected, the reference portfolio was misleading, correct?  A. I believe I said that, yes. I mean, I would like to look at the specific place. But I think without -- with the omission of a discussion of Paulson, I think it would be misleading, yes.").

opine as to what ACA understood about Paulson's motivation in early 2007, as to whether that understanding was reasonable, and as to whether ACA would have participated if it had had a different understanding.  Having concluded that ACA reasonably believed that Paulson was buying the equity and that ACA would not have served as portfolio selection agent had it understood his purely short interest, Wagner opines that it is "unlikely" the transaction could have closed.  *See* Wagner Report, at 9 ¶ (i)-(j), ¶¶ 53-61, 77-78.

To reach the opinion that ACA understood that Paulson was buying the equity and that that understanding was reasonable, Wagner simply reviews and narrates the contents of documents in the record reflecting "communications and meetings that took place among ACA, Goldman and Paulson," which, he concludes, caused ACA to understand that Paulson was buying the ABACUS equity tranche.  *See* Wagner Report ¶¶ 54-61.[5]

Having concluded as much, Wagner wholly discounts the countervailing evidence, arguing that the ABACUS offering circular, which showed that the Class FL ("First Loss," or "equity" notes) were not being issued, and the term sheet, which made clear that the "First Loss" tranche was "NA," "would not necessarily indicate that Paulson did not participate in the CDO Equity," and "would not be sufficient" to alter ACA's reasonable belief that Paulson was intending to be a long investor.  *See* Wagner Report ¶¶ 59-61.

As to his conclusion that ACA would not have agreed to participate as portfolio selection agent if it had known of Paulson's purely short interest, Wagner simply parrots the deposition testimony of Laura Schwartz and Alan Roseman of ACA, whom he knows and towards whom he developed positive feelings when he worked with them during his time at Bear Stearns.  *See* Wagner Report, at 9 ¶ (i), ¶ 77; Wagner Dep. Tr. at 32-33.

---

[5] In his rebuttal report, Wagner also references a telephone line recording, which was produced more than a year-and-a-half after domestic discovery closed in this matter, in which a Goldman Sachs employee (not Mr. Tourre) apparently states that "Paulson would be taking '100% equity.'"  Wagner Rebuttal ¶ 34. Pursuant to Federal Rule of Evidence 703, Wagner should not be allowed to rely on that recording, which will be the subject of a separate motion *in limine*.

### 3.     It Is "Unlikely" That IKB Would Have Invested In ABACUS If Paulson's "Atypical" Involvement Had Been Disclosed

Building on his opinion that ACA would not have served as portfolio selection agent if it had known of Paulson's purely short interest, and attempting further to support his opinion that it is "unlikely" that the ABACUS 2007-AC1 transaction would have closed if Paulson's purportedly "atypical" involvement had been disclosed, Wagner argues that it is "unlikely" that IKB would have made its investment if such disclosure had been made.[6]

Wagner bases this opinion on his review of evidence in the record that he says shows that "Goldman knew IKB's interest was contingent upon finding an acceptable Collateral Manager" and that "the record does not indicate that Goldman had lined up any other such manager" to serve as selection agent it ACA refused to participate. *See* Wagner Report ¶ 78.

Wagner's insight into what Goldman "knew," and into IKB's willingness to recommend a transaction, he explains, is derived from his review of documents provided him by the SEC, including a declaration signed by Mr. Zimmermann of IKB that is the subject of Mr. Tourre's motion to preclude, *see id.*; Wagner Rebuttal ¶ 11 ("The importance of disclosure of Paulson's role to IKB is demonstrated in the declaration of Jörg Zimmermann of IKB."),[7] as well as an email chain between Mr. Zimmerman of IKB and a number of Goldman employees, *not* including Mr. Tourre, *see* Wagner Report ¶ 78.

