UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE COMMISSION,

                                Plaintiff,

                        v.

FABRICE TOURRE,

                                Defendant.
_____

: 
: 
: 
: 
: 10 Civ. 3229 (KBF)
: 
: ECF Case
: 
: 
: 
: 

## SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE PORTIONS OF THE OPINION TESTIMONY OF DR. MUKESH BAJAJ

Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9362 (facsimile)
martensm@sec.gov
*Attorneys for Plaintiff*

Dated:  March 8, 2013
        Washington, D.C.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND .....................................................................................................2

    A.  Tourre's Fraud ............................................................................................2

    B.  Dr. Bajaj's Opinions ..................................................................................3

    C.  Dr. Bajaj's Deposition Testimony ............................................................4

ARGUMENT ..........................................................................................................5

I.      LEGAL STANDARD FOR *DAUBERT* CHALLENGES ...................................5

II.    DR. BAJAJ'S OPINION ON "ECONOMIC MATERIALITY" IS AN
      INADMISSIBLE LEGAL CONCLUSION UNSUPPORTED BY A
      FACTUAL FOUNDATION OR RELIABLE METHODOLOGY ...................................7

    A.    Dr. Bajaj's "Economic Materiality" Opinion is a Legal
          Conclusion that Invades the Province of the Jury...................................8

    B.    Dr. Bajaj Has No Basis to Opine on What CDO
          Investors Deemed Material .......................................................................10

III.   DR. BAJAJ IMPERMISSIBLY OPINES AS TO WHAT ACA
      AND INVESTORS "SHOULD HAVE KNOWN" BASED
      ON HIS REVIEW OF THE EVIDENCE .......................................................12

IV.   DR. BAJAJ IMPERMISSIBLY OPINES THAT ACA'S "ACTIONS
      CONTRADICT ITS CLAIM THAT IT WOULD HAVE BEHAVED
      DIFFERENTLY IF IT HAD KNOWN PAULSON'S SHORT POSITION" .................15

V.    DR. BAJAJ DID NOT UTILIZE STATISTICALLY RELIABLE
      METHODS IN ANALYZING THE PERFORMANCE OF THE
      AC1 REFERENCE PORTFOLIO ...............................................................16

    A.    Dr. Bajaj Failed to Calculate The Standard Deviation
          For Sur-Rebuttal Exhibit 4.......................................................................17

    B.    Dr. Bajaj Applies No Methodology In Concluding
          Comparison Sets Are Similar....................................................................18

CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Amorgianos v. Nat. R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)............................................................................17

*Arista Records LLC v. Lime Group LLC*,
    No. 06-cv-5936(KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) .................6, 10, 11

*Buckley v. Deloitte & Touche USA LLP*,
    No. 06-cv-3291 (SHS), 2012 WL 3538733 (S.D.N.Y. Aug. 16, 2012)...................6, 7, 12

*Celebrity Cruises Inc. v. Essef Corp.*,
    434 F. Supp. 2d 169 (S.D.N.Y. 2006)..........................................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)........................................................................ *passim*

*Dev. Specialists, Inc v. Weiser Realty Advisors LLC*,
    No.09-cv-4084(KBF), 2012 WL 242835 (S.D.N.Y. Jan. 24, 2012)........................ *passim*

*Ebbert v. Nassau County*,
    No. CV 05-5455 (FB)(AKT), 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ..................8

*EEOC v. Federal Reserve Bank of Richmond*,
    698 F.2d 633, 647 (4th Cir. 1983), *rev'd on other grounds*,
    *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984)....................................18

*Feinberg v. Katz*,
    No. 01-cv-2739(CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007)..............................7

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)........................................................................16

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)..........................................................7, 8

*In re Rezulin Products Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)..........................................................7, 13, 15, 16

ii

*In re SLM Corp. Sec. Litig.*,
No. 08 Civ. 1029(WHP), 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ..............................9

*Kumho Tire Co., LTD. v Carmichael*,
526 U.S. 137 (1999)........................................................................................................6, 7

*LaSalle Bank Nat'l Ass'n v. CIBC, Inc.*,
No. 08-cv-8426 (WHP) (HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ..........6, 8, 14

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................................................................6, 11, 19

*Mancuso v. Consol. Edison of New York, Inc.*,
967 F. Supp. 1437 (S.D.N.Y. 1997).................................................................................11

*Marx & Co., Inc. v. Diners' Club, Inc.*,
550 F.2d 505 (2d Cir. 1977)...................................................................................7, 8, 13

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)................................................................................... *passim*

*Primavera Familienstifung v. Askin*,
130 F. Supp. 2d 450, *amended on reconsideration on other grounds*,
137 F. Supp. 2d 438 (S.D.N.Y. 2001)................................................................................9

*R.F.M.A.S. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010)............................................................6, 11, 12, 16

*Sawant v. Ramsey*,
No. 3:07-cv-980 (VLB), 2012 WL 2046812 (D. Conn. June 6, 2012).................................9

*SEC v. Badian*,
822 F. Supp. 2d 352 (S.D.N.Y. 2011).............................................................................6, 7

*SEC v. Leslie*,
No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010).........................................10

*Snyder v. Wells Fargo Bank, N.A.*,
No. Civ. 4496 (SAS), 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ...........................9, 15

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ......................................................................7

*United States v. Mavashev*,
    No. 08-cr-902 (DLI)(MDG), 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010) .......................9

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988) ...............................................................13, 16

*United States v. Tomasetta*,
    No. 10-cr-1205 (PAC), 2012 WL 1080293 (S.D.N.Y. Mar. 30, 2012) ..........................8

*Williamson v. Verizon Comm'ns, Inc.*,
    No. 11-cv-4948 (LTS) (HBP), 2012 WL 5425033 (S.D.N.Y. Nov. 7, 2012) .................10

*Wingfield v. United Technologies Corp.*,
    678 F. Supp. 973 (D. Conn 1988) ...........................................................18

*Zaremba v. General Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004) ..............................................................6, 11

## STATUTES AND REGULATIONS

Federal Rule of Evidence 403 .......................................................................10, 19

Federal Rule of Evidence 702 ........................................................................ *passim*

## OTHER AUTHORITIES

*Market ABX.HE*, Markit Financial Information Services, http://www.markit.com/en/
    products/data/indices/structured-finance-indices/abx/abx.page ...........................1

Plaintiff U.S. Securities and Exchange Commission ("SEC") submits this memorandum of law in support of its *Daubert* motion to exclude the opinion testimony of Dr. Mukesh Bajaj.

