**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| | : | |
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | Civil Action |
| | : | No.: 10-cv-3229 (KBF) |
| Plaintiff, | : | |
| | : | ELECTRONICALLY FILED |
| v. | : | |
| | : | |
| FABRICE TOURRE, | : | |
| | : | |
| Defendant. | : | |
| | x | |

**MEMORANDUM OF LAW OF FABRICE TOURRE IN OPPOSITION TO
THE SEC'S *DAUBERT* MOTION TO EXCLUDE PORTIONS OF
THE OPINION TESTIMONY OF DR. MUKESH BAJAJ**

Pamela Rogers Chepiga
David C. Esseks
Andrew Rhys Davies
Brandon D. O'Neil

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

Dated:  March 29, 2013
        New York, New York

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 3

    A.    The SEC's Nonsensical Economic Theory Of This Case ..................................... 3

    B.    Dr. Bajaj's Opinion .............................................................................................. 4

        1.    Both Long And Short Investors Are Structurally Essential To A
            Synthetic CDO, So A Synthetic CDO Reference Portfolio Has To
            Be Acceptable To Both Long And Short Investors ................................... 5

        2.    All Economically Important Information Was Disclosed And
            Available To Investors ............................................................................ 6

        3.    The Economic Evidence Shows That ABACUS Was Not
            "Designed To Fail" ................................................................................ 7

        4.    Even Crediting ACA's Testimony That It Thought Paulson Was
            Buying The Equity, It Would Have Been Economically Irrational
            To Draw The Conclusion That Paulson Thereby Had The Same
            Interests As A Long Note Investor .......................................................... 8

ARGUMENT ................................................................................................................ 10

I.    THE SEC HAS NO BASIS TO CHALLENGE DR. BAJAJ'S EMPIRICAL
    ANALYSES ........................................................................................................ 10

    A.    Dr. Bajaj Correctly Determined The Lack Of Statistical Significance In
        His "Sur-Rebuttal" Exhibit 4 .............................................................................. 10

    B.    The SEC Fails Utterly To Establish That Dr. Bajaj "Applies No
        Methodology" With Respect To The Remainder Of His Exhibits ..................... 14

II.    BAJAJ'S ECONOMIC OPINIONS WILL ASSIST THE JURY IN REACHING
    A PROPER DETERMINATION ON THE ISSUE OF MATERIALITY AS
    DEFINED BY THE SUPREME COURT ................................................................... 16

    A.    Dr. Bajaj Is Well-Qualified To Opine On The Subjects Actually
        Addressed In His Report ...................................................................................... 16

B.     Dr. Bajaj Is Not Offering An Opinion On Legal Materiality .............................. 17

C.     Dr. Bajaj's Opinions Will Assist The Jury In Understanding The Total
       Mix Of Data That Was Available To ACA And Others In 2007 ........................ 19

CONCLUSION ...................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*EEOC v. Fed. Reserve Bank of Richmond*,
  698 F.2d 633 (4th Cir. 1983)................................................................................. 11

*Ebbert v. Nassau County*,
  No. 05 Civ. 5445(FB)(AKT), 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008).................18, 19

*Highland Capital Mgmt., L.P., v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................................. 19

*In re SLM Corp. Sec. Litig.*,
  No 08 Civ. 1029(WHP), 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012).................................. 17

*Matrixx Initiatives, Inc. v. Siracusano*,
  __ U.S. __, 131 S. Ct. 1309 (2011) ...........................................................................17, 18

*SEC v. Badian*,
  822 F. Supp. 2d 352 (S.D.N.Y. 2001) ...........................................................................16, 17

*Sawant v. Ramsey*,
  No. 07 Civ. 0980, 2012 WL 2046812 (D. Conn. Jun. 6, 2012) ........................................... 19

*United States v. Contorinis*,
  692 F.3d 136 (2d Cir. 2012)................................................................................. 18

*United States v. Mavashev*,
  08 Cr. 902(DLI), 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010) ........................................... 19

*United States v. Tomasetta*,
  No. 10 Cr. 1205(PAC), 2012 WL 1080293 (S.D.N.Y. Mar. 30, 2012).................................. 19

*Wingfield v. United Technologies Corp.*,
  678 F. Supp. 973 (D. Conn. 1988)......................................................................... 11

## RULES AND STATUTES

Fed. R. Evid. 702................................................................................................. 19

Fed. R. Evid. 701................................................................................................. 19

Fabrice Tourre respectfully submits this memorandum of law in opposition to the SEC's *Daubert* Motion To Exclude Portions of the Opinion Testimony of Dr. Mukesh Bajaj.[1]

## PRELIMINARY STATEMENT

A proper economic understanding of the synthetic nature of the ABACUS CDO reveals fatal flaws in the SEC's theory of liability in this case.  According to the SEC, Goldman misled the very experienced subprime debt specialist ACA into participating in the ABACUS transaction by misrepresenting, or not correcting ACA's "misimpression" that Paulson, then a little-known investor that no one took seriously, would be taking a long position in the CDO's equity tranche.  This, according to the SEC, caused ACA to jump to the conclusion that Paulson's economic interests were aligned with the interests of long note investors, whereupon ACA allowed Paulson to have input into portfolio selection.

ACA subjected every bond in the portfolio to its regular credit analysis process, and was sufficiently confident in its analysis to invest hundreds of millions of dollars in the transaction.  Despite this, according to the SEC, Paulson was still able to "adversely select" a portfolio, using only information about the securities that was equally available to ACA, that was "designed to fail."  If only ACA had known that Paulson was a short investor, ACA would have run, outraged, from the transaction.  The CDO would not, then, have closed, and IKB—another ultra-sophisticated CDO investor—would not have been defrauded by the allegedly misleading offering materials.

At each step, the SEC's theory becomes less plausible.  It is not surprising, thus, that the SEC would seek to limit expert testimony by qualified economists in this case.

