**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                   :

SECURITIES AND EXCHANGE    :
COMMISSION,                         :       Civil Action
                                   :       No.: 10-cv-3229 (KBF)
              Plaintiff,          :
                                   :       <u>ELECTRONICALLY FILED</u>
             v.                    :
                                   :

FABRICE TOURRE,               :
                                   :
            Defendant.        :
———————————————————— x

**REPLY MEMORANDUM OF LAW OF FABRICE TOURRE IN
FURTHER SUPPORT OF HIS MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT</u>**

 

Pamela Rogers Chepiga
David C. Esseks
Andrew Rhys Davies
Brandon D. O'Neil

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

Dated:  April 12, 2013
        New York, New York

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

SYNOPSIS.................................................................................................................1

I.    MR. TOURRE DID NOT MAKE A DOMESTIC "OFFER" OF SECURITIES
      TO IKB OR ABN AMRO .......................................................................................2

      A.    U.S.-Based Conduct Related To An Indisputably Foreign Securities
            Transaction Can Not Be Re-cast As An "Offer" In Order To Circumvent
            *Morrison* ....................................................................................................2

      B.    No One, Especially Mr. Tourre, Made A Domestic "Offer" To IKB....................9

            1.    The IKB Transaction Was A Europe-Based Transaction Managed
                  By London-Based GSI Employees .............................................9

            2.    IKB Well Understood That The Preliminary Offering Circular
                  Emailed By Mr. Tourre Did Not Constitute An "Offer" ...........................10

      C.    No One, Especially Mr. Tourre, Made A Domestic "Offer" To ABN Amro........12

II.   THE SEC HAS DONE NOTHING TO SUBSTANTIATE ITS CLAIMS
      REGARDING ALLEGED "OFFERS" MADE TO DOMESTIC INVESTORS.............14

CONCLUSION..........................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ..................................................................5

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................17

*In re Morgan Stanley Info. Fund Secs. Litig.*,
  592 F.3d 347 (2d Cir. 2010) .............................................................7, 8

*In re Royal Bank of Scotland Group PLC Secs. Litig.*,
  765 F. Supp. 2d 327 (S.D.N.Y. 2011) ...................................................5

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010) ............................................................... passim

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010) ...................................................8

*SEC v. Benger*,
  --- F. Supp. 2d ----, 2013 WL 1150578 (N.D. Ill. Mar. 21, 2013) ...............5

*SEC v. Benger*,
  --- F. Supp. 2d ----, 2013 WL 1277872 (N.D. Ill. Mar. 28, 2013) ...............6

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*,
  120 F.2d 738 (2d Cir. 1941) ...............................................................7

*SEC v. Goldman Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011) ................................................3, 8

*SEC v. Gruss*,
  859 F. Supp. 2d 653 (S.D.N.Y. 2012) ...................................................6

*SEC v. ICP Asset Mgmt., LLC*,
  No. 10 Civ. 4791 (LAK), 2012 WL 2359830 (S.D.N.Y. June 21, 2012) .....4, 5, 6

*SEC v. Nat'l Secs., Inc.*,
  393 U.S. 453 (1969) ..........................................................................4

*SEC v. Starmont*,
  31 F. Supp. 264 (E.D. Wash. 1939) ......................................................6

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
  No. 10 Civ. 4933 (ALC) (GWG), 2013 WL 81263 (S.D.N.Y. Jan. 8, 2013) ....................17

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) ................................................................................................15

## STATUTES & RULES

15 U.S.C. § 77b ....................................................................................................................4

15 U.S.C. § 77q ............................................................................................................. passim

17 C.F.R. § 230.901 .............................................................................................................9

Fed. R. Civ. P. 56 ...............................................................................................................1

Defendant Fabrice Tourre respectfully submits this reply memorandum of law in further support of his motion, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment to the extent the SEC's Amended Complaint dated November 22, 2010 purports to assert claims under Section 17(a) of the 1933 Securities Act (the "Securities Act"), 15 U.S.C. § 77q(a), as to "offers" allegedly made to German bank IKB Deutsche Industriebank AG ("IKB"), to the London branch of Dutch bank ABN Amro Bank NV ("ABN Amro"), and to unidentified domestic investors.

## SYNOPSIS

Throughout the course of this litigation, the SEC has steadfastly tried to ignore the plain meaning of the U.S. Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). Despite this Court correctly dismissing claims related to alleged IKB and ABN Amro "purchases" and "sales," because those are unambiguously foreign transactions, and despite the Supreme Court setting forth that the Securities Act shares the "same focus on domestic transactions" as the 1934 Exchange Act, *i.e.*, that those statutes apply only to "parties or prospective parties" to domestic securities transactions, the SEC refuses to accept that *Morrison* also mandates dismissal of its Section 17(a) "offer" claims as to IKB and ABN Amro.

Indeed, in its opposition to Mr. Tourre's partial summary judgment motion, the SEC does not even attempt to address *Morrison*'s clear statement that the "focus" of the Securities Act, like the Exchange Act, is on "domestic transactions." Instead, the SEC urges this Court to rely on pre-*Morrison* cases in order to resurrect the "conduct" and "effects" tests that were rejected wholesale in *Morrison*, and seeks to shoehorn Mr. Tourre's sparse New York-based conduct related to the IKB and ABN Amro transactions into the all-encompassing, circular definition of "offer" in the Securities Act.

The SEC either misunderstands Mr. Tourre's argument, or prefers to re-direct the Court's attention to arguments it finds more palatable. Either way, this effort fails. Mr. Tourre has shown that the expansive, circular definitions in the securities laws do not assist the SEC

here, and post-*Morrison* courts have recognized that these definitions can not be used to override *Morrison*'s mandates.  Further, post-*Morrison* courts have recognized that the transactional test applies equally to the Securities Act, and the remaining claims related to IKB and ABN Amro should now be dismissed.

