**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action<br>No.: 10-cv-3229 (KBF) |
| Plaintiff, | ELECTRONICALLY FILED |
| v. | |
| FABRICE TOURRE, | |
| Defendant. | |

**RESPONSE OF FABRICE TOURRE TO THE SEC'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED IN OPPOSITION TO MR. TOURRE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to the Court's order dated April 11, 2013, defendant Fabrice Tourre respectfully submits this response to the Securities & Exchange Commission's Separate Statement of Undisputed Material Facts dated March 29, 2013, ECF No. 226, ¶¶ 146-226 (the "SEC Separate Statement"). The numbered paragraphs in the SEC Separate Statement are reproduced below, followed by Mr. Tourre's responses.

Mr. Tourre hereby objects to the SEC Separate Statement, as it is impermissible under Local Civil Rule 56.1 and should be stricken or disregarded.

146. In 2006 and 2007, Goldman, Sachs & Co. ("GS&Co") was the principal United States broker-dealer of The Goldman Sachs Group, Inc., a global investment banking, securities and investment management firm headquartered in New York City. Martens Decl., Ex. 43 (SEC Amended Complaint), ¶9; Ex. 44 (Tourre Answer), ¶9.

**_Response to Paragraph 146:_**

Paragraph 146 is substantially identical to Paragraph 1 of the SEC's Local Civil Rule 56.1 Statement of Material Facts as to which there is no Genuine Issue, dated March 1, 2013 (the "SEC Original Statement"). *See* ECF No. 193, ¶ 1. In

accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute Paragraph 146.

147.   From 2004 through December 2006, Fabrice Tourre ("Tourre") was an associate on the structured products correlation desk at GS&Co in New York.  From the end of 2006 through October 2007, Tourre was a vice president on the structured products correlation desk at GS&Co in New York.  In these roles, Tourre's responsibilities were to develop, structure, market, and trade synthetic collateralized debt obligations ("CDOs").  Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 10-15; Ex. 11 (Tourre Dep. Tr.), at 13-19, 21, 312-13.

### *Response to Paragraph 147:*

Paragraph 147 is substantially identical to Paragraph 2 of the SEC Original Statement.  *See* ECF No. 193, ¶ 2.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 147.  Mr. Tourre did not join the structured products correlation trading desk (the "Correlation Desk") at Goldman, Sachs & Co. ("Goldman") in New York until July 2004.  Paragraph 2 also contains an incomplete description of Mr. Tourre's responsibilities on the Correlation Desk.  *See* ECF No. 230-13, Decl. of Pamela Rogers Chepiga in Opp. to the SEC's Mot. for Partial Summary Judgment, dated March 29, 2013 (the "Chepiga March 29 Decl."), Ex. 13 (Dep. Tr. of Fabrice Tourre dated Feb. 17-18, 2011 ("Tourre Dep. Tr.")), at 15:14-19:2, 371:3-14.

148.   In 2006 and 2007, Paulson & Co., Inc. ("Paulson") was a company based in New York, New York that managed the investments of certain hedge funds, including the Paulson Credit Opportunities Fund. Martens Decl., Ex. 9 (Pellegrini Dep. Tr.), at 15-16.

### *Response to Paragraph 148:*

Paragraph 148 is substantially identical to Paragraph 3 of the SEC Original Statement.  *See* ECF No. 193, ¶ 3.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute Paragraph 148.

149.   In 2007, Paolo Pellegrini was employed by Paulson as a managing director analyzing potential investment transactions.  Pellegrini was also co-portfolio manager of the Paulson Credit Opportunities Fund.  Martens Decl., Ex. 9 (Pellegrini Dep. Tr.), at 15-16.

**_Response to Paragraph 149:_**

       Paragraph 149 is substantially identical to Paragraph 4 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 4.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute Paragraph 149.

150.    ACA Management LLC ("ACA"), a subsidiary of ACA Capital Holdings, Inc., was an
asset manager specializing in CDOs.  As a CDO manager, ACA worked with investment
banks to select assets for CDO portfolios, structure the CDOs, market the CDOs to
investors, and then monitor the performance of the CDOs' portfolios.  Martens Decl., Ex.
2 (Schwartz Dep. Tr.), at 12-14, 20, 23-24.

**_Response to Paragraph 150:_**

       Paragraph 150 is substantially identical to Paragraph 5 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 5.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute that in 2006-2007, ACA

Management L.L.C. ("ACA") was a subsidiary of ACA Capital Holdings, Inc., but

the SEC's assertion that ACA specialized in CDOs is an incomplete statement of the

business lines of ACA, which also structured, managed and marketed other types of

financial products, including collateralized loan obligations.  *See* evidence cited in

ECF No. 185 (Mem. of Law in Supp. of Mr. Tourre's Mot. for Partial Summary

Judgment ("Tourre Summary Judgment Mem.")), at 13-14.

       Mr. Tourre also does not dispute that investment banks participated in the

portfolio selection, structuring and marketing of ACA CDOs, as did investors in

ACA's transactions.  *See* evidence cited in *id.* at 12-14.

151.    In 2007, Laura Schwartz ("Schwartz") was an officer of both ACA Capital Holdings, Inc.
and its subsidiary ACA Management LLC.  Schwartz was head of the firm's portfolio
management team, which included the head ABS portfolio manager Keith Gorman and
trader Lucas Westreich.  Martens Decl., Ex. 2 (Schwartz Dep. Tr.), at 20-22, 187, 226.

**_Response to Paragraph 151:_**

Paragraph 151 is substantially identical to Paragraph 6 of the SEC Original Statement. *See* ECF No. 193, ¶ 6. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute Paragraph 151.

152. A CDO is a pool of assets that is tranched into different payment priorities constituting a capital structure in which investors can make long investments. One of the types of assets in which a CDO can invest is residential mortgage-backed securities ("RMBS"). Martens Decl., Ex. 11, (Tourre Dep. Tr.), at 20; Ex. 2, (Schwartz Dep. Tr.), at 14-15.

**_Response to Paragraph 152:_**

Paragraph 152 is substantially identical to Paragraph 7 of the SEC Original Statement. *See* ECF No. 193, ¶ 7. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 152, which is an incomplete description of a CDO, and does not include key features of certain types of CDOs, including that, *inter alia*, every synthetic CDO requires both short and long investors. Mr. Tourre does not dispute that CDOs can purchase RMBS securities, or tranches of RMBS securities. *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 7-9.

153. A synthetic CDO is a CDO in which the CDO does not own securities, but rather enters into credit default swap contracts referencing certain securities, such as RMBS. Generally, a synthetic CDO issues notes to the long investors in the different tranches. The least senior tranche on the long side of a synthetic CDO is known as the "first loss," or "equity," tranche. Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 20-22, 202; Ex. 2 (Schwartz Dep. Tr.), at 47-48.

**_Response to Paragraph 153:_**

Paragraph 153 is substantially identical to Paragraph 8 of the SEC Original Statement. *See* ECF No. 193, ¶ 8. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 153, which is an incomplete description of a synthetic CDO. Further, in 2006-2007, some synthetic CDOs issued notes that contained both long and short components, including in at least one deal in

which ACA served as manager.  *See* ECF No. 230-21–23 (Chepiga March 29 Decl.,

Ex. 20, Crown Street CDO marketing flipbook), at SEC-07860842–43; ECF No.

230-24 (Chepiga March 29 Decl., Ex. 21, Dep. Tr. of Jonathan Egol dated Feb. 1,

2011 ("Egol Dep. Tr.")), at 19:2-9.  For a detailed description of synthetic CDOs, see

ECF No. 186-16 (Expert Report of Mukesh Bajaj dated Dec. 20, 2012 ("Bajaj

Report")), at ¶¶ 14-29.

154.    A party buying protection on a CDO reference portfolio does so through a credit default
swap contract between a protection seller and a protection buyer.  The party buying
protection on the reference portfolio has what is commonly referred to as a short position.
The party selling protection on the reference portfolio has what is commonly referred to
as a long position.  The party buying protection has an economic interest in the reference
portfolio experiencing credit events.  A credit event gives rise to a payment obligation
from the protection seller to the protection buyer.  Credit events involve things such as
failure to pay the principal with respect to the underlying reference assets or a writedown
or downgrade of components of the reference portfolio.  In other words, the party buying
protection benefits economically if the value of the reference portfolio declines. Martens
Decl., Ex. 11 (Tourre Dep. Tr.), at 23-26, 28-29; Ex. 2 (Schwartz Dep. Tr.), at 16-17.

### *Response to Paragraph 154:*

Paragraph 154 is substantially identical to Paragraph 9 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 9.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 154, which is an incomplete

and misleading description of a synthetic CDO.  For example, it is impossible to

accurately assess a party's "economic interest" by looking at one investment in one

CDO, but rather the party's entire investment portfolio must be considered.  *See* ECF

No. 230-24 (Chepiga March 29 Decl., Ex. 21, Egol Dep. Tr.), at 30:2-32:8.  For a

detailed description of synthetic CDOs, see ECF No. 186-16 (Bajaj Report), ¶¶ 14-

29.

155.    A purchaser of notes in a synthetic CDO has an economic interest in the successful
performance of the CDO's reference portfolio.  This is generally referred to as a long
position.  Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 23, 27-28.

**_Response to Paragraph 155:_**

Paragraph 155 is substantially identical to Paragraph 10 of the SEC Original Statement.  *See* ECF No. 193, ¶ 10.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 155.  As noted above, it is not possible to accurately assess a party's "economic interest" by looking at one investment in one CDO, but rather an investor's entire investment portfolio must be considered.  *See* ECF No. 230-24 (Chepiga March 29 Decl., Ex. 21, Egol Dep. Tr.), at 30:2-32:8.  Paragraph 155 is also contradicted by record evidence, including, *inter alia*, that some synthetic CDOs issued notes that contained both long and short components, and that some CDO note investors used investment income from a note purchase in order to meet their payment obligations on short positions.  *See* ECF No. 230-21–23 (Chepiga March 29 Decl., Ex. 20, Crown Street CDO marketing flipbook), at SEC-07860842–43; ECF No. 230-24 (Chepiga March 29 Decl., Ex. 21, Egol Dep. Tr.), at 19:2-9; ECF No. 230-16 (Chepiga March 29 Decl., Ex. 16, Dep. Tr. of Alan Roseman dated Apr. 5-6, 2011 ("Roseman Dep. Tr.")), at 170:4-13; ECF No. 186-16 (Bajaj Report), at 21-22 n.84.

156.   In or about late 2006, Paulson expressed an interest to GS&Co in buying protection on a portfolio of subprime RMBS.  In response, GS&Co attempted to structure a transaction to facilitate Paulson's interest.  The ABACUS 2007-AC1 transaction eventually resulted from Paulson's expression of interest.  Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 34-35; Ex. 11 (Tourre Dep. Tr.), at 55-56.

