UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                  v.

FABRICE TOURRE,

                              Defendant.
_____

: 
: 
: 
: 
: 10 Civ. 3229 (KBF)
: 
: ECF Case
: 
: 
: 
:

**SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE*
PURSUANT TO FEDERAL RULE OF EVIDENCE 611**

Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9362 (facsimile)
martensm@sec.gov
*Attorneys for Plaintiff*

Dated:  May 21, 2013
        Washington, D.C.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................2

    A.  The Investigation ...........................................................................................2

    B.  The Complaint .................................................................................................2

    C.  GS&Co's Interest In Tourre's Success ..........................................................3

    D.  David Gerst's Participation In The AC1 Transaction.....................................4

    E.  David Gerst's Demonstrated Memory Lapses ...............................................5

ARGUMENT ....................................................................................................................7

I.     Legal Standard For Motions *In Limine* ........................................................7

II.    The SEC Should Be Permitted To Ask Leading Questions Of Witnesses Identified With Defendant Fabrice Tourre ......................................................7

III.   The SEC Should Be Permitted To Ask Leading Questions Of Hostile Witnesses ......................................................................................................11

CONCLUSION.................................................................................................................14

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*ACA Financial Guaranty Corp. v. Goldman Sachs & Co.*,
    No. 650027/2011 (N.Y. Sup. Ct.) ..................................................................3, 4

*Ellis v. City of Chicago*,
    667 F.2d 606 (7th Cir. 1981) ..................................................................7, 9, 11

*Haney v. Mizell Mem'l Hosp.*,
    744 F.2d 1467 (11th Cir. 1984) ..................................................................7, 9

*Palmeri v. Defaria*,
    88 F.3d 136 (2d Cir. 1996)..................................................................7

*Perkins v. Volkswagen of America, Inc.*,
    596 F.2d 681 (5th Cir. 1979) ..................................................................8

*Richman v. Goldman Sachs Group, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................................3, 4

*SEC v. Stoker*,
    No. 11-CV-07388 (S.D.N.Y.) ..................................................................1, 9, 10

*Stahl v. Sun Microsystems, Inc.*,
    775 F. Supp. 1397 (D. Colo. 1991)..................................................................8

*United States v. Brown*,
    603 F.2d 1022 (1st Cir. 1979) ..................................................................11, 12

*United States v. Cisneros-Gutierrez*,
    517 F.3d 751 (5th Cir. 2008) ..................................................................11, 12

*United States v. Karnes*,
    531 F.2d 214 (4th Cir. 1976) ..................................................................12

*United States v. McLaughlin*,
    No. CRIM.A. 95-CR-0113, 1998 WL 966014 (E.D. Pa. Nov. 19, 1998) ..........................8

*United States v. Meza-Urtado*,
    351 F.3d 301 (7th Cir. 2003) ..................................................................13

*United States v. Perez*,
    106 F. App'x 597 (9th Cir. 2004) ..................................................................13

*United States v. Reddix*,
    106 F.3d 236 (8th Cir. 1997) .........................................................................11, 12

*United States v. Tunnell*,
    667 F.2d 1182 (5th Cir. 1982) ...............................................................................12

*Vanemmerik v. The Ground Round, Inc.*,
    No. CIV.A. 97-5923, 1998 WL 474106 (E.D. Pa. July 16, 1998)..............................8, 11

## STATUTES AND REGULATIONS

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).....................................2

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ....................................2

Rule 10b-5, 17 C.F.R. § 240.10b-5.................................................................................2

Federal Rule of Evidence 611 ............................................................................. *passim*

Federal Rule of Evidence 611, Advisory Committee Notes (1972) ...............................7

Federal Rule of Evidence 801(d)(2)(D)............................................................................11

## OTHER AUTHORITIES

Charles A. Wright and Victor J. Gold,
    28 *Fed. Prac. & Proc. Evid.*, § 6168 (2013)......................................................7

Plaintiff, the Securities and Exchange Commission ("SEC" or "Commission"), respectfully submits this Memorandum of Law in Support of its Motion *In Limine* to permit leading questions during the SEC's direct examination of witnesses identified with defendant Fabrice Tourre.

