UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
:
SECURITIES AND EXCHANGE :
COMMISSION, :
: Civil Action
: No.: 10-cv-3229 (KBF)
Plaintiff, :
: <u>ELECTRONICALLY FILED</u>
v. :
:
FABRICE TOURRE, :
:
Defendant. :
:
:
------------------------------------------------------x

**MEMORANDUM OF LAW OF FABRICE TOURRE IN SUPPORT OF HIS MOTION
IN LIMINE TO PRECLUDE THE SEC FROM OFFERING EVIDENCE OR
ARGUMENT IN RELIANCE ON AN UNPLEADED AND
<u>LEGALLY UNSUSTAINABLE "SCHEME" THEORY OF LIABILITY</u>**

Pamela Rogers Chepiga
Andrew Rhys Davies
Brandon D. O'Neil
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

John P. Coffey
LAW OFFICE OF JOHN P. COFFEY
1350 Avenue of the Americas, 2nd Floor
New York, New York  10019
(646) 790-8988

*Attorneys for Fabrice Tourre*

Dated:   May 30, 2013
         New York, New York

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .....................................................................................................................1

ARGUMENT.............................................................................................................................3

I.    THE SEC'S ELEVENTH-HOUR ATTEMPT TO ASSERT AN UNPLEADED AND LEGALLY UNSUSTAINABLE THEORY OF SCHEME LIABILITY MUST BE REJECTED.................................................................................................3

A.    The SEC Pleaded a "Misstatements and Omissions" Case, Not a "Scheme" Case.............3

B.    Permitting the SEC to Recast its Legal Theory on the Eve of Trial Would be Substantially and Unfairly Prejudicial ................................................................................8

II.    THE COURT MUST EXCLUDE EVIDENCE OR ARGUMENT OFFERED IN RELIANCE ON A PURPORTED "SCHEME" THEORY ...............................................11

CONCLUSION........................................................................................................................14

# **TABLE OF AUTHORITIES**

## **CASES**

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
 No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ................2, 3, 5, 6

*In re Global Crossing Ltd. Sec. Litig.*,
 322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..............................................................................6

*In re Initial Public Offering Sec. Litig.*,
 241 F. Supp. 2d 2811 (S.D.N.Y. 2003) ............................................................................6

*In re Parmalat Sec. Litig.*,
 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ..........................................................................6, 13

*Janus Capital Group, Inc. v. First Derivative Traders*,
 131 S. Ct. 2296 (2011) ....................................................................................................12

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) ............................................................................................13

*Mori v. Saito*,
 No. 10 Civ. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) .....................5, 6

*SEC v. Boock,*
 No. 09 Civ. 8261 (DLC), 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ....................2, 7

*SEC v. Boock*,
 No. 09 Civ. 8261 (DLC), 2011 WL 5417106 (S.D.N.Y. Nov. 9, 2011) ..........................7

*SEC v. Collins & Aikman Corp.*,
 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ............................................................................12

*SEC v. First Jersey Securities, Inc.*,
 101 F.3d 1450 (2d Cir. 1996) ..........................................................................................12

*SEC v. Garber*,
 No. 12 Civ. 9339 (SAS), 2013 WL 1732571 (S.D.N.Y. Apr. 22, 2013) .....................6, 7

*SEC v. Kelly*,
 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ..................................................................6, 12, 13

*SEC v. KPMG, LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) ................................................................................6, 13

*SEC v. Lucent Techs.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ..............................................................................................13

*SEC v. Militano*,
    No. 89 Civ. 572 (JFK), 1994 WL 558040 (S.D.N.Y. Oct. 11, 1994) ................................11

*SEC v. PIMCO Advisors Fund Mgmt. LLC*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004) ...........................................................................................13

**RULES**

Fed. R. Civ. P. 9(b) .............................................................................................................................5

Fed. R. Civ. P. 12(e) ...........................................................................................................................9

Fed. R. Civ. P. 15(a) .........................................................................................................................10

Defendant Fabrice Tourre respectfully submits this memorandum of law in support of his motion *in limine* to preclude the SEC from referencing, eliciting, or introducing into evidence at trial arguments or evidence offered in reliance on the SEC's new, unpleaded, unfairly prejudicial, and legally unsustainable theory that Mr. Tourre participated in a "scheme" to defraud ACA or other investors.

