UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
SECURITIES AND EXCHANGE                                        :
COMMISSION,                                                    :
                                                               :
                              Plaintiff,                       :
                                                               :
              -v-                                              :
                                                               :
FABRICE TOURRE,                                                :
                                                               :
                              Defendant.                       :
-------------------------------------------------------------- X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: June 4, 2013 |

10 Civ. 3229 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This case involves a three-year dispute between the SEC and Fabrice Tourre concerning allegations of fraud in the marketing and sale of interests in a synthetic collateralized debt obligation ("CDO").[1] The SEC alleges various misstatements and omissions concerning the role of Paulson & Co., Inc., ("Paulson") in structuring the CDO in issue: ABACUS 2007-AC1 ("AC1").[2] Although Paulson helped to select the assets that would determine AC1's value, it also shorted over $1 billion of those assets through credit default swaps ("CDS").[3]

---

[1] A CDO represents a pool of assets, which can be sliced into tranches of different payment priorities. (See Def.'s Resp. SEC's Rule 56.1 Statement Material Facts ¶ 7, ECF No. 228 ("DCSOF").) A CDO is synthetic when, rather than owning the pool of assets, it uses credit default swaps ("CDS") to reference those assets. (Id. ¶ 8.) Tranches typically range from super senior (highest priority) to equity or first loss (lowest priority).

[2] In particular, the SEC asserts three claims against defendant Fabrice Tourre: (1) a primary violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"); (2) a primary violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) aiding and abetting violations of Section 10(b) and Rule 10b-5 by Goldman Sachs & Co. ("Goldman"). (See Am. Compl., ECF No. 44.) The SEC asserts these claims in connection with representations to or transactions involving IKB Deutsche Industriebank AG ("IKB"), ABN AMRO Bank N.V. ("ABN"), ACA Capital Holdings, Inc. (referred to, along with ACA Management LLC, as "ACA"), ACA Credit Products-ABN AMRO, L.L.C. ("ACA LLC"), as well as other, unspecified domestic investors. (See generally id.)

[3] The Second Circuit has described CDS as follows:

Whether Tourre's statements or omissions about Paulson's interests and his role in the AC1 transaction were, in fact, fraudulent will be determined at trial, scheduled to commence in six weeks. The present motions for summary judgment focus primarily on the narrower question of whether the events that took place in the United States are sufficient to render any fraud that occurred actionable under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5, 17 C.F.R. § 240.10b-5, or Section 17(a) of the Securities Act of 1933 ("Securities Act"). The reason the parties ask that question — as well as the answer to it — lies in the Supreme Court's watershed decision Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), which redefined what it means for a claim of securities fraud to be "domestic" for purposes of Section 10(b) and Rule 10b-5.[4]

Now before the Court are cross motions for partial summary judgment from both Tourre and the SEC (ECF Nos. 184, 191).[5] Tourre moves for summary judgment on the SEC's claims under Section 17(a) of the Securities Act to the extent it alleges fraud in "offers" made to IKB Deutsche Industriebank AG ("IKB"), ABN

---

"A credit default swap is the most common form of credit derivative, i.e., '[a] contract which transfers credit risk from a protection buyer to a credit protection seller.' . . . Simply put, a credit default swap is a bilateral financial contract in which '[a] protection buyer makes[ ] periodic payments to . . . the protection seller, in return for a contingent payment if a predefined credit event occurs in the reference credit,' i.e., the obligation on which the contract is written."

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 171-72 (2d Cir. 2004) (internal citations omitted). In other words, CDS permit parties to assume or hedge against risk associated with assets without purchasing or selling the assets referenced.

[4] Because the Dodd-Frank Act effectively reversed Morrison in the context of SEC enforcement actions, the primary holdings of this opinion affect only pre-Dodd Frank conduct. See Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 § 929P(b)(1), Pub. L. No. 111-203, 124 Stat. 1376, 1864 (2010) (codified at 15 U.S.C. § 77v(c)).

[5] The parties have also made six evidentiary motions (ECF Nos. 188, 195, 197, 200, 203, 206). Because the Court can resolve the motions for summary judgment without relying on the challenged evidence, it will resolve the evidentiary motions in a separate order.

AMRO Bank N.V. ("ABN"), and unspecified domestic investors.  He argues that the alleged offers to IKB and ABN were not domestic and that the SEC has, more generally, failed to develop record evidence with respect to any offers to other entities.  The SEC, for its part, moves for summary judgment on (1) the interstate commerce element of its Section 17(a) claim as it relates to ACA and on (2) the domestic element of its Section 10(b) and Section 17(a) claims in connection with the offer and sale of securities to ACA and ACA LLC.[6]

For the reasons set forth below, Tourre's motion for partial summary judgment is DENIED, and the SEC's motion for partial summary judgment is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.    ABACUS 2007-AC1 and the Complaint

The transactions at the heart of this action involved AC1, a synthetic CDO. AC1 referenced a portfolio of ninety sub-prime and mid-prime residential mortgage-backed securities ("RMBS").  (See Chepiga Decl. Ex. 51, at S-A-1 to S-A-4, ECF No. 186; Martens Decl. Ex. 6, ECF No. 231.)  Through notes and CDS arrangements, AC1 offered investors a way to bet on the performance of its reference portfolio

