**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x
    :
SECURITIES AND EXCHANGE    :
COMMISSION,    :    Civil Action
    :    No.: 10-cv-3229 (KBF)
    Plaintiff,    :
    :    <u>ELECTRONICALLY FILED</u>
    v.    :
    :
FABRICE TOURRE,    :
    :
    Defendant.    :
    :
———————————————————————— x

**MEMORANDUM OF LAW OF FABRICE TOURRE IN OPPOSITION TO THE SEC'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FABRICE TOURRE FROM OFFERING EVIDENCE OR ARGUMENT AT TRIAL THAT HE <u>REASONABLY RELIED ON ADVICE OF COUNSEL</u>**

Pamela Rogers Chepiga
Andrew Rhys Davies
Brandon D. O'Neil
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

John P. Coffey
LAW OFFICE OF JOHN P. COFFEY
1350 Avenue of the Americas, 2nd Floor
New York, New York  10019
(646) 790-8988

*Attorneys for Fabrice Tourre*

Dated:    June 7, 2013
        New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................2

A.     Mr. Tourre Made Clear Three Years Ago That Evidence Concerning Goldman's Institutional Processes Is A Key Part Of His Defense ........................................2

B.     ABACUS 2007-AC1 Was Subjected To Goldman's Usual Institutional Approval Processes, And No One Suggested That Disclosure Of Paulson's Role Was Required ..............................................................................................................3

C.     No One Outside Goldman Suggested That The AC1 Offering Materials Were Deficient Either ................................................................................................6

ARGUMENT .....................................................................................................................9

     THE COURT SHOULD DENY THE SEC'S EXTRAORDINARY REQUEST TO PRECLUDE MR. TOURRE FROM OFFERING EVIDENCE TO MEET THE SEC'S FALSE FACTUAL ALLEGATIONS .............................................9

CONCLUSION.................................................................................................................15

## TABLE OF AUTHORITIES

### CASES

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ...................................................................................................13

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012) ......................................................................................13

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
  No. 09 MD 2058(PKC), 2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...............................10

*Johnson v. Acevedo*,
  572 F.3d 398 (7th Cir. 2009) ......................................................................................11

*SEC v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012) ......................................................................................14

*SEC v. Enterprise Solutions, Inc.*,
  142 F. Supp. 2d 561 (S.D.N.Y. 2001) ........................................................................10

*SEC v. Hughes Capital Corp.*,
  124 F.3d 449 (3d Cir. 1997) ......................................................................................13

*SEC v. O'Meally*,
  No. 06 Civ. 6438(LTS)(RLE), 2012 WL 1969300, at *3 (S.D.N.Y. May 30, 2012) ...........13

*SEC v. Obus*,
  693 F.3d 276 (2d Cir. 2012) ......................................................................................13

*SEC v. Pain Rauscher, Inc.*,
  254 F.3d 852 (9th Cir. 2001) ......................................................................................12

*SEC v. Shanahan*,
  646 F.3d 536 (8th Cir. 2011) ......................................................................................13

*United States v. Lopez*,
  518 F.3d 790 (10th Cir. 2008) ....................................................................................11

*United States v. Yannotti*,
  415 F. Supp. 2d 280 (S.D.N.Y. 2005) ..........................................................................1

Fabrice Tourre respectfully submits this memorandum of law in opposition to the SEC's motion, which is styled as a "motion *in limine* to preclude Defendant Fabrice Tourre from offering evidence or argument at trial that he reasonably relied on advice of counsel."[1]

## PRELIMINARY STATEMENT

The SEC's failure to obtain and produce to Mr. Tourre thousands of ACA audio recordings has vividly exposed how deeply flawed was the SEC's investigation into ABACUS 2007-AC1 ("AC1") and its charging decisions pertaining thereto.  Weeks before trial, the SEC's case against Mr. Tourre remains what it has always been—nonsense on multiple levels, a contrivance based on a counterfactual narrative that the SEC has conjured up by weaving together decontextualized snippets of emails, supplemented by the testimony of witnesses who will apparently be testifying under the threat that they will have to endure their own livelihood-threatening enforcement actions if the SEC is dissatisfied with their testimony.

