```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------------x

 4   SECURITIES AND EXCHANGE COMMISSION,

 5                    Plaintiff,

 6        vs.

 7   FABRICE TOURRE,

 8                    Defendant.

 9   10-CV-3229(BSJ)(MHD)

10   ----------------------------------------x

11

12

13

14        VIDEOTAPED DEPOSITION OF IRA WAGNER

15           Tuesday, February 5, 2013

16               New York, New York

17

18

19

20

21

22

23

24   REPORTED BY:

25   Christina Diaz, CRR, RMR, CSR, CLR
```

Ira Wagner                                                                    February 5, 2013
New York, NY

Page 2

```
 1              February 5, 2013
 2              9:02 a.m.
 3
 4          Videotaped deposition of IRA WAGNER, at
 5   the offices of Allen & Overy, LLP, 1221 Avenue of
 6   the Americas, New York, New York, before Christina
 7   Diaz, a Certified Realtime and Registered Merit
 8   Reporter and Notary Public within and for the State
 9   of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
 3   SECURITIES AND EXCHANGE COMMISSION
 4   Attorneys for Plaintiff
 5       100 F Street, N.E.
 6       Washington, DC 20549
 7   BY:  CHRISTIAN D.H. SCHULTZ, ESQ.
 8       MATTHEW MARTENS, ESQ.
 9       BRIDGET FITZPATRICK, ESQ.
10
11   ALLEN & OVERY, LLP
12   Attorneys for Defendant Fabrice Tourre
13       1221 Avenue of the Americas
14       New York, NY 10020
15   BY:  ANDREW RHYS DAVIES, ESQ.
16       PAMELA ROGERS CHEPIGA, ESQ.
17       BRANDON D. O'NEIL, ESQ.
18
19   ALSO PRESENT:
20       KEVIN MARTH, Videographer
21       ARUN SEN, Navigant Consulting
22
23
24
25
```

Page 4

```
 1              I N D E X
 2   WITNESS
 3   Ira Wagner
 4   EXAMINATION BY                    PAGE
 5   Mr. Rhys Davies              11, 177
 6   Mr. Schultz                  175
 7
 8
 9
10
11          E X H I B I T S
12      (Exhibits attached to transcript)
13   WAGNER      DESCRIPTION           PAGE
14   Exhibit 1   Expert Report of Ira      10
15              Wagner, December 20, 2012
16   Exhibit 2   Rebuttal Report of Ira    10
17              Wagner, January 18, 2012
18   Exhibit 3   E-mail string beginning   34
19              with e-mail dated 11/8/2006
20              bearing Production Nos.
21              GS MBS-3 7672496 through 97
22   Exhibit 4   Declaration of Jörg       36
23              Zimmermann, three pages
24
25
```

Page 5

```
 1          E X H I B I T S (Continued)
 2   WAGNER      DESCRIPTION           PAGE
 3   Exhibit 5   Excerpt from The Financial   60
 4              Crisis Inquiry Report,
 5              three pages
 6   Exhibit 6   Wall Street Journal       63
 7              Article entitled Abacus
 8              Deal:  As Bad as They Come,
 9              four pages
10   Exhibit 7   Transcript of Scott Eichel   64
11              dated May 3, 2010, 31 pages
12   Exhibit 8   E-mail dated 1/15/07       74
13              bearing Production No. SEC
14              6443286
15   Exhibit 9   E-mail dated 1/19/07 with   75
16              attachment bearing Production
17              Nos. SEC 6459332 through
18              6459345
19   Exhibit 10  E-mail string beginning with  79
20              e-mail dated 6/1/07 with
21              attachment bearing Production
22              Nos. SEC 7844825 through
23              7844916
24
25
```

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                      February 5, 2013
New York, NY

---

Page 6

```
1            E X H I B I T S (Continued)
2     WAGNER        DESCRIPTION              PAGE
3     Exhibit 11   E-mail string beginning with   81
4                  e-mail dated 6/6/07 with
5                  attachment bearing Production
6                  Nos. SEC 7855367 through
7                  7855424
8     Exhibit 12   E-mail dated 1/9/07 with      86
9                  attachment bearing Production
10                 Nos. SEC 1062119 through
11                 1062120
12    Exhibit 13   E-mail string beginning with   90
13                 e-mail dated 1/23/07 with
14                 attachment bearing Production
15                 Nos. SEC 1066745 through
16                 1067322
17    Exhibit 14   CIFG Assurance North          95
18                 America, Inc. vs. J.P. Morgan
19                 Securities, LLC, Complaint,
20                 46 pages
21    Exhibit 15   E-mail dated 3/5/07 with      104
22                 attachment bearing Production
23                 Nos. SEC 7076055 through
24                 7076070
25
```

Page 8

```
1            E X H I B I T S (Continued)
2     WAGNER        DESCRIPTION              PAGE
3     Exhibit 20   Record of Recommendation,   145
4                  Date of Decision:  3/27/07
5                  bearing Production Nos. SEC
6                  9181746 through 9181760
7     Exhibit 21   Record of Recommendation,   147
8                  Date of Decision:  3/27/07
9                  bearing Production Nos. SEC
10                 09767689 through 09767703
11
12
13
14         INFORMATION REQUESTS
15    INSERTED INFORMATION        - NONE -
16    INSTRUCTIONS TO CERTIFY     - NONE -
17    RULING:            - NONE -
18    REQUESTS FOR PRODUCTION     - NONE -
19
20
21
22
23
24
25
```

Page 7

```
1            E X H I B I T S (Continued)
2     WAGNER        DESCRIPTION              PAGE
3     Exhibit 16   CDO Asset Management       107
4                  Proposal for ACA CLO
5                  2007-2, Commitments
6                  Committee, February 12,
7                  2007 bearing Production
8                  Nos. SEC 6480405 through
9                  6480407
10    Exhibit 17   E-mail string beginning with  113
11                 e-mail dated 6/29/07 with
12                 attachment bearing Production
13                 Nos. SEC 222080 through
14                 222088
15    Exhibit 18   E-mail dated 6/26/07 with   116
16                 attachment bearing Production
17                 Nos. SEC 6662708 through
18                 6662980
19    Exhibit 19   E-mail string beginning with  118
20                 e-mail dated 4/5/07 with
21                 attachment beginning with page
22                 bearing Production No. SEC
23                 3426345
24
25
```

Page 9

```
1            S T I P U L A T I O N S
2
3         IT IS HEREBY STIPULATED AND AGREED,
4     by and between counsel for the respective parties
5     hereto, that the filing, sealing and certification
6     of the within deposition shall be and the same are
7     hereby waived;
8
9         IT IS FURTHER STIPULATED AND AGREED that
10    all objections, except as to the form of the
11    question, shall be reserved to the time of the
12    trial;
13
14        IT IS FURTHER STIPULATED AND AGREED that
15    the within deposition may be signed before any
16    Notary Public with the same force and effect as if
17    signed and sworn to before this court.
18
19
20
21
22
23
24
25
```

3 (Pages 6 to 9)

Ira Wagner                                                          February 5, 2013

New York, NY

---

Page 10

1                I. Wagner
2          (Wagner Exhibit 1, Expert Report of Ira
3     Wagner, December 20, 2012, was marked for
4     identification)
5          (Wagner Exhibit 2, Rebuttal Report of
6     Ira Wagner, January 18, 2012, was marked for
7     identification)
8          THE VIDEOGRAPHER:  Good morning.  This
9     marks the start of tape labeled number one of
10    the videotaped deposition of Mr. Ira Wagner
11    in the matter of the Securities and Exchange
12    Commission versus Fabrice Tourre in the
13    United States District Court for the Southern
14    District of New York.
15         The deposition today is being held in
16    the offices of Allen & Overy at 1221 Avenue
17    of the Americas in New York, New York on
18    February 5, 2013 at approximately 9:02 a.m.
19         My name is Kevin Marth.  I'm the legal
20    videographer today representing Alderson
21    Reporting.  Our court reporter today is Miss
22    Christina Diaz also representing Alderson.
23         At this time, will counsel please
24    identify themselves for the record.
25         MR. RHYS DAVIES:  Andrew Rhys Davies;

---

Page 11

1                I. Wagner
2     Allen & Overy, representing Mr. Tourre.
3          MR. O'NEIL:  Brandon O'Neil; Allen &
4     Overy, also representing Mr. Tourre.
5          MS. CHEPIGA:  Pamela Chepiga; Allen &
6     Overy, also representing Mr. Tourre.
7          MR. SCHULTZ:  Christian Schultz,
8     representing the Securities and Exchange
9     Commission.
10         MR. MARTENS:  Matthew Martens for the
11    Securities and Exchange Commission.
12         MS. FITZPATRICK:  Bridget Fitzpatrick
13    for the Securities and Exchange Commission.
14         THE VIDEOGRAPHER:  At this time, will
15    the court reporter please swear in the
16    witness and we may proceed.
17    I R A   W A G N E R,
18         having been duly sworn by a Notary
19    Public, was examined and testified as
20    follows:
21    EXAMINATION
22    BY MR. RHYS DAVIES:
23         Q.   Mr. Wagner, let me ask you about your
24    experience in structured finance collateralized
25    debt obligations.  That's experience that you

---

Page 12

1                I. Wagner
2     gained as a senior banker and then a senior
3     managing director at Bear Stearns; is that right?
4          A.   In CDOs, that was what I focused on at
5     Bear Stearns.  I joined Bears Stearns as a managing
6     director.  I was promoted to senior managing
7     director in 1998, yes.
8          And my prior experience before joining
9     Bear Stearns was also in structured finance and
10    securitizations.
11         Q.   And when were the first structured
12    finance CDOs done, to your recollection?
13         A.   They were done in the late '80s at
14    Drexel.  I believe that was a first wave of CDOs.
15    And they continued after that.
16         Q.   The CDOs that were done in the late '80s
17    at Drexel, were those CDOs that were collateralized
18    by structured finance instruments?
19         A.   No.
20         Q.   When were the first CDOs that were
21    collateralized by structured finance instruments
22    done?
23         A.   The first ones of those were in the very
24    late '90s, I believe, '98, '99.
25         Q.   So after you had joined Bear Stearns?

---

Page 13

1                I. Wagner
2          A.   After I had joined Bear Stearns, yes.
3          Q.   What is Bear Stearns?
4          A.   I guess it might be what was Bear
5     Stearns.  But it was a large investment bank
6     that -- a US broker-dealer.  Did all types of
7     institutional investment banking, trading, sales,
8     structuring securities, originations, et cetera.
9          Q.   It was an investment bank like Goldman
10    Sachs?
11         A.   Yes.
12         Q.   And you said, I guess it may be what was
13    Bear Stearns.
14         What do you mean by that?
15         A.   Well, Bear Stearns was taken over in
16    March of 2008 by JPMorgan.  It entered into a
17    crisis, I believe a liquidity crisis, and was
18    rescued by JPMorgan.
19         Q.   Do you know what caused the liquidity
20    crisis that led to Bear Stearns being rescued by
21    JPMorgan?
22         MR. SCHULTZ: Objection.  Foundation.
23         A.   I mean, a liquidity crisis is when
24    people are not willing to lend to the company.
25         I don't have the specifics of what was

---

4 (Pages 10 to 13)

Ira Wagner                                                                February 5, 2013
New York, NY

| Page 14 | Page 16 |
|---|---|

**Page 14**

I. Wagner

1
2      in their decision-making to do that.
3      BY MR. RHYS DAVIES:
4          Q.   In addition to Bear Stearns, how many
5      dealers were in the CDO business in the period 2000
6      through 2007?
7          A.   There were certainly more than ten.
8      Just about every major dealer worked in the CDO
9      space certainly.
10         Q.   And was Citigroup one of those dealers?
11         A.   Citigroup was a dealer, yes.
12         Q.   UBS?
13         A.   UBS, yes.
14         Q.   And Merrill Lynch?
15         A.   Merrill, yes.
16         Q.   Credit Suisse?
17         A.   Credit Suisse, yes.
18         Q.   Deutsche Bank?
19         A.   Deutsche Bank was a dealer, yes.
20         Q.   RBS?
21         A.   RBS did CDOs.
22         Q.   Goldman Sachs?
23         A.   Yes, they did CDOs.
24         Q.   Morgan Stanley?
25         A.   Yes.

**Page 15**

I. Wagner

1
2          Q.   Lehman Brothers?
3          A.   Yes.
4          Q.   Bank of America?
5          A.   Yes.
6          Q.   JPMorgan?
7          A.   Yes.
8          Q.   And was there a group of other dealers
9      that were involved in the CDO space that had
10     smaller market shares?
11             MR. SCHULTZ:  Objection.  Form.
12     Foundation.
13         A.   Were there other dealers that had
14     smaller market shares, yes.
15     BY MR. RHYS DAVIES:
16         Q.   And in that group, would you agree
17     Barclay's was a member of that group?
18         A.   I don't know whether I would put
19     Barclay's in the lower tier or upper tier.  They
20     were certainly another large dealer.
21         Q.   Calyon?
22         A.   Calyon did make an effort in the CDO
23     space.  I don't remember the years.  I probably
24     wouldn't consider them in the same vein as some of
25     the others you have mentioned.

**Page 16**

I. Wagner

1
2          Q.   How about Wachovia?
3          A.   Wachovia, they did some larger amounts
4      of CDOs.
5          Q.   SocGen?
6          A.   SocGen did some.  I mean, you can look
7      up -- there are rankings of issuance for each year.
8      I don't know where each of these rank.  But that's
9      certainly a way to look at relative size and market
10     share.  They changed from year to year.
11         Q.   What was Bear Stearns' share of the CDO
12     market, if you recall?
13         A.   I don't recall exactly.  I think we were
14     certainly -- we were always in the top ten; in some
15     years we were much higher.  Certainly in the top
16     five in many years in the 2000s.
17         Q.   Do you have a recollection of what the
18     market share was that Bear Stearns had?
19         A.   I do not.
20         Q.   Do you know who Scott Eichel is?
21         A.   Yes, I do.
22         Q.   Who is Mr. Eichel?
23         A.   He was a trader at Bear Stearns.
24         Q.   He was co-head of the mortgage
25     department?

**Page 17**

I. Wagner

1
2          A.   I don't know if that was his title or
3      not.
4          Q.   Was a senior person at Bear Stearns?
5          A.   He was a senior person in fixed income,
6      yes.
7          Q.   Are you aware that Mr. Eichel gave an
8      interview to the Financial Crisis Inquiry
9      Commission in May of 2010?
10         A.   I am not aware of his interview, no.
11         Q.   If I told you that Mr. Eichel told the
12     FCIC that synthetic CDOs were not Bear Stearns core
13     business practice, would you agree with that?
14             MR. SCHULTZ:  Objection.  Foundation.
15         A.   I'm not sure I would agree with that.
16     BY MR. RHYS DAVIES:
17         Q.   Do you recall testifying in another
18     case, US Bank against Barclays Bank, that Bear
19     Stearns did probably ten or twelve synthetic ABS
20     CDOs?
21         A.   I don't recall if that was Bear Stearns
22     or that I may have worked personally on them.  So
23     I'm not sure.  I would have to read the testimony
24     again.
25         Q.   Sitting here today, do you recall how

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

| Page 18 | Page 20 |
|---|---|

**Page 18**

I. Wagner

2 many synthetic CDOs Bear Stearns did?

3     A.  I don't have a number on the tip of my

4 fingers, no.

5     Q.  Do you think it may have been ten to

6 twelve?

7     A.  I think it was more than that.

8     Q.  Do you know how many more?

9     A.  I don't.  And if you get into what is a

10 synthetic CDO and which ones are they, I mean,

11 there are synthetics of corporate securities which

12 Bear Stearns did dozens of.  There are hybrid CDOs

13 which included synthetics in them which we did a

14 lot of.  So I just don't know how many more than

15 twelve.  I would say a lot more than twelve.

16     Q.  Let me ask you about synthetic CDOs

17 collateralized by residential mortgage-backed

18 securities.

19     A.  Okay.

20     Q.  How many CDOs of that character did Bear

21 Stearns do?

22     A.  Is it where the collateral included CDS

23 or it was entirely CDS?

24     Q.  Entirely synthetic CDOs collateralized

25 by RMBS.

**Page 19**

I. Wagner

2     A.  I don't know.  I'd say somewhere

3 probably the ten area.  Something like that.

4     Q.  How many of those had static portfolios?

5     A.  Static portfolios, I don't remember.

6     Q.  And what was your role in connection

7 with the ten or twelve CDOs that you referenced?

8     A.  Again -- well, the synthetics in RMBS

9 largely began to take place in 2005 and afterwards.

10 Really, it was a 2006 phenomena into the beginning

11 of 2007.

12         During that time I ran the CDO group.  I

13 was a banker that ran the CDO group.  I did work

14 personally on several of them as well.  Typically I

15 would be involved, particularly when there was an

16 innovation or a new type of transaction which these

17 were, so that, you know, I would take part in the

18 structuring and many of the issues that came up.

19         Now tell me again your specific

20 question.  I'm sorry.

21     Q.  I asked, what was your role in

22 connection with the ten or twelve synthetic CDOs

23 collateralized by RMBS?

24     A.  Well, so I think that was it.  I worked

25 hands-on on several of them.  And then supervised

**Page 20**

I. Wagner

2 the group that put them together on all of them.

3     Q.  You referenced getting involved in many

4 of the issues that came up.  What were the issues

5 that came up when there were innovations in

6 synthetic CDOs?

7     A.  I mean, they're quite numerous.  You

8 know, you had to figure out how the CDS would work;

9 how it fit into the structure.  Among the issues

10 were -- you had to be certain, for example, if

11 there was a credit protection payment due on the

12 CDS, how did the CDO achieve liquidity to do that.

13 And there were a variety of ways to figure that

14 out.

15         The firm -- generally the CDS

16 counterparty in these structured finance CDOs was

17 the underwriting dealer.  There were issues that

18 affected the dealer in terms of -- was collateral

19 required by the dealer in the -- for the CDS that

20 they were entering into?  When did it have to be

21 posted?  What were the conditions?  There were just

22 really innumerable issues to figure out to get

23 these together.

24     Q.  How many cash CDOs did Bear Stearns put

25 together that were collateralized by RMBS?

**Page 21**

I. Wagner

2     A.  Again, I don't have a specific number.

3 Certainly dozens, I would think.

4     Q.  So did Bear Stearns do more cash CDOs

5 than synthetic CDOs?

6     A.  Well, again, we did cash CDOs for longer

7 because that was the nature of the market.  I mean,

8 synthetic RMBS CDOs really didn't come into play,

9 like I said, until the 2005-'06 and after period.

10         So any CDOs before that would have been

11 cash.  I mean, I don't have the total of cash and

12 for what years versus synthetic.  But I would say

13 we were active in each of those sectors when those

14 sectors were active in being issued.

15     Q.  In the period 2006-2007, how many RMBS

16 CDOs, cash or synthetic, did Bear Stearns put

17 together?

18     A.  Again, I would say more than ten.

19 Perhaps more than twenty.  I just don't have the

20 deal list at this point.

21     Q.  Do you know what the notional amount of

22 those CDOs combined was?

23     A.  I would just be guessing.  I don't know.

24     Q.  Do you know how those deals have

25 performed for the long investors?

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 22

1           I. Wagner
2     A.  I don't have any firsthand knowledge of
3 how they performed, no.
4           MR. SCHULTZ:  Can we take a break for a
5     quick second.  We have lost our feed.
6           THE VIDEOGRAPHER:  Going off the record
7     at 9:14 a.m.
8           (Recess)
9           THE VIDEOGRAPHER:  We are back on the
10    record at 9:18 a.m.
11          MR. RHYS DAVIES:  Can we have the last
12    question and answer read back, please.
13          (Record read)
14 BY MR. RHYS DAVIES:
15    Q.  You don't know whether the long
16 investors who bought notes in Bear Stearns issued
17 RMBS CDOs in 2006-2007 have suffered a complete
18 write-down in their principal?
19          MR. SCHULTZ:  Objection.  Foundation.
20    A.  Could you say the question again.
21 BY MR. RHYS DAVIES:
22    Q.  My question relates to long investors
23 who bought notes in Bear Stearns CDOs,
24 collateralized by RMBS in 2006-2007.
25          My question is:  Do you know whether

Page 23

1           I. Wagner
2 those investors have suffered a complete write-down
3 in their principal?
4           MR. SCHULTZ:  Objection.  Foundation.
5     A.  I don't know the specific performance of
6 any of the transactions, no.
7 BY MR. RHYS DAVIES:
8     Q.  Generally, do you know the performance
9 of the transactions?
10    A.  Of the Bear Stearns transactions or of
11 CDO transactions generally?
12    Q.  The Bear Stearns CDOs collateralized by
13 RMBS.
14    A.  I don't know the specifics of the
15 performance of the Bear Stearns CDOs, no.
16    Q.  We've marked as Wagner Exhibits 1 and 2,
17 copies of your expert report dated December 20,
18 2012 and your rebuttal report dated January 18,
19 2012.
20          Referring you to your CV that's at the
21 back of your initial report, Exhibit 1.
22    A.  Yes.
23    Q.  You said that at Bear Stearns you
24 supervised a team of 40, including bankers,
25 structurers and distribution professionals,

Page 24

1           I. Wagner
2 correct?
3     A.  Yes.
4     Q.  And could you tell us, what are the
5 roles of each of those three groups of people:
6 bankers, structurers and distribution
7 professionals?
8     A.  Certainly.
9         The bankers were the people that
10 generally were responsible for the execution, the
11 completion of the transaction.  So they would -- a
12 team of bankers would be assigned to each CDO.
13 They would handle the day-to-day work involved in
14 putting the CDO together, working with the rating
15 agencies, working with the various outside third
16 parties as well.  Arrange for everything to take
17 place that needed to take place at the right times.
18 Would review all the documents for the transaction,
19 comment on them, work through issues that came up.
20         The structurers are the people that ran
21 the models for the CDOs.  So the structurers would
22 work with the collateral constraints and other
23 characteristics.  They would have an understanding
24 of how the rating agencies would evaluate the
25 structure and would develop the various sizes of

Page 25

1           I. Wagner
2 the tranches that would be issued.  They would do
3 cash flow analysis for the transactions.  They
4 would do the analysis that the rating agencies
5 required, and respond to other inquiry for
6 structural cash flows perhaps from investors, from
7 traders, from others.
8         The distribution team, there were a
9 number of people that were involved in what we
10 called new issue distribution.  So they maintained
11 relationships and dialogue with principal investors
12 in the market.  They would be both kind of
13 distribution for the product generally, where they
14 would be educating investors about CDOs, about
15 different offerings in the market.  They would also
16 try to identify interest in particular types of
17 CDOs or classes of CDOs.  And then they would be
18 involved when a transaction was being marketed in
19 coordinating the specific marketing of a CDO,
20 generally with investors directly as well as with
21 the sales force.
22    Q.  Was there some reason to have a separate
23 group of people who you classify as distribution
24 professionals having the interactions with
25 investors?

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 26

1           I. Wagner
2      A.   Was there a reason for it?  Well, there
3  was continuing dialogue.  I think there was enough
4  work to do, so that outside of an individual
5  transaction, the distribution people would have a
6  good understanding of what different investors were
7  looking for at a particular point in time.  And
8  that dialogue was ongoing.
9           Again, we did a large number of CDOs, so
10 there was room for someone to specialize in doing
11 that.
12     Q.   Is there some reason that you wouldn't
13 have the bankers or the structurers carrying out
14 this distribution work that you described?
15     A.   Well, the bankers would typically be
16 involved with the distribution of an individual
17 transaction that they were working on.
18          But, again, there were many different
19 types of transactions.  So it made sense to both
20 have the banker be available and participate in the
21 distribution of that specific transaction, but that
22 a small professional team would also generally know
23 and be in contact with investors on a regular basis
24 about the product.
25     Q.   When you described the role of the

Page 27

1           I. Wagner
2  bankers, you referred to being in contact with
3  outside third parties.
4           What did you mean by that?
5      A.   Well, a CDO has a large number of third
6  parties who participate in the transaction.
7  There's the collateral manager, of course.  And
8  there's a trustee.  There are, again, the
9  attorneys.  There is outside -- and that's
10 generally outside counsel.  There's the manager's
11 counsel, the trustee's counsel.  There's some audit
12 work that's done confirming some of the cash flows
13 and numbers that are in the prospectus.  So there
14 is a fairly large number of people outside of the
15 firm that are involved in each transaction.  And
16 the banking team again is responsible for getting
17 to the -- getting everyone to the finish line on
18 time.  And they do that.  They coordinate that.
19     Q.   What was the role of the outside
20 attorneys that you mentioned?
21     A.   The outside attorneys would be the
22 principal drafters of the transaction documents.
23 The principal documents -- the principal operative
24 documents of the transaction would generally be a
25 bond indenture, a collateral management agreement.

Page 28

1           I. Wagner
2  If there were synthetics, there would be, you know,
3  the various swap documents as well.  And then the
4  attorneys would also draft the offering circular,
5  the preliminary offering circular and the final
6  offering circular for each transaction.
7      Q.   When you were senior managing director
8  at Bear Stearns in the year 2006, what was your
9  salary and bonus?
10          MR. SCHULTZ:  Objection.  Relevance.
11     Foundation.
12     A.   My salary, and I think the salary of all
13 senior managing directors, I believe was $250,000.
14 I really don't remember my 2006 bonus.
15          In any event, I'm not really sure how to
16 characterize it, because a lot of it was in
17 deferred compensation.  And as you might imagine,
18 deferred compensation at Bear Stearns didn't prove
19 to have value over the long run, so... But I don't
20 remember.
21 BY MR. RHYS DAVIES:
22     Q.   You have no recollection of what your
23 2006 bonus was?
24     A.   It was -- it was several million
25 dollars.  But I don't recall.  And a lot of that I

Page 29

1           I. Wagner
2  never received.
3      Q.   When you say "several million dollars,"
4  what do you mean by that?
5      A.   More than one.  I'm not sure I remember
6  specifically.
7      Q.   You say it was more than one.  Do you
8  think it was more than ten?
9      A.   It was definitely not more than ten.
10     Q.   So it was between one and ten.  Can you
11 narrow it down any more than that?
12     A.   Yes.  It was between two and four, I
13 think.  Something like that.
14     Q.   And same question for the year 2007,
15 your salary and bonus?
16     A.   The salary was the same.  2007, it was
17 between one and two, I think.
18     Q.   Referring you to Exhibit 1, to your
19 opening report.  This is the list of documents that
20 you considered in forming your opinions in this
21 case; is that right?
22     A.   Yes.  Yes, it is.
23     Q.   When were you first contacted to become
24 an expert witness in this case?
25     A.   I think it was late in the spring of

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013
New York, NY

Page 30

1              I. Wagner
2    2010.
3        Q.   2010?
4        A.   I think so.
5        Q.   Do you remember what month?
6        A.   I'm thinking maybe June. May or June.
7    I'm not sure.
8        Q.   When did you review the materials listed
9    in Exhibit 1 to your opening report?
10       A.   I reviewed the investigative testimony
11   and exhibits in the fall of that year. And then I
12   think the depositions and exhibits were, you know,
13   somewhere after they were done, which I think was
14   in -- generally in the spring of 2011.
15       Q.   Looking at Wagner Exhibit 2, which is
16   your rebuttal report.
17       A.   Yes.
18       Q.   There is an Exhibit 1 there, too, is
19   that correct, which lists additional documents that
20   you considered in formulating your opinions in your
21   rebuttal report?
22       A.   Yes. In addition to everything that was
23   already listed, that's correct.
24       Q.   Besides the documents listed in Exhibit
25   1 to your opening report and Exhibit 1 to your

Page 31

1              I. Wagner
2    rebuttal report, have you considered any other
3    documents in coming to your opinions in this case?
4        A.   No.
5             MR. SCHULTZ: Objection. Form.
6    Foundation.
7        A.   These are the ones I relied on.
8    BY MR. RHYS DAVIES:
9        Q.   One of the documents that you identify
10   in Exhibit 1 to your opening report is the SEC's
11   complaint and its amended complaint. Is that
12   right?
13       A.   Yes. I read both.
14       Q.   Have you assumed that the statements in
15   the complaint and the amended complaint are
16   accurate for purposes of formulating your opinions?
17       A.   No. I don't think I did that.
18       Q.   Now, your understanding is that IKB was
19   one of the two purchasers of the Abacus notes; is
20   that right?
21       A.   My understanding is IKB made the
22   investment recommendation technically. I don't
23   believe it was IKB that invested.
24       Q.   Have you seen any deposition testimony
25   from any current or former employee of IKB?

Page 32

1              I. Wagner
2             MR. SCHULTZ: Objection. Foundation.
3        A.   I believe what I listed was what I saw,
4    which I think was the declaration of IKB -- or of
5    Zimmermann. That's what I saw.
6    BY MR. RHYS DAVIES:
7        Q.   That's all you've seen in terms of
8    evidence from IKB?
9             MR. SCHULTZ: Objection. Form.
10       A.   The two things I listed here, I think.
11   The declaration and the record of recommendation
12   were two things that I had from IKB.
13   BY MR. RHYS DAVIES:
14       Q.   Now, one of the opinions you have
15   expressed in your opening report is that you
16   consider it unlikely that Abacus would have been
17   completed if potential collateral managers and
18   investors knew of Paulson's interest and
19   involvement in the transaction; is that correct?
20            And I can direct you to paragraph 77.
21       A.   77?
22       Q.   77.
23       A.   Okay. Yes. That's the opinion I state
24   there.
25       Q.   And that's because, first of all, you

Page 33

1              I. Wagner
2    read the testimony of the ACA witnesses and you
3    conclude that it's unlikely that ACA would have
4    agreed to serve as portfolio selection agent if the
5    company understood Paulson's interest in Abacus; is
6    that right?
7        A.   That was what was in their testimony.
8    That's one of the things I considered in arriving
9    at that opinion. Not the only thing; but, yes.
10       Q.   What else did you consider?
11       A.   I considered -- I mean, first of all, I
12   considered the general experience I had in the CDO
13   market, and communication and knowledge of how
14   investors looked at CDOs through the many years
15   that I worked on it. So I think as a general
16   matter I thought about how CDO investors evaluate
17   transactions.
18            Then we had the specific testimony of
19   Laura Schwartz and Alan Roseman who both stated
20   that they would not have participated. And in
21   Zimmermann's declaration, he also comes to a
22   similar conclusion, I believe.
23       Q.   You have a statement in paragraph 78 of
24   your report where you write: "Goldman knew that
25   IKB's interest was contingent on finding an

Ira Wagner                                                           February 5, 2013
New York, NY

Page 34

1              I. Wagner
2    acceptable collateral manager."
3           Do you see that sentence?
4       A.   Let me just get to it.  Yes.
5       Q.   You write, "This is evident from an
6    e-mail chain among Jonathan Egol and Michael Nartey
7    of Goldman and Jörg Zimmermann of IKB."
8       A.   Yes.
9           MR. RHYS DAVIES:  Let's mark as the next
10   exhibit that e-mail chain.
11          (Wagner Exhibit 3, E-mail string
12       beginning with e-mail dated 11/8/2006 bearing
13       Production Nos. GS MBS-3 7672496 through 97,
14       was marked for identification)
15   BY MR. RHYS DAVIES:
16       Q.   If I understand it correctly,
17   Mr. Wagner, you are quoting in your report the
18   sentence which appears in the e-mail on November 8,
19   2006 at 12:20 a.m., where Mr. Zimmermann writes:
20   "To make this project a success, we need to work
21   with a manager already well known at IKB"?
22       A.   I mean, that's the sentence there.  I
23   refer to the whole chain.  But that is the sentence
24   there.
25       Q.   What makes you think that this e-mail

Page 35

1              I. Wagner
2    chain relates to the Abacus 2007-AC1 transaction?
3       A.   Well, I think it relates to the idea of
4    the AC1 transaction.  I mean, clearly the AC1 is
5    not specifically mentioned here.  And it wasn't
6    marketed or issued until later in, namely, early
7    2007.  But much of what's in here refers to a
8    structure and a type of security that by and large
9    is what Abacus was, I think.
10       Q.   Directing you to the first e-mail, which
11   is at the bottom of the chain, the November 7, 2006
12   e-mail at 8:15 a.m.  It begins -- this is from
13   Jonathan Egol to Michael Nartey.  "Michael,
14   regarding the managed synthetic program."
15          Do you know what the managed synthetic
16   program was?
17       A.   I don't know specifically what Goldman's
18   managed synthetic program was, no.
19       Q.   Do you know who Michael Nartey is?
20       A.   Only from reading these materials.
21       Q.   Fabrice Tourre is not on this e-mail
22   chain at all, correct?
23       A.   No, he is not.
24       Q.   And you did not read Michael Nartey's
25   deposition transcript; is that right?

Page 36

1              I. Wagner
2       A.   If I didn't list it, I don't think I
3    read it.
4           MR. RHYS DAVIES:  You referred a moment
5    ago to Mr. Zimmermann's declaration.  Let's
6    mark that as the next exhibit.
7           (Wagner Exhibit 4, Declaration of Jörg
8       Zimmermann, three pages, was marked for
9       identification)
10   BY MR. RHYS DAVIES:
11       Q.   Is this the declaration you were
12   referring to a moment ago?
13       A.   Yes, it is.
14       Q.   And in your rebuttal report you have
15   referenced this declaration as demonstrating the
16   importance of disclosure of Paulson's participation
17   to IKB; is that correct?
18       A.   Could you point me in the rebuttal
19   report what you are referring to?
20       Q.   Certainly.  It's the rebuttal report,
21   paragraph 11.
22       A.   And could you repeat the question.
23       Q.   My question was, in your rebuttal report
24   you've referenced Mr. Zimmermann's declaration as
25   demonstrating the importance of disclosure of

Page 37

1              I. Wagner
2    Paulson's participation to IKB?
3       A.   Yes.
4       Q.   Would you agree with me that this
5    declaration is somewhat short and perfunctory?
6           MR. SCHULTZ:  Objection.  Form.
7       A.   I'm not familiar with what would
8    generally be in a declaration.  It seems to cover
9    what is needed to me.
10   BY MR. RHYS DAVIES:
11       Q.   What do you mean when you say "it seems
12   to cover what is needed"?
13       A.   It explains -- if you read through it,
14   it talks about what he did, what his roles were.
15   Some of his understanding.  I mean, if you look,
16   you can go point by point as to what this is about.
17          It says in 8 what he understood about
18   the transaction, et cetera.
19          Number twelve begins where he has been
20   asked to consider:  "Whether with respect to AC1,
21   it would have been important or relevant for me to
22   have known that a single hedge fund manager that
23   bought protection on 100 percent of the reference
24   portfolio of the AC1 deal played a significant role
25   together with ACA in the process of selecting the

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                        February 5, 2013
New York, NY

Page 38

I. Wagner
1
2    AC1 reference portfolio.  Such facts, if true, and
3    if I had known of them at the time of the AC1
4    transaction, would have undermined my confidence in
5    ACA's process of selecting the AC1 reference
6    portfolio.  Therefore I would not have supported
7    the AC1 transaction."
8          So I think it covers what someone would
9    need to know about this from his perspective.
10       Q.  So in paragraph twelve it appears that
11   Mr. Zimmermann is being asked to consider a
12   hypothetical question; is that right?
13         MR. SCHULTZ:  Objection.  Form.
14       A.  I guess there is an element of this
15   being a hypothetical question, I think that's true.
16   BY MR. RHYS DAVIES:
17       Q.  Have you seen any testimony from
18   Mr. Zimmermann in which he is questioned about what
19   means in his statements in this declaration?
20       A.  No, I have not.
21       Q.  Do you know what Mr. Zimmermann meant
22   when he referred to "a significant role" in
23   paragraph 12?
24         MR. SCHULTZ:  Objection.  Foundation.
25       A.  I don't have firsthand knowledge of what

Page 39

I. Wagner
1
2    he meant, no.  But I think the words are fairly
3    straightforward.
4    BY MR. RHYS DAVIES:
5        Q.  Do you know what Mr. Zimmermann was told
6    that caused him to express the views in this
7    declaration?
8        A.  No, I do not.
9        Q.  Do you think it would be helpful to you
10   in evaluating his declaration to know what he was
11   told?
12       A.  If it was given to me, I would certainly
13   consider it.
14       Q.  And if you learned that some of the
15   facts that Mr. Zimmermann was told were not
16   correct, would that undermine your confidence on
17   relying on his declaration?
18       A.  From my review of the record, I don't
19   see facts in his declaration that weren't correct.
20   If there were facts that were identified that
21   weren't correct, I would again consider them.
22       Q.  By the way, referring you to paragraph 6
23   of Mr. Zimmermann's declaration, do you see there
24   that it says that it was in early 2007 that Goldman
25   showed IKB the Abacus 2007-AC1 transaction?

