UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                    v.

FABRICE TOURRE,

                              Defendant.
_____

: 10 Civ. 3229 (KBF)

: ECF Case


### SEC'S MEMORANDUM OF LAW IN OPPOSITION TO TOURRE'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING SCHEME LIABILITY

Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9362 (facsimile)
martensm@sec.gov
Attorneys for Plaintiff

Dated:  Washington, D.C.
        June 13, 2013

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ...........................................................................................................3

    A.  The SEC's Amended Complaint....................................................................3

    B.  Tourre's Motion to Dismiss the Amended Complaint...................................4

    C.  Discovery .....................................................................................................5

    D.  Motions for Partial Summary Judgment .......................................................5

ARGUMENT .................................................................................................................6

I.   The SEC's Scheme Liability Claim Under Both Rule 10b-5(a), (c) and Section
    17(a)(1), (3) Should Be Presented To The Jury...............................................6

    A.  The Amended Complaint Expressly Alleges Scheme Liability .......................7

    B.  The Amended Complaint Alleges An Actionable Scheme............................8

    C.  The Subsections Of The SEC's Fraud Claims Should Not Be Considered
        Piecemeal ...................................................................................................11

    D.  The Defense Conducted Discovery Regarding the Alleged Scheme................12

II.  The Admissibility Of The January 17 Recording At Trial Does Not Depend On
    Scheme Liability ............................................................................................13

CONCLUSION..............................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)........................................................................................................12

*Durland v. United States*,
  161 U.S. 306 (1896)........................................................................................................12

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)........................................................................................................11

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  No. 11 Civ. 4209(KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) .......................7, 10

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............................................................................9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...........................................................................................11

*In the Matter of Cady, Roberts & Co.*,
  40 S.E.C. 907, 1961 WL 60638 (Nov. 8, 1961) .............................................................11

*Janus Capital Group, Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)....................................................................................................12

*Santa Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977)........................................................................................................11

*S.E.C. v. Capital Gains Research Bureau*,
  375 U.S. 180 (1963)........................................................................................................11

*S.E.C. v. First Jersey Securities, Inc.*,
  101 F.3d 1450 (2d Cir. 1996)........................................................................................5, 6

*S.E.C. v. McNulty*,
  137 F.3d 732 (2d Cir. 1998)...........................................................................................11

*S.E.C. v. Obus*,
  693 F.3d 276 (2d Cir. 2012)...........................................................................................11

*S.E.C. v. Simpson Capital Mgmt., Inc.*,
  586 F. Supp. 2d 196 (S.D.N.Y. 2008)..............................................................................5

*S.E.C. v. Stoker*,
   865 F. Supp. 2d 457 (S.D.N.Y. 2012)...............................................................2, 8, 12

*S.E.C. v. Stoker*,
   873 F. Supp. 2d 605 (S.D.N.Y. 2012)......................................................................2, 10

*S.E.C. v. U.S. Environmental, Inc.*,
   155 F.3d 107 (2d Cir. 1998)...........................................................................................6

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000).........................................................................................12

*United States v. Doherty*,
   969 F.2d 425 (7th Cir. 1992) .......................................................................................12

*United States v. Persky*,
   520 F.2d 283 (2d Cir. 1975).........................................................................................12

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003).........................................................................................12

*USA Certified Merchs., LLC v. Koebel*,
   262 F. Supp. 2d 319 (S.D.N.Y. 2003)...........................................................................8

*Wright v. Ernst & Young LLP*,
   152 F.3d 169 (2d Cir. 1998)...........................................................................................6

## STATUTES AND REGULATIONS

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)..........................................*passim*

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ..........................................*passim*

Rule 10b-5, 17 C.F.R. § 240.10b-5.....................................................................................*passim*

Fed. R. Civ. P. 9(b) ...........................................................................................................4, 8

Fed. R. Civ. P. 12(b) ............................................................................................................8

Plaintiff, the Securities and Exchange Commission ("SEC" or "Commission"), respectfully submits this memorandum of law in opposition to defendant Fabrice Tourre's motion *in limine* to preclude the SEC from offering evidence or argument in support of a scheme theory of liability (Dkt. No. 296).

