UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
SECURITIES AND EXCHANGE                                      :
COMMISSION,                                                  :
                                                             :
                              Plaintiff,                     :
                                                             :
                    -v-                                      :
                                                             :
FABRICE TOURRE,                                              :
                                                             :
                              Defendant.                     :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 1 8 2013

10 Civ. 3229 (KBF)

MEMORANDUM
DECISION & ORDER

KATHERINE B. FORREST, District Judge:

In April 2010, the SEC sued Goldman Sachs & Co. ("Goldman") and its

employee, Fabrice Tourre, for alleged violations of the securities laws in connection

with the offer and sale of securities and security-based swap agreements. The

transaction at issue involved ABACUS 2007-AC1 ("AC1"), a synthetic collateralized

debt obligation ("CDO").

Like other CDOs, AC1 allowed investors to bet on the performance of a pool

of assets that was sliced into different tranches of payment priorities. Because AC1

was synthetic, however, it did not own the relevant portfolio of assets; rather, it

referenced those assets through credit default swaps ("CDS"). In the case of AC1,

the reference portfolio included ninety sub-prime and mid-prime residential

mortgage-backed securities. Investors betting that the reference portfolio would do

well were long investors, and those betting it would not do well were short

investors.

1

A key issue in this case relates to the role that Paulson & Co. ("Paulson") played in the structuring and marketing of AC1. In particular, Paulson participated in the selection of the reference portfolio and then took a short position. The SEC alleges that the disclosures relating to AC1 were materially misleading in that they failed adequately to disclose (1) Paulson's role in the selection of assets for the reference portfolio and (2) his short position on that portfolio. In short, the SEC alleges that Paulson, along with Tourre, created a synthetic CDO that was designed to fail — but that they did not make appropriate disclosures to actual or prospective investors.

Goldman Sachs settled its role in this matter in July 2010. The SEC and Tourre are scheduled to try the SEC's claims against him on July 15, 2013. Pending before this Court are a series of pre-trial motions relating to the admissibility of certain expert and other evidence at that trial.

This Memorandum Decision and Order addresses the following such motions:[1]

---

[1] In addition to the motions listed below, there were two other related motions on which the Court ruled on the record. The first was the SEC's motion to preclude the proposed expert testimony of Dr. Charles Cox. The Court granted that motion on June 10, 2013, for the reasons set forth on the record. In summary, the Court found that while Dr. Cox had impressive credentials in certain areas, he had no relevant expertise in the CDO and synthetic CDO areas at issue, or even in areas closely related to those. That lack of relevant expertise raised a <u>Daubert</u> issue directly, as well as an issue under Federal Rule of Evidence 403 — given that his credentials could unduly confuse the jury as to the relevance and weight of any opinions and would also unduly prejudice the plaintiff given his lack of relevant expertise. In addition, there were flaws in the analyses he proposed to present that rendered them separately inadmissible. The nature of his opinion (stated sometimes as a single opinion and other times as separate opinions) tread on the duties of the jury to find facts and of the Court to instruct on the law. Finally, certain statements (e.g., as to "Paulson's inexperience" in the subprime area) were without sufficient evidentiary basis and not a proper subject of testimony from this witness.

1. The SEC's <u>Daubert</u> motion to preclude the proposed expert testimony of Dr. Mukesh Bajaj (ECF No. 206);

2. Tourre's <u>Daubert</u> motion to preclude the proposed expert testimony of Andrew Davidson (ECF No. 203);

3. Tourre's <u>Daubert</u> motion to preclude the proposed expert testimony of Ira Wagner (ECF No. 197);

4. Tourre's <u>Daubert</u> motion to preclude the proposed expert testimony of Dwight M. Jaffee (ECF No. 200);

5. The SEC's motion in limine, under Federal Rule of Evidence 611, for leave to ask leading questions of individuals who were employees of Goldman during the events at issue (the "Rule 611" motion) (ECF No. 276); and

6. The SEC's motion in limine to preclude defendant Fabrice Tourre from offering evidence or argument at trial that he reasonably relied on the advice of counsel (ECF No. 284).

## I.   THE LEGAL STANDARD FOR DAUBERT MOTIONS

Courts have found that in complex securities cases — like this one — expert testimony can often be quite useful. <u>See, e.g.</u>, <u>United States v. Bilzerian</u>, 926 F.2d

---

The second was Tourre's motion in limine to preclude testimony from any IKB witness. The Court granted that motion for the reasons set forth on the record on June 10, 2013. There has been a long history of attempts to obtain testimony from IKB witnesses, both during the ordinary discovery period and during a specially extended discovery period. In June of this year — on the eve of trial — the SEC informed the Court that Klaus Dieter Bautnecht, an employee of IKB (whose testimony was once described by the SEC as "tangential" and "irrelevant" to this action), would make himself available for deposition in London. In light of the burdens imposed by permitting a deposition so close to trial, combined with the SEC's earlier concession of the limited utility of the witness, the Court declined to reopen discovery for that deposition.

