D6AJSECC                      Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE COMMISSION,

 4                   Plaintiff,

 5             v.                          10 Civ. 03229 KBF

 6   GOLDMAN SACHS & CO., et al.,

 7                   Defendants.

 8   ------------------------------x

 9                                        June 10, 2013
                                          1:00 p.m.
10

11

12   Before:

13                   HON. KATHERINE B. FORREST,

14                                        District Judge

15

16                        APPEARANCES

17
     SECURITIES AND EXCHANGE COMMISSION
18   BY:  MATTHEW THEODORE MARTENS
          CHRISTIAN DAVID HAMMEL SCHULTZ
19        BRIDGET M. FITZPATRICK
          RICHARD EDWARD SIMPSON
20

21   ALLEN & OVERY, LLP
          Attorneys for defendant Tourre
22   BY:  PAMELA ROGERS CHEPIGA, Esq.
          ANDREW RHYS DAVIES, Esq.
23        BRANDON DOUGLAS O'NEILL, Esq.
          JOHN PATRICK COFFEY, Esq.
24                   Of counsel

25

1            (In open court)

2            (Case called)

3            THE COURT:  Hi.  Good afternoon, everyone.  Please be

4    seated.  All right.  Good afternoon, everyone.

5            We're here for a status conference, but there are a

6    number of items that are both pending and that have recently

7    arisen.  Let me tell you what my plan is for today's conference

8    and we can see whether or not that corresponds with things that

9    you feel would be most useful to deal with right now.

10           I do want to talk a little bit about the witness lists

11   and how we're going to handle the calling of witnesses, in

12   particular overlapping witnesses so we can get the logistics of

13   that all worked out and see whether or not we have some basic

14   agreement and parameters.

15           I also want to talk about the IKB issue, I will call

16   it, that I have received letters on, and then I do want to deal

17   with Mr. Westreich, and the issue raised by what I understand

18   to be his wedding, and I have looked at some materials and some

19   back-and-forth on that.

20           I think that the SEC actually put in a letter and then

21   attached some letters from Ms. Chepige back and forth with

22   counsel for Mr. Westreich, so I have looked at those, but I

23   don't think that, Ms. Chepige, you have yet directly responded

24   to that, but I'll give you a chance to talk about it today.

25           Had you put in a Westreich letter?

1          MS. CHEPIGE:  Your Honor, we don't quite understand

2     why the SEC has brought this to your Honor's attention.  Mr.

3     Westreich is represented by the Kasowitz Benson firm.  We are

4     in communication.  If he wants to move to quash a subpoena, we

5     think it is Kasowitz Benson's right to do that.

6          THE COURT:  You and I are thinking along the same

7     lines.  We'll address that because it has been brought to the

8     fore.

9          MS. CHEPIGE:  We have no idea as to the facts.

10         THE COURT:  I also am going to deal with Cox and tell

11    you what my view is on Mr. Cox as a proposed expert, and I am

12    going to give you some thoughts on a couple of other ones, but

13    I'm not going to give you rulings right now.  The reason for

14    that is I want to assess from you folks what your plan is.

15         Similarly of the two, now there are several more

16    motions in limine.  Two of them I just want to figure out

17    whether or not these are things that you folks are in

18    disagreement on or whether or not there is some room for

19    agreement, and so I'll bring that up.

20         In particular, it is the scheme issue, and let me find

21    the other one, and the Goldman Sachs settlement.  I want to

22    hear what you folks are thinking about along those lines

23    because there may or may not be really an issue here that needs

24    to be briefed and addressed, and there is an awful lot to

25    happen between now and trial.

1      If we don't have to address something, I would rather

2 not have to.  So let's talk first.  That is what I had on my

3 agenda.  Did you folks have other items you wanted to raise

4 today?  I know there is a lot coming up.

5      MR. COFFEY:  At the end, obviously, we want to raise

6 an issue about a trial subpoena we are planning on issuing.  I

7 want to flag what that is about for your Honor.

8      THE COURT:  All right.  Make sure we don't miss that

9 if we get caught up in the fervor of what is going on.

10      MR. COFFEY:  It is my sole assignment today.  I am not

11 going to forget it.

12      THE COURT:  Anything else?

13      MR. MARTENS:  No, your Honor.

14      THE COURT:  Let's go first to the witnesses then.

15      I wanted to just speak with folks about the custodian

16 of records witnesses first.  You both have either listed or

17 made reference to calling the same custodian of records.  Is it

18 possible that you're going to be able to get a testimonial stip

19 that we can read to the jury that would obviate the need to

20 call a custodian of records?

21      MR. MARTENS:  Your Honor, we are in the process of

22 exchanging exhibit lists.  We exchanged them last week and we

23 spoke even yesterday briefly about the idea of reaching

24 stipulations.  I think that is something we are working

25 through, and I am optimistic after talking with opposing

1    counsel we are working something out.  Both sides are

2    preserving the issue.

3            THE COURT:  Even if, obviously, you can't agree

4    whether or not there are problems with various documents in

5    terms of hearsay or something else, if you're able to get over

6    authenticity by virtue of a custodial stip, that would be

7    helpful and eliminate the need to call these people.  There are

8    a few things less scintillating than custodians of records.

9    Let me know, if you could, how that process develops.  We can

10   talk about it.

11           We have got a final pretrial on July 9th.  Maybe if

12   you folks are close, but have some issues where you think the

13   court could be of assistance because people want to make sure

14   that by agreeing to a stip they're reserving certain rights, we

15   could get on the telephone if you let me know about that if you

16   get close but not quite over the finish line.

17           If you can't agree at all, call the custodians of

18   records and do it the old fashioned way.  Let me know if I can

19   be of help.

20           MR. MARTENS:  I would be surprised if we couldn't get

21   authenticity sorted out even if there are other issues.

22           THE COURT:  The next point that I had on the

23   witnesses, I noted there was some overlap, some significant

24   overlap on the two lists.  Here is the way that I normally do

25   it.  I do it this way both for Bench and for jury, which is

1  that the witnesses get called once because it is both

2  convenient for the witnesses, it allows the jury not to be

3  confused as to why they're hearing from somebody at two

4  different points in the case, and allows for a I think more

5  integrated story to be told.

6          As a result, I do allow if there is a witness called

7  in the other side's case, call it a hostile witness, Mr. Tourre

8  I think the SEC has listed, certainly Mr. Tourre's counsel

9  would be able to go beyond the scope of the direct of the SEC

10 and bring out whatever they need to on cross.  So that means if

11 the SEC is going to maintain its position to call Mr. Tourre,

12 it is possible Mr. Tourre could what I am going to say or

13 characterize as interrupt the SEC case for two days.  I don't

14 know how long he will be on the stand, if it is two hours or

15 two days, but that would be the way we would handle it.

