UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                                               :
SECURITIES AND EXCHANGE                                        :
COMMISSION,                                                    :   Civil Action
                                                               :   No.: 10-cv-3229 (KBF)
                      Plaintiff,                               :
                                                               :   ELECTRONICALLY FILED
       v.                                                      :
                                                               :
FABRICE TOURRE,                                                :
                                                               :
                      Defendant.                               :
                                                               :
-------------------------------------------------------------- x

**CONSOLIDATED MEMORANDUM OF LAW OF FABRICE TOURRE IN
OPPOSITION TO THE SEC'S MOTIONS TO PRECLUDE CERTAIN
ARGUMENT OR EVIDENCE REGARDING PAULSON & CO., INC.
AND TO PRECLUDE ARGUMENT OR EVIDENCE PERTAINING
TO STATEMENTS BY GOVERNMENT REGULATORS
<u>ABOUT THE HOUSING MARKET</u>**

Pamela Rogers Chepiga
Andrew Rhys Davies
Brandon D. O'Neil
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

John P. Coffey
LAW OFFICE OF JOHN P. COFFEY
1350 Avenue of the Americas, 2nd Floor
New York, New York  10019
(646) 790-8988

*Attorneys for Fabrice Tourre*

Dated:   July 2, 2013
         New York, New York

## **TABLE OF CONTENTS**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

THE INFORMATION IN THE 2006-07 MARKETPLACE ..................................................... 3

ARGUMENT ........................................................................................................................... 5

I.  THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS RELEVANT TO ISSUES OF MATERIALITY, CREDIBILITY AND STATE OF MIND ....................................................................................................... 5

    A.  Materiality ................................................................................................... 5

    B.  Credibility ................................................................................................... 7

    C.  State of Mind .............................................................................................. 9

II.  THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS NOT HEARSAY ................................................................................. 10

III. THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS NOT UNFAIRLY PREJUDICIAL AND WILL NOT CAUSE CONFUSION ........................................................................................................ 10

CONCLUSION ..................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................................................. 1

*Freidus v. ING Groep N.V.*,
  736 F. Supp. 2d 816 (S.D.N.Y. 2010) ....................................................................................... 6

*Garber v. Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) ........................................................................................... 1, 5

*Greenhouse v. MCG Capital Corp.*,
  392 F.3d 650 (4th Cir. 2004) ..................................................................................................... 6

*In re Geopharma, Inc. Secs. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005) ....................................................................................... 9

*In re UBS AG Secs. Litig.*,
  No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................................... 5

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) .................................................................................................... 2

*White v. H&R Block, Inc.*,
  No. 02 Civ. 8965(MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004) .................................. 9

**Rules**

Fed. R. Evid. 801(c) .................................................................................................................... 10

Defendant Fabrice Tourre respectfully submits this consolidated memorandum of law in opposition to the SEC's motions to preclude evidence or argument about (a) the widespread public reporting that Paulson & Co. ("Paulson") was executing a macro strategy to short the subprime housing market during the period in which the ABACUS 2007-AC1 ("AC1") transaction was being created and (b) public statements made by then-current or former government regulators that contributed to the total mix of information about the state of the U.S. housing and residential mortgage markets.

## PRELIMINARY STATEMENT

These two *limine* motions are the latest installments in the SEC's remarkable eve-of-trial campaign to keep important, relevant and admissible evidence from the jury. Here, in a case where its principal "victim" was supposedly duped into believing that Paulson was a long investor aligned in interest with prospective AC1 noteholders, the SEC would bar evidence that the market had been abuzz for months with reports of Paulson's aggressive short bets against the subprime market. And because evidence that influential government officials were giving comfort to long subprime investors in early 2007 conflicts with its litigation narrative—that Goldman Sachs & Co. ("Goldman") and Mr. Tourre had somehow lured long investors to AC1 when all the world knew the housing bubble was about the burst—the SEC would forbid mention of those contrary facts as well.