### 4.     Paulson's "Atypical" Involvement "Compromised" ACA's Independent Portfolio Selection Process

Based on his "review of the collateral selection process for ABACUS," Wagner Report at 6-7, ¶ (e), ¶ 44, Wagner opines that Paulson's "atypical" involvement "compromised" ACA's independent portfolio selection process. *See* Wagner Report, at 6-7 ¶ (e), ¶¶ 44-52.

---

[6] As explained in Mr. Tourre's motion for summary judgment, Wagner's understanding that IKB invested in ABACUS, *see* Wagner Report ¶ 78, is incorrect.

[7] For all the reasons set forth in Mr. Tourre's motion to preclude evidence as to IKB, Wagner should not be permitted to rely on Mr. Zimmermann's declaration. *See* Fed. R. Evid. 703.

Wagner even goes so far as to state that "in fact, Paulson was at least as important as ACA in selecting the portfolio."  Wagner Rebuttal ¶ 13.

Wagner has conducted no technical or empirical analysis to support his opinion of a "compromised" process, but merely relies on the evidence in this case, consisting principally of "a series of emails show[ing] the close interaction between ACA and Paulson in the development of the ABACUS reference portfolio in January and February 2007."  Wagner Report ¶ 49; *see also* Wagner Dep. Tr. at 127-28 (Q: "So that's a conclusion you are drawing from looking at the evidence in this case?  A: Correct.").

Although he reached a conclusion based on his review of those emails that Paulson's objective was to "identify Reference Obligations that would be more likely to underperform and incur losses," Wagner Report at 44, Wagner did not recall taking into account Mr. Pellegrini's testimony that what Paulson wanted was a portfolio that was representative of the market, and Wagner did not appear to recall that Mr. Pellegrini testified that it was not realistic to create an efficiently priced transaction consisting of the worst RMBS.  Wagner Dep. Tr. at 138-39.[8]

Moreover, in stark contrast to his willingness to credit the testimony of ACA's witnesses when it supported another of his opinions, *see* Opinion 2, *supra*, in reaching this opinion, Wagner parts company with the ACA witnesses, who stated unanimously under oath that ACA did, in fact, select the ABACUS 2007-AC1 reference portfolio. *See* Wagner Dep. Tr. at 128-32.[9]  Wagner acknowledges that testimony, but, in essence, rejects it, falling back on his

---

[8] Wagner also asserts that the "motivation" of the ABACUS 2007-AC1 transaction was to allow Paulson to short the subprime market, Wagner Report at 6, ¶ (d), ¶ 36a.  It is not clear whether Wagner is ascribing this motivation Paulson, to Goldman or to Mr. Tourre himself, nor what expert analysis he has conducted that permits him to express such an opinion.

[9] The ACA witnesses testified that ACA's review of the collateral for ABACUS 2007-AC1 was similar to every other CDO they worked on at the time, that ACA selected the ABACUS 2007-AC1 reference portfolio using its standard process, that the only way ACA could do the ABACUS 2007-AC1 transaction was to have a portfolio that met its credit standards and approvals, and that if the portfolio had not met those standards and approvals, ACA would have "walked away."  *See* Wagner Dep. Tr. at 128-32.

core disclosure opinion that, even accepting that ACA selected the portfolio, disclosure of Paulson's role was required.  *See id.* at 132-33.

> **5.    Mr. Tourre Was "Primarily Responsible" For The ABACUS Transaction**

Wagner opines that Mr. Tourre was "primarily responsible" for the ABACUS 2007-AC1 transaction.  *See* Wagner Report, at 5, ¶ (c); *see also* Wagner Report ¶¶ 37 (stating that "Fabrice Tourre led the transaction team for Goldman"). Wagner does not claim to have reached the conclusion that Mr. Tourre was "primarily responsible" for the transaction based on any expert analysis, but rather states it as an "admission" made by Mr. Tourre.