## PRELIMINARY STATEMENT

The financial product at the center of this case is a synthetic collateralized debt obligation ("CDO") known as ABACUS 2007-AC1 ("AC1"). Defendant Fabrice Tourre designated Dr. Bajaj as an expert witness to offer testimony about the basics of CDO formation and, specifically, the formation and performance of the AC1 reference portfolio. In addition, the defense intends for Dr. Bajaj to offer legal conclusions on what information was "economically material" to CDO investors, summarize testimony offered by other witnesses, opine on what those investors "should have known," and make improper credibility determinations by opining that fact witness testimony "contradicts" the prior conduct of those witnesses in other CDO transactions. Much of this is not proper expert opinion testimony. Dr. Bajaj offers no basis for certain of these opinions. And he has no experience creating or marketing CDOs or working with actual CDO investors when making their investment decisions.

Dr. Bajaj also makes some quantitative comparisons intended to prove that there was no statistically significant difference between the performance of the AC1 reference portfolio of residential mortgage-backed securities ("RMBS") and the performance of comparable RMBS. He can only reach that conclusion by ignoring what his own client observed in 2008, when Tourre stated that the "infamous" AC1 "portfolio is worse than" a comparable tranche of the benchmark ABX index.[1] Thus, it is not surprising that, in order to reach a different conclusion in this litigation, Dr. Bajaj employed no methodology other than his say-so for what constitutes comparable data or amounts to a statistically significant difference. Indeed, contrary to controlling law on the issue, Dr. Bajaj calculated no standard deviation to support his statistical significance conclusion.

---

[1] The ABX is a synthetic tradeable index referencing a basket of 20 subprime mortgage-backed securities on which investors can take either long or short positions by means of credit default swap contracts. *See Market ABX.HE*, Markit Financial Information Services, http://www.markit.com/en/ products/data/indices/structured-finance-indices/abx/abx.page.

While Dr. Bajaj may testify about the structure and formation of CDOs generally and the AC1 transaction in particular, Dr. Bajaj's other "opinions" serve only to give defense counsel a second voice, dressed up in the form of an "expert," who lacks any basis for his conclusions.  By presuming to opine on materiality and credibility, Dr. Bajaj's opinions impermissibly invade the province of the jury.  In sum, much of that on which Dr. Bajaj proposes to opine is not proper expert testimony, and his quantitative analyses have disqualifying methodological flaws.  For these reasons and those that follow, the Court should disregard Dr. Bajaj's opinions in deciding motions for summary judgment and should preclude the defense from offering those opinions at trial.[2]

## **BACKGROUND**

### A.  Tourre's Fraud.

This case concerns a fraud by Tourre and his employer, Goldman Sachs & Co. ("GS&Co"), in the offer and sale of securities and security-based swap agreements in the AC1 CDO transaction.  Specifically, the SEC has alleged that Tourre and GS&Co defrauded ACA Capital Holdings, Inc. and its subsidiaries (collectively, "ACA") when, in order to induce ACA to serve as portfolio selection agent for the AC1 CDO transaction, Tourre and GS&Co misrepresented to ACA that a Paulson & Co., Inc. hedge fund ("Paulson") was taking an equity (*i.e.*, long) interest in the AC1 transaction.  As a portfolio selection agent, ACA was to be acting in the interest of the CDO's long investors in selecting the CDO's reference portfolio.  Were Paulson a long investor in the AC1 CDO, it would have an economic interest in the successful performance of the CDO's reference portfolio.  But, as Tourre well knew, Paulson intended to and did take only a short position in the AC1 reference portfolio.  Having been misled by Tourre and GS&Co regarding Paulson's investment interest in the AC1 reference portfolio, ACA not

---

[2]      The SEC is simultaneously filing a Motion to Exclude the Expert Testimony of Charles Cox, and filed a Motion for Summary Judgment and memorandum in support thereof (collectively "SEC MSJ") on March 1, 2013.  Both motions are hereby incorporated as if fully set forth herein.

only worked with short investor Paulson to select the AC1 reference portfolio but also made an approximately $951 million long investment in the AC1 transaction.

The SEC has also alleged that Tourre and GS&Co misled IKB Deutsche Industriebank AG ("IKB") into recommending to certain advisory clients the purchase of $150 million in AC1 notes.  As noted above, GS&Co and Tourre misled ACA into participating as portfolio selection agent in the AC1 transaction, and that participation was critical to IKB's decision to recommend the AC1 investment.  In addition, GS&Co and Tourre misled IKB with the half-truth that ACA had "selected" the AC1 reference portfolio when the whole truth was that ACA had worked with Paulson, a purely short investor, to select the reference portfolio.

The AC1 investors have stated that Paulson's role and economic interest in selecting the AC1 reference portfolio of RMBS would have been important to them.  After the AC1 transaction closed, the assets in the AC1 reference portfolio suffered severe write-downs, to the detriment of long investors but to the benefit of short investor Paulson.  In April 2008, Tourre sent an e-mail to GS&Co colleagues referring to the "infamous" AC1 "portfolio [that] is worse than" the ABX in its performance.