---

[1] Dr. Bajaj's opening and rebuttal reports appear as Exhibits A and B to the SEC's *Daubert* Motion to Exclude Portions of the Opinion Testimony of Dr. Mukesh Bajaj, and are cited in the format "Bajaj Rep." and "Bajaj Rebuttal" respectively. Other Exhibits referenced herein are exhibited to the Declaration of Andrew Rhys Davies dated March 29, 2012, and are cited in the format "Davies Ex. __."  The SEC's Memorandum of Law is cited in the format "SEC Bajaj Mem," the SEC's Memorandum of Law in Support of its Motion for Partial Summary Judgment is cited "SEC SJ Mot." and Dr. Bajaj's Deposition Transcript, which appears at Davies Ex. 1, is cited in the format "Bajaj Dep. Tr."

Prosecuting a fraud case upon an untenable economic theory is not, however, a proper ground for excluding your opponent's experts under *Daubert*.

Dr. Bajaj—a lecturer in financial economics at the Haas School of Business, University of California, Berkeley—will be invaluable in helping the jury understand the true nature and economics of the ABACUS transaction, so that the jury will have a sound basis on which to make the legal determinations necessary to resolve this case.  Dr. Bajaj will equip the jury to understand the synthetic nature of the ABACUS transaction, including the fact that equal and opposite long and short investors are structurally essentially to such a transaction.  He will help the jury understand the economic interests of investors in ABACUS, and how those interests determine the way a portfolio selection agent must perform its role, which is, at base, to create a reference portfolio of securities that is attractive to both long and short investors, without both of whom there can be no synthetic CDO.   Dr. Bajaj will also explain to the jury the extensive data that were disclosed and available to investors in 2007, so that the jury will be able to determine for itself whether the allegedly omitted information was material.  Finally, through empirical analysis Dr. Bajaj will show that there is absolutely no substance to the SEC's claim that the ABACUS portfolio was "designed to fail," and that, whether examined *ex ante* as of April 2007 or *ex post* as of 2012, there is no evidence that the performance of ABACUS was worse in any statistically significant way than any other comparable portfolio.

The several objections the SEC raises to various parts of Dr. Bajaj's opinion fail to establish any proper basis for exclusion under *Daubert*:

<u>First</u>, the SEC's technical objection to Dr. Bajaj's empirical analyses—that he failed to properly calculate a standard deviation for purposes of judging statistical significance— is carelessly made.  The notes to those analyses clearly state that statistical significance was calculated using a test endorsed by the SEC's own expert, Andrew Davidson, at his deposition, and which incorporates multiple standard deviation calculations.

Second, Dr. Bajaj is well qualified to offer the opinion that he is actually offering. The SEC's claims that Dr. Bajaj is not qualified to opine on CDO industry practices and that he has not "surveyed" industry participants are irrelevant, as Dr. Bajaj is offering no such opinions.

Third, Dr. Bajaj does not offer an opinion on legal materiality.  Rather, as an economist and financial analyst, his opinion details the types of information that would be available for purposes of analyzing an investment in a synthetic CDO like ABACUS, and provides an economic perspective that will assist the jury in judging the relative importance of those data.  This testimony will aid the jury in reaching a determination on materiality under the standard set forth by the Supreme Court, which requires the jury to decide, from the perspective of a reasonable investor, whether disclosure of the allegedly omitted information would have significantly altered the "total mix" of information already available.

Finally, Dr. Bajaj does not offer any opinion on the credibility of the SEC's witnesses.  It is unavoidable that the jury, when it hears Dr. Bajaj's accurate economic perspective on the transaction at issue in this case, will question the plausibility of statements thus far offered by several of the SEC's witnesses.  This fact, however, does not justify the exclusion of expert testimony that will permit the jury a proper understanding of the case's issues.

## BACKGROUND

### A.    The SEC's Nonsensical Economic Theory Of This Case

The SEC alleges that Goldman tricked ACA—an experienced RMBS CDO collateral manager and insurer of subprime-related debt—into acting as "portfolio selection agent" for the ABACUS CDO.  Amended Complaint ("Am. Compl.") ¶¶ 4, 22-23, 30-36; SEC SJ Mot. at 4-6, 10-12.   Goldman accomplished this feat, according to the SEC, by misrepresenting to ACA, or at least not correcting ACA's "misimpression," that Paulson intended to take a long position in the ABACUS equity tranche, when it actually intended to take a short interest.  Am. Compl. ¶¶ 1, 4-6; SEC SJ Mot. at 4-6.  Despite ACA's long familiarity

3

with the economics of synthetic transactions, and its involvement in several prior transactions in which hedge funds made long investments in the equity tranche to fund a net short position, ACA's "misimpression" supposedly caused it to conclude that Paulson's interests were aligned with those of senior long investors.  Am. Compl. ¶¶ 4, 30-36; SEC SJ Mot. at 11.

Laboring under this misimpression, ACA allowed Paulson to have input into the selection of the ABACUS reference portfolio, unaware that Paulson's strategy was to "adversely select" the CDO reference portfolio of Baa2-rated subprime RMBS securities.  Am. Compl. ¶¶ 16; SEC SJ Mot. at 6, 10-11.  To do this, Paulson proposed reference securities that it identified using characteristics—like average FICO score and geographic location of the loans underlying the RMBS—that were readily apparent to anyone who looked at the portfolio, including ACA, using standard industry tools like Intex and CoreLogic LoanPerformance.  Am. Compl. ¶ 26.

Notwithstanding that ACA analyzed and approved each and every bond using its regular credit analysis process and was sufficiently pleased with the portfolio that it decided to invest hundreds of millions in the transaction, according to the SEC, what ACA had actually selected was a portfolio that was "designed to fail" because it had secretly been "adversely selected" by Paulson.  Am. Compl. ¶¶ 16.   As a result, the offering materials provided to IKB, itself a specialist in RMBS credit analysis, were materially misleading when they represented that ACA selected the portfolio.  Am. Compl. ¶¶ 37-44.