      Mr. Tourre has also shown that, despite the SEC promising the Court that it would substantiate, with actual evidence, its claims that Mr. Tourre is responsible for supposed offers of securities to domestic investors, the SEC has done nothing of the sort.  As this claim has only ever been a contrivance, inserted into the SEC's Amended Complaint to avoid dismissal of this case pursuant to *Morrison*, it, too, should now be dismissed.

## I.    MR. TOURRE DID NOT MAKE A DOMESTIC "OFFER" OF SECURITIES TO IKB OR ABN AMRO

### A.    U.S.-Based Conduct Related To An Indisputably Foreign Securities Transaction Can Not Be Re-cast As An "Offer" In Order To Circumvent *Morrison*

      The Supreme Court established in *Morrison* a transactional test that limits the applicability of the federal securities laws to "parties or prospective parties" to "purchases and sales of securities in the United States."  *See* ECF No. 185 (Mem. of Law in Supp. of Mr. Tourre's Mot. for Partial Summary Judgment dated Mar. 1, 2013 ("Tourre Summary Judgment Mem.")), at 26 (quoting *Morrison*, 130 S. Ct. at 2884).  Mr. Tourre has demonstrated that this Court's June 10, 2011 Order, while correctly recognizing that the alleged IKB and ABN Amro transactions were foreign, incorrectly relied on pre-*Morrison*, out-of-circuit case law to extend Section 17(a) to supposed "offers" made to foreign parties IKB and ABN Amro to enter into foreign transactions.  *Id.* at 26-31.

      Although the SEC halfheartedly argues that the Court's June 10, 2011 Order should not be revisited, *see* ECF No. 225 (SEC's Mem. of Law in Opp. to Mr. Tourre's Mot. for Partial Summary Judgment, dated Mar. 29, 2013 ("SEC Summary Judgment Mem.")), at 13-15, it does not seriously contest that the Court recognized this was an "issue of first impression" that

would need to be re-examined on summary judgment, to avoid a trial before the jury under an incorrect standard of law.  *See* Tourre Summary Judgment Mem. at 25.

    Instead, the SEC urges this Court to ignore *Morrison* and focus on the sparse New York-based conduct of Mr. Tourre related to the IKB and ABN Amro transactions, because, in the SEC's view, that conduct satisfies the all-encompassing definition of "offer" in the Securities Act.  *See*, *e.g.*, SEC Summary Judgment Opp. at 2 (arguing that Mr. Tourre's "domestic conduct is more than sufficient to satisfy the Securities Act's broad definition of an 'offer'"), 19 (Mr. Tourre's "conduct satisfies the Securities Act's expansive definition of an 'offer'").  The SEC does not address—in any respect—the *Morrison* court's statement that the securities laws apply only to "parties or prospective parties" to "purchases and sales of securities in the United States," nor does the SEC attempt to argue that *Morrison*'s transactional test does not apply to the Securities Act.

    The SEC's position is, as it has been throughout the course of this litigation, "an invitation for this Court to disregard *Morrison* and return to the 'conduct' and 'effects' tests." *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 158 (S.D.N.Y. 2011).  *See also* ECF No. 164 (Opinion and Order dated Nov. 19, 2012), at 12 (rejecting the SEC's argument that it could state a Section 10(b) claim because the "technical passing of title between the non-defrauded Goldman and the ABACUS Trustee in the United States set the wheels in motion" for a "foreign purchase of securities by IKB (for Loreley)").

    As discussed below, the sum total of the New York-based conduct described by the SEC consists of a few emails and a couple of phone calls concerning the ABACUS 2007-AC1 transaction.  But the SEC misses the point entirely:  even if Mr. Tourre's conduct could be said to satisfy the expansive, circular definition of "offer" in the Securities Act, which Mr. Tourre does not concede, this conduct related entirely to securities transactions that were always intended to be, and in fact were, foreign transactions, as this Court has already recognized. Pursuant to *Morrison*, U.S.-based conduct related to such transactions is outside the scope of the federal securities laws.

Indeed, the *Morrison* court noted that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Morrison*, 130 S. Ct. at 2884 (emphasis original). Instead, the *Morrison* court looked at the "focus" of the Exchange Act, which was "not upon the place where the deception originated," but, rather, "upon purchases and sales of securities in the United States." *Id.* As such, the court determined, "it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." *Id.* As Mr. Tourre has shown, the *Morrison* court recognized that its transactional test applied with equal force to the Securities Act, which shares the "same focus on domestic transactions," and was "enacted by the same Congress as the Exchange Act" and forms "part of the same comprehensive regulation of securities trading." *See* Tourre Summary Judgment Mem. at 27 (quoting *Morrison*, 130 S. Ct. at 2885).

As Mr. Tourre has shown, when the statutory definition of "offer" is applied in context, as the statute requires, it cannot, for *Morrison* purposes, encompass supposed "offers" made from the United States to enter into foreign transactions which are not themselves subject to the securities laws. *See* Tourre Summary Judgment Mem. at 29. Indeed, the Supreme Court has remarked that the definitions in the securities laws are "unhelpful," *see id.* at 29 n.22 (citing *SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 466 (1969)), and the Honorable John G. Koeltl held that, in applying *Morrison*, the definition of "purchase" could not have the expansive definition set forth in the Exchange Act because that would be contrary to *Morrison*. *See id.* at 29. Further, these definitions are circular on their face, as the term "offer" is defined to mean "every attempt to offer or dispose of, or solicitation of an offer to buy, a security or interest in a security, for value," *see* 15 U.S.C. § 77b(a)(3). In other words, an "offer" is an "offer" or an "attempt to offer." These definitions do not shed light on how *Morrison* applies to Section 17(a).