**_Response to Paragraph 156:_**

Paragraph 156 is substantially identical to Paragraph 11 of the SEC Original Statement.  *See* ECF No. 193, ¶ 11.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that Paulson & Co, Inc. ("Paulson") expressed interest to Goldman in late 2006 in buying protection on subprime RMBS.  Mr. Tourre disputes the remainder of Paragraph 156, which is an incomplete description of Paulson's transactions and the ABACUS 2007-AC1

transaction, since Goldman's sale of protection to Paulson through credit default swaps and the ABACUS 2007-AC1 CDO were not legally or structurally linked, and Goldman employees debated extensively whether Goldman should sell protection to Paulson or proceed with the ABACUS 2007-AC1 CDO without selling protection to Paulson.  *See* ECF No. 230-6 (Chepiga March 29 Decl., Ex. 6, Tr. of SEC inv. testimony of Fabrice Tourre dated Mar. 3, 2009 ("Tourre Inv. Tr.")), at 55:2-56:9; ECF No. 230-7 (Chepiga March 29 Decl., Ex. 7, Dep. Tr. of David Gerst dated Feb. 9, 2011 ("Gerst Dep. Tr.")), at 51:8-52:2.

157.    As a party buying protection on a CDO reference portfolio of RMBS, Paulson's economic interests would be adverse to the economic interests of the note purchasers in the CDO transaction. Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 219.

### ***Response to Paragraph 157:***

Paragraph 157 is substantially identical to Paragraph 12 of the SEC Original Statement.  *See* ECF No. 193, ¶ 12.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 157, which is an incomplete description of the economics of synthetic CDOs.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 7-8; ECF No. 230-24 (Chepiga March 29 Decl., Ex. 21, Egol Dep. Tr.), at 30:2-32:8.

158.    GS&Co and Tourre determined that a portfolio selection agent would be used in the AC1 transaction, as that would "assist with the marketing of the transaction" to potential long investors. Martens Decl., Ex. 45 (Plaintiff's Deposition Ex. 2); Ex. 10 (Tourre Inv. Tr.), at 35-36; Ex. 11 (Tourre Dep. Tr.), at 136-37, 141-42, 228, 232-33.

### ***Response to Paragraph 158:***

Paragraph 158 is substantially identical to Paragraph 13 of the SEC Original Statement.  *See* ECF No. 193, ¶ 13.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 158, which is an incomplete statement of the decision to use a portfolio selection agent in the ABACUS 2007-

AC1 transaction, and fails to include, *inter alia*, that Paulson suggested using a portfolio selection agent, and that ACA's role as Portfolio Selection Agent was to select the ABACUS 2007-AC1 reference portfolio and ensure it met ACA's credit quality standards. *See* ECF No. 230-6 (Chepiga March 29 Decl., Ex. 6, Tourre Inv. Tr.), at 34:19-36:19; ECF No. 230-13 (Chepiga March 29 Decl., Ex. 13, Tourre Dep. Tr.), at 138:13-140:23.

159.   In late 2006, Pellegrini understood that the only way an ABACUS-style transaction would take place is if the deal included the participation of a portfolio selection agent. Martens Decl., Ex. 9 (Pellegrini Dep. Tr.), at 76.

### Response to Paragraph 159:

Paragraph 159 is substantially identical to Paragraph 14 of the SEC Original Statement. *See* ECF No. 193, ¶ 14. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that, when the SEC asked Mr. Pellegrini on direct examination at his deposition the leading question of whether he "understood that in order for a second Abacus-style transaction to take place, the only way that would happen is if the deal included the participation of a portfolio selection agent, correct?", Mr. Pellegrini answered "Correct."

160.   In late 2006 and early 2007, "generally there was a problem in terms of arranging a meeting with a CDO manager who was marketing his or her CDO deal and telling them that we were only interested in shorting securities." Martens Decl., Ex. 9 (Pellegrini Dep. Tr.), at 192-93.

### Response to Paragraph 160:

Paragraph 160 is substantially identical to Paragraph 15 of the SEC Original Statement. *See* ECF No. 193, ¶ 15. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that the SEC has accurately quoted Mr. Pellegrini's deposition transcript, but this quotation provides no evidence whatever regarding general practices in the CDO market in 2006 and 2007, nor does

it provide any evidence regarding Mr. Tourre's conduct.  Mr. Tourre also notes that in the same pages cited by the SEC in support of Paragraph 160, Mr. Pellegrini testified that Paulson did, in fact, make long investments in the equity tranches of certain CDOs.

161.    Initially, Paulson and Tourre met in New York with a representative of New York-based Greenwich Street Capital ("GSC") about serving as portfolio selection agent for a synthetic CDO, but GSC declined to participate because it was "not comfortable" with selecting reference assets from a list provided by Paulson as a purely short investor. Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 37-40.

**_Response to Paragraph 161:_**

Mr. Tourre disputes Paragraph 161.  Although Mr. Tourre attended a meeting that included participants from Greenwich Street Capital ("GSC") and Paulson, as well as other Goldman employees, GSC did not decline to serve as portfolio selection agent in the potential CDO transaction because it was uncomfortable participating in a transaction with Paulson, as Paragraph 161 implies.  Rather, GSC declined to serve as portfolio selection agent because, at the time, it was "comfortable, from a credit standpoint, with only 40 (out of probably 400+) subprime RMBS transactions that have been underwritten in 2006."  *See* ECF No. 243-25 (Reply Declaration of Pamela Rogers Chepiga dated Apr. 12, 2013 ("Chepiga Apr. 12 Decl."), Ex. 114, email dated Jan. 11, 2007); ECF No. 243-16 (Chepiga Apr. 12 Decl., Ex. 105, Tourre Inv. Tr.), at 39:6-11.  Further, GSC negotiated directly with Paulson regarding other transactions involving subprime RMBS, including RMBS that GSC would "trade into one of [GSC's] warehouses" for subsequent inclusion in GSC CDOs, and GSC and Paulson searched for "common ground" concerning RMBS transactions.  *See* ECF No. 243-26 (Chepiga Apr. 12 Decl., Ex. 115, email dated Jan. 10, 2007); No. 243-27 (Chepiga Apr. 12 Decl., Ex. 116, email dated Jan. 11, 2007); No. 243-28 (Chepiga Apr. 12 Decl., Ex. 117, email dated Jan. 11, 2007).

162.   On January 8, 2007, Tourre met with representatives of Paulson and ACA, including
Laura Schwartz, to gauge ACA's interest in serving as the portfolio selection agent for
the AC1 transaction.  Martens Decl., Ex. 46 (Plaintiff's Deposition Ex. 61); Ex. 10
(Tourre Inv. Tr.), at 43; Ex. 11 (Tourre Dep. Tr.), at 89, 180-82; Ex. 2 (Schwartz Dep.
Tr.), at 29, 34-37; Ex. 9 (Pellegrini Dep. Tr.), at 93-95, 97, 101.

### *Response to Paragraph 162:*

Paragraph 162 is substantially identical to Paragraph 16 of the SEC Original
Statement.  *See* ECF No. 193, ¶ 16.  In accordance with Mr. Tourre's response to the
SEC Original Statement, Mr. Tourre does not dispute that he met with
representatives of Paulson and ACA on January 8, 2007, but disputes that the
meeting was arranged to "gauge ACA's interest" in serving as portfolio selection
agent.  *See* ECF No. 230-13 (Chepiga March 29 Decl., Ex. 13, Tourre Dep. Tr.), at
182:3-23.

163.   On January 10, 2007, Tourre sent an e-mail to Laura Schwartz of ACA describing the
CDO transaction that became the AC1 transaction, identifying Paulson as the transaction
sponsor, and falsely stating both that the "Contemplated Capital Structure" for the
transaction that became AC1 included a "pre-committed" first loss (equity) tranche and
that the transaction compensation structure "aligns" the interests of Paulson and ACA.
The term "pre-committed" means a party had already agreed to buy that portion of the
transaction. Martens Decl., Ex. 4; Ex. 10 (Tourre Inv. Tr.), at 141-42; Ex. 11 (Tourre
Dep. Tr.), at 197-205, 240.

### *Response to Paragraph 163:*

Paragraph 163 is substantially identical to Paragraph 17 of the SEC Original
Statement.  *See* ECF No. 193, ¶ 17.  In accordance with Mr. Tourre's response to the
SEC Original Statement, Mr. Tourre does not dispute that on January 10, 2007 he
sent an email to Laura Schwartz of ACA, copied to numerous employees at
Goldman, but Mr. Tourre otherwise disputes Paragraph 17, which is not a statement
of facts but rather legal argument and interpretation of a document.

164.   As of the time of his January 10, 2007 e-mail, Tourre knew that it was never
contemplated that the first loss (equity) tranche – the least senior tranche on the long side
of a CDO – would be pre-committed with regard to the transaction being discussed with
ACA and Paulson.  In fact, Tourre testified that the first loss tranche of the AC1 CDO

was not pre-committed, it "was not going to be placed," and it was not even "contemplated that the first loss tranche . . . would be pre-committed." Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 73, 145-46; Ex. 42 (Tourre Inv. Tr. II), at 25; Ex. 11 (Tourre Dep. Tr.), at 203-05.

### *Response to Paragraph 164:*

Paragraph 164 is substantially identical to Paragraph 18 of the SEC Original Statement. *See* ECF No. 193, ¶ 18. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that, as of January 10, 2007, he did not anticipate that the equity tranche in ABACUS 2007-AC1 would be issued, as reflected in the transaction offering documents, and otherwise disputes Paragraph 164, which is argument and not a statement of fact. *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 15, 17, 20.

165. Thus, the statement in Tourre's January 10, 2007 e-mail to the effect that the contemplated capital structure for the CDO transaction included a "pre-committed" first loss (equity) tranche was false. As Tourre stated in his deposition, that representation in his e-mail "could have been more accurate." Martens Decl., Ex. 4; Ex. 11 (Tourre Dep. Tr.), at 203-05.

### *Response to Paragraph 165:*

Paragraph 165 is substantially identical to Paragraph 19 of the SEC Original Statement. *See* ECF No. 193, ¶ 19. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 165, which is argument and not a statement of fact. As Mr. Tourre testified at his deposition, he "never represented to [ACA] that Paulson wanted to be long in any fashion." *See* ECF No. 230-13 (Chepiga March 29 Decl., Ex. 13, Tourre Dep. Tr.), at 189:15-190:8.

166. As of the time of the January 10, 2007 e-mail, Tourre knew that Paulson's only interest in the contemplated AC1 CDO transaction was as a short investor in the reference portfolio. Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 189, 198.

### *Response to Paragraph 166:*

Paragraph 166 is substantially identical to Paragraph 20 of the SEC Original Statement. *See* ECF No. 193, ¶ 20. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that as of January 10, 2007, he understood that Paulson sought to purchase protection on subprime RMBS, and also notes that (a) Paulson was under no obligation to make any investment, long or short, (b) Goldman was under no obligation to sell any investment, long or short, and (c) investors re-assessed their potential investments constantly in light of changing market conditions. *See* ECF No. 230-8 (Chepiga March 29 Decl., Ex. 8, Dep. Tr. of Paolo Pellegrini dated Mar. 14-15, 2011 ("Pellegrini Dep. Tr.")), at 163:13-164:25; ECF No. 230-7 (Chepiga March 29 Decl., Ex. 7, Gerst Dep. Tr.), at 120:20-121:7; ECF No. 230-16 (Chepiga March 29 Decl., Ex. 16, Roseman Dep. Tr.), at 33:16-34:17, 45:6-46:10. Mr. Tourre otherwise disputes Paragraph 166 as argument and not a statement of fact.

167. As of the time of the January 10, 2007 e-mail, Tourre knew that Paulson's economic interests were adverse to the economic interests of the purchasers of notes in the AC1 transaction. Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 219.