## PRELIMINARY STATEMENT

Federal Rule of Evidence 611 ("Rule 611") provides that a party should "ordinarily" be permitted to conduct a direct examination of witnesses by means of leading questions if those witnesses are "identified with an adverse party." Fed. R. Evid. 611(c). In the upcoming trial of this matter, the SEC expects to call as witnesses a number of Goldman Sachs & Co ("GS&Co") employees. The defendant, Fabrice Tourre, was an employee of GS&Co during the events in question, and the SEC sued both GS&Co and Tourre as a result of Tourre's conduct while employed by the company. GS&Co remains a defendant in several private actions arising out of the same facts and circumstances that gave rise to the SEC's enforcement action against GS&Co and Tourre. GS&Co and Tourre have a joint defense agreement, and Tourre has invoked a "common interest" privilege in response to the SEC's request for his communications with GS&Co. Under essentially these same facts, Judge Rakoff ruled in *SEC v. Stoker*, No. 11-CV-07388 (S.D.N.Y.), that, during the trial of Citigroup CDO structurer Brian Stoker, the SEC could use leading questions in the examination of Citigroup employees called by the SEC as witnesses. The SEC respectfully submits that this Court should do the same here with regard to the GS&Co witnesses called by the SEC at trial.

1

## BACKGROUND

### A.  The Investigation.

During the investigation of this matter, the SEC took the investigative testimony of numerous employees of GS&Co.  Among the employees whose testimony was taken were Fabrice Tourre and his colleague David Gerst.  Both Tourre and Gerst were represented during their investigative testimony by the law firm of Sullivan & Cromwell LLP.

### B.  The Complaint.

On April 16, 2010, the SEC filed a Complaint against Tourre and his employer, GS&Co, alleging that Tourre and GS&Co violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, by making false and misleading statements, employing devices to defraud, and engaging in fraudulent transactions, practices or course of business in connection with the purchase or sale of securities or security-based swap agreements.  GS&Co was represented in this litigation by Sullivan & Cromwell. Ultimately, on July 14, 2010, GS&Co consented to the Entry of Final Judgment ("Consent Judgment") based on the initial Complaint.

The SEC subsequently filed an Amended Complaint against Tourre ("Amend. Compl.") on November 22, 2010.  The Amended Complaint alleges that Tourre made materially false and misleading statements – and aided and abetted false statements and material omissions by GS&Co – in connection with a synthetic collateralized debt obligation ("CDO") that GS&Co structured and marketed to investors.  Amend. Compl. ¶ 1.  The CDO, known as ABACUS 2007-AC1 ("AC1"), was tied to the performance of subprime residential mortgage-backed securities ("RMBS") and was marketed by GS&Co and Tourre in early 2007.  *Id*. ¶ 1.

GS&Co marketing materials for AC1 touted that the reference portfolio of RMBS underlying the CDO was selected by ACA, a third party with experience analyzing credit risk in RMBS.  *Id.* ¶ 2.  The marketing materials failed to disclose that GS&Co arranged the transaction at the request of Paulson & Co ("Paulson"), a large hedge fund based in New York, that participated directly in selecting the reference portfolio of RMBS and then effectively shorted the portfolio by entering into credit default swaps buying protection on specific layers of the CDO's capital structure.  *Id.* ¶¶ 2, 27-28, 31-36.  The transaction resulted in a profit of approximately $1 billion for Paulson and losses in excess of $1 billion for investors in AC1.  *Id.* ¶¶ 5, 65.  Tourre and GS&Co never revealed to AC1 investors Paulson's role in the portfolio selection process and its adverse economic interest.  *Id.* ¶¶ 3, 17.