## INTRODUCTION

This lawsuit is, and for over three years has always been, a dispute over whether Mr. Tourre violated the securities laws by making alleged misstatements and omissions in connection with the ABACUS 2007-AC1 ("AC1") transaction. That battleground was mapped out in the very first sentence of the SEC's Amended Complaint, which alleges securities fraud by Mr. Tourre "*based on materially misleading statements and omissions*" in connection with AC1. Amended Complaint ("Complaint") ¶1 (emphasis added).[1] References to Mr. Tourre's purported misstatements and omissions pervade the factual allegations of the Complaint. *See infra* at 3-4 (Complaint's references to purported misstatements, misrepresentations and omissions). The word "scheme" appears nowhere – not once – in the seventy-three paragraphs in which the SEC lays out the allegations it contends give rise to Mr. Tourre's violations of law.

In the three years since the SEC filed suit, Mr. Tourre has endeavored to defend himself from the SEC's accusation that his communications with ACA Management LLC ("ACA") and other investors were materially false and misleading. Complexity of the financial instruments aside, there was no suggestion that this was anything other than a classic misstatements case, and the parties conducted their fact discovery, expert discovery, motion practice, and other pre-trial

---

[1] Paragraph 1 of the initial complaint filed on April 16, 2010 likewise alleged that the SEC had brought the action against Mr. Tourre and his then-employer, Goldman, Sachs & Co. ("Goldman") "*for making materially misleading statements and omissions*" in connection with AC1. (Emphasis added).

proceedings accordingly.  Not surprisingly, when the SEC recently filed its opening brief in support of its summary judgment motion, the case against Mr. Tourre was laid out as a series of misrepresentations and omissions.  *See, e.g.,* ECF No. 192, SEC's Memorandum of Law in Support of Its Motion for Partial Summary Judgment ("SEC SJM Br."), at 2 (bullet points of alleged misrepresentations), 9-19 (repeated use of "misleading," "false information," "misrepresentation," "omissions").  The word "scheme" appears nowhere – not once – in the twenty pages arguing that Mr. Tourre had violated the law.

The Court could thus be forgiven if, like Mr. Tourre, it was startled to learn in the SEC's reply brief that the SEC claimed to have moved for summary judgment "on its Section 17(a) *scheme* liability claim."  *See* ECF No. 253, SEC's Reply Memorandum of Law in Further Support of Its Motion for Partial Summary Judgment ("SEC Reply Br."), at 1 (emphasis added).  The problem with this assertion, of course, is that the SEC *never alleged* the existence of a "scheme" in this case.

The SEC's case against Mr. Tourre has always rested on purported misstatements and omissions, and the Complaint does not remotely resemble those found to have stated a claim of scheme liability.  Indeed, as discussed more fully below, one needs only to look at the courts' descriptions of the complaints filed in the two cases on which the SEC most prominently relies in its reply -- *IBEW Local 90 Pension Fund v. Deutsche Bank AG,* No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) and *SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2011 WL 3792819 (S.D.N.Y. Aug 25, 2011) -- to see the stark differences between pleadings that set out scheme allegations "clearly and prominently," *Local 90,* 2013 WL 1223844, at *2, and the Complaint here, which is utterly devoid of any factual basis to support a scheme theory of liability.