---

[6] The SEC originally moved for summary judgment as to every element of its Section 17(a) claim as it relates the allegations of misrepresentations and omissions to ACA.  At the oral argument on April 26, 2013, however, the Court informed the parties that, for reasons explained on the record, it would not consider the January 17, 2007, call between Gail Kreitman and Lucas Westreich on the SEC's motion for summary judgment.  (See Apr. 26, 2013, Hr'g Tr. 5:17-6:5.)  In light of that ruling, the SEC declined to pursue its broader, original motion for summary judgment on its claim under Section 17(a) of the Securities Act.  (See id. at 49:9-14, 55:15-23.)  Instead, the SEC decided to focus its motion on the "domestic" element of its remaining claims under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and on the interstate commerce element of its Section 17(a) claim.  (See id.; id. at 59:17-60:1.)  The Court agrees that, without the January 17 call, the SEC cannot satisfy its burden on summary judgment as to the abandoned elements of its affirmative motion.  Accordingly, the Court does not consider them further in this opinion.

without actually owning the underlying mortgages.  The value of the reference

portfolio depended in large part on the likelihood of "credit events," such as a failure

to pay the principal on underlying assets, or the writedown or downgrade of

components of the portfolio.  (See Def.'s Resp. SEC's Rule 56.1 Statement Material

Facts ¶ 9, ECF No. 228 ("DCSOF").)  Investors with a net long interest in AC1 (i.e.,

investors who bought AC1 notes or who sold protection through CDS) were betting

against the likelihood of credit events in the referenced portfolio.  Investors with a

net short interest in AC1 (i.e., investors who bought protection through CDS) were

betting that credit events would occur in the reference portfolio.

     Tourre worked with Paulson and ACA Management LLC (referred to, along

with ACA Capital Holdings, Inc., as "ACA") to structure AC1.  (See DCSOF ¶¶ 16,

33; Martens Decl. Ex. 10, at 56:11-58:1, ECF No. 231.)  He, along with other

colleagues, then worked with ACA to market AC1.  (See Martens Decl. Ex. 10, at

56:11-58:1, ECF No. 231; id. Ex. 11, at 321:12-13.)

     The crux of the SEC's complaint is that Tourre knew Paulson was both

participating in the selection of the reference portfolio and taking a short position

on AC1, but, through misstatements or omissions, he: (1) gave ACA the impression

that Paulson was taking a long position on AC1, and (2) gave potential investors the

impression that ACA selected the reference portfolio without input from Paulson.

(See Am. Compl. ¶¶ 2-3, ECF No. 44.)  The SEC essentially argues that Tourre

handed Little Red Riding Hood an invitation to grandmother's house while

concealing the fact that it was written by the Big Bad Wolf.  Tourre disputes the

SEC's characterization writ large and also points out that the alleged victims were not be-hooded children, but rather large financial institutions, operating in a dog-eat-dog world.

At present, however, the parties focus on the location of the alleged fraud, rather than whether the conduct in issue was fraudulent. The Court limits its recitation of the facts accordingly.

### B.    The Record Evidence[7]

From the end of 2006 through October 2007, Tourre worked as a vice president on the structured products correlation desk at Goldman Sachs & Co. ("Goldman") in New York. (DCSOF ¶ 2.) While there, his responsibilities were primarily to develop, structure, trade, and market synthetic CDOs and to hedge those products. (See id.; Chepiga Decl. Ex. 13, at 18:24-19:2, ECF No. 230; Martens Decl. Ex. 4, at 21:9-12, ECF No. 194.) At that time, Paulson was a New York-based company "that managed the investments of certain hedge funds." (DCSOF ¶ 3.)

In late 2006, Paulson expressed interest to Goldman in buying protection on (i.e., shorting) a portfolio of sub-prime RMBS. (Id. ¶ 11.) ACA was invited to serve as portfolio selection agent, in part to help make potential long investors more comfortable with the transaction. (See id. ¶ 13; Chepiga Decl. Ex. 6, at 34:22-35:21,

---

[7] The following facts are taken from the declarations and exhibits submitted in connection with the parties' cross motions for summary judgment. The Court cites to the parties' respective Local Rule 56.1 statements only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by material cited in a counterstatement. Citations to a paragraph in a 56.1 counterstatement are intended to direct readers both to the counterstatement itself as well as to the corresponding statement that it counters. Unless otherwise indicated, none of the factual propositions below are controverted by competent evidence.

ECF No. 230.) On January 8, 2007, Tourre met with representatives of Paulson and ACA to discuss the possible AC1 transaction. (See DCSOF ¶ 16.)

On January 10, 2007, Tourre sent an e-mail to Laura Schwartz (the head of ACA's portfolio management team) summarizing ACA's proposed role in AC1. (Id. ¶¶ 6, 17.) The e-mail described the equity (or first loss) tranche of AC1 as "pre-committed" and stated that "the compensation structure" aligned the "incentives" of Paulson, Goldman, and ACA. (Martens Decl. Ex. 9, ECF No. 194.) At that time, however, Tourre did not anticipate that the equity tranche of AC1 would be placed (DCSOF ¶ 18), and he knew that Paulson contemplated taking a short interest in AC1 (see id. ¶ 20; Martens Decl. Ex. 4, at 189:11-14, ECF No. 194).

ACA was formally engaged as the portfolio selection agent for the AC1 transaction by February 2007. (DCSOF ¶ 31.) In that capacity, ACA worked with Paulson to select the reference portfolio (see id. ¶ 33), which eventually included ninety Baa2-rated sub-prime and mid-prime RMBS (see Chepiga Decl. Ex. 51, at S-A-1 to S-A-4, ECF No. 186; Martens Decl. Ex. 6, ECF No. 231).