The SEC is now scrambling on multiple fronts to try to shore up this ill-founded case, attempting an unauthorized, unjust and legally unsustainable eleventh-hour change in legal theories, and filing motions *in limine* to try to slant and unfairly limit the evidence the jury will hear.  People whose testimony is inconsistent with the SEC's view of the world are now branded "co-conspirators," and, if the SEC has its way, their testimony will be delivered to the jury through leading questions designed to glide by the gaping holes and contradictions in the SEC's case. This agency that touts sunlight as "the best disinfectant" appears remarkably reluctant to allow the jury to decide this case based on full disclosure of all relevant evidence.[2]

---

[1] The SEC's Memorandum of Law (ECF No. 285) is cited in the format "SEC Mem.," and the exhibits to the Declaration of Bridget M. Fitzpatrick (ECF No. 286) are cited in the format "Fitzpatrick Ex. __". The exhibits to the Declaration of Pamela Rogers Chepiga dated June 7, 2013 are cited in the format "Chepiga Ex. __".

[2] *See*, *e.g.*, "Speech by SEC Acting Chairman: This Year's Proxy Season: Sunlight Shines on Auditor Independence and Executive Compensation," June 25, 2001, available at

This misleadingly titled motion is simply another example of the SEC's tactic. Insofar as the SEC's motion actually seeks the limited relief reflected in its title, *i.e.*, an order precluding Mr. Tourre from arguing that he specifically sought and received legal advice that Paulson's role in portfolio selection did not need to be disclosed, it is moot because Mr. Tourre has no intention of making that argument.

As to the remainder of the relief the SEC seeks, there is no basis whatsoever to preclude Mr. Tourre from explaining to the jury the institutional processes in place at Goldman, including the role of his former co-worker, David Gerst, all of which is directly responsive to the baseless claims and erroneous allegations the SEC has made. The SEC is no doubt correct that this evidence will be "prejudicial" to its case, because it will show the SEC's claims to be utterly meritless. That, however, is a compelling reason to admit the evidence, not to exclude it. The Court should, therefore, deny this ill-founded motion in its entirety.

## BACKGROUND

### A.   Mr. Tourre Made Clear Three Years Ago That Evidence Concerning Goldman's Institutional Processes Is A Key Part Of His Defense

In his Answer filed on July 19, 2010, almost three years to the day before the trial of this action will begin, Mr. Tourre expressly notified the SEC that he intends to argue that he is not liable because, *inter alia*, he made no materially misleading statement or omission, he had no duty to disclose the allegedly omitted information concerning Paulson, and he did not act with scienter or negligently. *See* ECF No. 24 (Answer filed July 19, 2010), at 11. Mr. Tourre specifically notified the SEC that he would support these arguments by showing the jury that:

---

http://www.sec.gov/news/speech/spch502.htm (last visited June 7, 2013) ("For those in the crowd who are securities lawyers, you've no doubt heard the phrase 'sunlight is the best disinfectant.' In other words, full disclosure makes our securities markets fairer and more efficient. I'd like to use my time this morning to prove that this old adage continues to ring true today. . . .").

> The purported claims against Mr. Tourre are based solely on alleged actions and omissions concerning information known to many different Goldman Sachs employees working in various aspects of its business, including Legal, Compliance, sales and trading.  Mr. Tourre, a French citizen and engineer by training, reasonably relied on Goldman Sachs' institutional process to ensure adequate legal review and disclosure of material information, and cannot be held liable for any alleged failings of that process.

*Id.* at 12.  Mr. Tourre again notified the SEC that he intended to present these arguments when he filed his Answer to the Amended Complaint on June 24, 2011, more than two years before trial. *See* ECF No. 94 (Answer to Am. Compl. filed June 24, 2011) at 13-14.

As the materials attached to the SEC's motion make clear, counsel for the SEC and counsel for Mr. Tourre explored these issues through questioning at Mr. Tourre's deposition in February 2011.  *See* Fitzpatrick Ex. D (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 367-68, 371-89.

In the reply brief in support of his motion for partial summary judgment, Mr. Tourre referenced these arguments again, noting that the AC1 offering documents were reviewed by other members of the desk on which Mr. Tourre worked, and by a host of lawyers representing Goldman, ACA and Paulson, none of whom raised any issues concerning the disclosures.  *See* ECF No. 244 (Reply Mem. of F. Tourre in Support of Mot. for Partial Summary Judgment) at 17-18.