Page 40

I. Wagner
1
2        A.  Yes.
3        Q.  And taking you back to Exhibit 3, do you
4    see this e-mail chain that we looked at earlier is
5    dated November 2006?
6        A.  These e-mails are from, yes, November of
7    2006.
8        Q.  Does that cause you to question whether
9    this e-mail chain, Exhibit 3, relates to the Abacus
10   2007-AC1 transaction?
11         MR. SCHULTZ:  Objection.  Form.
12       A.  No.
13   BY MR. RHYS DAVIES:
14       Q.  Do you know whether Mr. Zimmermann is
15   correct that it was in early 2007 that Goldman
16   showed IKB the Abacus 2007-AC1 transaction?
17       A.  Well, I believe it's correct.  I mean,
18   there's continuing dialogue with IKB that I
19   believe -- about the portfolio of AC1 in e-mail
20   chains that I think were in February of 2007.  So I
21   think that qualifies as early 2007.
22       Q.  Have you ever seen any e-mail chains
23   relating to the Abacus 2007-AC1 transaction dating
24   from November 2006?
25       A.  That specifically mention AC1 in

Page 41

I. Wagner
1
2    November of 2006?
3        Q.  Yes.
4        A.  I had not seen any that specifically
5    mention AC1, no.
6        Q.  Do you know Jörg Zimmermann?
7        A.  I may have met him, but I don't recall
8    specifically.
9        Q.  When do you think you may have met him?
10       A.  Somewhere after 2005 or '06, but, you
11   know, we would have -- we certainly met people from
12   IKB.  I just don't recall if I met him individually
13   or not.
14       Q.  Have you spoken with him about this
15   case?
16       A.  Oh, no.
17       Q.  Have you spoken with any other current
18   or former IKB employee about this case?
19       A.  No, I have not.
20       Q.  You have not reviewed any deposition
21   testimony from a director of Loreley Financing,
22   correct?
23       A.  I have not, no.
24       Q.  Mr. Wagner, you have opined that the
25   empirical analyses that Dr. Bajaj and Dr. Cox have

11 (Pages 38 to 41)

Ira Wagner                                          February 5, 2013
New York, NY

Page 42

1              I. Wagner
2    performed is flawed; is that correct?
3        A.   I would like to look at the report. But
4    I think I did characterize there as being flaws,
5    yes.
6        Q.   Let's look at your rebuttal report,
7    specifically paragraphs 41 and 42.
8        A.   Okay.
9        Q.   Let me ask you, first of all, have you
10   conducted any empirical analysis of the RMBS
11   tranches in the Abacus 2007-AC1 reference
12   portfolio?
13       A.   No, I have not. That was not my role.
14       Q.   You were not asked to conduct that
15   analysis?
16       A.   No.
17       Q.   Have you conducted any empirical
18   analysis of the loan pools that made up the RMBS
19   that were referenced in the Abacus 2007-AC1
20   portfolio?
21       A.   No, I did not.
22       Q.   In paragraph 41 of your rebuttal report,
23   you say that it's not relevant to compare the RMBS
24   in the Abacus reference portfolio with other Baa2
25   rated subprime RMBS from the 2006-2007 period; is

Page 43

1              I. Wagner
2    that right?
3        A.   Well, I disagree with their analysis,
4    because I think they were trying to show -- they
5    were trying to say, as I understood their reports,
6    whether Abacus performed in line with RMBS
7    generally. And my point is, I don't think that
8    comparison was the relevant comparison to make.
9        Q.   You think the relevant comparison is to
10   look at the Abacus portfolio versus the portfolios
11   of other RMBS CDOs that you think had portfolio
12   characteristics similar to Abacus?
13       A.   I think that would be a more relevant --
14   a significantly more relevant analysis to look at
15   than just comparing it to the market generally.
16       Q.   And that's the analysis that you have
17   set forth in paragraph 42 of your rebuttal report?
18       A.   I set forth an example of an analysis
19   that would be that type of analysis, that was a
20   research piece that was done that -- that I think
21   that type of analysis would be more relevant. And
22   I talked about what was found in that one, yes.
23       Q.   So what you have set forth in paragraph
24   42 and in Exhibit 2 to your rebuttal report is an
25   example of that sort of analysis?

Page 44

1              I. Wagner
2        A.   Of something that -- if I were going to
3    try and address those questions -- that I might
4    look at, yes, that I would consider.
5        Q.   But you have not yourself addressed
6    those questions?
7        A.   What do you mean by that?
8        Q.   Well, you said that the -- that what you
9    have described in paragraph 42 in Exhibit 2 is an
10   example of the sort of analysis that could be done?
11       A.   It's an example, and with results of a
12   way of looking at how a CDO might have performed
13   versus other CDOs. I think it's a reasonable
14   approach to take, yes.
15       Q.   Other than looking at the Wachovia
16   study, you have not performed that kind of analysis
17   yourself?
18       A.   No. That was not my role in this.
19       Q.   And if I understand paragraph 42 of your
20   rebuttal report and Exhibit 2 correctly, what you
21   have done is to compare Abacus against 42 other
22   CDOs; is that correct?
23       A.   What I tried to do, to make it as fair
24   -- to try and make it a fair and reasonable
25   comparison, was to look at CDOs with similar rating

Page 45

1              I. Wagner
2    scores and similar times of issuance. Because if
3    you were to look through that list, which is much
4    larger, they had many more vintages of issuance.
5    They had what are called high-grade deals as well
6    as mezzanine deals, so they had deals that were
7    backed largely by AAA or AA securities which didn't
8    seem relevant. So I just tried to pick a range of
9    time and rating scores that would seem to be
10   relevant to Abacus.
11           I think -- any other analysis would
12   actually, I think, have made Abacus look worse. I
13   think the average amount of downgrades with the
14   larger universe in that report would have been
15   lower than what's here.
16       Q.   And what this comparison does is to
17   compare the exposure of Abacus to downgraded
18   securities as of February 4, 2008 against these
19   other CDOs; is that correct?
20       A.   It looks at how many assets -- yes, how
21   many securities in each CDO portfolio were
22   downgraded as of that date.
23       Q.   Downgraded by the ratings agency?
24       A.   Correct. By Moody's or S&P.
25       Q.   What is the significance of February 4,

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                          February 5, 2013

New York, NY

Page 46

1              I. Wagner
2    2008 as a reference date here?
3        A.   I believe they published this report
4    periodically.  And that was the date that I used.
5    That was nine months -- approximately nine months
6    after, I think.  And the plaintiff's -- I'm sorry,
7    the defendant's experts talk about this as well, as
8    you get further into time, there was just an
9    overwhelming amount of losses and distress in these
10   securities.  And it becomes harder to distinguish
11   performance as you move further out in time.  I
12   didn't look at dozens of these, but I had this one
13   available, the February 4th.
14       Q.   You said there was an overwhelming
15   amount of losses.  You mean there were overwhelming
16   losses on all the CDOs issued in 2006-2007 that
17   were collateralized by subprime RMBS?
18           MR. SCHULTZ:  Objection.  Foundation.
19       A.   No.  The losses on the RMBS themselves.
20   BY MR. RHYS DAVIES:
21       Q.   You mean there were overwhelming losses
22   on all the RMBS that were originated in 2006-2007?
23       A.   I mean, I hesitate to use --
24           MR. SCHULTZ:  Objection.  Foundation.
25       A.   -- the word "all."  But in general the

Page 47

1              I. Wagner
2    market of RMBS, particularly subprime issued in
3    those years, performed very poorly.
4    BY MR. RHYS DAVIES:
5        Q.   So what is the significance of choosing
6    a date of February 4, 2008, which as you said, is
7    about nine months after issuance of the Abacus
8    transaction?
9            MR. SCHULTZ:  Objection.  Form.
10       A.   I think I was looking to somewhere -- a
11   reasonable amount of time after Abacus was issued
12   but not -- if you were to look three years down the
13   road, eventually most of these deals would likely
14   converge to virtually all of the underlying assets
15   being downgraded, I think.  In terms of what
16   actually happened.
17           And then, you know, Dr. Bajaj talks
18   extensively about ex post analysis not really being
19   useful or valid for these purposes.  Although he
20   does it anyway.  But at some point I think you have
21   to -- if you are going to look forward, you have to
22   pick a point.  You have to pick a point to do it.
23   I thought nine months was certainly reasonable.
24   BY MR. RHYS DAVIES:
25       Q.   And why did you think that was

Page 48

1              I. Wagner
2    reasonable?
3        A.   I think it was enough time that people
4    were beginning to understand that there was
5    distress in the market and that securities got
6    downgraded as their performance was deteriorating.
7            So in that period, these securities were
8    downgraded to a greater extent.  Their performance
9    appeared to be going worse than others in others of
10   these portfolios.  Eventually they might catch up.
11       Q.   And so is it your conclusion that the
12   Abacus securities were downgraded more quickly than
13   the securities in the other CDOs that you have
14   listed in Exhibit 2?
15       A.   That's what the numbers show, yes.
16       Q.   Do you draw a conclusion from that, that
17   you intend to offer as an opinion in this case?
18       A.   I think my conclusion is more really
19   what I said here, which is that I don't think it
20   was relevant to compare Abacus to the RMBS market
21   generally.  I think it would be more relevant to
22   think about how CDOs were put together and what CDO
23   portfolios looked like and how one CDO performs
24   versus another.
25           I mean, I think that's my principal

Page 49
`
1              I. Wagner
2    point of this section E.
3        Q.   What analysis did you perform to
4    determine that the other CDOs on this Exhibit 2 are
5    comparable to Abacus?
6        A.   I looked at the time of issuance, and I
7    considered mostly the rating scores of those deals,
8    given that the rating scores that I listed are the
9    Baa category of Moody's.  It would be anywhere from
10   Baa1 to Baa3.  So I think that was most relevant.
11           It excluded some deals that had higher
12   numbers which mean lower-rated collateral, as well
13   as deals that had lower rating scores, which would
14   be the high-grade collateral.  Because I think the
15   most relevant comparison would be essentially
16   mezzanine Baa quality portfolios one to the other.
17       Q.   Do you know how many of the -- that the
18   42 CDOs on this list, excluding Abacus, had static
19   portfolios?
20       A.   I do not.
21       Q.   Did you do any analysis to determine how
22   many individual securities are in the reference
23   portfolios of all these 42 CDOs?
24       A.   I did not.
25       Q.   So do you know how many of these

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013
New York, NY

Page 50

1                I. Wagner
2    securities were Baa2 rated subprime RMBS?
3        A.    Well, I know the average score, and that
4    these were in the RMBS category.  So -- but I don't
5    know specifically each of the underlying
6    portfolios.  That's not generally publicly
7    available information.
8        Q.    Directing your attention to the CDO
9    that's at the end of your list, Sorin CDO VI.
10       A.    Yes.
11       Q.    What do you know about the reference
12   portfolio of that CDO?
13       A.    I'm not familiar with the reference
14   portfolio, other than that it's weighted average
15   rating score is 307 -- or was 307.
16       Q.    If I told you that just over 2 percent
17   of the reference portfolio was subprime RMBS, would
18   you think that that CDO is meaningfully comparable
19   with the Abacus 2007-AC1 CDO?
20            MR. SCHULTZ:  Objection.  Foundation.
21       A.    Are you telling me that -- do you know
22   what the rest of the portfolio -- I mean, I would
23   have to know what the rest of the portfolio is.
24   BY MR. RHYS DAVIES:
25       Q.    Let me ask you to assume for a moment

Page 51

1                I. Wagner
2    that 2 percent of the reference portfolio was
3    subprime RMBS.  My question is:  Would you then
4    regard Soren CDO 6 as a meaningful comparison with
5    Abacus?
6            MR. SCHULTZ:  Objection.  Form.
7    Foundation.
8        A.    I think I would just have to know more
9    about what the rest was.
10   BY MR. RHYS DAVIES:
11       Q.    Directing your attention to one of the
12   CDOs that's listed about halfway down the list of
13   Exhibit 2, Gulf Stream Atlantic CDO 2007-1.
14       A.    Yes.
15       Q.    What do you know about the reference
16   portfolio of that CDO?
17       A.    Again, I know from what was quoted as
18   the rating score.
19       Q.    Let me ask you to assume that 47.89
20   percent of that reference portfolio consisted of
21   AAA-rated securities.  And let me ask you, based on
22   that assumption would you think that that CDO is
23   meaningfully comparable with Abacus 2007-AC1?
24            MR. SCHULTZ:  Objection.  Foundation.
25       A.    I would like to look at the whole

Page 52

1                I. Wagner
2    portfolio.  But I myself tried to exclude what I
3    thought were high-grade deals from this analysis.
4    BY MR. RHYS DAVIES:
5        Q.    Did you do any work to examine the rate
6    at which the Baa2 rated subprime RMBS in any of
7    these CDOs was downgraded?
8        A.    No.
9        Q.    Mr. Wagner, have you provided testimony
10   to any regulator concerning the work of your group
11   at Bear Stearns?
12       A.    Not that I -- no.  Not that I recall.
13       Q.    Not to the SEC?
14       A.    No.  No.
15       Q.    Not to the New York State Attorney
16   General's office?
17       A.    No.
18       Q.    Have you testified to any other federal,
19   state or foreign regulator concerning your work at
20   Bear Stearns?
21       A.    No.
22       Q.    Have you given any interviews to any of
23   those types of regulators that I just mentioned?
24       A.    I mean, I'm not sure they're a
25   regulator.  I had -- I think gave you the quote.  I

Page 53

1                I. Wagner
2    had a call with the FCIC.
3        Q.    And have you testified in any private
4    civil actions or arbitrations arising out of the
5    work of your group at Bear Stearns?
6        A.    I testified at a FINRA arbitration.
7        Q.    When was that?
8        A.    I think it was in 2006 or '07.
9        Q.    What do you recall about that
10   arbitration?
11       A.    It was an investor arbitration.
12   Honestly, I don't recall that much more about it.
13       Q.    Do you recall what sort of claim was
14   being made?
15       A.    I don't know.
16       Q.    This was a claim that an investor was
17   making against Bear Stearns?
18       A.    Yes.
19       Q.    And do you recall the outcome of that
20   arbitration?
21       A.    I actually don't know.
22       Q.    You referred to the interview that you
23   provided to the Financial Crisis Inquiry
24   Commission.
25            Do you recall that that was on April 20,

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                          February 5, 2013

New York, NY

---

Page 54

```
1                I. Wagner
2   2010?
3       A.  I don't recall the specific date.
4       Q.  Do you remember being questioned by the
5   staff of the FCIC about the Abacus 2007-AC1
6   transaction?
7       A.  I think that was the call that we talked
8   a bit about it.  That was what the call was about.
9       Q.  That was the purpose of the call, to ask
10  you about the Abacus 2007-AC1 transaction?
11      A.  Yes.
12      Q.  Do you recall that the SEC had filed
13  this case just a few days before you gave your
14  interview to the FCIC?
15      A.  I think so.
16      Q.  Mr. Wagner, you read the financial
17  press?
18      A.  (Nodding affirmatively).
19      Q.  Which are the publications that you
20  read?
21      A.  I mean, I generally read the Wall Street
22  Journal and The New York Times.
23      Q.  Do you recall that the financial press
24  was writing about little else in that time period?
25      A.  Yes.
```

Page 55

```
1                I. Wagner
2       Q.  Do you recall telling the FCIC staff
3   that the Paulson & Co. hedge fund had approached
4   your group at Bear Stearns to do the Abacus
5   2007-AC1 transaction?
6       A.  I mean, I don't recall -- I mean, if
7   it's what's in the material, then I think I said
8   it.  But if I could -- if that's what's in the --
9   if that's what's in their writing.  I mean, I don't
10  remember the specifics of the conversation, but...
11      Q.  While you were at Bear Stearns, did you
12  attend a meeting with representatives of the
13  Paulson & Co. hedge fund?
14      A.  I think I did, yes.
15      Q.  And when was that?
16      A.  2006 or '07.  I don't really remember
17  more specifically than that.
18      Q.  What do you recall about that meeting?
19      A.  I think it was one meeting.  And I think
20  it was several people from Bear Stearns.  And I
21  believe it was Mr. Pellegrini.  I think there was a
22  second person from Paulson, although I don't
23  remember who.  And they talked about what they were
24  looking to do.  And we listened, and that was the
25  meeting.
```

Page 56

```
1                I. Wagner
2       Q.  And you don't recall who the second
3   person from the Paulson hedge fund was?
4       A.  I don't.
5       Q.  Was it Brad Rosenberg?
6       A.  I don't know.
7       Q.  Was it Sihan Shu?
8       A.  I just don't know.  I'm sorry.
9       Q.  What do you recall the people from the
10  Paulson hedge fund telling you about what they were
11  looking to do?
12      A.  I think that it was that they wanted to
13  create a CDO where they were going to short and
14  choose the shorts for an entire portfolio.  And
15  they wanted to have a CDO issued that would
16  essentially be the long position for their short
17  position.
18      Q.  Who else was at the meeting from Bear
19  Stearns?
20      A.  I'm not sure.  There were some people
21  from the trading desk, I think, but I'm not sure
22  specifically who.  There would have been the
23  salesperson that covered Paulson, but I don't --
24  I'm not sure who that was.
25      Q.  Do you recall that Joe Evenchick was
```

Page 57

```
1                I. Wagner
2   there?
3       A.  He might have been.
4       Q.  Do you recall that Scott Eichel was
5   there?
6       A.  He might have been.  I just don't know.
7       Q.  Do you recall that Jeff Hingst was
8   there?
9       A.  Jeff Hingst.  He was a salesperson.  I
10  mean, that could be the salesperson that was there;
11  but, again, I'm not sure.
12      Q.  So you testified that the people from
13  the Paulson hedge fund said that they wanted to
14  create a CDO where they were going to short and
15  choose the shorts for an entire portfolio, and they
16  wanted a CDO issued that would essentially
17  be the long position for their short position.
18  Correct?
19      A.  I testified that.  And in many ways I'm
20  paraphrasing.  I don't remember exactly the words
21  they used.  But that was the transaction that was
22  being talked about by them and described.
23      Q.  Do you recall anything else that the
24  Paulson & Co. representatives said at that meeting?
25      A.  No.
```

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013
                           New York, NY

Page 58

1              I. Wagner
2       Q.   Do you recall any discussion about how
3   the reference portfolio for the CDO they were
4   discussing would be selected?
5       A.   Again, only that they were going to
6   select it.
7       Q.   Was there any discussion about what
8   types of RMBS the Paulson & Co. fund would be
9   intending to select for this portfolio?
10      A.   I just don't remember.
11      Q.   Do you recall any discussion about
12  whether the Paulson & Co. hedge fund would consider
13  buying equity in the CDO that they were discussing?
14      A.   I'm not sure.
15      Q.   Do you recall telling the FCIC that Bear
16  Stearns declined to participate in this
17  transaction?
18      A.   Again, if that's what's quoted there.
19  Something to that extent, yes.
20      Q.   Who at Bear Stearns decided not to
21  participate in this transaction?
22      A.   I think it was a consensus among the
23  people in the group, including myself.
24      Q.   Why did Bear Stearns make that decision?
25      A.   My own view was that it was a conflict

Page 59

1              I. Wagner
2   of interest that needed to be disclosed.  And I
3   thought that it would be very unlikely that -- with
4   that disclosure that someone would purchase it.
5           There were certainly also, you know,
6   reputational aspects of, "Is this the type of deal
7   you want to do?"  But those were among the reasons.
8       Q.   And, again, I'm sorry if I asked this,
9   but do you recall when this meeting was?
10      A.   I just -- 2006 or '07.  I just don't --
11  I couldn't give you anything more specific.
12      Q.   Did you take any notes while you were at
13  the meeting that you have been testifying about
14  with the representatives of the Paulson hedge fund?
15      A.   I don't think so.
16      Q.   Did you have a discussion after the
17  meeting with your colleagues at Bear about the
18  meeting that you had?
19      A.   Yes.
20      Q.   Was that an in-person discussion?
21      A.   Yes.
22      Q.   Did you have any e-mail discussions with
23  your colleagues at Bear Stearns about the meeting?
24      A.   Not that I know of.
25           MR. RHYS DAVIES:  Let's mark as the next

Page 60

1              I. Wagner
2   exhibit an extract from the FCIC inquiry
3   report.
4           (Wagner Exhibit 5, Excerpt from The
5   Financial Crisis Inquiry Report, three pages,
6   was marked for identification)
7   BY MR. RHYS DAVIES:
8       Q.   Exhibit 5 consists of the front cover of
9   the FCIC inquiry report together with pages 192 and
10  193 and page 589, which has the footnote referenced
11  on page 192.
12      A.   Okay.
13      Q.   Mr. Wagner, directing your attention to
14  the bottom of page 192, you will see there that
15  there is a reference to the SEC charging Goldman
16  Sachs with fraud in connection with the Abacus
17  2007-AC1 transaction?
18      A.   Yes.
19      Q.   And then at the top of page 193, you
20  will see that there is a paragraph that describes
21  the interview that you gave to the FCIC.
22           And let me ask you to read that to
23  yourself for a moment.
24      A.   (Witness reading document).
25           Okay.

Page 61

1              I. Wagner
2       Q.   You will see that footnote 27, which is
3   at the very end of that paragraph, it's on page
4   589.  And it refers to Ira Wagner interview by
5   FCIC, April 20, 2010.
6       A.   Yes.
7       Q.   Does that refresh your recollection that
8   that was the date on which you spoke with the FCIC?
9       A.   I presume this is correct.  I don't know
10  if it was, but I imagine that was the date.
11      Q.   Mr. Wagner, this paragraph at the top of
12  page 193 says that you described as ridiculous the
13  argument that Paulson's alleged involvement in
14  selecting the Abacus portfolio was immaterial.
15           Is that a reflection of what you said to
16  the FCIC in April of 2010?
17      A.   I presume they quoted me.  I don't know.
18  I certainly did not agree with the contention that
19  it was immaterial.
20      Q.   It also reflects that you told the FCIC
21  that the structure encouraged Paulson to pick the
22  worst assets.
23           Do you recall saying that to the FCIC on
24  April 20, 2010?
25      A.   Again, I don't know if they correctly

                                        16 (Pages 58 to 61)

Ira Wagner                                                        February 5, 2013

New York, NY

Page 62

I. Wagner

1        I. Wagner
2    quoted me or not.  I didn't listen to a tape of it.
3    It seems consistent with what I thought about the
4    transaction.
5        Q.   Finally, this paragraph reflects that
6    you told the FCIC that having short investors
7    select the reference collateral was a serious
8    conflict?
9        A.   I think it is, yes.
10        Q.   Is that a view you expressed to the FCIC
11    in April 20, 2010?
12        A.   Whether I said exactly those words or
13    not -- I don't know if they quoted the interview
14    correctly.  But it's in line with what I thought.
15        Q.   But these were views that you held as of
16    April 20, 2010?
17        A.   Yes.
18        Q.   A moment ago we were discussing the
19    Wachovia report from February of 2008.
20        Do you recall that?
21        A.   Yes.
22        Q.   When you wrote your rebuttal report,
23    what caused you to think of the February 2008
24    Wachovia report?
25        A.   Well, I was thinking about -- I mean, my

Page 63

I. Wagner

1        I. Wagner
2    reaction again to the Bajaj report -- and I think
3    Dr. Cox does some similar analysis.  And I thought
4    that -- as I stated, I just didn't think comparing
5    the performance of the CDO portfolio to RMBS
6    generally was relevant.  And I thought of some
7    material that I had that might have suggested
8    another type of approach to it, and that was the
9    Wachovia article.
10        Q.   How did the Wachovia article first come
11    to your attention; do you recall?
12        A.   I think in materials that I had received
13    from the SEC, that there was some articles that
14    they had given me, and that was one of them.
15        MR. RHYS DAVIES:  Let's mark the next
16    exhibit.
17        (Wagner Exhibit 6, Wall Street Journal
18        Article entitled Abacus Deal:  As Bad as They
19        Come, four pages, was marked for
20        identification.)
21    BY MR. RHYS DAVIES:
22        Q.   We have marked as Wagner Exhibit 6 an
23    article from the Wall Street Journal dated April
24    20, 2010.
25        A.   Yes.

Page 64

I. Wagner

1        I. Wagner
2        Q.   My question is, was the first time that
3    the Wachovia February 2008 report came to your
4    attention, when it was referenced in the Wall
5    Street Journal the day that you testified at the
6    FCIC?
7        A.   I don't recall seeing this reference at
8    that time, no.
9        Q.   But you do read the Wall Street Journal?
10        A.   Yes.
11        MR. RHYS DAVIES:  Why don't we take ten
12    minutes.
13        THE VIDEOGRAPHER:  This marks the end of
14    tape number one.  We are going off the record
15    at 10:15 a.m.
16        (Recess)
17        (Wagner Exhibit 7, Transcript of Scott
18    Eichel dated May 3, 2010, 31 pages, was
19    marked for identification.)
20        THE VIDEOGRAPHER:  This marks the start
21    of tape number two.  We are back on the
22    record at 10:27 a.m.
23    BY MR. RHYS DAVIES:
24        Q.   We have marked as Wagner Exhibit 7 a
25    transcript of an interview by Scott Eichel at the

Page 65

I. Wagner

1        I. Wagner
2    FCIC on May 3, 2010.  And as the front page of the
3    document reflects, this is a transcript that Allen
4    & Overy has prepared based on the MP3 file that's
5    available on the FCIC's website.
6        Mr. Wagner, let me ask you to turn to
7    page 16 of this transcript -- actually, I guess
8    it's page 17.  About halfway down the page.
9        You haven't listened to Mr. Eichel's
10    interview recording before, have you?
11        A.   No.  I've never seen this or heard it.
12        Q.   And when I asked you earlier, you didn't
13    recall whether Mr. Eichel was at the meeting with
14    Paulson?
15        A.   I did not recall, no.
16        Q.   I want to refer you to the section in
17    the middle of page 17 where Mr. Eichel to the FCIC,
18    describing a meeting with the Paulson firm, says, I
19    don't think it was a secret to anybody that he was
20    looking to place a short on the housing market or
21    the subprime market.
22        Do you see that section of text?
23        MR. SCHULTZ:  Objection.  Form.
24    Foundation.
25        A.   I see it.

Ira Wagner                                                         February 5, 2013

New York, NY

Page 66

```
1              I. Wagner
2    BY MR. RHYS DAVIES:
3        Q.  Let me ask you about the meeting with
4    the Paulson firm that you were testifying about
5    earlier.
6            Does this refresh your recollection that
7    at that meeting Mr. Pellegrini or someone else from
8    the Paulson firm was clear about Paulson's
9    intention to place a short on the housing market or
10   the subprime market?
11       A.  I don't recall them talking about their
12   strategy generally.  I recall it more in the
13   context of the transaction that they wanted to do.
14       Q.  Let me ask you to turn to page 19 of
15   this same document.  Let me ask you to focus on the
16   text beginning on line 6 where Mr. Eichel says, "He
17   left us with the impression of, because of
18   previous, you know, uh, interactions with them that
19   they would either want our help to select the worst
20   possible deals or that I just had the impression
21   that he would select the worst possible deals."
22           Does this refresh your recollection
23   about the meeting that you described earlier with
24   representatives of the Paulson firm?
25           MR. SCHULTZ:  Objection.  Form.
```

Page 67

```
1              I. Wagner
2    Foundation.
3        A.  It doesn't add anything to what I said
4    earlier, no.
5    BY MR. RHYS DAVIES:
6        Q.  Is it consistent with your recollection
7    of the meeting that you were describing earlier?
8            MR. SCHULTZ:  Same objections.
9        A.  I mean, it doesn't -- it almost says he
10   just doesn't really remember what they said.  So I
11   don't find it terribly enlightening, I guess.
12   BY MR. RHYS DAVIES:
13       Q.  Let me ask you to turn to page 22 of
14   this transcript.  At the top of the page, beginning
15   on line 4, where the transcript reflects Mr. Eichel
16   saying, "In this particular transaction, once
17   again, is the impression that I had that, you
18   know, Paulson would be selecting the assets to
19   perform as poorly as they can."
20           Does this refresh your recollection as
21   to what was said at the meeting you were testifying
22   about earlier?
23           MR. SCHULTZ:  Objection to form and
24   foundation.
25       A.  It doesn't add anything, no.
```

Page 68

```
1              I. Wagner
2    BY MR. RHYS DAVIES:
3        Q.  Is it consistent with your recollection
4    of what was said at that meeting by representatives
5    of the Paulson firm?
6        A.  I mean, I think it's generally
7    consistent.  I mean, he is really saying it's the
8    impression he had.  I'm not sure he is saying
9    whether Paulson said any of this specifically or
10   not.
11       Q.  Do you remember where the meeting took
12   place?
13       A.  I think it was on the floor I worked on,
14   but that's really about it.
15       Q.  It was at Bear Stearns?
16       A.  At Bear Stearns, yes.
17       Q.  Do you know whether anyone from the Bear
18   Stearns' side took notes of the meeting?
19       A.  I don't know.
20       Q.  Mr. Wagner, would you agree that as of
21   the end of the meeting with the Paulson firm that
22   took place sometime in 2006 or 2007 you had formed
23   a view that this was not an appropriate transaction
24   that they were proposing to do?
25           MR. SCHULTZ:  Objection to form.
```

Page 69

```
1              I. Wagner
2        A.  You are asking when I formed that
3    opinion or that I formed it at -- you're asking if
4    I formed it at the end of that meeting?
5    BY MR. RHYS DAVIES:
6        Q.  Yes.
7        A.  I think after the meeting my view was
8    that it was -- that there was a conflict that would
9    need to be disclosed, yes.
10       Q.  Had you formed the view that it was
11   inappropriate for a short investor to have
12   involvement in portfolio selection for a CDO?
13           MR. SCHULTZ:  Objection to form.
14       A.  I generally had that view.  I don't know
15   if I formed it immediately after or not.  I
16   certainly found it questionable, I thought, as the
17   motivating reason to a CDO.
18   BY MR. RHYS DAVIES:
19       Q.  Was there any discussion at the meeting
20   with the Paulson firm about whether their
21   involvement -- proposed involvement or interest
22   would be disclosed in connection with the
23   transaction they were proposing?
24       A.  I don't remember.  I don't think we
25   would have discussed it in a face -- in the
```

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                          February 5, 2013

New York, NY

Page 70

1          I. Wagner
2  face-to-face meeting at that time.
3      Q.  Had you concluded that the transaction
4  was inappropriate regardless of whether Paulson's
5  role and involvement would be disclosed?
6      A.  I don't remember specifically.
7      Q.  Bear Stearns decided not to participate
8  in this proposed transaction, correct?
9      A.  We did not do one, no.
10     Q.  Was that because you had determined that
11 it was an inappropriate transaction to be proposed?
12     A.  I think it wasn't my only -- necessarily
13 my decision.  It was -- again, I think there was
14 discussion and a consensus for these various
15 reasons that it wasn't something that we were going
16 to pursue.
17     Q.  Was the consensus at Bear Stearns that
18 it was an inappropriate transaction that was being
19 proposed?
20         MR. SCHULTZ:  Objection to form.
21     A.  I mean, it wasn't a meeting with minutes
22 and like, let's write a conclusion.  But I think
23 that was among the reasons that we did not.
24 BY MR. RHYS DAVIES:
25     Q.  And that was a view that you and your

Page 71

1          I. Wagner
2  colleagues formed based on the meeting that you had
3  with the Paulson representatives?
4      A.  I think it was based on responding to
5  their inquiry, yes.
6      Q.  Did you notify any regulator after the
7  meeting that Paulson was proposing to do a
8  transaction that you thought was inappropriate?
9          MR. SCHULTZ:  Objection to form.
10     A.  I did not.
11 BY MR. RHYS DAVIES:
12     Q.  Did you notify Bear Stearns' legal or
13 compliance department that Paulson had proposed
14 doing a transaction that you considered to be
15 inappropriate?
16         MR. SCHULTZ:  Objection to form.
17     A.  I did not.
18 BY MR. RHYS DAVIES:
19     Q.  When you gave your interview to the
20 FCIC, were you represented by counsel?
21     A.  I was not.
22     Q.  Do you have a transcript of your
23 interview with the FCIC?
24     A.  I do not.
25     Q.  How many CDO or CLO transactions did

Page 72

1          I. Wagner
2  Bear Stearns do with ACA as the collateral manager?
3      A.  Probably five or six, I think.
4  Something like that.
5      Q.  And those transactions were done by your
6  team at Bear Stearns?
7      A.  Yes.
8      Q.  Did Bear Stearns do other CDO
9  transactions in which ACA was not the collateral
10 manager but provided financial guarantee insurance?
11     A.  I don't think so, no.
12     Q.  In addition to the five or six CDO or
13 CLO transactions that Bear Stearns did with ACA as
14 the collateral manager, were there other
15 transactions that were worked on but that did not
16 ultimately close?
17     A.  With ACA?
18     Q.  Yes.
19     A.  I'm not aware of any.
20     Q.  Do you know who David King is?
21     A.  Yes, I do.
22     Q.  He was a senior person at Bear Stearns?
23     A.  He worked for a private equity investing
24 ARM.  I think it was overall part of Bear Stearns,
25 but it was very much a separate unit.

Page 73

1          I. Wagner
2      Q.  It was separate from your business area?
3      A.  And fixed income generally, I think.
4      Q.  But it was part of Bear Stearns?
5      A.  I believe it was.
6      Q.  Do you recall that Mr. King sat on the
7  board of ACA?
8      A.  I knew that, yes.
9      Q.  Do you know why a Bear Stearns employee
10 was sitting on the board of ACA?
11     A.  Well, I think it was -- the private
12 equity money that he managed invested in ACA.
13     Q.  Bear Stearns was ACA's largest
14 shareholder; isn't that correct?
15         MR. SCHULTZ:  Objection to form and
16 foundation.
17     A.  I don't know technically who was the
18 shareholder.  I believe it was within these funds.
19 And then who were the investors in the funds, I
20 don't know.
21         But I believe that investment entity
22 made a significant investment in ACA.
23 BY MR. RHYS DAVIES:
24     Q.  Do you recall the size of the
25 investment?