## PRELIMINARY STATEMENT

Under the guise of a "motion *in limine*," the defense has filed what is in effect a second motion for summary judgment seeking to eliminate from this case the SEC's scheme liability claims against Tourre under Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) thereunder, and Section 17(a)(1) and (3) of the Securities Act.  To justify this belated motion for summary judgment in disguise, the defense feigns surprise that the SEC intends to proceed under the scheme liability theory that it has alleged explicitly from the outset of this case.  The reality is that the defense chose to place all of its motion for summary judgment eggs in the *Morrison* basket.  That tactical decision failed.  The defense should not now be permitted to raise a second round of legal and factual challenges to the SEC's case that it elected to forgo at summary judgment.

Since the outset of this case, the SEC has expressly alleged in its Complaint and Amended Complaint that Tourre's conduct with regard to the structuring and marketing of the ABACUS 2007-AC1 ("AC1") transaction gave rise to liability both for material misstatements and omissions, in violation of Rule 10b-5(b) and Section 17(a)(2), and for participation in a fraudulent scheme and course of business, in violation of Rule 10b-5(a), (c) and Section 17(a)(1), (3).  The Amended Complaint, after outlining at length the conduct at issue, alleges that Tourre thereby "employed devices, schemes or artifices to defraud" and "engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit."  Amend. Compl. ¶¶ 6, 76, 80.  Given these allegations, the defense cannot credibly claim shock or surprise

1

at the SEC's intent to proceed in the alternative on a scheme liability theory at trial.  Indeed, the parties conducted extensive discovery on both theories during the last several years.  That the defense chose not to challenge the SEC's scheme allegations at the motion to dismiss stage and chose not to raise any of the current scheme liability arguments at summary judgment is hardly a basis for precluding the SEC from proving and arguing at trial the scheme liability theory that it has alleged from the outset.

Furthermore, the SEC's scheme liability theory is well-grounded in the law, as Judge Rakoff recently recognized in denying defense motions to dismiss and for summary judgment with regard to the scheme liability claim in *SEC v. Stoker*, No. 11 Civ. 7388 (S.D.N.Y.).  Though the complaint in *Stoker* did not did not use the word "scheme" at all (in contrast to the complaints here), Judge Rakoff nonetheless recognized that the SEC had alleged scheme liability under Section 17(a)(3) and found the evidence sufficient to go to the jury on the theory that the defendant "undertook a deceptive scheme or course of conduct that went beyond the misrepresentations" alleged.  *S.E.C. v. Stoker*, 873 F. Supp. 2d 605, 614 (S.D.N.Y. 2012). Specifically, Judge Rakoff found sufficient for scheme liability purposes the SEC's allegations that Citigroup believed that certain mortgage-based assets would perform poorly, that Citigroup structured a CDO specifically so that it could take a short position on those assets, that Citigroup engaged a collateral manager to help sell the transaction to investors, and that the CDO's notes were then sold to investors without disclosure that Citigroup was betting that the assets in the CDO would fail.  *See id.* at 615.  As Judge Rakoff observed, those allegations were "a rather straightforward fraud."  *S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 462 (S.D.N.Y. 2012).  And, according to Judge Rakoff, that fraudulent course of conduct fit well within the scheme liability theory.  *Stoker*, 873 F. Supp. 2d at 614.  The fraudulent scheme alleged here is not meaningfully

distinguishable from that in *Stoker*.  And as in *Stoker*, the SEC should be permitted to present its scheme liability claims to the jury.