1285, 1294 (2d Cir. 1991). In particular, "expert testimony may help a jury understand unfamiliar terms and concepts." Id. However, a trial court is obligated to act as a gatekeeper with respect to expert testimony. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008). "The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Daubert, 509 U.S. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact. See, e.g., Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005); Arista Records LLC v. Lime Group LLC, No. 06 Civ. 5936, 2011 WL 1674796,

at *1 (S.D.N.Y. May 2, 2011).  The party seeking to introduce and rely on expert testimony bears the burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence. Daubert, 509 U.S. at 593 & n.10; United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007); Arista Records, 2011 WL 1674796, at *1.

A court's inquiry into a proposed expert's qualifications is a threshold question conducted under Rule 104(a) of the Federal Rules of Evidence — one that seeks to determine whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify.  See Fed. R. Evid. 104(a); Daubert, 509 U.S. at 593 & n.10;  see also Arista Records, 2011 WL 1674796, at *2.  Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give.  See Arista Records, 2011 WL 1674796, at *2; see also United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004); Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc., No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003). Courts have construed the inquiry into an expert's qualifications with an eye towards the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony.'"  Daubert, 509 U.S. at 588-89; see also In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent

relevant practical experience."). If an expert's training and experience is in a field closely related to the area to the proposed testimony, that may — in appropriate circumstances — be sufficient to meet Rule 702's qualification standards. See Arista Records, 2011 WL 1674796, at *3; Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., 04 Civ. 7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006).

The inquiry into the reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Among the questions to be answered are whether the theory or methodology can be (and has been) tested, whether it has been subjected to peer review and publication, what its known or potential rate of error is, and whether it is a generally accepted methodology or theory. Id. at 593-94.

There are, however, limitations which a court can, and indeed sometimes must, place upon even a qualified expert proposing to testify as to some admissible opinions. For instance, the court may preclude an expert from testifying as to the credibility of other witnesses or evidence. See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), modified by 856 F.2d 5 (2d Cir. 1988); In re Blech Sec. Litig., No. 94 Civ. 7696, 2003 WL 1610775, at *21-22 (S.D.N.Y. Mar. 26, 2003); LinkCo, Inc. v. Fujitsu Ltd., No. 00 Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by

experts in the particular field in forming opinions or inferences on the subject.'" Daubert, 509 U.S. at 595 (citation omitted); see also Wantanabe Realty Corp. v. City of New York, No. 01 Civ. 10137, 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004). Rule 403 is as applicable to expert testimony as it is to percipient witnesses or other evidence and permits the exclusion of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Daubert, 509 U.S. at 595 (quoting Fed. R. Evid. 403). Expert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations. See Bilzerian, 926 F.2d at 1294; Marx & Co. v. Diner's Club, Inc., 550 F.2d 505, 510-11 (2d Cir. 1977). While an expert "may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." Bilzerian, 926 F.2d at 1294. Moreover, "[a]lthough testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, . . . testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." Id. at 1295.

It is also inappropriate for experts to become a vehicle for factual narrative. See Island Intellectual Prop. LLC v. Deutsche Bank AG, No. 09 Civ. 2675, 2013 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012); Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008); In re Rezulin Prods. Liab. Litig., 309 F.

Supp. 2d at 551.  Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.  Mere narration thus fails to fulfill Daubert's most basic requirements.  See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551.  In addition, narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion.  Id.

## II.    IN LIMINE MOTIONS

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks and citation omitted); accord Highland Capital Mgmt., 551 F. Supp. 2d at 176.  As with Daubert motions, Rule 104 of the Federal Rules of Evidence requires that a court make a preliminary determination of the admissibility of all evidence.  When evidence is challenged on an in limine motion, it should only be precluded when it is "clearly inadmissible on all possible grounds."  Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01 Civ. 3796, 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005).  A court's ruling regarding a motion in limine is necessarily preliminary — and is subject to change when the case unfolds. Highland Capital Mgmt., 551 F. Supp. 2d at 176.; Commerce Funding, 2005 WL 1026515, at *4 (citing Luce v. United States, 469 U.S. 38, 41 (1984)).  A foundation may be laid contrary to expectations; relevance may appear where

previously considered unlikely; the balancing of factors under Rule 403 may change as events in the courtroom drama unfold.  The Court recognizes that trials often contain unexpected moments and developments, and the parties should bear those developments in mind when determining whether to drop or re-raise an issue decided by this order.