16          So there would be each witness in whatever order in

17 which they are called by the party bearing the burden of proof

18 would call whomever that party chooses to call.  If it happens

19 to be an individual also listed on the other side's witness

20 list, you'll do your part with that witness in the other side's

21 case.  Does anybody have any strong objection to proceeding in

22 that manner?  If so, state it now.

23          MR. COFFEY:  Your Honor, a point of inquiry.  Is that

24 list limited to live witnesses or do you want the

25 depositions --

1          THE COURT:  Thank you, a good clarification.  It will

2     go to both.  It will be essentially every person whether it be

3     by being called live or having their depositions read, again

4     the depositions would be read, the designations and the

5     counter-designations.  If it is videotape, it would be the

6     videotape and counter-designations would all be done at the

7     same time.

8          MS. CHEPIGE:  One clarification.  If one side

9     designates Pages 1, 3 and 7, and the other side designates 2

10    and 6, do we play it sequentially?

11         THE COURT:  Sequentially.

12         MS. CHEPIGE:  Sequentially through the deposition, not

13    dependent on our separate designations?

14         THE COURT:  That's right.  Hopefully nobody will gain

15    anything by adding in too much just to sort of put fluff around

16    the good stuff, whatever you folks deem to be the good stuff,

17    but it is much more sensible to the jury to have it flow

18    through in terms of the story.  Otherwise, it can become a real

19    mess.  So we'll just do each witness in the order in which the

20    proponent desires and continue through.

21         If the SEC is putting on a deposition and it's going

22    to be not through a video deposition but reading, then you can

23    do it, and we'll talk about logistics of that.  You can put a

24    paralegal on the witness stand and read it back-and-forth.  I

25    don't allow inflection if it is not video because we don't know

1   what the inflection was.  You can read it back-and-forth that

2   way.  That is one way of doing it.  I don't mind if somebody

3   stands up and reads it question-answer, but that is hard

4   sometimes on the lawyer and not as interesting to the jury.  It

5   is best to tell the story all at once for each particular

6   witness.  Any other comments or questions on that?

7           MR. SCHULTZ:  I would like to follow up on Ms.

8   Chepige's question.

9           If, for instance, we were going to do Pages 1 through

10  50 of a deposition, and let's say at the end of 50 is when Ms.

11  Chepige started an examination, and then we would want some of

12  the redirect part that didn't necessarily flow from hers, if we

13  are using a video, can we show our part and then play what

14  would essential be their cross-examination after just the parts

15  we actually want?  I don't know --

16          THE COURT:  Let me put it I think in the simplest

17  possible terms unless you folks are able to reach some

18  agreement you assure me won't cause confusion or technical

19  difficulties.

20          Normally we start at the beginning and work our way

21  through to the end.  If it is on videotape, it is on Minute 1

22  to Hour 7, and you go in order of how it transpires.  That does

23  sometimes require the jury to remember what happened two hours

24  ago, but that they do that all the time when they're listening

25  to cross-examination anyway.  They're used to it.  Otherwise

1    there is often, even if you have great intentions and great

2    support for the trial, sometimes there can be misses, and then

3    we're flipping back-and-forth.  That is the way I've done it.

4            MR. MARTENS:  I have one question with regard to the

5    testimony of the defendant.  We are pretty firm in our view we

6    are going to call him in our case.  As I understood it, you

7    said his cross would not be scope-limited, but essentially it

8    would be the direct of the defense?

9            THE COURT:  Correct.

10           MR. MARTENS:  I assume then their direct of him would

11   not be through leading questions even though it is technically

12   called a cross.

13           THE COURT:  That's correct.  I am sure that they'll

14   treat him just as they would if he is their witness because he

15   is their witness.

16           MR. MARTENS:  Then with regard to the defense case,

17   can he then be called again or is it sort of the one time is

18   the one time?

19           THE COURT:  It ought to work.  I don't want to

20   preclude anybody from having a rebuttal case on an issue as to

21   which they bear the burden of proof or something like that.

22           We'll have to figure out if there is a need for this.

23   Typically there isn't a need for it.  You can get the person

24   on.  It will take a little while if it is a big witness, and I

25   expect Mr. Tourre will be a big witness where he will want to

1   have his lawyers have him walk him through his story, so that

2   would be the time to do it.

3           Now, the SEC then will cross-examine him on the

4   matters which are raised by the defendant during his effective

5   cross/direct.

6           MR. MARTENS:  Okay.

7           THE COURT:  It will work pretty seemlessly.

8           MR. MARTENS:  My concern was he can't offer a direct

9   in our case, as you said, to interrupt our case and offer

10  another direct in the defense case.

11          THE COURT:  No, no, unless something unusual comes up

12  that where you folks say we really have to call so and so back

13  to address this issue that we didn't expect to have to address

14  because this came up.  We have got somebody who can address it,

15  we really need to do it, and you make a case for that kind of

16  recall, but typically you're not going to want to do it and the

17  jury won't want to hear it, et cetera, et cetera.

18          That covers a number of what I had listed as the

19  overlaps.  I had listed them as B's for both and U's for

20  unique.

21          Mr. Nardi, Michael Nardi by video.  Is that by video

22  deposition or video link?

23          MS. CHEPIGE:  Video deposition.  We both designated

24  him.

25          THE COURT:  Is he on the other one, too?

1        MR. MARTENS:  I believe he is.

2        MS. CHEPIGE:  He is on both, your Honor.

3        THE COURT:  You know what?  He is below Mr. Tourre, I

4   see him now.  You are absolutely right, okay.  All right.

5        Now, in terms of timing for witnesses, we don't need

6   to do this now, and obviously you're not going to know exactly

7   how long you're going to take on cross until you hear the

8   direct, but it would be useful in terms of being able to really

9   map out the length of this trial because we have a jury sitting

10   here, to have you folks -- and I will ask you to do before the

11   final pretrial so if we need to put you on a clock, I will have

12   warned you about that beforehand, but so we can then talk about

13   that process -- but you'll need to map out approximately how

14   long you're going to take on direct and your guesstimate of

15   cross, which I understand is hard to do.

16        That will give us a sense whether or not our original

17   estimate, which was with only a couple of weeks, I think our

18   original estimate was a two-week trial.

19        MR. MARTENS:  Two to three.

20        THE COURT:  And we have got I think ample, we ought to

21   have ample time to do it with three weeks.  If for some reason

22   it turns out with some of these experts and things move slowly

23   that we are going to run into problems, we'll do a clock.  I am

24   hoping right now we don't have to go to a clock.

25        MR. MARTENS:  We began speaking about that yesterday

1    on the phone.  I spoke with defense counsel about that.  I

2    think we are reasonably confident we are going to be fine in a

3    two or three week timeframe.  We'll continue to refine that.

4              THE COURT:  We'll talk before the end about time for

5    submission probably sometime in the vicinity of the final

6    pretrial, JPTO, we'll get your guesstimates of your time

7    duration.