The prolific coverage of Paulson's short strategy, described more fully at pages 3-4 below, comprised a significant piece of the "total mix" of market information available to the supposed dupe, ACA, and should not be excluded. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) ("The total mix of information may include 'information already in the public domain and facts known or reasonably available to'" investors.) (quoting *United Paperworkers Int'l Union v. Int'l Paper*

*Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)).  Determining whether Mr. Tourre's alleged statements were misleading and whether the allegedly omitted information about Paulson's role in the AC1 transaction was material requires evaluating the total mix of information available to investors, including public reporting of Paulson's short positions and the ongoing debate about the direction the U.S. housing and mortgage markets would take—in other words, precisely the information that the SEC would like to withhold from the jury.

        While the evidence is admissible on that basis alone, another compelling ground for admissibility arises from the very same fact that buttresses the SEC's principal argument to exclude the articles:  because "no one [at ACA] remembers reading" them.  ECF No. 340 (SEC Mem. Of Law in Support of Mot. to Preclude Paulson Evidence ("SEC Paulson Br.")) at 3.  The additional ground, of course, is credibility.  The notion that the CDO specialists at ACA were ignorant of the media buzz about Paulson's short strategy when they placed their billion dollar bet is not credible, and the jury should see whether the ACA witness can repeat that testimony without squirming.  (This is especially imperative given that the ACA recordings, produced of course after the ACA witnesses had denied awareness of the Paulson media buzz, confirm that ACA personnel conducted Google searches regarding potential hedge fund deal partners.)

        In addition to materiality and credibility, the Paulson articles are also relevant to the state of mind of Mr. Tourre (and others that the SEC has recently sought to tar in its *limine* practice, namely David Gerst and Paolo Pellegrini).  The SEC contends that Mr. Tourre and others set out to fool Laura Schwartz into believing that Paulson was a long investor with interests aligned with the prospective long subprime investors in what would become AC1.  Mr. Tourre categorically rejects that accusation as false, and will also cite the challenged materials and other evidence to argue at trial that the SEC's theory rests on the fanciful idea that anyone

would have thought it possible to deceive any sophisticated subprime player as to Paulson's strategy given its widespread coverage in late 2006 and early 2007.

As for the remarks of the government officials, they are not offered to prove that what the official said was true; however, the fact that such comments were made contributes to the total mix of information in the marketplace.  The comments show that there were in fact divergent outlooks regarding the subprime market in early 2007, which is consistent with the defense theory and rebuts what is emerging as yet another new SEC theory, namely, that the positive views that lured long investors to AC1 came from Goldman.

## THE INFORMATION IN THE 2006-07 MARKETPLACE

The following summarizes briefly the evidence that the SEC would keep from the jury:

Paulson:

- September 15, 2006: "The *Paulson Credit Opportunities Fund* will be short credit on the sub-prime U.S. residential market."  "Paulson Launches Credit Fund," *Absolute Return+Alpha* (September 15, 2006) (attached as Ex. 1 to the July 2, 2013 Declaration of Pamela Rogers Chepiga ("Chepiga Decl."));

- October 30, 2006:  "[B]ig hedge funds increasingly are using derivatives to make outright bets against U.S. homeowners.  This summer, for example, New York hedge-fund manager Paulson & Co. launched a fund that has aimed specifically at profiting on subprime defaults."  Mark Whitehouse, "As Home Owners Face Strains, Market Bets on Loan Defaults:  New Derivatives Link Fates of Investors and Borrowers in Vast 'Subprime' Sector," *The Wall Street Journal* (October 30, 2006) (Chepiga Decl. Ex. 2);

- March 1, 2007:  Paulson & Co. is "[a]mong those doing well" as a result of "aggressively shorting US sub-prime mortgage bonds."  ECF No. 341-4 (James Mackintosh, "Hedge funds – wavering, not drowning," *Financial Times* (March 1, 2007)) at 2;

- March 9, 2007:  "[T]he meltdown of the subprime mortgage market is producing a who's who of winners and losers among hedge funds" and that "[s]ome hedge funds have made a killing.  Paulson & Company . . . had such a strong belief that the subprime market would fall apart that it started two funds last summer concentrated solely on expecting such a collapse."  ECF No. 341-4 (Jenny

- Anderson, "Winners Amid Gloom and Doom," *The New York Times* (March 9, 2007)) at 3;