> **6.    The Comparative Analyses Conducted By Mr. Tourre's Expert Witnesses Are "Flawed," But Wagner Has Not Conducted The Kind Of Analysis He Says Would Be "More Relevant"**

Wagner concedes that he has not conducted any empirical analysis of the ABACUS 2007-AC1 reference portfolio, stating that that was "not my role in this."  Wagner Dep. Tr. at 42-44.  Wagner claims, however, that the analyses performed by the experts retained by Mr. Tourre comparing the ABACUS 2007-AC1 reference portfolio with the universe of comparable bonds are "flawed."  *See* Wagner Rebuttal, at 5 ¶ (h).

Wagner argues that a more "relevant" performance comparison would be to look at the "ABACUS portfolio versus the portfolios of other RMBS CDOs that ham portfolio characteristics similar to ABACUS."  *Id.* ¶ 41.  Wagner attaches to his rebuttal report a list of CDOs that closed in 2007, including ABACUS 2007-AC1, which he extracted from a February 2008 Wachovia study that the SEC provided to him.  *Id.* ¶ 42; Wagner Dep. Tr. at 63.  That list purports to compare the exposure of the listed CDOs to downgraded RMBS as of February 2008, and to show that the RMBS in the ABACUS 2007-AC1 portfolio had among the highest downgrade rates as of that date.  *Id.* ¶ 42, Ex. 2; Wagner Dep. Tr. at 45.

Wagner was not able to explain, however, why February 2008 was a relevant date on which to compare the ABACUS 2007-AC1 portfolio against other CDO portfolios, other than the fact that was when Wachovia happened to publish the source report that the SEC provided to

Wagner.  *Id.* at 45-46.  Nor had he done any work to determine whether the reference portfolios of the other CDOs on his list are, in fact, comparable to ABACUS 2007-AC1. He did not know, for example, how many of the other portfolios were static, or what proportion of them consisted of Baa-2 rated subprime RMBS.  *Id.* at 49-52.

Mr. Tourre's expert witness, Dr. Mukesh Bajaj, conducted an analysis of the CDOs on Wagner's list, and found that, of the 2,608 bonds in those CDOs, only 353 were Baa-2-rated subprime RMBS issued between January 1, 2006 and March 31, 2007, *i.e.*, bonds of the kind included in the ABACUS 2007-AC1 reference portfolio.  Davies Ex. 5 (Bajaj Dep. Tr. at 298-300); Davies Ex. 6 (Bajaj Dep. Ex. 4 (Exs. 5-6)).  Restricting the comparison to those RMBS, there is no meaningful difference between the ABACUS 2007-AC1 reference portfolio, either in terms of downgrades or accumulated losses, at any reference date.  *Id.*

Indeed, at his deposition, Wagner retreated from his list, characterizing it merely as "an example" of the kind of comparative analysis that he believes "would be a reasonable approach to take."  Wagner Dep. Tr. at 43-44.  Wagner has not conducted any such study, but has only created the list attached to his rebuttal report by copying data from the Wachovia study the SEC provided him, without detailed analysis.  *Id.*

## STANDARD OF LAW

"[T]he trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also* Fed. R. Evid. 702.  "[T]he trial judge's general 'gatekeeping' obligation applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  Use of expert testimony must be "carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

## ARGUMENT

**I.     WAGNER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE, CONTRARY TO THE REPRESENTATIONS IN HIS REPORT, HE FORMED HIS OPINIONS BASED ON INADMISSIBLE EVIDENCE BEFORE HE REVIEWED THE EVIDENCE IN THIS MATTER**

As explained above, by April 20, 2010, before he was retained by the SEC and before he had reviewed any evidence in this case, Wagner had reached firm opinions about the ABACUS 2007-AC1 transaction—opinions firm enough that he was comfortable expressing them under penalty of perjury to the FCIC.   Those opinions that Wagner already held as of April 2010 mirror exactly the core opinions he now proposes to offer in this case—that it was materially misleading to omit disclosure of Paulson's role in selection of the ABACUS 2007-AC1 reference portfolio, that the ABACUS 2007-AC1 structure motivated Paulson to select the worst possible assets, that it was a serious conflict to allow a short investor to participate in portfolio selection, and that the transaction would not have been possible if the disclosure Wagner believes was required had been made.   Wagner failed to disclose these pre-formed opinions and the personal dealings on which they were based, instead misrepresenting to the Court that his opinions were based on his review of the evidence in this case.