### B.  Dr. Bajaj's Opinions.

Dr. Bajaj is the managing director of Navigant Economics.  He has a Ph.D. in Business Administration with a specialty in finance.  Outside of his work as consulting expert or an expert in litigation, Dr. Bajaj has limited experience in the CDO industry.  Importantly, Dr. Bajaj has no experience with the selection of assets for a CDO.  Nevertheless, Dr. Bajaj was retained to opine on the "economic materiality of the alleged misleading statements and omissions" in this case.[3] (Ex. A, Bajaj Report ¶12).  Specifically, Dr. Bajaj reached the following "principal conclusions":

---

[3]     Dr. Bajaj was also retained to "explain the basic economics of structured finance," (Bajaj Report ¶12), which he does from paragraphs 14 through 41 of his report.  As a general matter, the SEC is not challenging Dr. Bajaj's qualifications to explain these concepts.  However, the SEC objects on *Daubert* grounds to the extent Dr. Bajaj inserts summaries of testimony into economic background evidence, as he does in paragraphs 32-35 of his report.  His discussion of Laura Schwartz's testimony and "understanding" in those paragraphs of his report is inappropriate for the reasons set forth in Sections II-IV below.

1. The AC1 offering documents used to market AC1 provided all "economically material" information that sophisticated investors such as IKB and ACA "needed" to analyze the securities in the AC1 reference portfolio.

2. The failure to disclose to AC1 investors Paulson's economic interest and role in the selection of the AC1 reference portfolio did not cause any "economic harm" to the AC1 long investors.

3. When viewed *ex ante*, the omitted information regarding Paulson's role in "suggesting" subprime RMBS for the AC1 reference portfolio with the intention to take a short position against the portfolio, was not "economically material."

4. An *ex ante* analysis shows that the characteristics of the AC1 reference portfolio were broadly similar to those of the wider subprime RMBS market and the performance to date and the expected future performance of its reference portfolio were no different than those of similarly rated subprime RMBS more generally.

5. An *ex post* analysis of the AC1 reference portfolio shows that it performed no worse than the performance of similar vintage Baa2-rated subprime RMBS generally.

(Bajaj Report ¶13).   Dr. Bajaj offers essentially the same opinions, in restated form, in his rebuttal report.  (Ex. B, Bajaj Rebuttal Report ¶¶7-41).

In addition to his initial and rebuttal reports, Dr. Bajaj produced eight sur-rebuttal exhibits the night before his deposition that largely purport to demonstrate that the SEC's experts used flawed comparison sets in evaluating the performance of the AC1 reference portfolio.  (Ex. C, Bajaj Supp. Exhibits at exh. 1-3, 5).  One sur-rebuttal exhibit also asserts that the performance of AC1 was not statistically significantly different from comparable groups, (*id.* at exh. 4), while another asserts that the accumulated writedowns and ratings downgrades to the AC1 tranches are similar to the writedowns and downgrades for the comparable tranches in the comparison set that SEC expert Ira Wagner considered for his report, *(id.* at exh. 6).

## C.  Dr. Bajaj's Deposition Testimony.

At his February 7, 2013 deposition, Dr. Bajaj acknowledged that he has no experience working in the CDO industry.  (Ex. D, Bajaj Deposition ("Bajaj Dep.") at 29-30).  His exposure to that industry is entirely in the context of providing expert services subsequent to the financial crisis in 2007.  (*Id.* at 24, 41).  Indeed, Dr. Bajaj admitted that he had never "analyzed a CDO

outside the context of providing expert services." (*Id*. at 24).  Further, Dr. Bajaj testified that he "ha[d]n't surveyed [CDO] market participants as to what they were doing in early 2007." (*Id*. at 179).  Thus, when questioned regarding the CDO industry, Dr. Bajaj stated emphatically, "I can't speak to industry practices.  I can only speak to financial economic aspects of these securities." (*Id*. at 46).  More significantly, Dr. Bajaj testified, "I can't answer questions about what a typical [CDO] buyer would do." (*Id*. at 125).  In explaining what he meant when he opined that all "economically material" information has been provided to investors, Dr. Bajaj explained that he simply relied on his own assessment of "economic logic":

> Q:    When you say in paragraph A that the offering documents provide all economically material information, what do you mean by "economically material"?
>
> A:    I just wanted to be careful that to the extent materiality is a question of economics and law, I am not offering a legal opinion.  I'm not finding facts.  I'm analyzing the transaction and the evidence available to me and from an economic perspective.  And as a matter of economic logic, once the portfolio of securities in the reference portfolio is identified, then investors, such as IKB and ACA, that took positions in the billions in this marketplace, had the tools to evaluate the credit risk of the portfolio and formulate their own views of the future prospects of this portfolio, then it doesn't really matter that they know the process by which by which various parties suggested candidates for inclusion in the portfolio.
>
> Q:    And you are stating that as a matter of economic logic; is that correct?
>
> A:    Yes.

(*Id*. at 90-91).

## ARGUMENT

## I.    LEGAL STANDARD FOR *DAUBERT* CHALLENGES.

Federal Rule of Evidence 702 requires that experts be qualified, use reliable methods, and render opinions that will "assist" the jury.  *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "the district court has an obligation to act as a gatekeeper with respect to expert testimony, whether proffered at trial or on a motion for summary judgment."  *Dev. Specialists, Inc. v. Weiser Realty*

*Advisors LLC*, No.09-cv-4084(KBF), 2012 WL 242835, at *7 (S.D.N.Y. Jan. 24, 2012) (citations omitted).  This duty extends to all expert opinions, not simply those on scientific matters. *R.F.M.A.S. v. So,* 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010); (discussing *Kumho Tire, LTD. v. Carmichael*, 526 U.S. 137 (1999)).

The proponent of the expert testimony bears the burden of showing its admissibility. *R.F.M.A.S.*, 748 F. Supp. 2d at 253; *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 356 (S.D.N.Y. 2011). Courts evaluate and exclude expert testimony in connection with motions for summary judgment.  *See, e.g., Zaremba v. General Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (upholding trial court's exclusion of expert witnesses and award of summary judgment); *Weiser Realty*, 2012 WL 242835, at *8; *Buckley v. Deloitte & Touche USA LLP*, No. 06-cv-3291(SHS), 2012 WL 3538733, at *6 (S.D.N.Y. Aug. 16, 2012).