**B.**     **Dr. Bajaj's Opinion**

Dr. Bajaj's testimony will provide the jury with vital information from the perspective of a financial economist as to the economic attributes of the instruments at issue in this lawsuit and the economic interests of investors in them, and as to the lack of any empirical support for the SEC's "designed to fail" theory, together with invaluable evidence that will allow the jury to evaluate the "total mix" of information that was available in 2007 and to evaluate the plausibility of the economic theory advanced by the SEC.

1.      **Both Long And Short Investors Are Structurally Essential To A Synthetic CDO, So A Synthetic CDO Reference Portfolio Has To Be Acceptable To Both Long And Short Investors**

Dr. Bajaj will explain to the jury that short investors are structurally essential to a synthetic CDO, Bajaj Rep. ¶¶ 25-28, thereby correcting the misperception fostered by the SEC that the participation of short investors was somehow illegitimate or improper. As Dr. Bajaj will explain, because ABACUS was purely synthetic, meaning that it did not actually own the portfolio securities it "referenced," the only cash flows ABACUS could generate had to come from short investors interested in buying credit protection on the same referenced securities. *Id.* ¶¶ 26, 36-37. It was these credit protection premiums, paid to ABACUS under CDS contracts with short investors, that were the source of funds for the interest payments ABACUS paid to the long investors who purchased its bonds. *Id.* Likewise, these payments by short investors also funded the premiums paid to ACA under ACA's own synthetic long position, which it established through a CDS contract directly with ABACUS. *Id.* ¶¶ 39-41.

Thus, as Dr. Bajaj will explain, to select a portfolio that would produce gains for long investors if the portfolio performed well, the portfolio had to be of a nature that short investors would be willing to pay to buy credit protection on it, on the basis of their opposite view that the securities may perform poorly. Bajaj Report ¶¶ 28-29; Bajaj Dep. Tr. at 62-63, 70-71, 86-89, 222, 228-29, 243-45. Thus, to say, as the SEC does, that ACA was acting only in the interests of long investors is only accurate in a very superficial sense, and, without a proper explanation will only mislead the jury.

As Dr. Bajaj clearly explained at his deposition, the idea that a portfolio selection agent in a synthetic CDO can act in the interests of only long or only short investors is specious. It is simply not viable to design a portfolio that is expected to move in one direction only, because that portfolio would not be of interest to investors taking the opposite position. Rather, a synthetic CDO reference portfolio has to be sensitive to the variable on which long *and* short investors want to take positions, and must offer them an efficient price at which to take those positions. *Id.* ¶ 62-63, 70-71.

## 2. All Economically Important Information Was Disclosed And Available To Investors

Further, as Dr. Bajaj's analysis will permit the jury to understand, even if someone had wanted to select a portfolio that was "designed to fail," that would have been irrational and impossible. That is because it would have been transparent and obvious to the sophisticated long investors who participated in the transaction, as all economically relevant information necessary to conduct credit analysis on the investment, including all relevant information regarding the CDO structure, such as a cash flow priority and payment waterfall, was fully disclosed. *See* Bajaj Rep. ¶¶ 42-47; Bajaj Dep. Tr. at 234-37.

Moreover, because the identity of all 90 subprime RMBS were disclosed in the Offering Circular, investors like ACA and IKB, using standard industry sources such as CoreLogic LoanPerformance and Intex, could access information about each specific RMBS, including their subordination levels and credit enhancement features, as well as the characteristics of their underlying mortgage loans, such as vintage or mortgage borrower FICO scores, geographic location, debt-to-income ratio, and individual loan interest rate terms. *Id.* ¶ 43; Bajaj Rebuttal ¶19. Additionally, industry tools like Intex permitted investors to specifically model cashflows for each subprime RMBS based upon the input of forecasted variables such as prepayment and delinquency rates, the expected path of future interest rates, and other macroeconomic assumptions. *Id.* ¶ 43.

The SEC nowhere alleges that Paulson formed his opinion on the reference RMBS based upon information that was not equally available to ACA or to IKB. To the contrary, the Amended Complaint in fact alleges that Paulson's financial predictions and investment strategy were based upon his views of how characteristics like geographic location and low FICO scores would negatively impact RMBS prices. Am. Compl. ¶ 26. And, as Dr. Bajaj explains, Bajaj Rep. ¶ 42-47, information regarding each of these characteristics was equally available to, and was in fact analyzed by, ACA and IKB.

As such, to believe the SEC's theory of liability in this case—that ACA would have refused to participate in the transaction if it had known Paulson intended to take a short interest and that this would, in turn, have caused IKB not to invest—the jury must also believe that ACA, a leading industry expert on RMBS credit analysis, whose entire job it was, according to the SEC, to analyze these securities for portfolio selection purposes in order to safeguard the interests of long investors, would have regarded the views of Paulson, a hedge fund that people contemporaneously regarded as "kooks" or "tourist investors," as being so persuasive as to override ACA's own analysis of the reference portfolio.  Dr. Bajaj's analysis and opinions will help the jury evaluate the SEC's specious arguments on this point.

**3.     The Economic Evidence Shows That ABACUS Was Not "Designed To Fail"**

Indeed, actual financial analysis of the ABACUS reference portfolio demonstrates that the portfolio that ACA selected for ABACUS was not, in fact, "designed," *ex ante*, to perform any worse than the universe of RMBS with the same vintage and agency rating, and further that, *ex post*, it did not in fact perform any worse.  *See* Bajaj Rep. ¶¶ 57-80, 81-82.