By contrast, post-*Morrison* courts have recognized that the transactional test applies equally to Section 17(a), which, notably, is entitled "Fraudulent Interstate <u>Transactions</u>." *See* 15 U.S.C. § 77q (emphasis added). In *SEC v. ICP Asset Management, LLC*, No. 10 Civ.

4791 (LAK), 2012 WL 2359830, at *2 (S.D.N.Y. June 21, 2012), the Honorable Lewis A. Kaplan concluded that "the *Morrison* analysis for the Securities Act is <u>identical</u> [to] that applicable to claims under the Exchange Act," and denied a motion for partial summary judgment on both Section 17(a) and Section 10(b) claims because the evidence in that case, unlike here, was sufficient to "permit the inference that the trades complained of were <u>domestic transactions</u>" within the meaning of the Second Circuit's decision in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). *See ICP Asset Mgmt.*, 2012 WL 2359830, at *2 (emphasis added).

Similarly, the court in *SEC v. Benger*, --- F. Supp. 2d ----, 2013 WL 1150578, at *3 (N.D. Ill. Mar. 21, 2013) ("*Benger I*") dismissed Section 17(a) claims because the SEC failed to show any evidence that its allegations concerned "<u>domestic transactions</u>." *Id.* (emphasis added). *Accord In re Royal Bank of Scotland Group PLC Secs. Litig.*, 765 F. Supp. 2d 327, 338 n.11, 339 (S.D.N.Y. 2011) (finding that the Securities Act and Exchange Act share the "*same focus on domestic transactions*" and dismissing claims pursuant to Sections 11, 12 and 15 of the Securities Act) (emphasis original) (quoting *Morrison*, 130 S. Ct. at 2885). This Court has already concluded that the IKB and ABN Amro transactions are not domestic transactions, and the remaining "offer" claims should therefore be dismissed pursuant to *Morrison*.

The SEC points the Court to post-*Morrison* cases interpreting the 1940 Investment Advisers Act, and urges the Court to follow these cases in focusing on the conduct of U.S.-based investment advisers, rather than the indisputably-foreign nature of the IKB and ABN Amro transactions, as *Morrison* requires. *See* SEC Summary Judgment Opp. at 18. But the two cases cited by the SEC support Mr. Tourre's position, not the SEC's, because, in both cases, the courts, like the *Morrison* court, analyzed the "focus" of the statute at issue, and concluded that the "focus" of the Investment Advisers Act was "clearly on the investment adviser and its

actions." *See SEC v. Gruss*, 859 F. Supp. 2d 653, 662 (S.D.N.Y. 2012);[1] *see also ICP Asset Mgmt.*, 2012 WL 2359830, at \*3 (citation omitted).

           In stark contrast, the United States Supreme Court has already determined that the "focus" of the Securities Act is on "domestic transactions." *See* Tourre Summary Judgment Mem. at 27 (citing *Morrison*, 130 S. Ct. at 2885). Indeed, another federal court has rejected a similar attempt by the SEC to use the *Gruss* decision to override *Morrison*. *See SEC v. Benger*, --- F. Supp. 2d ----, 2013 WL 1277872, at \*2, 4-5 (N.D. Ill. Mar. 28, 2013) ("*Benger II*") (rejecting the SEC's "oceanic reading" of its authority under Section 15(a) of the Exchange Act, and finding that the "SEC has overlooked *Gruss'* emphasis on the distinct purposes behind the Exchange Act" compared to the Investment Advisers Act) (quotation omitted). The court in *Benger II* rejected the SEC's claims that the defendant was required to register as a broker under Section 15(a), holding that while registration is, "in its most basic aspect, a local event, where the failure to register occurs in connection with a foreign sale of a non-U.S. security, the considerations that underlay *Morrison* cannot be disregarded." *Id.* at \*6.

           Mr. Tourre has also shown that the statutory history of the Securities Act does not support the Court's bifurcation of the IKB and ABN Amro foreign transactions into domestic "offers" and foreign "sales," since the word "offer" was added to Section 17(a) only to ensure Section 17(a) covered the use of preliminary prospectuses, which were used during a period of time in the market when sales of securities were prohibited but offers could be made. *See* Tourre Summary Judgment Mem. at 30-31. In response, the SEC requests that the Court not consider the legislative history, *see* SEC Summary Judgment Mem. at 16, and argues that "offers" have always been separately actionable under Section 17(a). *See* SEC Summary Judgment Mem. at 16-17.

---

[1] The *Gruss* court also remarked that "Gruss' argument fails even if his premise that *Morrison* applies is accepted," because "more than half of the Offshore Fund's investors were located in the U.S., and . . . both the Offshore and Onshore Funds' investors were impacted by the alleged fraud." *Gruss*, 859 F. Supp. 2d at 665.

But the two cases cited by the SEC in support of its argument—both of which pre-date *Morrison* by seventy years and neither of which addresses Section 17(a)—do not help the SEC, and, in fact, confirm that courts have, consistent with *Morrison*, long viewed securities transactions as unitary events incorporating both the "offer" and "sale" into a single transaction. In *SEC v. Starmont*, 31 F. Supp. 264 (E.D. Wash. 1939), the court issued a preliminary injunction to prevent defendants from selling certain financial instruments without filing a registration statement, and rejected the defendants' arguments that the "right of free press" permitted them to distribute solicitations. *Id.* at 268. The court did not address Section 17(a).

In *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738 (2d Cir. 1941), the Second Circuit similarly determined that a benevolent association's committee, the members of which all resided in New York, violated Section 5 of the Securities Act by failing to file a registration statement for its solicitations to "members of Chinese communities in New York, New Jersey and Connecticut" to purchase Chinese government bonds. *Id.* at 739. Notably, the Second Circuit concluded that a "transaction" was a unitary event, finding that the "complete transaction" at issue "included not only solicitation by the defendant of offers to buy, but the offers themselves, the transmission of the offers and the purchase money through the banks to the Chinese government," as well as the "acceptance by that government of the offers and the delivery of the bonds to the purchaser or the defendant as his agent." *Id.* at 741.