### *Response to Paragraph 167:*

Paragraph 167 is substantially identical to Paragraph 21 of the SEC Original Statement. *See* ECF No. 193, ¶ 21. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that, as of January 10, 2007, he understood that every synthetic CDO, including ABACUS 2007-AC1, required long and short investors who take opposite economic positions. *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 7-9. Mr. Tourre again notes that (a) Paulson was under no obligation to make any investment, long or short, (b) Goldman was under no obligation to sell any investment, long or short, and (c) investors re-assessed their potential investments constantly in light of changing

market conditions.  *See* ECF No. 230-8 (Chepiga March 29 Decl., Ex. 8, Pellegrini

Dep. Tr.), at 163:13-164:25; ECF No. 230-7 (Chepiga March 29 Decl., Ex. 7, Gerst

Dep. Tr.), at 120:20-121:7; ECF No. 230-16 (Chepiga March 29 Decl., Ex. 16,

Roseman Dep. Tr.), at 33:16-34:17, 45:6-46:10.  Mr. Tourre otherwise disputes

Paragraph 167, which is an incomplete statement of the economic interests of CDO

investors.  *See* ECF No. 230-24 (Chepiga March 29 Decl., Ex. 21, Egol Dep. Tr.), at

30:2-32:8.

168.   As portfolio selection agent, ACA would be acting in the interest of long investors in the
       CDO transaction.  Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 156-57; Ex. 11 (Tourre
       Dep. Tr.), at 223; Ex. 24 ("Gerst Dep. Tr."), at 63-64, 115, 183-84.

       ### Response to Paragraph 168:

              Paragraph 168 is substantially identical to Paragraph 22 of the SEC Original

       Statement.  *See* ECF No. 193, ¶ 22.  In accordance with Mr. Tourre's response to the

       SEC Original Statement, Mr. Tourre disputes Paragraph 168, which is an incomplete

       statement of the role of a portfolio selection agent in a synthetic CDO.  *See* ECF No.

       230-7 (Chepiga March 29 Decl., Ex. 7, Gerst Dep. Tr.), at 58:15-59:13; ECF No.

       230-8 (Chepiga March 29 Decl., Ex. 8, Pellegrini Dep. Tr.), at 236:15-237:22; ECF

       No. 230-10 (Chepiga March 29 Decl., Ex. 10, Dep. Tr. of Mukesh Bajaj dated Feb. 7,

       2013), at 228:15-229:2.

169.   Thus, the statement in Tourre's January 10, 2007 e-mail to the effect that the CDO
       transaction structure aligned the interests of Paulson and ACA was false and misleading.
       Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 189, 198, 219, 223; Ex. 10 (Tourre Inv. Tr.),
       at 156-57.

       ### Response to Paragraph 169:

              Paragraph 169 is substantially identical to Paragraph 23 of the SEC Original

       Statement.  *See* ECF No. 193, ¶ 23.  In accordance with Mr. Tourre's response to the

       SEC Original Statement, Mr. Tourre disputes Paragraph 169, which is an inaccurate

description of Mr. Tourre's January 10, 2007 email, and, moreover, is argument and

not a statement of material fact.

170.   Schwartz reasonably understood the January 10, 2007 e-mail from Tourre as meaning
that Paulson was investing in the equity tranche of the proposed CDO. Martens Decl., Ex.
2 (Schwartz Dep. Tr.), at 46-47; Ex. 7 (Wagner Report), at 10.

### *Response to Paragraph 170:*

Paragraph 170 is substantially identical to Paragraph 24 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 24.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 170, as the cited evidence

does not support Paragraph 170, and consists only of Ms. Schwartz's interpretation

of the email at her deposition in 2011, not her recollection.  Ms. Schwartz testified at

her deposition on April 13, 2011 that she had no present recollection of reviewing

Mr. Tourre's January 10, 2007 email, and, in fact, could not even recall that she had

provided on the previous day the testimony reconstructing this email that the SEC

cites as support for Paragraph 170.  During the SEC's investigation of the ABACUS

2007-AC1 transaction, Ms. Schwartz testified on November 13, 2008 that she did not

recognize Mr. Tourre's January 10, 2007 email.  Further, during the SEC's

investigation, Ms. Schwartz provided a sworn statement dated January 21, 2010,

setting forth that she did "not have a specific recollection today precisely how I came

to my understanding that Paulson was the equity participant in the Abacus CDO,"

and that Mr. Tourre's email was only "consistent with" and "representative" of that

supposed understanding.  *See* ECF No. 230-3 (Chepiga March 29 Decl., Ex. 3, Dep.

Tr. of Laura Schwartz dated Apr. 12-13, 2011 ("Schwartz Dep. Tr.")), at 270:17-

271:22; ECF No. 230-14 (Chepiga March 29 Decl., Ex. 14, tr. of SEC investigative

testimony of Laura Schwartz dated Nov. 13, 2008), at 101:25-102:10; ECF No. 230-

15 (Chepiga March 29 Decl., Ex. 15, statement of Laura U. Schwartz dated Jan. 21,

2010), ¶¶ 9-10.  Mr. Tourre also notes that the SEC improperly relies on its expert

witness Ira Wagner to support its assertions about what Laura Schwartz, a percipient fact witness, actually understood.[1]

171. On January 14, 2007, Schwartz sent an e-mail to a GS&Co salesperson referencing "Paulson's equity perspective" in the transaction.  This e-mail was forwarded to Tourre who read it, but he did not respond to make clear that Paulson was to be a short investor, not a long equity investor, in the AC1 transaction.  Martens Decl., Ex. 47 (Plaintiff's Dep. Ex. 28); Ex. 11 (Tourre Dep. Tr.), at 211-14; Ex. 2 (Schwartz Dep. Tr.), at 54-56.

### *Response to Paragraph 171:*

Paragraph 171 is substantially identical to Paragraph 25 of the SEC Original Statement.  *See* ECF No. 193, ¶ 25.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that on January 14, 2007, Ms. Schwartz sent to Gail Kreitman the email described in Paragraph 171, and that Ms. Kreitman subsequently forwarded this email to Mr. Tourre, who forwarded it to David Gerst, a Correlation Desk employee.  Mr. Tourre otherwise disputes Paragraph 171, and the cited evidence does not establish that Mr. Tourre read the email, or focused on the quoted three words.  Mr. Tourre testified at his deposition that he did not remember receiving this email, and had no other recollection of Ms. Schwartz telling him that she believed Paulson was an equity investor in ABACUS 2007-AC1.  *See* ECF No. 230-13 (Chepiga March 29 Decl., Ex. 13, Tourre Dep. Tr.), at 212:5-213:10.  Moreover, Paragraph 171 does not address the possibility that Ms. Kreitman, Mr. Tourre, Mr. Gerst or some other Goldman employee orally responded to Ms. Schwartz's email.

172. Tourre testified that his "traditional protocol" was to communicate with ACA through GS&Co salesperson Gail Kreitman.  Martens Decl., Ex. 11 (Tourre Dep. Tr.), at 193-94.

---

[1] As the Court is aware, Mr. Tourre has moved to exclude the proposed expert testimony of Mr. Wagner. *See* ECF No. 199.

### Response to Paragraph 172:

Mr. Tourre disputes Paragraph 172, which is an incomplete statement of his deposition testimony.  The SEC asked Mr. Tourre whether, when he "wanted to communicate with ACA on occasion," he would speak with Ms. Kreitman, to which Mr. Tourre responded "[t]hat was the traditional protocol."  The SEC also asked whether "[p]eriodically when ACA wanted to communicate with you, they would communicate with Gail Kreitman," and Mr. Tourre replied "[t]hat was the protocol." *See* Decl. of Pamela Rogers Chepiga in Response to the SEC's Separate Statement, dated Apr. 17, 2013 (the "Chepiga Apr. 17 Decl."), Ex. 1 (Tourre Dep. Tr.), at 193:8-194:15 (emphasis added).  This testimony provides no evidence regarding whether Mr. Tourre conveyed any specific information to Ms. Kreitman.

In addition, Ms. Kreitman testified during the SEC's investigation that she may have spoken with Mr. Gerst, a member of the Correlation Desk who was also working on the ABACUS 2007-AC1 transaction, and may have also spoken to other Correlation Desk members.  Ms. Kreitman also attended a December 20, 2006 meeting between Goldman and ACA, which Mr. Tourre did not attend, and during which the parties discussed the potential transaction with Paulson.  *See* Chepiga Apr. 17 Decl., Ex. 2 (Tr. of inv. testimony of Gail Kreitman dated June 30, 2009), at 39:19-24; evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 14.

173.   At 7:46 a.m. on the morning of January 17, 2007, Tourre sent an e-mail to Kreitman stating, "Let's try to close the loop with ACA this morning!"  Martens Decl., Ex. 48 (email dated January 17, 2007, bearing production number SEC-05511765).

### Response to Paragraph 173:

Mr. Tourre does not dispute that he sent an email on January 17, 2007, at 7:46 a.m. to Ms. Kreitman, copied to Mr. Gerst of Goldman, with the text quoted in Paragraph 173.  Mr. Tourre notes that the SEC has offered no evidence from any witness as to the circumstances surrounding the email, its purpose or its meaning.

174.   On January 17, 2007, Kreitman spoke by telephone with Lucas Westreich of ACA and advised him that a mortgage-related full "capital structure" transaction involving "Paulson" was being discussed with "Laura" in which GS&Co was "placing a hundred percent of the equity" with Paulson.  Martens Decl., Ex. 12 (Kreitman Decl.); Ex. 13 (Boyajian Decl.).

> **_Response to Paragraph 174:_**
>
> Paragraph 174 is substantially identical to Paragraph 26 of the SEC Original Statement.  *See* ECF No. 193, ¶ 26.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre notes that he has moved to strike and preclude the SEC's reliance on the audio recording of this telephone call, which is irrelevant and inadmissible.  *See* ECF No. 210.  Further, Paragraph 174 does not accurately reflect the transcript of the telephone call.

175.   In late 2006 and early 2007, Kreitman was an "intermediary" between the GS&Co structured products trading desk and ACA, which was interested in investing in asset-backed securities ("ABS").  The employees of the GS&Co structured products trading desk with whom the GS&Co employee interacted for purposes of communicating with ACA were Tourre and David Gerst.  Kreitman's primary contacts at ACA were Laura Schwartz, Keith Gorman, and Lucas Westreich.  Martens Decl., Ex. 49 (Inv. Tr. of Gail Kreitman dated June 30, 2009 ("Kreitman Inv. Tr.")), at 16, 20, 27-28, 39; Ex. 11 (Tourre Dep. Tr.), at 193-94, 283; Ex. 2 (Schwartz Dep. Tr.), at 30-31.

> **_Response to Paragraph 175:_**
>
> Paragraph 175 is substantially identical to Paragraph 27 of the SEC Original Statement.  *See* ECF No. 193, ¶ 27.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that in late 2006 and 2007, Goldman Managing Director Gail Kreitman was sales coverage for ACA, and that, on occasion, she spoke with members of the Correlation Desk and also spoke with ACA.  Mr. Tourre also does not dispute that Ms. Kreitman testified in 2009 during the SEC's investigation that her primary contacts at ACA were Laura Schwartz, Keith Gorman and Lucas Westreich.
>
> Mr. Tourre otherwise disputes Paragraph 175.  Ms. Kreitman testified during the SEC's investigation that she may have spoken with other members of the

Goldman Correlation Desk in addition to Messrs. Tourre and Gerst.  Ms. Kreitman

also attended a December 20, 2006 meeting between Goldman and ACA, which Mr.