**C.  GS&Co's Interest In Tourre's Success.**

As noted above, when this matter was originally filed, GS&Co was a co-defendant with Tourre.  Tourre is alleged to have committed the securities law violations in question while acting as an employee and agent of GS&Co, and Tourre remained a GS&Co employee, albeit on paid leave, through last December.  Moreover, Tourre is alleged to have aided and abetted false statements and material omissions by GS&Co.  Amend Compl. ¶¶ 82-83.

Although GS&Co has settled with the SEC, it remains a defendant in several active private actions relating to the AC1 transaction.  For example, GS&Co is currently a defendant in a federal securities class action in this district related to the SEC's investigation of the AC1 transaction.  *See Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012) (denying motion to dismiss).  In addition, ACA – a victim in this case – has brought a fraud action under New York law against GS&Co based on the very same deception of ACA by GS&Co and Tourre that forms part of the basis for the SEC's action here.  *See ACA Financial*

*Guaranty Corp. v. Goldman Sachs & Co.*, No. 650027/2011 (N.Y. Sup. Ct.).[1]  Sullivan &
Cromwell LLP represents GS&Co in both the *Richman* and *ACA* litigation.  Tourre has invoked
the "joint defense" and "common interest" privileges in response to the SEC's discovery request
for "documents concerning communications by, between or among Goldman Sachs and Tourre
regarding the subject matter of this case."  (Fitzpatrick Decl., Ex. A, Tourre's Objections and
Responses to Plaintiff's First Set of Requests for Production, dated Aug. 26, 2010).

At the same time, several of the witnesses to be called at trial by the SEC in its case in
chief are currently employed by GS&Co.  Specifically, the SEC intends to call current or former
GS&Co employees David Gerst, Jonathan Egol, and Shin Yukawa, all of whom worked on the
structured products trading desk with Tourre during the events in question.  Moreover, Gerst and
Egol were represented by Sullivan & Cromwell LLP during both their investigative and
deposition testimony.  As noted above, Sullivan & Cromwell LLP also represented Tourre
during the SEC's investigation of this matter.  Sullivan & Cromwell LLP continues to represent
GS&Co in this matter.

GS&Co has a direct interest in the testimony of the GS&Co witnesses and, given the
pending litigation, GS&Co's interest is consistent with that of Tourre in the present matter.[2]

**D.  David Gerst's Participation In The AC1 Transaction.**

The alignment between GS&Co, GS&Co employees, and Tourre is particularly apparent
in the case of David Gerst, a GS&Co employee who will be called as a witness at trial by the
SEC.  Gerst was recruited by Tourre to join the structured products trading desk at GS&Co in

---

[1]     GS&Co's motion to dismiss ACA's First Amended Complaint was originally denied, but, in a split
decision, the Supreme Court, Appellate Division, First Department, reversed on May 14, 2013.  It was unclear as of
the time of this Motion whether ACA would appeal to the New York Court of Appeals.  ACA's Second Amended
Complaint is still pending in the trial court.

[2]     The Consent Judgment requires GS&Co to make its employees available for interviews and testimony in
this matter.  Consent Judgment ¶ 17.  However, the language of the Consent Judgment does not prohibit GS&Co
from providing assistance to Tourre during the course of the litigation.

2006. Tr. 12.[3]  He worked "underneath" Tourre on the AC1 deal.  Inv. Tr. 161.  Specifically, Gerst worked on the draft engagement letters with both Paulson and ACA.  Tr. 110.   He was copied on emails in which Paulson suggested which RMBS to include in the AC1 reference portfolio.  Tr. 124.  And he put together a database of RMBS from 2006 that met Paulson's criteria.  Tr. 37-38.

Gerst received an email from an ACA employee referencing Paulson's "equity perspective," placing him on notice that ACA believed Paulson was selecting RMBS with the intention of investing in the selected portfolio.  Tr. 104-05.  Gerst knew that a selection agent, like ACA, was supposed to act in the interest of the long investor.  Tr. 63-64.   However, he also understood that Paulson was interested in buying credit protection.  Tr. 30.  Gerst circulated the initial draft of the flip book – one of the misleading AC1 marketing materials referenced in the Amended Complaint – for review.  Tr. 171.  This conduct places Gerst at the center of the AC1 transaction.