This breathtaking attempt to rewrite the nature of this case just weeks from opening statements flies in the face of the rules governing civil procedure and pleading in securities fraud cases, and threatens to impart significant prejudice to Mr. Tourre.  As this Court recently noted in *Local 90*, scheme claims sound in fraud and thus must meet the strict pleading requirements of Rule 9(b).  2013 WL 1223844, at *11.  The SEC has not even attempted to provide the specificity and particularity required for a scheme claim, with concomitant and predictable effect on the defense's approach to discovery and trial.  There has been no discovery of the supposed scheme, because the SEC has never described one.  There has been no discovery of any supposed deceptive act or device, because the SEC has never identified (as it must) some act or device distinct from purported misstatements and omissions.  There were no questions asked of purported schemers about the supposed scheme, because the SEC never identified any alleged schemers.

This abrupt pivot to scheme liability is undoubtedly driven by the SEC's well-founded concern that certain evidence it would like to introduce against Mr. Tourre is inadmissible under the misstatements theory that has been the basis of the SEC's case for over three years.  But while the SEC may now prefer to try a case other than the one it has pleaded and Mr. Tourre has challenged, that is not a license to switch horses at this late stage.

## ARGUMENT

**I.  THE SEC'S ELEVENTH-HOUR ATTEMPT TO ASSERT AN UNPLEADED AND LEGALLY UNSUSTAINABLE THEORY OF SCHEME LIABILITY MUST BE REJECTED**

    **A.  The SEC Pleaded a "Misstatements and Omissions" Case, Not a "Scheme" Case**

This has always been a misstatements and omissions case.  The Complaint made no allegation of a scheme, but rather focused exclusively on what were claimed to be material

3

misrepresentations and omissions in connection with the AC1 transaction. *See, e.g.,* Complaint ¶2 ("represented," "[u]ndisclosed," "did not disclose"); ¶3 ("failed to disclose"); ¶4 ("concealed," "misled"); ¶7 ("contained incomplete information," "without disclosing"); at 12 (Section F heading: "misled"); ¶37 ("represented," "omitting"); ¶38 ("described," "contained no mention"); ¶39 ("represented," "assured," "contained no mention"); ¶42 ("description," "contained no mention"); ¶44 ("made no mention"); at 13 (Section G heading: "misled"); ¶45 ("misled"); ¶46 ("[h]ad ACA been aware," "ACA's misimpression"); ¶48 ("description"); ¶50 ("misled into believing"); ¶56 ("represented," "omitted," "[t]hose misrepresentations and omissions"); ¶64 ("representation," "had it known"); ¶68 ("was unaware," "if it had known"); ¶69 ("represented"); ¶70 ("represented," "omitted", "[t]hese misrepresentations and omissions"). As noted above, the word "scheme" is nowhere to be found in the factual allegations of the SEC's pleading.

Motion practice, fact discovery and expert discovery proceeded on that basis, with the parties focusing particular attention on the adequacy of the AC1 marketing materials, what had been said and not said to ACA and other investors, and the materiality of the alleged misstatements and omissions. The suggestion that the SEC had somehow pleaded a scheme liability case against Mr. Tourre was not aired until last month, in the SEC's summary judgment reply brief.

To support the remarkable proposition that it had sued Mr. Tourre for participation in a Section 17(a) "scheme," the SEC cited solely to one boilerplate paragraph, in the "Claims for Relief" section of the Complaint, quoting the text of Section 17(a). SEC SJM Reply, at 3 (citing

4

Complaint ¶76).[2]  The SEC did not identify a single passage in the Complaint's seventy-three paragraphs of factual allegations that could be construed to have put Mr. Tourre on notice that he was to defend a scheme case as well as a misstatements case.  The SEC did not do so because it could not do so.