Tourre, along with colleagues at Goldman, Goldman Sachs International ("GSI"), and ACA, then worked together to market and negotiate the AC1 transaction. (See Martens Decl. Ex. 10, at 56:11-58:1, ECF No. 231; id. Ex. 11, at 321:12-13.) They made a term sheet, flip book, and offering circular, each of which described the reference portfolio as selected by ACA, without mentioning Paulson's role in the selection process or its contemplated short position. (See Def.'s Resp. Pl.'s Resp. Def.'s Rule 56.1 Statement of Material Facts ¶ 187, ECF No. 255 ("Def.'s

6

Reply SOF").)  Tourre e-mailed a preliminary draft of the offering circular to Jörg

Zimmermann and Thomas Schirmer of IKB.  (See Martens Decl. Ex. 17, ECF No.

231.)  He and his colleagues at Goldman and GSI also discussed the AC1

transaction with IKB over the phone (see Martens Decl. Ex. 1, at 32-36, ECF No.

231; id. Ex. 19) and e-mailed other AC1 offering materials to IKB (Def.'s Reply SOF

¶ 193) and to numerous other individuals (see Martens Decl. Exs. 77, 78, ECF No.

231).  Tourre also e-mailed ABN discussing its potential role in intermediating a

CDS transaction involving the super senior tranche of AC1.  (See id. Ex. 11, at 323-

25; id. Ex. 25.)  The e-mail indicated that the reference portfolio was "selected by

ACA."  (Id. Ex. 25.)

On April 26, 2007, the AC1 transaction closed.  (Pl.'s Resp. Def.'s Rule 56.1

Statement of Material Facts ¶ 110, ECF No. 226 ("PCSOF").)  That day, three ACA-

managed funds purchased $42 million in Class A2 notes.  (See DCSOF ¶ 40.)  The

trade confirmations for those purchases show a trade from Goldman to the three

ACA-related entities with an account address for each entity listed as 140

Broadway, 48th Floor, New York, NY  10005.  (Martens Decl. Ex. 26, ECF No. 194.)

Two Loreley entities (advisory clients of IKB) also purchased $150 million in Class

A1 and A2 notes.  (See Def.'s Reply SOF ¶¶ 203-04.)  Title and irrevocable liability

passed to the Loreley entities in Europe.  (See Nov. 19, 2012, Opinion & Order 3-4,

ECF No. 164.)  Also on April 26, 2007, Paulson purchased protection on $192

million of Class A1 and A2 notes.  (See DCSOF ¶ 42; PCSOF ¶ 132.)

On approximately May 31, 2007, ACA LLC entered into a CDS in which it sold protection on $909 million of the super senior (50% - 100%) tranche of the AC1 reference portfolio. (DCSOF ¶ 45.) ACA LLC entered into that transaction pursuant to a master agreement and a trade confirmation, each of which were signed by Nora Dahlman on behalf of ACA LLC in the United States. (See DCSOF ¶¶ 47-48; Martens Decl. Exs. 36, 37, 40, 41, ECF No. 194.) ACA LLC also issued a financial guaranty insurance policy on that same tranche of the AC1 reference portfolio. (See PCSOF ¶ 140.) On May 31, 2007, Paulson purchased protection on approximately $1 billion of the super senior (45% - 100%) tranche of the AC1 reference portfolio. (See PCSOF ¶ 143.)

## II.   DISCUSSION

### A.   Standard on Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court is not to act as a trier of fact or to weigh the evidence. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

"When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks and citations omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).

### B.   Legal Background

The SEC will prevail on a claim under Section 17(a) of the Securities Act if it can prove that a defendant: (1) committed a fraudulent act; (2) that was material; (3) in the offer or sale of a security or security-based swap agreement; (4) through the use of any means or instruments of interstate commerce; and, with certain exceptions, (5) with the requisite scienter. See 15 U.S.C. § 77q(a); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). To be liable, the defendant need not speak a falsehood directly to a defrauded investor; it is enough to have "knowledge of the fraud and [to have] assisted in its perpetration." First Jersey, 101 F.3d at 1471 (internal quotation mark and citation omitted). In addition, for conduct that predates the Dodd-Frank Wall Street Reform and Consumer

Protection Act of 2010, the SEC must also prove that the fraud is domestic for purposes of Morrison.  See generally Morrison, 130 S. Ct. 2869; SEC v. Goldman Sachs & Co., 790 F. Supp. 2d 147, 164 (S.D.N.Y. 2011) (applying Morrison to claims under Section 17(a) of the Securities Act); see also 15 U.S.C. § 77v(c) (delineating the extraterritorial scope of post-Dodd Frank enforcement actions).  Section 10(b) of the Exchange Act and Rule 10b-5 also prohibit securities fraud.  Section 10(b) and Rule 10b-5 claims share, inter alia, the domestic transaction element of Section 17(a) claims.  See generally Morrison, 130 S. Ct. 2869.

The primary question of law that the parties dispute on these motions is what it means for fraud made "in the offer" of securities to be domestic for purposes of Section 17(a) and Morrison.

### 1.    Morrison and Section 10(b) of the Exchange Act

In Morrison, the Supreme Court held that Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges[] and [to] domestic transactions in other securities."[8]  Morrison, 130 S. Ct. at 2884.  Its holding constrained the geographic scope of Section 10(b) and Rule 10b-5 by repudiating the "conduct" and "effects" tests,[9] which the Second Circuit had developed to determine whether a claim for securities fraud would be actionable in the United States.  See id. at 2877-82.

---

[8] This Court omits further discussion of when a claim is actionable because it involves securities listed on domestic exchanges, as no party suggests any of the claims in issue here could potentially fall into that category.

[9] The conduct and effects tests, roughly speaking, permitted plaintiffs to bring claims under Section 10(b) and Rule 10b-5 as long as the wrongful conduct (1) occurred in the United States or (2) had a substantial effect in the United States or on U.S. citizens.  See Morrison, 130 S. Ct. at 2879.