**B.   ABACUS 2007-AC1 Was Subjected To Goldman's Usual Institutional Approval Processes, And No One Suggested That Disclosure Of Paulson's Role Was Required**

Mr. Tourre was a member of Goldman's structured products correlation trading desk (the "correlation trading desk").  His job was to develop, structure, trade and hedge synthetic CDOs.  Chepiga Ex. 1 (Dep. Tr. of F. Tourre dated Feb. 17, 2011) at 17-19; Chepiga Ex. 2 (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 369-71.  Mr. Tourre was one of six people who worked on the correlation trading desk, including the desk head, Jonathan Egol, to whom

Mr. Tourre reported.  Chepiga Ex. 1 (Dep. Tr. of F. Tourre dated Feb. 17, 2011) at 19, 29.

Outside the correlation trading desk and above Mr. Egol in seniority were the two managing

directors who co-headed the broader structured products group, David Lehman and Michael

Swenson.  *See id*. at 19.  Above Messrs. Lehman and Swenson was Dan Sparks, a Goldman

partner who headed the firm's mortgage department.  *See id.* at 14, 125.

   David Gerst was also a member of the correlation trading desk.  Before joining

Goldman, Mr. Gerst was an attorney at the law firm McKee Nelson, the correlation trading

desk's principal outside counsel.  *See id.* at 31-32.  While at McKee Nelson, Mr. Gerst had

worked on the majority of the ABACUS transactions and he was intimately familiar with the

transaction documents.  *See id.*  When Mr. Gerst was considering leaving his law firm, Mr.

Tourre arranged for him to interview for a job at Goldman, because Mr. Tourre thought it was a

good idea to have someone with a legal background on the correlation trading desk.  *See id.* at 32;

Chepiga Ex. 2 (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 373.

   There was an informal division of labor among the members of the correlation

trading desk.  While Mr. Tourre and others focused on the risk and economics of the trading

business, Mr. Gerst focused on the documentation and execution of transactions and on liaising

with internal and external counsel.  Chepiga Ex. 1 (Dep. Tr. of F. Tourre dated Feb. 17, 2011) at

30.

   Mr. Tourre knew that offering documents were customarily reviewed by internal

and external counsel and by Goldman's compliance department.  Chepiga Ex. 2 (Dep. Tr. of F.

Tourre dated Feb. 18, 2011) at 381-82. Because it was Mr. Gerst's responsibility to work with

internal and external counsel, Mr. Tourre did not recall at his deposition whether the AC1

offering documents were reviewed in accordance with this usual protocol.  *See id.*

Mr. Gerst testified that, although it would have been customary for the AC1 offering materials to have been reviewed by counsel and by Goldman's compliance group, years after the events, and without having his recollection refreshed by the contemporaneous documents, he did not remember whether they were, in fact, so reviewed.  *See* Fitzpatrick Ex. E (Dep. Tr. of D. Gerst dated Feb. 9, 2011) at 170.   The documentary evidence at trial will show that they were.  Mr. Gerst did not solicit specific advice on whether Paulson's role needed to be disclosed.  He did not, however, think it was necessary to make that disclosure, principally because ACA had selected and signed off on the portfolio.  *See* Fitzpatrick Ex. C (Tr. of Investigative Testimony of D. Gerst dated Jan. 29, 2009) at 66.  Mr. Gerst has no recollection of raising or discussing the potential disclosure issue with Mr. Tourre.  *See* Fitzpatrick Ex. E (Dep. Tr. of D. Gerst dated Feb. 9, 2011) at 212-13.

The AC1 transaction was approved by Goldman's Mortgage Capital Committee and by Goldman's Firmwide Capital Committee.  In addition to Mr. Sparks, the Mortgage Capital Committee consisted of ten senior individuals from Goldman's legal, compliance, credit, controllers, accounting, operations, and middle office functions.  Chepiga Ex. 2 (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 374; Chepiga Ex. 3 (Memorandum to Mortgage Capital Committee dated Mar. 12, 2007); Chepiga Ex. 4 (Memorandum to Firmwide Capital Committee dated Mar. 12, 2007).   Mr. Egol and Mr. Gerst presented the AC1 transaction to the Mortgage Capital Committee.  Mr. Tourre did not participate in that presentation, and indeed did not attend that meeting.  Chepiga Ex. 2 (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 379-80.