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                    February 5, 2013
New York, NY

Page 74

1            I. Wagner
2       A.   I think it was -- it may have been 170
3   million.  I think it was more than $100 million, I
4   believe.
5       Q.   Did Bear Stearns introduce investors to
6   ACA?
7       A.   What type of investors or for what
8   purpose?  Maybe you could be more specific.
9       Q.   Let me show you a document.
10      A.   Okay.
11           (Wagner Exhibit 8, E-mail dated 1/15/07
12      bearing Production No. SEC 6443286, was
13      marked for identification)
14  BY MR. RHYS DAVIES:
15      Q.   Exhibit 8 is a one-page document with a
16  Bates stamp SEC 06443286.
17      A.   Yes.
18      Q.   Mr. Wagner, this is an e-mail from a Kim
19  Leslie Shafer to Laura Schwartz and others, copied
20  to, among others, you; is that correct?
21      A.   Yes.
22      Q.   Who is Kim Leslie Shafer?
23      A.   She was a banker in the CDO group that
24  reported to me.
25      Q.   In the first e-mail in this string, the

Page 75

1            I. Wagner
2   one at 1635 on January 15th, do you see that Laura
3   Schwartz writes to Kim Leslie Shafer:  "We are
4   seeing a proposal from another investment bank on a
5   LCDS CDO.  Did you see the one Airlie did with
6   Lehman?  Airlie is any investor you introduced to
7   us, I believe."
8           Do you know whether Bear Stearns
9   introduced Airlie to ACA?
10      A.   No.  I don't know one way or the other.
11      Q.   Do you know whether Bear Stearns
12  introduced other investors to ACA?
13      A.   I don't know of any specific
14  investors we would have introduced to ACA.  No,
15  I don't.
16      Q.   Mr. Wagner, do you remember agreeing
17  with Laura Schwartz in late 2006 or early 2007 that
18  you personally would serve as a reference for ACA
19  in connection with ACA's efforts to market its CDO
20  management business?
21      A.   I don't remember doing that.
22           (Wagner Exhibit 9, E-mail dated 1/19/07
23      with attachment bearing Production Nos. SEC
24      06459332 through 6459345, was marked for
25      identification)

Page 76

1            I. Wagner
2   BY MR. RHYS DAVIES:
3       Q.   Exhibit 9 is an e-mail and attachment
4   that begins with the Bates number SEC 06459332 and
5   ends with 345.
6            Mr. Wagner, directing your attention to
7   the attachment that begins on the page that has the
8   number 06459333 at the bottom, do you see that this
9   is a CDO Manager Questionnaire, ACA Capital?
10      A.   Yes.
11      Q.   To Katonah Debt Advisors?
12      A.   Okay.
13      Q.   Dated October 26, 2006?
14      A.   Okay.
15      Q.   Have you seen this document before?
16      A.   This, I have not, no.
17      Q.   Directing your attention to the top of
18  page 11 where the questionnaire says, "Please
19  provide references (investors, bankers, dealers,
20  investments)."
21           Do you see that the first name listed
22  there is Ira Wagner, Bear Stearns?
23      A.   Yes.
24      Q.   Does this refresh your recollection that
25  you agreed with Laura Schwartz that you would serve

Page 77

1            I. Wagner
2   as a reference for ACA in marketing its CDO
3   management business?
4            MR. SCHULTZ:  Objection.  Foundation.
5       A.   I don't have any recollection of being
6   asked about this, no, or serving as the reference.
7   BY MR. RHYS DAVIES:
8       Q.   Do you recall serving as a reference for
9   ACA in connection with any other marketing of its
10  CDO management business?
11      A.   No.
12      Q.   Do you recall speaking with this entity
13  Katonah Debt Advisors about ACA?
14      A.   No.  No, I don't.
15      Q.   Are you sure that you did not serve as a
16  reference for ACA in connection with this
17  submission to Katonah?  Or is it that you just
18  don't recollect?
19           MR. SCHULTZ:  Objection to form and
20  foundation.
21      A.   Are you asking if I was ever contacted
22  or if I knew that I was going to be listed?  Could
23  you --
24  BY MR. RHYS DAVIES:
25      Q.   Well, let's take that first.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                February 5, 2013

New York, NY

Page 78

1              I. Wagner
2          Did you know that you were going to be
3   listed as a reference?
4      A.   No, I did not know that.
5      Q.   So is it your testimony that you were
6   listed in this document without your approval?
7          MR. SCHULTZ: Objection. Foundation.
8      Form.
9      A.   I just don't remember her asking me to
10  serve as a reference. So that's what I can tell
11  you.
12  BY MR. RHYS DAVIES:
13     Q.   Did you attend the Global ABS Conference
14  in Barcelona in June of 2007?
15     A.   In June of 2007?
16     Q.   Yes.
17     A.   I don't think I went in June of 2007.
18  I'm not sure, but I don't think so. I had gone to
19  Barcelona at some point, but I just don't remember
20  if I went to that conference. I might have.
21     Q.   You attended other Global ABS
22  conferences in Barcelona?
23     A.   Yes.
24     Q.   What is the Global ABS Conference?
25     A.   It's a conference -- it is quite well

Page 79

1              I. Wagner
2   attended. It talks about all different types of
3   securities in the ABS and structured finance
4   markets. It would be attended by bankers, by
5   investors, by collateral managers, by attorneys
6   that work in the field. It's a very substantial
7   get-together.
8          There are scheduled presentations about
9   different topics, and there are frequent
10  opportunities to converse with investors and
11  potential clients and participants in the market.
12         MR. RHYS DAVIES: Let's mark the next
13     exhibit.
14         (Wagner Exhibit 10, E-mail string
15     beginning with e-mail dated 6/1/07 with
16     attachment bearing Production Nos. SEC
17     07844825 through 07844916, was marked for
18     identification)
19  BY MR. RHYS DAVIES:
20     Q.   Exhibit 10 is a multipage document
21  beginning on SEC 07844825 and ending in 916.
22     A.   Okay.
23     Q.   Directing your attention to the e-mail
24  at the bottom of the first page, the e-mail from
25  Kim Leslie Shafer to Laura Schwartz, copied to

Page 80

1              I. Wagner
2   Jisook Choi.
3      A.   Yes.
4      Q.   Who is Jisook Choi?
5      A.   She is another person that was on the
6   banking team at Bear Stearns.
7      Q.   Let me ask you to just review that
8   e-mail, please.
9      A.   Okay.
10     Q.   Does this refresh your recollection that
11  Bear Stearns introduced ACA to potential clients?
12         MR. SCHULTZ: Objection. Form.
13     Foundation.
14     A.   Yes. We had meetings with investors for
15  ACA transactions, yes.
16  BY MR. RHYS DAVIES:
17     Q.   Does this appear to you to relate to
18  meetings with investors for ACA transactions?
19     A.   I think it's -- from looking at what's
20  here, I think it's for a specific transaction that
21  was being marketed at that time.
22     Q.   Do you know what the transaction was?
23     A.   I'm looking at -- I don't know, no. I
24  guess looking at the top -- well, they mention some
25  management sections from two different ACA deals,

Page 81

1              I. Wagner
2   so I don't know if we were -- I don't remember the
3   timing of whether we were marketing those at the
4   time or it was just to discuss ACA as a manager.
5          (Wagner Exhibit 11, E-mail string
6      beginning with e-mail dated 6/6/07 with
7      attachment bearing Production Nos. SEC
8      07855367 through 07855424, was marked for
9      identification)
10  BY MR. RHYS DAVIES:
11     Q.   Exhibit 11 is a multipage document
12  beginning SEC 07855367 through 5424.
13     A.   Okay.
14     Q.   I'm going to ask you to take a
15  moment to familiarize yourself with the
16  document generally.
17     A.   Okay.
18     Q.   You will see that the top e-mail has in
19  the subject line CLO Platform Marketing Book?
20     A.   Yes.
21     Q.   Who is Vladimir Guran?
22     A.   He is another person in the banking
23  group.
24     Q.   At Bear Stearns?
25     A.   Yes.

21 (Pages 78 to 81)

Ira Wagner                                                February 5, 2013

New York, NY

| Page 82 | Page 84 |
|---|---|
| I. Wagner | I. Wagner |

**Page 82**

I. Wagner

2    Q.   Let me ask you to take a look at the
3 attachment.
4    A.   Okay.
5    Q.   Which is headed "Preliminary
6 Confidential Information Memorandum on ACA
7 Management, LLC."
8    A.   Okay.
9    Q.   By the way, did Vladimir Guran report to
10 you?
11    A.   Yes.
12    Q.   You will see here on the front page of
13 this preliminary confidential information
14 memorandum it has the Bear Stearns and the ACA
15 logos side by side?
16    A.   Yes.
17    Q.   Is this a joint marketing book for Bear
18 Stearns and ACA?
19         MR. SCHULTZ:  Objection.  Foundation.
20    A.   Well, I think this is about ACA.  I
21 think this, as I look at this, is a general
22 presentation on ACA as a CDO manager.  And that's
23 what this is about.  It looks like we were hosting
24 a series of meetings for them.  And so our name is
25 on this as well.

**Page 83**

I. Wagner

2 BY MR. RHYS DAVIES:
3    Q.   From the e-mail on the front page, it
4 looks as though Bear Stearns prepared this
5 presentation; is that correct?
6         MR. SCHULTZ:  Objection.  Foundation.
7    A.   I mean, in terms of prepared, I think
8 from a word processing PowerPoint perspective, I
9 imagine that we did this.  But I think we put
10 together the ACA material though.
11 BY MR. RHYS DAVIES:
12    Q.   You didn't put together the substance of
13 the material?
14    A.   Of the ACA material.  I think that came
15 from ACA.
16    Q.   Referring you to page 3 of the
17 attachment, which has a heading Bear Stearns CDO
18 Team.
19    A.   Okay.
20    Q.   Do you see there is a list of people.
21 You are the second listed name, correct?
22    A.   Yes.
23    Q.   These are the people who reported to you
24 in your CDO group?
25    A.   Not everybody on this list, but many of

**Page 84**

I. Wagner

2 the people did.
3    Q.   Which of the people on this list
4 reported to you?
5    A.   The people under my name in New York.
6         Not every name in London, but six or
7 seven of those.
8         Not the trading or syndicate people, the
9 people listed under CDO trading and syndicate.
10         The CDO group analytics as a group
11 reported to a management called FAST.  But they
12 reported to me for the purpose of doing the CDOs.
13 And then the CDO product management team reported
14 to me.  That was the new issue distribution we
15 talked about earlier.
16    Q.   Then directing you to page 7 of this
17 presentation, you will see there's a heading,
18 Senior Management Team of ACA Capital Holdings,
19 Inc.
20    A.   Yes.
21    Q.   And these are the senior people at ACA?
22    A.   I believe so, yes.  I mean, I know that
23 Alan Roseman was the CEO.
24    Q.   And at the bottom of the list is Laura
25 Schwartz?

**Page 85**

I. Wagner

2    A.   Correct.
3    Q.   Do you know whether this book was used
4 to jointly market Bear Stearns and ACA at the
5 Barcelona ABS Conference?
6         MR. SCHULTZ:  Objection.  Foundation.
7    A.   I don't think it was, quote, jointly
8 marketing Bear Stearns and ACA.  I think in general
9 again at these conferences we would use it as an
10 opportunity to introduce managers to investors.
11         So it would be marketing the manager's
12 capabilities to investors.  If there wasn't a
13 specific deal that was being marketed, we would try
14 and use those opportunities where there were a lot
15 of investors in one place, and the managers were
16 attending, to set up a series of meetings for
17 potential future transactions.
18 BY MR. RHYS DAVIES:
19    Q.   So Bear Stearns used this book to market
20 ACA's capabilities to investors?
21    A.   To talk about ACA's management
22 capabilities with investors, yes.
23    Q.   Did you work with Laura Schwartz while
24 you were at Bear Stearns?
25    A.   I had some opportunity to work with her,

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                              February 5, 2013

New York, NY

Page 86

1              I. Wagner
2    yes.
3        Q.   When was the last time you spoke with
4    Laura Schwartz?
5        A.   Either at the very beginning of 2008
6    or in 2007. I haven't seen or spoken with her
7    since.
8        Q.   Do you know Alan Roseman?
9        A.   I had met him a couple of times.
10       Q.   When was the last time you spoke with
11   Alan Roseman?
12       A.   Maybe in 2007, but not after that.
13       Q.   Have you spoken with any current or
14   former ACA employees about this case?
15       A.   No.
16       Q.   Do you recall attending a dinner in
17   January 2007 with ACA to celebrate the closing of a
18   CDO?
19       A.   We would have dinners for closings. I
20   don't recall that specific one. If there was one,
21   I likely attended.
22           (Wagner Exhibit 12, E-mail dated 1/9/07
23            with attachment bearing Production Nos. SEC
24            1062119 through 1062120, was marked for
25            identification)

Page 87

1              I. Wagner
2    BY MR. RHYS DAVIES:
3        Q.   Exhibit 12 is a two-page document
4    beginning with Bates numbers SEC 001062119 and
5    ending in 120.
6        A.   Okay.
7        Q.   Does this refresh your recollection that
8    in January 2007 you went to a dinner at Del Posto
9    with ACA to celebrate the closing of a CDO called
10   ACA ABS 2006-2?
11           MR. SCHULTZ: Objection. Foundation.
12       A.   You know, I've been to Del Posto. And
13   I'm trying to picture being at an ACA dinner at Del
14   Posto, and it's not -- I don't recollect. I can
15   picture a dinner that I had with ACA at another
16   restaurant. I'm not sure if I went to this or not.
17   I'm sorry.
18   BY MR. RHYS DAVIES:
19       Q.   Where is Del Posto?
20       A.   The address is here. But it's in
21   Chelsea or the Meatpacking District. It's 10th
22   Avenue and 15th Street.
23       Q.   So it's a very fancy restaurant?
24       A.   It's fancy, yes.
25       Q.   Which is the meal that you do remember

Page 88

1              I. Wagner
2    attending with ACA?
3        A.   It was at a restaurant called Blue Hill
4    in Greenwich Village, I think.
5        Q.   By the way, ACA ABS 2006-2, that was a
6    CDO that your group put together at Bear Stearns?
7        A.   We were the bankers, yes.
8        Q.   And looking at the e-mail on the first
9    page of this document -- first of all, the From
10   line, who is Kent Johnson?
11       A.   He is another person in the banking
12   group at Bear Stearns.
13       Q.   Someone who reported to you?
14       A.   Yes.
15       Q.   And then in the To line, do you
16   recognize these people as ACA employees?
17       A.   Sarah Dunn and Barbara Johnston, I don't
18   know. Keith Gorman, yes. Lucas Westreich, yes.
19   Ava Regal, Alan Roseman, Bill Tomljanovic, Dennis
20   Kraft, Tracy. Some of these names, I don't know.
21       Q.   You recognize Laura Schwartz as senior
22   managing director responsible for ACA's asset
23   management business?
24       A.   CDO management business, yes. She ran
25   the CDO management business.

Page 89

1              I. Wagner
2        Q.   And you recognize Keith Gorman, his
3    name?
4        A.   Yes.
5        Q.   He was a director and portfolio manager;
6    is that right?
7        A.   I know he was involved in
8    portfolio management. I don't know his title
9    specifically.
10       Q.   Can you recall Lucas Westreich's role at
11   ACA?
12       A.   Some of these names are people I just
13   met. I don't remember the specific roles of them.
14   But I remember meeting them.
15       Q.   Alan Roseman you recall was the
16   president and chief executive officer?
17       A.   Yes.
18       Q.   And do you recall Dennis Kraft?
19       A.   He was in portfolio management or
20   credit, I think, sort of similarly involved in the
21   analysis.
22       Q.   And the other dinner you recall
23   attending at Blue Hill, do you recall, was that to
24   celebrate the closing of a transaction?
25       A.   Yes, I think it was.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                              February 5, 2013
New York, NY

Page 90

I. Wagner
1
2    Q.   Which transaction was that?
3    A.   I don't remember if it was an ABS deal
4    or a CLO.  I'm just not sure.
5    Q.   Who do you recall attended from ACA that
6    event?
7    A.   I can remember Laura.  I can remember
8    Bill Tomljanovic.  I don't remember too many of the
9    other people.
10   Q.   Who attended from Bear Stearns?
11   A.   I did.  I think Kim Shafer.  I don't
12   remember after that.
13   Q.   Did Kim Shafer report to you?
14   A.   Yes.
15   Q.   Let me ask you some questions about the
16   ACA ABS CDO 2006-2 transaction whose closing dinner
17   was celebrated at Del Posto.
18   A.   Okay.
19        MR. RHYS DAVIES:  Let's mark another
20   exhibit.
21        (Wagner Exhibit 13, E-mail string
22   beginning with e-mail dated 1/23/07 with
23   attachment bearing Production Nos. SEC
24   1066745 through 1067322, was marked for
25   identification)

Page 91

I. Wagner
1
2    BY MR. RHYS DAVIES:
3    Q.   Wagner Exhibit 13 is a document that
4    begins with the Bates number SEC 001066745.  We
5    have omitted one of the two attachments, the
6    indenture, but we have included the offering
7    circular.  And the Bates numbers of that document
8    are SEC 001067039 through 321.
9         Mr. Wagner, directing your attention to
10   the page which is the first page of the offering
11   circular.  It's on SEC 001067039.
12   A.   Okay.
13   Q.   Do you recognize this as the offering
14   circular for ACA ABS 2006-2?
15        MR. SCHULTZ:  Objection.  Foundation.
16   Form.
17   A.   I mean, it looks like it, yes.
18   BY MR. RHYS DAVIES:
19   Q.   Let me ask you to turn to the page
20   ending in SEC 001067041.  It's a couple of pages
21   after where you are right now.
22   A.   All right.
23   Q.   Do you see at the top of that page, it's
24   page (ii):  "ACA Management, LLC, a Delaware
25   limited liability company," defined as, "'ACA

Page 92

I. Wagner
1
2    Management' or the 'Collateral Manager' will
3    perform certain administrative and management
4    services for the issuer, including the selection of
5    the collateral debt securities as defined herein"?
6    A.   Yes.
7    Q.   And then let me ask you to turn next to
8    page 164 of the offering circular.
9    A.   Okay.
10   Q.   This is a section under the heading The
11   Collateral Manager, General.
12   A.   Yes.
13   Q.   You will see that about five or six
14   lines down into this text it says, "The collateral
15   manager" -- which we saw earlier defined as ACA,
16   correct?
17   A.   Yes.
18   Q.   -- "will select the portfolio of
19   collateral debt securities and eligible
20   investments."
21        And then do you see a few more lines
22   down it says, "Neither the initial purchaser nor
23   any of its affiliates will select any of the
24   collateral debt securities or eligible investments
25   to be acquired by the issuer"?

Page 93

I. Wagner
1
2        MR. SCHULTZ:  Objection to form and
3    foundation.
4    A.   Okay.
5    BY MR. RHYS DAVIES:
6    Q.   And the initial purchaser in this deal
7    was Bear Stearns; is that correct?
8         MR. SCHULTZ:  Objection.  Foundation.
9    A.   I think so.  It would be stated on the
10   cover.  But I believe so.
11   BY MR. RHYS DAVIES:
12   Q.   On the cover page of the offering
13   circular towards the bottom it says, "The
14   securities are offered by the issuers through Bear
15   Stearns and Co., Inc.," defined as "the 'Initial
16   Purchaser'."
17   A.   Yes.  So they are the initial purchaser.
18   Q.   Do you know why it was thought necessary
19   to make a disclosure that Bear Stearns was not
20   going to be selecting the portfolio?
21        MR. SCHULTZ:  Objection to form.
22   A.   I don't recall specific discussion of
23   this.
24   BY MR. RHYS DAVIES:
25   Q.   In light of the disclosure that the

24 (Pages 90 to 93)

Ira Wagner                                                                    February 5, 2013

New York, NY

Page 94

1                    I. Wagner
2    collateral manager will select the portfolio, do
3    you think it was necessary to disclose that Bear
4    Stearns was not going to be selecting the
5    portfolio?
6              MR. SCHULTZ:  Objection to form.
7         A.   I can say in general investors were
8    interested -- would be interested in the sourcing
9    of the portfolio and how it was selected.
10             But, again, I don't have a specific
11   recollection of placing this language here or what
12   was around it.
13   BY MR. RHYS DAVIES:
14        Q.   Do you know who did place this language
15   here?
16        A.   Specifically, no.
17        Q.   At Bear Stearns, who made decisions
18   about what language went into offering documents?
19             MR. SCHULTZ:  Objection.  Form.
20   Foundation.
21        A.   As a general matter, we would work with
22   the counsel for the transaction to have the
23   offering circular put together.  The bankers on
24   each transaction would read it and comment on it.
25   Some of these were developed prior to the specific

Page 95

1                    I. Wagner
2    transaction that you are looking at.  And we tended
3    to work with the same counsel, so we would have
4    forms of our documents that would be starting
5    points.
6    BY MR. RHYS DAVIES:
7         Q.   This transaction was done by your team
8    at Bear Stearns; is that right?
9         A.   Yes.
10        Q.   Are you aware that Bear Stearns or
11   JPMorgan has been sued for fraud by a monoline
12   insurer that provided a financial guarantee on this
13   transaction?
14             MR. SCHULTZ:  Objection, foundation.
15        A.   On this transaction?
16   BY MR. RHYS DAVIES:
17        Q.   Yes.
18        A.   I didn't know that.
19             (Wagner Exhibit 14, CIFG Assurance North
20   America, Inc. vs. J.P. Morgan Securities,
21   LLC, Complaint, 46 pages, was marked for
22   identification)
23   BY MR. RHYS DAVIES:
24        Q.   Wagner Exhibit 14 is a copy of a
25   complaint filed in the Supreme Court of the State

Page 96

1                    I. Wagner
2    of New York.  The case caption:  CIFG Assurance
3    North America, Inc. against JPMorgan Securities,
4    LLC.
5         A.   Okay.
6         Q.   You haven't seen this complaint before?
7         A.   No.
8         Q.   Let me ask you if you would to read
9    paragraph 1 to yourself.
10        A.   (Witness reading document).
11             Okay.
12        Q.   You will see that it's alleged in this
13   complaint that although the offering materials
14   represented that ACA would be selecting the
15   collateral in the interest of long investors, in
16   fact ACA allowed Bear Stearns to pick the
17   collateral.
18             Do you see that allegation?
19             MR. SCHULTZ:  Objection to form and
20   foundation.
21        A.   I see it.
22   BY MR. RHYS DAVIES:
23        Q.   And you see the allegation that what in
24   fact Bear Stearns selected was a portfolio of toxic
25   RMBS that it wanted off its balance sheet?

Page 97

1                    I. Wagner
2              MR. SCHULTZ:  Objection to form and
3    foundation.
4         A.   I see the allegation, yes.
5    BY MR. RHYS DAVIES:
6         Q.   You see the allegation also that Bear
7    Stearns then shorted those assets in an attempt to
8    further reduce its exposure to toxic RMBS?
9              MR. SCHULTZ:  Same objections.
10        A.   I don't see the last reference you are
11   mentioning, I'm sorry.
12   BY MR. RHYS DAVIES:
13        Q.   I'm looking at the first page of the
14   complaint, four or five lines down.
15             MR. SCHULTZ:  Same objections.
16        A.   Maybe you could reread the question.  I
17   don't think that's what's here, but...
18   BY MR. RHYS DAVIES:
19        Q.   Let me refer you to page 2.
20        A.   Okay.
21        Q.   The first full sentence, beginning on
22   that page begins with the words:  "In fact, as Bear
23   Stearns was well aware, but CIFG was not, the
24   collateral for these CDOs was selected not by ACA
25   and Strategos but by Bear Stearns itself, which not

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                February 5, 2013
New York, NY

Page 98

1              I. Wagner
2   only stocked the CDOs with toxic RMBS but also
3   profited from short positions it took against the
4   CDOs portfolios."
5              MR. SCHULTZ:  Same objections.
6   BY MR. RHYS DAVIES:
7       Q.  Do you think that the disclosure in the
8   offering circular we looked at a moment ago was
9   accurate?
10             MR. SCHULTZ:  Same objections.
11   Relevance.
12      A.  I have no reason to think it wasn't
13   accurate.
14   BY MR. RHYS DAVIES:
15      Q.  Do you expect to be a fact witness in
16   this litigation?
17      A.  I have never been contacted.  I don't
18   know.
19      Q.  Did Bear Stearns in fact participate in
20   selection of the reference portfolio for this
21   transaction?
22             MR. SCHULTZ:  Objection to form and
23   foundation.
24      A.  I don't know how the portfolio was put
25   together.

Page 99

1              I. Wagner
2   BY MR. RHYS DAVIES:
3       Q.  You were the person who was supervising
4   the team that put together this transaction; is
5   that correct?
6       A.  The bankers, yes.
7       Q.  Let's go back to Exhibit 1, which is
8   your opening report.
9           You have opined that the disclosure in
10   the Abacus 2007-AC1 transaction that ACA selected,
11   the reference portfolio was misleading, correct?
12      A.  I believe I said that, yes.  I mean, I
13   would like to look at the specific place.  But I
14   think without -- with the omission of a discussion
15   of Paulson, I think it would be misleading, yes.
16      Q.  And part of the reason for your opinion
17   is that you think that ACA was not able to select
18   names more broadly from the universe of RMBS
19   transactions?
20      A.  Among -- that's among the reasons.
21      Q.  And you think that the disclosure was
22   misleading even though the reference portfolio had
23   to meet ACA's approval ultimately?
24      A.  It had to meet ACA.  But it also had to
25   meet Paulson.  So I think the list itself is not

Page 100

1              I. Wagner
2   sufficient disclosure, no.  I don't think so.
3       Q.  And that's your opinion even though the
4   reference portfolio had to meet with ACA's
5   approval?
6       A.  Well, I think you have several questions
7   in there.  But I think it was clear to the
8   transaction team and Goldman that disclosure on ACA
9   was material and important.
10          So once you get to the point that the
11   reference portfolio itself is not sufficient, and
12   you go to that you need disclosure on the manager
13   or the portfolio selection agent in this case
14   because of their role in selecting, then you have
15   left out a critical piece of information about how
16   the portfolio was selected.  You've only told half
17   the story.
18      Q.  You say you think it was clear to the
19   transaction team at Goldman that disclosure on ACA
20   was material and important.
21          What is the basis for that comment?
22      A.  That ACA's role was material and
23   important.
24          I think it's largely elaborated in the
25   MCC memo that describes the transaction.  I think

Page 101

1              I. Wagner
2   throughout the e-mail and, you know, some of what
3   we looked at, it was clear that they needed a
4   manager.  They then talked about in the MCC memo
5   how ACA would enhance the ability to market the
6   transaction.
7           And if the reference portfolio itself
8   was sufficient, yet a lot of material was included
9   and, in fact, ACA was highlighted throughout that
10   material.
11      Q.  So this is a view you are deriving from
12   the e-mails and the mortgage capital committee
13   memo?
14      A.  From virtually every action in the
15   transaction.  I think it's the e-mails; the MCC
16   memo; dialogue about that they needed a manager to
17   put it together; that IKB wouldn't purchase a
18   transaction without a manager.  I mean, it was
19   almost in every part of this transaction that a
20   manager was necessary and that a static pool
21   without a manager would not have been -- a
22   transaction on that basis would not have been
23   successful.
24      Q.  This is a view you are deriving from
25   your review of the evidence in this case; is that

26 (Pages 98 to 101)

Ira Wagner                                                      February 5, 2013

New York, NY

Page 102

```
 1              I. Wagner
 2   right?
 3        A.  Yes.  Yes.
 4        Q.  I want to ask you some questions about
 5   ACA CLO 2007-2.
 6             Do you recall that transaction?
 7        A.  I know we did it.  I don't remember a
 8   lot of detail about it.
 9             MR. SCHULTZ:  Before you switch to that,
10   could we just take a quick break?
11             MR. RHYS DAVIES:  Certainly.
12             MR. SCHULTZ:  Thanks.
13             THE VIDEOGRAPHER:  This concludes tape
14   number two.  We are going off the record at
15   11:16 a.m.
16             (Recess)
17             THE VIDEOGRAPHER:  This marks the start
18   of tape number three.  We are back on the
19   record at 11:25 a.m.
20   BY MR. RHYS DAVIES:
21        Q.  Before we broke, I had been asking you
22   about the opinion in paragraph 50 of your opening
23   report that the disclosure that ACA selected the
24   reference portfolio was misleading, even though all
25   the names ultimately had to meet with ACA's
```

Page 103

```
 1              I. Wagner
 2   approval.
 3             Do you recall that testimony?
 4        A.  Yes.  Although I don't think I say that
 5   in paragraph 50.  But, yes, I recall discussing it.
 6        Q.  I would like to ask you some questions
 7   about ACA CLO 2007-1.
 8        A.  Okay.
 9        Q.  That's a transaction that you discuss in
10   your rebuttal report at paragraph 27.  So let's
11   take a look at that.
12        A.  Okay.
13        Q.  Yes.  I misspoke.  The transaction name
14   is actually ACA CLO 2007-2.
15        A.  Okay.
16        Q.  Now, you argue in your rebuttal report
17   that this transaction was different from Abacus,
18   correct?
19        A.  I think there are differences, yes.
20        Q.  Do you recall that ACA CLO 2007-2 was a
21   transaction done by your group at Bear Stearns?
22        A.  I mean, it's on a deal list.  I mean, I
23   recall that we did a CLO for ACA, yes.
24        Q.  Was there some reason that you didn't
25   say that in your rebuttal report?
```

Page 104

```
 1              I. Wagner
 2        A.  Say what?
 3        Q.  That this was a transaction that was
 4   done by Bear Stearns, by a group working under your
 5   supervision.
 6        A.  There was no reason one way or the
 7   other, no.
 8        Q.  In fact, the bank that provided the seed
 9   portfolio to ACA was Bear Stearns; is that correct?
10        A.  From reading this -- I mean, I recall
11   that we would have as a general matter in CLOs, you
12   know, had portfolios available for people, so
13   that's possible.  I really just don't have specific
14   recollection of this transaction, of all of the
15   components.
16             (Wagner Exhibit 15, E-mail dated 3/5/07
17   with attachment bearing Production Nos. SEC
18   7076055 through 7076070, was marked for
19   identification)
20             MR. SCHULTZ:  Is this number 15?
21             MR. RHYS DAVIES:  Yes.
22   BY MR. RHYS DAVIES:
23        Q.  Wagner Exhibit 15 is a document
24   beginning with the Bates stamp SEC 07076055
25   continuing through 70.
```

Page 105

```
 1              I. Wagner
 2        A.  Okay.
 3        Q.  You will see this is, on the front page,
 4   an e-mail from Kim Shafer -- who reported to you,
 5   correct?
 6        A.  Yes.
 7        Q.  To the three people at ACA?
 8        A.  Yes.
 9        Q.  Including Laura Schwartz?
10        A.  (Nodding affirmatively).
11        Q.  And this appears to be, would you agree,
12   a draft engagement letter for the ACA CLO 2007-2
13   transaction?
14             MR. SCHULTZ:  Objection to form.
15        A.  Yes.  It seems to be.
16   BY MR. RHYS DAVIES:
17        Q.  Let me ask you to turn to page 2 of this
18   draft engagement letter.
19        A.  The second page of the letter?
20        Q.  Yes.
21        A.  Okay.
22        Q.  The paragraph (b) which begins with the
23   words, "Bear Stearns' role shall include...."
24        A.  Okay.
25        Q.  I'm going to ask you to look at part (x)
```

27 (Pages 102 to 105)

Ira Wagner                                                    February 5, 2013
New York, NY

Page 106

1                I. Wagner
2  of that paragraph, which is four lines from the
3  bottom of the paragraph.
4        A.  Okay.
5        Q.  It says, "Bear Stearns' role shall
6  include:  'Providing a portfolio in an amount equal
7  to 50 percent of the original collateral, which
8  subject to ACA's approval, shall form part of the
9  original collateral, to speed accumulation
10 thereof.'"
11       A.  Okay.
12       Q.  You reviewed Laura Schwartz' testimony
13 in connection with preparing your opinions; is that
14 correct?
15       A.  I did.  I read her deposition and the
16 investigative testimony.
17       Q.  Do you recall Ms. Schwartz being asked
18 about this transaction and specifically about this
19 document?
20       A.  About this engagement letter?
21       Q.  Yes.
22       A.  I don't recall that specifically.
23       Q.  You don't recall that Ms. Schwartz was
24 asked:  "And would you say that the portfolio was
25 selected by ACA"; and she responded "Yes"?

Page 107

1                I. Wagner
2        MR. SCHULTZ:  Objection.  Foundation.
3        A.  Can you -- I mean, if I could look at it
4  I could see what she said.  I just don't -- I don't
5  remember specifically.
6        MR. RHYS DAVIES:  Let me mark another
7  exhibit.
8        (Wagner Exhibit 16, CDO Asset Management
9        Proposal for ACA CLO 2007-2, Commitments
10       Committee, February 12, 2007 bearing
11       Production Nos. SEC 6480405 through 6480407,
12       was marked for identification)
13 BY MR. RHYS DAVIES:
14       Q.  Wagner Exhibit 16 is a document
15 beginning Bates number SEC 06480405 through 07.
16       A.  Do you recall reviewing this document as
17       Q.  Do you recall reviewing this document as
18 an exhibit to Ms. Schwartz' deposition?
19       A.  I may have looked at it.  I don't recall
20 the specifics of what's in here.  I think I did
21 look at it actually, yes.
22       Q.  Directing your attention to the top of
23 page 2 under the heading Proposal, you will see
24 about halfway down the paragraph it says, "This
25 transaction was structured as a result of Bear

Page 108

1                I. Wagner
2  Stearns' coming to us with a seed portfolio of $200
3  million."
4        A.  Okay.
5        Q.  "Each credit and the transfer prices
6  will be approved by ACA."
7        A.  Okay.
8        Q.  And do you recall reading Laura
9  Schwartz' testimony at her deposition in this
10 matter where she testified that the portfolio was
11 selected by ACA because ACA had vetted and approved
12 the credits?
13       MR. SCHULTZ:  Objection.  Foundation.
14       A.  I just -- I mean, if she said that and I
15 could see it, fine.  I mean, if that's what she
16 said.  I just don't remember her specifically on
17 this point.
18 BY MR. RHYS DAVIES:
19       Q.  So if an investor in this transaction
20 was told that the portfolio was selected by ACA,
21 would that be a correct statement in your opinion?
22       A.  As far as I can understand from what I
23 have seen, I would say yes.
24       Q.  And that's true even though the seed
25 portfolio was provided by Bear Stearns subject only

Page 109

1                I. Wagner
2  to ACA's approval?
3        MR. SCHULTZ:  Objection to form.
4        A.  What I don't recall is how much we
5  showed them and what they -- I don't remember the
6  back and forth, if there was any on the specifics
7  of the portfolio.  I mean, this was in the context
8  of doing CLOs at the time Bear Stearns and others
9  would tend -- there was a lot of demand for
10 leveraged loans.
11       And so dealers would typically assemble
12 some amount of leveraged loans so that they could
13 do just this, seed a portfolio.
14       I don't know whether ACA approved every
15 single name or some or -- I just don't have the
16 details.
17 BY MR. RHYS DAVIES:
18       Q.  But your understanding is that it would
19 be accurate to disclose to investors that ACA had
20 selected the portfolio even though the investment
21 bank had provided a seed portfolio?
22       MR. SCHULTZ:  Objection to form.
23       A.  In general, if they went through their
24 process and approved it, then yes, they selected
25 these.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                          February 5, 2013
New York, NY

---

**Page 110**

1              I. Wagner
2    BY MR. RHYS DAVIES:
3        Q.   Taking you back to Exhibit 15 which was
4    the draft engagement letter that we looked at.
5        A.   Okay.
6        Q.   Do you recall that we looked at the part
7    of paragraph B where it said that: "Bear Stearns'
8    role shall include providing a portfolio in an
9    amount equal to 50 percent of the original
10   collateral which, subject to ACA's approval, shall
11   form part of the original collateral."
12            Do you know whether investors were told
13   that there was this agreement between Bear Stearns
14   and ACA?
15            MR. SCHULTZ:  Objection.  Foundation.
16   Form.
17       A.   I don't know.
18   BY MR. RHYS DAVIES:
19       Q.   In your rebuttal report, at paragraph
20   27, you say that this transaction was a cash CLO;
21   is that correct?
22       A.   Yes, it was.
23       Q.   Do you see that in Exhibit 16 that we
24   have just been looking at, ACA at least refers to
25   it as a cash/synthetic transaction?

---

**Page 111**

1              I. Wagner
2        A.   Where do they say that?
3        Q.   This is in the box under the heading Key
4    Transaction Metrics.
5        A.   I see they wrote that, yes.
6        Q.   So what is the basis for your
7    understanding that it was a purely cash
8    transaction?
9        A.   I think all the assets were cash in
10   fact.
11       Q.   You recall that?
12       A.   That was the general -- that was
13   generally how the CLOs we worked on worked.
14       Q.   Going back up to the text under the
15   heading Proposal in this Exhibit 16, you see the
16   text: "We have agreed to keep the fact of us
17   getting a seed portfolio confidential."
18       A.   Yes, I see that.
19       Q.   Did Bear Stearns ask ACA to keep
20   confidential the fact that Bear Stearns had
21   provided the seed portfolio?
22       A.   I honestly don't recall that we did.
23       Q.   And if that fact was withheld from
24   investors, would you regard that as a misleading
25   omission?