## BACKGROUND

### A.  The SEC's Amended Complaint.

The SEC's Amended Complaint alleges three claims against Tourre: (1) a primary violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); (2) a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) aiding and abetting the violations of Section 10(b) and Rule 10b-5 by Goldman Sachs & Co. ("GS&Co").   These claims arise out of the structuring and marketing of the AC1 collateralized debt obligation ("CDO") transaction by Tourre and GS&Co in order to allow the Paulson & Co., Inc. hedge fund ("Paulson") to take a short position on the AC1 reference portfolio of residential mortgage-backed securities ("RMBS").  Amend. Compl. ¶¶ 1-2.  By late 2006, it became clear that the successful marketing of such a CDO to long investors required that the CDO's reference portfolio be selected by a portfolio selection agent.  *Id.* ¶¶ 20-21. Accordingly, Tourre arranged for ACA Management LLC (together with affiliates, "ACA") to serve as portfolio selection agent for the AC1 transaction by misleading ACA, directly and indirectly, regarding Paulson's intent to make a long investment in the equity tranche of the AC1 transaction.  *Id.* ¶¶ 23, 45-51.  Believing that Paulson was to be an equity investor in the AC1 transaction, ACA worked with Paulson to select the AC1 reference portfolio.  *Id.* ¶ 52.  Tourre, through GS&Co, then marketed the AC1 transaction to dozens of potential long investors by means of the misleading representation that the AC1 reference portfolio was "selected by ACA" with no mention of Paulson's adverse economic interest and substantial role in the selection process.  *Id.* ¶ 40, 43, 66.  Ultimately, the AC1 long investors sustained losses in excess of $1 billion.  *Id.* ¶ 5, 72-73.  The opening paragraphs of the Amended Complaint allege that these

"transactions, acts, practices, and a course of business . . . violated Section 17(a) . . . , Section 10(b) . . . and Exchange Act Rule 10b-5." *Id.* ¶ 6.

After describing the course of fraudulent conduct by Tourre and GS&Co, the Amended Complaint specifies the SEC's three claims for relief.  The First Claim alleges that "Tourre violated Section 17(a)(1), (2) and (3)." *Id.* ¶ 75.  More specifically, that claim alleges that, "[a]s set forth above, Tourre . . . (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions . . . ; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities." *Id.* ¶ 76.[1]  Similarly, the Second Claim alleges that Tourre violated Section 10(b) and Rule 10b-5.  *Id.* ¶ 79.   Specifically, the Amended Complaint alleges that, "[a]s set forth above, Tourre . . . (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omissions . . . ; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon persons." *Id.* ¶ 80.  Finally, the Third Claim alleges that "Tourre aided and abetted violations by GS&Co of the federal securities laws." *Id.* ¶ 83.  That claim goes on to allege that "GS&Co employed fraudulent devices, made untrue statements of material facts and omissions . . . and engaged in transactions that operated as a fraud or deceit upon persons." *Id.*

### B.  Tourre's Motion to Dismiss the Amended Complaint.

On December 9, 2010, Tourre moved to dismiss the Amended Complaint, arguing (1) that ACA was not misled, (2) that the SEC had failed to specify, in accordance with Federal Rule of Civil Procedure 9(b), the identities of the other domestic investors defrauded by Tourre, and (3) that the transactions at issue were not domestic for purposes of *Morrison*.  Deft's Mem. of Law in Support of Motion to Dismiss (Dkt. No. 52).  For whatever strategic reason, Tourre did

---

[1]         The SEC's original Complaint contains this same allegation.  (Dkt. No. 1, at ¶ 69).

not move to dismiss the SEC's scheme liability claims, either for lack of specificity or for failure to state a claim.  *Compare S.E.C. v. Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196, 203 (S.D.N.Y. 2008) (defendant's moved to dismiss claims under Rule 10b-5(a), (c) for failure to state a claim on the ground that the "the Complaint merely repeats the language of" Rule 10b-5).

### C.  Discovery.

Throughout domestic discovery, the parties examined the alleged fraudulent scheme in detail.  For example, the parties deposed Paolo Pellegrini of Paulson about his desire in late 2006 to short a portfolio of 2006-vintage RMBS, Paulson's retention of GS&Co to structure and market a CDO to execute Paulson's short position, the need for a portfolio selection agent in order to market the CDO to potential long investors, Pellegrini's efforts to deceive portfolio selection agents into participating in the contemplated CDO transaction by "playing the role of an equity investor" in his meetings with prospective portfolio selection agents, Tourre's deception of the portfolio selection agent, Pellegrini's interactions with ACA in the course of selecting the AC1 reference portfolio, and the criteria Paulson applied in attempting to identify for the AC1 reference portfolio RMBS that were likely to experience credit events.