### A.    SEC's Daubert Motion to Preclude Bajaj

Mukesh Bajaj is a Managing Director of Navigant Economics, a consulting firm for legal and regulatory matters.  (Expert Report of Mukesh Bajaj ¶ 1, ECF No. 207-1 ("Bajaj Report").)  Prior to his current position, he was President and founder of AFE Consulting (id.); and prior to that was at LECG, LLC (id.), another consulting firm.  He is a "visiting lecturer" with the Haas School of Business at the University of California at Berkeley, where he teaches graduate level courses in corporate finance, investments and financial engineering.  (Id. ¶ 5.)  From 1988-1995 he was an Assistant Professor in Finance and Business Economics at the University of Southern California.  (Id.)  Bajaj obtained a Ph.D. in Business Administration from Berkeley.  (Id. ¶ 2.)

Bajaj's main experience is as a professional testifying expert.  He has a long list of matters in which he has testified in areas such as market efficiency, loss causation, and damages in securities cases (including a CDO case); market awareness of credit risks associated with structured financial products; tax treatment in leveraged lease transactions; economic source of value creation in algorithmic trading strategies; the value of interests in a limited partnership;

reasonable executive compensation; and the fair cash value of a minority stock position. (See id. Ex. 1.) He has published in the areas of, inter alia, optimal investment in company stock in 401(k) accounts, competition in IPO underwriting, a model to value employee stock options, an analysis of class action settlements, ownership structure, agency costs and dividend policy, transfer pricing and foreign exchange risk, market reaction to dividend announcements, and the efficient and inefficient media for campaign advertising. (Id.)

Nowhere in his report does Bajaj state the area in which he seeks to be qualified as an expert in this case. The Court assumes that defendant intends to offer him the general field of "financial economics." So far as the Court is aware, Bajaj has not worked, written, taught, or published in the area of CDOs generally, synthetic CDOs, or residential mortgage-backed securities ("RMBS").

In his report, he proffers five opinions:

1.  That the AC1 offering documents provided all economically material information (id. ¶ 13(a));

2.  The omission of Paulson's role in AC1 in those documents did not cause any economic harm to the parties with exposure to AC1 (id. ¶ 13(b));

3.  When viewed ex ante, Paulson's role in suggesting RMBS for the reference portfolio and its intention to take a short position against the portfolio was not economically material (id. ¶ 13(c));

4.  An ex ante analysis shows that the characteristics of the AC1 reference portfolio were broadly similar to those of the wider subprime RMBS

market, and, as of the closing of the AC1 deal, performance to date and future performance of its reference portfolio were no different than those of similarly rated RMBS more generally (id. ¶ 13(d)); and

5. Ex post analysis of the AC1 reference portfolio shows that it performed no worse than similar vintage Baa2-rated subprime RMBS generally (id. ¶ 13(e)).

The SEC argues that Bajaj's testimony is defective because (1) he does not have the appropriate qualifications, (2) aspects of his proposed testimony are improper and invade the province of the jury or court, and (3) his quantitative analyses are based on inadequate methodology or his ipse dixit. The SEC does not object to paragraphs 14-41 of his report in which he explains background on structured finance, including what a CDO is, the differing economic interests of investors in CDOs, the role of the "short" in synthetic CDOs, and a basic overview of the AC1 transaction.[2] (See SEC's Mem. Law Supp. Daubert Mot. Exclude Bajaj Testimony 3 n.3, ECF No. 207.)

At his deposition, Bajaj acknowledged that, aside from talking about CDOs in his class, his exposure to the CDO industry is entirely in the context of providing expert services subsequent to the financial crisis in 2007. (See Bajaj Depo. Tr. 24, 41, ECF No. 207-4.) He has never "analyzed a CDO outside the context of providing expert services." (Id. at 24.) He stated that he "can't speak to industry practices" (id. at 46) and can't answer "what a typical [CDO] buyer would do" (id. at 125).

---

[2] The SEC does object to the inclusion of summaries of testimony and what a person or entity might have "understood" in paragraphs 32-35 of the Bajaj Report.

Bajaj concedes that he has never been employed by a financial institution, a collateral manager, a portfolio selection agent, or any institution with any involvement with CDOs. (Id. at 29-30.) He has never structured a CDO, marketed a CDO or invested in a CDO. (See id. at 28-29.) He has not surveyed CDO market participants during the relevant time period. (Id. at 179.) Bajaj simply has no specialized knowledge, expertise, or training in CDO structuring, marketing or investing.