8              Now, in terms of Westreich, just to address this very

9    briefly, my view is the man's got to show up unless somebody

10   moves to quash the subpoena.  So it looks like he's been on

11   notice for a very long time of this trial.  I certainly

12   understand his personal difficulties.  I suppose the one good

13   thing is it is early in his honeymoon as opposed to right in

14   the middle of his honeymoon, so perhaps he can delay the

15   honeymoon.  I don't expect him to delay his wedding.

16             MS. CHEPIGE:  He is a defense witness.  He is not

17   being called by the government.  So he is getting married on

18   July 14th and he is out of the country for two weeks.  If we go

19   into a three-week trial, it shouldn't be a problem.

20             THE COURT:  You'll, Ms. Chepige, maybe you'll decide

21   as we map things out the risks you want to take and whether he

22   is willing to come on call, to come back if he had to be.

23             MS. CHEPIGE:  We'll deal with his counsel on that if

24   his counsel wants relief from the court.  We intend to call

25   him.  As your Honor is well aware, he is one of two people on

1  the January 17th call.  He is an essential witness.  If his

2  lawyer wants to move to quash, he can.  Otherwise --

3            THE COURT:  Try to work it out.  If in the mapping out

4  and the granular discussion of how long this trial is going to

5  take, it turns out he can be slotted in at the end in a way

6  convenient for everybody, that is terrific.  That is obviously

7  the best result so we don't have to interfere with his personal

8  plans.

9            If not, then you folks will only raise it with me if

10 it needs to get raised, but I do agree that frankly if either

11 party had listed him, and I guess it is listed, Ms. Chepige,

12 you're right, he is on your list, he is such an essential

13 witness that I, in light of a trial subpoena having been duly

14 issued, would have him here in person.  He is one of the

15 individuals where the jury needs to assess his credibility

16 well, as with all witnesses, but obviously there is a slight

17 difference or there is a difference when you're on a video link

18 or doing it by deposition.

19            IKB.  The IKB issue is an issue that never quite dies.

20 I have been dealing with IKB in my time on this case and then

21 there was a long history of IKB dealings before I ever

22 appeared, including in front of the magistrate and probably in

23 front of Judge Jones.  The IKB story is very long.

24            The critical points of the IKB story, as I distill

25 them, are that the defendant for a while had wanted to take

1    various discovery from IKB.  There are rules in Germany that

2    are quite difficult to overcome.  They don't have the same

3    kinds of ability to persuade cooperation is perhaps the right

4    phrase, something along those lines, as the SEC, but even the

5    SEC has its difficulties in getting the IKB folks.  So as we

6    all know, discovery in terms of the foreign discovery closed a

7    long time ago, in December.  Then we extended it because of Mr.

8    Schirmer twice, actually until February, but it was really

9    because of this one particular fellow, Mr. Schirmer.

10         It was not because of Mr. Bautnecht, B A U T N E C H

11   T, as I understand his last name.  Indeed, going back through

12   the materials related to Mr. Bautnecht, it does seem as if the

13   SEC had previously said that this fellow was tangential and

14   irrelevant.  Now, he may be as good as it gets right now for

15   IKB, and that may be the SEC's view.  I must say that I am

16   inclined strongly to say no to a London deposition of IKB at

17   this point in time for the following reason:

18         You folks are currently undertaking rather extensive

19   efforts to finish the discovery relating to the January 17th

20   call.  I know that that has taken a lot of people's time.  It

21   was not expected.  There are also lots of motions which require

22   lots of attention, and some of these motions are quite serious

23   motions.  These are not just quick motions in limine.  These

24   are serious, substantive motions.

25         So there is an awful lot of trial preparation work

1    that even with big teams, with firms that do this and do this

2    well, and the SEC which does this and does this well, you folks

3    are stretched, it just happens, because there are only so many

4    people who are at the top of the food chain who can do some of

5    the things that need to get done in the final hours.

6         Having people fly to London to take a deposition of

7    somebody who is considered to be tangential and irrelevant

8    during the pendency of this case is not something the court is

9    inclined to order at this point.  I would find it prejudicial

10   to the defendant in terms of the overall trial preparation, and

11   I don't find the testimony to be critical, and that is one of

12   the factors that the court is to consider under the Second

13   Circuit law in terms of whether or not I allow certain things

14   to occur.

15        Obviously, nobody asked for and I assume nobody would

16   seek an adjournment based upon IKB?  I am getting head noddings

17   of "no."  So, therefore, we are really into the world of how

18   important is this guy to the SEC?  You said before he wasn't

19   that important.  I understand you'd like him, but the

20   defendants are saying it is really prejudicial to them right

21   now to engage in this flying overseas or at least even planning

22   to and, by the way, they have been left at the alter before.

23        So for all of those reasons, I am going to preclude

24   the IKB witness.  The SEC has alternative ways of getting in

25   information related to IKB.  Those are set forth on your

1    witness list already.  You are beginning to be able to put

2    forward a case.  Anybody want to speak to that ruling?

3              MS. CHEPIGE:  No.

4              MR. MARTENS:  No.

5              THE COURT:  Hearing Mr. Martens saying "no," we are

6    going to dispense with that.

7              Let me move to the more difficult issue of Mr. Cox.

8    The reason I want to raise Mr. Cox today as opposed to having

9    you all read about him in writing is because I am going to

10   preclude Mr. Cox.  I want to make sure that people are able to

11   maneuver appropriately, and I believe that there are multiple

12   ways probably that you can come out, and this is for the

13   defendants, come at much of the same information in other ways,

14   not his study necessarily, but much of the same information,

15   and I can think of ways.  I am sure you folks can as well.

16             Let me tell you why I am going to preclude Mr. Cox.  I

17   will allow you, Ms. Chepige and Mr. Coffey, whoever wants to

18   address it if you want to address it, address it, but it is for

19   the following reason:  He really is giving an opinion about

20   what a reasonable investor would or would not conclude was

21   important.  He wants to give testimony that the Paulsen's

22   identity role and economic interest in AC-1 was not material

23   information that needed to have been disclosed.  He wants to

24   talk about what information a reasonable investor would have

25   considered important.

1    He is, his main qualification is that he was a

2    commissioner of the SEC and chief economist 30 years ago.

3    Those are big qualifications.  Those are significant titles,

4    and I am concerned that, number one, he does not himself have

5    direct experience in the CDO area.  He has no training,

6    experience or academic familiarity with the design, the

7    marketing, the analysis and the purchase of CDOs.  He has no

8    meaningful exposure to CDOs prior to being hired in the

9    lawsuit.  He stated at his deposition he had not studied,

10   "typical investors at the time and the information they used."

11   On pages 7 and 8 of the SEC's brief, they list a whole

12   series of snipets from his deposition where he essentially

13   concedes more of the same, similar points.  He, therefore, does

14   not have expertise in the area of what a CDO investor would

15   have deemed material or relevant.