- March 12, 2007: "New York's Paulson & Co hit paydirt last month with a series of derivative trades that gave it short exposure to subprime mortgage asset-backed securities" and that "Paulson's event-driven funds . . . have 'focused exclusively on short opportunities, primarily in the subprime area,' while its credit strategy, launched last July, is geared 'to realize the maximum potential from the subprime collapse.'"  "Paulson Hits Big on Subprime Play," *Securitization News* (March 12, 2007) (quoting a Paulson & Co. letter to its investors) (Chepiga Decl. Ex. 3);

- March 14, 2007: "The biggest winner appears to have been John Paulson's New York-based Paulson & Co., which set up a special $100m fund to short subprime last July."  ECF No. 341-4 (James Mackintosh & Sarah Spikes, "Survivors of the subprime storm," *Financial Times* (March 14, 2007)) at 7;

- March 15, 2007: Paulson & Co.'s letter to investors, stating "We believe we are in the early stage of a correction in this market and that the market will eventually implode."  ECF No. 341-4 (Jenny Strasburg, "Subprime Defaults to Soar, Hurt Lenders, Funds Say," *Bloomberg* (March 15, 2007)) at 9; and

- May 28, 2007: Paulson & Co. belongs to a "group of specialist short funds set up last year purely to profit from the loose lending standards."  ECF No. 341-4 (Saskia Scholtes & James Mackintosh, "Taking a long view on shorting subprime loans," *Financial Times* (May 28, 2007)) at 12.

Government Officials:

- February 14, 2007:  Report on remarks of "[f]ormer Federal Reserve Chairman Alan Greenspan [] that the U.S. housing slowdown may be coming to an end," as well as testimony of Federal Reserve Chairman Ben Bernanke to the Senate Banking Committee and a Federal Reserve statement indicating that Bernanke and the Federal Reserve likewise believed that the housing market was stabilizing and would not affect the overall economy.  ECF No. 338-2 (Doug Alexander, "Greenspan Says Worst of U.S. Housing Slowdown Is Over," *Bloomberg* (February 14, 2007 5:16 p.m. EST)) at 2; and

- March 13, 2007:  Report of on remarks of U.S. Treasury Secretary Henry Paulson in which he states that he believes that the U.S. housing market had reached bottom.  ECF No. 338-2 ("Housing woes not affecting economy:  Paulson," *Reuters* (March 13, 2007)) at 4.

4

**ARGUMENT**

I. **THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS RELEVANT TO ISSUES OF MATERIALITY, CREDIBILITY AND STATE OF MIND**

  A. **Materiality**

    With respect to each of the SEC's claims against Mr. Tourre, it must prove that the information he allegedly misrepresented or omitted to provide was material. The SEC correctly states that "[m]ateriality . . . is determined based on the total mix of information that a reasonable CDO investor would consider important" (SEC Paulson Br. at 4 (citing *Basic*, 485 U.S. at 232)), but the fact that "[m]ateriality is an objective standard" (*id.*) does not help the SEC in its quest to exclude this highly material evidence. If the question is whether a "reasonable investor" would have been misled, then information available to a reasonable investor, whether or not viewed by the actual investor, is undeniably relevant to evaluating the "total mix of information." *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *32 (S.D.N.Y. Sept. 28, 2012) (quoting *Garber*, 347 F. App'x at 668) (The "total mix of information" includes "information already in the public domain, whether "known or reasonably available to" investors.). The SEC cites no cases in which failure of particular investor to have read an article was determinative of its admissibility in connection with the materiality determination, and such a standard would be particularly inappropriate in cases brought by the SEC because it trumpets the fact that it need not have identify anyone who actually relied on any piece of information to prevail. ECF No. 192 (SEC Mem. of Law in Support of Partial SJ) at 15.

    The SEC argues that "the defense has offered no evidence, expert or otherwise, that its stack of press clippings, replete with hearsay and speculation, is the type of information that a reasonable investor would consider in making CDO investment decisions in early 2007." SEC Paulson Br. at 4-5. The argument is absurd. CDOs were marketed and sold only to the

most sophisticated investors.  The idea that the materiality inquiry should proceed on the assumption that such investors would be ignorant of the contents of the financial press is ludicrous.  Of course, prior to the SEC filing these motions, Mr. Tourre has never had the occasion to set forth the bases on which it contends the newspaper articles shown to deponents were part of the total mix of information a reasonable CDO investor would consider.  In fact, the ACA witnesses, while claiming not to recall the specific articles at issue, did concede that following the mainstream and financial press to learn about the housing, mortgage and CDO markets was part of their regular routine.