Wagner's proposed testimony should be excluded because it is based on undisclosed personal opinions that he formed before reviewing any evidence in this case.   As Judge Kaplan held, excluding an expert opinion in its entirety *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), "[c]ourts applying the principles outlined in *Daubert* have held that an expert may not reach his conclusion first and do the research later." *Id.* at 550; *see also Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of the [scientific] method."); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423 n.2 (5th Cir. 1987) ("An expert who forms an opinion before he begins his research is biased and lacking in objectivity."). As Judge Kaplan held, when an expert forms his opinions before doing the research, his opinions are not "'based upon sufficient facts or data' and do not proceed from 'reliable principles and

13

methods,' as required by Rule 702." *In re Rezulin*, 309 F. Supp. 2d at 540 (quoting Fed. R. Evid. 702).

Moreover, Wagner's failure to disclose his pre-formed views and the personal dealings on which they are based is an unjustified and prejudicial breach of Rule 26(a)(2)(B), which mandates that an expert's report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).  An expert's report that fails to disclose the bases and reasons for the expert's conclusions, as well as the facts and data they considered, is inadmissible absent a showing that the failure to comply with Rule 26 was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 482 (S.D.N.Y. 2000).

There is no justification for the non-disclosure in this case.  Nor is it harmless.  To the contrary, it would be particularly inappropriate to allow Wagner to testify to his undisclosed pre-formed negative views on the ABACUS 2007-AC1 transaction, because Mr. Tourre would have to introduce otherwise inadmissible and potentially highly prejudicial evidence on cross-examination to show the jury that Wagner's opinion should be accorded no weight because it was developed independently of the facts of this case.  Under Federal Rule of Evidence 703, the proponent of the expert evidence cannot disclose inadmissible facts on which the expert has relied unless "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.  Mr. Tourre should not be put in the position of having to adduce prejudicial, inadmissible evidence to help the jury evaluate Wagner's testimony.  *See also United States v. Onumonu,* 967 F.2d 782, 786 (2d Cir 1992) (holding that even relevant expert testimony, like all relevant evidence, may be excluded under Fed. R. Evid. 403, if its probative value is outweighed by the danger that it would confuse the jury, be unfairly prejudicial, cause undue delay, waste judicial resources, or be cumulative); *Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 515 (2d Cir. 1989) (affirming

the district court's refusal to allow an interested party to testify as an expert on the ground of undue prejudice).

First, as explained above, Wagner testified that the negative view he formed of the ABACUS 2007-AC1 transaction when Paulson approached Bear Stearns with a proposed transaction has embedded in it a lay legal opinion that Wagner developed without ever consulting Bear Stearns' legal and compliance department—that it would be necessary to disclose Paulson's involvement in portfolio selection to investors.  That is a core ultimate legal issue in this case, to which no expert may be permitted to testify.  *See* Point II, *infra*.  Mr. Tourre should not be put in the position of having to elicit the lay legal opinion that Wagner developed when Paulson approached Bear Stearns in order to demonstrate to the jury that his opinion is entitled to no weight because it is based on events unrelated to this case.