The court discharges its gatekeeping duty with regard to expert testimony first by assessing "whether a witness is qualified to be an 'expert.'"  *Nimely*, 414 F.3d at 396 n.11; *LaSalle Bank Nat'l Assoc. v. CIBC, Inc.,* No. 08-cv-8426(WHP)(HBP), 2012 WL 466785, at *6 (S.D.N.Y. Feb. 14, 2012).  That analysis proceeds in two steps.  *First*, the Court must ascertain "whether the proffered expert has the educational background or training in a relevant field." *Arista Records v. Lime Group*, No. 06-cv-5936(KJW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and quotation omitted).  *Second*, the Court must "compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony." *Id*.  "Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

The opinion of even a qualified expert is admissible only if it is "based upon reliable data and methodology" and "will assist the trier of fact."  *Arista Records*, 2011 WL 1674796, at *1. Rule 702 requires a "sufficiently rigorous analytical connection between that methodology and the expert's conclusions."  *Nimely*, 414 F.3d at 396.  The opinion must not be "connected to existing data only by the *ipse dixit* of the expert."  *Weiser Realty*, 2012 WL 242835, at *8;

*Nimely*, 414 F.3d at 396.  Whether the method is reliable depends on "the particular facts and circumstances of the particular case." *Kumho Tire*, 526 U.S. at 158; *Weiser Realty*, 2011 WL 242835, at *8.  Expert opinions that lack a "factual basis and are based on speculation or conjecture are…inappropriate material for consideration on a motion for summary judgment." *Buckley*, 2012 WL 3538733, at *6 (citation omitted).  "Sometimes, there is simply too great an analytical gap between any data and the opinion proffered."  *Badian*, 822 F. Supp. 2d at 357 (citation and quotation omitted).

In securities cases, testimony on industry custom and practice may assist the trier of fact. *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471-72 (S.D.N.Y 2005) (citing, among others, *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).  Even then, courts must ensure that expert testimony does not supplant the role of the jury.  *Nimely*, 414 F.3d at 397.  Testimony concerning industry standards or practices that simply states a legal conclusion is "specifically barred."  *Highland Capital*, 379 F. Supp. 2d at 472 (discussing cases); *Feinberg v. Katz*, No. 01-cv-2739(CSH), 2007 WL 4562930, at *7 (S.D.N.Y. Dec. 21, 2007) ("An expert witness's opinion may not merely tell the jury what result to reach." (citation and quotation omitted)).  Such testimony would "give the appearance that the court was shifting to witnesses the responsibility to decide the case."  *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977).  Finally, the expert must ground opinions in a valid study and analysis and not merely synthesize the record evidence to argue the client's case.  *See In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert because background evidence "is properly presented through percipient witnesses and documentary evidence").  "In other words, experts should not be permitted to supplant the role of counsel in making argument at trial."  *Id.* at 541.

## II. DR. BAJAJ'S OPINION ON "ECONOMIC MATERIALITY" IS AN INADMISSIBLE LEGAL CONCLUSION UNSUPPORTED BY A FACTUAL FOUNDATION OR RELIABLE METHODOLOGY.

As noted above, one of Dr. Bajaj's "principal conclusions" is that the AC1 investors were provided with all "economically material" information and thus the alleged misleading

statements and omissions by Tourre were not "economically material." (Bajaj Report ¶12). The basis for this opinion is set out in the report. (*Id*. at ¶¶ 42-47). When, at a previous hearing before this Court, the parties discussed offering expert witnesses who might testify on the question of materiality, the Court warned:

> That sounds very legal. That sounds like that is primed . . . for a motion to preclude…. [Y]ou'll find cases exactly on those kinds of witnesses. There are limits to what they can say without treading on what the jury should be entitled to do.

(Oct. 11, 2012 Hr'g Tr. at 60-61). Despite this warning, the defense has proffered in Dr. Bajaj an expert whose opinion amounts to just such an improper legal conclusion. And even then, Dr. Bajaj offers this opinion with no foundation or reliable methodology. Accordingly, his opinion in this regard should be excluded.

### A. Dr. Bajaj's "Economic Materiality" Opinion is a Legal Conclusion that Invades the Province of the Jury.

As this Court rightly advised, while a properly qualified expert may testify as to relevant industry custom and practice if that testimony will assist the jury, *LaSalle*, 2012 WL 466785, at *5, and may also testify as to "what would have been customary for a party to expect or assume," *id*. at *7, courts in the Second Circuit consistently exclude opinions that state legal conclusions such as Dr. Bajaj proffers in this case. *See, e.g.*, *Ebbert v. Nassau County*, No. CV 05-5455 (FB)(AKT), 2008 WL 4443238, at *6 (E.D.N.Y. Sept. 26, 2008) (admission of expert testimony at trial was improper where witness "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial that were based . . . on his examination of documents and correspondence . . . which were equally before the judge and jury because such testimony amounts to no more than an expression of [the witness'] general belief as to how the case should be decided" (citation and internal quotation marks omitted)); *Highland Capital*, 379 F. Supp. 2d at 471 (holding expert testimony on legal conclusions including materiality inadmissible) (citing *Marx*, 550 F.2d at 510); *United States v. Tomasetta*, No. 10-cv-1205(PAC), 2012 WL 1080293, at *4 (S.D.N.Y. Mar. 30, 2012) ("[T]he Government must not elicit testimony regarding whether

the analysts thought that the disclosures would have been material to an investor, because such testimony invades the province of the jury.").[4]  In light of this unequivocal authority, Dr. Bajaj's "economic materiality" opinion is inadmissible.  The Court should disregard it.[5]