Conducting an *ex ante* credit and performance analysis on the referenced RMBS securities, Dr. Bajaj demonstrates that the underlying loan quality and other credit characteristics of the ABACUS RMBS were comparable with or better than the universe of Baa2-rated subprime RMBS tranches.  *Id.* ¶¶ 59-63.  To begin, Dr. Bajaj used the Intex and CoreLogic LoanPerformance tools equally available to ACA and IKB to obtain performance characteristics of the loans underlying two groups of RMBS—the ABACUS reference portfolio and a comparison set of 425 Baa2-rated subprime RMBS issued, like those underlying ABACUS, between January 2006 and March 2007.  *Id.* ¶ 61.  These performance characteristics included foreclosure, bankruptcy, and delinquency rates of the loans underlying the RMBS; measures of credit risk including FICO scores, combined loan-to-value ratio, and debt-to-income ratio; and detailed loan level information, including loan type, loan purpose, lien position, occupancy status, geographic distribution, and level of documentation.  *Id.*

As reflected in Exhibits 10-11 in Dr. Bajaj's report, there is no evidence that the ABACUS reference portfolio was biased to contain bonds backed by loans with especially risky characteristics, like low FICO scores or concentrations in certain geographical areas, and any difference between the expected performance of the ABACUS portfolio and the larger universe of Baa2-rated RMBS is not statistically significant.   Additionally, in Exhibits 12a and 12b to his report, Dr. Bajaj demonstrated that there was little difference, on average, between attachment and detachment points for ABACUS and the Baa2-rated comparison set.  *Id.* ¶ 65, Exs. 12a-12b. Thus, in addition to possessing loan credit quality similar to their peers, the ABACUS subprime RMBS were also structured similarly and were not expected to fail more on average given the same level of risk in the underlying collateral.  *Id.*

Using two different methodologies, Dr. Bajaj next demonstrated that as of April 2007, based on an analysis of expected future performance, there was no reason to believe that the ABACUS subprime RMBS would underperform typical Baa2-rated subprime RMBS.  The results of these two analyses are reported across Exhibits 13 to 15 of Dr. Bajaj's report.  *Id.* ¶¶ 68-77, Exs. 13-15.

Finally, conducting an *ex post* analysis, Dr. Bajaj demonstrated that although the ABACUS reference securities performed poorly, so did all 2006-2007 subprime RMBS, and ABACUS' performance was largely in line with other Baa2 subprime RMBS of those vintages. Specifically, Dr. Bajaj demonstrated that as of 2012, there was no statistically significant difference in the average accumulated writedowns of the ABACUS RMBS and the comparison set of Baa2-rated subprime RMBS.  *Id.* ¶¶ 81-82.

### 4.    Even Crediting ACA's Testimony That It Thought Paulson Was Buying The Equity, It Would Have Been Economically Irrational To Draw The Conclusion That Paulson Thereby Had The Same Interests As A Long Note Investor

Bajaj's testimony additionally exposes a key fallacy underlying the SEC's theory of the case—that alleged misrepresentations regarding Paulson's plan to take an equity stake in

ABACUS convinced ACA that Paulson's interests were, in the SEC's words, "aligned" with those of long investors in ABACUS's more senior tranches.

Dr. Bajaj explains that the economic interests of equity investors and investors in more senior CDO tranches were not, as the SEC suggests, aligned. *Id.* ¶¶ 21-24.  Rather, an equity investor would expect higher returns from a less diversified portfolio with higher default correlation.  This higher correlation, however, would increase the risk to holders of the more senior tranches without offering the same increased returns.  *Id.*  Thus, as Dr. Bajaj explains, because equity and more senior investors have fundamentally different risk profiles, one cannot expect, as the SEC suggests, that they would want to pick the same securities for the reference portfolio. *Id.* ¶ 24.

More basically, however, Bajaj also explains that taking a long equity stake does not mean that such an investor's interests are aligned with long note holders, because hedge funds commonly used their long equity investments to fund larger short positions.  *Id.* ¶¶ 52-53; Bajaj Dep. Tr. 178-79, 188-89.[2]  Thus, even if, contrary to the evidence, the jury were to conclude that Mr. Tourre misled ACA into believing that Paulson was taking a long equity position, it simply would not be economically rational for ACA to have assumed that meant Paulson's interests were aligned with purely long note holders.

Additionally, Dr. Bajaj's testimony will provide useful economic background to allow the jury to evaluate the information regarding Paulson that was actually available to ACA in 2007, including, for example, information reflecting that Paulson's short subprime strategy caused him to "hit paydirt" and to be "up huge" during a market downturn, and that Paulson wanted to exclude loans that were "too seasoned."  Bajaj Rep. ¶¶ 49-50; Bajaj Dep. Tr. at 170.  Without this assistance from Dr. Bajaj that will permit the jury to decide what ACA actually knew regarding Paulson's position at the time of the transaction by providing a proper economic

---

[2] Dr. Bajaj references an FCIC survey of more than 170 hedge funds encompassing over $1.1 trillion in assets as of early 2010, finding this to be a common strategy among medium sized hedge funds:  of all the CDOs issued in the second half of 2006, more than half of the equity tranches were purchased by hedge funds that also shorted other tranches.  *See* Bajaj Rep. ¶ 53, n.84.

interpretation of the information ACA had at hand, the jury will be left with only ACA's *ex post facto*, self-serving claims as to how it understood all that evidence in 2007, and will be unable to evaluate the evidence properly.

## ARGUMENT

## I.   THE SEC HAS NO BASIS TO CHALLENGE DR. BAJAJ'S EMPIRICAL ANALYSES

### A.   Dr. Bajaj Correctly Determined The Lack Of Statistical Significance In His "Sur-Rebuttal" Exhibit 4

First, the SEC argues that Dr. Bajaj should be prohibited from testifying on the findings reflected in his Sur-Rebuttal Exhibit 4 on the ground that he failed to calculate a standard deviation for purposes of judging statistical significance.  SEC Bajaj Mot. at 17-18. This argument arises from some combination of the SEC's failure to read the document and to understand how statistical significance is properly calculated for an analysis of this type.