The Court should also disregard the SEC's footnoted, self-serving assertion that, despite the SEC being the plaintiff in this action, its legal interpretations are entitled to deference. *See* SEC Summary Judgment Opp. at 12 n.11. The *Morrison* court itself rejected a similar request by the SEC for deference to its interpretation that the federal securities laws should cover transactions that have "significant conduct in the United States that is material to [a] fraud's success." *See Morrison*, 130 S. Ct. at 2886 (quotation omitted). As the Supreme Court found, the SEC's interpretation was owed no deference where it relied on cases the Supreme Court rejected, *i.e.*, cases endorsing the conduct and effects tests. *See id.* at 2887-88. Further, the SEC's demand for deference here is based on *In re Morgan Stanley Info. Fund Sec.*

*Litig.*, 592 F.3d 347 (2d Cir. 2010), in which the SEC was not a party, but rather filed a brief as *amicus curiae* opining that certain disclosures were not required by the registration provisions of the Securities Act and SEC Form N-1A.  The Second Circuit stated that the SEC's position was entitled to deference, it was "persuasive," and it was "consistent with both its prior interpretations of Form N-1A and the [district court's] decision below."  *Id.* at 352.

    The SEC also relies on the same pre-*Morrison* cases cited by the Court in support of its decision to permit the SEC's "offer" claims regarding the IKB and ABN Amro transactions to proceed to discovery.  *Compare* cases cited in SEC Summary Judgment Mem. at 13-14 *with* cases cited in *Goldman Sachs*, 790 F. Supp. 2d at 164.  Given that all of these cases pre-date *Morrison*, they simply do not, and could not, address whether, following *Morrison*, the SEC can pursue claims using U.S. conduct related to an unambiguously foreign securities transaction as a statutory hook.  As demonstrated above, it is clear that the SEC cannot do so.

    Finally, Mr. Tourre has demonstrated that the *Morrison* court crafted its transactional test to address the "regulatory multiplicity that the Supreme Court has directed courts to avoid," *see Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010), a view confirmed by post-*Morrison* decisions.  *See* Tourre Summary Judgment Mem. at 28.  Mr. Tourre has also shown that the same policy concerns that animated *Morrison*, *i.e.*, international comity and the need to avoid subjecting participants in the global securities markets to overlapping regulatory regimes, led the SEC to promulgate Regulation S ("Reg. S"), which provides that an "offer" of securities is "deemed to occur outside the United States" where the offer is "not made to a person in the United States."  *See* Tourre Summary Judgment Mem. at 27-28.  The SEC complains that Reg. S applies only to the registration of securities and not to the antifraud provisions, *see* SEC Summary Judgment Mem. at 17, but, as Mr. Tourre has shown, in promulgating Reg. S, the SEC based that distinction on the now-discredited "conduct" and "effects" tests.  *See* Tourre Summary Judgment Mem. at 28.  The SEC has offered no reason why Reg. S is not instructive in applying *Morrison* to Section 17(a) of the Securities Act, especially since the *Morrison* court itself cited Reg. S as evidence

that the Securities Act is "focus[ed] on domestic transactions."  *See Morrison*, 130 S. Ct. at 2885. (citing Reg. S, 17 CFR § 230.901).

     **B.**     **No One, Especially Mr. Tourre, Made A Domestic "Offer" To IKB**

     Mr. Tourre has shown that, contrary to the SEC's Amended Complaint, IKB did not purchase any ABACUS 2007-AC1 securities at all.  Instead, the purchases in question were made by the English Channel islands-based Loreley Companies, which bought securities from London-based Goldman Sachs International ("GSI") in a foreign transaction pursuant to Reg. S. *See* Tourre Summary Judgment Mem. at 32-33.  The Loreley Companies are independent companies, for which IKB served as only one of several investment advisors, and no one at the Loreley Companies ever met or communicated with Mr. Tourre.  *Id.*  Mr. Tourre has also shown that neither the Loreley Companies nor IKB ever intended to be "parties or prospective parties" to securities transactions in the United States, but, rather, the transactions always were intended to be, and in fact were, foreign securities transactions.  *Id.*

     Nonetheless, the SEC argues in opposition that Mr. Tourre can be held primarily liable for a Section 17(a) "offer" of securities to IKB because of his New York-based "conduct," *see* SEC Summary Judgment Mem. at 19-20, namely that he emailed a preliminary offering circular to IKB representatives and may have participated in a phone call with them.  *See id.*  The SEC's arguments fail.

     **1.**     **The IKB Transaction Was A Europe-Based Transaction
                 Managed By London-Based GSI Employees**

     Even if the Court decides to focus on IKB, as opposed to the Loreley Companies, which actually entered into ABACUS 2007-AC1 securities transactions, it is clear that IKB's relationship with GSI was managed, as would be expected for a European bank, out of Europe by a London-based GSI employee.  Indeed, GSI employee Michael Nartey, who worked for GSI from July 1996 until August 2011, testified that he began managing GSI's relationship with IKB in late 2003, and he "covered" IKB throughout 2007.  *See* Reply Decl. of Pamela Rogers

Chepiga dated Apr. 12, 2013 ("Chepiga Reply Decl.")), Ex. 90 (Deposition Tr. of Michael Nartey dated Nov. 7, 2011 ("Nartey Dep. Tr.")), at 10:9-15, 12:15-23, 17:8-18:9, 157:6-9.