Tourre did not attend, and during which the parties discussed the potential

transaction with Paulson.  *See* ECF No. 230-1 (Chepiga March 29 Decl., Ex. 1, tr. of

inv. testimony of Gail Kreitman, dated June 30, 2009), at 39:19-24; evidence cited in

ECF No. 185 (Tourre Summary Judgment Mem.), at 14.

176.    The representation by Kreitman to Westreich of ACA on the January 17, 2007 telephone
        call to the effect that the contemplated CDO transaction involved a full capital structure
        in which Paulson was taking an "equity" position was false. Martens Decl., Ex. 10
        (Tourre Inv. Tr.), at 145; Ex. 11 (Tourre Dep. Tr.), at 189, 198, 203.

        ### *Response to Paragraph 176:*

        Paragraph 176 is substantially identical to Paragraph 28 of the SEC Original

        Statement.  *See* ECF No. 193, ¶ 28.  In accordance with Mr. Tourre's response to the

        SEC Original Statement, Mr. Tourre disputes Paragraph 176.  As noted above, Mr.

        Tourre has moved to strike and preclude the SEC's reliance on this audio recording,

        which is irrelevant and inadmissible.  *See* ECF No. 210.  Consistent with the

        ABACUS 2007-AC1 offering documents, Mr. Tourre does not dispute that the

        ABACUS 2007-AC1 transaction was not a full capital structure deal, but rather a

        "single tranche" transaction in which the full capital structure did not have to be

        placed, and also agrees that, again consistent with the offering documents, no one

        purchased the ABACUS 2007-AC1 equity tranche.  *See* evidence cited in ECF No.

        185 (Tourre Summary Judgment Mem.), at 17, 20.  Further, Paragraph 176 does not

        accurately reflect the transcript of the telephone call.

177.    Prior to May 31, 2007, neither GS&Co nor Paulson informed ACA that Paulson was not
        investing in the equity tranche of the AC1 CDO but was instead only buying protection
        (i.e., taking a short position) in certain tranches of the AC1 reference portfolio. Martens
        Decl., Ex. 47; Ex. 50 (email dated April 10, 2007, bearing production number SEC-
        07759422); Ex. 51 (Plaintiff's Dep. Ex. 126); Ex. 52 (Plaintiff's Dep. Ex. 127); Ex. 53
        (Plaintiff's Dep. Ex. 129); Ex. 8; Ex. 54 (email dated April 10, 2007, bearing production
        number SEC-07759424); Ex. 9 (Pellegrini Dep. Tr.), at 201-02; Ex. 55 (Dep. Tr. of Sihan

Shu dated March 24, 2011 ("Shu Dep. Tr.")), at 86; Ex. 2 (Schwartz Dep. Tr.), at 50-51, 54-56, 104-14, 116-18; Ex. 11 (Tourre Dep. Tr.), at 185.

### *Response to Paragraph 177:*

Paragraph 177 is substantially identical to Paragraph 29 of the SEC Original Statement. *See* ECF No. 193, ¶ 29.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 177, which is clearly contradicted by the factual record.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 15-17, 20; ECF No. 230-13 (Chepiga March 29 Decl., Ex. 13, Tourre Dep. Tr.), at 185:3-20.

178.  On January 23, 2007, Tourre sent an e-mail to a friend regarding structured finance.  In that e-mail, Tourre boasted that he would be "the only potential survivor" when the "exotic trades" he created collapsed but stated that he was "not feeling too guilty about this."  Specifically, Tourre stated in relevant part:

[Y]ou should take a look at this article . . .  Very insightful . . .  More and more leverage in the system, the whole building is about to collapse anytime now . . . the only potential survivor, the fabulous Fab . . . , standing in the middle of all these complex, highly levered, exotic trades he created without necessarily understanding all the implications of those monstruosities ! ! !  Anyway, not feeling too guilty about this, the real purpose of my job is to make capital markets more efficient and ultimately provide the US consumer with more efficient ways to leverage and finance himself, so there is a humble, noble and ethical reason for my job ;)  amazing how good I am in convincing myself ! ! ! . . .  I am now going to try to get away from ABX and other ethical questions, and immediately plunge into Freakonomics . . . .

Martens Decl., Ex. 56 (Plaintiff's Dep. Ex. 54); Ex. 11 (Tourre Dep. Tr.), at 152-57.

### *Response to Paragraph 178:*

Paragraph 178 is substantially identical to Paragraph 30 of the SEC Original Statement.  *See* ECF No. 193, ¶ 30.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that the SEC has quoted accurately selected portions of Mr. Tourre's January 23, 2007 email, but otherwise disputes Paragraph 178, which consists of argument and is not a statement of fact,

and moreover has nothing to do with ACA or the ABACUS 2007-AC1 transaction and is irrelevant.

179.    In or about February 2007, ACA was engaged to serve as the portfolio selection agent for the AC1 transaction. Martens Decl., Ex. 51; Ex. 57 (Plaintiff's Dep. Ex. 150); Ex. 2 (Schwartz Dep. Tr.), at 104-05, 114-15.

### Response to Paragraph 179:

Paragraph 179 is substantially identical to Paragraph 31 of the SEC Original Statement.  *See* ECF No. 193, ¶ 31.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that on February 15, 2007, ACA's General Counsel Nora Dahlman signed an engagement letter with Goldman, which provides that ACA "will select the Reference Portfolio (subject to the consent of the Protection Buyer)," *i.e.* Goldman.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 17.  On February 26, 2007, Dan Sparks, the head of Goldman's Mortgage Department, also signed the engagement letter.  *See* ECF No. 230-17 (Chepiga March 29 Decl., Ex. 17, email and attachment dated Feb. 26, 2007).

180.    At the time ACA agreed to serve as the portfolio selection agent for the AC1 transaction, ACA had been informed and understood that Paulson was to be an equity investor in the CDO transaction that became AC1. Martens Decl., Ex. 12 (Kreitman Decl.); Ex. 13 (Boyajian Decl.); Ex. 51; Ex. 2 (Schwartz Dep. Tr.), at 46-47, 54, 104-14.

### Response to Paragraph 180:

Paragraph 180 is substantially identical to Paragraph 32 of the SEC Original Statement.  *See* ECF No. 193, ¶ 32.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 180, which relies on an inadmissible and irrelevant audio recording, and which is clearly contradicted by the factual record.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 14-17.

181.    ACA "worked with" Paulson to select the reference portfolio. Martens Decl., Ex. 51, at 2; Ex. 2 (Schwartz Dep. Tr.), at 113-14.

### *Response to Paragraph 181:*

Paragraph 181 is substantially identical to Paragraph 33 of the SEC Original Statement.  *See* ECF No. 193, ¶ 33.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute that, consistent with ACA's universal practice that it employed in every CDO it undertook in 2006 and 2007, Paulson provided input on the ABACUS 2007-AC1 reference portfolio.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 12-17.  Mr. Tourre otherwise disputes Paragraph 181.

182.   GS&Co provided Paulson with a list of all the outstanding subprime deals.  Chepiga Decl., Ex. 11 (Shu Dep. Tr.), at 21:21-23, 50:5-22.  Martens Decl., Ex. 58 (Plaintiff's Dep. Ex. 115); Ex. 59 (Plaintiff's Dep. Ex. 116).  From that list, Paulson, through Tourre, provided ACA with a list of 123 potential reference assets for the AC1 portfolio.  Martens Decl., Ex. 60 (Plaintiff's Dep. Ex. 31); Ex. 61 (Plaintiff's Dep. Ex. 32); Ex. 62 (email dated January 9, 2007 and attachment, bearing production numbers SEC-07753105–7753108); Ex. 3; Ex. 55 (Shu Dep. Tr.), at 33:12-15.  ACA agreed to 55 of those assets and then continued discussions with Paulson regarding the remaining reference assets.  Martens Decl., Ex. 63 (Plaintiff's Dep. Ex. 33); Ex. 64 (Plaintiff's Dep. Ex. 35); Ex. 65 (Plaintiff's Dep. Ex. 36); Ex. 66 (Plaintiff's Dep. Ex. 37); Ex. 67 (Plaintiff's Dep. Ex. 38).  At times, ACA wanted to include particular reference assets that Paulson rejected.  Martens Decl., Ex. 67.  As defense expert Dr. Mukesh Bajaj described it, Paulson effectively had a "veto" over what assets were included in the AC1 reference portfolio.  Martens Decl., Ex. 5 (Bajaj Dep. Tr.), at 82:10-13.

### *Response to Paragraph 182:*

Mr. Tourre does not dispute that Goldman provided Paulson with a list of subprime RMBS securities, but it is unclear what the SEC means by "outstanding" in Paragraph 182 in reference to these deals.  Mr. Tourre does not dispute that, as part of his duties related to the ABACUS 2007-AC1 transaction, he sent an email on January 9, 2007 to Ms. Kreitman regarding ACA's review of potential reference assets to consider for inclusion in the transaction.  Mr. Tourre does not dispute that, after ACA performed an analysis of the initial list of 123 RMBS suggested by Paulson, ACA stated that it "would recommend taking exposure" to only 55 of the

123 RMBS.  ACA also stated that it would "not recommend" the other 68 names because "we did not like them," other tranches of the same RMBS were "already on negative watch," and some RMBS were "very susceptible to investor push back." *See* ECF No. 231-89 (Decl. of Matthew T. Martens dated March 29, 2013 ("Martens Mar. 29 Decl."), Ex. 60, email dated Jan. 22, 2007).  Mr. Tourre also notes that not all of the 55 RMBS originally recommended by ACA were in the final ABACUS 2007-AC1 reference portfolio.  *See* ECF No. 186-91 (ABACUS 2007-AC1 offering circular dated Apr. 26, 2007), at SEC-04942464–67.  Further, the cited evidence does not establish that Paulson had a "veto" over the ABACUS 2007-AC1 reference portfolio, and Mr. Tourre notes that every ACA representative to testify in this proceeding has stated that ACA selected the ABACUS 2007-AC1 reference portfolio using its "standard process" that it used in "every other" CDO it was involved with during 2006-2007.  This meant that every security in the reference portfolio had been reviewed and approved by ACA's Collateral Committee, and that each security had undergone a full analysis, including testing under ACA's various stress scenarios. *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 20.  Mr. Tourre otherwise disputes Paragraph 182.

Mr. Tourre also notes that Dr. Bajaj did <u>not</u> testify that "Paulson effectively had a 'veto' over what assets were included in the AC1 reference portfolio."  In response to the SEC's question "[d]o you agree that Paulson effectively had a veto over the reference assets in the Abacus 2007-AC1 reference portfolio?", Dr. Bajaj said that he had seen no evidence supporting that position.  Dr. Bajaj noted that no investor had to invest unless it was comfortable with the reference portfolio, and, in that sense, testified "But if you want to view the process where both parties came to an agreement as having a veto, then I guess both sides had a veto because it had to be acceptable to both."  *See* Chepiga Apr. 17 Decl., Ex. 7 (Dep. Tr. of Mukesh Bajaj dated Feb. 7, 2013), at 81:22-82:13.