### E.  David Gerst's Demonstrated Memory Lapses.

During discovery in this case, Gerst was deposed.   During that deposition, Gerst had difficulty recalling any details of the AC1 transaction or his role in it.  For example, Gerst claimed not to recall any of the following:

- The criteria for the RMBS that he participated in selecting (Tr. 37-38);

- An email from an ACA employee referencing Paulson's "equity perspective" in the AC1 transaction, or any conversations that prompted or followed the email, even though Tourre forwarded the message to Gerst for discussion (Tr. 104-08);

---

[3]      "Tr." refers to the Feb. 9, 2011 Deposition of David Gerst, excerpts of which are attached as exhibit B to the Fitzpatrick Declaration.  "Inv. Tr." refers to the transcript of David Gerst's Jan. 29, 2009 investigative testimony, excerpts of which are attached as exhibit C to the Fitzpatrick Declaration.

- Paulson providing a list of names to be included in the AC1 reference portfolio, even though Gerst emailed ACA's feedback on the initial list to Paulson, writing, "Attached is the feedback we received from ACA on the 123 names *that you provided*" (Tr. 130-31) (emphasis added);

- Paulson providing substitute RMBS to ACA, even though he forwarded Paulson's substitute suggestions to ACA (Tr. 150);

- Sending AC1 marketing materials to a London-based Goldman salesperson to forward to IKB, a German bank that invested heavily in the AC1 notes (Tr. 242-43; Amend. Compl. ¶¶ 53, 61).

Gerst's memory failures extended to his prior testimony, including:

- His own statement, during his investigative testimony, that a collateral selection agent is supposed to "select[] a portfolio that they thought was good" (Tr. 61);

- His own statement, during his investigative testimony, that "Paulson had to feel comfortable with the portfolio" (Tr. 69-70);

And Gerst also claimed an inability to understand prior email correspondence, including:

- The emails he received with GSC, an entity that was approached to act as the selection agent, but, according to Tourre, would not be willing to put its "name at risk for small economics on a weak quality portfolio …" (Tr. 70-73, 76-79);

- The term "pre-committed first loss," which Tourre used in an email to Gerst (Tr. 98);

- The term "Abacus format," which was used in an email sent to Gerst (Tr. 78-80).[4]

In sum, Gerst claimed memory failures in response to questions about almost every aspect of the AC1 transaction.

---

[4]     Although Gerst claimed not to understand the term, "Abacus format," Gerst referenced his work on Abacus CDOs in describing his own job.  Tr. 22-23.

**ARGUMENT**

## I.   Legal Standard For Motions *In Limine*.

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."   *Palmeri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted).   Rule 611 provides, in relevant part, that "the court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence" to "(1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."   Fed. R. Evid. 611(a).

## II.   The SEC Should Be Permitted To Ask Leading Questions Of Witnesses Identified With Defendant Fabrice Tourre.

Rule 611(c) provides that a district court "[o]rdinarily . . . should allow leading questions . . . when a party calls a hostile witness, an adverse party, **or** a witness identified with an adverse party."   (Emphasis added).   The use of the phrase "witness identified with an adverse party" was "designed to enlarge the category of persons" that could be asked leading questions on direct examinations.   Advisory Committee Notes to Fed. R. Evid. 611 (1972); *see Haney v. Mizell Mem'l Hosp.*, 744 F.2d 1467, 1477-78 (11th Cir. 1984) (Rule 611(c) intended to enlarge the class of witnesses subject to interrogation by leading questions without a showing of actual hostility).

In general, restrictions on leading questions during direct examination "were designed to guard against the risk of improper suggestion inherent in examining friendly witnesses."   *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir. 1981).   However, "the risks of suggestion are reduced where the witness has an interest in promoting a version of the facts contrary to that suggested."   Charles A. Wright and Victor J. Gold, 28 *Fed. Prac. & Proc. Evid.*, § 6168 (2013).