The SEC's reliance on the appearance of the word "scheme" in the recitation of statutory language at the back end of the Complaint does not a scheme case allege.  This is especially so given the different elements in a scheme case and the particularity requirements of Rule 9(b).  *See Mori v. Saito*, No. 10 Civ. 6465 (KBF), 2013 WL 1736527, at *3, *6 (S.D.N.Y. Apr. 19, 2013) (in alleged "Ponzi scheme" case, this Court distinguished elements of misrepresentation/ omission claims and scheme claims, and applied Rule 9(b)'s heightened pleading standards to both).  It is of course axiomatic that in order to evaluate whether the factual allegations of scheme liability pass Rule 9(b) muster there have to *be* factual allegations of scheme liability to evaluate.  Here there are none -- a fatal flaw that the SEC only underscores with the isolated reference to boilerplate in the Complaint's legal claims section.

The SEC will find no solace in arguing that the Complaint's factual allegations regarding alleged misstatements and omissions about the AC1 transaction might be construed to lay out a fraudulent "scheme" case as well as a misstatement case.  As this Court has recently noted, the elements of a scheme case are not co-extensive with those of a misstatement case.  *See Local 90*, 2013 WL 1223844, at *11 (to state claim that defendant engaged in fraudulent or deceptive scheme in violation of Rule 10b-5(a) and (c), plaintiff must allege defendant committed a

---

[2] If the SEC were to claim that it had also asserted a scheme case under Section 10(b), which it has not yet done, it would presumably cite to Complaint ¶80, which recites the text of that statute.  The analysis herein as to why no scheme claim was ever alleged, cannot be transplanted into this case at this point, and is in any event legally untenable also applies to a Section 10(b) scheme claim, if and when the SEC should contend that the Complaint alleged such a claim under that statute as well.

5

deceptive or manipulative act) (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005)*; In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004)*; In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 2811, 385 (S.D.N.Y. 2003)); *Mori*, 2013 WL 1736527, at *3, *6.  Chief among the differences is the requirement that, to plead a scheme case, the SEC must identify a deceptive act separate and distinct from the alleged misstatements and omissions.  *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344, 346 (S.D.N.Y. 2011) (Section 10(b) scheme liability "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement"; similar analysis applies for Section 17(a) scheme claims); *SEC v. KPMG, LLP,* 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) ("Because the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability on Yoho by designating the alleged fraud a 'manipulative device' rather than a 'misstatement'."); *cf. SEC v. Garber*, No. 12 Civ. 9339 (SAS), 2013 WL 1732571, at *4 (S.D.N.Y. Apr. 22, 2013) (noting that scheme cases do not focus on making of untrue statement, but sustaining scheme case there because "core misconduct" alleged was not a misstatement).

This case bears no resemblance to cases where scheme liability has been held sufficiently pleaded.  In *Mori*, defendants were accused of bilking investors through a scheme where, among other things, they set up false bank accounts, created an elaborate set of sham corporate books, and orchestrated sham "investments."  2013 WL 1736527, at *6 (scheme "pervade[d] every transaction alleged").  In *Local 90*, this Court sustained an RMBS-related scheme claim where, unlike here, plaintiffs laid out the alleged scheme "with specificity."  2013 WL 1223844, at *13.  The alleged scheme included acquisition of an aggressive, risk-taking mortgage originator, lax oversight by the parent bank, failure to audit early payment defaults, failure to perform adequate quality control, and failure even to open correspondence from outside auditors concerning

quality control lapses. *Id.* at *3-5. In *Garber*, the "inherently deceptive act" was acquiring and illegally reselling unregistered penny stock, "which involved numerous steps including buying the penny stocks at a discounted price and dumping the penny stocks into the market." 2013 WL 1732571, at *4.