The Court's reasoning started from the fundamental premise that Section 10(b) of the Exchange Act is subject to the same presumption against extraterritorial application as other legislation. See id. at 2877 (citing EEOC v. Arabian-Am. Oil Co., 499 U.S. 244, 248 (1991)). Of course, that presumption can apply in many different ways and could even theoretically be consistent with the conduct and effects tests that Morrison repudiated. Morrison's most important analytical contribution was therefore to instruct lower courts how to apply the presumption against extraterritoriality in the context of Section 10(b) claims. To that end, the Court sought a test that was grounded in the text of Section 10(b) and that would lend greater predictability and consistency to the analysis of whether particular conduct constitutes a "domestic" violation of that statute. See id. at 2879-81.

In developing its test, the Court began with the language of Section 10(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . .

15 U.S.C. § 78j(b) (emphasis added).

Noting that Section 10(b) does not proscribe fraud generally, but merely fraud "in connection with the purchase or sale of any security," id., the Court reasoned that the "objects of the [Exchange Act's] solicitude" are "transactions" and, consequently, that courts should look to the location of such transactions when

11

determining whether Section 10(b) applies. <u>Morrison</u>, 130 S. Ct. at 2884. In dicta

supporting that conclusion, the Court cited similarly transaction-focused language

in Section 30(a) of the Exchange Act and Section 5(a) of the Securities Act. <u>See</u> <u>id.</u>

at 2885 ("The same focus on domestic transactions is evident in the Securities Act of

1933 . . . .").

Because of this focus on transactions, the Supreme Court construed Section

10(b) of the Exchange Act and Rule 10b-5 to apply only to fraudulent conduct in

connection with "transactions in securities listed on domestic exchanges[] and [with]

domestic transactions in other securities." <u>Id.</u> at 2884. The Second Circuit has

subsequently held that a transaction is domestic, for purposes of Section 10(b),

when title passes or irrevocable liability is incurred in the United States. <u>Absolute</u>

<u>Activist Value Master Fund Ltd. v. Ficeto</u>, 677 F.3d 60, 62 (2d Cir. 2012).

### 2.   <u>Morrison</u> and Section 17(a) of the Securities Act

The issue here is how to apply <u>Morrison</u> to claims under Section 17(a) of the

Securities Act. As in <u>Morrison</u>, the Court begins by examining the text of Section

17(a):

> It shall be unlawful for any person <u>in the offer or sale of any</u>
> <u>securities</u> (including security-based swaps) or any security-based
> swap agreement (as defined in section 78c(a)(78) of this title) by
> the use of any means or instruments of transportation or
> communication in interstate commerce or by use of the mails,
> directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue
> statement of a material fact or any omission to state a material
> fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (emphasis added). The Securities Act defines "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." 15 U.S.C. § 77b(a)(3). Thus, like Section 10(b), Section 17(a) prohibits only a narrow subset of fraudulent activity. Unlike Section 10(b), however, the prohibited conduct is circumscribed by its connection with "the offer or sale of any securities," id., rather than with "the purchase or sale of any security," id. § 78j(b).

That distinction is key. Section 17(a)'s proscription extends beyond consummated transactions. See, e.g., SEC v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1366 (10th Cir. 1976) ("[A]ctual sales were not essential" to a claim under Section 17(a).). Because Section 17(a) is not exclusively concerned with fraudulent conduct in connection with a transaction in securities, but rather is concerned with such conduct in either the offer or the sale of securities, the requirement of domestic conduct under Section 17(a) must be extended accordingly. This means that a domestic offer may be actionable regardless of whether it results in a sale. Morrison's requirement of domestic conduct is necessarily applied individually and independently to each type of potential violation of Section 17(a).

The Court therefore holds that, for claims of fraud "in the offer" of securities, Section 17(a), in conjunction with Morrison and Absolute Activist, requires that the

13

relevant offer of securities be made in the United States. This interpretation both provides the consistency and predictability sought by the Morrison court and hews to the statutory text.

Tourre, by contrast, reads Section 17(a) as an "either/or, but not both" statute. He argues that if an offer leads to a consummated sale, only the sale is actionable. This, according to Tourre, necessarily means that if the sale is not domestic, neither the sale nor the offer is actionable under Morrison. (See Apr. 26, 2013, Hr'g Tr. 12:10-13:6.) Similarly, under Tourre's reading, an offer is actionable if and only if it is both domestic and ultimately unconsummated. He thus acknowledges that the SEC need not prove that title has passed or irrevocable liability is incurred in the United States when it brings a claim under Section 17(a) for an offer not leading to a sale — a sensible concession, given that the SEC can prove a violation of Section 17(a) in instances where irrevocable liability is never incurred and where title never passes. See 15 U.S.C. § 77q(a); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733-34 (1975); Am. Commodity Exch., 546 F.2d at 1366.

In support of his reading of Section 17(a), Tourre relies on the concept of a "transaction" as defining actionable conduct. He cites (1) dicta in Morrison, (2) Regulation S, 17 C.F.R. §230.901 ("Reg. S") (implementing Section 5 of the Securities Act), (3) the legislative history surrounding the 1954 amendments to the Securities Act, and (4) the policy concerns animating Morrison. He relies on everything, in short, but the text of Section 17(a) itself.

14

First, he notes that <u>Morrison</u> likened the Securities Act to the Exchange Act in its focus on transactions and described the purpose of the Exchange Act as protecting "parties or prospective parties" to domestic transactions. <u>Morrison</u>, 130 S. Ct. at 2884-85. This transactional focus, he argues, precludes the Court from enforcing Section 17(a) in the context of offers of securities associated with non-domestic transactions.