In addition to the other six members of the correlation trading desk and the ten members of the Mortgage Capital Committee, the AC1 Mortgage Capital Committee Memorandum was copied to nineteen other Goldman personnel, including the heads of several

business units and representatives from Goldman's legal and compliance departments.  Chepiga Ex. 3 (Memorandum to Mortgage Capital Committee dated Mar. 12, 2007); Chepiga Ex. 2 (Dep. Tr. of F. Tourre dated Feb. 18, 2011) at 377-79.

Through the whole of this rigorous approval process, Mr. Tourre has no recollection that anyone suggested that additional disclosures were required in the AC1 offering documents.  *See id.* at 383.

C.    **No One Outside Goldman Suggested That The AC1 Offering Materials Were Deficient Either**

Just as no one at Goldman raised any question about the adequacy of the disclosures in the AC1 offering materials, none of the people outside Goldman who reviewed those materials raised any issues either.

Paulson was represented in the AC1 transaction by Adam Glass, head of the structured finance and derivatives practice at the global law firm, Linklaters.  Chepiga Ex. 5 (Dep. Tr. of P. Pellegrini dated Mar. 15, 2011) at 262-63; Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011) at 13-14.  Mr. Glass had worked extensively with Paulson since 2005 when Paulson took one of its earliest short RMBS positions, serving as an "adjunct to [Paulson's] in-house counsel, negotiating everything that had to do with structured products."  Chepiga Ex. 5 (Dep. Tr. of P. Pellegrini dated Mar. 15, 2011) at 262-63.  Mr. Glass and his team at Linklaters were "intimately familiar with what [Paulson] did."  *Id.*

Earlier in his career, Mr. Glass clerked on the United States Court of Appeals for the Ninth Circuit, after receiving a J.D. from Stanford Law School in 1981, where he was editor-in-chief of the Stanford Law Review, and an A.B. in Economics from Harvard College in 1978, where he graduated Phi Beta Kappa.  Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011)

6

at 13-14; Chepiga Ex. 7 ("SEC's New Division of Risk, Strategy, and Financial Innovation Adds Experts to Senior Ranks," SEC Release No. 2009-238).

Since November 2009, Mr. Glass has served in a senior role at the SEC, as Co-Chief General Counsel of the Division of Risk, Strategy and Financial Innovation. *See id.* In that role, he has responsibility for, among other things, the formulation of new rules under the Dodd-Frank Act that will regulate structured products in the future. *See id*; Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011) at 13-15.

On February 8, 2007, Linklaters attorneys working under Mr. Glass' supervision reviewed and commented on draft engagement letters between Goldman and Paulson, and between Goldman and ACA, relating to the AC1 transaction. Chepiga Ex. 8 (Email dated Feb. 8, 2007 from B. Sung of Linklaters to P. Pellegrini of Paulson, copying, *inter alia*, A. Glass); Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011) at 36-55. These documents reflected that ACA was being retained "to help select" the AC1 reference portfolio, and that the reference portfolio required the "mutual agreement" of Paulson, Goldman and ACA. Chepiga Ex. 8 at 8. On the draft letters, Linklaters wrote that "PCO's [*i.e.*, Paulson's] involvement should be kept confidential," and that the "Parties should keep PCO's involvement confidential." *Id.* at 11, 23.

On February 9, 2007, Mr. Gerst sent Mr. Glass a draft preliminary termsheet for AC1, which stated that the reference portfolio would be "selected" by ACA. Chepiga Ex. 9 (Email dated Feb. 9, 2007 from D. Gerst to A. Glass and others) at 1; Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011) at 55-57. On Saturday, March 31, 2007, Mr. Pellegrini of Paulson sent the AC1 preliminary offering circular to Mr. Glass at his home email address and at his work email address. Chepiga Ex. 10 (Email dated Mar. 31, 2007 from F. Tourre to P. Pellegrini and others), Chepiga Ex. 11 (Email dated Mar. 31, 2007 from P. Pellegrini to A. Glass and

others).  The preliminary offering circular similarly represented that ACA was the Portfolio

Selection Agent, and that the reference portfolio "will be selected" by ACA.  Chepiga Ex. 10 at i,

ii, 84, 85.