---

**Page 112**

1              I. Wagner
2            MR. SCHULTZ:  Objection to form.
3        A.   In this circumstance, no, I don't think
4    I would reach that conclusion.
5    BY MR. RHYS DAVIES:
6        Q.   Although your opinion in this matter, if
7    I understand it correctly, is that collateral
8    managers typically were free to exercise
9    independent judgment as to collateral selection; is
10   that true?
11            MR. SCHULTZ:  Objection to form.
12       A.   I think you have to go into more detail
13   about what my opinion is in this case.  I do think
14   there were significant differences between what
15   took place in this CLO and what took place in
16   Abacus.
17   BY MR. RHYS DAVIES:
18       Q.   Is it your opinion that the word
19   "select" had a different meaning in CLOs than it
20   had in CDOs?
21       A.   No.
22       Q.   Let me ask you about another
23   transaction, ACA ABS CDO 2007-3.
24            Do you remember this transaction?
25       A.   We did -- I don't know if this is one

---

**Page 113**

1              I. Wagner
2    that Bear Stearns did.  We did some for ACA.
3            (Wagner Exhibit 17, E-mail string
4        beginning with e-mail dated 6/29/07 with
5        attachment bearing Production Nos. SEC 222080
6        through 222088, was marked for
7        identification)
8    BY MR. RHYS DAVIES:
9        Q.   Wagner Exhibit 17 is an e-mail with
10   attachment that begins on SEC 000222080 and
11   continues through 088.
12       A.   Okay.
13       Q.   Directing your attention first to the
14   e-mail, was Taylor Wakefield someone who reported
15   to you at Bear Stearns?
16       A.   Yes, he was.
17       Q.   What was his role?
18       A.   He was a banker on the -- doing these
19   types of transactions.
20       Q.   And the attachment to this e-mail,
21   is this the working group list that Bear
22   Stearns prepared for the ACA ABS CDO 2007-3
23   transaction?
24            MR. SCHULTZ:  Objection.  Foundation.
25       A.   It looks like it, yes.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                          February 5, 2013

New York, NY

Page 114

I. Wagner
1
2  BY MR. RHYS DAVIES:
3      Q.   And on the first page it has the people
4  at ACA working on this transaction, correct?
5      A.   Yes.
6      Q.   Including Laura Schwartz, Keith Gorman?
7      A.   Yes.
8      Q.   And then it has on the next page,
9  Transaction Counsel, Schulte Roth & Zabel?
10     A.   Yes.
11     Q.   What was the role of transaction
12  counsel, if you recall?
13         MR. SCHULTZ:  Objection to form.
14     A.   I think this was the counsel to ACA
15  actually.  I'm not sure what was meant when they
16  called it transaction counsel.
17  BY MR. RHYS DAVIES:
18     Q.   Then the next page is the Bear Stearns
19  team; is that correct?
20     A.   Yes.
21     Q.   With your name first?
22     A.   Yes.
23     Q.   And these people worked under your
24  supervision on this transaction?
25     A.   Yes.  The CDS people didn't report to

Page 115

I. Wagner
1
2  me, and neither did Scott Eichel.
3      Q.   Other than the CDS people and
4  Mr. Eichel --
5      A.   Yes.  The other people did.  I'm sorry.
6  There's people on the next page.
7          Adam Siegel and Tom Duda, the trading
8  people did not.  Jean Fleischhacker did.  Carol
9  Fuller did not.  And the CDO settlement people did
10  not.
11     Q.   And then next are underwriter counsel.
12     A.   Yes.  Orrick.
13     Q.   What was their role in this transaction,
14  if you recall?
15     A.   They represented Bear Stearns.
16  Actually, looking at this, I would say that
17  typically we had Orrick do the transaction
18  documents.  I think -- I would conclude from this
19  that -- sometimes a manager would ask that, for
20  example, their counsel would do the documents so
21  that they would be similar, the indenture would be
22  similar to what they use.  So I think that was the
23  case here.  So Orrick would review the documents on
24  behalf of Bear Stearns.
25     Q.   So in this transaction Schulte Roth &

Page 116

I. Wagner
1
2  Zabel prepared them and Orrick reviewed them; is
3  that what you recall?
4         MR. SCHULTZ:  Objection.  Foundation.
5      A.   I'm not sure I'm concluding it from the
6  titles here and how this may have worked.
7  BY MR. RHYS DAVIES:
8      Q.   When you refer to the documents, which
9  documents are you referring to?
10     A.   Well, the principal documents
11  would be the indenture, the collateral management
12  agreement and the offering circular.
13         (Wagner Exhibit 18, E-mail dated 6/26/07
14  with attachment bearing Production Nos. SEC
15  6662708 through 6662980, was marked for
16  identification)
17  BY MR. RHYS DAVIES:
18     Q.   Wagner Exhibit 18 is a multipage
19  document beginning on SEC 06662708 running through
20  2980.
21     A.   Okay.
22     Q.   Which has an e-mail from Jorge Martin.
23     A.   Yes.
24     Q.   Do you recognize that person?
25     A.   I don't actually.

Page 117

I. Wagner
1
2      Q.   It was sent to a group of people,
3  including Laura Schwartz and others, at ACA?
4      A.   Yes.
5      Q.   And including a group of people at Bear
6  Stearns?
7      A.   Yes.
8      Q.   And attaching the preliminary offering
9  circular for ACA ABS 2007-3?
10     A.   Yes.
11     Q.   Let me ask you to turn to page (ii) of
12  the offering circular.
13     A.   Okay.
14     Q.   You see there at the top:  "ACA
15  Management, LLC, a Delaware limited liability
16  company," defined as "'ACA Management' or the
17  'Collateral Manager' will perform certain
18  administrative and management services for the
19  issuer, including the selection of the collateral
20  debt securities as defined herein."
21     A.   Yes.
22     Q.   Do you see that?
23         Let me ask you now to turn to page 147
24  of the offering circular.
25     A.   Okay.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 118

I. Wagner

1          I. Wagner
2      Q.  This is, again, the section under the
3  heading The Collateral Manager.
4      A.  (Nodding affirmatively).
5      Q.  Do you see under the heading General,
6  five or six lines down it says, "The collateral
7  manager will select the portfolio of collateral
8  debt securities and eligible investments."
9      A.  Okay.
10      Q.  Do you recall that in this transaction
11  in fact Bear Stearns had to approve each and every
12  bond before it went into the reference portfolio?
13      MR. SCHULTZ:  Objection to form and
14  foundation.
15      A.  I don't recall.
16      (Wagner Exhibit 19, E-mail string
17      beginning with e-mail dated 4/5/07 with
18      attachment beginning with page bearing
19      Production No. SEC 03426345, was marked for
20      identification)
21  BY MR. RHYS DAVIES:
22      Q.  Wagner Exhibit 19 is a series of
23  documents.  It's a compilation that we have put
24  together.  And I would ask you to take a moment to
25  familiarize yourself with it, please.

Page 119

1          I. Wagner
2      A.  Okay.
3      (Witness reviewing document).
4      Okay.
5      Q.  Have you had a chance to look at this
6  document?
7      A.  Some of it, yes.  Okay.
8      Q.  Let's look at the first page, the
9  document with the Bates number SEC 03426345.
10  You'll see the e-mail from Sarah Dunn at ACA to
11  this group of people from Bear?
12      A.  Yes.
13      Q.  Where Ms. Dunn writes:  "We are
14  considering the purchase of the following security
15  into ACA ABS 2007-3.  Please let me know if you
16  have any questions."
17      And then there is a description of the
18  security.  Correct?
19      MR. SCHULTZ:  Objection to form.
20      Foundation.
21      A.  Yes.  Well, it looks like it, yes.
22  BY MR. RHYS DAVIES:
23      Q.  And then the top e-mail is from Keith
24  Lind at Bear.
25      Is Keith Lind someone who reported to

Page 120

1          I. Wagner
2  you?
3      A.  No.  I don't remember Keith.
4      MR. SCHULTZ:  Andrew, just so I don't
5  interrupt all your questions about the
6  various documents in there, can I have a
7  standing objection to form and foundation so
8  I don't interrupt your flow?
9      MR. RHYS DAVIES:  Certainly.
10  BY MR. RHYS DAVIES:
11      Q.  Do you see in the top e-mail Mr. Lind
12  from Bear Stearns writes:  "Approved"?
13      A.  Yes.  I do want to point out what the
14  subject of it is, which it talks about warehouse
15  approval.  I just want to point out that I think
16  it's important to consider the purpose of all of
17  this.
18      Q.  Mr. Wagner, do you know whether the
19  assets in the warehouse on this transaction became
20  part of the reference portfolio upon closing?
21      MR. SCHULTZ:  Objection.  Same
22  objections.
23      A.  I don't know.
24  BY MR. RHYS DAVIES:
25      Q.  Typically would the assets in the

Page 121

1          I. Wagner
2  warehouse have become part of the reference
3  portfolio on closing?
4      A.  Typically, yes.
5      Q.  And do you see from this exhibit that
6  this pattern of ACA asking for approval for a
7  certain bond and then approval being provided by
8  Bear happened throughout the course of this -- of
9  the e-mails reflected in this exhibit?
10      A.  Well, I would note that we approved
11  each request that you have shown me.  I don't
12  know if this is exhaustive; but I would say that
13  they were approved for the purpose of going into
14  the warehouse, and I don't see any that we turned
15  down.
16      Q.  Do you recall the disclosure that we
17  looked at in the offering circular in Exhibit 18 a
18  moment ago where it said, "The collateral manager
19  will select the portfolio of collateral debt
20  securities and eligible investments"?
21      A.  Yes.
22      Q.  Did you see any reference in there to
23  Bear Stearns having to approve each bond?
24      MR. SCHULTZ:  Objection to form.
25      A.  No.

31 (Pages 118 to 121)

Ira Wagner                                                                  February 5, 2013

New York, NY

|  | Page 122 |
|---|---|

```
 1              I. Wagner
 2   BY MR. RHYS DAVIES:
 3       Q.  So do you believe that the disclosure in
 4   the offering document is misleading?
 5           MR. SCHULTZ:  Objection to form.
 6       A.  I think in the context of all of the
 7   facts that are relevant in this transaction, no.  I
 8   don't think it's misleading.  I think they're
 9   different, again, from Abacus; but I don't think
10   they're misleading in this transaction.
11   BY MR. RHYS DAVIES:
12       Q.  Do you think that the word select has a
13   different meaning in this transaction than it had
14   in the Abacus 2007-AC1 transaction?
15           MR. SCHULTZ:  Object to form.
16       A.  No.  I don't think they're a different
17   meaning.
18   BY MR. RHYS DAVIES:
19       Q.  Do you recall that Bear Stearns was the
20   initial protection buyer or the short on the
21   super-senior tranche of ACA ABS CDO 2007-3?
22           MR. SCHULTZ:  Objection to form.
23   Foundation.
24       A.  That we were the short...  I'm sorry.
25   Say that again.
```

|  | Page 124 |
|---|---|

```
 1              I. Wagner
 2       But I don't know how -- if we were short
 3   any of the positions or how that would have
 4   impacted it.
 5       If you look through these, you can see
 6   that they're getting positions from other dealers.
 7   BY MR. RHYS DAVIES:
 8       Q.  Let me ask you to take a look back at
 9   Exhibit 18 for a moment, the offering circular.
10       A.  Okay.
11       Q.  Page 20 of the offering circular.
12       A.  Okay.
13       Q.  In the middle of the page it says, "No
14   Coverage Tests."
15       A.  Yes.
16       Q.  And the language says, "The indenture
17   will not provide for any interest coverage tests or
18   overcollateralization tests, and the issuer will
19   not be required to maintain specified levels of
20   overcollateralization or minimum levels of interest
21   proceeds before distributing excess interest
22   proceeds to the preference shareholders."
23       Do you see that language?
24           MR. SCHULTZ:  Objection to form.
25       A.  Yes.
```

|  | Page 123 |
|---|---|

```
 1              I. Wagner
 2   BY MR. RHYS DAVIES:
 3       Q.  Do you recall that Bear Stearns was the
 4   initial short on the super-senior tranche of this
 5   transaction?
 6           MR. SCHULTZ:  Same objections.
 7       A.  I don't know whether -- we typically
 8   would be the counterparty to the CDS in the CDO,
 9   but I don't recall specifically that position.
10   BY MR. RHYS DAVIES:
11       Q.  Do you know whether Bear Stearns was
12   short any other part of the CDO?
13       A.  I don't know.
14       Q.  Do you know what other positions Bear
15   Stearns had in respect of the reference collateral
16   in this CDO?
17       A.  No.
18       Q.  Did Bear Stearns make sure that it
19   wasn't short any part of the underlying collateral
20   before it was allowed to have input into the
21   selection of the portfolio for this CDO?
22           MR. SCHULTZ:  Objection to form.
23       A.  I just want to say what we did was
24   approve assets into the warehouse.  And I don't
25   know that we did anything else.
```

|  | Page 125 |
|---|---|

```
 1              I. Wagner
 2   BY MR. RHYS DAVIES:
 3       Q.  In the CDO market as of this time, 2007,
 4   was the absence of interest coverage or
 5   overcollateralization triggers an unusual feature?
 6           MR. SCHULTZ:  Objection to form.
 7       A.  I mean, I don't know if I would consider
 8   it unusual.  It was certainly a risk factor which
 9   this is included in, because many CDOs, including
10   structured finance CDOs, would have those features
11   which would be considered a protection or an added
12   protection to investors.  There were certainly
13   transactions structured in this way.
14   BY MR. RHYS DAVIES:
15       Q.  You said it was a risk factor that was
16   disclosed to investors?
17       A.  In this transaction it was.
18       Q.  Would you consider it a shortcoming of
19   this CDO that it did not have these triggers?
20       A.  It was a risk factor.  I think it was
21   important for investors to think about how that
22   impacted the performance.
23       Q.  But any issue was addressed by it being
24   disclosed to investors?
25       A.  I think the disclosure made the point
```

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                    February 5, 2013
New York, NY

Page 126

1              I. Wagner
2    that that was something an investor should
3    consider.
4        Q.  Do you think that this factor, the
5    absence of the interest coverage and
6    overcollateralization triggers, made the role of
7    ACA as portfolio selection agent more important in
8    this transaction?
9            MR. SCHULTZ:  Objection to form.
10   Foundation.
11       A.  I can't say it made it more important or
12   less important, no.
13   BY MR. RHYS DAVIES:
14       Q.  Do you recall appearing in 2009 in a
15   television program on CNBC called House of Cards?
16       A.  Yes.
17       Q.  Do you recall being asked about
18   investors' ability to understand CDOs?
19       A.  I think that was a topic that was asked
20   about, yes.
21       Q.  And do you recall saying that if you are
22   investing in them you had a responsibility to
23   understand them?
24       A.  I don't recall what I said specifically.
25   That doesn't -- I may have said that.

Page 127

1              I. Wagner
2        Q.  Is that consistent with your view?
3        A.  I think so, yes.
4            MR. RHYS DAVIES:  Let's take five
5    minutes if we could.
6            THE VIDEOGRAPHER:  We are going off the
7    record at 11:56 a.m.
8            (Recess)
9            THE VIDEOGRAPHER:  We are back on the
10   record at 12:06 p.m.
11   BY MR. RHYS DAVIES:
12       Q.  Mr. Wagner, it's your opinion, isn't it,
13   that Paulson's involvement compromised ACA's
14   portfolio selection process in a way that increased
15   the risk to long investors?
16       A.  I think that's true, yes.
17       Q.  And in your rebuttal report, you have
18   expressed the view that Paulson was at least as
19   important as ACA in selecting the portfolio; that's
20   your opinion?
21       A.  I think that's true given the activities
22   that they -- excuse me, how they participated in
23   the portfolio selection process.
24       Q.  So that's a conclusion you are drawing
25   from looking at the evidence in this case?

Page 128

1              I. Wagner
2        A.  Correct.
3        Q.  Could I ask you to turn to paragraph 68
4    of your opening report.  And you'll see this is a
5    slide from the Abacus flip book which describes
6    ACA's credit selection process?
7        A.  Yes.
8        Q.  Do you have any reason to think that
9    these steps did not take place in the Abacus
10   2007-AC1 transaction?
11       A.  Well, I think they didn't take place to
12   the extent of Paulson's involvement limiting --
13   vetoing assets that were selected by ACA, and I
14   think limiting the universe that essentially ACA
15   could select from.
16           So I think that they didn't really do
17   exactly what was here without some other material
18   information that needed to be disclosed.
19       Q.  Do you know whether the ultimate
20   portfolio in the Abacus 2007-AC1 CDO contained
21   bonds outside the list originally provided by
22   Paulson?
23       A.  I think it did.
24       Q.  Let me ask you to turn to paragraph 77
25   of your opening report.  And we looked at this

Page 129

1              I. Wagner
2    earlier this morning.  In this paragraph, if I
3    understand it correctly, you are crediting Laura
4    Schwartz and Alan Roseman's testimony about whether
5    ACA would have agreed to serve as portfolio
6    selection agent if it had known certain facts about
7    Paulson; is that correct?
8        A.  Yes.
9        Q.  When you were formulating your opinions,
10   you read Laura Schwartz' deposition transcript; is
11   that correct?
12       A.  Yes.
13       Q.  And do you recall Laura Schwartz
14   testifying that ACA selected the initial reference
15   portfolio for the Abacus 2007 AC1 transaction?
16       A.  I believe she said something to that
17   extent, yes.
18       Q.  And on the list of documents that you
19   considered was also Alan Roseman's deposition
20   transcript; is that correct?
21       A.  Yes, it was.
22       Q.  And do you recall Mr. Roseman testifying
23   that ACA's review of the collateral was similar to
24   every other cash or synthetic RMBS CDO ACA was
25   involved with during that time period?

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                        February 5, 2013

New York, NY

| Page 130 | Page 132 |
|---|---|
| 1          I. Wagner | 1          I. Wagner |
| 2          MR. SCHULTZ: Objection. Foundation. | 2     do the transaction. |
| 3          A.  I think he said something like that.  I | 3          "QUESTION:  And if it didn't meet your |
| 4     don't have it in front of me. | 4     credit standards and your approvals, would |
| 5     BY MR. RHYS DAVIES: | 5     you have walked away? |
| 6          Q.  Also on the list of documents you | 6          "ANSWER:  Yes." |
| 7     considered were Keith Gorman's deposition | 7          Do you recall reviewing that testimony |
| 8     transcript; is that correct? | 8     in connection with formulating your opinions? |
| 9          A.  Yes. | 9          MR. SCHULTZ: Objection to form. |
| 10         Q.  And do you recall Mr. Gorman testifying | 10         A.  I read his testimony, so, yes. |
| 11    that ACA selected the portfolio in the standard | 11    BY MR. RHYS DAVIES: |
| 12    process that it would work on for any transaction? | 12         Q.  How do you reconcile your opinion that |
| 13         MR. SCHULTZ: Objection. Foundation. | 13    this was a compromised selection process with the |
| 14         A.  I think so. | 14    evidence provided by Ms. Schwartz, Mr. Gorman and |
| 15    BY MR. RHYS DAVIES: | 15    Mr. Roseman? |
| 16         Q.  Do you recall Mr. Gorman testifying that | 16         A.  I would reconcile it, I think, because |
| 17    Paulson wanted 100 names in the Abacus 2007-AC1 | 17    they took each security and did their usual |
| 18    reference portfolio, and that it was ACA that | 18    analysis.  They talk about systems that they have. |
| 19    pushed for to get to 100 and didn't. | 19    I think one is called SARA, for example, so they |
| 20         A.  I don't recall that statement.  I saw | 20    did that on a security-by-security basis. |
| 21    that they arrived at 90 names ultimately and that | 21         But I think when you look through the |
| 22    they tried to get to 100 and didn't. | 22    whole process, and maybe they -- you know, whether |
| 23         Q.  Do you recall Mr. Gorman testifying that | 23    they had the opportunity to do that or consider it, |
| 24    ACA worked to achieve a portfolio that was | 24    that's something that I could do. |
| 25    bulletproof? | 25         And as I looked at it, again, they put |

| Page 131 | Page 133 |
|---|---|
| 1          I. Wagner | 1          I. Wagner |
| 2          MR. SCHULTZ: Objection. Foundation. | 2     forward a number of ideas that were not considered |
| 3          A.  I don't recall. | 3     because Paulson didn't want them.  They put forward |
| 4     BY MR. RHYS DAVIES: | 4     names that weren't considered because Paulson |
| 5          Q.  You reviewed the deposition exhibits to | 5     didn't want them. |
| 6     Mr. Gorman's deposition; is that right? | 6          Again, I think what I say in general is |
| 7          A.  I think so. | 7     I'm not questioning the -- that ACA selected.  I'm |
| 8          Q.  Do you recall an e-mail in which | 8     saying there was another piece of information |
| 9     Mr. Gorman referred to the Abacus portfolio as | 9     that -- that in and of itself is not a complete |
| 10    awesome? | 10    statement of what took place in this transaction. |
| 11         MR. SCHULTZ: Foundation. | 11         Q.  So you disagree with the testimony from |
| 12         A.  It doesn't stand out in my mind.  I read | 12    the ACA witnesses that ACA selected the portfolio? |
| 13    the exhibits. | 13         MR. SCHULTZ: Objection to form. |
| 14    BY MR. RHYS DAVIES: | 14         A.  I think I just said I didn't disagree. |
| 15         Q.  When you reviewed Mr. Gorman's | 15         I think I -- my position is that while |
| 16    deposition transcript, do you recall the following | 16    ACA selected it, that is not the complete story of |
| 17    questions and answers that I will read: | 17    how this portfolio was put together. |
| 18         "QUESTION: Did you ever feel stressed | 18    BY MR. RHYS DAVIES: |
| 19    to accept any particular suggestion by | 19         Q.  Do you recall which entity was the |
| 20    Goldman Sachs or Paulson? | 20    largest long investor in the Abacus transaction? |
| 21         "ANSWER:  I would say that there was | 21         A.  I think in notional amount it would have |
| 22    some push on us to try to take some names, | 22    been ACA in terms of where different -- in terms of |
| 23    but at the end we had a portfolio that we had | 23    different people in the capital structure.  IKB |
| 24    to meet our credit standards and our | 24    took a large position in a mezzanine tranche, but I |
| 25    approvals, and that was the only way we could | 25    think it was ACA. |

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                        February 5, 2013

New York, NY

Page 134

I. Wagner

1        I. Wagner
2        Just to be clear, ACA's risk position
3   was -- in the super-senior was not direct.  There
4   was ABN in between.  So in effect really the
5   largest investor was ABN.  But where the risk
6   resided was at ACA.
7        Q.   How would you reconcile ACA's
8   investments in the Abacus 2007-AC1 transaction with
9   your view that the portfolio selection process was
10   compromised?
11        MR. SCHULTZ:  Objection to form.
12        A.   I think I would -- first, I would
13   reconcile it by the fact that they didn't have all
14   the information necessary to evaluate what they
15   were doing.  In fact, they had information that was
16   exactly the opposite of what was taking place.
17        So I think from that fundamental
18   perspective, they couldn't really evaluate what was
19   happening.
20   BY MR. RHYS DAVIES:
21        Q.   You think that ACA couldn't evaluate the
22   securities in the portfolio?
23        A.   They could evaluate the securities on an
24   individual basis, but I don't know that they would
25   have put those together as a portfolio without

Page 135

1        I. Wagner
2   Paulson's active involvement in it.
3        Q.   Do you know that one way or the other?
4        A.   No.  I don't.  I'm just saying that.
5   But Paulson clearly influenced the composition of
6   the portfolio.
7        Q.   Do you have any basis to think that ACA
8   was unaware of what influence Paulson may have had
9   in the portfolio that it was putting together?
10        A.   I think they didn't understand the
11   objectives of Paulson in putting the portfolio
12   together.
13        Q.   Let me ask you about your opinion in
14   connection with Paulson's objective.  Let me ask
15   you to turn to your opening report on page 2.
16        A.   Page 2?
17        Q.   Page 2.  This is the --
18        A.   The questions presented?
19        Q.   The questions presented.
20        A.   Okay.
21        Q.   Question E reads:  "How could Paulson's
22   atypical involvement in the portfolio selection
23   process have impacted the risk to long investors,
24   such as note purchasers in the Abacus CDO?"
25        Is that the form in which the question

Page 136

1        I. Wagner
2   was put to you?
3        A.   These were put to me this way, yes.
4        Q.   You say it was put to you that Paulson's
5   involvement was atypical?
6        A.   The question was asked this way.
7        Q.   Let me ask you to look at paragraph 44
8   of your opening report.  Here you opine that
9   Paulson's objective in choosing collateral was to
10   identify reference obligations that would be more
11   likely to underperform and incur losses.
12        Is that correct?
13        A.   That's my conclusion.  That's what
14   Pellegrini and Shu in fact testified I think.
15        Q.   So that's the basis for your opinion,
16   it's Pellegrini and Shu's testimony?
17        A.   Yes.
18        Q.   When you refer to assets most likely to
19   suffer losses, you are referring to the testimony
20   from Mr. Pellegrini and Mr. Shu about
21   characteristics of the loans in the RMBS?
22        MR. SCHULTZ:  Objection to form.
23        A.   I think they were specifically asked
24   essentially this question, and they confirmed that
25   that was their objective.

Page 137

1        I. Wagner
2   BY MR. RHYS DAVIES:
3        Q.   You recall that there was questioning at
4   Mr. Pellegrini's deposition by the SEC about
5   whether the Paulson hedge fund was looking for this
6   portfolio to include RMBS with loans, including
7   borrowers with low FICO scores, and ARM's recent
8   vintage, high LTV ratios, and geographic
9   concentrations in certain states that were having
10   housing price bubbles?
11        A.   Yes.
12        Q.   Would you agree that those are
13   characteristics that could be seen by any investor
14   that looked at the loans in the RMBS?
15        A.   If they had access to that information,
16   yes.
17        Q.   By the way, which were the states that
18   were experiencing housing price bubbles at the end
19   of 2006, early 2007?
20        A.   I think there were bubbles in a lot of
21   places.  I believe that what Paulson was looking
22   for, if I remember right, was California and
23   Florida, perhaps Arizona and Nevada.  But those
24   regions were certainly having those bubbles.
25        Q.   In formulating your opinion as to what

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 138

1           I. Wagner
2    Paulson's objective was, you said you considered
3    Mr. Pellegrini's deposition testimony, correct?
4         A.   Yes.
5         Q.   Do you recall Mr. Pellegrini testifying
6    that it was not realistic to try to identify the
7    worst RMBS in the market and then to have an
8    efficiently priced transaction?
9             MR. SCHULTZ:  Objection to form.
10    Foundation.
11         A.   If it's there, he said it.
12             I guess I was relying on what I quote
13    which is, he was asked:  "Is it fair to say that in
14    choosing RMBS on which to purchase protection,
15    Paulson was looking essentially for the RMBS that
16    had the highest probability of loss and being
17    written off?"  And he responded:  "Correct."
18    BY MR. RHYS DAVIES:
19         Q.   Did you take into account his -- the
20    testimony from Mr. Pellegrini that it was not
21    realistic to try to identify the worst RMBS in the
22    market and then to have an efficiently priced
23    transaction?
24             MR. SCHULTZ:  Objection to form.
25    Foundation.

Page 139

1           I. Wagner
2         A.   That may have been his view.  But his
3    objective was not changed.  I mean, he was looking
4    to try and find the RMBS and include the RMBS that
5    had the highest probability of loss and being
6    written off.  That was his objective.
7    BY MR. RHYS DAVIES:
8         Q.   And you derived that from reading
9    portions of his testimony?
10         A.   It seemed like a direct question and
11    answer.  I don't think I had to -- it wasn't hard
12    to reach that conclusion.
13         Q.   Did you take into account
14    Mr. Pellegrini's testimony that what Paulson was
15    trying to create was a portfolio that was
16    representative of the market?
17             MR. SCHULTZ:  Objection to form.
18    Foundation.
19         A.   I don't recall.
20    BY MR. RHYS DAVIES:
21         Q.   You reviewed Mr. Pellegrini's deposition
22    testimony in 2011; is that what you testified
23    earlier?
24         A.   I think in the spring of 2011.
25         Q.   But you had met Mr. Pellegrini in 2006

Page 140

1           I. Wagner
2    or 2007; is that correct?
3         A.   Yes, I think so.
4         Q.   And at that meeting in 2006 or 2007 you
5    had formed a view about the propriety of the
6    transaction that the Paulson fund was trying to put
7    together; is that correct?
8             MR. SCHULTZ:  Objection to form.
9    Misstates testimony.
10         A.   Some point after meeting them I did,
11    yes.
12    BY MR. RHYS DAVIES:
13         Q.   So it would be fair to say that you
14    reviewed his deposition testimony, having already
15    formed a view about the propriety of that
16    transaction?
17         A.   I think I read it fairly.  And I think
18    his words speak for themselves.
19         Q.   So you think you were able to put out of
20    your mind the negative views that you had formed
21    about the proposed transaction that was put to Bear
22    Stearns in 2006 and 2007?
23             MR. SCHULTZ:  Objection to form.
24         A.   I think I tried to carefully consider
25    what was here and evaluate it without that negative

Page 141

1           I. Wagner
2    bias.
3    BY MR. RHYS DAVIES:
4         Q.   Was there some reason that you did not
5    disclose in either of your reports that you had met
6    Mr. Pellegrini in 2006-2007?
7         A.   There was no reason either way.
8         Q.   You testified that you tried to
9    carefully consider the evidence and to evaluate
10    without that negative bias; what do you mean by
11    "negative bias"?
12             MR. SCHULTZ:  Objection to form.
13         A.   I feel like you just -- I think it's
14    what you said to me.  But I don't have the benefit
15    of reading all of this.
16             But you said that I had formed this
17    opinion about the propriety of the transaction and
18    read it with that in mind.  And I was trying to say
19    no, not with that in mind, but just to look at what
20    was presented and what people testified.
21    BY MR. RHYS DAVIES:
22         Q.   But will you agree that you had a
23    negative bias towards Mr. Pellegrini based on your
24    prior meeting with him?
25             MR. SCHULTZ:  Objection to form.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 142

                    I. Wagner
1
2        A.   No.  I don't think I had a negative bias
3   towards him.
4             I just read what he said.  And I quoted
5   what he said.  I mean, these are -- they're not my
6   -- I don't think these are words that are hard to
7   understand or interpret.  It's exactly what he
8   said.
9   BY MR. RHYS DAVIES:
10       Q.   You agree the opinions that you have
11  expressed in your two reports are consistent with
12  the negative views you had developed towards the
13  Paulson firm and the transaction that it was
14  proposing to put together back in 2006-2007?
15            MR. SCHULTZ:  Objection to form.
16       A.   I mean, I don't have negative views
17  about the Paulson firm -- I don't really have a
18  view about the Paulson firm.  I don't think that's
19  relevant.
20            I think that -- again, I evaluated this
21  transaction for the questions at issue, which is
22  about the disclosure and was disclosure -- was the
23  proper disclosure made to these investors.
24            And I read it to the best ability I had
25  to be fair about looking and evaluating this.

Page 143

                    I. Wagner
1
2   BY MR. RHYS DAVIES:
3        Q.   So your opinion in your mind is a
4   question of adequacy of disclosure?
5        A.   Well, I think among the issues in this
6   case are whether the disclosure is full and
7   complete and there's no omission, no material
8   omission.  I think that is certainly among the
9   issues.
10       Q.   And is that one of the issues on which
11  you're opining?
12       A.   Well, I'm not -- I state that I think
13  there was an omission, and that this information
14  would have been important to CDO investors.
15            Based on my knowledge that I gained in
16  meeting with CDO investors throughout my career, I
17  think they would have wanted to know about
18  Paulson's role specifically as it was executed in
19  this transaction; and that it would have been
20  important to their investment decision; and that
21  each of the investors in this transaction testified
22  to say it was important.  It would have been
23  important to them.
24       Q.   With respect to the investors in the
25  Abacus 2007-AC1 transaction, you refer in your

Page 144

                    I. Wagner
1
2   reports to IKB's record of recommendation.
3             Do you recall that?
4        A.   Yes.
5        Q.   Do you recall what IKB said in that
6   document about its views of ACA?
7        A.   I do, yes.
8        Q.   What do you recall?
9        A.   They made a number of different
10  comments.  They talked about ACA managing a large
11  number of transactions.  They looked at the ratings
12  migration of those transactions.  I think they said
13  something along the lines of -- at some place they
14  were more neutral about ACA.  I don't recall the
15  exact words, but there were pluses and minuses
16  about ACA, I think.  But again on the whole, I
17  think ACA was important to their participation in
18  the transaction.
19       Q.   That's something that you have derived
20  from reading the record of recommendation?
21       A.   Yes.  The record and the various e-mails
22  about having a manager and which one -- not wanting
23  to look at other managers.
24       Q.   Do you remember IKB writing in the
25  record of recommendation that it was concerned over

Page 145

                    I. Wagner
1
2   ACA's prudence?
3        A.   As I said, I think there were some
4   positives and negatives that they mentioned about
5   ACA.
6        Q.   Would you characterize a concern over
7   ACA's prudence as neutral?
8        A.    Could I see exactly what they said?  I
9   don't remember the words.  I would like to see the
10  whole --
11            MR. RHYS DAVIES:  Certainly.  Let's mark
12  this document.
13            (Wagner Exhibit 20, Record of
14  Recommendation, Date of Decision:  3/27/2007
15  bearing Production Nos. SEC 9181746 through
16  9181760, was marked for identification)
17  BY MR. RHYS DAVIES:
18       Q.   We have marked as Wagner Exhibit 20 a
19  copy of IKB's record of recommendation dated March
20  27, 2007.  It's SEC 09767689 through 703.
21            MR. SCHULTZ:  Which Bates number are you
22  referring to?
23            MR. RHYS DAVIES:  My apologies,
24  the Bates numbers are SEC 09181746
25  through 760.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                February 5, 2013

New York, NY

Page 146

1           I. Wagner
2    BY MR. RHYS DAVIES:
3      Q.   And the sections that I was asking you
4    about, Mr. Wagner, are on page 14.
5      A.   I'm sorry.  Say it again.
6      Q.   Page 14.  The last page.
7      A.   The last page.  Wow.  This is really
8    small.  I apologize, I can't read this.
9           MR. RHYS DAVIES:  Why don't we take a
10   break and we will see if we can get a more
11   legible version.
12          THE WITNESS:  It's really small.  I did
13   read it.  I don't think it's quite as small
14   or quite as not clear.
15          MR. RHYS DAVIES:  Let's take our lunch
16   break.
17          THE VIDEOGRAPHER:  This concludes tape
18   number three.  We are going off the record at
19   12:31 p.m.
20          (Lunch recess:  12:31 p.m.)
21
22
23
24
25

Page 147

1           I. Wagner
2        AFTERNOON SESSION
3             1:36 p.m.
4        (Wagner Exhibit 21, Record of
5    Recommendation, Date of Decision:  3/27/07
6    bearing Production Nos. SEC 9767689 through
7    9767703, was marked for identification)
8           THE VIDEOGRAPHER:  This marks the start
9    of tape number four.  We're back on the
10   record at 1:36 p.m.
11   EXAMINATION CONTINUED
12   BY MR. RHYS DAVIES:
13     Q.   We've marked as Exhibit 21 a more
14   legible version of the IKB record of
15   recommendation, Bates stamped SEC 09767689 through
16   703.
17          Mr. Wagner, before the lunch break, I
18   had asked you about your opinion that ACA's role
19   was important to IKB.
20          Do you recall that testimony?
21     A.   In general I thought that a manager was
22   important to IKB, and ACA met their criteria, yes.
23     Q.   In coming to that opinion, did you take
24   into account the comments that IKB made about ACA
25   in the record of recommendation?