### D.  Motions for Partial Summary Judgment.

At the close of discovery, Tourre moved for partial summary judgment only on *Morrison* grounds.  (Dkt. No.185).  The SEC moved for partial summary judgment on its claim under Section 17(a).  (Dkt No. 191).  In its opening brief in support of that motion, the SEC expressly cited subsections (1) and (3) of Section 17(a).  (Dkt. No. 192, at 14 ("For purposes of a Section 17(a) claim, a defendant is liable if he 'employ[s]' or 'engages in' the fraud.  15 U.S.C. § [77q](a)(1), (3).").  The SEC also quoted the Second Circuit's decision in *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996), to the effect that, under Section 17(a), "[p]rimary liability may be imposed not only on persons who made fraudulent representations

but also on those who had knowledge of the fraud and assisted in its perpetration." (Dkt. No. 192, at 14). In opposition to the SEC's motion, the defense noted that *First Jersey* involved a scheme and maintained that its holding had been limited by the Second Circuit in *Wright v. Ernst & Young LLP*, 152 F.3d 169, 172 (2d Cir. 1998). (Dkt. No. 227, at 12). In reply, the SEC noted that the holding of *First Jersey* was reaffirmed by the Second Circuit in *S.E.C. v. U.S. Environmental, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998). (Dkt. No. 253, at 9).

On April 26, 2013, this Court held a lengthy hearing on the parties' summary judgment motions and other issues. At no time during that hearing did the defense raise any objection to the SEC's scheme liability argument as being un-alleged in the Amended Complaint. Nor was any motion to strike filed with regard to those portions of the SEC's briefs arguing that Tourre was subject to scheme liability.

On June 4, 2013, this Court ruled on the SEC's motion for partial summary judgment. (Dkt. No. 302). While denying that portion of the SEC's motion that sought partial summary judgment on the Section 17(a) scheme liability claim, this Court recognized the continuing vitality of the holding of *First Jersey*, stating that, to be liable under Section 17(a), "the defendant need not speak a falsehood directly to a defrauded investor; it is enough to have 'knowledge of the fraud and [to have] assisted in its perpetration.'" (*Id.* at 9 (quoting *First Jersey*, 101 F.3d at 1471)).

## ARGUMENT

### I. The SEC's Scheme Liability Claim Under Both Rule 10b-5(a), (c) and Section 17(a)(1), (3) Should Be Presented To The Jury.

The defense moves *in limine* to preclude the SEC from offering evidence or argument at trial relating to the scheme liability theory under Rule 10b-5 and Section 17(a). According to the defense, "[t]he Complaint made no allegation of a scheme," Deft's Mem. at 3, if the Complaint

did make such an allegation it was only in "one boilerplate paragraph," *id.* at 4, the Amended Complaint fails to allege the scheme "with specificity," *id.* at 6, and the allegations are insufficient to support a scheme liability claim. These belated arguments merit little response.

### A. The Amended Complaint Expressly Alleges Scheme Liability.

The defense's bold claim that "[t]he Complaint made no allegation of a scheme" is belied by the plain language of the Amended Complaint. As noted above, the introductory paragraphs of the Amended Complaint allege that "GS&Co and Tourre directly and indirectly engaged in transactions, acts, practices, and a course of business that violated Section 17(a) . . ., Section 10(b) . . . and Exchange Act Rule 10b-5." Amend. Compl. ¶ 6. The Amended Complaint goes on to allege that "Tourre violated Section 17(a)(1), (2) and (3) of the Securities Act," *id.* ¶ 75, in that he "employed devices, schemes or artifices to defraud" and "engaged in transactions, practices, or courses of business which operated or would operate as a fraud," in violation of both Section 17(a)(1), (2) and Rule 10b-5(a), (c), *id.* ¶¶ 76, 80. In short, the Amended Complaint explicitly alleged that Tourre's specified conduct gave rise to scheme liability under both Rule 10b-5 and Section 17(a).

Tourre responds by noting that the Amended Complaint also contains numerous allegations of false statements and omissions. *See* Deft's Mem. at 3-4. While true, such allegations are in no way inconsistent with a scheme liability theory. As this Court recognized in *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209(KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013), a fraudulent scheme "may, but need not necessarily, involve separately actionable statements." *Id.* at *1. The Amended Complaint here alleges a scheme to design a CDO to allow Paulson to take a short interest in the CDO's reference portfolio, to trick a portfolio selection agent into participating in the transaction in order to make the CDO marketable to long investors, and then to deceive those long investors by omitting to mention

7

Paulson's role in the selection of the CDO's reference portfolio.  That this deceptive scheme also involves separately actionable misstatements is unremarkable.