A key opinion that Bajaj seeks to offer is that the AC1 offering documents provided all "economically material" information. He testified that he is not offering a "legal" opinion but is stating that:

> as a matter of economic logic, once the portfolio of securities in the reference portfolio is identified, then investors such as IKB and ACA, that took positions in the billions in this marketplace, had the tools to evaluate the credit risk of the portfolio and formulate their own views of the future prospects of this portfolio, then it doesn't really matter that they know the process by which various parties suggested candidates for inclusion in the portfolio.

(Bajaj Depo. Tr. 91, ECF No. 207-4.)

This opinion suffers from several defects that preclude its admissibility. First, Bajaj is not qualified to present this opinion. He has no experience in the CDO industry apart from acting as an expert witness, yet he intends to opine about what information would and would not matter to CDO investors. He has no education, expertise, or experience in this area upon which to make such a statement. See, e.g., Tin Yat Chin, 371 F.3d at 40. He does not meet the basic requirements of Rule 702 or Daubert. The Court has specifically considered — and

rejected — the possibility that Bajaj's area of expertise is sufficiently proximate to the subject of his proposed testimony to overcome his lack of experience with the structuring or marketing of CDOs. See Arista Records, 2011 WL 1674796, at *3 (noting permissibility of expert testimony on topics closely related to an expert's area of expertise). He does appear to have expertise in the general area of structured finance, but that is so broad a category as to become meaningless when particularized here to synthetic CDOs, a very specific type of security. Bajaj also has expertise in reading and talking about finance generally; he has a degree in business administration and lectures on topics of finance. But those qualifications are, again, too general to allow defendant to present him to a jury as a true expert on synthetic CDOs.

In addition, Bajaj's testimony that his opinion as to "economically material" information is based on "economic logic" is simply a form of inadmissible ipse dixit. The law is clear that mere ipse dixit is not appropriate expert testimony because it is not based on reliable methodology, as Daubert requires. See Daubert, 509 U.S. at 592-94.

In addition, opining on whether or not all "economically material" information has been disclosed improperly invades both the province of the judge to instruct on the law and the jury to find the facts. See Bilzerian, 926 F.2d at 1294; Marx, 550 F.2d at 510-11. No party would doubt — one hopes — that an expert cannot testify as to whether the specific information at issue in a case is or is not "material." Inserting the word "economically" material does not somehow transform

13

what is a legal proposition and a finding of fact into an admissible opinion. Setting that problem aside, the opinion would, in any event, be excludable under Rule 403 as unduly confusing to a jury. Even with a cautionary instruction to the jury, expert testimony that all "economically material" information was disclosed may suggest to the jury that their job is done, that they have been told the answer to an ultimate question.

Bajaj's second opinion — that the failure to disclose Paulson's economic interest did not cause any "economic harm" to the AC1 long investors — is similarly inadmissible. Although Bajaj does not refer to "economic harm" explicitly after the summary of his opinions, this second opinion appears to comprise two, equally inadmissible components. First, it is the logical outgrowth of his first opinion combined with certain assumptions (e.g., that a party with all "economically material" cannot be harmed by the failure to disclose non-economically material information). This basis for the opinion is problematic for the reasons described above.

Additionally, in his report, Bajaj also opines that "ACA should have known that Paulson was short" and that "ACA would [not] have behaved differently if it had known of Paulson's short position." (Bajaj Report 20-23.) Again, Bajaj is not qualified to make these statements. But even if he were, they invade the province of the jury insofar as they simply assemble the record evidence and opine on what it means. See Bilzerian, 926 F.2d at 1294. It is true that experts may opine on industry practice, but Bajaj has specifically stated that he is not qualified to do so.

Therefore, his reading and statement about the AC1 disclosure materials must be only in the context of the evidence of this case — and not against the backdrop of the industry.

Bajaj's final opinions relate to his analyses as to whether the reference portfolio was "designed to fail" ex ante and its ex post performance reflected such a design. Again, he has no apparent expertise to analyze a portfolio of CDOs: he has no experience in assembling or evaluating a portfolio of CDOs. He has no experiential basis to evaluate how a portfolio would be or should be selected. His analysis in which he selects a portfolio to compare with the AC1 reference portfolio simplistically deems the selection process to involve matching ratings. He lacks the qualifications under Rule 702 to conduct such an analysis. See Arista Records, 2011 WL 1674796, at *2.[3]

In addition, the analyses set forth in the exhibits are methodologically flawed. For instance, he fails to set forth the criteria by which he judged "similarity," and he fails to calculate the standard deviation between comparison sets. Thus, there is no methodologically sound basis upon which Bajaj may opine that the AC1 portfolio is "not statistically significantly different" from the comparison sets. Cf. Daubert, 509 U.S. at 592-94.