16   The court, I, have to act as a gatekeeper.  I have to

17   figure out whether or not the proponent of the expert who does

18   bear the burden has been able to show that the particular

19   expert has the particular expertise in the area that they are

20   offering, and that the expertise has got to match then the

21   testimony.

22   This fellow Mr. Cox is obviously an individual who has

23   a great deal of knowledge in the financial services arena, but

24   he essentially has no knowledge in the CDO area in particular

25   apart from what he has learned in this case.  At least that is

1    what was put forward by the SEC, and in terms of the opposition

2    brief on the motion in limine or the Daubert motion as to

3    Mr. Cox, there wasn't really any contention that that was not

4    the case.  It is in the court's view a classic case of an

5    expert, proposed expert trying to offer credentials rather than

6    direct experience and analysis; and he, therefore, ends up

7    really giving an ipse dixit type-opinion for the bulk of what

8    he was going to say.

9           Now, I also find in addition to that there are areas

10   in which his methodology is either nonexistent or certainly

11   wasn't stated.  I don't think that he can talk about whether

12   market participants could have concluded that the sub-prime

13   mortgage market would decline based upon publicly-available

14   information because while he as an individual and an individual

15   in the financial services area who certainly could look at

16   publicly-available information, there is no doubt about that,

17   he doesn't have any expertise as to market participants in this

18   particular market which is the CDO slash -- even in the RMBS

19   area.  That wasn't his area.

20          The idea he could talk about Paulsen's inexperience or

21   experience, that I would have precluded anyway.  That is not a

22   proper area.  The fact the risk and capture structure of AC-1

23   was or was not disclosed, that is the kind of thing defendants

24   can put in otherwise.  There are lots of ways to get that in

25   from percipient witnesses who have been listed.

1        He doesn't cite economic principles or specific

2    studies that he has done apart from having read a lot of

3    material, reading material and studying material in an area

4    about which he prior to his case had little expertise or no

5    expertise.  Then he does his study where he compares the AC-1

6    reference portfolio of RMBS against the universe of RMBS.  If

7    he had deep background in CDOs, frankly I would let the

8    defendants put him on and have the SEC just cross-examine him

9    on the fact that the study has got flaws.

10       While there is under the Daubert factors, the court

11   should look at the methodology and whether the methodology is

12   inherently flawed.  I do think there are some flaws.  I think

13   they're also the kind of thing which could be subject to

14   cross-examination.

15       However, when we dealing with methodology which he

16   himself it wasn't clear could himself replicate, it is unclear

17   if he even knew the methodology, that the flaws are even more

18   difficult.  So, for instance, he does a study of comparing the

19   AC-1 portfolio against a larger universe than existed for the

20   ACS portfolio, he goes more deeply into the '07 universe of

21   transactions than AC-1.  So, therefore, it skews it and so the

22   comparison sets in, is an inappropriate comparison set.

23       There is a second piece which is comparing this

24   particular transaction in the disclosures in the counter-party

25   to the 24 other CDO transactions, but there are his lack of

1    experience also is a problem in this particular market area.

2    Again this is an individual with a great deal of expertise in

3    many areas, just not in this area.  So he was only really able

4    to look at what was publicly available and disclosed about CDOs

5    and counterparties that were publicly disclosed.

6         He himself is not an industry expert in this area, and

7    to state what is typical in terms of disclosures of

8    counter-parties, in terms of what would be important in the

9    industry in terms of the disclosure of counter-parties, and so

10   he didn't know anything about the counter-parties in those

11   transactions except for what had been put forward in the public

12   filings.  There really was no analysis, nor does he have the

13   expertise to do any analysis that is of significance.

14        I did look at, and I looked very hard at obviously the

15   defendant's positions on why this fellow Mr. Cox should be able

16   to testify here.  The main argument is that he can help the

17   jury understand the total mix of information, but the total mix

18   of information really goes to a question of the mix of

19   information in the CDO transaction area.  It is not just the

20   mix of information out there in the aether in some nonspecific

21   way.  It is in a very specific way.

22        What was important and typical to what CDO investors

23   were looking at becomes a critical question.  What was the

24   total mix of information they had available?  That is the

25   specific area in which he himself said he didn't have any

1    expertise.  So the court finds that he does not have the kind

2    of specific expertise that would be necessary to allow him to

3    offer the opinions that he is offering and that his studies

4    are, and also, secondly, they are flawed and then, thirdly,

5    when you mix into all of this, so to speak, the fact that his

6    credentials are of a sufficiently high magnitude it would give

7    undue weight to opinions that don't have sufficient depth and

8    expertise behind them, I am going to preclude the testimony of

9    Mr. Cox.

10           I will, because I know I am precluding an expert you

11   folks have spent a lot of time on, I will give you an

12   opportunity to address this.  By that I am not talking to the

13   SEC so much, I am talking to Ms. Chepige and Mr. Coffey.  I had

14   not previewed for you this would come up today, but I want to

15   give you a chance to respond if you want to.

16           By not responding, you are not waiving your

17   disagreement with my ruling.  That ruling is what it is and it

18   is there for appeal purposes.

19           MS. CHEPIGE:  Judge, I think we would like to consider

20   what you said and wait and perhaps come back with a letter if

21   we want to put forth any other points.

22           THE COURT:  Why don't you do that.

23           With many motions in limine, they are necessarily

24   tentative because things evolve during trial.  However, with

25   Mr. Cox, I didn't think it is the kind of situation where

1    things really are going to evolve in that way and it is a

2    Daubert motion that differentiates from the normal motion in

3    limine.  So I will look at a letter, Ms. Chepige, if you would

4    like to submit one.

5              MS. CHEPIGE:  Thank your Honor.

6              THE COURT:  If you don't submit anything, that does

7    not waive any objections you have to my ruling.

8              MS. CHEPIGE:  Thank you.

9              THE COURT:  I wanted to also just mention generally,

10   this comes up for Mr. Davidson and it comes up for Mr. Bajaj.

11             MS. CHEPIGE:  Bajaj.

12             THE COURT:  Bajaj.  No witness is going to be allowed

13   to use words that are along the lines of intentionality no

14   matter how cast.

15             Whether they call it creatively obscured or try to use

16   words like economically material, you are going to have to find

17   other euphemisms and other ways of coming at it, and I will be

18   more specific in a ruling and I will give you guidance in

19   particular in terms of how, what witnesses can say and not say.

20             I will tell you I am concerned about Mr. Bajaj's lack

21   of publication in this area of CDOs, his lack of speaking at

22   conferences or teaching.  I read through his resume quite

23   carefully, tried to find something I could hook into for

24   expertise in this area.  I note Mr. Davidson and others have

25   expertise directly in this area.  There are people out there

1    who do have expertise in this area apart from just testifying

2    repeatedly, but I've not yet found a hook.