Indeed, the  law expects investors to monitor the financial press and mainstream media for information relevant to their investments.  *See*, *e.g.*, *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 827 (S.D.N.Y. 2010), *adhered to on reconsideration*, 09 Civ. 1049(LAK), 2011 WL 4056743 (S.D.N.Y. Mar. 29, 2011) ("Once plaintiffs are put on 'inquiry notice'—that is, when the circumstances would suggest to an investor of ordinary intelligence the probability that a cause of action existed—they have a duty to inquire. The duty to inquire can be triggered by information contained in the financial press, mainstream media, and publicly filed documents."); *see also Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing.") (citation omitted).

These news reports about Paulson's short strategy and the more optimistic views of current and former government regulators were part of the total mix of information available to and relied upon by CDO investors in assessing the likely course of the U.S. housing and mortgage markets.  They demonstrate that market participants had competing theories about

6

those markets, which attracted sophisticated investors to wager on the direction and extent of the impact of subprime mortgages. Whether or not anyone at ACA actually read these particular articles is irrelevant to their inclusion in the total mix of information. The articles demonstrate a significant amount of coverage about Paulson's position in the market at precisely the time when ACA was working on the reference portfolio for the AC1 transaction and just weeks before ACA purchased $42 million in AC1 notes and then placed its approximately $900 million bet on the super-senior tranche.

The comments of regulators were also reported in the relevant time period. The account of Treasury Secretary Henry Paulson's remarks about his view that the housing market had "bottomed out" was published on March 13, 2007; similar views of former Fed Chairman Alan Greenspan and current Fed Chairman Ben Bernanke were reported the prior month. As with the Paulson reports, no individual at ACA (or IKB or ABN for that matter) need have actually read these particular articles for them to be relevant to showing the total mix of information available to a reasonable investor in the relevant time period. They demonstrate the diversity of views about whether (and to what extent) the housing and mortgage markets would continue deteriorating, views that drove certain market participants to take short positions and others to take long positions. The stature of those reported to be taking optimistic views is also relevant to determining whether the fact that a given market participant, particularly the far less-prominent contrarian Paulson & Co., was taking a short position would be material to a reasonable investor.

  B.  **Credibility**

The articles are also relevant to the credibility of the ACA witnesses. Each testified to regularly reading the financial and mainstream press in which the articles appeared, yet insists he or she never even set eyes on these widely disseminated reports.

7

Laura Schwartz testified that, among the newspapers she "generally read to follow the market" were *The New York Times* (her "preferred paper"), *The Wall Street Journal* (which she "often read") and *Financial Times* (which she read "sometimes"). Apr. 13, 2011 Laura Schwartz Dep. Tr. (Chepiga Decl. Ex. 4) 174:22-175:3. Schwartz also had a *Bloomberg* log-in. *Id.* 175:6-18. Alan Roseman testified that he "kept [him]self as aware as [he] could as to what was going on in the [RMBS] market," including by "reading trade periodicals and general publications," such as *The Wall Street Journal*, *Financial Times* and *The New York Times*, and periodically received *Bloomberg* articles from colleagues. Apr. 6, 2011 Alan Roseman Dep. Tr. (Chepiga Decl. Ex. 5) 111:11-112:25; 126:17-23. Keith Gorman testified that it "was part of [his] responsibilities on a daily basis" to "follow what was happening in developments in the market" in CDOs and RMBS, which he did by, *inter alia*, "reading market newspapers" and following the financial press, such as *The Wall Street Journal*, *The New York Times* and *Financial Times*. May 10, 2011 Keith Gorman Dep. Tr. (Chepiga Decl. Ex. 6) 28:9-29:17. Contrary to the SEC's contention that none of the ACA witnesses testified to reading the articles, in the excerpt of Gorman's testimony provided by the SEC, he says "even though *we saw this*" with respect to one of *The New York Times* articles in question. ECF No. 341-2 (Gorman Depo. Tr.) 196:23-25 (emphasis added).