Second, evidence of what Paulson proposed to Bear Stearns, or of Bear Stearns' internal determination that the proposal raised reputational issues, is not admissible in this case because it is not relevant.  Again, Mr. Tourre should not be put in the position of having to elicit that evidence in order to cross-examine Wagner about the undisclosed pre-formed "negative bias" that he tried to put out of his mind when evaluating the evidence in this case.  The prejudice Mr. Tourre would suffer is especially acute as Wagner does not even recall the specifics of what Pellegrini said about Paulson's proposal that caused his strong negative reaction, making it impossible to elicit evidence as to how Paulson's proposal to Bear Stearns may have differed from the ABACUS 2007-AC1 transaction that Goldman actually undertook.

Third, as explained above, Wagner draws some very fine and clearly unsustainable lines to distinguish transactions that his group at Bear Stearns did with ACA, as to which he believes the disclosures were accurate, from the ABACUS 2007-AC1 disclosures, which, in his role as the SEC's expert, he opines were misleading.  The issues that will be presented to the jury in this case are more than complex enough already, without having to conduct mini-trials within the trial, to allow the jury to assess the merits of Wagner's tortured self-serving arguments to distinguish the Bear Stearns transactions from ABACUS 2007-AC1.

For all these reasons, Wagner's testimony should be excluded in its entirety. Moreover, as explained below, the total exclusion of Wagner's testimony for these reasons would not detract from the jury's decision-marking process in the least, because very little of what Wagner has to say is admissible anyway.

II.   **WAGNER'S OPINIONS ARE INADMISSIBLE BECAUSE THEY CONSIST LARGELY OF THE NARRATION OF FACT EVIDENCE AND CONCLUSIONS AS TO THE ULTIMATE LEGAL ISSUES IN THIS CASE**

A.   **Wagner Usurps The Jury's Role By Narrating And Commenting Upon Factual Evidence**

As explained above, Wagner should be excluded because his opinions are based on his undisclosed personal dealings, and were developed before he reviewed the evidence in this case.  In addition, his reports contain very little in the way of permissible expert opinion anyway.[10]

Although the Second Circuit has acknowledged that "in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts," the Court of Appeals has also cautioned that such expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citations omitted). Heeding this caution, courts have recognized that experts cannot be permitted to "shed[] light on industry practices *only* by reference to the facts of [the] case."  *Snyder v. Wells Fargo Bank, N.A.,* No 11 Civ. 4496, 2012 WL 4876938 at *4 (S.D.N.Y. Oct. 15, 2012) (emphasis in original).

Moreover, no expert may be permitted to testify "solely for the purpose of constructing a factual narrative based upon record evidence."  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *accord Island Intellectual Prop. LLC v.*

---

[10] To the extent Wagner's opinion simply describes the instruments at issue in this case, *see* Wagner Report ¶¶ 1-22, it is entirely cumulative of the opinion offered by another SEC expert, Dwight Jaffee.

*Deutsche Bank AG,* No. 09 Civ. 2675, 2012 WL 526722 at *2 (S.D.N.Y. Feb. 14, 2013) (an expert may not "directly transmit facts to the jury, about which he has no personal knowledge, simply because his testimony represents the easiest way to do that.").  And, more emphatically, no expert may draw conclusions addressing "lay matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

Wagner's reports repeatedly violate all these limitations on expert testimony. The following opinions, which Wagner draws merely from reading and regurgitating the factual record, are questions that the jury is well-capable of deciding for itself based on the factual record, without expert assistance:

- It is "unlikely" that the ABACUS 2007-AC1 transaction would have been completed if Paulson's role had been disclosed.

- ACA reasonably believed that Paulson was an equity investor.

- ACA would not have served as portfolio selection agent if it understood Paulson's purely short interest.

- It is "unlikely" that IKB would have invested in ABACUS if Paulson's involvement had been disclosed.

- Paulson "compromised" ACA's independent portfolio selection process.

- Mr. Tourre was "primarily responsible" for the ABACUS transaction.

To the extent the SEC wishes to introduce evidence on any of these questions at trial, it must do so through competent fact witnesses and admissible documents.  *See Rezulin*, 309 F. Supp. 2d at 551 ("Such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence.").  It cannot do so under the guise of offering Wagner's opinions on industry practice.