Dr. Bajaj attempts to rescue his impermissible opinion regarding the "economic materiality" of Tourre's misstatements and omissions by contending, in his deposition testimony, that he is using the term "materiality" in an economic, rather than legal, sense.  (Bajaj Dep. at 90).  But there is nothing "economic" about Dr. Bajaj's opinion.  Unlike economists who conduct, for example, a quantitative price impact analysis to conclude that information was or was not "economically material," *see*, *e.g.*, *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029(WHP), 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012), Dr. Bajaj simply examines the AC1 disclosure documents and reasons that because sophisticated investors could have analyzed the information in those disclosure documents, the undisclosed information was not material, (*see* Bajaj Report ¶¶42-47).  No economic expertise is used in this "analysis."  (*See id.*).  It is little more than the defendant's argument – namely, that the AC1 investors could have analyzed the reference portfolio for themselves – dressed up as an expert opinion.  Such testimony is not helpful to the jury.  *See Snyder v. Wells Fargo Bank, N.A.*, No. Civ. 4496 (SAS), 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012) (excluding expert testimony that amounted to "little more than a summation from the witness stand" and addressed matters the jury was capable of understanding without help (internal citations and quotations omitted)); *see also Primavera Familienstifung v.*

---

[4]    *See also, e.g.*, *United States v. Mavashev*, No. 08-cv-902(DLI)(MDG), 2010 WL 234773, at *4 (E.D.N.Y. Jan. 14, 2010) ("No witness, expert or otherwise, may testify as to legal conclusions, including whether a particular statement is material or not.") (citation omitted); *Sawant v. Ramsey*, No. 3:07-cv-980(VLB), 2012 WL 2046812, at *2 (D. Conn. June 6, 2012) ("To the extent that Miller's report and proffered testimony opines on the 'materiality' of the purported misrepresentations and omissions at issue in his case as a legal conclusion, such testimony is inadmissible.").

[5]    Dr. Bajaj's opinion on economic materiality is repeated throughout his rebuttal materials.  For example, Dr. Bajaj opines that the identity, reputation, and motivation of a selection agent was not economically material (Bajaj Rebuttal Report ¶25), Paulson's role would not have been economically material (Bajaj Rebuttal Report ¶10), and that the identity and motivation of a short investor would not have been economically material (Bajaj Rebuttal Report ¶¶26, 29).  All of these opinions are impermissible for the reasons stated above.

*Askin*, 130 F. Supp. 2d 450, 529, *amended on reconsideration on other grounds,* 137 F. Supp. 2d 438 (S.D.N.Y. 2001) (excluding expert opinion that "seeks to supplant the role of counsel in making argument at trial and fails to specify any of the "'industry practices'" it referenced).

What is more, Dr. Bajaj uses the term "materiality" in rendering his opinion.  Because that term is a legal one on which the Court will instruct the jury, "the risk of undue prejudice from [Dr. Bajaj's] use of that legal term would substantially outweigh its minimal probative value."  *S.E.C. v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *9 (N.D. Cal. July 29, 2010) (citing Federal Rule of Evidence 403).  Accordingly, Dr. Bajaj's opinion that all "economically material" information was disclosed to investors, (Bajaj Report ¶12.a.), and his opinion that the misstatements and omissions were not "economically material," (*id.* ¶12.c.), should be excluded.

**B.  Dr. Bajaj Has No Basis to Opine on What CDO Investors Deemed Material.**

Even were it permissible for Dr. Bajaj to opine on what was material to CDO investors in 2007, he has no proper basis to do so here.  Lacking any experience in the CDO industry, Dr. Bajaj also fails to identify any economic principles on which he is basing his opinion; he merely summarizes and weighs the evidence in terms of "economic logic" to form his opinion about "economic materiality."  (Bajaj Report ¶¶42-47).  That opinion has no *Daubert*-qualified support.

The process for evaluating an expert's qualifications has two steps: (1) the Court must ascertain "whether the proffered expert has the educational background or training in a relevant field;" and (2) the Court must "compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony."  *Arista Records*, 2011 WL 1674796, at *2 (quotation and citation omitted).  Courts have routinely held that experts cannot testify if their background – no matter how impressive – does not encompass the proposed subject matter of their testimony.  *See Williamson v. Verizon Comm'ns, Inc.*, No. 11-cv-4948(LTS), 2012 WL 5425033, at *2 (S.D.N.Y. Nov. 7, 2012) (expert with "extensive experience" in related areas not qualified to testify on specific "technical aspects of computer

networks"); *Nimely*, 414 F.3d at 399 n.13 (forensic pathologist not qualified on specific issues of human perception and cognition); *Arista Records*, 2011 WL 1674796, at *5 (despite expert's "technological expertise," expert not qualified on specific statistical issues); *Mancuso v. Consol. Edison of New York, Inc.*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) (internist prevented from testifying that PCBs caused injuries because medical training did not establish requisite specialized knowledge).

Dr. Bajaj has never been employed by a financial institution, a collateral manager, a portfolio selection agent, or any institution that had any involvement with CDOs. (Bajaj Dep. 29-30). He has never structured a CDO, selected reference obligations for a CDO, marketed a CDO, or invested in a CDO. (*Id.* at 22). He has never analyzed a CDO outside the context of providing expert services after the financial crisis.[6] (*Id.* at 24, 41). Moreover, Dr. Bajaj admitted that he could "not speak to industry practices," (*id*. at 46), or "answer questions about what a typical CDO buyer would do," (*id*. at 125), and he has not "surveyed [CDO] market participants as to what they were doing in early 2007," (*id*. at 179). Thus, in the present case, there is simply too great a gap between Dr. Bajaj's training and experience and his opinions regarding what would be material to CDO investors. *See R.F.M.A.S.*, 748 F. Supp. 2d at 268-69 (excluded experts had "wealth of experience in the jewelry industry," but failed to "draw on their areas of actual expertise" in arriving at their conclusions); *Malletier,* 525 F. Supp. 2d at 642 ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.").