By way of background, Dr. Bajaj created Sur-Rebuttal Exhibit 4, a copy of which appears as Exhibit C to the SEC's *Daubert* motion (ECF No. 207-3, at 7), to expose astounding methodological errors in a similar analysis attempted by the SEC's expert, Andrew Davidson, which purported to compare the *ex post* performance of ABACUS, as of December 2012, with a comparison set of purportedly similar RMBS securities.[3]  Dr. Bajaj's research revealed that Davidson's comparison set was not remotely comparable to ABACUS, and that over forty percent of Davidson's comparison set contained dissimilar securities that contained option adjustable rate mortgages, Alt-A loans, and other RMBS that did not contain a Baa2-rated tranche.  Bajaj. Dep. Tr. at 291-300.  At his deposition, Davidson conceded that the representation in his report that he constructed his comparison set from the "Intex universe" of subprime deals was "inelegant" (that, apparently, being a euphemism for "inaccurate"), because,

---

[3] The SEC complains that this exhibit was offered in sur-rebuttal, but that was the result of the SEC's tactical decision, in violation of at least the spirit of the stipulated schedule, to withhold its experts' empirical analysis of the ABACUS 2007-AC1 portfolio until it served its rebuttal reports.  *See* Davidson *Daubert* Mot. at 1.  If Davidson had submitted an opening report, Dr. Bajaj would have responded to it in his rebuttal report.

in fact, he used a categorization created for his own consulting business.  Davies Ex. 2 (Davidson Dep. Tr. at 177-79).  Davidson has since admitted that he does not know how a former employee created that categorization and he cannot find any documents memorializing it.  Davies Exs. 3, 4.

In Sur-Rebuttal Exhibit 4, Dr. Bajaj undertook to construct correctly the comparison set that Davidson claimed to have created, and demonstrated that there was no statistically significant difference, as of December 2012, in the percentage cumulative losses between ABACUS and that comparison set.  Bajaj Dep. Tr. at 291-300.

Attempting to save face, the SEC now argues that Sur-Rebuttal Exhibit 4 is inadmissible because it thinks that Dr. Bajaj failed to calculate a standard deviation to determine whether that difference was statistically significant.   It is the SEC, however, that has made an error, by failing to read the notes to Dr. Bajaj's one-page exhibit.  Those notes plainly state that Dr. Bajaj determined statistical significance using a difference-in-means test rather than a simple standard deviation calculation.  *See* Sur-Rebuttal Ex. 4 ("Difference in means tests between ABACUS and any comparable group over all performance metrics show that differences in performance of ABACUS are not statistically significant.").

The difference-in-means test, which may be run automatically in the Stata statistical software used to generate the analysis, allows one to test for statistical significance in the differences between two sample means.  The test thus incorporates into its equation the standard deviation using data from both sets.  *See* Davies Ex. 5 (Declaration of Dr. Mukesh Bajaj dated Mar. 29, 2013).  Thus, while the SEC is correct that Dr. Bajaj did not himself calculate a standard deviation for each variable separately, the method he used incorporated this information.[4]  Moreover, the underlying data for Sur-Rebuttal Exhibit 4 is available through

---

[4]  The SEC cites to two cases, *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633 (4th Cir. 1983), and *Wingfield v. United Technologies Corp.*, 678 F. Supp. 973 (D. Conn. 1988), for the proposition that the standard deviation is the only proper method to determine "legal significance" on the basis of statistical evidence.  These cases, however, in no way aid the SEC's argument because, as explained above, the difference-in-means test incorporates the standard deviation calculation.

Intex, so the SEC's experts might easily have run the calculation to verify that there is, in fact, no statistically significant difference.

Moreover, any challenge to the appropriateness of the difference-in-means test as a "statistically reliable method" would be difficult going for the SEC, as its own expert employed just such a test. *See* Davies Ex. 2 (Davidson Dep. Tr. at 184-85). As Davidson explained at his deposition, *in response to questioning on this very same topic by SEC counsel*, the difference-in-means test must be used to judge statistical significance where one is comparing differences of two sample sets, because a simple standard deviation calculation will not suffice. *See id.* ("But, unfortunately, when we are comparing two samples, we can't just take raw standard deviation differences.").

Second, displaying once again a disheartening tendency to litigate based on snippets of evidence that it spins out of context, the SEC argues that the Court should exclude Sur-Rebuttal Exhibit 4 because Mr. Tourre has already "conceded," in an April 23, 2008 email and at his deposition, that the ABACUS reference portfolio performed more poorly than average. SEC Bajaj Mem. at 17. Not only is this a wholly improper basis for a *Daubert* motion, as it has no bearing on the reliability of Dr. Bajaj's analysis, but the SEC has truncated the email and distorted the deposition testimony, thereby misrepresenting the import of both.

The April 23, 2008 email, when not truncated by the SEC, makes clear that Mr. Tourre was simply referencing "ABX.06-1 BBB-" as a comparison point for pricing a possible trade as of April 2008. *See* SEC Ex. G. Not only does April 2008 have no relevance whatsoever as a date for assessing the performance of ABACUS, but, as the SEC's own experts have repeatedly pointed out, later vintage subprime RMBS performed worse than earlier vintages, *see, e.g.,* Davies Ex. 2 (Davidson Dep. Tr. at 172), so it is not at all surprising that ABACUS, which includes bonds issued in 2006 and the first quarter of 2007, would price lower than ABX.06-1, which is composed entirely of RMBS from the second half of 2005 (and the email says nothing about how much worse the performance of ABACUS was as of that date). More fundamentally, however, Mr. Tourre's email simply makes a price comparison between

12

two different products on a specific date—it does not "concede" in any way that ABACUS'

performance was poor in any objective or absolute sense, or worse somehow than subprime

Baa2-rated RMBS generally.