　　　　　Consistent with his role as the long-term sales coverage for IKB, Mr. Nartey testified that, as to the ABACUS 2007-AC1 transaction, it was his "responsibility as the sales person . . . on behalf of the firm, to sell . . . [IKB] the notes." *Id.* at 27:16-28:1.  In fact, when IKB "indicated that it intended to recommend purchase of the ABACUS 2007-AC1 notes" to the Loreley Companies, *see* Am. Compl. ¶ 59, IKB sent its indication only to Mr. Nartey in London, and did not send it to Mr. Tourre or any other employee of Goldman, Sachs & Co. ("Goldman") in New York.  *See* Chepiga Reply Decl., Ex. 91 (email dated Mar. 27, 2007).  Notably, IKB's recommendation was explicitly made contingent on, among other things, the "approval" of the Loreley Companies, "satisfactory documentation" and receipt of satisfactory ratings from the relevant ratings agencies, and, without receiving all of these, "we didn't have a trade." *Id.*; Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 219:22-223:20.

## 2.　　IKB Well Understood That The Preliminary Offering Circular Emailed By Mr. Tourre Did Not Constitute An "Offer"

　　　　　Although Mr. Tourre sent to IKB representatives on April 2, 2007 a blacklined preliminary offering circular, he did so only after IKB's representatives explicitly agreed that these documents did not constitute an "offer" of securities.  As Mr. Nartey explained, GSI required that its clients read the final offering circular for each transaction, since that is the definitive document for each transaction, and investors must make investment decisions based only on that document.  *See* Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 104:8-18.  As such, prior to Mr. Tourre sending the preliminary offering circular to IKB, IKB representatives explicitly agreed that the documents were "not an offer to buy or sell or a solicitation of an offer to buy or sell any security," and also that IKB understood that "[a]ll investment decisions must be made on the basis of the information contained in the final offering circular."  *See* Chepiga Reply Decl., Ex. 92 (email dated April 2, 2007); Ex. 90 (Nartey Dep. Tr.), at 224:9-227:13.

In fact, IKB had long understood that blacklines and preliminary offering circulars did not constitute "offers" of securities on which it (or anyone else) could conduct a transaction.  The record indicates that IKB had agreed on multiple occasions dating back to 2005 that such documents did not constitute "an offer to buy or sell or a solicitation of an offer to buy or sell any security."  *See* Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 212:6-217:9; Ex. 93 (email dated May 12, 2005); Ex. 94 (email dated July 20, 2005); Ex. 95 (email dated Aug. 31, 2006).  As Mr. Nartey explained, Goldman's "legal department wanted to be clear . . . [and] confident that people were not, if you like, shirking," and that blacklined preliminary offering circulars are "not what you should be making your decision on, and your decision should be based on reading the final offering circular."  *See* Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 215:13-216:7.

Further, Mr. Tourre sent the preliminary offering circular to IKB only because Mr. Nartey was out of the office on Easter vacation.  London-based Mr. Nartey testified that he was responsible for communicating directly with IKB, but, if he was unavailable, he could authorize other Goldman employees to communicate on his behalf.  *See id.* at 217:10-219:11.  When this specific email was sent, Mr. Nartey was out of the office on vacation, and authorized Mr. Tourre to send the preliminary offering circular to IKB.  *See id.* at 218:24-219:11; Ex. 96 (email dated Mar. 29, 2007).  When the final ABACUS 2007-AC1 offering circular was sent to IKB, it was sent by Mr. Nartey—and he did not copy Mr. Tourre or any other New York-based Goldman, Sachs & Co. employee.  *See* Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 107:4-108:21; Ex. 97 (email dated Apr. 30, 2007).

The Loreley Companies also understood that no "offer" of securities was outstanding as of the date of Mr. Tourre's email:  on April 4 and 5, 2007, subsequent to Mr. Tourre's April 2, 2007 email to IKB, the Loreley Companies, in letters addressed to both IKB and Société Générale and copied to the Loreley Companies' Investment Committee, requested that IKB and Société Générale "assist the [Loreley] Compan[ies] in making an offer to the

potential Seller," *i.e.*, Goldman Sachs International, to purchase ABACUS 2007-AC1 securities. *See* Chepiga Reply Decl., Ex. 98 (letter dated Apr. 4, 2007), Ex. 99 (letter dated Apr. 5, 2007).

Such paltry facts cannot constitute an actionable "offer" of securities by Mr. Tourre. As this Court has recognized, the *Morrison* court "wanted to pull things closer," and "wanted a transaction to be domestic." *See* Chepiga Reply Decl., Ex. 100 (Tr. dated Oct. 11, 2012), at 4:21-24. The SEC's allegations here would do the opposite, and would extend the federal securities laws to a transaction that this Court has already determined to be unambiguously foreign, by shoehorning a possible phone call and an email into the broad, circular statutory definition of "offer." This cannot be reconciled with *Morrison*. The SEC has shown no evidence that IKB or the Loreley Companies were "parties or prospective parties" to "purchases and sales of securities in the United States," *Morrison*, 130 S. Ct. at 2884, and Mr. Tourre should be granted summary judgment dismissing this claim.

### C.     No One, Especially Mr. Tourre, Made A Domestic "Offer" To ABN Amro

As with IKB, Mr. Tourre has demonstrated that ABN Amro never intended to be, and in fact was not, a "part[y] or prospective part[y]" to a securities transaction in the United States. *See* Tourre Summary Judgment Mem. at 33-34. Rather, the London branch of ABN Amro entered into an English-law governed swap with London-based GSI, pursuant to a 1996 master agreement between these two European entities. *See id.* at 22-23. There is nothing remotely domestic about this transaction.

The SEC nonetheless asserts that Mr. Tourre can be held liable for a Section 17(a) "offer" to ABN Amro because, as with IKB, Mr. Tourre sent a couple of emails and participated in a phone call with ABN Amro. Again, the SEC is seeking nothing more than to disinter the "conduct" test.