183.    On February 2, 2007, Tourre attended a meeting with Paulson representatives, including
        Pellegrini, and ACA representatives, including Schwartz, to finalize discussions
        regarding the AC1 reference portfolio.  During that meeting, Tourre sent an e-mail to a
        GS&Co colleague stating, "I am at this aca paulson meeting, this is surreal."  Martens
        Decl., Ex. 68 (Plaintiff's Dep. Ex. 22); Ex. 11 (Tourre Dep. Tr.), at 221-22, 225-26.

   **_Response to Paragraph 183:_**

   Paragraph 183 is substantially identical to Paragraph 34 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 34.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute that on February 2, 2007, he

attended a meeting at ACA's offices, which Mr. Pellegrini and Ms. Schwartz also

attended, and also does not dispute that the SEC has accurately quoted his email from

that day sent to Jonathan Egol, head of Goldman's Correlation Desk.  Mr. Tourre

otherwise disputes Paragraph 183, and notes that Mr. Egol testified that, after Mr.

Tourre returned from the meeting, he reported to Mr. Egol that, during the meeting,

Paulson expressed its view on the market, which was so negative that it was buying

credit default swap protection on investment banks like Goldman, which Paulson

believed were going to experience distress.  *See* ECF No. 230-24 (Chepiga March 29

Decl., Ex. 21, Egol Dep. Tr.), at 237:2-238:14.

184.    Paulson was attempting to identify subprime RMBS for the AC1 reference portfolio that
        were weaker in credit quality than other comparable reference assets and thus more likely
        to default or experience credit events. Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 48-50;
        Ex. 11 (Tourre Dep. Tr.), at 88, 92-93; Ex. 9 (Pellegrini Dep. Tr.), at 21, 26-27, 103-04;
        Ex. 55 (Shu Dep. Tr.), at 36-42, 48-49, 92-93.

   **_Response to Paragraph 184:_**

   Paragraph 184 is substantially identical to Paragraph 35 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 35.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 184.  Mr. Pellegrini of

Paulson testified that Paulson was attempting to "price protection on a slice of the

market," and that Paulson's objective was to "derive value from the transaction," so

Paulson was "equally happy trading price for quality one way or the other." *See* ECF No. 230-8 (Chepiga March 29 Decl., Ex. 8, Pellegrini Dep. Tr.), at 127:4-128:14, 247:10-248:17.

185.  Had Schwartz known of Paulson's short interest in the AC1 transaction, "it would have been very difficult for [her] and for ACA to support and promote the transaction." Martens Decl., Ex. 2 (Schwartz Dep. Tr.), at 127-28.

> ### <u>Response to Paragraph 185:</u>
>
> Paragraph 185 is substantially identical to Paragraph 36 of the SEC Original Statement. *See* ECF No. 193, ¶ 36.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 185, which is derived from Ms. Schwartz answering hypothetical questions in April 2011, and is inconsistent with Ms. Schwartz's actions in 2006-2007, including, *inter alia*, her enthusiastic support of the participation of short investors in ACA transactions.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 8-9.

186.  ACA's CEO, Alan Roseman, who headed the ACA committee that approved ACA's role as portfolio selection agent for the AC1, testified that he "likely . . . would not have voted to approve" ACA's role as portfolio selection agent in the AC1 transaction had be known that Paulson was buying protection on the AC1 reference portfolio rather than being an equity investor. Martens Decl., Ex. 69 (Dep. Tr. of Alan Roseman dated April 5, 2011 ("Roseman Dep. Tr.")), at 56-57.

> ### <u>Response to Paragraph 186:</u>
>
> Paragraph 186 is substantially identical to Paragraph 37 of the SEC Original Statement. *See* ECF No. 193, ¶ 37.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 186, which is derived from Mr. Roseman answering hypothetical questions in April 2011, and is inconsistent with ACA's actions in 2006-2007.  Further, Mr. Roseman testified that had ACA discussed Paulson's short position in ABACUS 2007-AC1, it might have considered Paulson a "kook" for having such extremely negative views of the market, which

were the "opposite" of ACA's views at the time.  *See* evidence cited in ECF No. 185

(Tourre Summary Judgment Mem.), at 12-14; ECF No. 230-16 (Chepiga March 29

Decl., Ex. 16, Roseman Dep. Tr.), at 192:24-195:15.

187.   As part of its marketing efforts for the AC1 transaction, GS&Co and Tourre prepared a
term sheet, flip book, and offering circular.  Those documents represented to potential
investors that the AC1 reference portfolio was "selected" by ACA, but made no reference
to Paulson's adverse economic interest and role in the portfolio selection process.
Martens Decl., Ex. 6; Ex. 70 (Plaintiff's Dep. Ex. 15); Ex. 71 (Plaintiff's Dep. Ex. 16).

### *Response to Paragraph 187:*

Mr. Tourre does not dispute that Goldman employees prepared a term sheet,

flip book and offering circular for the ABACUS 2007-AC1 transaction.  Mr. Tourre

notes that the fact witnesses in this matter testified uniformly that ACA did, in fact,

select the ABACUS 2007-AC1 reference portfolio.  *See* evidence cited in ECF No.

244 (Reply Mem. of Law in Supp. of Mr. Tourre's Mot. for Partial Summary

Judgment dated April 12, 2013 ("Tourre Reply Mem.")), at 17 n.2.  Mr. Tourre

further notes that ACA contributed materials to the flip book and the offering

circular, including a section of the offering circular for which ACA took sole

responsibility and which states that ACA "will . . . select the Initial Reference

Portfolio."  *See* ECF No. 186-87 (offering circular dated Apr. 26, 2007), at SEC-

04942368–69; ECF No. 231-11 (Martens Mar. 29 Decl., Ex. 10, Tourre Inv. Tr.), at

58:7-17.  Mr. Tourre also notes that the ABACUS 2007-AC1 offering documents

were reviewed by other Correlation Desk employees, and by a host of lawyers from

Goldman, Goldman's external counsel, ACA and its external counsel, as well as

Paulson's external counsel, which functioned as an "adjunct" to Paulson's in-house

counsel and the lead lawyer of which is currently a senior lawyer at the SEC itself.

*See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 18 n.3.  None of these

lawyers suggested any additional disclosure was required.

188.   Tourre had "primary responsibility" for the preparation of the term sheet and flip book
       and assisted in the preparation of the offering circular.  Martens Decl., Ex. 10 (Tourre
       Inv. Tr.), at 57-58, 75-76.

> ***Response to Paragraph 188:***
>
> Mr. Tourre disputes Paragraph 188 as a vague and inaccurate statement
> regarding Mr. Tourre's role with respect to the ABACUS 2007-AC1 offering
> materials.  Mr. Tourre does not dispute that he "contributed" to the term sheet and
> the flip book, and that his role in the offering circular was limited to reviewing the
> summary section.  *See* Chepiga Apr. 17 Decl., Ex. 1 (Tourre Dep. Tr.), at 270:21-
> 272:10; ECF No. 231-11 (Martens Mar. 29 Decl., Ex. 10, Tourre Inv. Tr.), at 76:1-
> 10.  To the extent the SEC is attempting to imply that Mr. Tourre was "primarily
> responsible" for the legal disclosures in the offering documents, Mr. Tourre disputes
> this implication and otherwise disputes Paragraph 188.  Mr. Tourre notes that he
> helped to recruit Mr. Gerst, a trained lawyer, to work on the Correlation Desk, Mr.
> Gerst thought about whether Paulson's role in portfolio selection needed to be
> disclosed and decided it did not, and did not recall ever discussing this issue with Mr.
> Tourre.  *See* ECF No. 243-23 (Chepiga Apr. 12 Decl., Ex. 112, tr. of inv. testimony
> of David Gerst dated Jan. 29, 2009), at 65:15-66:21; ECF No. 243-13 (Chepiga Apr.
> 12 Decl., Ex. 102, Tourre Dep. Tr.), at 371:15-373:17.  Further, the ABACUS 2007-
> AC1 offering documents were reviewed by other Correlation Desk employees, and
> by a host of lawyers from Goldman, Goldman's external counsel, ACA and its
> external counsel, as well as Paulson's external counsel, which functioned as an
> "adjunct" to Paulson's in-house counsel and the lead lawyer of which is currently a
> senior lawyer at the SEC itself.  *See* evidence cited in ECF No. 244 (Tourre Reply
> Mem.), at 18 n.3.  None of these lawyers suggested any additional disclosure was
> required.

189.   According to Tourre, "it was important to have ACA's name on this transaction . . .
       because investors in the ABS senior market were not all expert in the underlying

subprime RMBS market.  So they need to have an independent third party . . . ."  Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 174.

### Response to Paragraph 189:

Mr. Tourre disputes Paragraph 189, which is an incomplete statement of the role of ACA in the ABACUS 2007-AC1 transaction.  Mr. Tourre testified that the "first purpose" of ACA's role was to select a reference portfolio.  *See* Chepiga Apr. 17 Decl., Ex. 1 (Tourre Dep. Tr.), at 138:13-139:6, 234:23-235:5.  Mr. Tourre notes again that, according to ACA's own employees, ACA selected the ABACUS 2007-AC1 reference portfolio using its "standard process" that it used in "every other" CDO it was involved with during 2006-2007.  This meant that every security in the reference portfolio had been reviewed and approved by ACA's Collateral Committee, and that each security had undergone a full analysis, including testing under ACA's various stress scenarios.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 20.

190.    Tourre sent a copy of the AC1 offering circular by e-mail directly to IKB and invited any questions regarding the document.  Martens Decl., Exs. 16, 17, 18, 20; Ex. 11 (Tourre Dep. Tr.), at 296-303.

### Response to Paragraph 190:

Mr. Tourre disputes Paragraph 190, which is an incomplete statement of the facts at issue.  On April 2, 2007, Mr. Tourre sent to IKB representatives a preliminary ABACUS 2007-AC1 offering circular.  Further, Mr. Tourre sent this email to IKB only because Michael Nartey, the London-based employee of Goldman Sachs International ("GSI") who was the sales person covering IKB, and had held that responsibility since 2003, was out of the office on Easter vacation.  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 10-12.

191.    The very first page of the offering circular Tourre e-mailed to IKB states that the notes were being "offered" and contains the misleadingly incomplete representation that ACA

was the portfolio selection agent.  Martens Decl., Ex. 17, at 3; Ex. 11 (Tourre Dep. Tr.), at 300-01.

### Response to Paragraph 191:

Mr. Tourre disputes Paragraph 191, which is an inaccurate statement of the facts at issue.  As noted above in Mr. Tourre's response to Paragraph 187, the fact witnesses in this matter have uniformly testified that ACA did, in fact, select the ABACUS 2007-AC1 reference portfolio.  Further, as noted above in Mr. Tourre's response to Paragraph 188, Mr. Tourre is not responsible for the disclosures in Goldman's ABACUS 2007-AC1 offering materials.  Further, IKB well understood that the preliminary offering circular sent by Mr. Tourre did not constitute an offer of securities on which it, or anyone else, could undertake a transaction.  IKB had held this understanding since at least 2005, and, prior to Mr. Tourre sending the preliminary offering circular, IKB representatives explicitly agreed that the document was "not on offer to buy or sell or a solicitation of an offer to buy or sell any security."  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 10-12.

192.   Tourre also spoke directly with IKB by telephone regarding the AC1 transaction. Martens Decl., Ex. 19; Ex. 1 (Nartey Dep. Tr.), at 32-36, 52, 97-98, 218.