Thus, the term "witness identified with an adverse party" should be broadly interpreted to "mean, in general, an employee, agent, friend, or relative of an adverse party." *Vanemmerik v. The Ground Round, Inc.*, No. CIV.A. 97-5923, 1998 WL 474106, at *1 (E.D. Pa. July 16, 1998); *United States v. McLaughlin*, No. CRIM.A. 95-CR-0113, 1998 WL 966014, at *1 (E.D. Pa. Nov. 19, 1998) (holding that "the term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to an opposing party" (internal citations omitted)).

Following these principles, courts have allowed leading questions when witnesses are current or former co-workers of a defendant. For example, in *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979), a products liability action, the court held that it was error not to allow the plaintiff to employ leading questions in the examination of a Volkswagen employee given that the employee was "a witness identified with an adverse party." *Id.* at 682-83. Similarly, in *Stahl v. Sun Microsystems, Inc.*, 775 F. Supp. 1397 (D. Colo. 1991), an employment discrimination case, the plaintiff was permitted to ask leading questions of a former employee who was "clearly identified with [the] Defendant, both through her previous employment and her ongoing relationship with [her former boss], a key witness who attended trial on behalf of [the defendant corporation]." *Id.* at 1398; *accord McLaughlin*, 1998 WL 966014, at *1 (permitting leading questions of defendant's accountant, an independent contractor who prepared defendant's tax returns, because the term "witness identified with an adverse party is intended to apply broadly to an identification based upon employment by the party or by virtue of a connection to an opposing party" (internal quotations omitted)).

The rationale for treating employees or co-workers as witnesses "identified with an adverse party" is particularly pronounced when, as here, the witness was present for or a

participant in the events giving rise to the litigation.  In *Haney*, for example, the plaintiff in a medical malpractice lawsuit sought to lead during the examination of a nurse at the defendant hospital.  744 F.2d at 1477.  The Eleventh Circuit held that "[s]ince Nurse Williamson, an employee of one of the defendants present when the alleged malpractice may have occurred, certainly was identified with a party adverse to Haney, the district court misread Rule 611(c) when it refused to allow Haney to lead him until actual hostility was established." *Id*. at 1478. The Seventh Circuit applied similar reasoning in *Ellis, supra*, where a dog owner sued the city and a police officer who had killed his dog.  667 F.2d at 609.  The Seventh Circuit held that leading questions were appropriate for two police officers who were employees of the city at all times during the litigation and were "each present during portions of the incident that gave rise to this lawsuit." *Id*. at 613.  Because of their adverse interest, these witnesses were "*automatically* … subject to interrogation by leading questions without further showing of actual hostility." *Id.* at 612-613 (emphasis added).

Invoking these principles, the SEC recently moved *in limine* in *SEC v. Stoker* for permission under Rule 611 to lead certain witnesses who the SEC intended to call in its case in chief.  *See Plaintiff's Motion in Limine, SEC v. Stoker,* No. 11-CV-07388 (S.D.N.Y.) (Dkt. No. 61).  In that case, which was brought against Brian Stoker, a former employee of Citigroup, based on the fraudulent structuring and marketing of a synthetic CDO, the SEC sued and settled with Citigroup based on the conduct of Stoker and others, but then litigated the matter through trial against Stoker.  During discovery, a "common interest" privilege was asserted between Stoker, Citigroup and other employees.  (Fitzpatrick Decl., Ex. D, Tr. of Jul. 12, 2012 Hearing in *SEC v. Stoker*, at 36).  At Stoker's trial, the SEC sought to use leading questions on direct examination of the witnesses who were Citigroup employees.  Judge Rakoff considered those

witnesses "presumptively adverse" because they were subject to the assertion of a "common privilege" with Citigroup. (*Id.* at 29). Judge Rakoff noted the proposed consent judgment between Citigroup and the SEC regarding the CDO at issue in the case, but held that Citigroup *and its employees* were nevertheless "in an adversary position with the SEC on the very facts that are the same essential facts that are being charged against Mr. Stoker." (*Id*. at 32). He also noted the relative sophistication of the Citigroup employees who were witnesses in the SEC's case. (*Id*. at 29). Given these facts, Judge Rakoff granted the SEC's motion and permitted the SEC to lead during the direct examination of those witnesses who were Citigroup employees. (*Id*. at 38).