In its summary judgment reply (at 5), the SEC cites *SEC v. Boock* for the proposition that a scheme theory relieves it of certain evidentiary burdens, but says nothing about how the SEC's theory of the case in *Boock* compares to the theory it pleaded in this case. The two could not be more starkly different. Judge Cote begins her summary judgment opinion in *Boock* by noting that the SEC brought that action "alleging a securities fraud scheme." 2011 WL 3792819, at *1. Unlike the present case, the SEC's intent to allege a scheme case in *Boock* was revealed, not on the eve of trial, but rather in the first sentence of that complaint, which states: "This case involves a scheme…to hijack dozens of defunct publicly-traded corporations…." Coffey Decl., Ex. 1 ¶1. The *Boock* complaint goes on to describe various deceptive acts in furtherance of the scheme. *Id.* ¶2 ("Boock conceived of the scheme in late 2003."); ¶5 (use of "variety of aliases, mailbox addresses and telephone numbers to hide their roles"); ¶64 (improperly obtaining new CUSIP numbers and ticker symbols for re-named hijacked companies); ¶68 (failing to file certain FINRA forms and thereby improperly relying on "piggy-back" exception to Exchange Act reporting rules); ¶69 (changing names of some hijacked companies multiple times to further complicate the SEC's investigation). *Boock* is thus of no assistance to the SEC here. Indeed, the complete absence of any overlap between the SEC's approach in *Boock* and this case is highlighted by Judge Cote's subsequent observation that the SEC had not even alleged any material misstatements or omissions in that case. *SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2011 WL 5417106, at *2 (S.D.N.Y. Nov. 9, 2011) (opinion denying reconsideration motion).

7

To conclude that the SEC has alleged a scheme case against Mr. Tourre, the Court would have to ignore the Complaint's self-description as a misstatements and omissions case, overlook the SEC's failure to plead the distinct elements of a scheme case, give the SEC a pass on Rule 9(b) particularity, and fill in the blanks as to what supposedly deceptive and manipulative device Mr. Tourre had employed.  The Court should do none of these things, for this case is and has always been a classic misstatement case.

### B.  Permitting the SEC to Recast its Legal Theory on the Eve of Trial Would be Substantially and Unfairly Prejudicial

If the Court were to abide the SEC's attempt to transplant scheme liability into this case at this late stage, the prejudice to Mr. Tourre would be unfathomable.

Three-plus years ago, Mr. Tourre and his legal team were put to the task of defending the case the SEC had elected to bring against him:  a classic misstatements and omissions case.  Strategic litigation decisions were made and executed; motions to dismiss were filed; document requests were drafted and served; thousands of hours of document reviews were conducted; deponents (including potential witnesses residing abroad) were identified, noticed, and examined; experts were retained, wrote reports, and were deposed; and trial strategy was formulated -- all based on the unremarkable supposition that the SEC meant what it said when it averred that its action was "based on materially misleading statements and omissions" regarding AC1.  Complaint ¶1.  The SEC's untimely effort to recast its theory to one more to its liking cannot be permitted, because Mr. Tourre was given neither the notice nor the opportunity to prepare a defense to that new theory.

The prejudice is self-evident.  As the analysis in the preceding section demonstrates, a motion to dismiss the supposed scheme case would have been exceptionally robust here given the absence of any factual allegations to support such a claim.  Mr. Tourre's motions to dismiss

8

did not challenge scheme liability, of course, because until last month no one (including the SEC, one can say with some confidence) understood there to be a claim of scheme liability in this case.

The impact of an overt assertion of scheme liability would have dramatically altered Mr. Tourre's discovery program. For instance, before formulating his discovery plan Mr. Tourre could have and would have served a Rule 12(e) request for a more definite statement that, among other things, would have demanded that the SEC identify the claimed inherently deceptive act and, moreover, explain how that act was "inherently deceptive" in a way distinct from the alleged misrepresentations and omissions. The SEC's response would have undoubtedly affected fact discovery as to witnesses (who and how they would be questioned) and documents (what to seek and how they would be reviewed). It would also have materially affected expert retention, reports and discovery, where the parties would have battled over the legitimacy or illegitimacy of whatever inherently deceptive act would have been identified. Mr. Tourre was denied the opportunity to pursue those matters in discovery because scheme liability, having not been pleaded, was never an issue to be explored *in* discovery. Indeed, even now, less than seven weeks from picking a jury, Mr. Tourre has not been told what deceptive device the SEC has in mind (if any).