Second, he notes that the word "offer" was added to Section 17(a) in a "technical" amendment to the Securities Act. <u>See</u> H.R. Rep. No. 83-1542 (Apr. 23, 1954). The nature of the amendment, he suggests, indicates "that 'offers' were not intended to be divisible from 'sales'" under Section 17(a). (<u>See</u> Tourre Mem. Law Supp. Mot. Partial Summ. J. 30, ECF No. 185.) Consequently, Tourre contends that where a sale would not be domestic for purposes of <u>Morrison</u>, the Court should not be able to find a domestic offer. (<u>See</u> <u>id.</u> at 29-30.) Tourre's theory is essentially that once there is a sale, there can be no violation on the basis of a related offer. (<u>See</u> Apr. 26, 2013, Hr'g Tr. 13:2-14:14.) Hence, he concludes that the legislative history requires the Court to read a silent "unconsummated" before the word "offer" in Section 17(a). Otherwise, the Court would give an unintended "double bang" (<u>id.</u> 14:12) to Section 17(a) by permitting the SEC to charge the "same conduct" (<u>id.</u> 14:13) — the offer and its related sale — twice.

Third, he points to Reg. S, which exempts offers made to non-U.S. persons (even when made from the United States) from certain registration requirements. <u>See</u> 17 C.F.R. §§ 230.901, 230.902(h), 230.903(a). While Reg. S expressly does not

apply to the anti-fraud provisions of the Securities Act, see Offshore Offers & Sales, Securities Act Release No. 122, 1990 WL 311658, at *5 (Apr. 24, 1990), Tourre argues that, after Morrison, it should apply to them. In any event, he argues that it constitutes an SEC endorsement of the reasoning behind Morrison and an example of a narrower reading of the Securities Act than the text of the act might support.

Finally, he invokes Morrison's concerns favoring comity and disfavoring overlapping and conflicting regulatory requirements. Morrison, 130 S. Ct. 2885-86. These concerns, he argues, support reading Section 17(a) not to impose its requirements on foreign investors who deliberately seek to avoid the regulations imposed by U.S. securities laws.

The problem with each of these arguments is their disregard of the statutory text. Section 17(a) does not distinguish between consummated and unconsummated offers, and the Court can find no other statutory basis from which to make that distinction. It would take especially compelling dicta, legislative history, and policy concerns to merit adding the word "unconsummated" before the word "offer" and thereby create a statutory distinction out of whole cloth. There is no basis for such judicial rewriting of the clear statutory language.

In addition to its disregard of the plain language of Section 17(a), Tourre's reading of Morrison is problematic insofar as it obfuscates the differences between Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. These differences extend beyond the language of the statute and into the enforcement mechanisms. For example, Section 17(a) has no private right of action, see Finkel v.

16

Stratton Corp., 962 F.2d 169, 174-75 (2d Cir. 1992), so there is less risk of

enforcement activities conflicting with the laws of other countries, and there is no

risk that international plaintiffs will use Section 17(a) to forum-shop for favorable

securities laws or for the generous discovery rules of U.S. courts.  Similarly, just as

there is no private cause of action under Section 17(a), neither are reliance or

economic loss necessary elements to a Section 17(a) claim.  Compare SEC v.

Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (describing the elements

of a claim under Section 17(a) and an SEC enforcement action under Section 10(b)),

with In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d 229, 234 n.3 (2d Cir. 2012)

(listing the elements of a private 10(b) claim, including economic loss, loss

causation, and reliance).  The fact that Section 17(a) does not require proof of loss or

reliance confirms what the lack of a private right of action suggests: that Section

17(a) is less concerned with the counterparty to alleged fraud than with the offering

or selling party.  See SEC v. Gruss, 859 F. Supp. 2d 653, 663 (S.D.N.Y. 2012)

(noting the lack of private right of action under the Investment Advisors Act

suggests a relative focus on the party regulated rather than on the party potentially

protected); see also Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that

focus on the person regulated rather than the individuals protected create 'no

implication of an intent to confer rights on a particular class of person.'" (citing

California v. Sierra Club, 451 U.S. 287, 294 (1981))).

　　Moreover, Tourre's argument that allowing a claim based on a consummated

offer would give an impermissible "double bang" to Section 17(a) rings hollow.

Section 17(a) prohibits neither offers nor sales of securities; it prohibits fraudulent conduct "in the offer or sale of any security." 15 U.S.C. § 77q(a). The "offer or sale" language simply limits the scope of actionable fraudulent conduct. See id.

The Court's interpretation of Section 17(a) is dictated by common sense. It defies reason to adopt a construction of Section 17(a) that could permit the SEC to prove that each and every element of its claim occurred — and occurred in the United States — only to require dismissal because a separate "sale" took place abroad. The presumption against extraterritoriality does not require such a result; Morrison's holding does not require such a result; and the Court sees no reason to interpret Morrison's dicta to require it either.

### 3.   When an Offer is Domestic

Holding that the SEC can state a claim under Section 17(a) and Morrison if it alleges fraud in connection with a domestic offer only answers half of the question. The other half of the question requires the Court to decide when an offer is domestic. Tourre appears to argue that an offer should be considered domestic only if it is made to a person physically located in the United States. The SEC, by contrast, argues that an offer is domestic if the person who makes the offer engages in the necessary "offering conduct" in the United States.