        Mr. Glass recalled participating in a telephone conference on which Mr. Tourre

was also present.  *See* Chepiga Ex. 6 (Dep. Tr. of A. Glass dated May 16, 2011) at 45-48.   As

reflected above, however, Mr. Tourre has no recollection that anyone ever suggested that the

disclosures were deficient.

        The record also reflects that ACA's internal and external counsel at Schulte Roth

& Zabel LLP ("Schulte") reviewed the AC1 offering documents, and that none of them raised

any issue concerning the disclosure that ACA had selected the AC1 reference portfolio.  ACA's

general counsel, Nora Dahlman, signed the engagement letter between Goldman and ACA,

which made clear that ACA's selection of the reference portfolio was "subject to the consent of

the Protection Buyer," *i.e*., the short party.  Chepiga Ex. 12 (Email dated Feb. 26, 2007 from D.

Gerst to ACA employees, attaching engagement letter).  For Goldman, the engagement letter was

signed by partner Dan Sparks, head of the mortgage department.  *See id.*  ACA's internal counsel

reviewed the AC1 preliminary term sheet, and raised no issue concerning the statement that

ACA "selected" the reference portfolio.  Chepiga Ex. 13 (Email dated Feb. 15, 2007 from L.

Schwartz to ACA, attaching the draft AC1 term sheet "as reviewed by [ACA's] counsel and

business sides").   ACA's external counsel at Schulte reviewed the preliminary offering circular,

and provided comments to Goldman's external counsel at McKee Nelson, copying Ms. Dahlman.

Chepiga Ex. 14 (Email dated Mar. 28, 2007 from P. Azzolini, attaching comments of ACA's

counsel to the draft AC1 offering circular).  Neither ACA's internal counsel nor external counsel

raised any comments concerning the disclosure that ACA "selected" the reference portfolio.  *See id*.

## ARGUMENT

**THE COURT SHOULD DENY THE SEC'S EXTRAORDINARY REQUEST TO PRECLUDE MR. TOURRE FROM OFFERING EVIDENCE TO MEET THE SEC'S FALSE FACTUAL ALLEGATIONS**

The SEC's request for an order precluding Mr. Tourre from asserting an advice of counsel defense, *i.e.*, from arguing that he specifically solicited and received legal advice that Paulson's role in portfolio selection did not need to be disclosed, is moot, because Mr. Tourre is advancing no such defense.

Shorn of the irrelevant argument concerning an advice of counsel defense that Mr. Tourre is not asserting, the SEC's brief is devoid of any support for its request to preclude Mr. Tourre from offering evidence about the context in which Mr. Tourre worked and in which the AC1 transaction was done, including Goldman's institutional processes.  That evidence cannot be precluded because, as explained below, and as pleaded in Mr. Tourre's Answer filed in July 2010, it is directly relevant to rebut the SEC's incorrect factual allegations.

At its core, this evidence that the SEC would like to preclude is directly responsive to the centerpiece of the SEC's case—that Mr. Tourre was "principally responsible" for the AC1 transaction.  Under the SEC's theory, that makes Mr. Tourre legally responsible for the allegedly deficient disclosures in Goldman's offering documents, even though the SEC acknowledges that Mr. Tourre only reviewed portions of the offering circular.  *See* Am. Compl. ¶¶ 4, 10, 40, 43.

As described above, the evidence that the SEC would have the Court preclude exposes the nonsense of the SEC's position that Goldman would allow a $1 billion transaction, including decisions as to what disclosure should be made in offering materials, to rest on the

shoulders of a single, relatively junior structurer like Mr. Tourre.  The jury must, therefore, be permitted to understand that the SEC is simply wrong that Mr. Tourre was "principally responsible" for AC1, and that, to the contrary, dozens of people in multiple functions at Goldman, many of them much more senior and much more experienced than Mr. Tourre, reviewed and approved the transaction and the offering documents.