Page 148

1           I. Wagner
2      A.   Yes.  I looked at the record of
3    recommendation.
4      Q.   Directing you to the final page, page
5    14.
6      A.   Sure.  Okay.
7      Q.   First of all, in the section headed
8    Relative Assessment --
9      A.   Yes.
10     Q.   -- you will see about halfway down that
11   paragraph there is a reference that begins:  "Thus
12   although low-level data and a more cautious view on
13   housing supports more relevant and risk conscious
14   analysis, we remain concerned over ACA's prudence."
15     A.   Yes.
16     Q.   Did you take that into account when
17   coming to your opinion that ACA was important to
18   IKB's decision making?
19          MR. SCHULTZ:  Object to form.
20     A.   I mean, I think you have to look at
21   their comments on ACA throughout this material.
22   But they seem to be talking about that with regards
23   to the prior discussion about ACA's -- some of
24   their views on the housing market.  And I mean, it
25   does continue.  They talk about some other things,

Page 149

1           I. Wagner
2    and they say, "This assessment has proven correct
3    making ACA now more relevant as a potential asset
4    manager."
5           Up above under "Investment Philosophy of
6    Manager," they say, "Expertise lies in credit
7    analysis, making ACA a candidate for mezzanine
8    portfolio."
9           I mean, think I testified they had
10   pluses and minuses about ACA, and these are some of
11   them.
12   BY MR. RHYS DAVIES:
13     Q.   In the section at the bottom of this
14   page under the heading Worth Mentioning/Investment
15   Recommendation --
16     A.   Yes.
17     Q.   -- it says, "ACA's increased focus on
18   low-level analysis and house price implications are
19   commendable.  However, their strong market views
20   and belief in their models results in a less
21   favorable score regarding prudence."
22     A.   Okay.
23     Q.   Did you take that into account in
24   forming your opinion?
25          MR. SCHULTZ:  Objection to form.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                    February 5, 2013

New York, NY

Page 150

I. Wagner

1           I. Wagner
2       A.   Yes.  I mean, again, as I said, I think
3   they had positives and negatives, but they
4   certainly always expressed that they wanted a
5   manager; and ACA seemed on balance to meet their
6   approval.
7   BY MR. RHYS DAVIES:
8       Q.   To your knowledge did IKB invest in any
9   of Bear Stearns' CDOs or CLOs?
10      A.   I think they did.  I don't remember
11  which transactions but they were an investor, yes.
12      Q.   Do you remember how many transactions
13  they invested in?
14      A.   I don't know.
15      Q.   Did you ever travel to Germany to meet
16  with IKB?
17      A.   I don't believe I ever met IKB in
18  Germany, no.
19      Q.   Did you meet IKB representatives
20  elsewhere?
21      A.   In New York, I think I did, yes.
22      Q.   Do you remember which representatives?
23      A.   This was a group.  There was a woman.
24  Her name was Ute, but I don't remember her last
25  name.  I'm sorry.

Page 151

1           I. Wagner
2       Q.   Do you recall when that was?
3       A.   Not with any specificity.
4       Q.   Is that the only meeting you can
5   remember?
6       A.   Yes.
7       Q.   Do you still have a calendar for the
8   years 2006-2007?
9       A.   No.
10      Q.   Do you know whether others at Bear
11  Stearns met with IKB?
12      A.   I think so, yes.
13      Q.   Including people who reported to you?
14      A.   Yes.  I think so.
15      Q.   Which people who reported to you do you
16  think met with IKB?
17      A.   I think Joe Evenchick would have met
18  with IKB.
19      Q.   And did Mr. Evenchick report to you on
20  his meetings with IKB?
21      A.   I recall some information about IKB from
22  him, yes.
23      Q.   What do you recall learning from
24  Mr. Evenchick about IKB?
25      A.   As I recall, they had some sort of list

Page 152

1           I. Wagner
2   of approved managers, I think, and some general
3   transaction characteristics that they would be
4   interested in; but I don't remember who was on the
5   list or exactly what they were.  But they did have
6   some guidelines as to what they were interested in.
7       Q.   IKB was an investor in the CDO markets;
8   is that correct?
9       A.   Yes.
10      Q.   Did you maintain your calendar when you
11  were working at Bear Stearns on the Bear Stearns
12  computer system?
13      A.   Yes.  By and large, yes.
14      Q.   How did you maintain your calendar other
15  than on the Bear Stearns computer system?
16      A.   I think that was generally it.  I just
17  can't tell you I necessarily input everything in
18  there.  But that's where I would have done it.
19      Q.   In the meeting where you met with an IKB
20  representative, was ACA present at that meeting?
21      A.   I don't think so.  I'm not sure, but I
22  don't think so.
23      Q.   I think you testified earlier that Bear
24  Stearns did five or six CDOs or CLOs where ACA was
25  the collateral manager; is that correct?

Page 153

1           I. Wagner
2       A.   I think I said that.  It's around that
3   number.
4       Q.   What percentage of Bear Stearns CDOs and
5   CLOs had ACA as the collateral manager?
6       A.   It wouldn't have been a large
7   percentage, I don't think.
8       Q.   So would you say that your team at Bear
9   Stearns were in frequent contact with ACA?
10      A.   I would say probably Kim Shafer, who was
11  sort of -- she was assigned to ACA generally,
12  probably maintained contact with her.  I don't know
13  how frequently she might have spoken with people at
14  ACA, but certainly from time to time.
15      Q.   How frequently were you in communication
16  with ACA?
17      A.   Less frequently than Kim.  I don't know
18  if -- it depended on what was going on.  Maybe I
19  would talk to someone at ACA, it could have been
20  once a month.
21      Q.   You would talk to people at ACA on
22  specific deals you were working on?
23      A.   It would be a range of things.  Either
24  the specific deals we were working on or things in
25  the market, or sometimes a question from ACA about

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                                    February 5, 2013

New York, NY

Page 154

I. Wagner

1            I. Wagner
2   what was going on in the market.  Things like that.
3       Q.   Did you see the ACA people socially?
4       A.   Only in a work context or a conference
5   context.  So, you know, like the closing dinner or
6   at a conference.  But not on a personal level
7   outside of a work-related thing.
8       Q.   Apart from the closing dinners that we
9   have talked about, when do you recall spending time
10  with ACA in a business social setting?
11      A.   I'm trying think.  I don't think I could
12  point to a specific thing.  I can think of events
13  that they might have been at, but I don't remember
14  really spending time with them there.  It's things
15  that I would have been at that I think they would
16  have been at.
17      Q.   Did you ever visit ACA's offices?
18      A.   Once -- I think I was there maybe only
19  two or three times.  Something like that.
20      Q.   And did ACA come to Bear Stearns'
21  offices and meet you there?
22      A.   Sometimes, yes.
23      Q.   Through your interactions with ACA, did
24  you form a view as to their competence as
25  collateral managers?

Page 155

I. Wagner

1            I. Wagner
2       A.   I think I had an understanding of their
3   -- some understanding of their approach.  I mean,
4   we also got feedback from marketing transactions
5   about what the market perception of ACA was, which
6   was generally a good one.
7       Q.   You testified two or three times that
8   you may have been at ACA's offices?
9       A.   (Nodding affirmatively).
10      Q.   Do you remember when that was?
11      A.   One was even probably before Laura
12  Schwartz was there or Laura Schwartz wasn't in her
13  position.  There was a prior person that had
14  Laura's position named Maryam Muessel.  And I
15  remember meeting with her.  That's the one that
16  most prominently sticks out in my mind.  I think I
17  probably went another time.  I don't recall.
18      Q.   Do you remember when that first meeting
19  was?
20      A.   With Maryam Muessel?  Not really, no.
21  I'm trying to think when Maryam Muessel left.  It
22  was probably -- you could find it out -- I don't
23  know, 2005 maybe.
24      Q.   Do you recall one or two other meetings
25  at ACA?

Page 156

I. Wagner

1            I. Wagner
2       A.   I think so.  They don't really stand out
3   in my mind.  I just think I probably went another
4   time or two.
5       Q.   When you reviewed Laura Schwartz'
6   investigative testimony and deposition testimony,
7   that was in, you said, 2011?
8       A.   Well, I read the investigative testimony
9   in the fall of 2010.  And I read the other
10  testimony, the deposition, in the spring of 2011.
11      Q.   Do you remember when you first met Laura
12  Schwartz?
13      A.   It was subsequent to Maryam Muessel
14  leaving because Laura stepped into that role.  And
15  I think that's when I met her.  So it probably was
16  2005 or '06, something like that.
17      Q.   And so you worked and were in contact
18  with Laura Schwartz 2005, 2006, 2007 into 2008?
19      A.   I left Bear Stearns in February of 2008.
20  So whether I had one conversation with her in 2008,
21  I'm not sure.
22      Q.   Did your interactions with Laura
23  Schwartz leave you with a view as to her
24  credibility?
25           MR. SCHULTZ:  Object to form.

Page 157

I. Wagner

1            I. Wagner
2       A.   Yes.  I would say so.
3   BY MR. RHYS DAVIES:
4       Q.   What was that view?
5       A.   I think it was positive.  She is a
6   credible person.  Very professional, serious.
7       Q.   Let me ask you the same question as to
8   Alan Roseman.  When did you first meet Alan
9   Roseman?
10      A.   It was more recent than the first
11  meetings with ACA.  I'm trying to think when he
12  actually became -- came into his role.  I just
13  remember having dinner with him at one time with a
14  few other ACA people.  And he may have come to that
15  closing dinner that I went to, I'm not 100 percent
16  sure.  He may have been there.  So I may have
17  talked with him in a meeting once or twice.
18      Q.   Did you form a view of him in terms of
19  his credibility at those interactions?
20      A.   I didn't have the same degree of
21  dealings with him.  I had no reason -- nothing
22  about him sort of said, This is someone I couldn't
23  believe.  He seemed -- again, he seemed
24  professional, I think, but I didn't have -- it
25  wasn't an in-depth discussion to base that on.

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013

New York, NY

Page 158

I. Wagner

1           I. Wagner
2       Q.   Let me ask you the same questions about
3   Keith Gorman.  When did you first meet Keith
4   Gorman?
5       A.   When did I first meet Keith Gorman?
6   Probably in person -- maybe at a meeting at our --
7   I'm not really sure.  They may have come up to our
8   offices.  I certainly met him or talked with him at
9   the closing dinner, I think.
10      Q.   And based on your interactions with
11  Keith Gorman while you were still at Bear Stearns,
12  did you formulate a view of him in terms of his
13  credibility?
14      A.   Yes.  I think so.  I mean, I think --
15  again, I think he was much more junior than Laura.
16  I don't remember his exact number of years of
17  experience, but it was certainly less.  He was
18  young, which is okay.  And he seemed to know how to
19  do his job.  I don't know that I had a bigger
20  impression than that.
21      Q.   Did you consider including in your
22  report any disclosure of your interactions with
23  Ms. Schwartz, Mr. Roseman or Mr. Gorman while you
24  were at Bear Stearns?
25      A.   No.  I don't think there was really

Page 159

I. Wagner

1           I. Wagner
2   anything particularly notable about it nor
3   necessarily relevant, so no.
4       Q.   Mr. Wagner, you have opined that it was
5   not typical for a purely short investor to play a
6   direct role in portfolio selection; is that
7   correct?
8       A.   Yes.  I think that's in the report, yes.
9       Q.   Let's go to your opening report.
10      A.   Okay.
11      Q.   On page 5.
12      A.   Okay.
13      Q.   You say that long investors did
14  sometimes participate in portfolio selection; is
15  that right?
16      A.   I don't think I said exactly that.
17      Q.   Let me take you to the sentence that
18  begins with the words "At times...."
19      A.   Right.
20      Q.   "At times, CDOs would arise out of a
21  'reverse inquiry' in which a prospective long
22  investor would approach an underwriter regarding
23  its interest in making a significant investment in
24  a portion of a CDO for a specific asset class and
25  in participating in the selection of a collateral

Page 160

I. Wagner

1           I. Wagner
2   manager for the transaction."
3           Is it your understanding that long
4   investors sometimes participated not only in
5   selection of a collateral manager but in the
6   portfolio selection itself?
7       A.   By and large not to a great extent or
8   really -- I think it would be quite limited, if
9   any.
10      Q.   What do you mean by "not to a great
11  extent"?
12      A.   Well, for example -- there's a couple of
13  different things, I think.  If a participant had,
14  for example, ended up investing and then taking
15  warehouse risk, for example, they might have some
16  ability to approve or disapprove assets going into
17  the warehouse.
18          Sometimes a CDO investor would ask to
19  see the ramped-up portfolio because, I think as you
20  know, CDOs sometimes are marketed or even priced
21  and closed without the full portfolio, so they'll
22  ask to see what's there.
23          I would say from time to time an
24  investor might be very specific about a credit or
25  two that they might be worried about and ask to

Page 161

I. Wagner

1           I. Wagner
2   speak to the manager about it and get their
3   perspective.  And sometimes an investor might say,
4   I would invest but I really -- I don't want name X.
5   But this is like one name or two.
6           I really don't recall an investor
7   saying, I would like you to buy X, Y or Z.  It was
8   really more, Could I see the portfolio?  And
9   occasionally asking about some credits, What was
10  the manager's thoughts.  And maybe voicing some
11  particular concern about one or two.
12      Q.   When a long investor had any of those
13  forms of involvement or discussions, was that
14  disclosed to short investors?
15      A.   To short investors?
16      Q.   In a synthetic CDO.
17      A.   Well, there wouldn't have been a short
18  investor in the CDO.  I mean, the short to the CDO
19  is usually the originating dealer.
20      Q.   And if the originating dealer sold its
21  short to another protection buyer, would the fact
22  of the long investor's involvement, if any, in
23  portfolio selection be disclosed?
24      A.   Well, usually -- I mean, as a general
25  rule -- there could be many different ways the

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                          February 5, 2013
New York, NY

Page 162

I. Wagner
1  I. Wagner
2  dealers handled it. But they tended to be -- the
3  shorts on the other side of the dealer or the
4  dealer selling protection to balance the short
5  would more typically be name by name, not sort of
6  taking that same portfolio as the CDO.
7      Q.  You used the expression "a pure short"
8  several times in your report. Can you explain what
9  you mean by that?
10     A.  Well, I think -- what I mean is what
11  Paulson was, which was only a short investor. They
12  weren't also investing in any of the long
13  securities in the CDO itself. So their only
14  interest was being the purely short investor. They
15  had no other interest in the CDO.
16     Q.  And you address that in footnote 4 of
17  your opening report, is that right, page 5?
18     A.  Yes. I mean, I think that's what it
19  says, right, by purely I'm referring to an investor
20  who did not also take a long position in the CDO.
21     Q.  So a purely short investor is someone
22  who has no long investment at all?
23     A.  In the CDO.
24     Q.  In the CDO.
25         And how much of a long investment does

Page 163

1  I. Wagner
2  it take to move an investor out of the purely short
3  category?
4      A.  I guess it's hypothetical. Clearly
5  "pure" means there's zero on the other side. I
6  think pure is a pretty high standard. I imagine if
7  they made some investment, they would no longer be
8  purely short.
9      Q.  And is there a monetary threshold for a
10  minimum level of long investment that it would take
11  to move someone out of the purely short category?
12     A.  I don't know.
13     Q.  When you refer to a purely short
14  investor, do I understand correctly that you are
15  assessing whether someone is short or long with
16  respect to a specific CDO only?
17     A.  Yes. As their role or interest in the
18  transaction being considered, yes.
19     Q.  So you would not take into account
20  whether an investor had other short positions away
21  from the specific CDO you are considering?
22     A.  Not for this purpose. Not for purposes
23  of this definition.
24     Q.  Were you familiar in the 2006-2007 time
25  period with a phenomenon whereby some investors

Page 164

1  I. Wagner
2  would invest in equity and also take larger short
3  positions on the notes higher up in the CDO
4  structure?
5      A.  Yes. I mean, I know of those
6  transactions.
7      Q.  You would not regard those as pure
8  shorts; is that correct?
9      A.  As a general matter, as I understand it,
10  I would not. I guess if you had to look at a
11  specific transaction, you would want to look at
12  what in fact they were doing. But, no, as a
13  general matter, I wouldn't think that was a purely
14  short investor in the CDO based on purchasing some
15  usually significant amount of the CDO capital
16  structure.
17     Q.  Was it typical for investors of that
18  kind, people who were buying some equity and taking
19  larger short positions -- was it typical for those
20  types of investors to have a role in portfolio
21  selection?
22     A.  Well, I think, you know, again -- I
23  mean, I don't -- was it typical? There were
24  certainly a number of transactions that hedge funds
25  had that strategy of purchasing equity and shorting

Page 165

1  I. Wagner
2  mezzanines. I haven't seen a situation, but I
3  haven't been able -- you know, you're not able to
4  see all that took place behind it, as to whether
5  and to what extent they exercised control or say
6  over the assets in the -- that went into the CDO.
7  I would say that -- but in those sorts of positions
8  I would say that's not a purely short investor
9  certainly.
10     Q.  So do you have an opinion on whether
11  that sort of investor having input into portfolio
12  selection had to be addition closed to long
13  investors?
14     A.  I think I couldn't give a general
15  answer. I think you would have to look -- if a
16  transaction of that type was at issue, I think
17  you'd have to look at the rights and the exercise
18  of those rights, and how did they shape the
19  portfolio, and what was their motivation in doing
20  so.
21         So I think it's a lot of the same
22  questions as here; but I don't think the
23  information is available to necessarily make that
24  assessment generally.
25     Q.  What is the information you would need

Alderson Reporting Company
1-800-FOR-DEPO

Page 166

I. Wagner

1           I. Wagner
2    to make a determination as to whether disclosure
3    was required?
4         A.   I think you would have to look at --
5    again, what were they purchasing and perhaps
6    shorting?  What rights did they have?  How did they
7    exercise those rights?  What was their -- you know,
8    to try and understand their motivation, if they had
9    involvement in selecting the portfolio.  And did
10   they in fact exercise those rights and in what way.
11   Did they veto anything?  Did they suggest the
12   manager buy certain securities?  It's this whole
13   range of actions and impact that you would have to
14   look into and evaluate.
15        Q.   When you were at Bear Stearns, were you
16   involved in making disclosure decisions based on
17   factors such as those that you just identified?
18        A.   To the extent that I knew of things of
19   this sort, we would certainly consider it with our
20   counsel as to whether disclosure was necessary,
21   based on whatever the facts of the transaction
22   were.
23        Q.   Did Bear Stearns ask investors what
24   their overall strategies were for purpose of
25   determining whether disclosure was required?

Page 167

I. Wagner

1           I. Wagner
2         A.   Just as a matter of investment, there
3    would not necessarily be a disclosure required,
4    just because there is an investor in a CDO.  So I
5    don't think we would generally do that.
6         Q.   In determining whether an investor
7    should be allowed to have input into portfolio
8    selection, did Bear Stearns ask such investors what
9    their overall motivation was?
10        A.   Could I hear the question again, please.
11             (Question read)
12        A.   Well, I guess there's two things there.
13   One is the input.  I think the input that I'm aware
14   of is what I described earlier, which is just in
15   general the investor was considering investing in
16   the CDO, asked to see the portfolio and perhaps
17   asked about -- may have asked the manager about
18   particular names, their rationale for buying them.
19        And, again, this was not every deal that
20   this came up.  But occasionally might say, I'm not
21   comfortable with that name.  That was not a usual
22   circumstance.  But that was it.
23        So I kind of have a hard time
24   characterizing -- characterizing that as input as I
25   think you intended.

Page 168

I. Wagner

1           I. Wagner
2         But if someone asked that, we didn't
3    then say, Why are you asking or what's your
4    interest in the CDO.  I mean, they were considering
5    making a long investment.
6         Q.   Did Bear Stearns put together any CDOs
7    in which investors made an equity investment and
8    then took larger short positions higher up in the
9    structure?
10        A.   I'm not aware of it, no.  We never did a
11   transaction for Magnetar, for example.  And I don't
12   think -- I'm not aware of other ones that we did
13   that.
14        Q.   You testified a moment ago about some
15   of the factors that would have to be considered in
16   determining whether disclosure should be made of an
17   investor's involvement in portfolio selection.
18        Do you recall that?
19        A.   Yes.
20        Q.   Where were those factors set forth?
21   Were they in a document somewhere?
22        A.   No.
23        Q.   Was there an SEC rule, to your
24   knowledge, that described them?
25        A.   I think that it's the -- as I understand

Page 169

I. Wagner

1           I. Wagner
2    it, it's the responsibility of the -- among the
3    responsibility of the issuer, the underwriter,
4    working with their counsel to consider when
5    disclosure is required.  I don't think these are
6    specifically set forward anywhere that I know of.
7         Q.   Was Paulson the only short investor that
8    approached Bear Stearns with a request to put
9    together a CDO that they would short?
10             MR. SCHULTZ:  Object to form.
11        A.   No others came to my attention.  I'm not
12   aware of any.
13   BY MR. RHYS DAVIES:
14        Q.   Do you know whether Magnetar ever
15   approached Bear Stearns with a request to put
16   together a CDO?
17        A.   I don't know, actually.  I mean, they
18   may have talked to a salesperson, but we never did
19   one.
20        Q.   Do you know whether Morgan Stanley's
21   prop desk approached Bear Stearns with a request to
22   put together a CDO that they would intend to take a
23   short position?
24        A.   I don't know.
25        Q.   Your opinion, if I understand it, is

Ira Wagner                                                          February 5, 2013
New York, NY

Page 170

1              I. Wagner
2    that it was not typical for a purely short investor
3    to have a direct role in portfolio selection?
4        A.   (Nodding affirmatively).
5        Q.   Are you intending in that opinion to
6    distinguish a direct role from an indirect role?
7        A.   The only, in a sense, indirect role is
8    just the market.  Right?  If you had a long,
9    presumably there had to be a short.  So a short
10   might choose to short a certain name and might
11   choose -- there might not be any shorts for another
12   name.  But certainly nothing beyond that.
13          MR. RHYS DAVIES:  Let's take five
14       minutes, please.
15          THE VIDEOGRAPHER:  We are going off the
16       record at 2:07 p.m.
17          (Recess)
18          THE VIDEOGRAPHER:  We are back on the
19       record at 2:15 p.m.
20   BY MR. RHYS DAVIES:
21       Q.   Mr. Wagner, is it your view that
22   Paulson's role in portfolio selection should have
23   been disclosed because his purely short interest
24   was adverse to those of the long noteholders?
25       A.   That is part of it, yes.

Page 171

1              I. Wagner
2        Q.   Before we took a break, I was asking you
3    about investors who took a long equity position and
4    took also larger short positions higher up in the
5    capital structures.
6            Is it your view that an investor who is
7    net short has an interest that is adverse to the
8    long noteholders?
9        A.   If they're net short, they would I think
10   make more money than -- in the poor performance
11   than the long performance.  So then that interest
12   could be adverse.
13       Q.   Going back to your rebuttal report,
14   which is Exhibit 2.
15       A.   Okay.
16       Q.   And the chart of CDOs on Exhibit 2.
17       A.   Okay.
18       Q.   Are any of these Bear Stearns' deals, to
19   your knowledge?
20       A.   I'm trying to remember.  We did some for
21   Libertas.  I don't remember the numbering.  I think
22   there may be a couple.  I didn't look to see
23   specifically.
24       Q.   When you went through the Wachovia
25   report, did you exclude Bear Stearns' deals?

Page 172

1              I. Wagner
2        A.   No.  Certainly not.  I don't think the
3    underwriter is actually in the report.  I'm not
4    sure it is.
5        Q.   Before you were engaged as an expert in
6    this matter, had you ever met Fabrice Tourre?
7        A.   No.
8        Q.   Did you see Mr. Tourre's testimony
9    before Congress?
10       A.   I didn't watch -- I mean, I think I can
11   picture a picture of it.  I don't know that I
12   watched it completely.
13       Q.   Did you read any press commentary on
14   Mr. Tourre's testimony before Congress?
15       A.   Some.  Some.
16       Q.   What do you recall about that press
17   commentary?
18       A.   Probably the largest thing I remember is
19   sort of questioning, well, you know, him versus the
20   firm and who was testifying, and was this guy kind
21   of -- I don't know how to put it, but sort of
22   singled out for his role.
23       Q.   Did you form any views as to
24   Mr. Tourre's credibility through reading this press
25   commentary?

Page 173

1              I. Wagner
2        A.   Neither -- not either way, no.
3        Q.   Did you form any views as to whether
4    Mr. Tourre had been singled out in any sense?
5        A.   No.  Not really, no.
6        Q.   When you were at Bear Stearns, did you
7    have interactions with Goldman Sachs as another
8    dealer in this market?
9        A.   Very limited.
10       Q.   Based on whatever interactions you had,
11   did you develop any views on Goldman Sachs as an
12   institution?
13       A.   Based on interaction, no.
14       Q.   Do you have any general views on Goldman
15   Sachs as an institution?
16       A.   They make a lot of money.  Not really.
17       Q.   Other than they make a lot of money, do
18   you have any views on Goldman Sachs as an
19   institution?
20       A.   Not anything in particular, no.
21       Q.   Since you left Bear in February of 2008,
22   what have you been doing?
23       A.   I have been doing a variety of things.
24   I do consulting work pretty continually.  Probably
25   about anywhere from half time to three-quarters

44 (Pages 170 to 173)

Ira Wagner                                                    February 5, 2013
New York, NY

---

Page 174

```
 1              I. Wagner
 2    time.
 3              I've done the other expert witness work
 4    that you've seen.  And I've been doing some
 5    personal interests that I have.
 6        Q.   Other than the expert testimony, what
 7    sort of consulting work have you been doing?
 8        A.   I have been doing consulting work mostly
 9    with a firm called Treliant.  I'm a contractor with
10    them.  And I work on a variety of projects.  It's
11    related to financial institutions, not really to
12    securitization, if you will.  But a lot of it has
13    to do with mortgage breaches, working with clients
14    on analyzing breach claims.  Things like that.
15              Sometimes looking -- helping with
16    reviews of fair lending, for example.  Pricing and
17    underwriting decisions and fair lending reviews by
18    regulators.  Things like that.
19        Q.   Have you also been studying?
20        A.   Studying?
21        Q.   Studying.
22        A.   Yes.  As I said, I have personal
23    interests I have been working on.  I have been
24    studying extensively photography.
25        Q.   Are you due to be studying during July
```

Page 175

```
 1              I. Wagner
 2    and August of this year?
 3        A.   There is a class that I have scheduled
 4    in -- somewhere late in July into the beginning of
 5    August.
 6        Q.   And this is the photography course?
 7        A.   Yes.
 8              MR. RHYS DAVIES:  No further questions.
 9    Thank you.
10              MR. SCHULTZ:  Mr. Wagner, I have a
11    couple of follow-up questions from some of
12    what you were asked earlier.
13    EXAMINATION
14    BY MR. SCHULTZ:
15        Q.   In your report which Mr. Rhys Davies
16    marked as Exhibit 1, in paragraph 92 you list
17    matters in which you have submitted expert
18    testimony.  And one of them is LaSalle Bank versus
19    Goldman Sachs International.
20        A.   Yes.
21        Q.   Which of the two parties did you submit
22    a report for in that case, LaSalle Bank or Goldman
23    Sachs?
24        A.   It was for Goldman.
25        Q.   Mr. Rhys Davies asked you a number of
```

Page 176

```
 1              I. Wagner
 2    questions earlier today about the views you had
 3    about Paulson's deal that they presented to you
 4    back in the 2006-2007 time frame.
 5              Do you recall those questions?
 6        A.   Yes.
 7        Q.   Mr. Rhys Davies followed up with some
 8    questions that asked whether you thought that deal
 9    that you were approached about was proper, whether
10    it -- I think he used the word "propriety," and
11    whether you had negative views.
12              Do you recall those questions?
13        A.   Yes.
14        Q.   In the 2006-2007 time frame when you met
15    with Paulson & Company and declined to get involved
16    in that deal, did you consider what they were doing
17    to be improper?
18        A.   No.
19        Q.   Did you have negative views about it at
20    that time other than that you didn't want to get
21    involved in it?
22              MR. RHYS DAVIES:  Objection.
23        A.   No.  No.  My principal view was that
24    there was a conflict that probably needed
25    disclosure.  And I think for our franchise, we
```

Page 177

```
 1              I. Wagner
 2    didn't want to get involved.
 3              MR. SCHULTZ:  Those are the only
 4    questions we have.
 5              One second.
 6              (Pause in the proceedings)
 7              MR. SCHULTZ:  We don't have any other
 8    questions.
 9    FURTHER EXAMINATION
10    BY MR. RHYS DAVIES:
11        Q.   The expert testimony that you submitted
12    in the LaSalle Bank against Goldman Sachs
13    International case, what was the topic of that
14    expert testimony?
15        A.   I think that had to do with the specific
16    terms of the indenture for that transaction, how
17    that transaction operated.  And there was an
18    investor who thought, I believe, as I remember,
19    that it should operate differently, and it wasn't
20    -- the way they thought it should work was not what
21    the indenture said.  So that was largely what that
22    was about, as I remember.
23        Q.   It was nothing to do with whether it was
24    typical for a purely short investor to play a
25    direct role in portfolio selection?
```

Alderson Reporting Company
1-800-FOR-DEPO

Ira Wagner                                                    February 5, 2013
New York, NY

Page 178

```
1              I. Wagner
2       A.    No.  No, it was not.
3             MR. RHYS DAVIES:  No further questions.
4   Thank you.
5             THE VIDEOGRAPHER:  This completes the
6   deposition.  We are going off the record at
7   2:25 p.m.
8             (Proceedings concluded at 2:25 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 179

```
1          CERTIFICATE OF DEPONENT
2
3   I hereby certify that I have read and examined the
4   foregoing transcript, and the same is a true and
5   accurate record of the testimony given by me.
6   Any additions or corrections that I feel are
7   necessary, I will attach on a separate sheet of
8   paper to the original transcript.
9
10        _____
11           Signature of Deponent
12
13   I hereby certify that the individual representing
14   himself/herself to be the above-named individual,
15   appeared before me this _____ day of _____,
16   2013, and executed the above certificate in my
17   presence.
18
19        _____
20        NOTARY PUBLIC IN AND FOR
21
22        _____
23           County Name
24
25   MY COMMISSION EXPIRES:
```

Page 180