Tourre counters that "the appearance of the word 'scheme' in the recitation of statutory language at the back end of the Complaint" is insufficient because the scheme liability claim was not alleged with specificity under Federal Rule of Civil Procedure 9(b).  Deft's Mem. at 5-8.  A motion *in limine*, however, is not the proper vehicle for objecting that a complaint fails to allege the elements of scheme claim with the specificity required by Rule 9(b).  If the defense wished to make that argument, it should have been made long ago during motions practice at the pleading stage, not in the weeks before trial by means of a purported motion *in limine*.  *See* Fed. R. Civ. P. 12(b) (providing that a motion asserting the defense of failure to state claim "must be made before pleading if a responsive pleading is allowed"); *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 332-33 (S.D.N.Y. 2003) (refusing to consider defendant's argument under Rule 9(b) that complaint failed to allege fraud with particularity when raised after the close of discovery).

### B.  The Amended Complaint Alleges An Actionable Scheme.

Tourre further argues that a motion to dismiss the scheme liability claim "would have been exceptionally robust," Deft's Mem. at 9, but asserts that he did not file such a motion because he did not "underst[and] there to be a claim of scheme liability in this case," *id.* at 9. For the reasons explained above, Tourre's contention that he was unaware of a scheme liability claim despite its express allegation in the Amended Complaint is specious.

In any event, a motion to dismiss the SEC's scheme liability claim, however "robust," would have failed just as did the similar motion in *SEC v. Stoker*, No. 11 Civ. 7388 (S.D.N.Y.). In *Stoker*, the defendant worked in the division of Citigroup that structured and marketed CDOs. 865 F. Supp. 2d at 459.  The SEC alleged that Citigroup created a CDO so that Citigroup could

short assets into the CDO in the amount of approximately $500 million. *See id.* at 460-61. In order to facilitate the marketing of the CDO's notes to long investors, Citigroup retained a portfolio selection agent purportedly to select the assets included in the CDO's portfolio. *Id.* at 459-60. The portfolio selection agent, however, was selecting assets from lists provided by Citigroup. *Id.* at 460. Citigroup and Stoker then marketed the CDO notes to investors by means of an offering circular and pitch book that emphasized the role of the portfolio selection agent in constructing the CDO's portfolio without mentioning Citigroup's role or intended short position on the CDO's assets. *Id.* at 461.

Based on these allegations, the SEC sued Stoker asserting both a misrepresentation claim under Section 17(a)(2) and a scheme liability claim under Section 17(a)(3). *Id.* at 458. The defendant moved to dismiss the scheme liability claim on the ground that it was not legally viable in that it merely duplicated the misrepresentation claim. Judge Rakoff rejected this argument, explaining that "a defendant may be liable under Section 17(a)(2) and Section 17(a)(3) based on allegations stemming from the same set of facts as long as the SEC alleges that the defendants 'undertook a deceptive scheme or course of conduct that went beyond misrepresentations.'" *Id.* at 467 (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005)). Judge Rakoff concluded that the complaint "alleges a course of conduct beyond the misrepresentations that are covered by Section 17(a)(2). The misrepresentations and omissions were part of that conduct, but they were not the entirety of it." *Id.* at 467. Specifically, Judge Rakoff noted that the rationale for the CDO's creation was to allow Citigroup to short certain assets for its own account, Citigroup engaged a collateral manager because it knew that it could not sell the CDO notes to investors unless the portfolio was chosen by a reputable outside entity, Citigroup worked with the collateral manager to include certain assets in

the CDO so that Citigroup could short them, and Stoker marketed the CDO to prospective investors by sending the pitch book "even though he knew that Citigroup had chosen assets for the [CDO] that it believed were likely to perform poorly." *Id.* at 467-68. These allegations, Judge Rakoff concluded, were "more than sufficient to state a claim under Section 17(a)(3)." *Id.* at 468. At summary judgment, Stoker again challenged the SEC's scheme liability claim, and Judge Rakoff again ruled that the evidence "would be more than sufficient for the SEC to prevail on this claim." *Stoker*, 873 F. Supp. 2d at 615.