Defendant argues that Bajaj's opinion directly addresses the point that the SEC lacks any empirical basis for its "designed to fail" theory. To the extent that

---

[3] Bajaj also submits a rebuttal report to the expert report of Andrew Davidson. Because the Court precludes the Davidson report, see infra Part II.B.1, the need for the testimony in Bajaj's rebuttal report should also be mooted. Moreover, the rebuttal report must be excluded for the independent reason that Bajaj is not qualified to testify as an expert on the matters discussed in the report.

there was otherwise admissible evidence on this point, it would be relevant. However, the proposed expert, Bajaj, lacks the qualifications to present this opinion and his related analyses to a jury. Being a professional testifying expert in the financial area does not give an individual the qualification to opine in every financial area as to every type of analysis. See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989) ("Although it would be incorrect to conclude that [the proposed expert's] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.").

Although the Court finds that Bajaj is not qualified to testify about the materiality of Paulson's role in AC1 disclosures or any potential loss that may have resulted to investors from that role, the Court will permit Bajaj to present the unobjected-to testimony set forth in paragraphs 14 through 41 of his expert report, as long as the testimony is not unduly repetitive and will be helpful to the jury. The Court permits this testimony primarily because the SEC has consented to it.[4] The Court also notes, however, that Bajaj's financial economics expertise is less problematic in the context of providing a background on the "basic economics of structured finance" that it is in the context of purporting to opine on the materiality of certain disclosures to CDO investors in 2007.

---

[4] For this reason, as well as the reasons set forth above, the Court will not permit the summary of testimony set forth in paragraphs 32-35 of the Bajaj Report. Such testimony is the province of percipient, not expert, witnesses. See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551 (experts may not act as vehicle for the narration of facts).

## B.   Tourre's Daubert Motions to Preclude the SEC's Experts

Defendant Tourre has moved to preclude the SEC's proposed economic experts: Andrew Davidson, Ira Wagner, and Dwight M. Jaffee.  For the reasons and as set forth below, the Court limits but does not preclude their testimony.

### 1.   Andrew Davidson

The SEC identified Andrew Davidson as a rebuttal expert to Charles Cox and Mukesh Bajaj.  The Court has ruled that neither Cox not Bajaj shall present objected-to testimony at trial. Those rulings should moot the proposed testimony from Davidson.

### 2.   Dwight Jaffee and Ira Wagner

Jaffee is a professor of finance and real estate at Berkeley.  (Expert Report of Dwight Jaffee ¶ 1, ECF No. 201-1 ("Jaffee Report").)  He has held that position for twenty years.  (Id.)  Prior to that, he was a professor at Princeton University.  (Id.) He regularly teaches courses in asset-backed securitization and real estate finance. (Id.)  His area of academic concentration is therefore directly applicable to the issues in the this case.  He received a Ph.D. in economics from M.I.T.  (Id.)

Jaffee has spent forty-plus years researching and studying the U.S. mortgage markets.  He has written over fifty papers and books concerning the U.S. mortgage market, including over twenty studies in the past five years that focus on the role of securitization, including both mortgage-backed securities and CDOs.  (Id. ¶ 2.)  He has additional, relevant professional credentials and industry experience.

Jaffee's opinions are (1) that AC1 generally applied the standard format of a synthetic CDO; and (2) special risks embedded in the reference portfolio and structure and the falling housing prices created large losses for investors. (Id. ¶ 41.)

Wagner is an independent consultant for a financial services firm. (Expert Report of Ira Wagner Ex. 3, ECF No. 198-1 ("Wagner Report").) He conducts risk evaluations of portfolios of mortgages and corporate loan assets for financial institutions. (Id.) He also acts as a litigation consultant on securitization-related legal actions. (Id.) Prior to that (from 1996-2008), he was a Senior Managing Director with Bear, Stearns & Co. (Id.) In that position, he was head of Bear, Stearns' Global CDO group. (Id.) He supervised a team of forty individuals in the CDO area and served as Chair of the Bond Market Association's CDO Committee. (Id.)