3           That is not to say I am going to preclude him.  I

4    haven't reached a final decision, but as to everybody, I'll be

5    giving you very specific guidance on words that get to anything

6    that approximates ultimate legal conclusions.  To the extent

7    you plan on having someone be narrator of facts, you have both

8    cited a case I previously decided on that, and that obviously

9    is not going to be allowed by either the SEC or for Tourre.

10          You can't have somebody who stands up here and says so

11   and so, I've read their deposition and they say such and such.

12   Then I read the following four documents and they did this and

13   they did that.  That is not going to work.

14          They can get up there and say I'm qualified and here

15   is my expertise and I have looked at all kinds of documents in

16   this case and they show me and support my view that -- blank,

17   but they can't be a narrator of the facts.

18          I expect to have a ruling on the remaining motions in

19   relatively short order, I would say probably either by the end

20   of this week or very early next week.  So you will be able to

21   adjust.  Those are the things that I had before I got to the

22   two motions in limine where I want to note, is there really

23   going to be an issue about the scheme liability?  What are you

24   folks doing and how about the Goldman Sachs settlement?  Do

25   these motions need to be joined here?  What are you doing with

1    the Sachs settlement and --

2              MR. MARTENS:  We have not put the settlement on any

3    exhibit we sent over.  I am aware of the rules of evidence and

4    don't intend to offer that.

5              THE COURT:  Are you going to have anybody, Mr. Wagner,

6    anybody who does mention it speak to it and get it in sideways?

7              MR. MARTENS:  No.

8              THE COURT:  So based upon -- tell me if I am wrong

9    because I am going to set forth now something that will be --

10   hold on.

11             (Off-the-record discussion)

12             MR. MARTENS:  We have no intention of using the

13   settlement.  We don't want counter-evidence coming in about

14   statements made at press conferences or whatever surrounding

15   the settlement.  No, we are not intending on using the

16   settlement, not intending to introduce it, to make it an

17   exhibit or have an expert talk about it.  That is not part of

18   our case.

19             THE COURT:  Let me put this ruling or not, just sort

20   of statement, the SEC has represented they're not going to be

21   seeking to introduce the Goldman Sachs settlement, the fact of

22   the settlement at trial.

23             MR. MARTENS:  Correct.

24             THE COURT:  We will need as a group collectively to

25   decide how to deal with the fact that Goldman Sachs was named

 1   as a defendant and is no longer a defendant and whether or not

 2   people are content to let that just be.  I don't typically send

 3   the complaints back into the jury room.  I will with an

 4   indictment, but I don't with a complaint.  It is not

 5   necessarily the case that the jury is going to see it.

 6          The caption for the purposes, for my purposes, the

 7   caption for the jury instructions could simply say Tourre, but

 8   we need to figure out the extent to which anybody is going to

 9   be raising Goldman Sachs being sued and then no longer being

10   part of the case because once the door is open, the horse has

11   bolted and people have the ability to respond.

12          MR. MARTENS:  There are a couple of ways, and we are

13   working on motions in limine to think through how this could

14   play out and is something to discuss with the defense.  In the

15   summary judgment papers there was a lot of about the F A I R U

16   F N D, there was discussion about how payments were made to IKB

17   and ABN but not ACA, suggesting that somehow the SEC didn't

18   really think ACA was a victim.

19          Obviously, what is good for the goose, we argue, is

20   good for the gander if we are not going to have discussions

21   about settlement, no discussions about settlement including

22   payment of funds and how it was distributed.  That is one

23   example of how it could come up.

24          There is also going to be issues as we see in our Rule

25   611 motion about alignment of interests and how the party, what

1    interest parties might have when they're testifying.  In fact,

2    there is ongoing litigation against Goldman and whether

3    witnesses might have any bias as a result of that.  Those are

4    issues we are thinking through and briefing to get guidance

5    from the court on those issues.

6            THE COURT:  I appreciate that.  I appreciate your

7    statement on the Goldman Sachs issue, and so based upon your

8    representation, Mr. Martens, I don't think that this then

9    motion needs to be responded to because basically on consent of

10   the SEC, the defendants have prevailed in their motion in

11   limine that is set forth at ECF number -- we'll figure it out.

12           But in terms of the other issues, it would be I think

13   most useful for you folks to confer before anybody has to

14   brief.  There is so much paper floating around, it would be

15   terrific if you can reach some rules of the road on consent,

16   rules of the road on consent, and present them to me these are

17   the parameters.  If you can't agree, it might be you can do it

18   in a much narrower way, which is without briefing a whole

19   motion in limine, here is the issue, we've gotten this far

20   along with the issue, but we can't get the final across the

21   finish line because they don't want to raise something about

22   ACA not being a victim, and they do think it is fair to do that

23   and they want to do it in the following way, and we think we

24   might be able to come up with something that is short of 20

25   page briefs apiece with a reply.  See what you can do.

1    MR. MARTENS:  I agree with that and we will try to do

2    that.  There has been some already where frankly we can just

3    talk to the defense and reach some agreement including on the

4    financial crisis and the causes of the financial crisis and

5    things like that.  I think those are the types of things where

6    we can give defense counsel a call, and I am hopeful we can

7    work that out.

8         THE COURT:  That would be useful.  On the scheme

9    liability, what is your plan on the scheme liability?

10        MR. MARTENS:  Our plan on the scheme liability is as

11   alleged in the complaint, we intend to ask the court to

12   instruct the jury both on the misreps prong, misrepresentations

13   and the scheme prong.

14        This was the same way the case was presented in SEC

15   versus Stoker.  The issue there was raised that it wasn't --

16   there was a motion made both at the motion to dismiss stage and

17   the summary judgment stage by Mr. Stoker, arguing there was not

18   a scheme theory, it was simply a misreps theory, and Judge

19   Rakoff disagreed with that and allowed for the scheme theory go

20   to the jury.  We are briefing that, and we intend to take issue

21   with that, and we'll flesh out our position more fully in that

22   brief.

23        THE COURT:  It would be helpful to the court since we

24   know this matter was transferred to me, and so that early

25   history for this case I have to go back and review the papers

1    to become familiar with it.  To the extent that there was

2    briefing on this issue similar to what happened in the Stoker

3    case, that would be helpful to point out.  If it is just a

4    matter of being alleged in the complaint and it happened to be

5    captured in the wording of the complaint, then I'll consider

6    the motion when it is fully briefed.

7            MR. MARTENS:  Yes, your Honor.

8            THE COURT:  All right.  So we are not going to be able

9    to get rid of that one.  You'll try.  If you folks can talk

10   about the fact that -- are you going to put on that CDOs caused

11   the entire financial crisis?

12           MR. MARTENS:  We are not taking on that burden.  This

13   is a case about Mr. Tourre and the AC-1 transaction.