In light of the widespread coverage of Paulson's views in the very publications Schwartz, Roseman and Gorman say they read regularly, including articles published in the weeks before ACA purchased the AC1 notes and wrote protection on the super-senior tranche, the jury should be permitted to decide for itself whether to credit the ACA witnesses' professions of ignorance about Paulson's position in the CDO space, and the companion claim that, had they known of Paulson's short position, they would not have entered into the AC1 transaction. The

8

jury will be particularly interested in the fact that these articles were available through online sources once they hear the tape on which ACA discusses Googling hedge funds they worked with.

### C. State of Mind

Neither Mr. Tourre nor any other person the SEC has accused (or may yet accuse) of intentionally or recklessly concealing information from ACA about Paulson's strategy could have expected to conceal from ACA information that could be discovered simply by reading major financial and mainstream media publications. To the contrary, Mr. Tourre will testify that he was aware of widespread reporting of Paulson's position and thus believed that ACA was likewise informed. Mr. Tourre cannot have acted with scienter to conceal information he believed to be public. *See White v. H&R Block, Inc.*, No. 02 Civ. 8965(MBM), 2004 WL 1698628, at *8-9 (S.D.N.Y. July 28, 2004) (Plaintiffs failed to plead scienter with respect to alleged failure to disclose publicly filed litigation where defendant "had no 'opportunity' to conceal" it and reasonably believed "the investing public would give these court filings and news articles the same attention as defendants' public statements, in which case the investing public would be well aware of the [] litigation."); *see also In re Geopharma, Inc. Secs. Litig.*, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) (Scienter could not be established based on motive and opportunity where "the alleged scheme could not possibly have succeeded" because information allegedly intended to be concealed was publicly available.). The articles the SEC seeks to prevent the jury from seeing are relevant to show the reasonableness of Mr. Tourre's belief that the information was publicly accessible.

II.  **THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS NOT HEARSAY**

The SEC's argument that reports about government regulators' remarks are hearsay is frivolous. Indeed, while claiming that the Paulson articles are "replete with hearsay and speculation" (SEC Paulson Br. at 5), it does not attempt to exclude those articles on the basis of hearsay. None of the news reports trigger hearsay concerns because they are not being offered to prove that what the senior government official said was true. FRE 801(c). Indeed, their prognostications, like the bets placed by ACA, IKB and ABN, turned out to be wrong. Rather, the articles are relevant and admissible for the fact they were published and therefore part of the "total mix" available to market participants in guiding their investment decisions.

III. **THE EVIDENCE AND ARGUMENT THAT THE SEC SEEKS TO PRECLUDE IS NOT UNFAIRLY PREJUDICIAL AND WILL NOT CAUSE CONFUSION**

In its chronic refrain that the jury will be "confused" by any relevant evidence that does not support the SEC's positions, the SEC conclusorily asserts that there will be prejudice and confusion if the jury is made aware of these news reports, but does not explain how or why the jury will be confused. To the contrary, what concerns the SEC is that the jury will *not* be confused and will see through the notion that ACA made a billion dollar bet because it believed Paulson was a long subprime investor.

## **CONCLUSION**

    For all the foregoing reasons, Fabrice Tourre respectfully requests that this Court deny the SEC's motion and permit him to introduce evidence about news coverage of Paulson's short position and regulators' statements about the U.S. housing and residential mortgage markets.

Dated: July 2, 2013
   New York, New York

                   Respectfully submitted,

                   /s/ Pamela Rogers Chepiga
                   Pamela Rogers Chepiga
                   (pamela.chepiga@allenovery.com)
                   Andrew Rhys Davies
                   (andrew.rhys.davies@allenovery.com)
                   Brandon D. O'Neil
                   (brandon.o'neil@allenovery.com)

                   ALLEN & OVERY LLP
                   1221 Avenue of the Americas
                   New York, New York  10020
                   (212) 610-6300


                   /s/ John P. Coffey
                   John P. Coffey
                   (seancoffey78@gmail.com)

                   LAW OFFICE OF JOHN P. COFFEY
                   1350 Avenue of the Americas, 2nd Floor
                   New York, New York  10019
                   (646) 790-8988

                   *Attorneys for Fabrice Tourre*