### B.     Wagner Usurps The Jury's Role By Opining On The Ultimate Legal Issues In The Case

The principal conclusions drawn in Wagner's reports encompass, unmistakably, the ultimate legal issues in the case—whether the ABACUS 2007-AC1 offering documents were materially misleading, or, to put the same question differently, whether disclosure was required of Paulson's involvement in portfolio selection.

This proposed testimony plainly and improperly crosses the line separating discussion of industry practices from the offering of improper legal conclusions. Second Circuit law is clear that although "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice," "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *Bilzerian*, 926 F.2d at 1294-95 (citation omitted). Wagner's opinion that Mr. Tourre was "primarily responsible" for the ABACUS transaction is inadmissible for the same reason, to the extent it encompasses or would convey to the jury an opinion on legal responsibility.

This distinction—between explaining industry standards that touch upon legal issues (which is permitted) and applying those standards to the facts of the case (which is not)— is elaborated in the *Bilzerian* decision. That case involved a defendant accused of making false disclosures on an SEC Schedule 13D regarding the source of funds for an investment— specifically, although the defendant had raised the money by taking loans from several other investors, he identified its source as "personal funds" on the Schedule 13D. *Id*. at 1289-90. The Second Circuit held that the testimony of the government's expert, which addressed "general background on federal securities regulation and the filing requirements of Schedule 13D," was admissible and did not "usurp the jury's function of applying the law to the facts of the case." *Id*. at 1294. By contrast, the Second Circuit upheld the district court's decision to exclude testimony from the defendant's expert stating that "the phrase 'personal funds,' as generally

understood in the securities industry, include[d] funds derived from loans of the type received by [the] defendant." This, the Second Circuit held, "related directly to the issue of whether [the defendant's] actual 13D disclosures complied with the legal requirements, [and] constituted an impermissible instruction on governing law." *Id*. at 1295.

The conclusions Wagner draws go well beyond the line identified by the Second Circuit in *Bilzerian*. Indeed, his reports are shot through with assertions that the offering documents were materially misleading because they failed to disclose the role of Paulson, a purely short investor, in portfolio selection. That opinion is plainly inadmissible as "expert" testimony, and usurps the role of judge in instructing the jury on matters of law and the role of the jury in applying that law to the evidence.

### C.    Wagner Should Not Be Permitted To Testify About The List Of CDOs Attached To His Rebuttal Report Because It Is Neither Helpful To The Jury Nor Reliable

As explained above, Wagner admitted at this deposition that the list of CDOs attached to his rebuttal report, Wagner Rebuttal, Ex. 2, is only "an example" of the kind of comparable analysis that would be "a reasonable approach to take," but he himself has not performed such an analysis. As also explained above, Wagner did no work to determine whether the CDOs on his list were, in fact, fairly comparable to ABACUS 2007-AC1, and they are not.

Under these circumstances, Wagner should not be permitted to testify about his list. It is not relevant because it will not "assist the trier of fact" to see a list of CDOs that is only an example of a kind of analysis that has not been done. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. Nor, to the extent the SEC and Wagner sought to present the list to the jury as a meaningful comparison between ABACUS 2007-AC1 and other CDOs, is it the result of a reliable process, as Wagner conceded at his deposition and as Dr. Bajaj has shown. *See* Fed. R. Evid. 702. Under these circumstances, Wagner should not be permitted to testify about the list.

## **CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court grant his *Daubert* motion and exclude the proposed testimony of SEC expert Ira Wagner in its entirety.

Dated:  March 8, 2013
New York, New York

Respectfully submitted,

/s/ Pamela Rogers Chepiga
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
David C. Esseks
(david.esseks@allenovery.com)
Andrew Rhys Davies
(andrew.rhys.davies@allenovery.com)
Brandon D. O'Neil
(brandon.o'neil@allenovery.com)

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*