Moreover, Dr. Bajaj's opinion on "economic materiality" is based on a summary of evidence and conjecture about what market participants could have done. (Bajaj Report ¶¶42-47). Dr. Bajaj applies no economic principles or methodology. Indeed, he employs no

---

[6]     Dr. Bajaj's prior work as an expert witness – none of which involved the construction of a CDO portfolio or advising clients at the time they were entering into a transaction, (Bajaj Dep. at 24-28) – does not qualify him to testify about what information CDO market participants found material in 2007. *See Malletier*, 525 F. Supp. 2d at 615-16 (noting that an expert does not accumulate relevant experience simply by testifying); *Zaremba*, 360 F.3d at 359-360 (district court's *Daubert* analysis was "almost superfluous" when expert's "meager qualifications" consisted almost entirely of consulting for purposes of litigation).

methodology at all to determine what should be deemed material or immaterial.  (*See id.*).  This failure alone would be sufficient to exclude the opinion.  *See R.F.M.A.S.,* 748 F. Supp. 2d at 253 ("Expert testimony that is merely subjective belief or unsupported speculation should be excluded" (internal quotations omitted))*; see also Buckley*, 2012 WL 3538733, at *8 (excluding expert who provided "his conclusion independent of the actual facts" and "did not provide any industry data on how lenders react to negative borrower disclosures"); *Nimely*, 414 F.3d at 396-97 (*Daubert* mandates exclusion when "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached" (internal quotations and citations omitted)).

In sum, Dr. Bajaj has reached an improper conclusion on "economic materiality" that is outside his area of expertise and based on no industry data.  Tourre should be precluded from relying on or using this opinion at the summary judgment stage or trial.

### III. DR. BAJAJ IMPERMISSIBLY OPINES AS TO WHAT ACA AND INVESTORS "SHOULD HAVE KNOWN" BASED ON HIS REVIEW OF THE EVIDENCE.

Dr. Bajaj next opines that "economic evidence" suggests that ACA "should have known" that Paulson was short, (Bajaj Report ¶¶48-53), and "the relative weakness of recent vintages of subprime RMBS *should have been known* to the investors in ABACUS,"[7] (Bajaj Rebuttal Rept. ¶44).   While purporting to offer these opinions based on "economic evidence," Dr. Bajaj in fact simply reviews evidence and weighs the testimony of the witnesses in this case.   And even then, Dr. Bajaj fails to consider relevant evidence on the question of what ACA and investors "should have known."   Such a weighing of evidence and testing of witness credibility is not the proper purview of an expert witness.

---

[7]     Dr. Bajaj offers similarly improper opinions about what investors "knew or should have known," including that "based on publicly available information as of April 2007 that there were risks involved in investing in instruments backed by subprime mortgages." (Bajaj Rebuttal Report ¶7(4)).

The courts have repeatedly held that an expert witness may not simply weigh the evidence[8] and evaluate the credibility of witnesses.  *See Nimely*, 414 F.3d at 398 ("expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under rule 702"); *Marx & Co*, 550 F.2d at 510 ("examination of documents and correspondence . . . which were equally before the judge and jury" is improper subject of expert testimony); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination [of] the jury"); *In re Rezulin*, 309 F. Supp. 2d at 551 (precluding narrative of product that jury was "equally capable of constructing").  Yet Dr. Bajaj proposes to do precisely what these courts have forbidden.  Dr. Bajaj weighs what he understands to be the SEC's allegations about ACA's knowledge against the documentary and testimonial evidence that he deems credible, (Bajaj Report ¶¶48-53), in order to reach the conclusion that ACA "should have known that Paulson was short,"[9] (*id.*).  This is plainly impermissible.

Dr. Bajaj's report and deposition testimony make clear that he was not bringing any economic expertise to bear in his analysis of what ACA "should have known."  For example, Dr. Bajaj compares the testimony of Laura Schwartz of ACA to contemporaneous press articles. (Bajaj Report ¶51).  It is hard to see how such opinion testimony is within Dr. Bajaj's expertise as an economist, much less proper expert opinion testimony.  Similarly, Dr. Bajaj opines that the AC1 offering documents (*i.e.*, the offering circular and term sheet) "show that the equity tranche was not held by anyone."  (Bajaj Report ¶48).  However, when Dr. Bajaj was questioned about this assertion in his deposition, he ultimately conceded that he lacked the expertise to "opin[e] on

---

[8]     It is also noteworthy that, in weighing the evidence about what ACA "should have known" about Paulson's purely short position, Dr. Bajaj fails to consider the audio recording, (*See* SEC MSJ at 5), in which a GS&Co salesperson told ACA that Paulson was taking all of the equity, (Bajaj Dep. at 155).

[9]     To the extent Dr. Bajaj's opinion is based on the understanding that the SEC's case rests simply on the fact that Paulson's short position was not disclosed to ACA, he is mistaken.  GS&Co and Tourre affirmatively misrepresented to ACA both that Paulson was taking an equity position in the AC1 transaction **and** that the interests of Paulson and ACA in that transaction were aligned.  *See* SEC's MSJ at 2-8.

how a typical investor in early 2007 would have read those documents." (Bajaj Dep. at 138). Rather, he said he was purportedly "reading the documents for their plain meaning." (*Id.*) Of course, if that is all Dr. Bajaj is doing, then there is no need for expert testimony on this point. *See LaSalle Bank*, 2012 WL 466785, at *10 (holding that there was no need for an expert witness to testify as to the meanings of words in a contract that are "straightforward and well known").

Furthermore, the deposition of Dr. Bajaj revealed that the cited documents (*i.e.,* the AC1 term sheet and offering circular) did not support his opinion that ACA should have known that the AC1 "equity tranche was not held by anyone." (Bajaj Report ¶48). With regard to the AC1 term sheet, Dr. Bajaj admitted that it did not establish what would happen with the equity tranche:

> Q:    So as of February 26, 2007, does Egol Exhibit 14 [the AC1 term sheet] say that an equity first-loss tranche will not be sold?
>
> A:    I don't know that it says anything one way or the other.  Whether it ought to be interpreted one way or another depends on legal obligations to disclose and various other legal issues that I can't opine on.