      Similarly distortive is the SEC's claim, which is based on a quotation taken

wholly out of context, that Mr. Tourre "conceded" at his deposition that the ABACUS portfolio

was "weaker than other portfolios." SEC Bajaj Mem at 17.   The full line of questioning (with

the text cherry-picked by the SEC emphasized) reads as follows:

> Q.    You were aware that the AC1 transaction involved a particularly weak portfolio
> of Baa2 RMBS, correct?
>
> [Objection]
>
> A.    My view was that this portfolio may have been *weaker than other portfolios*; but
> again, in absolute, that's not correct.
>
> Q.    But putting aside the absolutes, you recognize that this portfolio was weaker than
> other comparable portfolios, correct?
>
> [Objection]
>
> A.    You can't put this on the side.  It has to be compared to some other.

SEC Ex. F (emphasis added).

      As the full passage makes perfectly clear, Mr. Tourre was rejecting the SEC's

premise that the ABACUS portfolio was weak in any objective or "absolute" sense.  That it

"may have been weaker than other portfolios" is simply a truism, and the comment in no way

supports the implication the SEC makes here, which is that it was weaker than the comparison

sets identified in Dr. Bajaj's exhibit.

      This merely underscores that Dr. Bajaj's opinion is necessary to help the jury

come to a considered verdict based on accurate economic analysis.  As Dr. Bajaj's testimony will

make clear, the ABACUS portfolio—like every other CDO portfolio—was neither "weak" nor

"strong" in any objective or absolute sense.  It was simply a portfolio composed such that both

long and short investors could agree to take contrasting exposures at a particular price point.

And, as Dr. Bajaj's *ex ante* financial analysis of the referenced securities demonstrates, it was not "designed to fail" in the simplistic sense offered by the SEC, nor did it fail, relative to other similar comparison sets, as is shown by Dr. Bajaj's *ex post* analysis.

**B.   The SEC Fails Utterly To Establish That Dr. Bajaj "Applies No Methodology" With Respect To The Remainder Of His Exhibits**

The SEC proceeds from one ill-founded challenge to another, making the largely unexplained assertion that, "as a general matter," Dr. Bajaj "applie[d] no methodology" in connection with "all of the comparisons in Dr. Bajaj's reports and the sur-rebuttal exhibits." SEC Bajaj Mem. at 18.[5]  The SEC specifically moves to exclude Exhibits 10 through 15 attached to Dr. Bajaj's opening report, which appears as Exhibit A to the SEC's *Daubert* motion, purportedly on the basis that he failed to calculate the standard deviation when comparing ABACUS against other comparison sets with respect to certain criteria.   The SEC is wrong. Once again, the SEC has not only failed to comprehend the import of the exhibits Dr. Bajaj prepared, it has apparently failed to read the notes explaining how Dr. Bajaj reached his conclusions on statistical significance.

The SEC appears not to realize that these exhibits fall into two categories:  (1) Exhibits 11, 13, 14, 15, and 16, which compare the actual and projected *performance* of the ABACUS portfolio, across a specified time period, to the performance of a generalized comparison set of Baa2-rated subprime RMBS;[6] and (2) Exhibits 10 and 12, which are demonstratives that break out certain individual RMBS characteristics, including characteristics that the SEC claims Paulson was focused on as a means of creating a portfolio that would fail.[7]

---

[5] Reserving all rights to respond to any further *Daubert* challenges the SEC may be permitted to make, Mr. Tourre will respond here with respect to the exhibits that the SEC specifically challenges.

[6] For example, Exhibit 11a compares the 60+ day delinquency rates of the two sets from January 2006 to April 2007; Exhibit 11b compares the foreclosure rates between the two sets over the same period; and Exhibit 11c compares the bankruptcy rates.

[7] For example, Exhibit 10a is a bar graph showing the differences in FICO scores across the two comparison sets, and Exhibit 10b does the same with debt-to-income ratios.

As to the first category of exhibits, which address the actual or projected *performance* of ABACUS in relation to the comparison set, Dr. Bajaj concluded that the differences were not statistically significant by employing difference-in-means tests. This is explained, quite plainly, in the notes for each of the exhibits, and also in the text of Dr. Bajaj's report. *See* Bajaj Report ¶ 64, Exs. 11, 14, 15, 16. It bears noting, also, that Dr. Bajaj did not need to use a difference-in-means test to assess whether the differences shown in Exhibit 11c (bankruptcy rates) or 13 (projected total loss) were statistically significant, because the exhibits showed that ABACUS actually matched or outperformed the comparison set.

As to the second category of exhibits, which are demonstratives that show graphically certain characteristics of the RMBS in ABACUS and the comparison set, Dr. Bajaj does not purport to opine on the question of statistical significance.[8] To the extent those characteristics actually affected *performance*, that would be addressed in the first category of exhibits, which do include a statistical significance test. Moreover, these exhibits will allow the jury to consider whether the evidence bears out the SEC's claim that the ABACUS portfolio was biased to contain RMBS backed by loans with certain especially risky characteristics, such as low FICO scores or concentration in certain markets like California, Florida, Arizona, and Nevada. *See* Am. Compl. ¶ 26.

Exhibit 10a, for example, will allow the jury to see graphically the range of FICO scores of the loans referenced in the ABACUS portfolio, as compared with the universe. Exhibit 10e will allow the jury to see the geographic distribution of the loans, which shows, *inter alia*, that although ABACUS may have had a larger proportion of loans in California than the universe, it had a smaller proportion of loans in Florida, Arizona and Nevada.