As with IKB, the business relationship with the London branch of ABN Amro was managed, unsurprisingly, by GSI employees based in London. Mr. Nartey, head of United Kingdom sales at GSI, testified that he supervised the GSI-ABN Amro relationship, and another

London-based GSI employee, Charlie Remnant, "covered" ABN Amro and, as to the ABACUS 2007-AC1 transaction, Mr. Remnant was the sales person "who was trying to . . . place that risk and . . . find the counterparty," and was "the sales person who did the trade" with ABN Amro. *See* Chepiga Reply Decl., Ex. 90 (Nartey Dep. Tr.), at 132:21-134:4.

The only factual record developed in witness testimony in this matter is that Mr. Tourre participated in one phone call with London-based Dean Atkins of ABN Amro, and sent a handful of emails to London-based ABN Amro representatives.  *See* Chepiga Reply Decl., Ex. 101 (Dep. Tr. of Dean Atkins dated Oct. 4, 2011 ("Atkins Dep. Tr.")), at 60:16-21; SEC Summary Judgment Opp. at 21.  As to the phone call, neither Mr. Atkins or Mr. Tourre remember when the call occurred or the substance of what was discussed, so the call clearly provides no evidence of any purported misrepresentation made to ABN Amro.  *See* Chepiga Reply Decl., Ex. 101 (Atkins Dep. Tr.), at 60:16-61:22; Ex. 102 (Dep. Tr. of Fabrice Tourre dated Feb. 17-18, 2011 ("Tourre Dep. Tr.")), at 336:8-23.  Further, either Mr. Nartey or Mr. Remnant, as the London-based managers of the GSI-ABN Amro relationship, was also on the call.  *See id.*  As to the few emails Mr. Tourre sent to ABN Amro representatives around this time, Mr. Tourre testified in response to questioning by the SEC that his purpose in sending these emails, as a structurer who worked on the transaction, was simply to provide information on the "specific nature of the transaction," *see* Chepiga Reply Decl., Ex. 102 (Tourre Dep. Tr.), at 324:7-325:15.

Finally, it bears noting, as Mr. Tourre has demonstrated, that although the SEC's Amended Complaint repeatedly emphasizes the supposedly critical importance of the allegedly-misleading offering documents, *see, e.g.*, Am. Compl. ¶¶ 2, 4, 37-44, 56-62, 70, ABN Amro did <u>not</u> receive any of these documents, despite the SEC's claim that it did so.  *See id.* ¶ 70; Tourre Summary Judgment Mem. at 23, 34.

Although the SEC does not dispute in its memorandum of law that ABN Amro did not receive the offering documents, it does contest this fact in its response to Mr. Tourre's Local Civil Rule 56.1 statement of undisputed material facts, claiming that a Goldman employee

13

"e-mailed copies of the term sheet and offering circular to ABN Amro."  *See* ECF No. 226
(SEC's Response to Mr. Tourre's Local Rule 56.1 statement), ¶ 136.  This is simply misdirection
on the SEC's part.  The Goldman employee who sent these emails testified in response to direct
examination by the SEC that these emails had nothing to do with ABN Amro's investment in the
ABACUS 2007-AC1 super senior tranche, and were sent to people with "abnamro.com" email
addresses in their role as trustee for the ABACUS 2007-AC1 special purpose vehicle.  *See*
Chepiga Reply Decl., Ex. 103 (Dep. Tr. of Shin Yukawa dated Mar. 28, 2011), at 81:20-83:7.
Further, as testified to by Mr. Atkins, the trustee department of ABN Amro was completely
separate from Mr. Atkins' London-based group that actually entered the ABN Amro swap,
neither Mr. Atkins nor anyone else on his team had any contact with anyone from the trustee
department concerning ABN Amro's swap, and Mr. Atkins did not know any of the people listed
on the emails referenced by the SEC.  *See* Chepiga Reply Decl., Ex. 101 (Atkins Dep. Tr.) at
43:8-47:12.  The offering documents therefore have no bearing on the SEC's claims as to ABN
Amro, which, like their claims as to IKB, are unsustainable under *Morrison* and should now be
dismissed.

## II.   THE SEC HAS DONE NOTHING TO SUBSTANTIATE ITS CLAIMS REGARDING ALLEGED "OFFERS" MADE TO DOMESTIC INVESTORS

As Mr. Tourre has shown, the SEC's claim that "offers" of ABACUS 2007-AC1
securities were made to unnamed domestic investors is a contrivance, inserted into the SEC's
Amended Complaint only in an attempt to satisfy *Morrison*'s requirement that the SEC provide
evidence of offers to specific investors in the United States to enter into domestic securities
transactions.  *See* Tourre Summary Judgment Mem. at 34-35.  The SEC promised the Court in
February 2011 that it would substantiate these claims, representing that, if these claims were
allowed to proceed to discovery, the SEC would put some "meat on that bone" by taking
discovery into the "meetings, conversations, etc." concerning these supposed offers.  *See* Tourre
Summary Judgment Mem. at 34-35.

Contrary to these representations, however, as Mr. Tourre has demonstrated, the SEC has done nothing of the kind, having not deposed even one supposed offeree or subpoenaed any documents from these purported potential investors. *Id.* at 34-36. As the plaintiff in this action, the SEC has clearly failed to meet its burden to "put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quotation omitted).

Instead, the SEC argues that it can defeat summary judgment because it obtained during fact discovery one email from Goldman that was purportedly sent to various external email addresses, and because it cobbles together other Goldman emails referencing the ABACUS 2007-AC1 transaction, some of which do not involve Mr. Tourre at all, and some of which are discussions between only Goldman employees. *See* SEC Summary Judgment Opp. at 21-23.