### Response to Paragraph 192:

Mr. Tourre disputes Paragraph 192 as vague, and further because the evidence cited does not establish the occurrence of any particular calls between Mr. Tourre and IKB regarding the ABACUS 2007-AC1 transaction.  Mr. Tourre further notes that Mr. Nartey, whose deposition testimony the SEC relies on as support for Paragraph 192, testified that he could not recall a single word spoken by Mr. Tourre to IKB in connection with the ABACUS 2007-AC1 transaction.  *See* Chepiga Apr. 17 Decl., Ex. 3 (Nartey Dep. Tr.), at 239:20-240:14.

193.   Tourre and others at GS&Co also indirectly transmitted AC1 offering materials to IKB from New York through the Goldman Sachs International ("GSI") sales desk in London.

For example, on February 15, 2007, David Gerst, who worked on the same desk at GS&Co in New York as Tourre, sent an e-mail, copying Tourre, to a GSI sales person in London that attached a copy of the AC1 term sheet and stated, "Please send these to IKB." An updated AC1 term sheet was again sent by Gerst to GSI for forwarding to IKB on March 23, 2007, again with the message, "Please send these to IKB." Martens Decl., Ex. 72 (Plaintiff's Dep. Ex. 17); Ex. 73 (Plaintiff's Dep. Ex. 18); ); Ex. 74 (Plaintiff's Dep. Ex. 19); Ex. 75 (Plaintiff's Dep. Ex. 45); Ex. 76 (Plaintiff's Dep. Ex. 189); Ex. 24 (Gerst Dep. Tr.), at 242-49; Ex. 1 (Nartey Dep. Tr.), at 34-37, 80-82.

### **Response to Paragraph 193:**

Mr. Tourre does not dispute that Mr. Gerst sent emails to Mr. Nartey of GSI in London, but notes that none of the cited evidence concerns Mr. Tourre emailing anything to anyone.

194. IKB recommended that its advisory clients, the Loreley entities, purchase the AC1 notes. Martens Decl., Ex. 15 (Hunter Dep. Tr.), at 30-31.

### **Response to Paragraph 194:**

Mr. Tourre does not dispute that on or about March 27, 2007, IKB provided a recommendation to the Loreley Companies to purchase $50 million of Class A-1 and $100 million of Class A-2 ABACUS 2007-AC1 notes. Mr. Tourre further notes that IKB's recommendation was "based on" the "credit enhancement" of the notes, the RMBS in the reference portfolio all holding a rating of Baa2, and the "excellent risk/return" of the notes. IKB also provided an analysis of ACA, and concluded that ACA is below IKB's "Benchmark" for "Prudence," for "Regional perspective on [the] US housing market," and for "House price assessment/eco[nomic] impact." The Risk Evaluation section of IKB's recommendation described ACA's involvement under the heading "Threats," since, in IKB's view, ACA had "no proven track record" and IKB considered ACA "average compared to our overall manager universe." Further, IKB conducted an economic analysis of the ABACUS 2007-AC1 transaction, noting that IKB viewed the "average FICO and LTV [loan-to-value ratio] distribution" as "favourable" compared to other transactions then in the

market.  IKB also conducted a "Quantitative Analysis" of every reference obligation

in the ABACUS 2007-AC1 portfolio, using the Intex computer program and Credit

Suisse First Boston's "Locus-Tool for RMBS bond analysis."  IKB projected that

losses on the ABACUS 2007-AC1 reference portfolio would be 6.80%, more than

three times below the tranche level at which IKB recommended investing.  *See*

Chepiga Apr. 17 Decl., Ex. 4 (Record of Recommendation dated Mar. 27, 2007), at

SEC-09181747, SEC-09181750, SEC-09181753 and SEC-09181756–57; Ex. 5 (Dep.

Tr. of Alasdair Hunter dated Dec. 14, 2011 ("Hunter Dep. Tr.")), at 44:12-45:13.

Mr. Tourre also notes that he has been denied any meaningful discovery of

IKB.  *See* ECF No. 170 (Mr. Tourre's Mem. of Law in Opp. to take IKB Depositions

in London, England, dated Dec. 14, 2012).

195. The Loreley entities never made an investment decision without the advice of IKB, and
those entities never made an investment decision contrary to the advice of IKB.  Martens
Decl., Ex. 15 (Hunter Dep. Tr.), at 35-36.

### ***Response to Paragraph 195:***

Mr. Tourre does not dispute that the Loreley Companies, as independent

entities, entered into a contractual arrangement whereby IKB's recommendation was

one of the conditions of investments by the Loreley Companies.  Mr. Tourre also

notes that the Loreley Companies' decision to invest in ABACUS 2007-AC1

securities was made solely by the Loreley Companies themselves.  Mr. Tourre

further notes that IKB was just one of several advisors to the Loreley Companies,

which were advised by an investment committee composed of two individuals from

Wilmington Trust Company, one from Dresdner Bank AG, and one from IKB.  *See*

Chepiga Apr. 17 Decl., Ex. 5 (Hunter Dep. Tr.), at 20:9-16, 25:15-26:5, 34:23-36:12.

196. The GS&Co syndicate desk served as an intermediary between the GS&Co structured
products correlation desk on which Tourre worked and the GS&Co sales force.  Martens
Decl., Ex. 1 (Nartey Dep. Tr.), at 231-32; Ex. 11 (Tourre Dep. Tr.), at 280-83.

**_Response to Paragraph 196:_**

      Mr. Tourre does not dispute that the Goldman syndicate desk, of which Mr. Tourre was not a member, served as a liaison between a variety of structuring and product desks, such as the Correlation Desk on which Mr. Tourre worked, and the Goldman sales force, of which Mr. Tourre was not a member.  *See* evidence cited by SEC in support of Paragraph 196.

197.    Tourre testified that he anticipated at the time that the AC1 notes would be purchased by more parties than IKB and ACA.  Martens Decl., 10 (Tourre Inv. Tr.), at 53.

**_Response to Paragraph 197:_**

      Mr. Tourre disputes Paragraph 197, which is not supported by the cited evidence.

198.    On February 27, 2007, the GS&Co syndicate desk sent a "New Issue Announcement" e-mail for the AC1 transaction to the GS&Co sales force.  That e-mail prominently identified ACA as the "Portfolio Selection Agent," and the attached AC1 term sheet stated that the reference portfolio was "selected by ACA."  Neither the e-mail nor the term sheet disclosed Paulson's short interest and role in the AC1 portfolio selection process.  Martens Decl., Ex. 77 (email dated February 27, 2007 and attachments, bearing production numbers SEC-03546356–3546433); Ex. 11 (Tourre Dep. Tr.), at 307-11.

**_Response to Paragraph 198:_**

      Mr. Tourre disputes Paragraph 198, which is an inaccurate description of the facts at issue.  As noted above, the fact witnesses in this matter testified uniformly that ACA did, in fact, select the ABACUS 2007 AC-1 reference portfolio.  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 17 n.2.  Further, the ABACUS 2007-AC1 offering documents, including those attached to the email described in Paragraph 198, were reviewed by other Correlation Desk employees, and by a host of lawyers from Goldman, Goldman's external counsel, ACA and its external counsel, as well as Paulson's external counsel, which functioned as an "adjunct" to Paulson's in-house counsel and the lead lawyer of which is currently a

senior lawyer at the SEC itself.  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 18 n.3.  None of these lawyers suggested any additional disclosure was required.  Mr. Tourre also notes that he testified at his deposition that he was not involved in Goldman's process of sending new issue announcements.  *See* evidence cited by SEC in support of Paragraph 198 (Tourre Dep. Tr., at 310:22-311:8).

199.   Curtis Willing, who was a Vice President on the GS&Co mortgage sales team in New York, sent the "New Issue Announcement" e-mail to more than five dozen individuals at various financial institutions.  Martens Decl., Ex. 77; Ex. 11 (Tourre Dep. Tr.), at 307-11; Ex. 78 (Declaration of Joseph Yanagisawa dated March 27, 2013 ("Yanagisawa Decl.")).

   *Response to Paragraph 199:*

   Mr. Tourre does not dispute that Mr. Willing sent the email described in Paragraph 199, but the cited evidence does not establish, in any respect, any facts about whether the emails were received, who received them, or whether the recipients, if any, were parties or prospective parties to domestic securities transactions, or what those entities knew or considered material to the making of investment decisions.

200.   One of the recipients of this "New Issue Announcement" e-mail was GSC.  Upon receiving the New Issue Announcement e-mail, a GSC's representative responded to GS&Co stating, "I do not have to say how bad it is that you guys are pushing this thing." Martens Decl., Ex. 79 (Plaintiff's Dep. Ex. 13); Ex. 78 (Yanagisawa Decl.).

   *Response to Paragraph 200:*

   Mr. Tourre does not dispute that the SEC has accurately quoted the email described in Paragraph 200.  Mr. Tourre notes that the SEC has offered no evidence regarding the meaning of this email and declined to take the deposition testimony of any individual with knowledge about this email.  Mr. Tourre further notes that he was not involved in any respect with the email described in Paragraph 200.

201.   The AC1 CDO was a synthetic CDO with a static reference portfolio of subprime residential mortgage-backed securities.  The AC1 CDO issued tranches of secured notes. Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 32-33; Ex. 11 (Tourre Dep. Tr.), at 112.

***Response to Paragraph 201:***

     Paragraph 201 is substantially identical to Paragraph 38 of the SEC Original Statement. *See* ECF No. 193, ¶ 38. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre does not dispute Paragraph 201, but it is an incomplete description of the ABACUS 2007-AC1 transaction. For a complete description of the transaction, see ECF No. 186-84–91 (ABACUS 2007-AC1 offering circular dated Apr. 26, 2007).

202. The AC1 transaction closed in New York in April 2007. Martens Decl., Ex. 24 (Gerst Dep. Tr.), at 280-81; Ex. 80 (Dep. Tr. of Shin Yukawa dated March 28, 2011 ("Yukawa Dep. Tr.")), at 84-85; Ex. 81 (Declaration of Trevor Williams dated June 11, 2012 ("Williams Decl.")).

***Response to Paragraph 202:***

     Paragraph 202 is substantially identical to Paragraph 39 of the SEC Original Statement. *See* ECF No. 193, ¶ 39. In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 202, as the cited evidence establishes only that on April 26, 2007, Goldman's lawyers effected Goldman's purchase as underwriter of ABACUS 2007-AC1 notes from the ABACUS issuer, and that this "closing," which no one attended in person, did not concern purchases by investors, which were "something separate" that was done "later on." *See* ECF No. 230-7 (Chepiga March 29 Decl., Ex. 7, Gerst Dep. Tr.), at 280:8-282:10.

203. In April 2007, ACA purchased $42 million in Class A2 notes issued by the AC1 CDO for funds it managed. Another $150 million of Class A1 and A2 notes issued by the AC1 CDO were sold to the Loreley entities, an advisory client of IKB. The notes were purchased with a trade date of April 10, 2007, and a settlement date of April 26, 2007. Martens Decl., Ex. 82 (Confirmations of Trade, bearing production numbers SEC-09768089–9768091); Ex. 10 (Tourre Inv. Tr.), at 36-37, 77, 83, 86, 90; Ex. 11 (Tourre Dep. Tr.), at 320; Ex. 83 (Inv. Tr. of Keith Gorman dated May 12, 2009 ("Gorman Inv. Tr.")), at 141-42; Ex. 84 (Dep. Tr. of Keith Gorman dated May 10, 2011 ("Gorman Dep. Tr.")), at 214-16.