In the present case, the same concerns underscore the need for leading questions during the direct examinations of GS&Co employees called by the SEC at trial. Tourre worked with many of these witnesses on the very AC1 transaction that is the subject of this litigation. Sullivan & Cromwell, which previously represented Tourre during the investigation of this matter, now represents GS&Co, Gerst, and numerous other GS&Co employees who may be called by the SEC as witnesses at trial. Tourre has invoked the "common interest privilege" with regard to his communications with GS&Co. GS&Co and Tourre were both defendants in this very matter, and GS&Co remains a defendant in active private litigation over the same factual allegations that form the basis for this action. Tourre himself has referenced joint efforts at "defining GS' [*i.e.*, GS&Co's] and my defense strategy against these allegations." (Fitzpatrick Decl., Ex. E, May 5, 2010 Email from Fabrice Tourre). This common strategy is necessitated by the fact that testimony elicited by the SEC in this matter could become an admission by a party opponent in the two pending cases against GS&Co, and that risk provides the witnesses a motive to guard against and minimize any suggestions contained in questions asked by the SEC. Fed. R.

Evid. 801(d)(2)(D) (statements made by an opposing party's agent or employee on a matter within the scope of that relationship are not hearsay).  In these circumstances, it is clear that the GS&Co employees, such as Gerst, who may be called at trial by the SEC, are identified with Tourre.  Accordingly, the rationale for restrictions on leading questions is not applicable.  *See Ellis*, 667 F.2d at 612 (restrictions "were designed to guard against the risk of improper suggestion inherent in examining friendly witnesses").  Pursuant to Rule 611, the SEC should be permitted to use leading questions in its examination of any trial witness currently or previously employed by GS&Co.

## III.    The SEC Should Be Permitted To Ask Leading Questions Of Hostile Witnesses.

With respect to the anticipated testimony of Gerst, there are two ***alternative*** rationales beyond his status as a GS&Co employee for allowing leading questions. First, his role in the AC1 transaction was substantial enough for him reasonably to be considered a co-conspirator. Second, his "bias [has been] revealed by pretrial actions and demeanor."  *Vanemmerik*, 1998 WL 474106, at *1

It is appropriate to treat a witness as hostile pursuant to Rule 611 when the evidence "strongly suggests" that the witness "was a participant in the crime."  *United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979); *see also United States v. Cisneros-Gutierrez*, 517 F.3d 751 (5th Cir. 2008) (use of leading questions during direct examination of defendant's co-conspirator was not error); *United States v. Reddix*, 106 F.3d 236 (8th Cir. 1997) (same).  As the Fourth Circuit has noted:

> The government must, of course, use its witnesses as it finds them.  In many cases the prosecution must depend upon the testimony of persons who are co-defendants, co-conspirators, felons, accomplices, etc., and such witnesses often evidence hostility, are impeachable from their past or current activities, or change or slant their testimony from what, based upon prior statements, the government expects them to say.  Under such circumstances, a district judge may afford wide

11

latitude to the government to lead, to cross-examine, and partially to impeach
such witnesses.

*United States v. Karnes*, 531 F.2d 214, 217 (4th Cir. 1976).