A Rule 12(e) request also would have asked for the identities of everyone the SEC believes were members of the supposed scheme. Who were they? Anyone and everyone at Goldman who was aware of or approved the transaction? What about Paulson & Co., which as the SEC often notes made a billion dollar profit thanks to AC1? Does the SEC contend that Paulson was part of some "scheme"?

And how about ACA's Laura Schwartz? She would appear to meet the criteria for "co-conspirator" laid out in a memorandum filed by the SEC just last week. *See* ECF No. 277,

9

SEC's Memorandum of Law in Support of Its Motion *In Limine* Pursuant to Federal Rule of Evidence 611, at 12-13 (characterizing for the first time Goldman employee David Gerst as a "participant or co-conspirator in the relevant misconduct" and seeking leave to conduct his direct examination through leading questions).[3]  The SEC, which never issued a Wells Notice to Mr. Gerst, now labels him a participant in the "relevant misconduct" in part because he "worked to develop marketing materials that touted ACA as the selection agent without disclosing Paulson's role in selecting the RMBS." *Id.* at 12.  So did Laura Schwartz.  She is presumably on the SEC's witness list for trial but the question is, would she also be on the SEC's list of schemers?  For that matter, what about Adam Glass, then-outside counsel for Paulson & Co., who knew of Paulson's plan to short AC1, reviewed the marketing materials for AC1, and raised no issue about the non-disclosure of Paulson's role in materials that went to investors.  By the SEC's own criteria, wouldn't Mr. Glass need to be identified as part of the supposed scheme?  And if so, how would the SEC square his participation in the fraudulent scheme with the fact that it subsequently hired him to assist in drafting regulations governing the very type of deceptive acts the SEC would presumably raise in this litigation?  The fact that such questions are even in play two years after fact discovery closed and weeks from trial only underscores the absurdity of the SEC's gambit regarding scheme liability – a gambit that must be firmly rejected.

Finally, while a court may allow amendment of a complaint "when justice so requires," F.R.C.P. 15(a), it is important to note that, even now, the SEC has *not* moved for leave to amend its Complaint.  Rather, and apparently in hope that no one would notice, the SEC has opted to declare, matter-of-factly, in a reply brief on summary judgment, that its "Section 17(a) scheme liability claim" has always been there.  SJM Reply Br. at 1.  As shown above, the current

---

[3] Mr. Tourre opposes that motion and will file his response in due course.

Complaint does not allege a scheme case and Mr. Tourre reserves his rights to assert futility, undue delay, bad faith, unfair prejudice, relation-back and other legal arguments should the SEC move for leave to so substantially alter the landscape at this late stage. *See SEC v. Militano*, No. 89 Civ. 572 (JFK), 1994 WL 558040, at *2 (S.D.N.Y. Oct. 11, 1994) (denying SEC application on eve of trial to amend complaint to add legal theory based on facts that were long known to SEC and which would trigger need for additional discovery).

## II. THE COURT MUST EXCLUDE EVIDENCE OR ARGUMENT OFFERED IN RELIANCE ON A PURPORTED "SCHEME" THEORY

The reason for the SEC's abrupt pivot to a new legal theory is not a mystery: it is about getting the January 17, 2007 call in front of the jury notwithstanding the absence of any link to Mr. Tourre beyond rank speculation. *See* SJM Reply Br. at 5 (arguing that in a fraudulent scheme case, the SEC need not prove defendant participated in the misstatement at issue). The Court must reject this improper attempt to bootstrap the introduction of such "evidence" against Mr. Tourre through reliance on a theory of liability that was never pleaded and in any event is not legally sustainable.