The statutory language answers this question. An "offer" is just that—the act of making an offer, as defined by Section 2(a)(3).[10] The statute is not worded as

---

[10] Tourre cites Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753 F. Supp. 2d 166 (S.D.N.Y. 2010), for the proposition that the statutory definitions in the Securities Act and in the Exchange Act are too broad to be helpful in the context of Morrison. See id. at 177. While it is true that Plumbers' Union declined to apply the Exchange Act definition of "purchase" for purposes

"to whom" an offer is made, or some other construct. An offer is domestic if it is made in the United States.[11] As discussed above, this focus on the offering party is confirmed by the fact that Section 17(a) does not require proof of reliance or loss and does not provide a private right of action. <u>See, e.g.</u>, <u>Monarch Funding Corp.</u>, 192 F.3d at 308; <u>Gruss</u>, 859 F. Supp. 2d at 663.

Tourre's counterargument — that what constitutes a domestic "offer" under Section 17(a) should conform with the requirements of Reg. S — is interesting, but unavailing. Reg. S defines "offers and sales" as non-domestic (roughly speaking) where they are not made to a person in the United States and where the buyer is outside the United States at the time the buy order is originated.[12] While Reg. S does represent an interpretation of the Securities Act by the SEC (and one entitled to deference), the Court declines to adopt this reading of Reg. S to define what constitutes and "offer" for Section 17(a).

of Morrison, Tourre overreads that case by suggesting it (as well as other cases bemoaning the unhelpfulness of Securities Act and Exchange Act definitions generally) requires the Court to ignore the Securities Act's definition of the term "offer." It is one thing to limit the construction of a term beyond the limits of a statute's own definition in order to avoid eviscerating the holding of binding Supreme Court precedent. It is quite another thing to set aside a statute's definitions entirely because doing so might be in keeping with the spirit of Supreme Court dicta.

[11] The Court also considered and decided the issue in this manner at the motion to dismiss stage, and that holding is the law of the case. <u>See</u> SEC v. Goldman Sachs & Co., 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011); <u>see also</u> In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). The Court continues to stand by the reasoning of that decision, which noted that the focus of the term "offer," both in the context of Section 17(a) and as it is defined at 15 U.S.C. § 77b(a)(3), is on the person offering or attempting to offer securities, not on the recipient of the offer. <u>See</u> Goldman Sachs & Co., 790 F. Supp. 2d at 165.

[12] More specifically, Reg. S provides that "an offer or sale of securities . . . shall be deemed to occur outside the United States . . . if: (1) [t]he offer or sale is made in an offshore transaction." 17 C.F.R. § 230.903(a). Reg. S further states that an "offer or sale of securities is made in an 'offshore transaction' if: (i) [t]he offer is not made to a person in the United States; and . . . [at] the time the buy order is originated, the buyer is outside the United States, or the seller and any person acting on its behalf reasonably believe that the buyer is outside the United States." <u>Id.</u> § 230.902(h). That definition of "offshore transaction" excludes the two safe harbor provisions as well as the various exemptions, none of which are relevant for present purposes.

First, Reg. S concededly does not apply to the anti-fraud provisions of the Securities Act.  See 17 C.F.R. § 230 Regulation S Preliminary Note ¶ 1.  It is therefore not an interpretation of Section 17(a) to which this Court must defer under Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  While the SEC's explanation for not applying Reg. S to the Security Act's anti-fraud provisions is grounded in the very conduct and effects tests that Morrison repudiated, see Offshore Offers & Sales, Securities Act Release No. 122, 1990 WL 311658, at *5 (Apr. 24, 1990), that explanation may not have been comprehensive.  The SEC may well have chosen to limit the scope of Reg. S for other reasons, too, had it anticipated the Supreme Court's decision in Morrison.

Second, as the SEC points out here, Reg. S is framed as an "exemption" to the registration requirements of the Securities Act, not merely as an interpretation of them.  See 17 C.F.R. § 230 Regulation S Preliminary Note ¶ 1 (noting that Reg. S only applies to Section 5 of the Securities Act); Offshore Offers & Sales, Securities Act Release No. 103, 1989 WL 1184447, at *16 (July 11, 1989) (referring to Reg. S as an "exemption" to the Security Act's registration requirements).  That description suggests that offers deemed non-domestic under Reg. S should be considered domestic in ordinary circumstances.  Accordingly, even if the Court were to defer to the interpretation in Reg. S here, it is not obvious whose position that would support.

In light of the various problems with adopting Reg. S as an interpretation of the term "offer" under Section 17(a) the Court declines to depart from the meaning of the plain language of the statute on that basis.

### C.     Tourre's Motion for Summary Judgment

Tourre moves for summary judgment on two related issues.  First, he moves against the SEC's claims under Section 17(a) of the Securities Act to the extent they relate to fraud in "offers" made to IKB and ABN.  He argues that Morrison bars them because — regardless of where any "offers" were made — they related to non-domestic transactions.  Second, he moves for summary judgment on the SEC's claims under Section 17(a) to the extent they relate to offers allegedly made to unspecified domestic entities.  Here, Tourre argues that the SEC has failed to substantiate its claims with sufficient proof.  As discussed below, the Court disagrees in both cases.

### 1.     Domestic Offers in Connection with Non-Domestic Transactions

The bulk of Tourre's motion for summary judgment is devoted to the argument that the Court must reject the SEC's claims to the extent they assert that Tourre violated Section 17(a) in connection with the "offer" of securities that were later sold in non-domestic transactions.  For the reasons discussed at length above, the Court rejects that construction of Section 17(a) and Morrison.