   The SEC argues that Mr. Tourre should be precluded from rebutting the SEC's allegations as to who was "responsible" for the AC1 transaction, on the basis that it does not matter because, according to the SEC, "a corporate executive has 'an independent duty to ensure compliance with disclosure obligations.'"  SEC Mem. at 10 n.2.  The SEC neglects to mention that the case from which it quotes that decontextualized snippet of text concerned claims against the former chief executive officer and chief financial officer of Bank of America, who were being sued over alleged misstatements and omissions in proxy statements they had signed, and who were arguing in their defense, at the motion to dismiss stage, that the Bank's general counsel had approved the non-disclosures.  *See In re Bank of America Corp. Sec., Derivative and ERISA Litig*., No. 09 MD 2058(PKC), 2011 WL 3211472, at *1, *5 (S.D.N.Y. July 29, 2011).  Similarly, in *SEC v. Enterprise Solutions, Inc*., 142 F. Supp. 2d 561 (S.D.N.Y. 2001), the case quoted in *Bank of America*, the defendant was the issuer's chief executive officer, who was being sued over nondisclosures in a registration statement that he had signed.  *See id*. at 565.

   Unlike the defendants in *Bank of America* and *Enterprise Solutions,* Mr. Tourre was not, of course, the chief executive officer or chief financial officer, and he did not sign or authorize the filing of SEC disclosures.  The SEC's cases and the analysis contained in them are completely inapposite to Mr. Tourre and to the arguments he intends to present in this case.

It simply was not Mr. Tourre's role to authorize or sign offering documents, or to make decisions concerning legal and regulatory requirements. Obviously, therefore, Mr. Tourre would not ordinarily be the person soliciting or receiving advice from counsel. Rather, Mr. Tourre would, and did, perform his role as a member of the Goldman institutional process, relying on the knowledge that other people participating in that process attended to legal disclosure issues.

Thus, Mr. Tourre is not arguing that anyone, including Mr. Gerst, affirmatively advised him that the disclosures in the AC1 offering documents were legally sufficient. To the contrary, the relevant fact for someone in Mr. Tourre's position and role is that the people whose positions and responsibilities did involve consideration of questions of legal disclosure did *not* raise any concern.

It is axiomatic that a jury may draw inferences from circumstantial evidence, including, where appropriate, from the fact that an expected event did *not* happen. As the Honorable Frank H. Easterbrook has put it "Sherlock Holmes recognized in *Silver Blaze* that the dog's failure to bark, when barking would have been expected, conveyed a powerful message." *Johnson v. Acevedo*, 572 F.3d 398, 401 (7th Cir. 2009) (holding that an out-of-court statement may be inconsistent with an in-court statement due to a curious omission); *see also United States v. Lopez*, 518 F.3d 790, 798 (10th Cir. 2008) ("But the government reminds us of the logical significance of the dog that didn't bark, and we believe that omission of an expected or customary action, equal to actions themselves, can be of use in assessing whether something is amiss and criminal activity may be afoot."); *United States v. Yannotti*, 415 F. Supp. 2d 280, 291 (S.D.N.Y. 2005) (holding that an absence of evidence that defendant engaged in criminal activity

after a certain date was circumstantial evidence of his withdrawal from a conspiracy, and that to preclude defendant from presenting that argument to the jury would violate due process).

       As explained above, dozens of people inside and outside Goldman were involved in the AC1 transaction, including in the review and approval of the offering documents.  The fact that none of them raised any issue about the transaction or about the disclosures when they would have been expected to do so if they saw a problem is highly probative evidence that there was no problem, that the AC1 offering materials satisfied contemporaneous disclosure standards, and that certainly Mr. Tourre had no reason to think that they were deficient.

       Further, the SEC apparently intends to try to meet its burden to prove materiality by relying on the self-serving *ex post facto* testimony of employees of the alleged victims concerning what they would have liked to know.  *See* ECF No. 192 (SEC's Mem. of Law in Support of its Mot. for Partial Summary Judgment) at 12-14.  Mr. Tourre is clearly entitled to rebut that evidence by offering evidence that none of the dozens of people inside and outside Goldman who reviewed the offering materials, including counsel for Paulson and ACA, contemporaneously thought that Paulson's involvement in portfolio selection was a material fact that needed to be disclosed to investors.  Indeed, Mr. Gerst evidently considered the question such a non-issue that he did not even bother to raise it with Mr. Tourre.  This contemporaneous evidence is far more compelling than the *ex post facto* views of, for example, former ACA employee Laura Schwartz, who, in addition to justifying her own decision to enter into a transaction that turned out badly for ACA, will apparently be testifying in the SEC's case while under threat of enforcement action if the SEC is dissatisfied with her testimony.