```
1          C E R T I F I C A T E
2
3   STATE OF NEW YORK )
4                     ) ss.
5   COUNTY OF NEW YORK)
6
7        I, Christina Diaz, a Certified Realtime
8   and Registered Merit Reporter and Notary Public
9   within and for the State of New York, do hereby
10  certify:
11        That IRA WAGNER, the witness whose
12  deposition is hereinbefore set forth, was duly
13  sworn by me and that such deposition is a true
14  record of the testimony given by such witness.
15        I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in the
18  outcome of this matter.
19
20
21        _____
22        CHRISTINA DIAZ, CRR, RMR, CSR, CLR
23
24
25
```

46 (Pages 178 to 180)

Ira Wagner                                                                                    February 5, 2013
New York, NY

| A | | | | |
|---|---|---|---|---|
| **AA** 45:7 | 73:13 75:19 | **additional** 30:19 | 89:15 129:4,19 | **anybody** 65:19 |
| **AAA** 45:7 | 85:20,21 88:22 | **additions** 179:6 | 157:8,8 | **anyway** 47:20 |
| **AAA-rated** | 99:23 100:4,22 | **address** 44:3 | **Alderson** 10:20 | **Apart** 154:8 |
| 51:21 | 102:25 106:8 | 87:20 162:16 | 10:22 | **apologies** 145:23 |
| **Abacus** 5:7 31:19 | 109:2 110:10 | **addressed** 44:5 | **allegation** 96:18 | **apologize** 146:8 |
| 32:16 33:5 35:2 | 127:13 128:6 | 125:23 | 96:23 97:4,6 | **appear** 80:17 |
| 35:9 39:25 40:9 | 129:23 134:2,7 | **adequacy** 143:4 | **alleged** 61:13 | **appeared** 48:9 |
| 40:16,23 42:11 | 145:2,7 147:18 | **administrative** | 96:12 | 179:15 |
| 42:19,24 43:6 | 148:14,23 | 92:3 117:18 | **Allen** 2:5 3:11 | **appearing** |
| 43:10,12 44:21 | 149:17 154:17 | **adverse** 170:24 | 10:16 11:2,3,5 | 126:14 |
| 45:10,12,17 | 155:8 | 171:7,12 | 65:3 | **appears** 34:18 |
| 47:7,11 48:12 | **accept** 131:19 | **Advisors** 76:11 | **allowed** 96:16 | 38:10 105:11 |
| 48:20 49:5,18 | **acceptable** 34:2 | 77:13 | 123:20 167:7 | **approach** 44:14 |
| 50:19 51:5,23 | **access** 137:15 | **affiliates** 92:23 | **amended** 31:11 | 63:8 155:3 |
| 54:5,10 55:4 | **account** 138:19 | **affirmatively** | 31:15 | 159:22 |
| 60:16 61:14 | 139:13 147:24 | 54:18 105:10 | **America** 6:18 | **approached** 55:3 |
| 63:18 99:10 | 148:16 149:23 | 118:4 155:9 | 15:4 95:20 96:3 | 169:8,15,21 |
| 103:17 112:16 | 163:19 | 170:4 | **Americas** 2:6 | 176:9 |
| 122:9,14 128:5 | **accumulation** | **AFTERNOON** | 3:13 10:17 | **appropriate** |
| 128:9,20 | 106:9 | 147:2 | **amount** 21:21 | 68:23 |
| 129:15 130:17 | **accurate** 31:16 | **agencies** 24:15 | 45:13 46:9,15 | **approval** 78:6 |
| 131:9 133:20 | 98:9,13 109:19 | 24:24 25:4 | 47:11 106:6 | 99:23 100:5 |
| 134:8 135:24 | 179:5 | **agency** 45:23 | 109:12 110:9 | 103:2 106:8 |
| 143:25 | **achieve** 20:12 | **agent** 33:4 | 133:21 164:15 | 109:2 110:10 |
| **ability** 101:5 | 130:24 | 100:13 126:7 | **amounts** 16:3 | 120:15 121:6,7 |
| 126:18 142:24 | **acquired** 92:25 | 129:6 | **analyses** 41:25 | 150:6 |
| 160:16 | **action** 101:14 | **ago** 36:5,12 | **analysis** 25:3,4 | **approvals** |
| **able** 99:17 | 180:16 | 62:18 98:8 | 42:10,15,18 | 131:25 132:4 |
| 140:19 165:3,3 | **actions** 53:4 | 121:18 168:14 | 43:3,14,16,18 | **approve** 118:11 |
| **ABN** 134:4,5 | 166:13 | **agree** 15:16 | 43:19,21,25 | 121:23 123:24 |
| **above-named** | **active** 21:13,14 | 17:13,15 37:4 | 44:10,16 45:11 | 160:16 |
| 179:14 | 135:2 | 61:18 68:20 | 47:18 49:3,21 | **approved** 108:6 |
| **ABS** 17:19 78:13 | **activities** 127:21 | 105:11 137:12 | 52:3 63:3 89:21 | 108:11 109:14 |
| 78:21,24 79:3 | **AC1** 35:4,4 | 141:22 142:10 | 132:18 148:14 | 109:24 120:12 |
| 85:5 87:10 88:5 | 37:20,24 38:2,3 | **agreed** 9:3,9,14 | 149:7,18 | 121:10,13 |
| 90:3,16 91:14 | 38:5,7 40:19,25 | 33:4 76:25 | **analytics** 84:10 | 152:2 |
| 112:23 113:22 | 41:5 129:15 | 111:16 129:5 | **analyzing** 174:14 | **approximately** |
| 117:9 119:15 | **Adam** 115:7 | **agreeing** 75:16 | **Andrew** 3:15 | 10:18 46:5 |
| 122:21 | **add** 67:3,25 | **agreement** 27:25 | 10:25 120:4 | **April** 53:25 61:5 |
| **absence** 125:4 | **added** 125:11 | 110:13 116:12 | **answer** 22:12 | 61:16,24 62:11 |
| 126:5 | **addition** 14:4 | **Airlie** 75:5,6,9 | 131:21 132:6 | 62:16 63:23 |
| **ACA's** 38:5 | 30:22 72:12 | **Alan** 33:19 84:23 | 139:11 165:15 | **arbitration** 53:6 |
| | 165:12 | 86:8,11 88:19 | **answers** 131:17 | 53:10,11,20 |

Ira Wagner                                                    February 5, 2013
New York, NY

**arbitrations** 53:4
**area** 19:3 73:2
**argue** 103:16
**argument** 61:13
**arising** 53:4
**Arizona** 137:23
**ARM** 72:24
**ARM's** 137:7
**Arrange** 24:16
**arrived** 130:21
**arriving** 33:8
**article** 5:7 63:9
  63:10,18,23
**articles** 63:13
**ARUN** 3:21
**asked** 19:21
  37:20 38:11
  42:14 59:8
  65:12 77:6
  106:17,24
  126:17,19
  136:6,23
  138:13 147:18
  167:16,17,17
  168:2 175:12
  175:25 176:8
**asking** 69:2,3
  77:21 78:9
  102:21 121:6
  146:3 161:9
  168:3 171:2
**aspects** 59:6
**assemble** 109:11
**assessing** 163:15
**assessment**
  148:8 149:2
  165:24
**asset** 7:3 88:22
  107:8 149:3
  159:24
**assets** 45:20
  47:14 61:22
  67:18 97:7

111:9 120:19
120:25 123:24
128:13 136:18
160:16 165:6
**assigned** 24:12
  153:11
**assume** 50:25
  51:19
**assumed** 31:14
**assumption**
  51:22
**Assurance** 6:17
  95:19 96:2
**Atlantic** 51:13
**attach** 179:7
**attached** 4:12
**attaching** 117:8
**attachment** 5:16
  5:21 6:5,9,14
  6:22 7:12,16,21
  75:23 76:3,7
  79:16 81:7 82:3
  83:17 86:23
  90:23 104:17
  113:5,10,20
  116:14 118:18
**attachments**
  91:5
**attempt** 97:7
**attend** 55:12
  78:13
**attended** 78:21
  79:2,4 86:21
  90:5,10
**attending** 85:16
  86:16 88:2
  89:23
**attention** 50:8
  51:11 60:13
  63:11 64:4 76:6
  76:17 79:23
  91:9 107:22
  113:13 169:11

**Attorney** 52:15
**attorneys** 3:4,12
  27:9,20,21 28:4
  79:5
**atypical** 135:22
  136:5
**audit** 27:11
**August** 175:2,5
**Ava** 88:19
**available** 26:20
  46:13 50:7 65:5
  104:12 165:23
**Avenue** 2:5 3:13
  10:16 87:22
**average** 45:13
  50:3,14
**aware** 17:7,10
  72:19 95:10
  97:23 167:13
  168:10,12
  169:12
**awesome** 131:10
**a.m** 2:2 10:18
  22:7,10 34:19
  35:12 64:15,22
  102:15,19
  127:7

---
**B**
---
**b** 4:11 5:1 6:1 7:1
  8:1 105:22
  110:7
**Baa** 49:9,16
**Baa1** 49:10
**Baa2** 42:24 50:2
  52:6
**Baa3** 49:10
**back** 22:9,12
  23:21 40:3
  64:21 99:7
  102:18 109:6
  110:3 111:14
  124:8 127:9

142:14 147:9
170:18 171:13
176:4
**backed** 45:7
**Bad** 5:8 63:18
**Bajaj** 41:25
  47:17 63:2
**balance** 96:25
  150:5 162:4
**bank** 13:5,9
  14:18,19 15:4
  17:18,18 75:4
  104:8 109:21
  175:18,22
  177:12
**banker** 12:2
  19:13 26:20
  74:23 113:18
**bankers** 23:24
  24:6,9,12 26:13
  26:15 27:2
  76:19 79:4 88:7
  94:23 99:6
**banking** 13:7
  27:16 80:6
  81:22 88:11
**Barbara** 88:17
**Barcelona** 78:14
  78:19,22 85:5
**Barclays** 17:18
**Barclay's** 15:17
  15:19
**base** 157:25
**based** 51:21 65:4
  71:2,4 141:23
  143:15 158:10
  164:14 166:16
  166:21 173:10
  173:13
**basis** 26:23
  100:21 101:22
  111:6 132:20
  134:24 135:7

136:15
**Bates** 74:16 76:4
  87:4 91:4,7
  104:24 107:15
  119:9 145:21
  145:24 147:15
**bearing** 4:20
  5:13,16,21 6:5
  6:9,14,22 7:7
  7:12,16,22 8:5
  8:9 34:12 74:12
  75:23 79:16
  81:7 86:23
  90:23 104:17
  107:10 113:5
  116:14 118:18
  145:15 147:6
**Bears** 12:5
**began** 19:9
**beginning** 4:18
  5:19 6:3,12
  7:10,19,21
  19:10 34:12
  48:4 66:16
  67:14 79:15,21
  81:6,12 86:5
  87:4 90:22
  97:21 104:24
  107:15 113:4
  116:19 118:17
  118:18 175:4
**begins** 35:12
  37:19 76:4,7
  91:4 97:22
  105:22 113:10
  148:11 159:18
**behalf** 115:24
**belief** 149:20
**believe** 12:14,24
  13:17 28:13
  31:23 32:3
  33:22 40:17,19
  46:3 55:21 73:5

73:18,21 74:4
75:7 84:22
93:10 99:12
122:3 129:16
137:21 150:17
157:23 177:18
**benefit** 141:14
**best** 142:24
**beyond** 170:12
**bias** 141:2,10,11
141:23 142:2
**bigger** 158:19
**Bill** 88:19 90:8
**bit** 54:8
**blood** 180:16
**Blue** 88:3 89:23
**board** 73:7,10
**bond** 27:25
118:12 121:7
121:23
**bonds** 128:21
**bonus** 28:9,14,23
29:15
**book** 81:19 82:17
85:3,19 128:5
**borrowers** 137:7
**bottom** 35:11
60:14 76:8
79:24 84:24
93:10 106:3
149:13
**bought** 22:16,23
37:23
**box** 111:3
**Brad** 56:5
**Brandon** 3:17
11:3
**breach** 174:14
**breaches** 174:13
**break** 22:4
102:10 146:10
146:16 147:17
171:2

**Bridget** 3:9
11:12
**broadly** 99:18
**broke** 102:21
**broker-dealer**
13:6
**Brothers** 15:2
**bubbles** 137:10
137:18,20,24
**bulletproof**
130:25
**business** 14:5
17:13 73:2
75:20 77:3,10
88:23,24,25
154:10
**buy** 161:7 166:12
**buyer** 122:20
161:21
**buying** 58:13
164:18 167:18

───── C ─────

**C** 3:1 180:1,1
**calendar** 151:7
152:10,14
**California**
137:22
**call** 53:2 54:7,8,9
**called** 25:10 45:5
84:11 87:9 88:3
114:16 126:15
132:19 174:9
**Calyon** 15:21,22
**candidate** 149:7
**capabilities**
85:12,20,22
**capital** 76:9
84:18 101:12
133:23 164:15
171:5
**caption** 96:2
**Cards** 126:15

**career** 143:16
**carefully** 140:24
141:9
**Carol** 115:8
**carrying** 26:13
**case** 17:18 29:21
29:24 31:3
41:15,18 48:17
54:13 86:14
96:2 100:13
101:25 112:13
115:23 127:25
143:6 175:22
177:13
**cash** 20:24 21:4
21:6,11,11,16
25:3,6 27:12
110:20 111:7,9
129:24
**cash/synthetic**
110:25
**catch** 48:10
**category** 49:9
50:4 163:3,11
**cause** 40:8
**caused** 13:19
39:6 62:23
**cautious** 148:12
**CDO** 7:3 14:5,8
15:9,22 16:11
18:10 19:12,13
20:12 23:11
24:12,14 25:19
27:5 33:12,16
44:12 45:21
48:22,23 50:8,9
50:12,18,19
51:4,13,16,22
56:13,15 57:14
57:16 58:3,13
63:5 69:12,17
71:25 72:8,12
74:23 75:5,19

76:9 77:2,10
82:22 83:17,24
84:9,10,13
86:18 87:9 88:6
88:24,25 90:16
107:8 112:23
113:22 115:9
122:21 123:8
123:12,16,21
125:3,19
128:20 129:24
135:24 143:14
143:16 152:7
159:24 160:18
161:16,18,18
162:6,13,15,20
162:23,24
163:16,21
164:3,14,15
165:6 167:4,16
168:4 169:9,16
169:22
**CDOs** 12:4,12
12:14,16,17,20
14:21,23 16:4
17:12,20 18:2
18:12,16,20,24
19:7,22 20:6,16
20:24 21:4,5,6
21:8,10,16,22
22:17,23 23:12
23:15 24:21
25:14,17,17
26:9 33:14
43:11 44:13,22
44:25 45:19
46:16 48:13,22
49:4,18,23
51:12 52:7
84:12 97:24
98:2,4 112:20
125:9,10
126:18 150:9

152:24 153:4
159:20 160:20
168:6 171:16
**CDS** 18:22,23
20:8,12,15,19
114:25 115:3
123:8
**celebrate** 86:17
87:9 89:24
**celebrated** 90:17
**CEO** 84:23
**certain** 20:10
92:3 117:17
121:7 129:6
137:9 166:12
170:10
**certainly** 14:7,9
15:20 16:9,14
16:15 21:3 24:8
36:20 39:12
41:11 47:23
59:5 61:18
69:16 102:11
120:9 125:8,12
137:24 143:8
145:11 150:4
153:14 158:8
158:17 164:24
165:9 166:19
170:12 172:2
**certificate** 179:1
179:16
**certification** 9:5
**Certified** 2:7
180:7
**certify** 8:16
179:3,13
180:10,15
**cetera** 13:8
37:18
**chain** 34:6,10,23
35:2,11,22 40:4
40:9

Ira Wagner                                                           February 5, 2013
New York, NY

chains 40:20,22
chance 119:5
changed 16:10
    139:3
character 18:20
characteristics
    24:23 43:12
    136:21 137:13
    152:3
characterize
    28:16 42:4
    145:6
characterizing
    167:24,24
charging 60:15
chart 171:16
Chelsea 87:21
Chepiga 3:16
    11:5,5
chief 89:16
Choi 80:2,4
choose 56:14
    57:15 170:10
    170:11
choosing 47:5
    136:9 138:14
Christian 3:7
    11:7
Christina 1:25
    2:6 10:22 180:7
    180:22
CIFG 6:17 95:19
    96:2 97:23
circular 28:4,5,6
    91:7,11,14 92:8
    93:13 94:23
    98:8 116:12
    117:9,12,24
    121:17 124:9
    124:11
circumstance
    112:3 167:22
Citigroup 14:10

14:11
civil 53:4
claim 53:13,16
claims 174:14
class 159:24
    175:3
classes 25:17
classify 25:23
clear 66:8 100:7
    100:18 101:3
    134:2 146:14
clearly 35:4
    135:5 163:4
clients 79:11
    80:11 174:13
CLO 7:4 71:25
    72:13 81:19
    90:4 102:5
    103:7,14,20,23
    105:12 107:9
    110:20 112:15
CLOs 104:11
    109:8 111:13
    112:19 150:9
    152:24 153:5
close 72:16
closed 160:21
    165:12
closing 86:17
    87:9 89:24
    90:16 120:20
    121:3 154:5,8
    157:15 158:9
closings 86:19
CLR 1:25 180:22
CNBC 126:15
collateral 18:22
    20:18 24:22
    27:7,25 32:17
    34:2 49:12,14
    62:7 72:2,9,14
    79:5 92:2,5,11
    92:14,19,24

94:2 96:15,17
    97:24 106:7,9
    110:10,11
    112:7,9 116:11
    117:17,19
    118:3,6,7
    121:18,19
    123:15,19
    129:23 136:9
    152:25 153:5
    154:25 159:25
    160:5
collateralized
    11:24 12:17,21
    18:17,24 19:23
    20:25 22:24
    23:12 46:17
colleagues 59:17
    59:23 71:2
combined 21:22
come 5:8 21:8
    63:10,19
    154:20 157:14
    158:7
comes 33:21
comfortable
    167:21
coming 31:3
    108:2 147:23
    148:17
commendable
    149:19
comment 24:19
    94:24 100:21
commentary
    172:13,17,25
comments
    144:10 147:24
    148:21
Commission 1:4
    3:3 10:12 11:9
    11:11,13 17:9
    53:24 179:25

Commitments
    7:5 107:9
committee 7:6
    101:12 107:10
communication
    33:13 153:15
company 13:24
    33:5 91:25
    117:16 176:15
comparable 49:5
    50:18 51:23
compare 42:23
    44:21 45:17
    48:20
comparing 43:15
    63:4
comparison 43:8
    43:8,9 44:25
    45:16 49:15
    51:4
compensation
    28:17,18
competence
    154:24
compilation
    118:23
complaint 6:19
    31:11,11,15,15
    95:21,25 96:6
    96:13 97:14
complete 22:17
    23:2 133:9,16
    143:7
completed 32:17
completely
    172:12
completes 178:5
completion 24:11
compliance
    71:13
components
    104:15
composition

135:5
compromised
    127:13 132:13
    134:10
computer 152:12
    152:15
concentrations
    137:9
concern 145:6
    161:11
concerned
    144:25 148:14
concerning 52:10
    52:19
conclude 33:3
    115:18
concluded 70:3
    178:8
concludes
    102:13 146:17
concluding 116:5
conclusion 33:22
    48:11,16,18
    70:22 112:4
    127:24 136:13
    139:12
conditions 20:21
conduct 42:14
conducted 42:10
    42:17
conference
    78:13,20,24,25
    85:5 154:4,6
conferences
    78:22 85:9
confidence 38:4
    39:16
confidential 82:6
    82:13 111:17
    111:20
confirmed
    136:24
confirming 27:12

Ira Wagner                                                                February 5, 2013
New York, NY

**conflict** 58:25
  62:8 69:8
  176:24
**Congress** 172:9
  172:14
**connection** 19:6
  19:22 60:16
  69:22 75:19
  77:9,16 106:13
  132:8 135:14
**conscious** 148:13
**consensus** 58:22
  70:14,17
**consider** 15:24
  32:16 33:10
  37:20 38:11
  39:13,21 44:4
  58:12 120:16
  125:7,18 126:3
  132:23 140:24
  141:9 158:21
  166:19 169:4
  176:16
**considered** 29:20
  30:20 31:2 33:8
  33:11,12 49:7
  71:14 125:11
  129:19 130:7
  133:2,4 138:2
  163:18 168:15
**considering**
  119:14 163:21
  167:15 168:4
**consisted** 51:20
**consistent** 62:3
  67:6 68:3,7
  127:2 142:11
**consists** 60:8
**constraints**
  24:22
**consulting** 3:21
  173:24 174:7,8
**contact** 26:23

27:2 153:9,12
  156:17
**contacted** 29:23
  77:21 98:17
**contained** 128:20
**contention** 61:18
**context** 66:13
  109:7 122:6
  154:4,5
**contingent** 33:25
**continually**
  173:24
**continue** 148:25
**continued** 5:1 6:1
  7:1 8:1 12:15
  147:11
**continues** 113:11
**continuing** 26:3
  40:18 104:25
**contractor** 174:9
**control** 165:5
**converge** 47:14
**conversation**
  55:10 156:20
**converse** 79:10
**coordinate** 27:18
**coordinating**
  25:19
**copied** 74:19
  79:25
**copies** 23:17
**copy** 95:24
  145:19
**core** 17:12
**corporate** 18:11
**correct** 24:2
  30:19,23 32:19
  35:22 36:17
  39:16,19,21
  40:15,17 41:22
  42:2 44:22
  45:19,24 57:18
  61:9 70:8 73:14

74:20 83:5,21
  85:2 92:16 93:7
  99:5,11 103:18
  104:9 105:5
  106:14 108:21
  110:21 114:4
  114:19 119:18
  128:2 129:7,11
  129:20 130:8
  136:12 138:3
  138:17 140:2,7
  149:2 152:8,25
  159:7 164:8
**corrections**
  179:6
**correctly** 34:16
  44:20 61:25
  62:14 112:7
  129:3 163:14
**counsel** 9:4
  10:23 27:10,11
  27:11 71:20
  94:22 95:3
  114:9,12,14,16
  115:11,20
  166:20 169:4
**counterparty**
  20:16 123:8
**County** 179:23
  180:5
**couple** 86:9
  91:20 160:12
  171:22 175:11
**course** 27:7
  121:8 175:6
**court** 1:1 9:17
  10:13,21 11:15
  95:25
**cover** 37:8,12
  60:8 93:10,12
**coverage** 124:14
  124:17 125:4
  126:5

**covered** 56:23
**covers** 38:8
**Cox** 41:25 63:3
**co-head** 16:24
**create** 56:13
  57:14 139:15
**credibility**
  156:24 157:19
  158:13 172:24
**credible** 157:6
**credit** 14:16,17
  20:11 89:20
  108:5 128:6
  131:24 132:4
  149:6 160:24
**crediting** 129:3
**credits** 108:12
  161:9
**crisis** 5:4 13:17
  13:17,20,23
  17:8 53:23 60:5
**criteria** 147:22
**critical** 100:15
**CRR** 1:25
  180:22
**CSR** 1:25 180:22
**current** 31:25
  41:17 86:13
**CV** 23:20

---
                    **D**

**D** 3:17 4:1
**data** 148:12
**date** 8:4,8 45:22
  46:2,4 47:6
  54:3 61:8,10
  145:14 147:5
**dated** 4:19 5:11
  5:12,15,20 6:4
  6:8,13,21 7:11
  7:15,20 23:17
  23:18 34:12
  40:5 63:23

64:18 74:11
  75:22 76:13
  79:15 81:6
  86:22 90:22
  104:16 113:4
  116:13 118:17
  145:19
**dating** 40:23
**David** 72:20
**day** 64:5 179:15
**days** 54:13
**day-to-day** 24:13
**DC** 3:6
**deal** 5:8 21:20
  37:24 59:6
  63:18 85:13
  90:3 93:6
  103:22 167:19
  176:3,8,16
**dealer** 14:8,11
  14:19 15:20
  20:17,18,19
  161:19,20
  162:3,4 173:8
**dealers** 14:5,10
  15:8,13 76:19
  109:11 124:6
  162:2
**dealings** 157:21
**deals** 21:24 45:5
  45:6,6,6 47:13
  49:7,11,13 52:3
  66:20,21 80:25
  153:22,24
  171:18,25
**debt** 11:25 76:11
  77:13 92:5,19
  92:24 117:20
  118:8 121:19
**December** 4:15
  10:3 23:17
**decided** 58:20
  70:7

Ira Wagner                                                    February 5, 2013
New York, NY

decision 8:4,8
58:24 70:13
143:20 145:14
147:5 148:18
decisions 94:17
166:16 174:17
decision-making
14:2
declaration 4:22
32:4,11 33:21
36:5,7,11,15
36:24 37:5,8
38:19 39:7,10
39:17,19,23
declined 58:16
176:15
Defendant 1:8
3:12
defendant's 46:7
deferred 28:17
28:18
defined 91:25
92:5,15 93:15
117:16,20
definitely 29:9
definition 163:23
degree 157:20
Del 87:8,12,13
87:19 90:17
Delaware 91:24
117:15
demand 109:9
demonstrating
36:15,25
Dennis 88:19
89:18
department
16:25 71:13
depended 153:18
Deponent 179:1
179:11
deposition 1:14
2:4 9:6,15

10:10,15 31:24
35:25 41:20
106:15 107:18
108:9 129:10
129:19 130:7
131:5,6,16
137:4 138:3
139:21 140:14
156:6,10 178:6
180:12,13
depositions
30:12
derived 139:8
144:19
deriving 101:11
101:24
described 26:14
26:25 44:9
57:22 61:12
66:23 167:14
168:24
describes 60:20
100:25 128:5
describing 65:18
67:7
description 4:13
5:2 6:2 7:2 8:2
119:17
desk 56:21
169:21
detail 102:8
112:12
details 109:16
deteriorating
48:6
determination
166:2
determine 49:4
49:21
determined
70:10
determining
166:25 167:6

168:16
Deutsche 14:18
14:19
develop 24:25
173:11
developed 94:25
142:12
dialogue 25:11
26:3,8 40:18
101:16
Diaz 1:25 2:7
10:22 180:7,22
differences
103:19 112:14
different 25:15
26:6,18 79:2,9
80:25 103:17
112:19 122:9
122:13,16
133:22,23
144:9 160:13
161:25
differently
177:19
dinner 86:16
87:8,13,15
89:22 90:16
154:5 157:13
157:15 158:9
dinners 86:19
154:8
direct 32:20
134:3 139:10
159:6 170:3,6
177:25
directing 35:10
50:8 51:11
60:13 76:6,17
79:23 84:16
91:9 107:22
113:13 148:4
directly 25:20
director 12:3,6,7

28:7 41:21
88:22 89:5
directors 28:13
disagree 43:3
133:11,14
disapprove
160:16
disclose 94:3
109:19 141:5
disclosed 59:2
69:9,22 70:5
125:16,24
128:18 161:14
161:23 170:23
disclosure 36:16
36:25 59:4
93:19,25 98:7
99:9,21 100:2,8
100:12,19
102:23 121:16
122:3 125:25
142:22,22,23
143:4,6 158:22
166:2,16,20,25
167:3 168:16
169:5 176:25
discuss 81:4
103:9
discussed 69:25
discussing 58:4
58:13 62:18
103:5
discussion 58:2,7
58:11 59:16,20
69:19 70:14
93:22 99:14
148:23 157:25
discussions
59:22 161:13
distinguish 46:10
170:6
distress 46:9
48:5

distributing
124:21
distribution
23:25 24:6 25:8
25:10,13,23
26:5,14,16,21
84:14
District 1:1,2
10:13,14 87:21
document 60:24
65:3 66:15 74:9
74:15 76:15
78:6 79:20
81:11,16 87:3
88:9 91:3,7
96:10 104:23
106:19 107:14
107:17 116:19
119:3,6,9 122:4
144:6 145:12
168:21
documents 24:18
27:22,23,24
28:3 29:19
30:19,24 31:3,9
94:18 95:4
115:18,20,23
116:8,9,10
118:23 120:6
129:18 130:6
doing 26:10
71:14 75:21
84:12 109:8
113:18 134:15
164:12 165:19
173:22,23
174:4,7,8
176:16
dollars 28:25
29:3
downgraded
45:17,22,23
47:15 48:6,8,12

Ira Wagner

New York, NY

February 5, 2013

Page 187

52:7
**downgrades** 45:13
**dozens** 18:12 21:3 46:12
**Dr** 41:25,25 47:17 63:3
**draft** 28:4 105:12 105:18 110:4
**drafters** 27:22
**draw** 48:16
**drawing** 127:24
**Drexel** 12:14,17
**Duda** 115:7
**due** 20:11 174:25
**duly** 11:18 180:12
**Dunn** 88:17 119:10,13
**D.H** 3:7

**E**

**E** 3:1,1 4:1,11 5:1 6:1 7:1 8:1 11:17 49:2 135:21 180:1,1
**earlier** 40:4 65:12 66:5,23 67:4,7,22 84:15 92:15 129:2 139:23 152:23 167:14 175:12 176:2
**early** 35:6 39:24 40:15,21 75:17 137:19
**educating** 25:14
**effect** 9:16 134:4
**efficiently** 138:8 138:22
**effort** 15:22
**efforts** 75:19
**Egol** 34:6 35:13

**Eichel** 5:10 16:20 16:22 17:7,11 57:4 64:18,25 65:13,17 66:16 67:15 115:2,4
**Eichel's** 65:9
**either** 66:19 86:5 141:5,7 153:23 173:2
**elaborated** 100:24
**element** 38:14
**eligible** 92:19,24 118:8 121:20
**empirical** 41:25 42:10,17
**employee** 31:25 41:18 73:9
**employees** 86:14 88:16
**encouraged** 61:21
**ended** 160:14
**ends** 76:5
**engaged** 172:5
**engagement** 105:12,18 106:20 110:4
**enhance** 101:5
**enlightening** 67:11
**entered** 13:16
**entering** 20:20
**entire** 56:14 57:15
**entirely** 18:23,24
**entitled** 5:7 63:18
**entity** 73:21 77:12 133:19
**equal** 106:6 110:9
**equity** 58:13

72:23 73:12 164:2,18,25 168:7 171:3
**ESQ** 3:7,8,9,15 3:16,17
**essentially** 49:15 56:16 57:16 128:14 136:24 138:15
**et** 13:8 37:18
**evaluate** 24:24 33:16 134:14 134:18,21,23 140:25 141:9 166:14
**evaluated** 142:20
**evaluating** 39:10 142:25
**Evenchick** 56:25 151:17,19,24
**event** 28:15 90:6
**events** 154:12
**eventually** 47:13 48:10
**everybody** 83:25
**evidence** 32:8 101:25 127:25 132:14 141:9
**evident** 34:5
**ex** 47:18
**exact** 144:15 158:16
**exactly** 16:13 57:20 62:12 128:17 134:16 142:7 145:8 152:5 159:16
**EXAMINATI...** 4:4 11:21 147:11 175:13 177:9
**examine** 52:5

**examined** 11:19 179:3
**example** 20:10 43:18,25 44:10 44:11 115:20 132:19 160:12 160:14,15 168:11 174:16
**Excerpt** 5:3 60:4
**excess** 124:21
**Exchange** 1:4 3:3 10:11 11:8,11 11:13
**exclude** 52:2 171:25
**excluded** 49:11
**excluding** 49:18
**excuse** 127:22
**executed** 143:18 179:16
**execution** 24:10
**executive** 89:16
**exercise** 112:8 165:17 166:7 166:10
**exercised** 165:5
**exhaustive** 121:12
**exhibit** 4:14,16 4:18,22 5:3,6 5:10,12,15,19 6:3,8,12,17,21 7:3,10,15,19 8:3,7 10:2,5 23:21 29:18 30:9,15,18,24 30:25 31:10 34:10,11 36:6,7 40:3,9 43:24 44:9,20 48:14 49:4 51:13 60:2 60:4,8 63:16,17 63:22 64:17,24

74:11,15 75:22 76:3 79:13,14 79:20 81:5,11 86:22 87:3 90:20,21 91:3 95:19,24 99:7 104:16,23 107:7,8,14,18 110:3,23 111:15 113:3,9 116:13,18 118:16,22 121:5,9,17 124:9 145:13 145:18 147:4 147:13 171:14 171:16 175:16
**exhibits** 4:12 23:16 30:11,12 131:5,13
**expect** 98:15
**experience** 11:24,25 12:8 33:12 158:17
**experiencing** 137:18
**expert** 4:14 10:2 23:17 29:24 172:5 174:3,6 175:17 177:11 177:14
**Expertise** 149:6
**experts** 46:7
**EXPIRES** 179:25
**explain** 162:8
**explains** 37:13
**exposure** 45:17 97:8
**express** 39:6
**expressed** 32:15 62:10 127:18 142:11 150:4

Ira Wagner

New York, NY

February 5, 2013

**expression** 162:7
**extensively**
47:18 174:24
**extent** 48:8
58:19 128:12
129:17 160:7
160:11 165:5
166:18
**extract** 60:2
**e-mail** 4:18,19
5:12,15,19,20
6:3,4,8,12,13
6:21 7:10,11,15
7:19,20 34:6,10
34:11,12,18,25
35:10,12,21
40:4,9,19,22
59:22 74:11,18
74:25 75:22
76:3 79:14,15
79:23,24 80:8
81:5,6,18 83:3
86:22 88:8
90:21,22 101:2
104:16 105:4
113:3,4,9,14
113:20 116:13
116:22 118:16
118:17 119:10
119:23 120:11
131:8
**e-mails** 40:6
101:12,15
121:9 144:21

**F**

**F** 3:5 180:1
**Fabrice** 1:7 3:12
10:12 35:21
172:6
**face** 69:25
**face-to-face** 70:2
**fact** 96:16,24

97:22 98:15,19
101:9 104:8
111:10,16,20
111:23 118:11
134:13,15
136:14 161:21
164:12 166:10
**factor** 125:8,15
125:20 126:4
**factors** 166:17
168:15,20
**facts** 38:2 39:15
39:19,20 122:7
129:6 166:21
**fair** 44:23,24
138:13 140:13
142:25 174:16
174:17
**fairly** 27:14 39:2
140:17
**fall** 30:11 156:9
**familiar** 37:7
50:13 163:24
**familiarize** 81:15
118:25
**fancy** 87:23,24
**far** 108:22
**FAST** 84:11
**favorable** 149:21
**FCIC** 17:12 53:2
54:5,14 55:2
58:15 60:2,9,21
61:5,8,16,20
61:23 62:6,10
64:6 65:2,17
71:20,23
**FCIC's** 65:5
**feature** 125:5
**features** 125:10
**February** 1:15
2:1 7:6 10:18
40:20 45:18,25
46:13 47:6

62:19,23 64:3
107:10 156:19
173:21
**federal** 52:18
**feed** 22:5
**feedback** 155:4
**feel** 131:18
141:13 179:6
**FICO** 137:7
**field** 79:6
**figure** 20:8,13,22
**file** 65:4
**filed** 54:12 95:25
**filing** 9:5
**final** 28:5 148:4
**Finally** 62:5
**finance** 11:24
12:9,12,18,21
20:16 79:3
125:10
**financial** 5:3 17:8
53:23 54:16,23
60:5 72:10
95:12 174:11
**Financing** 41:21
**find** 67:11 139:4
155:22
**finding** 33:25
**fine** 108:15
**fingers** 18:4
**finish** 27:17
**FINRA** 53:6
**firm** 20:15 27:15
65:18 66:4,8,24
68:5,21 69:20
142:13,17,18
172:20 174:9
**first** 12:11,14,20
12:23 29:23
32:25 33:11
35:10 42:9
63:10 64:2
74:25 76:21

77:25 79:24
88:8,9 91:10
97:13,21
113:13 114:3
114:21 119:8
134:12 148:7
155:18 156:11
157:8,10 158:3
158:5
**firsthand** 22:2
38:25
**fit** 20:9
**Fitzpatrick** 3:9
11:12,12
**five** 16:16 72:3
72:12 92:13
97:14 118:6
127:4 152:24
170:13
**fixed** 17:5 73:3
**flawed** 42:2
**flaws** 42:4
**Fleischhacker**
115:8
**flip** 128:5
**floor** 68:13
**Florida** 137:23
**flow** 25:3 120:8
**flows** 25:6 27:12
**focus** 66:15
149:17
**focused** 12:4
**followed** 176:7
**following** 119:14
131:16
**follows** 11:20
**follow-up** 175:11
**footnote** 60:10
61:2 162:16
**force** 9:16 25:21
**foregoing** 179:4
**foreign** 52:19
**form** 9:10 15:11

31:5 32:9 37:6
38:13 40:11
47:9 51:6 65:23
66:25 67:23
68:25 69:13
70:20 71:9,16
73:15 77:19
78:8 80:12
91:16 93:2,21
94:6,19 96:19
97:2 98:22
105:14 106:8
109:3,22
110:11,16
112:2,11
114:13 118:13
119:19 120:7
121:24 122:5
122:15,22
123:22 124:24
125:6 126:9
132:9 133:13
134:11 135:25
136:22 138:9
138:24 139:17
140:8,23
141:12,25
142:15 148:19
149:25 154:24
156:25 157:18
169:10 172:23
173:3
**formed** 68:22
69:2,3,4,10,15
71:2 140:5,15
140:20 141:16
**former** 31:25
41:18 86:14
**forming** 29:20
149:24
**forms** 95:4
161:13
**formulate** 158:12

Ira Wagner                                                              February 5, 2013

New York, NY

| | | | | |
|---|---|---|---|---|
| **formulating** 30:20 31:16 129:9 132:8 137:25 | **frequently** 153:13,15,17 | 54:21 63:6 66:12 68:6 69:14 73:3 81:16 111:13 152:16 153:11 155:6 165:24 167:5 | 34:7 39:24 40:15 60:15 100:8,19 131:20 173:7 173:11,14,18 175:19,22,24 177:12 | **Guran** 81:21 82:9 **guy** 172:20 |

**formulating**
30:20 31:16
129:9 132:8