Judge Rakoff's ruling in *Stoker* is similar to this Court's scheme liability ruling in *IBEW Local 90*, *supra*. In that case, this Court described the alleged scheme as one to maximize Deutsche Bank's profit "by originating or acquiring residential mortgages and by packaging them into residential mortgage-backed securities ('RMBS') and collateralized debt obligations ('CDOs'), which they knew presented far greater risk than they told the market." 2013 WL 1223844, at *1. The only alleged deceptive acts identified by this Court were the false and misleading statements by the defendants to investors. *See id.* at *6. Nevertheless, this Court held that the allegations were sufficient to state a scheme liability claim. *Id.* at *13-14.

As in *Stoker* and *IBEW Local 90*, the allegations and evidence in this case are more than sufficient to constitute an actionable scheme and course of conduct under Section 17(a)(1), (3) and Rule 10b-5(a), (c). The Amended Complaint alleges that:

> In sum, GS&Co and Tourre arranged a transaction at Paulson's request in which Paulson heavily influenced the selection of the portfolio to suit its economic interests, but failed to disclose to investors, as part of the description of the portfolio selection process contained in the marketing materials used to promote the transaction, Paulson's role in the portfolio selection process or its adverse economic interests.

Amend. Compl. ¶ 3. In furtherance of this scheme, Tourre tricked ACA into serving as the portfolio selection agent by misleading ACA into believing that Paulson was an equity investor.

*Id.* ¶¶ 4, 46.  The Amended Complaint alleges that Tourre, by these "transactions, acts, practices and . . . course of business . . . violated Section 17(a) . . . , Section 10(b) . . . and Exchange Act Rule 10b-5." *Id.* ¶ 6.  These allegations, if proven at trial, are more than sufficient to establish an actionable securities fraud scheme.

### C. The Subsections Of The SEC's Fraud Claims Should Not Be Considered Piecemeal.

The defense effort to force this Court to resolve the SEC's scheme liability claim on a "motion *in limine*" detached from a consideration of the full reach of Section 17(a) and Rule 10b-5 risks creating anomalous results.  The Supreme Court has repeatedly explained that the federal securities laws should be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes."  *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963).  In particular, the Supreme Court has held that Section 10(b) is "meant to prohibit the full range of ingenious devices that might be used," *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477 (1977), and is "cumulative" in its construction, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 384 (1983).  Accordingly, the Commission has long held that "the three main subdivisions of Section 17 and Rule 10b-5 have been considered to be mutually supporting rather than mutually exclusive."  *In the Matter of Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL 60638, at *4 (Nov. 8, 1961).[2]  "Thus, a breach of duty of disclosure may be viewed as a device or scheme, an implied misrepresentation, and an act or practice, violative of all three subdivisions."  *Id.*[3]  The defense, however, presents the scheme liability issue to this

---

[2]    The Second Circuit has cited the *Cady, Roberts & Co.* decision with approval.  *See, e.g.*, *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).  This is consistent with the principle that the SEC's interpretation of the Commission's regulations and the Securities Act "is entitled to judicial deference."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 352 (2d Cir. 2010); *see also S.E.C. v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998).

[3]    The defense cites a handful of district court cases for the proposition that a scheme liability claim requires "a deceptive act separate and distinct from the alleged misstatements and omissions."  Def't Mem. at 6 (citing cases).  None of the decisions Tourre cites for this proposition attempt to reconcile their holdings with the language

Court in isolation, presumably saving for another day its (meritless) argument that Tourre is also

not liable under Rule 10b-5(b) as the "maker" of the false statements at issue, as that term was

interpreted in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).

While this piecemeal approach is certainly a clever tactic, these substantive legal issues, taken in

isolation, are hardly the stuff of a "motion *in limine*."  If Tourre wished to raise these arguments,

he should have done so through a motion to dismiss or for summary judgment.  Having passed

on that option, his substantive arguments should now await the close of the SEC's case and his

Rule 50 motion when they can be considered in a comprehensive way.