Wagner's proposed opinions are:

1. Background on CDOs, credit default swaps and synthetic CDOs, and the role of the Collateral Manager, Portfolio Selection Agent, underwriter, and long and short investors (id. ¶¶ 1-35);

2. That AC1 was executed by Goldman, that Tourre was "primarily responsible" for the AC1 transaction, and how Tourre came to have that role (id. at 5-6, ¶¶ 36-38);

3. There were three ways in which the process for creating AC1 varied from the typical process — all of which relate to Paulson's "motivation" as a short investor, and Paulson's role compromising ACA's independent

18

selection process and preventing ACA from independently selecting assets it thought were suitable (<u>id.</u> at 6, ¶ 44);

4. Paulson's "atypical and undisclosed role" in the process of selecting reference assets for the AC1 transaction (as confirmed by a review of that process) increased the risk to long investors (<u>id.</u> at 6);

5. The AC1 marketing materials do not mention Paulson's role in the portfolio selection process(<u>id.</u> at 7, ¶ 71);

6. A CDO market participant in the 2006-2007 time period would not reasonably have expected a purely short investor to have any role in the identification and selection of the reference portfolio for a synthetic CDO transaction, unless such involvement was disclosed (<u>id.</u> at 7, ¶ 73);

7. Consequently, a reasonable CDO market participant would not customarily have interpreted the disclosures in the AC1 offering and marketing materials to reflect any direct role in the process of selecting the reference assets for a purely short investor (<u>id.</u> at 7, ¶ 70);

8. In light of industry practice at the time, the AC1 marketing documents would have misled a reasonable CDO market participant. During the 2006-2007 timeframe, a CDO did not typically result from a reverse inquiry from a purely short investor (<u>id.</u> at 8, ¶ 35);

9. As a general matter, CDO investors consider the asset selection process and motivation for a CDO transaction to be relevant and important considerations in their investment decision (<u>id.</u> at 9-10, ¶ 74);

10. The failure to disclose Paulson's role and motivation for the transaction deprived investors of the ability to properly assess the risk of investing in the CDO (id.); and

11. ACA's belief regarding Paulson's role and its basis for that belief (id. at 10, ¶ 77).

As noted, both Jaffee and Wagner possess relevant and appropriate qualifications to offer certain opinions in this matter. However, both have proposed to provide the jury with background to CDOs generally and to AC1 in particular. The Court will allow one, but not both, to offer such testimony.

Defendant Tourre takes issue with the fact that apparently large portions of Jaffee's current report providing the background of CDOs and AC1 are taken directly or indirectly from a prior report he offered in another matter. The Court is not concerned with that issue. The fact remains that Jaffee is fully qualified to offer the opinions that he does on the background. It is of no moment that those background facts have not changed between last year and now. The parties have both recognized that there may be portions of the current Jaffee report that are unnecessary in light of the particular facts at issue in this case; the SEC has expressed an intention not to have Jaffee testify as to unnecessary matters. The Court will deal with any objections as to specific aspects of testimony as the trial proceeds.

Defendant Tourre also objects to Jaffee narrating facts and testimony from the record of this case. The Court agrees that for Jaffee to do so before the jury

20

would be inappropriate.  See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551.

In contrast to Jaffee's relatively unobjectionable proposed testimony, there are various aspects of Wagner's testimony which are problematic and not admissible.

Wagner cannot be a conduit for a factual narrative.  See id.  He also may not invade the province of the jury by "finding facts" that are in contention in this case. Thus, for instance, he will not be allowed to opine that Tourre was "primarily responsible" for the AC1 transaction.  (See Wagner Report 5.)  There are percipient witnesses who can describe roles and responsibilities in issue.  In addition, he cannot describe Paulson's role as "undisclosed" in the offering material.  (See id. at 6.)  The parties disagree as to the extent that disclosure was made, needed to be made or was obvious.  Nor may Wagner testify as to Paulson's objective in choosing reference assets.  (Paulson's state of mind is not a proper subject of expert testimony.)  Similarly, Wagner may not testify as to whether Paulson "actively" participated in the collateral selection process (see id. at 6-7), whether the AC1 marketing materials identify ACA as having selected the reference portfolio, or how the disclosures would be interpreted.

Wagner's testimony will also be precluded to the extent it invades the province of the Court to instruct on the law.  Thus, Wagner should avoid all characterizations of the marketing materials as "misleading."  (See id. at 8.)  That is

a legal conclusion and not proper expert testimony.  See Bilzerian, 926 F.2d at 1294.

By contrast, Wagner may testify as to what a CDO market participant would have reasonably expected in terms of the role of a short investor in the selection process. That testimony is squarely within his area of expertise and is in the nature of industry custom and practice.