14           MR. COFFEY:  If I may speak briefly to that.  One of

15   their experts has a table, and in the table it has got a box

16   that says the CDOs accelerated the financial crisis.

17           THE COURT:  Mr. Wagner?

18           MR. COFFEY:  No.  It is Mr. Jaffe.  I am happy to chat

19   with Mr. Martens about it, but he has a paragraph specifically

20   we didn't have the great recession, we didn't have a financial

21   crisis.  Mr. Jaffe said we had a CDO crisis.

22           THE COURT:  There may have been a CDO crisis within a

23   greater financial crisis.  Try to work it out and see whether

24   or not there is a way of having his opinions as they come in at

25   trial worded in such a way it is not going to step over any

1    lines and maybe you can redact something from a chart.

2           MR. MARTENS:  There is often I think, as everyone

3    knows, there is often things you're working through during the

4    course of discovery.  We have narrowed the issue and we have no

5    intention of presenting anything like that at trial.  We will

6    work it out with defense counsel, but I can assure you we are

7    not going to make this case about who caused the great

8    recession.

9           THE COURT:  All right.  What is the ECF number of the

10   Goldman Sachs settlement?

11          (Off-the-record discussion)

12          THE COURT:  For the record, the motion brought at ECF

13   No. 299 which relates to the got Goldman Sachs settlement is

14   essentially decided in the defendant's favor on consent and

15   subject to the parties working out whether or not how they're

16   going to mention, if at all, the role of Goldman Sachs in terms

17   of being a party to litigation.  Obviously, Goldman Sachs will

18   be mentioned an awful lot in the case, but the issue was as

19   party to this litigation and settling with the SEC.

20          LAW CLERK:  There are two related motions in limine.

21          (Off-the-record discussion)

22          THE COURT:  The motion in limine the court was just

23   referring to in terms of the cause of the financial crisis was

24   ECF No. 290.  As I understand it from Mr. Martens now, the SEC

25   is not going to take the position that CDOs caused the

1  financial crisis; and, therefore, ECF motion at 290 is

2  essentially moot.

3          MR. MARTENS:  Correct.  There are obviously

4  discussions of CDOs and discussion of turmoil in the markets

5  during the relevant time period.  It is necessary context, but

6  we are not taking on any burden of proving which caused what.

7          THE COURT:  Mr. Coffey or Ms. Chepige, anybody believe

8  that needs to be further ruled on apart from the representation

9  from the SEC on the record?

10          MS. CHEPIGE:  That is fine, your Honor.

11          THE COURT:  Now I had not raised, and I think it is a

12  different issue, the link of Abacus 2007 AC-1 to the collapse

13  of ACA and ABN.  You have seen that?

14          MR. MARTENS:  I have.  Obviously, there is some again

15  context that will need to come out in the case including losses

16  sustained, but again we are not here trying to prove, I don't

17  need to prove that this is what put ACA out of business or put

18  ABN out of business.  There will be testimony about ACA and ABN

19  losing money in these transactions, or hopefully we'll get

20  proposed stipulations to defense to try to sort that out and

21  narrow it further.  If that happens, it takes us out of that

22  context entirely.

23          THE COURT:  The motion does go to a narrow issue which

24  you may be intending to put in which is AC-1 contributed to the

25  financial difficulties of ACA and ABN.  The motion in limine

1    says you're going to raise that and he says he doesn't want you

2    to.

3              MR. MARTENS:  I would state it a little differently.

4              The case laws does recognize if somebody losses money

5    as a result of conduct, that that is evidence of scienter or

6    can be evidence of intent to defraud.  That is a separate

7    question from where losing money on ACS contributed to the

8    entire financial crisis that ACA or ABN faced.

9              I don't intend to prove that last piece.  I don't

10   really care what caused ABN to go out of business or what

11   caused ACA to go out of business.  What I care about is that

12   ABN or ACA lost money on this particular transaction, and that

13   is what I intend to focus on, not whether they went bankrupt.

14             That is why I sent stipulations over to the defense

15   that if we can agree on testimony about or a stipulation on

16   losing money on this transaction, we don't get into that sort

17   of neighborhood in the testimony.

18             THE COURT:  Ms. Chepige.

19             MS. CHEPIGE:  We are happy to speak with Mr. Martens,

20   but I think this is a complicated issue particularly given your

21   Honor's ruling last week in which you bifurcated one

22   transaction into offer and completed transaction.  So

23   particularly as to IKB and ABN, this Court has held those are

24   foreign transactions, so all we are litigating is the offer.

25   We need to think through what evidence is admissible on offer

1  and what isn't admissible because the transactions are foreign

2  transactions.

3      If we are proving losses from the completed

4  transaction, how does that play with your bifurcation of offer

5  and completed transaction, one being before this Court and one

6  being not before this Court?  There is a complex interplay we

7  are trying to look into as we look through the evidence lists.

8      How does your Honor's ruling on offer only in the

9  transaction play out?

10     THE COURT:  I think there is a lot embedded in your

11 statements.  I don't know that I agree that as an evidentiary

12 matter as many things would be precluded or excluded as a

13 result, but that is not really the point for the moment.  The

14 point for the moment is just did I have to read this brief and

15 do I have to make a ruling, and the answer is yes.  I will do

16 so.  That is on the Abacus 2007 AC-1 being linked to the

17 collapse of ACA and ABN.  When that is fully briefed, I will

18 issue a ruling.

19     What else did I have on my list?  Then Mr. Coffey has

20 his piece.  We have the joint pretrial order is due on July

21 1st.  The thing I care the most about are the jury

22 instructions, obviously, and where you folks disagree, they

23 should be on the same page or dueling pages with citations,

24 obviously.  I may not use yours even if you agree.  It depends

25 on how it is worded and whether or not I think it complies with

1   the current Second Circuit and Supreme Court precedent, but

2   I'll use them as a guide as much as possible.

3          In terms of deposition designations and objections,

4   let me describe the format that is easiest for me to work with

5   which is set forth in my individual rules, but it is useful

6   sometimes to lay it out just in words orally here in court,

7   which is put in the deposition, one party will designate one

8   color, the other party will counter-designate another color.

9   Where you object, put it in red.  I don't care whose objection

10  it is, it will be red.  It will be yellow, red or green however

11  you've done it.  That allows me to flip through the depositions

12  and figure out where the red is, all right, which is just

13  helpful to me.

14         Then you will have, in addition to deposition X,

15  you'll have -- it only comes up a few times, there aren't that

16  many depositions from which you're designating, you will have a

17  line sheet, list the witness, lines designated and

18  counter-designations and whether anybody has objected, and if

19  there is an objection, a few words, hearsay, partial document,

20  whatever the objection is, and the other side can respond, it

21  is not being offered for the truth, and I will then rule on

22  those in advance.

23         It is helpful but not required that you give me that

24  spreadsheet on a memory stick or a disk of some sort so I can

25  actually do it in Excel format, I can go into it and enter in

1    "sustained" or "overruled" and a few words about why.