(Bajaj Dep. at 146).  Similarly, while Dr. Bajaj claimed that the offering circular informed readers that the equity tranche was not held by anyone because, he claims, it stated that the amount of the first loss notes was $0, (*id*. at 137), Dr. Bajaj conceded that the offering circular also listed the amount of the super senior tranche as $0 even though that tranche was actually sold by means of a credit default swap rather than notes, (*id*. at 140, 144).  Dr. Bajaj's opinion fails to consider the possibility that the equity tranche could similarly be placed by means of a credit default swap in which Paulson sold protection, (*i.e.,* went long), on that tranche.  (Ex. E, May 17, 2007 Email from Laura Schwartz).  Thus, there is nothing to be gleaned from the offering circular about what ACA "should have known" about Paulson's investment in the equity tranche of AC1.

Dr. Bajaj's error in this respect highlights the danger of allowing purported expert witnesses to, in effect, provide a summation of the defense arguments under the guise of expert testimony.  *See In re Rezulin*, 309 F. Supp. 2d at 541 ("experts should not be permitted to supplant the role of counsel in making argument at trial").  Dr. Bajaj's attempt to weigh the evidence, evaluate the credibility of the witness testimony, and then render an opinion on which side's argument is the strongest is plainly impermissible.

## IV.   DR. BAJAJ IMPERMISSIBLY OPINES THAT ACA'S "ACTIONS CONTRADICT ITS CLAIM THAT IT WOULD HAVE BEHAVED DIFFERENTLY IF IT HAD KNOWN PAULSON'S SHORT POSITION."

Dr. Bajaj should also not be allowed to opine that ACA's prior conduct in separate and unrelated CDO transactions involving different parties "contradict[s]" the testimony of ACA's Laura Schwartz that ACA would not have served as portfolio selection agent for the AC1 transaction had it known that Paulson did not take an equity position in AC1, but instead took a purely short position.  (Bajaj Report ¶¶54-56).  In order to reach this conclusion, Dr. Bajaj does nothing more than compare Laura Schwartz's testimony to that of other witnesses and documents.  (*See id.* fns. 85-91).  Setting aside the fact that the other cited transactions in which ACA participated do not actually contradict the testimony of ACA's Schwartz,[10] comparing such evidence is not the proper purview of an expert in economics.  *See Snyder*, 2012 WL 4876938 (precluding expert from summarizing testimony of other witnesses and characterizing it as false).  Dr. Bajaj identifies no economic principles that guide his analysis.[11]  (*See* Bajaj Report ¶¶54-56).

---

[10]     In the two other synthetic CDO transactions cited by Dr. Bajaj in which ACA served as the portfolio manager, the two hedge funds that (arguably) played a role in the asset selection process both invested in the CDO's equity tranche.  (*See* Bajaj Report ¶¶54-55).  This arrangement is entirely consistent with the testimony of the ACA witnesses that, had they known that Paulson was purely short the AC1 transaction without investing in the equity, they would have deemed such information important.  The other two transactions cited by Dr. Bajaj were not even CDOs, much less synthetic ones in which there was a short party.  (*Id.* ¶ 56).

[11]     Dr. Bajaj frequently couches his analysis of evidence in legal, as opposed to economic, terms.  He argues that the risk associated with 2006 and 2007 RMBS was "not relevant" because it was known to the market, (Bajaj Rebuttal Report ¶14), that his own report "demonstrated" that ACA had the economically "relevant" information, (Bajaj Rebuttal Report ¶22), and that "ACA had ample opportunity" to follow its

Dr. Bajaj is, in effect, offering an opinion on Laura Schwartz's credibility, which is exclusively for the jury to decide.  An expert may not usurp the jury's role in this regard.  *See Nimely*, 414 F.3d at 398 ("this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under rule 702");  *Scop*, 846 F.2d at 142 (same).  Accordingly, his opinion in this regard should be disregarded at the summary judgment stage and precluded at trial.

## V. DR. BAJAJ DID NOT UTILIZE STATISTICALLY RELIABLE METHODS IN ANALYZING THE PERFORMANCE OF THE AC1 REFERENCE PORTFOLIO.

The only portion of Dr. Bajaj's testimony that is even arguably within his expertise as an economist is found in the final section of his report where he opines regarding the performance of the AC1 reference portfolio as compared against the supposed universe of subprime RMBS deals.  (*See* Bajaj Report ¶¶57-82).  There, Dr. Bajaj offers several comparisons of the subprime RMBS in the AC1 reference portfolio with other subprime RMBS.  (*See id.*)  These comparisons purport to show that AC1 was not "designed to fail" and that its abysmal performance was not significantly different from the poor performance of other RMBS.[12]  (*See id.*)  However, the comparisons that Dr. Bajaj undertakes are all fatally flawed and inherently unreliable.

Generally, if statistical analyses are not properly constructed, the expert's opinion is inadmissible.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997).  "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."

---

usual rules and procedures, (Bajaj Rebuttal Report ¶22).  These are all arguments that can be made in the defense's closing argument, but they are devoid of any methodology other than rehashing evidence in the light most favorable to the defense, and thus have no place in an expert report.  *Snyder,* 2012 WL 4876938, at *4 (precluding portions of expert report that "consist largely of rehashing and characterizing testimony" as an "impermissible narrative amounting to little more than a summation from the witness stand" (internal citation and quotation omitted)).

[12]     To the extent Dr. Bajaj's description of his analyses is couched in terms that purport to demonstrate what the parties intended at the time or whether AC1 was designed to fail, it is impermissible.  "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *In re Rezulin,* 309 F. Supp. 2d at 547; *see also R.F.M.A.S,* 748 F. Supp. 2d at 268 (same).

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 176 (S.D.N.Y. 2006) (quoting *Amorgianos v. Nat. R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)).  Moreover, "[t]he reliability inquiry is context-specific, and the question before the Court is not the reasonableness of the expert's methodology *in general*, but rather the reasonableness of using such an approach to draw a conclusion *regarding the particular matter to which the expert testimony was directly relevant.*"  *Weiser Realty*, 2012 WL 242835 at *8 (emphasis in original) (internal citation and quotation omitted).