---

[8] As Dr. Bajaj explains in his declaration (Davies Ex. 5), he was asked at his deposition by counsel for the SEC whether differences exhibited in Exhibits 10a, 10b and 10c were statistically different, and Dr. Bajaj testified as to his recollection, from compiling the Exhibits, that the differences were not. Those exhibits themselves, however reflect no opinion whether the differences in characteristics shown were statistically significant, and Dr. Bajaj intends to offer none at trial.

A careful reading of the notes to Dr. Bajaj's exhibits should have dispensed with the SEC's challenge to these exhibits before it was brought.  The Court should disregard it accordingly.

## II.    BAJAJ'S ECONOMIC OPINIONS WILL ASSIST THE JURY IN REACHING A PROPER DETERMINATION ON THE ISSUE OF MATERIALITY AS DEFINED BY THE SUPREME COURT

### A.    Dr. Bajaj Is Well-Qualified To Opine On The Subjects Actually Addressed In His Report

The SEC challenges Dr. Bajaj's qualifications to offer an expert opinion in this matter, on the basis that he has not personally worked in the CDO industry and has not "surveyed" CDO market participants.  *See* SEC Bajaj Mem at 5, 10-12.   This is a straw man argument, however, because Dr. Bajaj is not offering an opinion on CDO industry practices, and has never claimed either to be qualified by virtue of having worked in the CDO industry or through "surveying" members of that industry.

Dr. Bajaj is, however, well qualified to offer the opinions that he is actually offering, as a financial economist who is very familiar with the structured finance markets generally and with innovations in those markets, including CDOs specifically.  Dr. Bajaj is a professor of financial economics at the Haas School of Business, University of California, Berkeley, where he teaches classes in securities design and financial engineering, which, for the last five years, have covered topics relating to CDO structure and mortgage securitizations.  Bajaj Dep. Tr. at 18-21; Bajaj Rep. Ex. 1.   Dr. Bajaj has also provided expert testimony concerning CDOs on several other occasions.  Bajaj Dep. Tr. at 23, 31-35.[9]  As such, he is eminently qualified to opine on the subjects set forth in his report.

This much is made clear in at least one case the SEC cites in its brief, *SEC v. Badian*, 822 F. Supp. 2d 352 (S.D.N.Y. 2001).  In that case, which involved a specific type of "future-priced convertible debenture," the defendant moved for exclusion of the SEC's two

---

[9] Unlike the witnesses in the cases cited by the SEC, *see* SEC Bajaj Mem. at 11 n.6, Dr. Bajaj has not gained his experience "simply" or "almost entirely" through testifying or consulting.

experts because neither had specific personal experience with the type of security at issue.  The court denied the motion, finding that the SEC's two experts were qualified by virtue of being professors of economics and finance, and that their "extensive experience, although not specific to future-priced securities, [was] sufficient to provide them with the knowledge and skill necessary to evaluate the securities involved in this matter, especially their experience studying asset pricing, debt instruments and econometric modeling."  *Id.* at 363.

### B.   Dr. Bajaj Is Not Offering An Opinion On Legal Materiality

The SEC also argues that, by offering an opinion on the "economic materiality" of information regarding Paulson's role and short interest, Dr. Bajaj is offering an impermissible legal conclusion.  He is not, however, as his deposition testimony, block-quoted by the SEC in its brief, makes clear:

> I just wanted to be careful that to the extent materiality is a
> question of economics and law, I am not offering a legal opinion.
> I'm not finding facts.  I'm analyzing the transaction and the
> evidence available to me from an economic perspective.

Bajaj Dep. Tr. at 90-91.

The case law cited by the SEC does not support its argument, and rather makes clear that such opinions on economic materiality are perfectly permissible when offered by qualified economic experts.  For example, in *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029(WHP), 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012), *see* SEC Bajaj Mem. at 9, the court recognized that "'materiality' has a specific meaning for economists, [and] [a] legal assessment of materiality is different—it is not determined by a single factor such as price impact, but must take into account all the relevant circumstances in a particular case."  *Id.* at *5 (citing *Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S. Ct. 1309 (2011)).[10]

---

[10] The SEC suggests that *In re SLM* requires an opinion on economic materiality to be based on "a quantitative price impact analysis," but the *SLM* court actually rejected Defendants' "wooden insistence" on such an analysis.  *See In re SLM*, 2010 WL 209095, at *6.  Moreover, even if a "price impact" analysis might be relevant in a stock-drop case like *SLM*, it would be completely inapposite in this case.

To make its finding on legal materiality in this case, the jury will be required to decide whether there is a "substantial likelihood" that a "reasonable investor" would have found the allegedly omitted information "important in making investment decisions," *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012), so that it "would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available," *Matrixx*, 131 S. Ct. at 3211.

To make this determination, the jury must, <u>first</u>, have some basis for understanding what comprised the "total mix" of information available in order to judge whether disclosure of facts about Paulson would have "significantly altered" that mix, and, <u>second</u>, some economic perspective on the transaction that will enable it to judge whether disclosure of additional facts would have been incrementally valuable relative to what information was already available. That is precisely what Dr. Bajaj's expert opinion will provide, so that the jury can make the required legal determination in an informed way.

Without the benefit of expert testimony, the jury will be left with only the SEC's specious economic theories, supported by the self-serving, *ex post facto* claims by ACA that it did not know about Paulson's economic interest and that it would have considered such information material. No doubt it suits ACA's former employees, personally and professionally, to testify that they were misled, as opposed to accepting that they simply made decisions that, with the benefit of hindsight, they wish they had not made. Nothing, however, requires the jury to make the required objective materiality determination based only on such subjective accounts of revisionist history.