The Court should view these efforts with skepticism, in light of the SEC's prior missteps on this issue. In its opposition to Mr. Tourre's motion for judgment on the pleadings pursuant to *Morrison* in September 2010, the SEC represented that it could provide evidence of offers regarding domestic securities transactions that, unlike its claims as to IKB and ABN Amro, would satisfy *Morrison*. *See* ECF No. 35 (SEC's Mem. of Law in Opp. to Mr. Tourre's Mot. for Judgment on the Pleadings, dated Oct. 13, 2010), at 12-13. On reply, Mr. Tourre pointed out that the SEC failed to understand the emails referenced in its brief, noting that, for example, a company named "LRI" referred to in one email was not, as the SEC claimed, Nashville, Tennessee-based Lri Holdings, Inc., which, according to filings made with the SEC itself, is not a participant in the structured finance markets but instead operates a restaurant chain featuring bottomless buckets of in-shell peanuts. The "LRI" referenced in the email is, in fact, LRI Landesbank Rheinland-Pfalz International, which, like IKB and ABN Amro, is a European bank. *See* ECF No. 39 (Reply Mem. in Supp. of Mr. Tourre's Mot. for Judgment on the Pleadings, dated Oct. 25, 2010), at 15.

In its opposition to Mr. Tourre's motion for partial summary judgment, the SEC, again, throws out a scattershot of emails it collected during its investigation, but without

providing any evidence demonstrating whether the supposed potential investors described by the SEC are actually domestic or who made offers of securities, if any.  For example, the SEC asserts that an offer was made to "New York-based Athilon Group Holdings," *see* SEC Summary Judgment Opp. at 22.  The SEC offers as evidence a single email between Goldman employees referring to "Athilon," and also cites the testimony of Goldman employee David Gerst.  *Id.*  But Mr. Gerst testified that he did not know where "Athilon" was located, and, in fact, the SEC's questions to Mr. Gerst during his deposition concerned Athilon Capital Corporation, not Athilon Group Holdings.  *See* Chepiga Reply Decl., Ex. 104 (Dep. Tr. of David Gerst dated Feb. 9, 2011 ("Gerst Dep. Tr.")), at 268:14-269:13.  Similarly, the SEC asserts that an offer was made to "Stamford, Connecticut-based Paramax Capital Group, LLC," *see* SEC Summary Judgment Opp. at 22-23, and offers as evidence Mr. Gerst's testimony and a single email referring to "Paramax."  But, again, Mr. Gerst testified that he was not certain where Paramax was located, and the SEC failed to ask him if the "Paramax" referred to in the email is, in fact, Paramax Capital Group, LLC.  *See* Chepiga Reply Decl., Ex. 104 (Gerst Dep. Tr. at 274:5-21).

As additional proof of domestic "offers" of securities, the SEC cites Mr. Tourre's investigative testimony, *see* SEC Summary Judgment Opp. at 22-23, but Mr. Tourre testified in the cited passage only that he thought that China Development Investment Bank, certainly not a domestic investor, may have considered purchasing ABACUS 2007-AC1 securities.  *See* Chepiga Reply Decl., Ex. 105 (Tr. of inv. testimony of Fabrice Tourre dated Mar. 3, 2009), at 112:7-20.  The SEC also cites as support an email involving only Goldman employees, most of who work at Goldman Sachs JBWere in Australia, discussing "CBA," the Australia-based Commonwealth Bank of Australia, yet another foreign investor.  *See* ECF No. 231-123 (Martens Decl. dated Mar. 29, 2013, Ex. 91).

The SEC's unsupported assertions that these are domestic "offers" of securities are not sufficient to show that an offer of securities was made to anyone, and certainly not sufficient at the summary judgment stage to show that Mr. Tourre is somehow responsible for

such offers, if any.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (the "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment); *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 10 Civ. 4933 (ALC) (GWG), 2013 WL 81263, at *3 (S.D.N.Y. Jan. 8, 2013) ("[t]o avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor.").

   The SEC's assertions that Mr. Tourre bears "primary responsibility" for the ABACUS 2007-AC1 offering documents, *see* SEC Summary Judgment Opp. at 21-22, do not remedy the SEC's failure to develop evidence regarding supposed domestic "offers."  The jury will determine whether Mr. Tourre, a trained mathematician who was 28 years old at the time of the ABACUS 2007-AC1 transaction, bears "primary responsibility" for the allegedly incomplete legal disclosure in the Goldman, Sachs & Co. offering documents that ACA "selected" the reference portfolio.  The jury's decision will be particularly informed by not only the universal belief of the fact witnesses in this matter that ACA did, in fact, select the reference portfolio,[2] but also the fact that Mr. Tourre recruited Mr. Gerst, a trained lawyer, to work on his trading desk, Mr. Gerst thought about whether Paulson's role in portfolio selection needed to be disclosed and decided it did not, and did not recall ever discussing this issue with Mr. Tourre.  *See* Chepiga Reply Decl., Ex. 112 (Tr. of inv. testimony of David Gerst dated Jan. 29, 2009), at 65:15-66:21; Ex. 102 (Tourre Dep. Tr.), at 371:15-373:17.  Further, the ABACUS 2007-AC1 offering documents were reviewed by a bevy of lawyers from Goldman, Goldman's external counsel, ACA and its external counsel, as well as Paulson's external counsel, which functioned as an "adjunct" to Paulson's in-house counsel and the lead lawyer of which is currently a senior lawyer

---

[2] *See* Chepiga Reply Decl., Ex. 106 (Dep. Tr. of Laura Schwartz dated Apr. 12-13, 2011), at 277:7-12, 353:25-355:23; Ex. 107 (Dep. Tr. of Keith Gorman dated May 10, 2011), at 221:20-222:18; Ex. 108 (Dep. Tr. of Alan Roseman dated Apr. 5-6, 2011), at 110:20-111:10; Ex. 109 (Dep. Tr. of Sihan Shu dated Mar. 24, 2011), at 21:18-22:5; Ex. 110 (Dep. Tr. of Paolo Pellegrini dated Mar. 14-15, 2011), at 246:4-7; Ex. 104 (Gerst Dep. Tr.), at 229:12-15; Ex. 111 (Dep. Tr. of Jonathan Egol dated Feb. 1, 2011), at 120:17-21; Ex. 102 (Tourre Dep. Tr.), at 124:25-125:5.

at the SEC itself.[3]  None of these lawyers suggested there was a disclosure problem, because, in fact, there is none.