**_Response to Paragraph 203:_**

The majority of Paragraph 203 is substantially identical to Paragraph 40 of the SEC Original Statement.  *See* ECF No. 193, ¶ 40.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 203, as the cited evidence establishes that three ACA-managed CDOs purchased a total of $42 million of ABACUS 2007-AC1 Class A-2 notes on April 26, 2007.  All three of these CDOs are Cayman Islands companies, and the cited evidence does not establish where these transactions occurred.  *See* ECF No. 230-4 (Chepiga March 29 Decl., Ex. 4, Gorman Dep. Tr.), at 215:7-216:8; ECF No. 230-26 (Chepiga March 29 Decl., Ex. 23, Bloomberg security description for Zenith Funding Ltd.); ECF No. 230-27 (Chepiga March 29 Decl., Ex. 24, Businessweek company overview of Grenadier Funding Ltd.); ECF No. 230-28 (Chepiga March 29 Decl., Ex. 25, Bloomberg security description for ACA ABS 2003-2, Ltd.).  Mr. Tourre does not dispute that, on April 26, 2007, the Loreley Companies collectively purchased $50 million of Class A-1 notes and $100 million of Class A-2 notes from GSI in foreign transactions, but otherwise disputes Paragraph 203 as an inaccurate statement of the transactions at issue.

204.   The notes sold to the Loreley entities were initially transferred, in New York, from the AC1 CDO to GS&Co.  Martens Decl., Ex. 81 (Williams Decl.); Ex. 24 (Gerst Dep. Tr.), at 280-83; Ex. 80 (Yukawa Dep. Tr.), at 83-85.  GS& Co transferred the notes to GSI, which then transferred the notes to the Loreley entities.  Id.; Ex. 85 (Plaintiff's Dep. Ex. 214); Ex. 86 (Plaintiff's Dep. Ex. 215).

**_Response to Paragraph 204:_**

Mr. Tourre disputes Paragraph 204, as it inaccurately characterizes the transactions at issue.  Goldman, in its capacity as underwriter, purchased ABACUS 2007-AC1 notes from the ABACUS 2007-AC1 CDO issuer.  Goldman sold certain amounts and classes of those notes to GSI.  GSI sold ABACUS 2007-AC1 notes to

the Loreley Companies in foreign transactions.  *See* evidence cited by SEC as

support for Paragraph 204.

205. At the time ACA purchased the AC1 notes for funds it managed, ACA had been informed and understood that Paulson was to be an equity investor in the CDO transaction that became AC1.  Martens Decl., Ex. 12 (Kreitman Decl.); Ex. 13 (Boyajian Decl.); Exs. 4, 50, 51, 52; Ex. 2 (Schwartz Dep. Tr.), at 46-47, 54, 104-14, 116-18.

#### *Response to Paragraph 205:*

Paragraph 205 is substantially identical to Paragraph 41 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 41.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes paragraph 205, which relies on the

inadmissible audio recording, and which is clearly contradicted by the factual record.

*See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 15-21.

206. In April 2007, the Paulson Credit Opportunities Fund entered into credit default swap transactions buying protection on the Class A1 and A2 tranches of the AC1 reference portfolio in the notional amount of $192 million.  These transactions were intermediated through a GS&Co affiliate. Martens Decl., Ex. 87 (Plaintiff's Dep. Ex. 72); Ex. 88 (Plaintiff's Dep. Ex. 97); Ex. 89 (confirmation dated April 10, 2007, bearing production numbers SEC-09345228–9345256); Ex. 90 (confirmation dated April 26, 2007, bearing production numbers SEC-04776534–4776585); Ex. 10 (Tourre Inv. Tr.), at 32-33; Ex. 11 (Tourre Dep. Tr.), at 250-51; Ex. 9 (Pellegrini Dep. Tr.), at 81-82, 183-85.

#### *Response to Paragraph 206:*

Paragraph 206 is substantially identical to Paragraph 42 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 42.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 206, which is an inaccurate

description of Paulson's transactions.  *See* evidence cited in ECF No. 185 (Tourre

Summary Judgment Mem.), at 22.

207. Prior to and after the April closing of the AC1 transaction, GS&Co and Tourre marketed the super senior tranche of AC1 notes and credit default swaps to potential investors using the AC1 term sheet stating that the reference portfolio was "selected by ACA." Martens Decl., Ex. 91 (email dated May 4, 2007 and attachments, bearing production numbers SEC-04785258–4785465); Ex. 92 (email dated April 24, 2007 and attachments, bearing production numbers SEC-04789844–4789921).

**_Response to Paragraph 207:_**

Mr. Tourre disputes Paragraph 207 because the cited evidence does not establish the existence of any securities transactions or marketing efforts that would be subject to the federal securities laws. Exhibit 91 to the Martens Mar. 29 Decl. is an email discussion between Mr. Tourre and several employees of Goldman Sachs JBWere, an Australia-based company, and references "CBA," the Commonwealth Bank of Australia. As to Exhibit 92, the SEC has offered no evidence regarding whether the recipients of the email were parties or prospective parties to domestic securities transactions.

Mr. Tourre further notes that the cited evidence does not establish, in any respect, what the entities referenced in Paragraph 207 knew or considered material to the making of investment decisions.

208. Tourre had extensive telephonic communications with ABN personnel in an effort to market the swap transaction between GSI and ABN. Martens Decl., Exs. 25, 26, 28, 29, 30; Ex. 10 (Tourre Inv. Tr.), at 87-88.

**_Response to Paragraph 208:_**

Mr. Tourre disputes Paragraph 208. The cited evidence establishes only that Mr. Tourre had a limited number of phone calls with London-based ABN Amro representatives, and the cited evidence does not support the SEC's assertion that these calls concerned an "effort to market" the GSI-ABN Amro swap. _See_ evidence cited in ECF No. 244 (Tourre Reply Mem.), at 13.

209. On April 5, 2007, Tourre sent an e-mail to ABN inquiring as to ABN's interest in "intermediate[ing]" a $1 billion super senior swap transaction with ACA on the AC1 reference portfolio and providing a "Summary of Terms" for that swap transaction. Martens Decl., Ex. 25; Ex. 11 (Tourre Dep. Tr.), at 323-35. In that e-mail Tourre stated that the reference portfolio was "selected by ACA." Martens Decl., Ex. 25.

### *Response to Paragraph 209:*

Mr. Tourre does not dispute that on April 5, 2007, he sent an email to a London-based ABN Amro representative.  Mr. Tourre notes that he copied on his email Charlie Remnant, a London-based employee of GSI, who was GSI's sales coverage for ABN Amro and, as to the ABN Amro swap transaction, Mr. Remnant was the sales person "who was trying to . . . place that risk" and was the "sales person who did the trade" with ABN Amro.  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at 12-13.  Mr. Tourre further notes that he testified at deposition that his purpose in sending this email was to "provide information on the specific nature of the transaction."  *See* Chepiga Apr. 17 Decl., Ex. 1 (Tourre Dep. Tr.), at 324:17-325:15.  Finally, as Mr. Tourre noted in his response to Paragraph 187, the fact witnesses in this matter have uniformly testified that ACA did, in fact, select the ABACUS 2007-AC1 reference portfolio.

210.   Tourre was part of the GS&Co team that initiated and negotiated the swap transactions. Martens Decl., Ex. 93 (email dated February 21, 2007, bearing production numbers SEC-05822747–5822749); Ex. 10 (Tourre Inv. Tr.), at 86-88; Ex. 11 (Tourre Dep. Tr.), at 129-30, 321.

### *Response to Paragraph 210:*

Paragraph 210 is substantially identical to Paragraph 46 of the SEC Original Statement.  *See* ECF No. 193, ¶ 46.  In accordance with Mr. Tourre's response to the SEC Original Statement, Mr. Tourre disputes Paragraph 210, which is an incomplete statement of the relevant circumstances.  Although Mr. Tourre had a role with respect to certain swap agreements, the GSI-ABN Amro transaction was managed by London-based GSI employees Charlie Remnant and Michael Nartey.  Further, neither Goldman nor GSI was a party to the ABN Amro-ACA transaction.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment Mem.), at 23, 34.

211.   Tourre sent more than a half dozen e-mails to ABN in connection with the negotiation of the super senior swap agreement between GSI and ABN referencing the AC1 portfolio. Martens Decl., Exs. 25, 28, 29, 30.

### Response to Paragraph 211:

Mr. Tourre disputes Paragraph 211.  Although the precise number of emails Mr. Tourre sent to London-based ABN Amro representatives is not relevant to whether the ABN Amro swap transaction is a "domestic transaction" pursuant to *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), Mr. Tourre notes that the cited evidence establishes that Mr. Tourre sent five emails to ABN Amro representatives.

212.   Tourre spoke personally by telephone with ABN representatives regarding the AC1 super senior swap transaction.  Martens Decl., Ex. 10 (Tourre Inv. Tr.), at 87-88.

### Response to Paragraph 212:

Mr. Tourre does not dispute that he had a limited number of phone calls with London-based ABN Amro representatives around the time of the ABACUS 2007-AC1 transaction, and notes that the SEC investigative testimony cited in Paragraph 212 indicates Mr. Tourre's recollection was that he discussed with an ABN Amro representative the "compensation that ABN AMRO wanted to get paid" and ABN Amro's ability to hedge its swap transaction.  *See* evidence cited by SEC in Paragraph 212.

213.   When it appeared that the transaction would not be completed with ABN, Tourre sent an e-mail to GSI sales personnel insisting that he be allowed to "get on the phone with the trader(s)" at ABN because "this is too big P&L for me to give up that easily."  Martens Decl., Ex. 27.

### Response to Paragraph 213:

Mr. Tourre does not dispute that the SEC has accurately quoted the email cited in Paragraph 213, except for the use of the word "the" in front of "trader(s)," when the email actually states "his trader(s)," referring to traders who worked with

London-based ABN Amro employee Dean Atkins.  Mr. Tourre also notes that the

three GSI sales personnel to whom he sent his email were all based in London,

England at the time of the email, and were responsible for managing the ABN Amro

relationship and swap transaction.  *See* Chepiga Apr. 17 Decl., Ex. 3 (Nartey Dep.

Tr.), at 10:9-12:4, 132:21-134:4, 225:4-13.

214.    In a May 10, 2007 e-mail, Tourre recounted to GS&Co colleagues that he "had a long
call with Dean Atkins [of ABN] before ABN agreed to do the intermediation for ACA."
Martens Decl., Ex. 26; Ex. 11 (Tourre Dep. Tr.) at 335-36.

### *Response to Paragraph 214:*

Mr. Tourre does not dispute that the SEC has accurately quoted Mr. Tourre's

email.  Mr. Tourre notes that the email chain relied on by the SEC refers to a meeting

that took place, in London, between representatives of ACA and representatives of

ABN Amro, at which the ACA-ABN Amro swap transaction was discussed, and at

which no Goldman representative was present.  Mr. Tourre further notes that at no

time did ABN Amro representatives ask anyone from ACA about ACA's process for

selecting the ABACUS 2007-AC1 reference portfolio.  *See* Chepiga Apr. 17 Decl.,

Ex. 6 (Dep. Tr. of Dean Atkins dated Oct. 4, 2011 ("Atkins Dep. Tr.")), at 79:13-

82:25.