Here, Gerst could be considered a participant or co-conspirator in the relevant
misconduct to the same extent as the witnesses in *Brown*, *Cisneros-Gutierrez, and Reddix*.[5]
Gerst knew that Paulson was interested in buying credit protection and he participated in
Paulson's selection of RMBS.  Tr. 37-38, 40, 64.  He was copied on correspondence where ACA
referenced Paulson's "equity perspective," and he did nothing to correct that misimpression.  Tr.
104-05.  To the contrary, he worked to develop marketing materials that touted ACA as the
selection agent without disclosing Paulson's role in selecting the RMBS.  Tr. 171.  Indeed,
because Tourre is charged with aiding and abetting conduct by GS&Co employees, some of
Gerst's actions could form a basis for liability in this case.

Moreover, like the witnesses in *Brown* and *Cisneros-Gutierrez,* Gerst's prior testimony is
"replete with lapses of memory."  *Brown*, 603 F.2d at 1026; *see also Cisneros-Gutierrez*, 517
F.3d at 762 (noting the extent of witness's "memory problems, which reasonably appear[] to
have been feigned").  A witness's conduct during a deposition can demonstrate sufficient
hostility to support ruling that the witness should be treated as hostile at trial pursuant to Rule
611(c).  *United States v. Tunnell*, 667 F.2d 1182, 1188 (5th Cir. 1982) (leading questions
appropriate where witness "evinced a hostility to the prosecution" during deposition).[6]  Gerst

---

[5]     *See Brown*, 603 F.2d at 1024-1026 (in prosecution for stealing 16 birds, witness who drove defendant to
and from airport, returning with a large box, and later cared for 3 birds was treated as hostile because evidence
suggested he was a participant in the crime); *Cisneros-Gutierrez*, 517 F.3d at 756, 762 (in drug trial, defendant's
brother, who had pled guilty to the same drug possession conspiracy, was treated as hostile witness on direct);
*Reddix*, 106 F.3d at 238 (in drug distribution trial, co-conspirator who was found with a kilogram of cocaine she
received from defendant was treated as a hostile witness).

[6]     In *Tunnell,* the court reviewed a videotape of the deposition.  As a result, the "trial judge was able to note
[the witness's] attitude reflected by his motions, facial expressions, demeanor, and voice inflections."  *Tunnell*, 667
F.2d at 1188.

demonstrated such hostility at his deposition in the present case by repeatedly claiming memory loss in response to questions regarding the AC1 transaction in which he participated.  Gerst's lack of recollection encompassed language in his own email correspondence, and the content of his prior testimony.  *See supra* pages 5-6.  Such memory lapses compel the use of leading questions at trial.  *United States v. Meza-Urtado*, 351 F.3d 301, 303 (7th Cir. 2003) (leading questions of cooperating witness were appropriate because he could be "treated as a hostile witness" after he "became conveniently 'forgetful'"); *United States v. Perez*, 106 F. App'x 597, 598 (9th Cir. 2004) ("The district court did not abuse its discretion when it allowed the government to lead a witness, Perez's mother, who was either reluctant, or suffering from significant lapses of memory, or both").

In sum, Gerst's role in the misconduct alleged in the Amended Complaint and extensive claims of memory loss at his deposition in this case make him a hostile witness pursuant to Rule 611(c).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the Commission's motion *in limine* and permit the Commission to employ leading questions in its direct examination of certain witnesses.

Dated:  May 21, 2013
       Washington, D.C.

Respectfully submitted,

/s/ *Bridget Fitzpatrick*
Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9292 (fax)
martensm@sec.gov

## CERTIFICATE OF SERVICE

I certify that on May 21, 2013, I electronically filed the foregoing SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* PURSUANT TO FEDERAL RULE OF EVIDENCE 611 using the CM/ECF system, which will send notification of such filing to the following email address:

> Pamelachepiga@allenovery.com
> Pamela Rogers Chepiga
> Allen & Overy LLP
> 1221 Avenue of the Americas
> New York, New York 10020
>
> seancoffey78@gmail.com
> John Patrick Coffey
> Law Office of John P. Coffey
> 1350 Avenue of the Americas, 2d Floor
> New York, NewYork 10019
>
> Attorneys for defendant Fabrice Tourre

> /s/ *Bridget Fitzpatrick*
> Bridget Fitzpatrick

15