Despite its review of over twelve million pages of documents, thousands of ACA tapes, and dozens of investigation interview and deposition transcripts, the SEC has apparently come to regard the January 17 call as its foremost piece of evidence against Mr. Tourre. *See* SJM Br. at 2 (where the call receives top billing on the bullet point list of Mr. Tourre's supposed wrongs). The SEC's reliance on the January 17 call is curious, since Mr. Tourre neither speaks nor is mentioned on it, and the Goldman participant, Gail Kreitman, can link neither the initiation of

11

the call nor its substance to Mr. Tourre.[4]  Leaving aside what such reliance on the January 17 call says about the strength of its case, the SEC has apparently concluded, with good reason, that the admission of this belatedly-surfaced call under the misstatements theory it has pursued for three years is highly problematic; hence the flight to the belatedly-surfaced "scheme" strategy.

The SEC's concerns about the admissibility of the January 17 call were undoubtedly triggered by Mr. Tourre's brief in opposition to summary judgment, which demonstrated that the January 17 call cannot be attributed to Mr. Tourre.  *See* ECF No. 227, Memorandum of Law of Fabrice Tourre in Opposition to the SEC's Motion for Partial Summary Judgment, at 5-8 (showing how *Janus Capital Group, Inc. v. First Derivative Traders,* 131 S. Ct. 2296 (2011), *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007), and proper application of *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450 (2d Cir. 1996), foreclose SEC argument that Mr. Tourre could be responsible for a statement he did not make).  Perhaps the best evidence of the force of Mr. Tourre's argument in this regard was the SEC's dramatic effort to change the subject and claim that Mr. Tourre "misconstrues the SEC's theory."  SJM Reply. Br. at 1 (introducing, for the first time, the theory that had supposedly been "misconstrued").

The courts of this District have seen this sort of pleading alchemy before and do not countenance it.  As Judge McMahon observed in another case where the SEC tried to evade the holding in *Janus*:

> Nonetheless, where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose "misstatement" liability under subsection(b) by labeling the alleged misconduct a "scheme" rather than a misstatement.

---

[4] Reacting to what she viewed as inaccuracies in SEC counsel's representations to the Court at the April 26 hearing, counsel for Ms. Kreitman recently confirmed that, if called at trial, her client would testify that she has no recollection of the call or where she obtained the information discussed on the call.  *See* Coffey Decl., Ex. 2.

*Kelly,* 817 F.Supp.2d at 343 (citing *SEC v. Lucent Techs.,* 610 F. Supp. 2d 342, 359-61 (D.N.J. 2009)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *KPMG LLP,* 412 F. Supp. at 377-78 (S.D.N.Y. 2006); *SEC v. PIMCO Advisors Fund Mgmt. LLC,* 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004). *See also In re Parmalat Sec. Litig.,* 376 F. Supp. 2d at 503 (courts have not allowed allegations of Rule 10b-5(a) and (c) scheme liability as a "back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5").

Here, of course, the case against opening the "back door" is even more compelling since there is no evidence whatsoever that Mr. Tourre "helped" Ms. Kreitman make the statements on the January 17 call. The SEC must be precluded from offering the January 17 call – or any other evidence or argument – in reliance on a "scheme" theory.

**CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court preclude the SEC from referencing, eliciting, or introducing into evidence at trial arguments or evidence offered in reliance on a theory that Mr. Tourre participated in a "scheme" to defraud ACA or other investors.


Dated: May 30, 2013
       New York, New York

        Respectfully submitted,

        /s/ Pamela Rogers Chepiga

        Pamela Rogers Chepiga
        (pamela.chepiga@allenovery.com)
        Andrew Rhys Davies
        (andrew.rhys.davies@allenovery.com)
        Brandon D. O'Neil
        (brandon.o'neil@allenovery.com)

        ALLEN & OVERY LLP
        1221 Avenue of the Americas
        New York, New York  10020
        (212) 610-6300


        /s/ John P. Coffey

        John P. Coffey
        (seancoffey78@gmail.com)

        LAW OFFICE OF JOHN P. COFFEY
        1350 Avenue of the Americas, 2nd Floor
        New York, New York  10019
        (646) 790-8988

        *Attorneys for Fabrice Tourre*