Instead, to the extent the SEC seeks to hold Tourre liable for fraudulent conduct in the offer of securities to IKB and ABN, Morrison requires only that the SEC prove that Tourre engaged in fraudulent conduct in connection with a domestic

21

offer of those securities. To make that showing, the SEC must prove only that the offeror was in the United States at the time he or she made the relevant offer. Because the SEC has not cross-moved for summary judgment on these claims, however, its burden on this motion is only to cite record evidence that would allow a reasonable jury to find that Tourre's allegedly fraudulent conduct occurred in connection with a domestic offer.

The SEC has satisfied that burden. It has cited to record evidence that would allow a reasonable jury to find that Tourre worked in New York at all relevant times. (See Def.'s Reply SOF ¶ 147.) It has also cited to record evidence that would allow a reasonable jury to conclude that he e-mailed and called both IKB and ABN to discuss possible transactions involving AC1. (See Martens Decl. Ex. 1, at 32-36, ECF No. 231; id. Ex. 11, at 323-25; id. Exs. 17, 19, 25.) A reasonable jury could conclude that such conduct amounted to an "offer."

These materials suffice to defeat summary judgment on the domestic element of the SEC's claims under Section 17(a) for fraud in connection with the offer of securities to IKB and ABN.[13]

---

[13] Tourre also appears to advance other, less compelling arguments in support of his motion for summary judgment on the SEC's Section 17(a) claims relating to offers of securities to IKB and ABN. First, he appears to argue that no offer to IKB can be actionable because IKB was merely an investment advisor and never purchased any securities or security-based swaps in connection with the AC1 transaction. But the law is clear that no transaction is required to state a claim under Section 17(a). See, e.g., 15 U.S.C. § 77q(a); Blue Chip Stamps, 421 U.S. at 733-34; Am. Commodity Exch., Inc., 546 F.2d at 1366. Moreover, Tourre does not cite, and the Court is not aware, of any precedent requiring the SEC to show that a defendant offered securities to a prospective investor as opposed to an investment advisor. See United States v. Naftalin, 441 U.S. 768, 772-73 (1979) (holding that Section 17(a) prohibits fraudulent conduct directed against securities brokers rather than investors). Second, Tourre argues that ABN did not receive the documents that the SEC claims Tourre sent them. Tourre is welcome to present that testimony to the jury, but the Court cannot grant summary judgment to Tourre on that basis in light of the record evidence cited by the SEC.

### 2.   Offers to Domestic Entities

Tourre also argues that the SEC has failed to substantiate its allegations that he violated Section 17(a) by marketing AC1 "to additional investors through [Goldman's] structured products syndicate desk."[14]  (Am. Compl. ¶ 66, ECF No. 44.) The Court disagrees.

Because Section 17(a) prohibits persons from "directly or indirectly" employing or engaging in deceptive conduct "in the offer or sale of any securities," courts have held that defendants need not personally offer or sell securities to be liable under that provision. See, e.g., SEC v. Wolfson, 539 F.3d 1249, 1263-64 (10th Cir. 2008).  Rather, courts have held defendants liable for fraudulent conduct where they have acted as a "necessary participant" or a "substantial factor" in the relevant offer or sale of securities. See, e.g., SEC v. Holschuh, 694 F.2d 130, 139 (7th Cir. 1982) (collecting cases).  Moreover, as discussed above, in the context of the Securities Act, "offer" is not constrained to "the common law contract concept of an offer."  SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998).  The Securities Act instead defines "offer" expansively to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value."  15 U.S.C. § 77b(a)(3).

Here, the SEC has cited to evidence suggesting that Tourre had "primary responsibility" for creating the allegedly fraudulent AC1 term sheet and flip book.

---

[14] Because the materiality of any allegedly fraudulent statements or omissions and Tourre's scienter associated with those statements or omissions is common between the alleged offers to IKB, ABN, ACA LLC, and the alleged offers to "additional investors," the Court treats this challenge as one to the SEC's ability to prove that any offers were made to these "additional investors" for which Tourre may be held primarily liable.

(See Martens Decl. Ex. 10, at 57-58, ECF No. 231.)  It has also cited to evidence that Tourre participated in the marketing of the AC1 transaction (see Martens Decl. Ex. 10, at 56:11-58:1, ECF No. 231; id. Ex. 11, at 321:12-13) and that the Goldman syndicate desk e-mailed the AC1 term sheet and flip book to several dozen e-mail addresses associated with the names of nearly as many individuals (id. Exs. 77-78). From this evidence, a reasonable jury could conclude that offers of securities were made to additional investors for which Tourre could be held liable.  Tourre's motion for summary judgment on these claims is therefore denied.

### D.    The SEC's Motion for Partial Summary Judgment

The SEC, for its part, moves for summary judgment on (1) the interstate commerce element of its Section 17(a) claim as it relates to ACA and on (2) the domestic element of its Section 10(b) and Section 17(a) claims in connection with the offer and sale of securities to ACA and ACA LLC.  The SEC is entitled to summary judgment on both aspects of its motion.

### 1.    Interstate Commerce

The interstate commerce element of a Section 17(a) claim is satisfied where the defendant uses the telephone, Internet, or e-mail to accomplish the alleged fraud.  See SEC v. Shehyn, No. 04 Civ. 2003, 2010 WL 3290977, at *4-5 (S.D.N.Y. Aug. 9, 2010); cf. United States v. D'Amelio, 683 F.3d 412, 422-23 (2d Cir. 2012) (describing communications by telephone and Internet as facilities of interstate commerce capable of a claim under the similarly worded wire fraud statute).  Here, it is undisputed that Tourre and his colleagues at Goldman accomplished the alleged fraud in part through communications with ACA via phone and e-mail.  The

SEC is therefore entitled to summary judgment on the interstate commerce element of its Section 17(a) claim as it relates to the alleged fraud on ACA.