       Mr. Tourre is also entitled to present to the jury the above-referenced evidence to rebut the SEC's claims that he acted with the required mental states.   When it evaluates that

question, the jury must be permitted to consider evidence that Mr. Tourre was not the person at Goldman who was responsible for ensuring the adequacy of disclosures in offering documents, that Mr. Tourre knew that there were other people at Goldman whose role did include that responsibility, that Mr. Tourre facilitated the correlation trading desk's hire of a former lawyer because he thought it would be a good idea to have someone with legal skills working on the desk, and that no one inside or outside Goldman raised any issues as to the sufficiency of the AC1 disclosures.

For its claim under Section 17(a)(2) of the Securities Act of 1933, the SEC will need to prove that Mr. Tourre acted at least negligently, *i.e.*, that Mr. Tourre's conduct fell below the standard of care a reasonably careful person in his position would have exercised. *See SEC v. O'Meally*, No. 06 Civ. 6438(LTS)(RLE), 2012 WL 1969300, at *3 (S.D.N.Y. May 30, 2012) (citing *SEC v. Shanahan*, 646 F.3d 536, 545-46 (8th Cir. 2011); *SEC v. Pain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir. 1997)). When it evaluates the question, the jury should be permitted to consider whether the evidence that the SEC would like to preclude shows that the AC1 disclosures met contemporaneous market standards, and whether there is any indication that Mr. Tourre failed to satisfy a duty of care in that regard. *See Shanahan*, 646 F.3d at 545 (holding that "evil must be based on contemporaneous standards," not based on intervening changes in public perceptions about certain practices, or based on a changed regulatory climate).

To prevail on its claim under Section 10(b) of the Securities Exchange Act of 1934, the SEC will need to prove that Mr. Tourre acted with scienter, *i.e.*, with "a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, & n.12 (1976)). To the extent the

SEC seeks to prove scienter on the basis that Mr. Tourre acted recklessly, that requires proof of highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it.  *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012).  The fact that none of the dozens of people who were aware of Paulson's role and reviewed the transaction and the documents saw any issue will be highly relevant to the issue of whether the danger of misleading investors was so obvious that Mr. Tourre must have been aware of it.

To prevail on its claim under Section 20(e) of the Securities Exchange Act of 1934, *i.e.*, the claim that Mr. Tourre aided and abetted Goldman's primary violation of Section 10(b), the SEC will need to prove that Mr. Tourre had actual knowledge of Goldman's primary violation.  *See SEC v. Apuzzo*, 689 F.3d 204, 206, 211 (2d Cir. 2012).  When it evaluates that issue, the jury should be permitted to consider whether Mr. Tourre had actual knowledge that Goldman was committing securities fraud, when Mr. Tourre was aware that Goldman had an institutional process for reviewing and approving transactions, and that no one involved in that process raised any issues with the AC1 transaction.

Finally, the SEC argues that if Mr. Tourre is allowed to refer to the fact that lawyers were involved in the AC1 transaction, the jury will be confused into thinking that he is raising an advice of counsel defense.  The SEC evidently thinks the jury will have a very low confusion threshold, but if, having heard the evidence, the Court considers there is a real risk of confusion, that obviously can be addressed with an appropriate instruction at the time.   The SEC's speculation about possible confusion provides no basis, however, to exclude this highly relevant evidence.

**CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court deny the SEC's motion *in limine* to preclude Defendant Fabrice Tourre from offering evidence or argument at trial that he reasonably relied on advice of counsel.

Dated: June 7, 2013
     New York, New York

                    Respectfully submitted,


                    /s/ Pamela Rogers Chepiga
                    Pamela Rogers Chepiga
                    (pamela.chepiga@allenovery.com)
                    Andrew Rhys Davies
                    (andrew.rhys.davies@allenovery.com)
                    Brandon D. O'Neil
                    (brandon.o'neil@allenovery.com)

                    ALLEN & OVERY LLP
                    1221 Avenue of the Americas
                    New York, New York  10020
                    (212) 610-6300


                    /s/ John P. Coffey
                    John P. Coffey
                    (seancoffey78@gmail.com)
                    LAW OFFICE OF JOHN P. COFFEY
                    1350 Avenue of the Americas, 2nd
                    Floor
                    New York, New York  10019
                    (646) 790-8988

                    *Attorneys for Fabrice Tourre*