137:25
**forth** 43:17,18,23
109:6 168:20
180:12
**forward** 47:21
133:2,3 169:6
**found** 43:22
69:16
**foundation** 13:22
15:12 17:14
22:19 23:4
28:11 31:6 32:2
38:24 46:18,24
50:20 51:7,24
65:24 67:2,24
73:16 77:4,20
78:7 80:13
82:19 83:6 85:6
87:11 91:15
93:3,8 94:20
95:14 96:20
97:3 98:23
107:2 108:13
110:15 113:24
116:4 118:14
119:20 120:7
122:23 126:10
130:2,13 131:2
131:11 138:10
138:25 139:18
**four** 5:9 29:12
63:19 97:14
106:2 147:9
**frame** 176:4,14
**franchise** 176:25
**fraud** 60:16
95:11
**free** 112:8
**frequent** 79:9
153:9

**frequently**
153:13,15,17
**front** 60:8 65:2
82:12 83:3
105:3 130:4
**full** 97:21 143:6
160:21
**Fuller** 115:9
**fund** 37:22 55:3
55:13 56:3,10
57:13 58:8,12
59:14 137:5
140:6
**fundamental**
134:17
**funds** 73:18,19
164:24
**further** 9:9,14
46:8,11 97:8
175:8 177:9
178:3 180:15
**future** 85:17

---
**G**

**G** 11:17
**gained** 12:2
143:15
**general** 33:12,15
46:25 82:21
85:8 92:11 94:7
94:21 104:11
109:23 111:12
118:5 133:6
147:21 152:2
161:24 164:9
164:13 165:14
167:15 173:14
**generally** 20:15
23:8,11 24:10
25:13,20 26:22
27:10,24 30:14
37:8 43:7,15
48:21 50:6

54:21 63:6
66:12 68:6
69:14 73:3
81:16 111:13
152:16 153:11
155:6 165:24
167:5
**General's** 52:16
**geographic**
137:8
**Germany** 150:15
150:18
**getting** 20:3
27:16,17
111:17 124:6
**get-together**
79:7
**give** 59:11
165:14
**given** 39:12 49:8
52:22 63:14
127:21 179:5
180:14
**Global** 78:13,21
78:24
**go** 37:16 99:7
100:12 112:12
159:9
**going** 22:6 44:2
47:21 48:9
56:13 57:14
58:5 64:14
70:15 77:22
78:2 81:14
93:20 94:4
102:14 105:25
111:14 121:13
127:6 146:18
153:18 154:2
160:16 170:15
171:13 178:6
**Goldman** 13:9
14:22 33:24

34:7 39:24
40:15 60:15
100:8,19
131:20 173:7
173:11,14,18
175:19,22,24
177:12
**Goldman's** 35:17
**good** 10:8 26:6
155:6
**Gorman** 88:18
89:2 114:6
130:10,16,23
131:9 132:14
158:3,4,5,11
158:23
**Gorman's** 130:7
131:6,15
**great** 160:7,10
**greater** 48:8
**Greenwich** 88:4
**group** 15:8,16,17
19:12,13 20:2
25:23 52:10
53:5 55:4 58:23
74:23 81:23
83:24 84:10,10
88:6,12 103:21
104:4 113:21
117:2,5 119:11
150:23
**groups** 24:5
**GS** 4:21 34:13
**guarantee** 72:10
95:12
**guess** 13:4,12
38:14 65:7
67:11 80:24
138:12 163:4
164:10 167:12
**guessing** 21:23
**guidelines** 152:6
**Gulf** 51:13

**Guran** 81:21
82:9
**guy** 172:20

---
**H**

**H** 4:11 5:1 6:1
7:1 8:1
**half** 100:16
173:25
**halfway** 51:12
65:8 107:24
148:10
**handle** 24:13
**handled** 162:2
**hands-on** 19:25
**happened** 47:16
121:8
**happening**
134:19
**hard** 139:11
142:6 167:23
**harder** 46:10
**headed** 82:5
148:7
**heading** 83:17
84:17 92:10
107:23 111:3
111:15 118:3,5
149:14
**hear** 167:10
**heard** 65:11
**hedge** 37:22 55:3
55:13 56:3,10
57:13 58:12
59:14 137:5
164:24
**held** 10:15 62:15
**help** 66:19
**helpful** 39:9
**helping** 174:15
**hereinbefore**
180:12
**hereto** 9:5

Ira Wagner                                                                February 5, 2013
New York, NY

hesitate 46:23
high 137:8 163:6
higher 16:15
  49:11 164:3
  168:8 171:4
highest 138:16
  139:5
highlighted
  101:9
high-grade 45:5
  49:14 52:3
Hill 88:3 89:23
himself/herself
  179:14
Hingst 57:7,9
Holdings 84:18
honestly 53:12
  111:22
hosting 82:23
house 126:15
  149:18
housing 65:20
  66:9 137:10,18
  148:13,24
hybrid 18:12
hypothetical
  38:12,15 163:4

_____ I _____

idea 35:3
ideas 133:2
identification
  10:4,7 34:14
  36:9 60:6 63:20
  64:19 74:13
  75:25 79:18
  81:9 86:25
  90:25 95:22
  104:19 107:12
  113:7 116:16
  118:20 145:16
  147:7
identified 39:20

166:17
identify 10:24
  25:16 31:9
  136:10 138:6
  138:21
ii 91:24 117:11
IKB 31:18,21,23
  31:25 32:4,8,12
  34:7,21 36:17
  37:2 39:25
  40:16,18 41:12
  41:18 101:17
  133:23 144:5
  144:24 147:14
  147:19,22,24
  150:8,16,17,19
  151:11,16,18
  151:20,21,24
  152:7,19
IKB's 33:25
  144:2 145:19
  148:18
imagine 28:17
  61:10 83:9
  163:6
immaterial 61:14
  61:19
immediately
  69:15
impact 166:13
impacted 124:4
  125:22 135:23
implications
  149:18
importance
  36:16,25
important 37:21
  100:9,20,23
  120:16 125:21
  126:7,11,12
  127:19 143:14
  143:20,22,23
  144:17 147:19

147:22 148:17
impression 66:17
  66:20 67:17
  68:8 158:20
improper 176:17
inappropriate
  69:11 70:4,11
  70:18 71:8,15
include 105:23
  106:6 110:8
  137:6 139:4
included 18:13
  18:22 91:6
  101:8 125:9
including 23:24
  58:23 92:4
  105:9 114:6
  117:3,5,19
  125:9 137:6
  151:13 158:21
income 17:5 73:3
increased 127:14
  149:17
incur 136:11
indenture 27:25
  91:6 115:21
  116:11 124:16
  177:16,21
independent
  112:9
indirect 170:6,7
individual 26:4
  26:16 49:22
  134:24 179:13
  179:14
individually
  41:12
influence 135:8
influenced 135:5
information 8:14
  8:15 50:7 82:6
  82:13 100:15
  128:18 133:8

134:14,15
  137:15 143:13
  151:21 165:23
  165:25
initial 23:21
  92:22 93:6,15
  93:17 122:20
  123:4 129:14
innovation 19:16
innovations 20:5
innumerable
  20:22
input 123:20
  152:17 165:11
  167:7,13,13,24
inquiry 5:4 17:8
  25:5 53:23 60:2
  60:5,9 71:5
  159:21
INSERTED
  8:15
institution
  173:12,15,19
institutional 13:7
institutions
  174:11
INSTRUCTI...
  8:16
instruments
  12:18,21
insurance 72:10
insurer 95:12
intend 48:17
  169:22
intended 167:25
intending 58:9
  170:5
intention 66:9
interaction
  173:13
interactions
  25:24 66:18
  154:23 156:22

157:19 158:10
  158:22 173:7
  173:10
interest 25:16
  32:18 33:5,25
  59:2 69:21
  96:15 124:17
  124:20,21
  125:4 126:5
  159:23 162:14
  162:15 163:17
  168:4 170:23
  171:7,11
interested 94:8,8
  152:4,6 180:17
interests 174:5
  174:23
International
  175:19 177:13
interpret 142:7
interrupt 120:5,8
interview 17:8
  17:10 53:22
  54:14 60:21
  61:4 62:13
  64:25 65:10
  71:19,23
interviews 52:22
introduce 74:5
  85:10
introduced 75:6
  75:9,12,14
  80:11
invest 150:8
  161:4 164:2
invested 31:23
  73:12 150:13
investigative
  30:10 106:16
  156:6,8
investing 72:23
  126:22 160:14
  162:12 167:15

Ira Wagner
New York, NY

February 5, 2013

**investment** 13:5
13:7,9 31:22
73:21,22,25
75:4 109:20
143:20 149:5
159:23 162:22
162:25 163:7
163:10 167:2
168:5,7
**investments**
76:20 92:20,24
118:8 121:20
134:8
**investor** 53:11
53:16 69:11
75:6 108:19
126:2 133:20
134:5 137:13
150:11 152:7
159:5,22
160:18,24
161:3,6,12,18
162:11,14,19
162:21 163:2
163:14,20
164:14 165:8
165:11 167:4,6
167:15 169:7
170:2 171:6
177:18,24
**investors** 21:25
22:16,22 23:2
25:6,11,14,20
25:25 26:6,23
32:18 33:14,16
62:6 73:19 74:5
74:7 75:12,14
76:19 79:5,10
80:14,18 85:10
85:12,15,20,22
94:7 96:15
109:19 110:12
111:24 125:12

125:16,21,24
126:18 127:15
135:23 142:23
143:14,16,21
143:24 159:13
160:4 161:14
161:15 163:25
164:17,20
165:13 166:23
167:8 168:7
171:3
**investor's**
161:22 168:17
**involved** 15:9
19:15 20:3
24:13 25:9,18
26:16 27:15
89:7,20 129:25
166:16 176:15
176:21 177:2
**involvement**
32:19 61:13
69:12,21,21
70:5 127:13
128:12 135:2
135:22 136:5
161:13,22
166:9 168:17
**in-depth** 157:25
**in-person** 59:20
**Ira** 1:14 2:4 4:3
4:14,16 10:2,6
10:10 61:4
76:22 180:11
**issuance** 16:7
45:2,4 47:7
49:6
**issue** 25:10
84:14 125:23
142:21 165:16
**issued** 21:14
22:16 25:2 35:6
46:16 47:2,11

56:15 57:16
**issuer** 92:4,25
117:19 124:18
169:3
**issuers** 93:14
**issues** 19:18 20:4
20:4,9,17,22
24:19 143:5,9
143:10

_____

**J**

**January** 4:17
10:6 23:18 75:2
86:17 87:8
**Jean** 115:8
**Jeff** 57:7,9
**Jisook** 80:2,4
**job** 158:19
**Joe** 56:25 151:17
**Johnson** 88:10
**Johnston** 88:17
**joined** 12:5,25
13:2
**joining** 12:8
**joint** 82:17
**jointly** 85:4,7
**Jonathan** 34:6
35:13
**Jorge** 116:22
**Journal** 5:6
54:22 63:17,23
64:5,9
**JPMorgan** 13:16
13:18,21 15:6
95:11 96:3
**judgment** 112:9
**July** 174:25
175:4
**June** 30:6,6
78:14,15,17
**junior** 158:15
**J.P** 6:18 95:20
**Jörg** 4:22 34:7

36:7 41:6

_____

**K**

**Katonah** 76:11
77:13,17
**keep** 111:16,19
**Keith** 88:18 89:2
114:6 119:23
119:25 120:3
130:7 158:3,3,5
158:11
**Kent** 88:10
**Kevin** 3:20 10:19
**Key** 111:3
**Kim** 74:18,22
75:3 79:25
90:11,13 105:4
153:10,17
**kind** 25:12 44:16
164:18 167:23
172:20
**King** 72:20 73:6
**knew** 32:18
33:24 73:8
77:22 166:18
**knowledge** 22:2
33:13 38:25
143:15 150:8
168:24 171:19
**known** 34:21
37:22 38:3
129:6
**Kraft** 88:20
89:18

_____

**L**

**L** 9:1
**labeled** 10:9
**language** 94:11
94:14,18
124:16,23
**large** 13:5 15:20
26:9 27:5,14
35:8 133:24

144:10 152:13
153:6 160:7
**largely** 19:9 45:7
100:24 177:21
**larger** 16:3 45:4
45:14 164:2,19
168:8 171:4
**largest** 73:13
133:20 134:5
172:18
**LaSalle** 175:18
175:22 177:12
**late** 12:13,16,24
29:25 75:17
175:4
**Laura** 33:19
74:19 75:2,17
76:25 79:25
84:24 85:23
86:4 88:21 90:7
105:9 106:12
108:8 114:6
117:3 129:3,10
129:13 155:11
155:12 156:5
156:11,14,18
156:22 158:15
**Laura's** 155:14
**LCDS** 75:5
**learned** 39:14
**learning** 151:23
**leave** 156:23
**leaving** 156:14
**led** 13:20
**left** 66:17 100:15
155:21 156:19
173:21
**legal** 10:19 71:12
**legible** 146:11
147:14
**Lehman** 15:2
75:6
**lend** 13:24

Ira Wagner                                                          February 5, 2013
New York, NY

**lending** 174:16
174:17
**Leslie** 74:19,22
75:3 79:25
**letter** 105:12,18
105:19 106:20
110:4
**let's** 34:9 36:5
42:6 59:25
63:15 70:22
77:25 79:12
90:19 99:7
103:10 119:8
127:4 145:11
146:15 159:9
170:13
**level** 154:6
163:10
**levels** 124:19,20
**leveraged**
109:10,12
**liability** 91:25
117:15
**Libertas** 171:21
**lies** 149:6
**light** 93:25
**limited** 91:25
117:15 160:8
173:9
**limiting** 128:12
128:14
**Lind** 119:24,25
120:11
**line** 27:17 43:6
62:14 66:16
67:15 81:19
88:10,15
**lines** 92:14,21
97:14 106:2
118:6 144:13
**liquidity** 13:17
13:19,23 20:12
**list** 21:20 29:19

36:2 45:3 49:18
50:9 51:12
83:20,25 84:3
84:24 99:25
103:22 113:21
128:21 129:18
130:6 151:25
152:5 175:16
**listed** 30:8,23,24
32:3,10 48:14
49:8 51:12
76:21 77:22
78:3,6 83:21
84:9
**listen** 62:2
**listened** 55:24
65:9
**lists** 30:19
**litigation** 98:16
**little** 54:24
**LLC** 6:19 82:7
91:24 95:21
96:4 117:15
**LLP** 2:5 3:11
**loan** 42:18
**loans** 109:10,12
136:21 137:6
137:14
**logos** 82:15
**London** 84:6
**long** 21:25 22:15
22:22 28:19
56:16 57:17
96:15 127:15
133:20 135:23
159:13,21
160:3 161:12
161:22 162:12
162:20,22,25
163:10,15
165:12 168:5
170:8,24 171:3
171:8,11

**longer** 21:6
163:7
**look** 16:6,9 37:15
42:3,6 43:10,14
44:4,25 45:3,12
46:12 47:12,21
51:25 82:2,21
99:13 103:11
105:25 107:3
107:21 119:5,8
124:5,8 132:21
136:7 141:19
144:23 148:20
164:10,11
165:15,17
166:4,14
171:22
**looked** 33:14
40:4 48:23 49:6
98:8 101:3
107:19 110:4,6
121:17 128:25
132:25 137:14
144:11 148:2
**looking** 26:7
30:15 44:12,15
47:10 55:24
56:11 65:20
80:19,23,24
88:8 95:2 97:13
110:24 115:16
127:25 137:5
137:21 138:15
139:3 142:25
174:15
**looks** 45:20
82:23 83:4
91:17 113:25
119:21
**Loreley** 41:21
**loss** 138:16
139:5
**losses** 46:9,15

46:16,19,21
136:11,19
**lost** 22:5
**lot** 18:14,15
28:16,25 85:14
101:8 102:8
109:9 137:20
165:21 173:16
173:17 174:12
**low** 137:7
**lower** 15:19
45:15 49:13
**lower-rated**
49:12
**low-level** 148:12
149:18
**LTV** 137:8
**Lucas** 88:18
89:10
**lunch** 146:15,20
147:17
**Lynch** 14:14

**M**
**Magnetar**
168:11 169:14
**maintain** 124:19
152:10,14
**maintained**
25:10 153:12
**major** 14:8
**making** 53:17
148:18 149:3,7
159:23 166:16
168:5
**managed** 35:14
35:15,18 73:12
**management** 7:3
27:25 75:20
77:3,10 80:25
82:7 84:11,13
84:18 85:21
88:23,24,25

89:8,19 91:24
92:2,3 107:8
116:11 117:15
117:16,18
**manager** 27:7
34:2,21 37:22
72:2,10,14 76:9
81:4 82:22 89:5
92:2,11,15 94:2
100:12 101:4
101:16,18,20
101:21 115:19
117:17 118:3,7
121:18 144:22
147:21 149:4,6
150:5 152:25
153:5 160:2,5
161:2 166:12
167:17
**managers** 32:17
79:5 80:10,15
112:8 144:23
152:2 154:25
**manager's** 27:10
85:11 161:10
**managing** 12:3,5
12:6 28:7,13
88:22 144:10
**March** 13:16
145:19
**mark** 34:9 36:6
59:25 63:15
79:12 90:19
107:6 145:11
**marked** 10:3,6
23:16 34:14
36:8 60:6 63:19
63:22 64:19,24
74:13 75:24
79:17 81:8
86:24 90:24
95:21 104:18
107:12 113:6

Ira Wagner                                                              February 5, 2013

New York, NY

116:15 118:19
145:16,18
147:7,13
175:16
**market** 15:10,14
16:9,12,18 21:7
25:12,15 33:13
43:15 47:2 48:5
48:20 65:20,21
66:9,10 75:19
79:11 85:4,19
101:5 125:3
138:7,22
139:16 148:24
149:19 153:25
154:2 155:5
170:8 173:8
**marketed** 25:18
35:6 80:21
85:13 160:20
**marketing** 25:19
77:2,9 81:3,19
82:17 85:8,11
155:4
**markets** 79:4
152:7
**marks** 10:9
64:13,20
102:17 147:8
**marriage** 180:17
**Martens** 3:8
11:10,10
**Marth** 3:20
10:19
**Martin** 116:22
**Maryam** 155:14
155:20,21
156:13
**material** 55:7
63:7 83:10,13
83:14 100:9,20
100:22 101:8
101:10 128:17

143:7 148:21
**materials** 30:8
35:20 63:12
96:13
**matter** 10:11
33:16 94:21
104:11 108:10
112:6 164:9,13
167:2 172:6
180:18
**matters** 175:17
**Matthew** 3:8
11:10
**MBS-3** 4:21
34:13
**MCC** 100:25
101:4,15
**meal** 87:25
**mean** 13:14,23
16:6 18:10 20:7
21:7,11 27:4
29:4 33:11
34:22 35:4
37:11,15 40:17
44:7 46:15,21
46:23 48:25
49:12 50:22
52:24 54:21
55:6,6,9 57:10
62:25 67:9 68:6
68:7 70:21 83:7
84:22 91:17
99:12 101:18
103:22,22
104:10 107:3
108:14,15
109:7 125:7
139:3 141:10
142:5,16
148:20,24
149:9 150:2
155:3 158:14
160:10 161:18

161:24 162:9
162:10,18
164:5,23 168:4
169:17 172:10
**meaning** 112:19
122:13,17
**meaningful** 51:4
**meaningfully**
50:18 51:23
**means** 38:19
163:5
**meant** 38:21 39:2
114:15
**Meatpacking**
87:21
**meet** 99:23,24
99:25 100:4
102:25 131:24
132:3 150:5,15
150:19 154:21
157:8 158:3,5
**meeting** 55:12
55:18,19,25
56:18 57:24
59:9,13,17,18
59:23 65:13,18
66:3,7,23 67:7
67:21 68:4,11
68:18,21 69:4,7
69:19 70:2,21
71:2,7 89:14
140:4,10
141:24 143:16
151:4 152:19
152:20 155:15
155:18 157:17
158:6
**meetings** 80:14
80:18 82:24
85:16 151:20
155:24 157:11
**member** 15:17
**memo** 100:25

101:4,13,16
**memorandum**
82:6,14
**mention** 40:25
41:5 80:24
**mentioned** 15:25
27:20 35:5
52:23 145:4
**mentioning**
97:11
**Mentioning/In...**
149:14
**Merit** 2:7 180:8
**Merrill** 14:14,15
**met** 41:7,9,11,11
41:12 86:9
89:13 139:25
141:5 147:22
150:17 151:11
151:16,17
152:19 156:11
156:15 158:8
172:6 176:14
**Metrics** 111:4
**mezzanine** 45:6
49:16 133:24
149:7
**mezzanines**
165:2
**Michael** 34:6
35:13,13,19,24
**middle** 65:17
124:13
**migration** 144:12
**million** 28:24
29:3 74:3,3
108:3
**mind** 131:12
140:20 141:18
141:19 143:3
155:16 156:3
**minimum** 124:20
163:10

**minuses** 144:15
149:10
**minutes** 64:12
70:21 127:5
170:14
**misleading** 99:11
99:15,22
102:24 111:24
122:4,8,10
**misspoke** 103:13
**Misstates** 140:9
**models** 24:21
149:20
**moment** 36:4,12
50:25 60:23
62:18 81:15
98:8 118:24
121:18 124:9
168:14
**monetary** 163:9
**money** 73:12
171:10 173:16
173:17
**monoline** 95:11
**month** 30:5
153:20
**months** 46:5,5
47:7,23
**Moody's** 45:24
49:9
**Morgan** 6:18
14:24 95:20
169:20
**morning** 10:8
129:2
**mortgage** 16:24
101:12 174:13
**mortgage-bac...**
18:17
**motivating** 69:17
**motivation**
165:19 166:8
167:9

Ira Wagner                                                                    February 5, 2013

New York, NY

move 46:11
163:2,11
MP3 65:4
Muessel 155:14
155:20,21
156:13
multipage 79:20
81:11 116:18

**N**

N 3:1 4:1 9:1
11:17
name 10:19
76:21 82:24
83:21 84:5,6
89:3 103:13
109:15 114:21
150:24,25
161:4,5 162:5,5
167:21 170:10
170:12 179:23
named 155:14
names 88:20
89:12 99:18
102:25 130:17
130:19,21
131:22 133:4
167:18
narrow 29:11
Nartey 34:6
35:13,19
Nartey's 35:24
nature 21:7
Navigant 3:21
necessarily
70:12 152:17
159:3 165:23
167:3
necessary 93:18
94:3 101:20
134:14 166:20
179:7
need 34:20 38:9

69:9 100:12
165:25
needed 24:17
37:9,12 59:2
101:3,16
128:18 176:24
negative 140:20
140:25 141:10
141:11,23
142:2,12,16
176:11,19
negatives 145:4
150:3
neither 92:22
115:2 173:2
net 171:7,9
neutral 144:14
145:7
Nevada 137:23
never 29:2 65:11
98:17 168:10
169:18
new 1:2,16,16
2:6,6,9 3:14
10:14,17,17
19:16 25:10
52:15 54:22
84:5,14 96:2
150:21 180:3,5
180:9
nine 46:5,5 47:7
47:23
Nodding 54:18
105:10 118:4
155:9 170:4
North 6:17 95:19
96:3
Nos 4:20 5:17,22
6:6,10,15,23
7:8,13,17 8:5,9
34:13 75:23
79:16 81:7
86:23 90:23

104:17 107:11
113:5 116:14
145:15 147:6
notable 159:2
Notary 2:8 9:16
11:18 179:20
180:8
note 121:10
135:24
noteholders
170:24 171:8
notes 22:16,23
31:19 59:12
68:18 164:3
notify 71:6,12
notional 21:21
133:21
November 34:18
35:11 40:5,6,24
41:2
number 10:9
18:3 21:2 25:9
26:9 27:5,14
37:19 64:14,21
76:4,8 91:4
102:14,18
104:20 107:15
119:9 133:2
144:9,11
145:21 146:18
147:9 153:3
158:16 164:24
175:25
numbering
171:21
numbers 27:13
48:15 49:12
87:4 91:7
145:24
numerous 20:7
NY 3:14
N.E 3:5

**O**

O 9:1
Object 122:15
148:19 156:25
169:10
objection 13:22
15:11 17:14
22:19 23:4
28:10 31:5 32:2
32:9 37:6 38:13
38:24 40:11
46:18,24 47:9
50:20 51:6,24
65:23 66:25
67:23 68:25
69:13 70:20
71:9,16 73:15
77:4,19 78:7
80:12 82:19
83:6 85:6 87:11
91:15 93:2,8,21
94:6,19 95:14
96:19 97:2
98:22 105:14
107:2 108:13
109:3,22
110:15 112:2
112:11 113:24
114:13 116:4
118:13 119:19
120:7,21
121:24 122:5
122:22 123:22
124:24 125:6
126:9 130:2,13
131:2 132:9
133:13 134:11
136:22 138:9
138:24 139:17
140:8,23
141:12,25
142:15 149:25
176:22

objections 9:10
67:8 97:9,15
98:5,10 120:22
123:6
objective 135:14
136:9,25 138:2
139:3,6
objectives
135:11
obligations 11:25
136:10
occasionally
161:9 167:20
October 76:13
offer 48:17
offered 93:14
offering 28:4,5,6
91:6,10,13 92:8
93:12 94:18,23
96:13 98:8
116:12 117:8
117:12,24
121:17 122:4
124:9,11
offerings 25:15
office 52:16
officer 89:16
offices 2:5 10:16
154:17,21
155:8 158:8
Oh 41:16
okay 18:19 32:23
42:8 60:12,25
74:10 76:12,14
79:22 80:9
81:13,17 82:4,8
83:19 87:6
90:18 91:12
92:9 93:4 96:5
96:11 97:20
103:8,12,15
105:2,21,24
106:4,11

Ira Wagner                                                          February 5, 2013

New York, NY

107:16 108:4,7
110:5 113:12
116:21 117:13
117:25 118:9
119:2,4,7
124:10,12
135:20 148:6
149:22 158:18
159:10,12
171:15,17
**omission** 99:14
111:25 143:7,8
143:13
**omitted** 91:5
**once** 67:16
100:10 153:20
154:18 157:17
**ones** 12:23 18:10
31:7 168:12
**one-page** 74:15
**ongoing** 26:8
**opening** 29:19
30:9,25 31:10
32:15 99:8
102:22 128:4
128:25 135:15
136:8 159:9
162:17
**operate** 177:19
**operated** 177:17
**operative** 27:23
**opine** 136:8
**opined** 41:24
99:9 159:4
**opining** 143:11
**opinion** 32:23
33:9 48:17 69:3
99:16 100:3
102:22 108:21
112:6,13,18
127:12,20
132:12 135:13
136:15 137:25

141:17 143:3
147:18,23
148:17 149:24
165:10 169:25
170:5
**opinions** 29:20
30:20 31:3,16
32:14 106:13
129:9 132:8
142:10
**opportunities**
79:10 85:14
**opportunity**
85:10,25
132:23
**opposite** 134:16
**original** 106:7,9
110:9,11 179:8
**originally** 128:21
**originated** 46:22
**originating**
161:19,20
**originations** 13:8
**Orrick** 115:12,17
115:23 116:2
**outcome** 53:19
180:18
**outside** 24:15
26:4 27:3,9,10
27:14,19,21
128:21 154:7
**overall** 72:24
166:24 167:9
**overcollaterali...**
124:18,20
125:5 126:6
**overwhelming**
46:9,14,15,21
**Overy** 2:5 3:11
10:16 11:2,4,6
65:4
**O'Neil** 3:17 11:3
11:3

**P**

**P** 3:1,1 9:1
**page** 4:4,13 5:2
6:2 7:2,21 8:2
60:10,11,14,19
61:3,12 65:2,7
65:8,8,17 66:14
67:13,14 76:7
76:18 79:24
82:12 83:3,16
84:16 88:9
91:10,10,19,23
91:24 92:8
93:12 97:13,19
97:22 105:3,17
105:19 107:23
114:3,8,18
115:6 117:11
117:23 118:18
119:8 124:11
124:13 135:15
135:16,17
146:4,6,6,7
148:4,4 149:14
159:11 162:17
**pages** 4:23 5:5,9
5:11 6:20 36:8
60:5,9 63:19
64:18 91:20
95:21
**Pamela** 3:16 11:5
**paper** 179:8
**paragraph** 32:20
33:23 36:21
38:10,23 39:22
42:22 43:17,23
44:9,19 60:20
61:3,11 62:5
96:9 102:22
103:5,10
105:22 106:2,3
107:24 110:7
110:19 128:3

128:24 129:2
136:7 148:11
175:16
**paragraphs** 42:7
**paraphrasing**
57:20
**part** 19:17 72:24
73:4 99:16
101:19 105:25
106:8 110:6,11
120:20 121:2
123:12,19
170:25
**participant**
160:13
**participants**
79:11
**participate** 26:20
27:6 58:16,21
70:7 98:19
159:14
**participated**
33:20 127:22
160:4
**participating**
159:25
**participation**
36:16 37:2
144:17
**particular** 25:16
26:7 67:16
131:19 161:11
167:18 173:20
**particularly**
19:15 47:2
159:2
**parties** 9:4 24:16
27:3,6 175:21
180:16
**pattern** 121:6
**Paulson** 55:3,13
55:22 56:3,10
56:23 57:13,24

58:8,12 59:14
61:21 65:14,18
66:4,8,24 67:18
68:5,9,21 69:20
71:3,7,13 99:15
99:25 127:18
128:22 129:7
130:17 131:20
133:3,4 135:5,8
135:11 137:5
137:21 138:15
139:14 140:6
142:13,17,18
162:11 169:7
176:15
**Paulson's** 32:18
33:5 36:16 37:2
61:13 66:8 70:4
127:13 128:12
135:2,14,21
136:4,9 138:2
143:18 170:22
176:3
**Pause** 177:6
**payment** 20:11
**Pellegrini** 55:21
66:7 136:14,16
136:20 138:5
138:20 139:25
141:6,23
**Pellegrini's**
137:4 138:3
139:14,21
**people** 13:24
24:5,9,20 25:9
25:23 26:5
27:14 41:11
48:3 55:20 56:9
56:20 57:12
58:23 83:20,23
84:2,3,5,8,9,21
88:16 89:12
90:9 104:12

Ira Wagner                                                February 5, 2013

New York, NY

Page 196

105:7 114:3,23
114:25 115:3,5
115:6,8,9 117:2
117:5 119:11
133:23 141:20
151:13,15
153:13,21
154:3 157:14
164:18
**percent** 37:23
50:16 51:2,20
106:7 110:9
157:15
**percentage**
153:4,7
**perception** 155:5
**perform** 49:3
67:19 92:3
117:17
**performance**
23:5,8,15 46:11
48:6,8 63:5
125:22 171:10
171:11
**performed** 21:25
22:3 42:2 43:6
44:12,16 47:3
**performs** 48:23
**perfunctory** 37:5
**period** 14:5 21:9
21:15 42:25
48:7 54:24
129:25 163:25
**periodically** 46:4
**person** 17:4,5
55:22 56:3
72:22 80:5
81:22 88:11
99:3 116:24
155:13 157:6
158:6
**personal** 154:6
174:5,22

**personally** 17:22
19:14 75:18
**perspective** 38:9
83:8 134:18
161:3
**phenomena**
19:10
**phenomenon**
163:25
**Philosophy** 149:5
**photography**
174:24 175:6
**pick** 45:8 47:22
47:22 61:21
96:16
**picture** 87:13,15
172:11,11
**piece** 43:20
100:15 133:8
**place** 19:9 24:17
24:17 65:20
66:9 68:12,22
85:15 94:14
99:13 112:15
112:15 128:9
128:11 133:10
134:16 144:13
165:4
**places** 137:21
**placing** 94:11
**Plaintiff** 1:5 3:4
**plaintiff's** 46:6
**Platform** 81:19
**play** 21:8 159:5
177:24
**played** 37:24
**please** 10:23
11:15 22:12
76:18 80:8
118:25 119:15
167:10 170:14
**pluses** 144:15
149:10

**point** 21:20 26:7
36:18 37:16,16
43:7 47:20,22
47:22 49:2
78:19 100:10
108:17 120:13
120:15 125:25
140:10 154:12
**points** 95:5
**pool** 101:20
**pools** 42:18
**poor** 171:10
**poorly** 47:3
67:19
**portfolios** 19:4,5
43:10 48:10,23
49:16,19,23
50:6 98:4
104:12
**portion** 159:24
**portions** 139:9
**position** 56:16,17
57:17,17 123:9
133:15,24
134:2 155:13
155:14 162:20
169:23 171:3
**positions** 98:3
123:14 124:3,6
163:20 164:3
164:19 165:7
168:8 171:4
**positive** 157:5
**positives** 145:4
150:3
**possible** 66:20
66:21 104:13
**post** 47:18
**posted** 20:21
**Posto** 87:8,12,14
87:19 90:17
**potential** 32:17
79:11 80:11

85:17 149:3
**PowerPoint** 83:8
**practice** 17:13
**preference**
124:22
**preliminary** 28:5
82:5,13 117:8
**prepared** 65:4
83:4,7 113:22
116:2
**preparing** 106:13
**presence** 179:17
**present** 3:19
152:20
**presentation**
82:22 83:5
84:17
**presentations**
79:8
**presented**
135:18,19
141:20 176:3
**president** 89:16
**press** 54:17,23
172:13,16,24
**presumably**
170:9
**presume** 61:9,17
**pretty** 163:6
173:24
**previous** 66:18
**price** 137:10,18
149:18
**priced** 138:8,22
160:20
**prices** 108:5
**Pricing** 174:16
**principal** 22:18
23:3 25:11
27:22,23,23
48:25 116:10
176:23
**prior** 12:8 94:25

141:24 148:23
155:13
**private** 53:3
72:23 73:11
**probability**
138:16 139:5
**probably** 15:23
17:19 19:3 72:3
153:10,12
155:11,17,22
156:3,15 158:6
172:18 173:24
176:24
**proceed** 11:16
**proceedings**
177:6 178:8
**proceeds** 124:21
124:22
**process** 37:25
38:5 109:24
127:14,23
128:6 130:12
132:13,22
134:9 135:23
**processing** 83:8
**product** 25:13
26:24 84:13
**Production** 4:20
5:13,16,21 6:5
6:9,14,22 7:7
7:12,16,22 8:5
8:9,18 34:13
74:12 75:23
79:16 81:7
86:23 90:23
104:17 107:11
113:5 116:14
118:19 145:15
147:6
**professional**
26:22 157:6,24
**professionals**
23:25 24:7

Ira Wagner                                                February 5, 2013
New York, NY

25:24
**profited** 98:3
**program** 35:14
   35:16,18
   126:15
**project** 34:20
**projects** 174:10
**prominently**
   155:16
**promoted** 12:6
**prop** 169:21
**proper** 142:23
   176:9
**proposal** 7:4 75:4
   107:9,23
   111:15
**proposed** 69:21
   70:8,11,19
   71:13 140:21
**proposing** 68:24
   69:23 71:7
   142:14
**propriety** 140:5
   140:15 141:17
   176:10
**prospective**
   159:21
**prospectus** 27:13
**protection** 20:11
   37:23 122:20
   125:11,12
   138:14 161:21
   162:4
**prove** 28:18
**proven** 149:2
**provide** 76:19
   124:17
**provided** 52:9
   53:23 72:10
   95:12 104:8
   108:25 109:21
   111:21 121:7
   128:21 132:14

**providing** 106:6
   110:8
**prudence** 145:2
   145:7 148:14
   149:21
**Public** 2:8 9:16
   11:19 179:20
   180:8
**publications**
   54:19
**publicly** 50:6
**published** 46:3
**purchase** 59:4
   101:17 119:14
   138:14
**purchaser** 92:22
   93:6,16,17
**purchasers**
   31:19 135:24
**purchasing**
   164:14,25
   166:5
**pure** 162:7 163:5
   163:6 164:7
**purely** 111:7
   159:5 162:14
   162:19,21
   163:2,8,11,13
   164:13 165:8
   170:2,23
   177:24
**purpose** 54:9
   74:8 84:12
   120:16 121:13
   163:22 166:24
**purposes** 31:16
   47:19 163:22
**pursue** 70:16
**push** 131:22
**pushed** 130:19
**put** 15:18 20:2,24
   21:16 48:22
   83:9,12 88:6

94:23 98:24
99:4 101:17
118:23 132:25
133:3,17
134:25 136:2,3
136:4 140:6,19
140:21 142:14
168:6 169:8,15
169:22 172:21
**putting** 24:14
   135:9,11
**p.m** 127:10
   146:19,20
   147:3,10
   170:16,19
   178:7,8

---
**Q**
**qualifies** 40:21
**quality** 49:16
**question** 9:11
   19:20 22:12,20
   22:22,25 29:14
   36:22,23 38:12
   38:15 40:8 51:3
   64:2 97:16
   131:18 132:3
   135:21,25
   136:6,24
   139:10 143:4
   153:25 157:7
   167:10,11
**questionable**
   69:16
**questioned** 38:18
   54:4
**questioning**
   133:7 137:3
   172:19
**questionnaire**
   76:9,18
**questions** 44:3,6
   90:15 100:6

102:4 103:6
119:16 120:5
131:17 135:18
135:19 142:21
158:2 165:22
175:8,11 176:2
176:5,8,12
177:4,8 178:3
**quick** 22:5
   102:10
**quickly** 48:12
**quite** 20:7 78:25
   146:13,14
   160:8
**quote** 52:25 85:7
   138:12
**quoted** 51:17
   58:18 61:17
   62:2,13 142:4
**quoting** 34:17

---
**R**
**R** 3:1  11:17,17
   180:1
**ramped-up**
   160:19
**ran** 19:12,13
   24:20 88:24
**range** 45:8
   153:23 166:13
**rank** 16:8
**rankings** 16:7
**rate** 52:5
**rated** 42:25 50:2
   52:6
**rating** 24:14,24
   25:4 44:25 45:9
   49:7,8,13 50:15
   51:18
**ratings** 45:23
   144:11
**rationale** 167:18
**ratios** 137:8

**RBS** 14:20,21
**reach** 112:4
   139:12
**reaction** 63:2
**read** 17:23 22:12
   22:13 31:13
   33:2 35:24 36:3
   37:13 54:16,20
   54:21 60:22
   64:9 94:24 96:8
   106:15 129:10
   131:12,17
   132:10 140:17
   141:18 142:4
   142:24 146:8
   146:13 156:8,9