### D.  The Defense Conducted Discovery Regarding the Alleged Scheme.

The defense contends that, had it known of the SEC's (expressly alleged) scheme liability

claim, different steps would have been taken in discovery.  *See* Def't's Mem. at 8-9.  For

example, the defense asserts that it would have served a Rule 12(e) request for a more definite

statement regarding "the identities of everyone that SEC believes were members of the supposed

---

of the statute and rule, the Commission's interpretations of that language, or Supreme Court's decisions.  For example, in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court held that liability under Rule 10b-5(a) and (c) was established even though the case was one "involving primarily a failure to disclose" to investors.  *See id.* at 153.  In that case, the defendants made misleading statements and omissions for purposes of enticing investors to sell their securities.  *See id.* at 152-53.  No additional or "distinct" deceptive conduct was present.  Yet the Court concluded that this conduct fell squarely within the scope of scheme liability under subsections (a) and (c) of Rule 10b-5.  *See id.* at 153.  A judicially created requirement of deceptive conduct "separate and distinct" from misrepresentations in order to state a scheme liability claim cannot be squared with that decision.  Nor can the district court holdings cited by Tourre be reconciled with the broad language of Section 17(a) and Rule 10b-5, which both apply to "any" fraudulent scheme or course of conduct.  Section 17(a) was modeled after the mail fraud statute.  *See Stoker*, 865 F. Supp. 2d at 463 ("It is worth noting that Section 17(a) is modeled on the federal mail fraud statute").  Rule 10b-5, in turn, was modeled after Section 17(a).  *United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975).  For more than a century it has been understood that misrepresentation cases are at the core of the "scheme to defraud" outlawed by the mail fraud statute.  *See Durland v. United States*, 161 U.S. 306, 314-15 (1896). (holding that a scheme to defraud "includes everything designed to defraud by representations as to the past or present").  And as the Second Circuit more recently said, "the phrase 'scheme or artifice to defraud' *requires* 'material misrepresentations.'"  *United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)) (emphasis added); *see also United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) ("As its ordinary meaning suggests, the term 'scheme to defraud' describes a broad range of conduct, some of which involve false statements or misrepresentations of fact and others which do not." (internal citations omitted).  In any event, the Court need not resolve here the full scope of scheme liability under Section 17(a) and Rule 10b-5 because, as discussed above, the SEC has alleged and can prove conduct in furtherance of the scheme beyond the misrepresentations to investors.

scheme." *Id.* at 9.   This argument rings hollow.   Tourre has been defended throughout this litigation by able counsel who has vigorously contested the SEC at every stage of the litigation. Numerous witnesses have been deposed concerning the origin of the AC1 transaction, Paulson's role in the asset selection and economic interest in the AC1 reference portfolio, the need for a portfolio selection agent to market the transaction to potential long investors, Tourre's role in identifying and then deceiving ACA into serving as portfolio selection agent, Tourre's role in the preparation of the AC1 marketing materials, the worldwide marketing efforts with regard to the AC1 transaction, and the substantial profits reaped by Paulson as a result of this scheme.   If the defense chose not to take additional steps during discovery, whether for strategic reasons or otherwise, that is not something for which the SEC should now be penalized by an order precluding it from arguing an alleged and legally-supportable theory of Tourre's liability.[4]   And the recent arrival of new lead trial counsel for the defense does not reset the clock and afford new counsel the opportunity to make motions, take discovery, and advance legal arguments that original counsel long ago chose to forgo.

## II.   The Admissibility Of The January 17 Recording At Trial Does Not Depend On Scheme Liability.

Finally, the defense attempts to utilize its scheme liability motion as a vehicle to revive its failed efforts to exclude the January 17 recording from evidence at trial.   In particular, the defense suggests that the SEC's reliance on scheme liability is necessary to admit the January 17 recording at trial.   This argument is a figment of the defense imagination.

---

[4]   The SEC submits that the Court should be skeptical of this latest defense claim of prejudice it has suffered in discovery.  As the Court will recall, the defense sought to exclude the January 17 recording by claiming that allowing the recording into evidence would require the "Court to re-open the depositions of numerous individuals already deposed in this litigation as well as allow depositions of individuals who have never been deposed." (Dkt. No. 210, at 13-14).  Now that the Court has allowed the SEC to use the recording, the defense has not noticed a single deposition.