Tourre objects to Wagner's testimony on the basis, inter alia, that he formed his opinions of Paulson, the transaction and individuals at ACA before he was ever retained for this matter.  The Court has essentially limited Wagner's testimony to industry custom and practice and general descriptions of CDOs, investors in CDOs, and an explanation of the AC1 transaction.  He will not be a narrator of the facts. Accordingly, his view of Paulson and ACA should not come into play.  However, to the extent that Tourre wishes to utilize any of Wagner's prior involvement with Paulson, ACA and an AC1-like transaction on cross-examination, he may do so.  Of course, once a door is opened into a particular area, the SEC would be able to go into that area on redirect.

As to both Wagner and Jaffee there may well be specific issues as to which more explicit direction will be needed.  The parties should raise any such questions before the witness goes onto the stand, or we shall address additional objections during the trial itself.

### C.    The SEC's 611 Motion

Both the SEC and Tourre intend to call individuals who were employed by Goldman when the events at issue occurred.  The SEC has moved in limine to be able to ask leading questions of such witnesses.  The SEC made a nearly identical motion in an earlier case, SEC v. Stoker, No. 11 Civ. 7388 (S.D.N.Y. filed Oct. 19, 2011).  After asking a series of questions of the parties regarding the relationship of the parties to the various witnesses, Judge Rakoff allowed leading questions but reserved specific evidentiary rulings until trial.

Similarly, this Court believes that in order to rule on the SEC's motion, it needs further to understand the nature of the relationship between specific witnesses and Tourre or the SEC.  It is possible, and in the case of some witnesses (such as David Gerst) probable, that certain Goldman witnesses will be sufficiently allied with Tourre and adversarial to the SEC to be questioned by the SEC in a leading manner.  The Court will make specific determinations on a witness-by-witness basis at the final pre-trial conference and at trial.

### D.    Advice of Counsel

Tourre has stated that he has no intention of relying on an advice of counsel defense.  (See, e.g., June 14, 2013, Hr'g Tr. 15:11-16, 22:12-21.)  He concedes that he would not be able to – and will not seek to – meet the four factor test for the availability of an advice of counsel defense: (1) complete disclosure to counsel, (2) sought advice as to the legality of specific conduct, (3) received advice that his

conduct was legal, and (4) relied on that advice. (See id.); Markowski v. SEC, 34 F.3d 99, 104-05 (2d Cir. 1994).

The SEC has moved in limine to preclude Tourre from introducing the following evidence or focusing on the following points:

1. That counsel for Paulson reviewed or was copied on various draft documents/communications or that Tourre (reasonably) relied on such review;

2. That counsel for ACA reviewed certain transaction documents or that Tourre (reasonably) relied on such review;

3. That in house or outside counsel for Goldman drafted or reviewed disclosure language or that Tourre (reasonably) relied on the involvement of counsel for Goldman in drafting or reviewing such language;

4. That Tourre (reasonably) relied on Gerst's involvement in AC1 because Gerst had previously worked as a lawyer.

(June 14, 2013, Hr'g Tr. 38:6-39:7.)

At oral argument on this motion, the Court also raised whether the SEC seeks to preclude Tourre from highlighting that counsel was copied on a memorandum the SEC would otherwise want to introduce, or that a memorandum references that disclosure advice would be sought from counsel. The SEC informed that Court that it was "simply going to request that the defense be precluded from emphasizing" counsel's participation. (Id. at 50:23-51:13.)

According to the SEC, given Tourre's concession that he is not pursuing (and could not successfully pursue) a reliance on advice of counsel defense, he should not be able to put in the same evidence and express essentially the same type of reliance that an advice of counsel defense would provide. To do so, according to the SEC, would be to introduce through the "back door" the same evidence that could only be relevant to an advice of counsel defense. Thus, according to the SEC, mentions of relying on the presence of lawyers, counsel, a legal process, general practices of legal review, and the like, are all ways of seeking to portray Tourre as having reasonably relied on the presence and general involvement of counsel — though not specific advice as to specific disclosure language for the AC1 transaction. The SEC asserts that such evidence is both irrelevant to whether Tourre was negligent or had the requisite state of mind, or any other issue in the case (including materiality), and prejudicial under Rule 403 of the Federal Rules of Evidence.

The SEC made a similar in limine motion in <u>Stoker</u>. In the pre-trial conference, Judge Rakoff declined to issue a general preclusion order and instead stated that particular evidentiary issues on that topic would be dealt with at trial. At the trial in <u>Stoker</u>, the SEC failed to object to the initial introduction and focus on lawyers. When the SEC did raise the issue, Judge Rakoff expressed a waiver concern but ultimately gave a limiting instruction to the jury and circumscribed additional evidence. He stated that, because no advice of counsel defense was being asserted, focus on counsel was irrelevant to the issues in the case.