2           If in the rush of time that is not really the way you

3    folks think is the easiest way to do it, that is fine.  I can

4    do it just in an order and I don't need to do it in your Excel

5    Spreadsheet, but it is nice if you leave a final column for me.

6           The same thing is true for exhibits.  When you're

7    objecting to exhibits, it is both what I need are the exhibits

8    to which there is an objection.  I don't need the other

9    exhibits until the day of trial.  I just need on a sheet of

10   paper -- again I prefer Excel Spreadsheet, but however it works

11   for you -- which will have the exhibit and the exhibit number,

12   what the nature of the objection is and a few words for

13   response.  Again if it is hearsay and somebody says no, it was

14   a business record, and it may be for a number of those that

15   they'll be subject to connection, let me tell you as to,

16   depending on whether or not you're, in fact, able to show it is

17   a business record.  As to the documents where I make a ruling

18   in advance, if you intend to continue to desire to offer it at

19   trial, offer it at trial.

20          If you do not offer it at trial, I am going to assume

21   you thought my ruling, in fact, showed you the light; and,

22   therefore, that you didn't need to offer it at trial and

23   decided that gosh, it really was rank hearsay and it would be

24   embarrassing to offer it trial.  If it is in the morning and

25   you know you have five, and you don't want to take up the time,

1    say I would like to make a record that we would today have

2    offered exhibits blank, blank, blank and blank, but consistent

3    with your prior ruling, we are not going to do that, but we

4    want to ensure we have the appropriate appellate record, I will

5    say that is right because, for instance, there may be a whole

6    line of questioning you don't do as a result of that, so you're

7    not going to have an opportunity to offer it and have me

8    sustain the objection.  If you will run into that problem, I

9    want to make sure you can make your record, all right?

10           In other words, the rulings for documents in advance

11   of trial are to give you guidance on what you should expect.

12   They are necessarily preliminary because lots of things happen

13   in terms of what witnesses, what kind of foundation they can

14   lay or not lay.  If an objection is there is no foundation,

15   somebody responds I have a witness who will lay a foundation,

16   and I overrule the objection, it may turn out that that witness

17   does not lay the foundation appropriately and, therefore, when

18   the objection is made live at trial, I sustain something that

19   previously I indicated I would overrule based upon a

20   representation that there would be an appropriate foundation.

21           So things are fluid for documents, but for your

22   planning purposes, I will rule in advance, all right?  Does

23   that make sense?

24           MR. MARTENS:  Yes.

25           THE COURT:  For appellate purposes everybody

1  understands the rules of the road on those things.

2           MS. CHEPIGE:  Just for clarification, the exhibits

3  that we disagree on as to which there are objections, would you

4  like us to deliver to you a binder of the hard copy of the

5  exhibits we disagree on?

6           THE COURT:  Yes, yes.  Thank you.  I only need one

7  copy because I'll do it myself and so I need one copy of any

8  exhibits as to which there is an objection, and then I'll

9  literally flip through them.

10           Now, I don't know if you guys still have defendants

11  doing A, B, C, D, E, F and G, so I can't stand that.  I have

12  been up to quadruple Q.

13           PX 1 and DX 1 will work.

14           MR. MARTENS:  It is already done.

15           MR. COFFEY:  We have already done that.

16           THE COURT:  There are people who still want to do

17  quadruple Q, and it is very confusing.

18           MR. COFFEY:  Not to mention the famous transcript

19  where after Exhibit F2 had been marked, the judge asked what is

20  the next exhibit?  That drew a blank.  I don't know if you ever

21  have seen that famous transcript, "What is the name of that

22  Exhibit?"  "F-U," your Honor.

23           THE COURT:  Oh!

24           MR. COFFEY:  I thought that informed your Honor's

25  preference.

1        THE COURT:  No, it doesn't because they do AAAAA,

2    BBBBB.  I understand your point, Mr. Coffey; and, therefore, as

3    a result of it, it is all the more reason.

4        You had something, Mr. Coffey you wanted to raise?

5        MR. COFFEY:  Yes, your Honor, about a couple of trial

6    subpoenas we plan on issuing.  The best way to start is to

7    bring up something Mr. Martens said about Goldman witnesses.

8    In the context of his Rule 611 motion, they're seeking to lead

9    the Goldman witnesses.  What Mr. Martens referred to is Goldman

10   has engaged in litigation and they might have bias as they

11   testify.  The subpoenas we are going to issue go directly to

12   the bias of Laura Schwartz.  We plan on issuing subpoenas to

13   the SEC and Laura Schwartz for a discrete set of documents.  I

14   wanted to raise it with your Honor today because there will

15   undoubtedly be a motion to quash.

16       THE COURT:  Different from the Wells notice?

17       MR. COFFEY:  It includes the Wells notice.

18       THE COURT:  Didn't I just rule on that.

19       MR. COFFEY:  You ruled on what I see was cast as a

20   discovery battle.  There were at least four discrete points

21   that we didn't get an opportunity to address in that context.

22       If I can identify the four points, and I recognize

23   that what will be said is you have already ruled across the

24   board, and I respectfully submit this is too important on an

25   incomplete record to rule.

1      The four points -- there were three submissions that

2   came in after our letter.  There was the SEC's response to your

3   questions had a very important piece of evidence on there we

4   have to talk about.  There was SEC's letter and there was the

5   letter from Ms. Schwartz's counsel.

6      It is my bad, but I anticipate we might have to call,

7   and I didn't see a provision in your rules for submitting a

8   response, but we didn't really join the issue on the discovery

9   issue or on the impeachment itself issue because those were

10  essentially conceded in my meet-and-confer with Mr. Martens,

11  that there was no issue prior to that whether it was tardy or

12  un-tardy, and there wasn't any issue about my right to

13  cross-examine Ms. Schwartz about the investigation.  Those are

14  news to us as though those letters came in.  We didn't have a

15  chance to grapple with those fully.

16     The other two very important issues is that, one was

17  the fact that the SEC said we couldn't even question her about

18  it.  That we think under the case such as Wolfson, 437 F.2d

19  862, we think that our ability to impeach can't be so

20  constricted by the little bit of evidence in the SEC's filing

21  which I thought was important addressed one of the points your

22  Honor made in the order which was that the motive to lie

23  because of the investigation would have arisen after she

24  testified.  In the SEC submission it said that some of the

25  impeachment materials were created in 2008, which predated her

1    deposition in this case.