### A.  Dr. Bajaj Failed to Calculate The Standard Deviation For Sur-Rebuttal Exhibit 4.

During his deposition, Dr. Bajaj discussed his sur-rebuttal exhibit number 4, which is captioned, "The Performance of [AC1] was Not ***Statistically Significantly Different*** From Comparable Groups." (Ex. C at exh. 4 (emphasis added)).  As an initial matter, it is worth noting that this conclusion is contrary to Tourre's own statements about the quality of the AC1 portfolio.  At his deposition, Tourre conceded that he viewed the AC1 portfolio as "weaker than other portfolios." (Ex. F, Fabrice Tourre Dep. at 175).  Moreover, in an April 23, 2008 email, Tourre referred to AC1 as "infamous" and noted that the "portfolio is worse than ABX.06-1 BBB and INDX." (Ex. G, Apr. 23, 2008 Email from Fabrice Tourre).

Dr. Bajaj, however, reached a strikingly different conclusion by comparing the AC1 portfolio of RMBS deals to 493 other subprime RMBS deals.  (Ex. C at exh. 4).  According to Dr. Bajaj, this comparison set of 493 subprime deals has a 27.05% cumulative loss rate, whereas AC1 has 28.49% cumulative loss rate.  (Bajaj Dep. at 303-305).  At his deposition, Dr. Bajaj revealed that he had not calculated the standard deviation necessary to determine the supposed "statistical significance" of the difference between the two numbers:

> Q.  And the mean percentage of cumulative loss for that set is 27.05 percent; is that correct?
>
> A.  That is correct.
>
> Q.  Do you know what the standard deviation is on the set number 5?
>
> A.  No.

Q. Did you calculate that?

A. No.

Q. Do you know how many standard deviations 28.49 is from 27.05?

A. No.  I do not know because I did not calculate the standard deviation, and that would be a meaningless calculation in any way.

(*Id*. at 305).  Dr. Bajaj conceded, as he must, that there is an approximately 5 percent difference in cumulative losses between AC1 and Dr. Bajaj's comparison set.  (*Id*. at 309 (agreeing that 28.49% is roughly 5% higher than 27.05%)).  Dr. Bajaj offers no explanation for how he concludes this difference is "not statistically significant," and he cannot so opine without calculating the standard deviation.  Defense expert Dr. Charles Cox agreed that statistical significance cannot be determined without calculating a standard deviation.  (Ex. H, Charles Cox Dep. at 56-57).  The standard deviation is "the proper method for determining 'legal significance' on the basis of statistical evidence."  *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 647 (4th Cir. 1983), *rev'd on other grounds*, *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984).  Thus, "without expert analysis of the standard deviation, [Dr. Bajaj's] statistical evidence . . . is meaningless, confusing, and irrelevant."  *Wingfield v. United Technologies Corp.*, 678 F. Supp. 973, 983 (D. Conn. 1988).

**B.  Dr. Bajaj Applies No Methodology In Concluding Comparison Sets Are Similar.**

As a general matter, all of the comparisons in Dr. Bajaj's reports and the sur-rebuttal exhibits suffer a similar methodological flaw.  Dr. Bajaj opined in connection with these exhibits that an array of metrics show that the AC1 portfolio of RMBS was "similar," "comparable," or not "significantly different" from other RMBS.  (*See, e.g.*, Bajaj Report ¶63 (exhibits 10-11 show AC1 credit quality "comparable" to that of comparison set), ¶64 (exhibits 11a, 11b, and 11c show difference in delinquency rates, foreclosure rates, and bankruptcy rates is not "statistically significant"); ¶65 (exhibits 12a and 12b show "little difference on average" between attachment points); exhs. 13, 14a, 14b ("similar" projected total losses); ¶79 (exhibit 15 shows

"similar" projected writedowns)).   However, Dr. Bajaj never set forth the criteria by which he judged similarity.   (*Id.*).   Indeed, he consistently failed to calculate the standard deviations between comparison sets, and his reports highlight no other statistical or economic method for determining similarity.   (*Id.*).

Exhibits 10a and 10b underscore the danger of permitting Dr. Bajaj to opine on similarity without any reliable methodology.   In exhibit 10a, Dr. Bajaj compared the FICO scores of AC1 and the comparison set.   (Bajaj Report at exh. 10a).   He opined that there was no statistically significant difference.   (Bajaj Dep. at 277).   However, he did not even know which set had a higher FICO score.   (*Id*. at 276).   For exhibit 10b, which compared debt-to-income ratios, Dr. Bajaj did not know the average numbers for AC1 and the comparison set, but nevertheless testified that any differences between them were not statistically significant.   (*Id*. at 277).   In these analyses, there appears to be no methodology whatsoever.   (Bajaj Report at exhs. 10a-b).   The comparison sets are deemed similar simply because Dr. Bajaj states that it is so.   It is well established that opinions "connected to existing data only by the *ipse dixit* of the expert" are inadmissible.   *Weiser Realty*, 2012 WL 242835, at *8; *Nimely*, 414 F.3d at 396.

"Both Rule 702 and Rule 403 require the court to look at the cumulative effect of all the flaws in a survey."   *Malletier*, 525 F. Supp. 2d at 596 (citation omitted).   Because there is no methodological, legal, or factual support for Dr. Bajaj's opinions about AC1's performance, and with deep methodological flaws that permeate his analyses, Dr. Bajaj's opinions and reports should be excluded from consideration at summary judgment or trial.

## **CONCLUSION**

For the reasons set forth above, the SEC respectfully requests that the Court disregard Dr. Bajaj's report in ruling on the parties' motions for summary judgment and preclude Dr. Bajaj from testifying at trial.

Dated:  March 8, 2013

Respectfully submitted,

*/s/ Bridget Fitzpatrick*
Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9292 (fax)
martensm@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 8, 2013, I directed the foregoing SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE PORTIONS OF THE OPINION TESTIMONY OF DR. MUKESH BAJAJ to be electronically filed using the CM/ECF system, which will send notification of such filing to the following email address:

> Pamelachepiga@allenovery.com
> Pamela Rogers Chepiga
> Allen & Overy LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attorney for defendant Fabrice Tourre

> /s/ *Bridget Fitzpatrick*
> Bridget Fitzpatrick