Finally, the case law cited by the SEC does not support its argument that Dr. Bajaj is offering an impermissible legal opinion. In *Ebbert v. Nassau County*, No. 05 Civ. 5445(FB)(AKT), 2008 WL 4443238 at *7 (E.D.N.Y. Sept. 26, 2008), for example, the court distinguishes between expert testimony offering specialized knowledge and factual interpretation to assist the jury in reaching a legal determination, and expert testimony on "how the law ought

to be applied to the facts of the case." *Id.* at *7.   Dr. Bajaj is plainly offering the former, not the latter.[11]

In *Sawant v. Ramsey*, No. 07 Civ. 0980, 2012 WL 2046812 (D. Conn. Jun. 6, 2012), the court held that the financial issues in that case were too simple to justify expert testimony directly on the question of materiality, but recognized nonetheless that "in some instances, in the context of a much more complicated segment of the stock market, expert testimony may be admissible as helpful to suggest 'the inference which should be drawn from applying the specialized knowledge to the facts'" *Id.* at *1 (quoting Notes of Advisory Committee on Proposed Rule 702, Fed. R. Evid.).   The case before this Court, clearly, is just such an instance.

Finally, in *United States v. Mavashev,* 08 Cr. 902(DLI), 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010), the court held that expert testimony on "the significance of the misrepresentations in mortgage loan applications" was permissible so long as counsel did not elicit use of the term "material," stating that "such testimony from a witness with specialized mortgage procedures would clearly assist the finder of fact in this case." *Id.* at *4.   Mr. Tourre would have no objection to such a limitation in this case, which would not impact the substance of Dr. Bajaj's testimony at all.

### C.   Dr. Bajaj's Opinions Will Assist The Jury In Understanding The Total Mix Of Data That Was Available To ACA And Others In 2007

Finally, the SEC argues that the proposed testimony set forth in paragraphs 48 to 56 of Dr. Bajaj's opening report should be excluded on the basis that Dr. Bajaj is improperly

---

[11] *Accord Highland Capital Management, L.P., v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (precluding expert testimony that included a "discussion of the federal securities laws, including statutes and cases," "defined various technical legal terms pertaining to securities fraud, including 'market manipulation,' 'insider trading,' 'tippers,' 'tippees,' 'material' information, and 'non-public' information," and "appl[ied] these generic legal principles to the facts of the [] case").   It is unclear why the SEC cited *United States v. Tomasetta*, No 10 Cr. 1205(PAC), 2012 WL 1080293 (S.D.N.Y. Mar. 30, 2012), which deals with *non*-expert opinion testimony under Rule 701.

weighing evidence and, "in effect," judging the credibility of the SEC's principal witness, Laura Schwartz of ACA.  SEC Bajaj Mem. at 12-16.

The SEC's argument is ill-founded because Dr. Bajaj is neither weighing evidence nor opining on Ms. Schwartz's credibility.  He is merely providing the jury assistance in understanding the economic information that was concededly known to her and to ACA in 2007.  The fact that the jury may, and should, conclude that that information reflects poorly on Ms. Schwarz's veracity when she now denies knowledge of Paulson's interest and claims that she would have found that information important is no reason to deny the jury the benefit of Dr. Bajaj's assistance.   To the contrary, it makes it vital that the jury hear Dr. Bajaj's evidence.

In the challenged sections of his report, Dr. Bajaj offers testimony that will help the jury understand the economic implications of Paulson's statements to ACA that he saw "opportunities" in a "deteriorating" subprime RMBS market, Bajaj Rep. ¶ 49, of Paulson's preference not to have in the portfolio loans that were "too seasoned," *id*. ¶ 50; Bajaj Dep. Tr. at 170, and of news reports reflecting that Paulson was "up huge" during a market downturn that caused losses to long investors, *id.* ¶ 51.   It will be helpful to the jury to hear expert testimony as to the clear economic import of these pieces of information, *i.e.*, that Paulson was a short investor, rather than leaving the jury with only ACA's *ex post facto*, self-serving, implausible claims as to how it understood all that evidence in 2007.

Dr. Bajaj's opinions will also help the jury evaluate ACA's claim that it thought that Paulson's long equity investment aligned its interests with those of long note holders and that ACA would not have participated in ABACUS if it had known of Paulson's short interest. Dr. Bajaj will explain that it was a common hedge fund strategy to purchase the equity tranche of a synthetic CDO and then to use the returns on equity to fund larger short positions.  Bajaj. Rep. ¶ 53.  Dr. Bajaj will also explain that, in fact, in 2006, ACA and Ms. Schwartz participated in a CDO called Aquarius 2006-1, in which the hedge fund Magnetar, which Ms. Schwartz knew to be a "core short" investor, had influence in the portfolio selection process, invested in the equity of the CDO but also took short positions in the transaction.  Bajaj Rep. ¶ 54.

Dr. Bajaj will, thereby, help the jury understand that it is impossible to determine an investor's economic interest simply by reference to a single investment in a CDO's equity tranche, without knowing what other investments that investor makes elsewhere in the transaction and outside the transaction.  As Dr. Bajaj's testimony will make clear, by accurately describing the economic reality of a synthetic transaction, the notion that a net short investor's interests could somehow be "aligned" with that of long investors is pure nonsense.  The fact that this testimony may "in effect" reflect poorly on the credibility of the SEC's witnesses is not proper basis to exclude it.  Bluntly, it is not the fault of Dr. Bajaj or Mr. Tourre that Ms. Schwartz is offering incredible testimony, and no legitimate interest is served by denying the jury access to evidence that shows the implausibility of ACA's testimony and the SEC's economic theory.

## **CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court deny the SEC's *Daubert* Motion To Exclude Portions Of The Opinion Testimony Of Dr. Mukesh Bajaj.

Dated: March 29, 2013
          New York, New York

Respectfully submitted,

/s/ Pamela Rogers Chepiga
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
David C. Esseks
(david.esseks@allenovery.com)
Andrew Rhys Davies
(andrew.rhys.davies@allenovery.com)
Brandon D. O'Neil
(brandon.o'neil@allenovery.com)

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

22