As to the SEC's arguments regarding GSC, which met with Paulson and Goldman representatives on January 5, 2007 to discuss serving as portfolio selection agent in the potential CDO transaction, the most notable thing about the SEC's position is its admission that Goldman and Paulson fully disclosed Paulson's short interest to GSC, casting even further doubt, if any still exists, on the SEC's claim that Goldman and Paulson withheld this same information from ACA Management LLC.  *See* SEC Summary Judgment Opp. at 9 (admitting that GSC was "aware of Paulson's short interest").

Regarding the SEC's assertions that GSC declined to participate in the transaction because "it was 'not comfortable' selecting reference assets from a list provided by Paulson as a purely short investor," *see* SEC Summary Judgment Opp. at 5, the SEC, again, offers no evidence to back this up, citing only Mr. Tourre's investigative testimony.  But Mr. Tourre did <u>not</u> testify that GSC was not comfortable participating in a transaction with Paulson, as the SEC implies.  Rather, he testified that GSC was "not comfortable" with the particular list of RMBS it had received.  *See* Chepiga Reply Decl., Ex. 105 (Tr. of inv. testimony of Fabrice Tourre dated March 3, 2009), at 39:2-11.  Contemporaneous internal Goldman emails show that GSC's concerns related to its economic analysis of 2006 vintage subprime RMBS, which was not an uncommon view in the market at the time, *see* Tourre Summary Judgment Mem. at 6-7.  Mr. Tourre reported to Goldman colleagues that GSC's "key rationale" for declining to participate in the transaction "is the fact that they are currently comfortable, from a credit standpoint, with only 40 (out of probably 400+) subprime RMBS transactions that have been underwritten in 2006,"

---

[3] *See* Chepiga Reply Decl., Ex. 112 (Tr. of inv. testimony of David Gerst dated Jan. 29, 2009), at 65:15-66:21; Ex. 102 (Tourre Dep. Tr.), at 371:15-373:17, 380:12-384:6; Ex. 110 (Dep. Tr. of Paolo Pellegrini dated Mar. 14-15, 2011), at 262:14-263:11; Ex. 113 (Dep. Tr. of Adam Glass dated May 16, 2011), at 14:8-15:4, 18:3-22, 55:18-57:11, 66:24-68:18; Ex. 104 (Gerst Dep. Tr.), at 19:4-17, 169:22-170:11, 210:15-211:14.

and another Goldman employee expressed disbelief, asking if GSC was "for real." *See* Chepiga Reply Decl., Ex. 114 (email dated Jan. 11, 2007).

GSC was not, as the SEC suggests, horrified over Paulson's participation in the transaction, and, indeed, negotiated directly with Paulson regarding other transactions involving subprime RMBS, including RMBS that GSC would "trade into one of [GSC's] warehouses" for subsequent inclusion in GSC CDOs, and, if GSC and Paulson could "find common ground," Ed Steffelin, a GSC representative, noted that GSC has "more deals to ramp." *See* Chepiga Reply Decl., Ex. 115 (email dated Jan. 10, 2007); Ex. 116 (email dated Jan. 11, 2007); Ex. 117 (email dated Jan. 11, 2007).

As to the February 27, 2007 email involving Mr. Steffelin and Peter Ostrem of Goldman, *see* SEC Summary Judgment Opp. at 9, 22, the SEC, again, puts forth only its own interpretation of this email.  Indeed, the SEC interviewed Mr. Steffelin during its investigation, after which it decided <u>not</u> to take his testimony, *see* Chepiga Reply Decl., Ex. 118 (letter dated Sept. 17, 2010), and also did not take testimony from Mr. Ostrem, so it now offers only insinuation rather than evidence.  Similarly, as to a supposed offer of securities to GSC, *see* SEC Summary Judgment Opp. at 21-22, the SEC has, again, failed to put forth any evidence, save for one email, unburdened by testimony from anyone actually involved in sending or receiving it. Mr. Tourre did not send or receive this email, and the SEC has offered no evidence to establish that Mr. Tourre was aware of it or connected to it in any way, and, as Mr. Tourre has shown, the SEC has not, and can not, state any claims for aiding and abetting a Section 17(a) violation.  *See* Tourre Summary Judgment Mem. at 33.

For all of these reasons, the SEC's claims regarding purported offers made to unidentified domestic investors should be dismissed.

## CONCLUSION

For all the foregoing reasons, as well as the reasons stated in Mr. Tourre's memorandum of law in support of his motion for partial summary judgment dated March 1, 2013, Fabrice Tourre respectfully requests that the Court grant his motion for partial summary judgment, and dismiss the Amended Complaint dated November 22, 2010 insofar as it purports to assert claims under Section 17(a) of the 1933 Securities Act as to "offers" allegedly made to IKB Deutsche Industriebank AG, to ABN Amro NV, and to unidentified domestic investors.

Dated:  April 12, 2013
　　　New York, New York

Respectfully submitted,

/s/ Pamela Rogers Chepiga
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
David C. Esseks
(david.esseks@allenovery.com)
Andrew Rhys Davies
(andrew.rhys.davies@allenovery.com)
Brandon D. O'Neil
(brandon.o'neil@allenovery.com)

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*