215.    On May 31, 2007, the Paulson Credit Opportunities Fund entered into a credit default
swap transaction with GSI referencing the 45 to 100 portion of the super senior tranche of
the AC1 reference portfolio.  Martens Decl., Ex. 94 (Plaintiff's Dep. Ex. 96); Ex. 10
(Tourre Inv. Tr.), at 32-33; Ex. 11 (Tourre Dep. Tr.), at 250-53; Ex. 9 (Pellegrini Dep.
Tr.), at 81-82, 186-88.

### *Response to Paragraph 215:*

Paragraph 215 is substantially identical to Paragraph 43 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 43.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute that on May 31, 2007, Paulson

entered a credit default swap with GSI which referenced the 45-100% tranche and

referenced the same RMBS included in the reference portfolio of the ABACUS

2007-AC1 CDO.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment

Mem.), at 23.

216.    On May 31, 2007, GSI entered into a credit default swap transaction with the London
branch of ABN AMRO Bank N.V. ("ABN") referencing the 50 to 100 portion of the
super senior tranche of the AC1 reference portfolio.  Martens Decl., Ex. 95 (confirmation
dated May 31, 2007, bearing production numbers SEC-04088355–4088382); Ex. 10
(Tourre Inv. Tr.), at 86-87; Ex. 11 (Tourre Dep. Tr.), at 320-21, 328-29, 332; Ex. 33
(Atkins Dep. Tr.), at 26-27, 41.

### Response to Paragraph 216:

Paragraph 216 is substantially identical to Paragraph 44 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 44.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute that on May 31, 2007, London-

based GSI entered into an English-law governed credit default swap with the London

branch of ABN Amro N.V., which referenced the 50-100% tranche and referenced

the same RMBS contained in the reference portfolio of the ABACUS 2007-AC1

CDO.  This credit default swap was entered pursuant to a Master Agreement entered

into between GSI and ABN Amro in 1996.  *See* evidence cited in ECF No. 185

(Tourre Summary Judgment Mem.), at 22-23.

217.    In effect, the swap by GSI was "going to be executed with ACA, through ABN Amro as
intermediation counterparty."  Martens Decl., Ex. 96 (Plaintiff's Dep. Ex. 9); Ex. 10
(Tourre Inv. Tr.), at 32-33.

### Response to Paragraph 217:

Mr. Tourre disputes Paragraph 217, which does not accurately characterize the

transactions at issue.  On May 31, 2007, the London branch of ABN Amro entered

into an English law-governed swap with London-based GSI, pursuant to a 1996

Master Agreement between these two entities, related to the 50-100% tranche of the

same RMBS that constituted the ABACUS 2007-AC1 reference portfolio.  Also on

May 31, 2007, ACA's affiliated insurance company issued a financial guaranty

insurance policy related to the 50-100 % tranche of the RMBS that constituted the

ABACUS 2007-AC1 reference portfolio.  *See* evidence cited in ECF No. 185 (Tourre

Summary Judgment Mem.), at 22-23.

218.   On May 31, 2007, ABN entered into a credit default swap transaction with an affiliated
limited liability company of ACA known as ACA Credit Products-ABN AMRO, L.L.C.
("ACA LLC") referencing the 50 to 100 portion of the super senior tranche of the AC1
reference portfolio in the amount of $909 million. Martens Decl., Ex. 31; Ex. 32
(Dahlman Decl.); Ex. 10 (Tourre Inv. Tr.), at 86-87; Ex. 33 (Atkins Dep. Tr.), at 26-29,
41-43, 83; Ex. 34.

   ***Response to Paragraph 218:***

   Paragraph 218 is substantially identical to Paragraph 45 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 45.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute Paragraph 218, but it is an

incomplete description of the transaction between ABN Amro and ACA on May 31,

2007, in which ACA's affiliated insurance company issued a financial guaranty

insurance policy for the 50-100% tranche of the same reference portfolio used in the

ABACUS 2007-AC1 CDO.  *See* evidence cited in ECF No. 185 (Tourre Summary

Judgment Mem.), at 23.  This transaction included a credit default swap as described

in Paragraph 218.

219.   The May 31, 2007 swap transaction between ABN and ACA LLC was entered pursuant
to a master agreement between those entities as supplemented by a trade confirmation,
both dated May 31, 2007.  Martens Decl., Ex. 32 (Dahlman Decl.); Ex. 97 (ISDA Master
Agreement dated May 31, 2007, bearing production numbers SEC-03619044–3619061);
Ex. 98 (ISDA Master Agreement dated May 31, 2007, bearing production numbers SEC-
04088271–4088272); Ex. 31.

   ***Response to Paragraph 219:***

   Paragraph 219 is substantially identical to Paragraph 47 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 47.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre does not dispute Paragraph 219, but it is an

incomplete description of the ABN Amro-ACA transaction, in which ACA's

affiliated insurance company issued a financial guaranty insurance policy to ABN

Amro on May 31, 2007.  *See* evidence cited in ECF No. 185 (Tourre Summary

Judgment Mem.), at 23.

220.   Both the master agreement and trade confirmation between ABN and ACA LLC were signed and agreed to by ACA's General Counsel, Nora Dahlman, in the United States on behalf of ACA LLC. Martens Decl., Ex. 32 (Dahlman Decl.).

   **_Response to Paragraph 220:_**

Paragraph 220 is substantially identical to Paragraph 48 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 48.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 220, which is incomplete in

that it provides no evidence as to where ABN Amro signed these documents, and

therefore provides no evidence as to where ACA and ABN Amro reached agreement

on the transaction.

221.   The credit default swap agreement between ABN and GSI was based on securities, namely the residential mortgage-based securities in the swap's reference portfolio. Martens Decl., Ex. 95, at 26-28.

   **_Response to Paragraph 221:_**

Mr. Tourre disputes Paragraph 221, which asserts a legal argument and is not a

statement of fact.

222.   The credit default swap agreement between ABN and ACA LLC was based on securities, namely the residential mortgage-based securities in the swap's reference portfolio. Martens Decl., Ex. 31, at 25-28; Ex. 32 (Dahlman Decl.).

   **_Response to Paragraph 222:_**

Paragraph 222 is substantially identical to Paragraph 49 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 49.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 222, which asserts a legal

argument and is not a statement of fact.

223.    After the swap transactions with Paulson and ABN, GSI had a long exposure on the 45 to
50 portion of the super senior tranche.  Martens Decl., Ex. 24 (Gerst Dep. Tr.), at 267-68.

> **_Response to Paragraph 223:_**
>
> Mr. Tourre does not dispute that GSI held a long position on the 45-50%
>
> tranche on the same RMBS in the ABACUS 2007-AC1 reference portfolio, but
>
> otherwise disputes the characterization of GSI's position in Paragraph 223.

224.    GS&Co had no interest in GSI maintaining this 45 to 50 long position on the super senor
tranche of the AC1 reference portfolio.  Martens Decl., Ex. 42 (Tourre Inv. Tr. II), at 36.

> **_Response to Paragraph 224:_**
>
> Mr. Tourre disputes Paragraph 224, which inaccurately states that Goldman
>
> and GSI had "no interest" in holding a long position on the ABACUS 2007-AC1
>
> reference portfolio.  The cited evidence provides only that Goldman did not
>
> "anticipate . . . retaining that layer of risk."  Mr. Tourre also notes that senior
>
> managers at Goldman were consulted about whether Goldman should make the long
>
> investment described in Paragraph 224, and those managers approved this
>
> investment.  *See* Chepiga Apr. 17 Decl., Ex. 1 (Tourre Dep. Tr.), at 127:7-130:22.

225.    GS&Co and Tourre attempted to market the 45 to 50 portion of the super senior tranche
of the AC1 reference portfolio to numerous potential long investors, including, among
others, New York-based Athilon Group Holdings, New York-based Evy Adamidou of
CIFG, and Stamford, Connecticut-based Paramx Capital Group, LLC.  Martens Decl.,
Exs. 35, 36, 37, 38, 39, 40; Ex. 10 (Tourre Inv. Tr.), at 112; Ex. 24 (Gerst Dep. Tr.), at
267-79.  The misleading representation that the reference portfolio was "selected by
ACA" was made in Tourre's e-mails and the attached AC1 term sheet sent to these
potential investors.  Martens Decl., Exs. 36, 91, 92.

> **_Response to Paragraph 225:_**
>
> Mr. Tourre disputes Paragraph 225.  The cited evidence does not establish,
>
> *inter alia*, that "Athilon Group Holdings" is based in New York, that Evy Adamidou

was based in New York or that "Paramax Capital Group, LLC" was based in

Stamford, Connecticut.  *See* evidence cited in ECF No. 244 (Tourre Reply Mem.), at

14-16.  Mr. Tourre further notes that, as stated above in his response to Paragraph

187, the fact witnesses in this matter have testified uniformly that ACA did, in fact,

select the ABACUS 2007-AC1 reference portfolio.  Mr. Tourre further notes that, as

also stated above in his response to Paragraph 187, the ABACUS 2007-AC1 offering

documents were reviewed by other Correlation Desk employees, and by a host of

lawyers from Goldman, Goldman's external counsel, ACA and its external counsel,

as well as Paulson's external counsel, which functioned as an "adjunct" to Paulson's

in-house counsel and the lead lawyer of which is currently a senior lawyer at the SEC

itself.  None of these lawyers suggested any additional disclosure was required.

Mr. Tourre further notes that the cited evidence does not establish, in any

respect, whether the individuals and entities described in Paragraph 225 were parties

or prospective parties to domestic securities transactions, or what those individuals

and entities knew or considered material to the making of investment decisions.

226.  At the time ACA approved the swap transaction selling protection on the super senior
tranche of the AC1 reference portfolio, ACA had been informed and understood that
Paulson was to be an equity investor in the CDO transaction that became AC1.  Martens
Decl., Exs. 4, 47, 50, 51, 52, 53, 8, 54; Ex. 12 (Kreitman Decl.); Ex. 13 (Boyajian Decl.);
Ex. 9 (Pellegrini Dep. Tr.), at 201-02; Ex. 55, (Shu Dep. Tr.), at 86; Ex. 2 (Schwartz Dep.
Tr.), at 50-51, 54-56, 104-14, 116-18; Ex. 11 (Tourre Dep. Tr.), at 185.

### ***Response to Paragraph 226:***

Paragraph 226 is substantially identical to Paragraph 50 of the SEC Original

Statement.  *See* ECF No. 193, ¶ 50.  In accordance with Mr. Tourre's response to the

SEC Original Statement, Mr. Tourre disputes Paragraph 226, which relies on the

inadmissible and irrelevant audio recording, and which is clearly contradicted by the

factual record.  *See* evidence cited in ECF No. 185 (Tourre Summary Judgment

Mem.), at 15-21.

Dated: April 17, 2013
      New York, New York

                         Respectfully submitted,

                         /s/ Pamela Rogers Chepiga
                         Pamela Rogers Chepiga
                         (pamela.chepiga@allenovery.com)
                         David C. Esseks
                         (david.esseks@allenovery.com)
                         Andrew Rhys Davies
                         (andrew.rhys.davies@allenovery.com)
                         Brandon D. O'Neil
                         (brandon.o'neil@allenovery.com)

                         ALLEN & OVERY LLP
                         1221 Avenue of the Americas
                         New York, New York  10020
                         (212) 610-6300

                         *Attorneys for Fabrice Tourre*