### 2.   Domestic Transaction

The SEC can satisfy the domestic element of its Section 10(b) and Rule 10b-5 claims by proving that the alleged fraud occurred in connection with a securities transaction in which title passed or irrevocable liability was incurred in the United States. <u>Absolute Activist</u>, 677 F.3d at 69.

Here, the SEC moves on two separate sets of transactions. First, it moves on its claims associated with ACA's purchase of $42 million world of AC1 notes. In connections with these note purchases, it has produced three trade confirmations. (Martens Decl. Ex. 26, ECF No. 194.) The face of each of those documents indicates a trade confirmed by Goldman for three separate, ACA-related entities: (1) "ACA SECURITIES, LLC (ZENITH FUNDING, LTD. WAREHOUSE ACCOUNT)," (2) "GRENADIER FUNDING, LIMITED C/O A C A SECURITIES, LLC," and (3) "ACA ABS 2003-2 LTD ACA FINANCIAL GUARANTY CORP." (<u>Id.</u>) Each confirmation also indicates an address for Goldman (85 Broad Street, New York, NY 10004) and an address for each ACA-related entity (140 Broadway, 48th Floor, New York, NY 10005). (<u>Id.</u>) This evidence tends to suggest that title to these notes passed in the United States.

Tourre, by contrast, cites no record evidence suggesting that title passed outside the United States. Instead, he merely cites the fact that the entities purchasing the notes are organized under the laws of the Cayman Islands. (<u>See</u> Chepiga Decl. Exs. 23-25, ECF No. 230.) <u>Absolute Activist</u>, however, makes clear

that a party's residence is irrelevant to the location of a transaction.  Absolute
Activist, 677 F.3d at 69 ("While it may be more likely for domestic transactions to
involve parties residing in the United States, '[a] purchaser's citizenship or
residency does not affect where a transaction occurs; a foreign resident can make a
purchase within the United States, and a United States resident can make a
purchase outside the United States.'" (citing Plumbers' Union Local No. 12 Pension
Fund v. Swiss Reinsurance Co., 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010)).

Based on the trade confirmations in combination with the absence of any
contradictory record evidence, no rational juror could conclude that title to the $42
million in AC1 notes passed to ACA (or related entities) outside of the United
States.  Accordingly, the SEC is entitled to summary judgment on the domestic
elements of its 10(b) and 10b-5 claims as they relate to ACA's purchase of $42
million in AC1 notes.[15]

The SEC also moves on its 10(b) and 10b-5 claims as they relate to ACA
LLC's sale of protection (through CDS) on $909 million of the super senior tranche
of AC1.  Here, it points to a declaration of Nora Dahlman, the general counsel of
ACA LLC and the individual who signed the master agreement and trade
confirmation through which ACA LLC entered into the relevant CDS.  (See Martens
Decl. Exs. 36-37, 40-41, ECF No. 194.)  In her affidavit, Dahlman states that, based
on her calendar, passport, and receipts, she believes that she signed those
agreements while she was in the United States.  (Id. Ex. 37, at ¶ 6.)  Because the

---

[15] The Court notes that Tourre himself previously relied on trade confirmations to argue that the
Loreley purchases were not domestic.  See SEC v. Tourre, No. 10 Civ. 3229, 2012 WL 5838794, at *1-
2, *5 (S.D.N.Y. Nov. 19, 2012).

agreements were addressed to ACA LLC from ABN (ACA LLC's counterparty), and because they represented an offer to which Dahlman's agreement would constitute an acceptance (see id. Ex. 37, at 56 of 153), the SEC argues that Dahlman's signature represented the point in time when ACA LLC incurred irrevocable liability on those CDS. See N.Y.U.C.C. § 2-201(1) (contract for sale of goods over $500 enforceable if signed by the party to be charged); Justice v. Lang, 42 N.Y. 493, 494 (1870) (contracts at common law are enforceable under the statute of frauds if signed by the party to be charged); see also Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999) (offer and acceptance create a meeting of the minds sufficient to give rise to a contract).

Tourre does not seriously dispute the proposition of law that ACA LLC incurred irrevocable liability when (and where) Dahlman signed the master agreement and trade confirmation. Nor does Tourre point to any evidence that would allow a reasonable juror to conclude that Dahlman did not, in fact, sign those agreements in the United States. He simply notes that the SEC has not provided evidence of the location where ABN (ACA LLC's counterparty) signed the agreements. But there is no reason to believe the location where ABN signed the agreements is relevant to the location where ACA LLC incurred irrevocable liability.

Because, on this record, no reasonable jury could find that ACA LLC did not incur irrevocable liability on the $909 million CDS in the United States, the SEC is entitled to summary judgment on the domestic elements of its 10(b) and 10b-5

27

claims as they relate to ACA LLC's sale of protection through CDS on $909 million of the super senior tranche of AC1.

## III.   CONCLUSION

For the reasons set forth above, Tourre's motion for partial summary judgment is DENIED, and the SEC's motion for partial summary judgment is GRANTED as to:

1. The domestic element of its remaining claim under Section 10(b); and

2. The interstate commerce and domestic elements of its Section 17(a) claim pertaining to ACA's purchase of AC1 notes and ACA LLC's sale of protection on $909 million of the super senior tranche of the AC1 reference portfolio.

In all other respects, the SEC's motion for partial summary judgment is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 184 and 191.

SO ORDERED.

Dated:        New York, New York
              June 4, 2013

                                        _Katherine B. Forrest_
                                        KATHERINE B. FORREST
                                        United States District Judge