   167:11 172:13
   179:3
**reading** 35:20
   60:24 96:10
   104:10 108:8
   139:8 141:15
   144:20 172:24
**reads** 135:21
**realistic** 138:6
   138:21
**really** 19:10
   20:22 21:8
   28:14,15 47:18
   48:18 55:16
   67:10 68:7,14
   104:13 128:16
   134:4,18
   142:17 146:7
   146:12 154:14
   155:20 156:2
   158:7,25 160:8
   161:4,6,8 173:5
   173:16 174:11
**Realtime** 2:7
   180:7
**reason** 25:22
   26:2,12 69:17

Ira Wagner
New York, NY
February 5, 2013

98:12 99:16
103:24 104:6
128:8 141:4,7
157:21
**reasonable**
44:13,24 47:11
47:23 48:2
**reasons** 59:7
70:15,23 99:20
**rebuttal** 4:16
10:5 23:18
30:16,21 31:2
36:14,18,20,23
42:6,22 43:17
43:24 44:20
62:22 103:10
103:16,25
110:19 127:17
171:13
**received** 29:2
63:12
**recess** 22:8
64:16 102:16
127:8 146:20
170:17
**recognize** 88:16
88:21 89:2
91:13 116:24
**recollect** 77:18
87:14
**recollection**
12:12 16:17
28:22 61:7 66:6
66:22 67:6,20
68:3 76:24 77:5
80:10 87:7
94:11 104:14
**recommendation**
8:3,7 31:22
32:11 144:2,20
144:25 145:14
145:19 147:5
147:15,25

148:3 149:15
**reconcile** 132:12
132:16 134:7
134:13
**record** 8:3,7
10:24 22:6,10
22:13 32:11
39:18 64:14,22
102:14,19
127:7,10 144:2
144:20,21,25
145:13,19
146:18 147:4
147:10,14,25
148:2 170:16
170:19 178:6
179:5 180:14
**recording** 65:10
**reduce** 97:8
**refer** 34:23 65:16
97:19 116:8
136:18 143:25
163:13
**reference** 37:23
38:2,5 42:11,24
46:2 49:22
50:11,13,17
51:2,15,20 58:3
60:15 62:7 64:7
75:18 77:2,6,8
77:16 78:3,10
97:10 98:20
99:11,22 100:4
100:11 101:7
102:24 118:12
120:20 121:2
121:22 123:15
129:14 130:18
136:10 148:11
**referenced** 19:7
20:3 36:15,24
42:19 60:10
64:4

**references** 76:19
**referred** 27:2
36:4 38:22
53:22 131:9
**referring** 23:20
29:18 36:12,19
39:22 83:16
116:9 136:19
145:22 162:19
**refers** 35:7 61:4
110:24
**reflected** 121:9
**reflection** 61:15
**reflects** 61:20
62:5 65:3 67:15
**refresh** 61:7 66:6
66:22 67:20
76:24 80:10
87:7
**Regal** 88:19
**regard** 51:4
111:24 164:7
**regarding** 35:14
149:21 159:22
**regardless** 70:4
**regards** 148:22
**regions** 137:24
**Registered** 2:7
180:8
**regular** 26:23
**regulator** 52:10
52:19,25 71:6
**regulators** 52:23
174:18
**relate** 80:17
**related** 174:11
180:15
**relates** 22:22
35:2,3 40:9
**relating** 40:23
**relationships**
25:11
**relative** 16:9

148:8
**Relevance** 28:10
98:11
**relevant** 37:21
42:23 43:8,9,13
43:14,21 45:8
45:10 48:20,21
49:10,15 63:6
122:7 142:19
148:13 149:3
159:3
**relied** 31:7
**relying** 39:17
138:12
**remain** 148:14
**remember** 15:23
19:5 28:14,20
29:5 30:5 54:4
55:10,16,23
57:20 58:10
67:10 68:11
69:24 70:6
75:16,21 78:9
78:19 81:2
87:25 89:13,14
90:3,7,7,8,12
102:7 107:5
108:16 109:5
112:24 120:3
137:22 144:24
145:9 150:10
150:12,22,24
151:5 152:4
154:13 155:10
155:15,18
156:11 157:13
158:16 171:20
171:21 172:18
177:18,22
**repeat** 36:22
**report** 4:14,16
5:4 10:2,5
23:17,18,21

29:19 30:9,16
30:21,25 31:2
31:10 32:15
33:24 34:17
36:14,19,20,23
42:3,6,22 43:17
43:24 44:20
45:14 46:3 60:3
60:5,9 62:19,22
62:24 63:2 64:3
82:9 90:13 99:8
102:23 103:10
103:16,25
110:19 114:25
127:17 128:4
128:25 135:15
136:8 151:19
158:22 159:8,9
162:8,17
171:13,25
172:3 175:15
175:22
**reported** 1:24
74:24 83:23
84:4,11,12,13
88:13 105:4
113:14 119:25
151:13,15
**reporter** 2:8
10:21 11:15
180:8
**Reporting** 10:21
**reports** 43:5
141:5 142:11
144:2
**representative**
139:16 152:20
**representatives**
55:12 57:24
59:14 66:24
68:4 71:3
150:19,22
**represented**

Ira Wagner                                                          February 5, 2013
New York, NY

Page 199

| | | | | |
|---|---|---|---|---|
| 71:20 96:14 | 101:25 115:23 | 180:22 | 173:11,15,18 | 156:12,18,23 |
| 115:15 | 129:23 | **road** 47:13 | 175:19,23 | 158:23 |
| **representing** | **reviewed** 30:10 | **ROGERS** 3:16 | 177:12 | **score** 50:3,15 |
| 10:20,22 11:2,4 | 41:20 106:12 | **role** 19:6,21 | **salary** 28:9,12 | 51:18 149:21 |
| 11:6,8 179:13 | 116:2 131:5,15 | 26:25 27:19 | 28:12 29:15,16 | **scores** 45:2,9 |
| **reputational** 59:6 | 139:21 140:14 | 37:24 38:22 | **sales** 13:7 25:21 | 49:7,8,13 137:7 |
| **request** 121:11 | 156:5 | 42:13 44:18 | **salesperson** | **Scott** 5:10 16:20 |
| 169:8,15,21 | **reviewing** 107:17 | 70:5 89:10 | 56:23 57:9,10 | 57:4 64:17,25 |
| **REQUESTS** | 119:3 132:7 | 100:14,22 | 169:18 | 115:2 |
| 8:14,18 | **reviews** 174:16 | 105:23 106:5 | **SARA** 132:19 | **sealing** 9:5 |
| **required** 20:19 | 174:17 | 110:8 113:17 | **Sarah** 88:17 | **SEC** 5:13,17,22 |
| 25:5 124:19 | **ridiculous** 61:12 | 114:11 115:13 | 119:10 | 6:6,10,15,23 |
| 166:3,25 167:3 | **right** 12:3 24:17 | 126:6 143:18 | **sat** 73:6 | 7:8,13,17,22 |
| 169:5 | 29:21 31:12,20 | 147:18 156:14 | **saw** 32:3,5 92:15 | 8:5,9 52:13 |
| **reread** 97:16 | 33:6 35:25 | 157:12 159:6 | 130:20 | 54:12 60:15 |
| **rescued** 13:18,20 | 38:12 43:2 89:6 | 163:17 164:20 | **saying** 61:23 | 63:13 74:12,16 |
| **research** 43:20 | 91:21,22 95:8 | 170:3,6,6,7,22 | 67:16 68:7,8 | 75:23 76:4 |
| **reserved** 9:11 | 102:2 131:6 | 172:22 177:25 | 126:21 133:8 | 79:16,21 81:7 |
| **resided** 134:6 | 137:22 159:15 | **roles** 24:5 37:14 | 135:4 161:7 | 81:12 86:23 |
| **residential** 18:17 | 159:19 162:17 | 89:13 | **says** 37:17 39:24 | 87:4 90:23 91:4 |
| **respect** 37:20 | 162:19 170:8 | **room** 26:10 | 61:12 65:18 | 91:8,11,20 |
| 123:15 143:24 | **rights** 165:17,18 | **Roseman** 33:19 | 66:16 67:9 | 104:17,24 |
| 163:16 | 166:6,7,10 | 84:23 86:8,11 | 76:18 92:14,22 | 107:11,15 |
| **respective** 9:4 | **risk** 125:8,15,20 | 88:19 89:15 | 93:13 106:5 | 113:5,10 |
| **respond** 25:5 | 127:15 134:2,5 | 129:22 132:15 | 107:24 118:6 | 116:14,19 |
| **responded** | 135:23 148:13 | 157:8,9 158:23 | 124:13,16 | 118:19 119:9 |
| 106:25 138:17 | 160:15 | **Roseman's** | 149:17 162:19 | 137:4 145:15 |
| **responding** 71:4 | **RMBS** 18:25 | 129:4,19 | **scheduled** 79:8 | 145:20,24 |
| **responsibility** | 19:8,23 20:25 | **Rosenberg** 56:5 | 175:3 | 147:6,15 |
| 126:22 169:2,3 | 21:8,15 22:17 | **Roth** 114:9 | **Schulte** 114:9 | 168:23 |
| **responsible** | 22:24 23:13 | 115:25 | 115:25 | **second** 22:5 |
| 24:10 27:16 | 42:10,18,23,25 | **rule** 161:25 | **Schwartz** 33:19 | 55:22 56:2 |
| 88:22 | 43:6,11 46:17 | 168:23 | 74:19 75:3,17 | 83:21 105:19 |
| **rest** 50:22,23 | 46:19,22 47:2 | **RULING** 8:17 | 76:25 79:25 | 177:5 |
| 51:9 | 48:20 50:2,4,17 | **run** 28:19 | 84:25 85:23 | **secret** 65:19 |
| **restaurant** 87:16 | 51:3 52:6 58:8 | **running** 116:19 | 86:4 88:21 | **section** 49:2 |
| 87:23 88:3 | 63:5 96:25 97:8 | | 105:9 106:12 | 65:16,22 92:10 |
| **result** 107:25 | 98:2 99:18 | **————** | 106:17,23 | 118:2 148:7 |
| **results** 44:11 | 129:24 136:21 | **S** | 107:18 108:9 | 149:13 |
| 149:20 | 137:6,14 138:7 | **S** 3:1 4:11 5:1 6:1 | 114:6 117:3 | **sections** 80:25 |
| **reverse** 159:21 | 138:14,15,21 | 7:1 8:1 9:1,1 | 129:4,10,13 | 146:3 |
| **review** 24:18 | 139:4,4 | **Sachs** 13:10 | 132:14 155:12 | **sectors** 21:13,14 |
| 30:8 39:18 80:7 | **RMR** 1:25 | 14:22 60:16 | 155:12 156:5 | **securities** 1:4 3:3 |
| | | 131:20 173:7 | | |

Ira Wagner                                                                        February 5, 2013
New York, NY

11:11,13 13:8
18:11,18 45:7
45:18,21 46:10
48:5,7,12,13
49:22 50:2
51:21 79:3 92:5
92:19,24 93:14
95:20 96:3
117:20 118:8
121:20 134:22
134:23 162:13
166:12
**securitization**
174:12
**securitizations**
12:10
**security** 35:8
119:14,18
132:17
**security-by-se...**
132:20
**SEC's** 31:10
**see** 34:3 39:19
39:23 40:4
60:14,20 61:2
65:22,25 75:2,5
76:8,21 81:18
82:12 83:20
84:17 91:23
92:13,21 96:12
96:18,21,23
97:4,6,10 105:3
107:4,23
108:15 110:23
111:5,15,18
117:14,22
118:5 119:10
120:11 121:5
121:14,22
124:5,23 128:4
145:8,9 146:10
148:10 154:3
160:19,22

161:8 165:4
167:16 171:22
172:8
**seed** 104:8 108:2
108:24 109:13
109:21 111:17
111:21
**seeing** 64:7 75:4
**seen** 31:24 32:7
38:17 40:22
41:4 65:11
76:15 86:6 96:6
108:23 137:13
165:2 174:4
**select** 58:6,9
62:7 66:19,21
92:18,23 94:2
99:17 112:19
118:7 121:19
122:12 128:15
**selected** 58:4
94:9 96:24
97:24 99:10
100:16 102:23
106:25 108:11
108:20 109:20
109:24 128:13
129:14 130:11
133:7,12,16
**selecting** 37:25
38:5 61:14
67:18 93:20
94:4 96:14
100:14 127:19
166:9
**selection** 33:4
69:12 92:4
98:20 100:13
112:9 117:19
123:21 126:7
127:14,23
128:6 129:6
132:13 134:9

135:22 159:6
159:14,25
160:5,6 161:23
164:21 165:12
167:8 168:17
170:3,22
177:25
**selling** 162:4
**SEN** 3:21
**senior** 12:2,2,6
17:4,5 28:7,13
72:22 84:18,21
88:21
**sense** 26:19
170:7 173:4
**sent** 117:2
**sentence** 34:3,18
34:22,23 97:21
159:17
**separate** 25:22
72:25 73:2
179:7
**series** 82:24
85:16 118:22
**serious** 62:7
157:6
**serve** 33:4 75:18
76:25 77:15
78:10 129:5
**services** 92:4
117:18
**serving** 77:6,8
**SESSION** 147:2
**set** 43:17,18,23
85:16 168:20
169:6 180:12
**setting** 154:10
**settlement** 115:9
**seven** 84:7
**Shafer** 74:19,22
75:3 79:25
90:11,13 105:4
153:10

**shape** 165:18
**share** 16:10,11
16:18
**shareholder**
73:14,18
**shareholders**
124:22
**shares** 15:10,14
**sheet** 96:25
179:7
**short** 37:5 56:13
56:16 57:14,17
62:6 65:20 66:9
69:11 98:3
122:20,24
123:4,12,19
124:2 159:5
161:14,15,17
161:18,21
162:4,7,11,14
162:21 163:2,8
163:11,13,15
163:20 164:2
164:14,19
165:8 168:8
169:7,9,23
170:2,9,9,10
170:23 171:4,7
171:9 177:24
**shortcoming**
125:18
**shorted** 97:7
**shorting** 164:25
166:6
**shorts** 56:14
57:15 162:3
164:8 170:11
**show** 43:4 48:15
74:9
**showed** 39:25
40:16 109:5
**shown** 121:11
**Shu** 56:7 136:14

136:20
**Shu's** 136:16
**side** 68:18 82:15
82:15 162:3
163:5
**Siegel** 115:7
**Signature** 179:11
**signed** 9:15,17
**significance**
45:25 47:5
**significant** 37:24
38:22 73:22
112:14 159:23
164:15
**significantly**
43:14
**Sihan** 56:7
**similar** 33:22
43:12 44:25
45:2 63:3
115:21,22
129:23
**similarly** 89:20
**single** 37:22
109:15
**singled** 172:22
173:4
**sitting** 17:25
73:10
**situation** 165:2
**six** 72:3,12 84:6
92:13 118:6
152:24
**size** 16:9 73:24
**sizes** 24:25
**slide** 128:5
**small** 26:22
146:8,12,13
**smaller** 15:10,14
**SocGen** 16:5,6
**social** 154:10
**socially** 154:3
**sold** 161:20

Ira Wagner                                                    February 5, 2013

New York, NY

somewhat 37:5
Soren 51:4
Sorin 50:9
sorry 19:20 46:6
    56:8 59:8 87:17
    97:11 115:5
    122:24 146:5
    150:25
sort 43:25 44:10
    53:13 89:20
    151:25 153:11
    157:22 162:5
    165:11 166:19
    172:19,21
    174:7
sorts 165:7
sourcing 94:8
Southern 1:2
    10:13
space 14:9 15:9
    15:23
speak 140:18
    161:2
speaking 77:12
specialize 26:10
specific 19:19
    21:2 23:5 25:19
    26:21 33:18
    54:3 59:11 74:8
    75:13 80:20
    85:13 86:20
    89:13 93:22
    94:10,25 99:13
    104:13 153:22
    153:24 154:12
    159:24 160:24
    163:16,21
    164:11 177:15
specifically 29:6
    35:5,17 40:25
    41:4,8 42:7
    50:5 55:17
    56:22 68:9 70:6

89:9 94:16
106:18,22
107:5 108:16
123:9 126:24
136:23 143:18
169:6 171:23
specificity 151:5
specifics 13:25
    23:14 55:10
    107:20 109:6
specified 124:19
speed 106:9
spending 154:9
    154:14
spoke 61:8 86:3
    86:10
spoken 41:14,17
    86:6,13 153:13
spring 29:25
    30:14 139:24
    156:10
ss 180:4
staff 54:5 55:2
stamp 74:16
    104:24
stamped 147:15
stand 131:12
    156:2
standard 130:11
    163:6
standards
    131:24 132:4
standing 120:7
Stanley 14:24
Stanley's 169:20
start 10:9 64:20
    102:17 147:8
starting 95:4
state 2:8 32:23
    52:15,19 95:25
    143:12 180:3,9
stated 33:19 63:4
    93:9

statement 33:23
    108:21 130:20
    133:10
statements
    31:14 38:19
states 1:1 10:13
    137:9,17
static 19:4,5
    49:18 101:20
stepped 156:14
steps 128:9
sticks 155:16
STIPULATED
    9:3,9,14
stocked 98:2
story 100:17
    133:16
straightforward
    39:3
strategies
    166:24
Strategos 97:25
strategy 66:12
    164:25
Stream 51:13
Street 3:5 5:6
    54:21 63:17,23
    64:5,9 87:22
stressed 131:18
string 4:18 5:19
    6:3,12 7:10,19
    34:11 74:25
    79:14 81:5
    90:21 113:3
    118:16
strong 149:19
structural 25:6
structure 20:9
    24:25 35:8
    61:21 133:23
    164:4,16 168:9
structured 11:24
    12:9,11,18,21

20:16 79:3
107:25 125:10
125:13
structurers
    23:25 24:6,20
    24:21 26:13
structures 171:5
structuring 13:8
    19:18
study 44:16
studying 174:19
    174:20,21,24
    174:25
subject 81:19
    106:8 108:25
    110:10 120:14
submission
    77:17
submit 175:21
submitted
    175:17 177:11
subprime 42:25
    46:17 47:2 50:2
    50:17 51:3 52:6
    65:21 66:10
subsequent
    156:13
substance 83:12
substantial 79:6
success 34:20
successful
    101:23
sued 95:11
suffer 136:19
suffered 22:17
    23:2
sufficient 100:2
    100:11 101:8
suggest 166:11
suggested 63:7
suggestion
    131:19
Suisse 14:16,17

supervised 19:25
    23:24
supervising 99:3
supervision
    104:5 114:24
super-senior
    122:21 123:4
    134:3
supported 38:6
supports 148:13
Supreme 95:25
sure 17:15,23
    28:15 29:5 30:7
    52:24 56:20,21
    56:24 57:11
    58:14 68:8
    77:15 78:18
    87:16 90:4
    114:15 116:5
    123:18 148:6
    152:21 156:21
    157:16 158:7
    172:4
swap 28:3
swear 11:15
switch 102:9
sworn 9:17 11:18
    180:13
syndicate 84:8,9
synthetic 17:12
    17:19 18:2,10
    18:16,24 19:22
    20:6 21:5,8,12
    21:16 35:14,15
    35:18 129:24
    161:16
synthetics 18:11
    18:13 19:8 28:2
system 152:12
    152:15
systems 132:18
S&P 45:24

Ira Wagner

February 5, 2013

New York, NY

| **T** | | | | |
|---|---|---|---|---|
| **T** 4:11 5:1 6:1 7:1 8:1 9:1,1 180:1 180:1 | 95:7 99:4 100:8 100:19 114:19 153:8 | 129:4 132:7,10 133:11 136:16 136:19 138:3 | 24:5 36:8 47:12 60:5 102:18 105:7 146:18 | **Tomljanovic** 88:19 90:8 |
| **take** 19:9,17 22:4 24:16,17 44:14 59:12 64:11 77:25 81:14 82:2 102:10 103:11 118:24 124:8 127:4 128:9,11 131:22 138:19 139:13 146:9 146:15 147:23 148:16 149:23 159:17 162:20 163:2,10,19 164:2 169:22 170:13 | **technically** 31:22 73:17 **television** 126:15 **tell** 19:19 24:4 78:10 152:17 **telling** 50:21 55:2 56:10 58:15 **ten** 14:7 16:14 17:19 18:5 19:3 19:7,22 21:18 29:8,9,10 64:11 **tend** 109:9 **tended** 95:2 162:2 **terms** 20:18 32:7 47:15 83:7 133:22,22 157:18 158:12 177:16 | 138:20 139:9 139:14,22 140:9,14 147:20 156:6,6 156:8,10 172:8 172:14 174:6 175:18 177:11 177:14 179:5 180:14 **tests** 124:14,17 124:18 **text** 65:22 66:16 92:14 111:14 111:16 **Thank** 175:9 178:4 | 154:19 155:7 **three-quarters** 173:25 **threshold** 163:9 **tier** 15:19,19 **time** 9:11 10:23 11:14 19:12 26:7 27:18 38:3 45:9 46:8,11 47:11 48:3 49:6 54:24 64:2,8 70:2 80:21 81:4 86:3,10 109:8 125:3 129:25 153:14,14 | **top** 16:14,15 60:19 61:11 67:14 76:17 80:24 81:18 91:23 107:22 117:14 119:23 120:11 **topic** 126:19 177:13 **topics** 79:9 **total** 21:11 **Tourre** 1:7 3:12 10:12 11:2,4,6 35:21 172:6 173:4 |
| **taken** 13:15 **talk** 46:7 85:21 132:18 148:25 153:19,21 | **terribly** 67:11 **testified** 11:19 52:18 53:3,6 | **Thanks** 102:12 **thereof** 106:10 **thing** 33:9 154:7 | 154:9,14 155:17 156:4 157:13 160:23 | **Tourre's** 172:8 172:14,24 **toxic** 96:24 97:8 98:2 |
| **talked** 43:22 54:7 55:23 57:22 84:15 101:4 144:10 154:9 157:17 158:8 169:18 | 57:12,19 64:5 108:10 136:14 139:22 141:8 141:20 143:21 149:9 152:23 155:7 168:14 | 154:12 172:18 **things** 32:10,12 33:8 148:25 153:23,24 154:2,14 160:13 166:18 167:12 173:23 174:14,18 | 160:23 163:24 167:23 173:25 174:2 176:4,14 176:20 **times** 24:17 45:2 54:22 86:9 154:19 155:7 159:18,20 | **Tracy** 88:20 **trader** 16:23 **traders** 25:7 **trading** 13:7 56:21 84:8,9 115:7 **tranche** 122:21 |
| **talking** 66:11 148:22 **talks** 37:14 47:17 79:2 120:14 | **testifying** 17:17 59:13 66:4 67:21 129:14 129:22 130:10 | **thinking** 30:6 62:25 **third** 24:15 27:3 27:5 | 162:8 **timing** 81:3 **tip** 18:3 **title** 17:2 89:8 | 123:4 133:24 **tranches** 25:2 42:11 **transactions** 23:6,9,10,11 |
| **tape** 10:9 62:2 64:14,21 102:13,18 146:17 147:9 | 130:16,23 138:5 172:20 **testimony** 17:23 30:10 31:24 | **thought** 33:16 47:23 52:3 59:3 62:3,14 63:3,6 69:16 71:8 | **titles** 116:6 **today** 10:15,20 10:21 17:25 176:2 | 25:3 26:19 33:17 71:25 72:5,9,13,15 80:15,18 85:17 |
| **Taylor** 113:14 **team** 23:24 24:12 25:8 26:22 27:16 72:6 80:6 83:18 84:13,18 | 33:2,7,18 38:17 41:21 52:9 78:5 103:3 106:12 106:16 108:9 | 93:18 147:21 176:8 177:18 177:20 **thoughts** 161:10 **three** 4:23 5:5 | **told** 17:11,11 39:5,11,15 50:16 61:20 62:6 100:16 108:20 110:12 **Tom** 115:7 | 99:19 113:19 125:13 144:11 144:12 150:11 150:12 155:4 164:6,24 **transcript** 4:12 |

Ira Wagner                                                                February 5, 2013

New York, NY

5:10 35:25
64:17,25 65:3,7
67:14,15 71:22
129:10,20
130:8 131:16
179:4,8
**transfer** 108:5
**travel** 150:15
**Treliant** 174:9
**trial** 9:12
**tried** 44:23 45:8
52:2 130:22
140:24 141:8
**triggers** 125:5,19
126:6
**true** 38:2,15
108:24 112:10
127:16,21
179:4 180:13
**trustee** 27:8
**trustee's** 27:11
**try** 25:16 44:3,24
85:13 131:22
138:6,21 139:4
166:8
**trying** 43:4,5
87:13 139:15
140:6 141:18
154:11 155:21
157:11 171:20
**Tuesday** 1:15
**turn** 65:6 66:14
67:13 91:19
92:7 105:17
117:11,23
128:3,24
135:15
**turned** 121:14
**twelve** 17:19
18:6,15,15 19:7
19:22 37:19
38:10
**twenty** 21:19

**twice** 157:17
**two** 29:12,17
31:19 32:10,12
64:21 80:25
91:5 102:14
142:11 154:19
155:7,24 156:4
160:25 161:5
161:11 167:12
175:21
**two-page** 87:3
**type** 19:16 35:8
43:19,21 59:6
63:8 74:7
165:16
**types** 13:6 25:16
26:19 52:23
58:8 79:2
113:19 164:20
**typical** 159:5
164:17,19,23
170:2 177:24
**typically** 19:14
26:15 109:11
112:8 115:17
120:25 121:4
123:7 162:5

─────────
**U**
─────────

**U** 9:1
**UBS** 14:12,13
**uh** 66:18
**ultimate** 128:19
**ultimately** 72:16
99:23 102:25
130:21
**unaware** 135:8
**underlying** 47:14
50:5 123:19
**undermine** 39:16
**undermined** 38:4
**underperform**
136:11

**understand**
34:16 44:19
48:4 108:22
112:7 126:18
126:23 129:3
135:10 142:7
163:14 164:9
166:8 168:25
169:25
**understanding**
24:23 26:6
31:18,21 37:15
109:18 111:7
155:2,3 160:3
**understood** 33:5
37:17 43:5
**underwriter**
115:11 159:22
169:3 172:3
**underwriting**
20:17 174:17
**unit** 72:25
**United** 1:1 10:13
**universe** 45:14
99:18 128:14
**unusual** 125:5,8
**upper** 15:19
**use** 46:23 85:9
85:14 115:22
**useful** 47:19
**usual** 132:17
167:21
**usually** 161:19
161:24 164:15
**Ute** 150:24

─────────
**V**
─────────

**valid** 47:19
**value** 28:19
**variety** 20:13
173:23 174:10
**various** 24:15,25
28:3 70:14

120:6 144:21
**vein** 15:24
**version** 146:11
147:14
**versus** 10:12
21:12 43:10
44:13 48:24
172:19 175:18
**veto** 166:11
**vetoing** 128:13
**vetted** 108:11
**VI** 50:9
**videographer**
3:20 10:8,20
11:14 22:6,9
64:13,20
102:13,17
127:6,9 146:17
147:8 170:15
170:18 178:5
**videotaped** 1:14
2:4 10:10
**view** 58:25 62:10
68:23 69:7,10
69:14 70:25
101:11,24
127:2,18 134:9
139:2 140:5,15
142:18 148:12
154:24 156:23
157:4,18
158:12 170:21
171:6 176:23
**views** 39:6 62:15
140:20 142:12
142:16 144:6
148:24 149:19
172:23 173:3
173:11,14,18
176:2,11,19
**Village** 88:4
**vintage** 137:8
**vintages** 45:4

**virtually** 47:14
101:14
**visit** 154:17
**Vladimir** 81:21
82:9
**voicing** 161:10
**vs** 1:6 6:18 95:20

─────────
**W**
─────────

**W** 11:17
**Wachovia** 16:2,3
44:15 62:19,24
63:9,10 64:3
171:24
**waived** 9:7
**Wakefield**
113:14
**walked** 132:5
**Wall** 5:6 54:21
63:17,23 64:4,9
**want** 59:7 65:16
66:19 102:4
120:13,15
123:23 133:3,5
161:4 164:11
176:20 177:2
**wanted** 56:12,15
57:13,16 66:13
96:25 130:17
143:17 150:4
**wanting** 144:22
**warehouse**
120:14,19
121:2,14
123:24 160:15
160:17
**Washington** 3:6
**wasn't** 35:5
70:12,15,21
85:12 98:12
123:19 139:11
155:12 157:25
177:19

Ira Wagner

February 5, 2013

New York, NY

**watch** 172:10
**watched** 172:12
**wave** 12:14
**way** 16:9 39:22
  44:12 75:10
  82:9 88:5 104:6
  125:13 127:14
  131:25 135:3
  136:3,6 137:17
  141:7 166:10
  173:2 177:20
  180:17
**ways** 20:13 57:19
  161:25
**website** 65:5
**weighted** 50:14
**went** 78:17,20
  87:8,16 94:18
  109:23 118:12
  155:17 156:3
  157:15 165:6
  171:24
**weren't** 39:19,21
  133:4 162:12
**Westreich** 88:18
**Westreich's**
  89:10
**We're** 147:9
**We've** 23:16
  147:13
**willing** 13:24
**withheld** 111:23
**witness** 4:2 11:16
  29:24 60:24
  96:10 98:15
  119:3 146:12
  174:3 180:11
  180:14
**witnesses** 33:2
  133:12
**woman** 150:23
**word** 46:25 83:8
  112:18 122:12

176:10
**words** 39:2 57:20
  62:12 97:22
  105:23 140:18
  142:6 144:15
  145:9 159:18
**work** 19:13 20:8
  24:13,19,22
  26:4,14 27:12
  34:20 52:5,10
  52:19 53:5 79:6
  85:23,25 94:21
  95:3 130:12
  154:4 173:24
  174:3,7,8,10
  177:20
**worked** 14:8
  17:22 19:24
  33:15 68:13
  72:15,23
  111:13,13
  114:23 116:6
  130:24 156:17
**working** 24:14
  24:15 26:17
  104:4 113:21
  114:4 152:11
  153:22,24
  169:4 174:13
  174:23
**work-related**
  154:7
**worried** 160:25
**worse** 45:12 48:9
**worst** 61:22
  66:19,21 138:7
  138:21
**Worth** 149:14
**wouldn't** 15:24
  26:12 101:17
  153:6 161:17
  164:13
**Wow** 146:7

**write** 33:24 34:5
  70:22
**writes** 34:19 75:3
  119:13 120:12
**write-down** 22:18
  23:2
**writing** 54:24
  55:9 144:24
**written** 138:17
  139:6
**wrote** 62:22
  111:5

**X**

**x** 1:3,10 4:1,11
  5:1 6:1 7:1 8:1
  105:25 161:4,7

**Y**

**Y** 161:7
**year** 16:7,10,10
  28:8 29:14
  30:11 175:2
**years** 15:23
  16:15,16 21:12
  33:14 47:3,12
  151:8 158:16
**York** 1:2,16,16
  2:6,6,9 3:14
  10:14,17,17
  52:15 54:22
  84:5 96:2
  150:21 180:3,5
  180:9
**young** 158:18

**Z**

**Z** 161:7
**Zabel** 114:9
  116:2
**zero** 163:5
**Zimmermann**
  4:23 32:5 34:7
  34:19 36:8

38:11,18,21
  39:5,15 40:14
  41:6
**Zimmermann's**
  33:21 36:5,24
  39:23

**$**

**$100** 74:3
**$200** 108:2
**$250,000** 28:13

**0**

**000222080**
  113:10
**001062119** 87:4
**001066745** 91:4
**001067039** 91:8
  91:11
**001067041** 91:20
**03426345** 118:19
  119:9
**06** 21:9 41:10
  156:16
**06443286** 74:16
**06459332** 75:24
  76:4
**06459333** 76:8
**06480405** 107:15
**06662708** 116:19
**07** 53:8 55:16
  59:10 107:15
**07076055** 104:24
**07844825** 79:17
  79:21
**07844916** 79:17
**07855367** 81:8
  81:12
**07855424** 81:8
**088** 113:11
**09181746** 145:24
**09767689** 8:10
  145:20 147:15
**09767703** 8:10

**1**

**1** 4:14 10:2 23:16
  23:21 29:18
  30:9,18,25,25
  31:10 96:9 99:7
  175:16
**1/15/07** 5:12
  74:11
**1/19/07** 5:15
  75:22
**1/23/07** 6:13
  90:22
**1/9/07** 6:8 86:22
**1:36** 147:3,10
**10** 4:14,16 5:19
  79:14,20
**10th** 87:21
**10-CV-3229(B...**
  1:9
**10:15** 64:15
**10:27** 64:22
**100** 3:5 37:23
  130:17,22
  157:15
**10020** 3:14
**104** 6:21
**1062119** 6:10
  86:24
**1062120** 6:11
  86:24
**1066745** 6:15
  90:24
**1067322** 6:16
  90:24
**107** 7:3
**11** 4:5 6:3 36:21
  76:18 81:5,11
**11/8/2006** 4:19
  34:12
**11:16** 102:15
**11:25** 102:19
**11:56** 127:7
**113** 7:10

Ira Wagner
New York, NY
February 5, 2013

**116** 7:15
**118** 7:19
**12** 6:8 7:6 38:23
  86:22 87:3
  107:10
**12:06** 127:10
**12:20** 34:19
**12:31** 146:19,20
**120** 87:5
**1221** 2:5 3:13
  10:16
**13** 6:12 90:21
  91:3
**14** 6:17 95:19,24
  146:4,6 148:5
**145** 8:3
**147** 8:7 117:23
**15** 6:21 104:16
  104:20,23
  110:3
**15th** 75:2 87:22
**16** 7:3 65:7 107:8
  107:14 110:23
  111:15
**1635** 75:2
**164** 92:8
**17** 7:10 65:8,17
  113:3,9
**170** 74:2
**175** 4:6
**177** 4:5
**18** 4:17 7:15 10:6
  23:18 116:13
  116:18 121:17
  124:9
**19** 7:19 66:14
  118:16,22
**192** 60:9,11,14
**193** 60:10,19
  61:12
**1998** 12:7

**2**

**2** 4:16 10:5 23:16
  30:15 43:24
  44:9,20 48:14
  49:4 50:16 51:2
  51:13 97:19
  105:17 107:23
  135:15,16,17
  171:14,16
**2:07** 170:16
**2:15** 170:19
**2:25** 178:7,8
**20** 4:15 8:3 10:3
  23:17 53:25
  61:5,24 62:11
  62:16 63:24
  124:11 145:13
  145:18
**2000** 14:5
**2000s** 16:16
**2005** 19:9 21:9
  41:10 155:23
  156:16,18
**2006** 19:10 28:8
  28:14,23 34:19
  35:11 40:5,7,24
  41:2 53:8 55:16
  59:10 68:22
  75:17 76:13
  137:19 139:25
  140:4,22
  156:18
**2006-2** 87:10
  88:5 90:16
  91:14
**2006-2007** 21:15
  22:17,24 42:25
  46:16,22 141:6
  142:14 151:8
  163:24 176:4
  176:14
**2007** 7:7 14:6
  19:11 29:14,16
  35:7 39:24

40:15,20,21
68:22 75:17
78:14,15,17
86:6,12,17 87:8
107:10 125:3
129:15 137:19
140:2,4,22
145:20 156:18
**2007-AC1** 35:2
  39:25 40:10,16
  40:23 42:11,19
  50:19 51:23
  54:5,10 55:5
  60:17 99:10
  122:14 128:10
  128:20 130:17
  134:8 143:25
**2007-1** 51:13
  103:7
**2007-2** 7:5 102:5
  103:14,20
  105:12 107:9
**2007-3** 112:23
  113:22 117:9
  119:15 122:21
**2008** 13:16 45:18
  46:2 47:6 62:19
  62:23 64:3 86:5
  156:18,19,20
  173:21
**2009** 126:14
**2010** 5:11 17:9
  30:2,3 54:2
  61:5,16,24
  62:11,16 63:24
  64:18 65:2
  156:9
**2011** 30:14
  139:22,24
  156:7,10
**2012** 4:15,17
  10:3,6 23:18,19
**2013** 1:15 2:1

10:18 179:16
**20549** 3:6
**21** 8:7 147:4,13
**22** 67:13
**222080** 7:13
  113:5
**222088** 7:14
  113:6
**26** 76:13
**27** 61:2 103:10
  110:20 145:20
**2980** 116:20

**3**

**3** 4:18 5:11 34:11
  40:3,9 64:18
  65:2 83:16
**3/27/07** 8:4,8
  147:5
**3/27/2007** 145:14
**3/5/07** 6:21
  104:16
**307** 50:15,15
**31** 5:11 64:18
**321** 91:8
**34** 4:18
**3426345** 7:23
**345** 76:5
**36** 4:22

**4**

**4** 4:22 36:7 45:18
  45:25 47:6
  67:15 162:16
**4th** 46:13
**4/5/07** 7:20
  118:17
**40** 23:24
**41** 42:7,22
**42** 42:7 43:17,24
  44:9,19,21
  49:18,23
**44** 136:7
**46** 6:20 95:21

**47.89** 51:19

**5**

**5** 1:15 2:1 5:3
  10:18 60:4,8
  159:11 162:17
**50** 102:22 103:5
  106:7 110:9
**5424** 81:12
**589** 60:10 61:4

**6**

**6** 5:6 39:22 51:4
  63:17,22 66:16
**6/1/07** 5:20 79:15
**6/26/07** 7:15
  116:13
**6/29/07** 7:11
  113:4
**6/6/07** 6:4 81:6
**60** 5:3
**63** 5:6
**64** 5:10
**6443286** 5:14
  74:12
**6459332** 5:17
**6459345** 5:18
  75:24
**6480405** 7:8
  107:11
**6480407** 7:9
  107:11
**6662708** 7:17
  116:15
**6662980** 7:18
  116:15
**68** 128:3

**7**

**7** 5:10 35:11
  64:17,24 84:16
**70** 104:25
**703** 145:20
  147:16

Ira Wagner                                                    February 5, 2013
New York, NY

| | |
|---|---|
| **7076055** 6:23<br>   104:18 | **98** 12:24<br>**99** 12:24 |
| **7076070** 6:24<br>   104:18 | |
| **74** 5:12 | |
| **75** 5:15 | |
| **760** 145:25 | |
| **7672496** 4:21<br>   34:13 | |
| **77** 32:20,21,22<br>   128:24 | |
| **78** 33:23 | |
| **7844825** 5:22 | |
| **7844916** 5:23 | |
| **7855367** 6:6 | |
| **7855424** 6:7 | |
| **79** 5:19 | |

**8**

**8** 5:12 34:18
   37:17 74:11,15
**8:15** 35:12
**80s** 12:13,16
**81** 6:3
**86** 6:8

**9**

**9** 5:15 75:22 76:3
**9:02** 2:2 10:18
**9:14** 22:7
**9:18** 22:10
**90** 6:12 130:19
   130:21
**90s** 12:24
**916** 79:21
**9181746** 8:6
   145:15
**9181760** 8:6
   145:16
**92** 175:16
**95** 6:17
**97** 4:21 34:13
**9767689** 147:6
**9767703** 147:7