As explained at the April 26, 2013 hearing before this Court, the SEC expects to introduce testimonial and documentary evidence at trial establishing that Tourre was the source of the misinformation communicated to ACA by GS&Co salesperson Gail Kreitman in the January 17 telephone call.  In that recorded call, Ms. Kreitman falsely advised ACA that Paulson was an equity investor in the AC1 transaction.  Mr. Tourre testified that his "traditional protocol" was to communicate with ACA through Ms. Kreitman.  (Martens Decl., Ex. 1, Tourre Dep. at 194).  Tourre copied Ms. Kreitman on the January 10, 2007 e-mail that he sent to Laura Schwartz and in which he falsely stated that the first loss tranche of the AC1 CDO transaction was "pre-committed."  (Martens Decl., Ex. 2).  On the morning of the January 17 call, Tourre wrote to Ms. Kreitman with the emphatic message, "Let's try to close the loop with ACA this morning !"  (Martens Decl., Ex. 3).  Shortly before the call that day, Tourre and Ms. Kreitman apparently met to discuss the AC1 transaction.  (Martens Decl., Ex. 4).  This and other documentary evidence, combined with Ms. Kreitman's expected testimony, is more than sufficient to allow a reasonable jury to find Tourre responsible, under Rule 10b-5 and Section 17(a), for the January 17 misstatement to ACA.

The defense contention that the SEC suddenly invoked the scheme liability theory in the summary judgment briefing as a result of concern over the admissibility of the January 17 recording is without basis.  As noted above, the scheme liability theory has been in the case since the outset.  And the SEC will easily establish the admissibility of the January 17 recording in support of its misrepresentation theory of liability.  The SEC relied on the scheme liability theory in its summary judgment papers because, at the summary judgment stage, the inferences must be drawn in the non-movant's favor.  While the inference that Tourre was the source of Ms. Kreitman's misinformation is overwhelming, the SEC's summary judgment papers were framed

to avoid reliance on that inference.  The scheme liability theory provided a basis for granting summary judgment to the SEC, given Tourre's documented participation in the scheme through his false January 10 e-mail, even without drawing the inference in the SEC's favor at summary judgment that Tourre was the source of the inaccurate information conveyed by Ms. Kreitman in the January 17 recording.  As the SEC made clear in its summary judgment papers, the theory on which it moved for summary judgment was narrower than the theory on which the SEC intends to try the case.  (Dkt. No. 253, at 12).  Both theories will be part of the SEC's presentation at trial, as both were alleged in the SEC's Amended Complaint more than two years ago.

## CONCLUSION

For the foregoing reasons, the SEC respectfully submits that this Court should deny the defense motion to preclude evidence or argument concerning Tourre's scheme to defraud and his transactions, practices, and courses of business that operated as a fraud or deceit on others, including AC1 investors.


Dated:  Washington, D.C.  
       June 13, 2013

Respectfully submitted,

/s/ *Matthew T. Martens*  
Matthew T. Martens  
Richard E. Simpson  
Christian D. H. Schultz  
Bridget Fitzpatrick  
Attorneys for Plaintiff  
Securities and Exchange Commission  
100 F Street, N.E.  
Washington, D.C. 20549  
(202) 551-4481 (Martens)  
(202) 772-9292 (fax)  
martensm@sec.gov

## **CERTIFICATE OF SERVICE**

I certify that on June 13, 2013, I directed the foregoing SEC'S MEMORANDUM IN

OPPOSITION TO TOURRE'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OR

ARGUMENT CONCERNING SCHEME LIABILITY to be electronically filed using the

CM/ECF system, which will send notification of such filing to the following email addresses:

Pamelachepiga@allenovery.com
Pamela Rogers Chepiga
Allen & Overy LLP
1221 Avenue of the Americas
New York, New York 10020

seancoffey78@gmail.com
John Patrick Coffey
Law Office of John P. Coffey
1350 Avenue of the Americas, 2d Floor
New York, New York 10019

Attorneys for defendant Fabrice Tourre

/s/ *Matthew T. Martens*
Matthew T. Martens