Tourre argues — as the defendant in <u>Stoker</u> argued — that while he does not intend to pursue an advice of counsel defense, he does intend to argue that he was not the individual with primary responsibility for the AC1 transaction and that the context in which the transaction occurred was one in which there were many people with expertise in many areas.  He simply argues that among those areas of expertise was legal expertise. Tourre asserts that the context in which the events at issue in this lawsuit are essential to whether he intentionally or negligently violated any legal obligations.  According to Tourre, he should be permitted to present evidence that he encouraged Goldman to hire Gerst in part because he thought it would be helpful to have someone with a legal background on the correlation desk.  He also believes he should be able to present evidence that, as between the two of them, Gerst was the one with the responsibility for interfacing with counsel regarding disclosures for the AC1 transaction, Gerst was the one with a legal background, and Gerst never felt the need to raise the issue of disclosing Paulson's role in AC1 with Tourre (or presumably, with Goldman's counsel).  (<u>Id.</u> at 55:11-17, 60:22-61:6.)

The rules of evidence most applicable to the Court's ruling on this issue are 401 (relevance) and 403 (undue prejudice, confusion).  Both rules come into play here, given Tourre's concession that he will not be able to prove the required elements of a reliance on advice of counsel defense.  It would be confusing and unduly prejudicial for Tourre to present extensive evidence on the presence and involvement of lawyers — who are presumably paid to ensure that any disclosures

26

comply with the relevant legal requirements — while at the same time professing not to have relied on their advice in preparing or disseminating those disclosures. Much of that testimony would also be irrelevant, given Tourre's intention not to present a reliance on counsel defense. Tourre argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury. A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly "blessed" the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as "blessing" the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

Accordingly, the Court will preclude evidence relevant solely to show that lawyers attended meetings or set up meetings. (This is intended to eliminate evidence such as otherwise irrelevant meeting invitations presumably included on witness lists because an attorney, such as Darren Littlejohn, was invited.) The Court will also preclude Tourre from placing undue focus on the fact of a lawyer's presence at a meeting or that counsel reviewed disclosures. In light of the clear concession that Tourre did not request advice from counsel, that he does not claim that he ever provided all of the relevant information to counsel, and that Gerst did not request advice from counsel, it would be irrelevant, misleading, or both to

27

emphasis the presence of counsel in a case that is about the appropriateness of disclosure. Tourre may not suggest that counsel blessed the relevant disclosures because he is not pursuing a defense based on such a fact. The Court therefore precludes evidence that can only be intended to make that point.[5]

However, Tourre will be allowed to present evidence tending to show that he was not the person primarily responsible for the transaction and that the transaction occurred in the context of a sophisticated financial institution. As Tourre's counsel conceded, however, he can present such evidence without any reference to lawyers and legal advice at all. (Id. at 40:12-18.) The Court will allow evidence of the numerous individuals and/or committees who participated in the transaction, as it is relevant to the context in which the AC1 transaction occurred.

In the process of presenting that evidence, however, the Court will limit Tourre's ability to focus on the presence and participation of lawyers. But where the SEC or Tourre introduces a document into evidence, the Court will not require an unnatural avoidance of identifying addressees or participants reflected in such evidence. To the extent that Tourre finds it otherwise relevant to do so, he may identify the individuals reflected on the document. So, for example, the Court will not preclude witnesses from identifying the identity or profession of the individuals reflected on those documents. In short, Tourre will not be precluded altogether from saying the words "counsel," "lawyer," or "attorney," regardless of the context of the evidence or testimony, but nor will he be permitted to zero in on the presence or

---

[5] For example, the Court will preclude the introduction of drafts of documents that — because they are not the version actually disseminated — are only relevant because they were reviewed by a lawyer.

involvement of lawyers for the sake of highlighting their presence or involvement. Put in more concrete terms, counsel should not include references to the presence and involvement of lawyers in the opening. Moreover, to the extent that Tourre does reference the involvement of lawyers in a manner that could suggest he relied on their advice, the Court will give a limiting instruction.

To the extent this Order does not address every iteration of Tourre's contemplated evidence concerning lawyers, the Court suggests that Tourre make a specific proffer of evidence and argument as it becomes relevant at trial. The Court will rule on those items specifically.

## III.    CONCLUSION

The Clerk of Court is directed to terminate the motions at ECF Nos. 197, 200, 203, 206, 276, and 284.

SO ORDERED.

Dated:    New York, New York
          June 18, 2013

_____
KATHERINE B. FORREST
United States District Judge