2            we didn't have an opportunity to talk about those

3    important issues going to issue the subpoenas.  We appreciate

4    your Honor has looked at the discovery piece, but trial

5    subpoenas are different.  We have narrowed this to documents

6    that were created at least a year after discovery closed.  We

7    are not clairvoyant.  We didn't say --

8            THE COURT:  Why don't you do this.  If you don't mind

9    laying this much out, I don't want to ask you to divulge too

10   much of your trial strategy, but for Schwartz it would be

11   helpful if I had as much particularity you're willing to go

12   into on the kinds of questions you want to ask her about this

13   topic, and in particular assume it is a Wells notice that looks

14   like every other Wells notice, what would you ask about that or

15   would you want to elicit?  Have you received a request or do

16   you know you're the subject of an investigation from the SEC?

17           Give me as much as you can about what you're planning

18   on doing, and we can sort of go Q and A by Q and A and see.  I

19   understand the bias point.  You want to say she, if she

20   testifies for the SEC, is doing it so they don't bring a case

21   against her, right?

22           MR. COFFEY:  That is one of the two pieces.  There are

23   actually three pieces.  Obviously, the incentive to curry favor

24   with the SEC which Wells'd her four months ago, and by their

25   timing in their letter, they have to make a decision whether to

1  charge her or not.  Shortly after the completion of the trial

2  we see the timing is quite curious.  There is also the motive

3  for her to shade her testimony to support the merits of her own

4  case separate and apart from trying to help the SEC in this

5  case.

6          The third point is perhaps substantive.  She is taking

7  the position in this case that she was shocked, shocked to find

8  there was a short involved in a synthetic CDO.  We submit that

9  the self-described CDO specialist that had done 16 of these

10  before for almost $16 billion wasn't quite the naive babe in

11  the woods she is making herself out to be.

12          THE COURT:  That is not whether you have to go into

13  Wells.  That is cross-examination, which don't synthetic CDOs

14  have short positions?  That is --

15          MR. COFFEY:  I get that, I do.  The jury will find it

16  interesting to know this is her 16th or 17th CDO.

17          THE COURT:  That you can go into.

18          MR. COFFEY:  I believe so.  I am a little unclear

19  because we had a meet-and-confer in on the call.  I took away

20  Mr. Martens said you can ask her.  I think that fact is

21  memorialized in my follow-up letter to Mr. Martins.  You said I

22  can ask her, but it is like poking around in the dark.  At that

23  point in time I understood the SEC to say you can ask her, you

24  can do the examination, we would just like it to be an

25  ineffective examination by depriving you of the documents.

1          THE COURT:  I hear your point.  I have a trial I need

2     to resume right now.  I am sorry.

3          MR. COFFEY:  I just wanted to give you a heads-up.

4          THE COURT:  Thank you.  As people know, I appreciate

5     the heads-up.  I would like you folks to continue to confer

6     about these.  Many of the things you're raising, Mr. Coffey,

7     are issues where it is just whether or not you'll be able to

8     elicit the truth or not.  It is not so much did you receive a

9     Wells notice or not?  Are you under investigation from the SEC

10    or not?  Therefore, it shouldn't go into too much trial

11    strategy of revealing your questioning.  I would like you folks

12    to consider if the SEC says prior to trial that it is not

13    intending to bring a case against Ms. Schwartz, does that

14    change the analysis.

15         MR. COFFEY:  It makes it just as important because the

16    timing is very curious.  What deal was cut?  What was she

17    willing to do at trial in order to avoid being charged?  The

18    timing we have here, your Honor, is entirely in the SEC's

19    making.  They decided to give her a Wells notice in February.

20    Clearly there is a tolling agreement in place because these

21    events took place a long time ago.

22         I don't want to have to do a cross-examination where I

23    don't know what the Sword of Damocles over her head is or is it

24    a penny.  We need to know something.  We are prepared to have

25    attorney's eyes only and revisit the issue what is an

1    appropriate scope of cross.  We don't want to do it in the dark

2    and we don't want to be hamstrung with this critical witness.

3    She is going to say Mr. Tourre lied to her, and a lot will ride

4    on her testimony.

5            THE COURT:  I understand what has been briefed about

6    her role.  I am sure I don't understand all of the facts of her

7    role, but I have a sense of her importance in this case.  You

8    will bring on the issue, and the SEC will respond and then

9    we'll resolve it.

10           I would encourage you to be as granular as possible so

11   I am able to understand the issues and give you very specific

12   rulings because it may be you can ask X, Y and Z or not A, B,

13   C, and maybe the SEC won't contest A, B, C, like he worked on

14   24 or 16 other CDOs, synthetic CDOs.  I don't know.

15           MR. MARTENS:  I have two quick questions.

16           THE COURT:  Yes.

17           MR. MARTENS:  One is does the court have a typical

18   length of time or do you expect how long the parties will have

19   for opening statements in this matter?

20           THE COURT:  My view is that frankly if you bore the

21   jury, it is going to be your own head on a platter, right?

22           The jury will have about one hour of patience for you

23   maximum, in my view, and if you are going on and on and on,

24   then you're probably just going to be shooting yourself in the

25   foot.

1           MR. MARTENS:  I will be under an hour.

2           THE COURT:  That is about what I am expecting.  I

3   would think we would have -- I haven't decided on the number of

4   jurors.  I don't know whether you want to go with a unanimous

5   jury.  I assume you want to go with a unanimous.  You will tell

6   me at the final pretrial.  We don't have to end up with more

7   than six.  We will start because it is a multi-week trial with

8   maybe even twelve.  We'll figure it out.  We fit a lot in,

9   which is why I stayed in this courtroom, you can fit a lot in

10  the jury box.  I would expect with a multi-week trial, it will

11  take several hours to pick a jury but not take all day.

12          I will conduct the voir dire myself.  It will go very

13  quickly.  You will have cause challenges, you will have

14  peremptories and we'll take it from there.  We'll talk about

15  those logistics at the final pretrial.  Do give me on July 1st

16  the amount of time you expect with your witnesses to close out

17  the --

18          MR. MARTENS:  One other thing, one of the motions you

19  didn't mention today, a motion in limine has been filed, our

20  motion on advice of counsel defense.  That is a very

21  significant issue.

22          THE COURT:  I didn't think I had a chance of disposing

23  of it by agreement.  Therefore, I didn't mention it.

24          MR. MARTENS:  I agree.  I didn't know if the court was

25  planning on waiting until the final pretrial conference because

1  that will dramatically affect objections to documents based on

2  our initial review of the exhibit list and probably affect

3  everybody's approach to the trial.  That is one that will be

4  useful if the court was willing to hear somewhat in advance of

5  the final pretrial conference.

6          THE COURT:  Let's do that.  Joe, can we find -- let me

7  get back to my trial.  Let me issue an order and hope that you

8  folks can work out the time.  Blocks of time for a couple of

9  hours between now and the time our trial starts are hard to

10 come by.  I will find something and make some time and try to

11 give you more than one option and set aside two hours to

12 address that if you think it is that important.

13          MR. MARTENS:  It is.

14          THE COURT:  Then we'll do that.

15          (Court adjourned)

16

17

18

19

20

21

22

23

24

25