UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                          :
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                         Plaintiff,       :
                                          :  10 Civ. 3229 (KBF)
                  v.                      :
                                          :  ECF Case
FABRICE TOURRE,                           :
                                          :
                         Defendant.       :
_____:


### SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE <u>"SECURITY-BASED SWAP AGREEMENT" ISSUE</u>

Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9362 (facsimile)
martensm@sec.gov
Attorneys for Plaintiff

Dated:  New York, N.Y.
        July 11, 2013

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .......................................................................................................................2

    A.  The Amended Complaint ...........................................................................................2

    B.  Summary Judgment Motions ....................................................................................2

    C.  The Record Evidence ................................................................................................3

ARGUMENT ...........................................................................................................................4

I.      Whether An Instrument Is a "Security Or Security-Based Swap Agreement" Is
       a Question of Law For the Court ...................................................................................4

II.     The Statutory Definition of a "Security-Based Swap Agreement" ...................................5

III.    The Credit Default Swaps Between ACA LLC and ABN and Between ABN
       and GSI Each Satisfy the Statutory Definition of a "Security-Based Swap
       Agreement".................................................................................................................7

    A.  The Swap Agreements Were Between "Eligible Contract Participants.".....................7

    B.  The Credit Default Swap Agreements Here Were Each a "Swap
        Agreement" As Statutorily Defined..........................................................................7

    C.  The Swap Agreements Were Each "Security-Based" As Statutorily
        Defined.....................................................................................................................9

CONCLUSION........................................................................................................................11

# TABLE OF AUTHORITIES

## CASES

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
  738 F. Supp. 2d 450 (S.D.N.Y. 2010)................................................................3

*Feldman v. Sanders Legal Group*,
  No. 11 Civ. 0494(ER), 2012 WL 6625288 (S.D.N.Y. Dec. 19, 2012)..............5

*Fraglin v. Mezei*,
  No. 09 Civ. 10287(AJN), 2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) .........4

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009)..............................................................................5

*McNabb v. S.E.C.*,
  298 F.3d 1126 (9th Cir. 2002) ...........................................................................5

*S.E.C. v. Rorech*,
  720 F. Supp. 2d 367 (S.D.N.Y. 2010)..............................................................8, 9

*Stoiber v. S.E.C.*,
  161 F.3d 745 (D.C. Cir. 1998) ...........................................................................5

*T.Y. v. New York City Dept. of Educ.*,
  584 F.3d 412 (2d Cir. 2009)...............................................................................5

*United States v. Austin*,
  462 F.2d 724 (10th Cir. 1972) ...........................................................................5

*United States v. Leonard*,
  529 F.3d 83 (2d Cir. 2008)................................................................................5

## STATUTES AND REGULATIONS

Section 2A(b)(1) of the Securities Act of 1933, 15 U.S.C. § 77b-1(b)(1)..................................5, 6

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)......................................... *passim*

Section 3 of the Exchange Act of 1934, note, 15 U.S.C. § 78c ........................................1, 6, 8, 9

Section 3A(b)(1) of the Exchange Act of 1934, 15 U.S.C. § 78c-1(b)(1) ..................................5, 6

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ......................................... *passim*

Rule 10b-5, 17 C.F.R. § 240.10b-5 ...........................................................................2

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Pub. L. 111-203, H.R. 4173).............................................................................................................5

Section 1a of the Commodity Exchange Act, 7 U.S.C. § 1a (2007)..........................6, 7

Section 1(b) of the International Banking Act of 1978, 12 U.S.C. § 3101(7) ...............6

Plaintiff, the Securities and Exchange Commission ("SEC"), respectfully submits this memorandum of law in support of its motion for partial summary judgment on the issue of whether the credit default swaps between Goldman Sachs International ("GSI") and ABN AMRO Bank, N.V. ("ABN"), and between ABN and an affiliate of ACA Capital Holdings, Inc. known as ACA Credit Products – ABN AMRO LLC ("ACA LLC"), were "security-based swap agreements" for purposes of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 17(a) of the Securities Act of 1933 ("Securities Act").

## PRELIMINARY STATEMENT

The two credit default swap agreements at issue here – between ACA LLC and ABN and between ABN and GSI – are documented in swap confirmations that are designated as trial exhibits to which no objections have been raised.  The swap confirmations plainly spell out the parties to those agreements and their terms.  In order to qualify as a "security-based swap agreement" subject to Section 10(b) and Section 17(a), the swap agreements must, among other things, be agreements in which "a material term is based on the price, yield, value or volatility of any security or any group or index of securities, or any interest therein."  15 U.S.C. § 78c note.

Based on discussions with the defense, it is the SEC's understanding that the "material term" element is the only element of the statutory definition now contested.  Yet it is clear from the face of the swaps that this element is satisfied.  Under those swaps, the obligation of the swaps' protection sellers to make payments to the protection buyers arose on the occurrence of a "credit event," defined as a writedown in the underlying reference portfolio of residential mortgage-backed securities.  Accordingly, a material term of those agreements – namely, the obligation of the protection seller to make payment – was based on the value of the underlying reference portfolio of securities.  Indeed, Tourre has testified that, with respect to the protection buyer (*i.e.*, short party) in a collateralized debt obligation, "the value of the protection buyer's

economic position increases as the *value* of the reference portfolio declines." (Martens Decl., Ex. 11 (Dep. Tr. at 28:25-29:11) (emphasis added)). Because there is no genuine issue of material fact here for the jury to decide, this Court should hold as a matter of law that the swap agreements at issue were "security-based swap agreements" for purposes of Section 10(b) and Section 17(a).

## **BACKGROUND**

### **A. The Amended Complaint.**

The SEC's Amended Complaint alleges three claims against Tourre: (1) a primary violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); (2) a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) aiding and abetting GS&Co's violations of Section 10(b) and Rule 10b-5. Both the Section 17(a) and Section 10(b) claims allege fraud in connection with the offer and/or sale of "securities or security-based swap agreements." (Amend. Compl. ¶¶ 76, 80, 83).

Of particular relevance to this motion, the Amended Complaint alleges that Tourre committed his fraud scheme in the offer and sale to ACA of a credit default swap ("CDS") agreement that referenced the ABACUS 2007-AC1 ("AC1") portfolio of residential mortgage-based securities ("RMBS"). (*Id.* ¶¶ 67, 69). In addition, the Amended Complaint alleges that Tourre committed his fraud scheme in the offer to ABN of a CDS with GSI referencing the AC1 portfolio of RMBS. (*Id.* ¶ 69).

### **B. Summary Judgment Motions.**

On March 1, 2013, the defense filed a motion for partial summary judgment, in which it stated the following:

> A synthetic CDO such as ABACUS 2007-AC1 is an investment vehicle whose returns are ***linked to the performance of a pool of assets, such as subprime RMBS***. Such investments provide investors with differing viewpoints

the ability to express their investment theories, because, by definition, synthetic CDOs require both investors who believe the value of the CDO will go up, referred to as "long" investors or "protection sellers," and investors who believe the value of the CDO will go down, referred to as "short" investors or "protection buyers." . . . . [T]he CDO references a portfolio of securities, such as RMBS, referred to as a "reference portfolio," through the use of credit default ***swaps*** ("CDS"), which replicate the cash flows of the securities included in the reference portfolio.   Long investors receive periodic interest payments from the short investors so long as the reference portfolio assets perform, but ***in the event of losses or default the long investor must pay the short investor an amount commensurate with the losses incurred by the reference portfolio assets***.

(Tourre SJ Mem. (Dkt. No. 185), at 7-8 (emphasis added)).

### C. The Record Evidence.

As set forth in the parties' summary judgment papers, on or about May 31, 2007, ACA LLC entered into a CDS agreement with ABN referencing the super senior (50-100%) tranche of the AC1 reference portfolio of RMBS.  (Martens Decl., Exs. 1, 2, 3 and 13; Tourre's Rule 56.1 Opp. Stmt. (Dkt. No. 228), at ¶45; Joint Pretrial Order at 5 (stipulations of fact)).[1]  This Court has ruled that ACA LLC incurred irrevocable liability in the United States with regard to this swap transaction.  (Dkt. No. 302).  ACA LLC was a limited liability company incorporated in Delaware for purposes of executing this transaction.  (Martens Decl., Ex. 4 (Dahlman Decl. ¶ 2)). ABN was a bank incorporated under the laws of the Netherlands.  (Joint Pretrial Order at 5 (stipulations of fact)).  On or about that same date as the swap agreement was entered, another ACA affiliate known as ACA Financial Guaranty Corporation ("ACA FG") issued an insurance policy on the swap agreement.  (Martens Decl., Ex. 5)  ACA FG was a stock insurance company regulated by the state of Maryland.  (*Id.*; *see also* Joint Pretrial Order at 5 (stipulations of fact)).

Also on or about May 31, 2007, a swap agreement was entered between GSI and ABN. (Martens Decl, Exs. 6, 7, and 13; Tourre's Rule 56.1 Opp. Stmt. (Dkt. No. 228), at ¶44; Tourre

---

[1]    *See CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 455 (S.D.N.Y. 2010) (discussing the various documents that make up a CDS).

Rule 56.1 Stmt. (Dkt. No. 187), at ¶134; Joint Pretrial Order at 4 (stipulations of fact)).  GSI was a UK broker-dealer regulated by the UK's Financial Services Authority ("FSA").  (Joint Pretrial Order at 2 (stipulations of fact); Tourre Rule 56.1 Stmt. (Dkt. No. 187), at ¶128).

Tourre testified that he "was part of the team that negotiated that swap." (Martens Decl., Ex. 8 (Dep. Tr. at 321:4-13)).   In addition, David Gerst testified that he was involved in "negotiating credit default swap confirmations" for the AC1 transaction.  (Martens Decl., Ex. 9 (Dep. Tr. at 47:1-9, 259:114-260:10); Ex. 10 (Inv. Tr. at 55:1-2, 58:21-59:9, 75:15-23)).  Tourre further testified that, with respect to the protection buyer (*i.e.*, short party) in a collateralized debt obligation, "the value of the protection buyer's economic position increases as the ***value*** of the reference portfolio declines."  (Martens Decl., Ex. 11 (Dep. Tr. at 28:25-29:11) (emphasis added)).  The flipbook for the AC1 transaction stated that the credit events applicable to the reference portfolio included "loss . . . of principal."  (Martens Decl., Ex. 12, at 18).

## ARGUMENT

Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act prohibit fraud in the offer or sale of any "securities or any security-based swap agreement."  The indisputable record evidence establishes that the swap agreements between ACA LLC and ABN and between ABN and GSI were each a "security-based swap agreement," as that term is statutorily defined. The question of whether those swap agreements were "security-based swap agreements" is a question of law to be decided by the Court.  Accordingly, the SEC respectfully submits that the Court should grant summary judgment to the SEC on this question and thereby narrow the issues to be resolved by the jury in this already complex case.

## I.   Whether An Instrument Is a "Security Or Security-Based Swap Agreement" Is a Question of Law For the Court.

In a civil case, "[t]he question of whether an instrument is a security is a question of law for the court." *Fraglin v. Mezei*, No. 09 Civ. 10287(AJN), 2012 WL 3613813, at *8 n.3 (S.D.N.Y. Aug. 22, 2012); *see also McNabb v. S.E.C.*, 298 F.3d 1126, 1130 (9th Cir. 2002) ("Whether a note is a security under the 1934 Act is a question of law"); *Stoiber v. S.E.C.*, 161 F.3d 745, 749 (D.C. Cir. 1998) (same); *United States v. Austin*, 462 F.2d 724, 736-37 (10th Cir. 1972) (same).[2]   These holdings are consistent with the proposition, well-established in this circuit, that contract interpretation is a question of law for the court. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("If the contract is unambiguous, its meaning is likewise a question of law for the court to decide.").   Accordingly, the question of whether the CDS contracts between ACA LLC and ABN and between ABN and GSI are each a "security or security-based swap agreement" for purposes of the SEC's claims under Section 17(a) and Section 10(b) should be resolved by this Court on the papers as a matter of law.[3]

---

[2]      In a criminal case, the question of whether an instrument is a "security" may be a question for the jury.  *See United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (assuming without deciding that the question whether an instrument was a "security" was a question for the jury in a criminal case).

[3]      In opposing the SEC's motion of partial summary judgment, the defense stated, in response to the SEC's Rule 56.1 statement, that the SEC's assertion that the swaps at issue here were security-based was "a legal argument and is not a statement of fact."  (Dkt. No. 228, at ¶49).  If the defense was correct in making that assertion, then, as the SEC contends, the question of whether the swaps at issue were "security-based swap agreements" should be resolved by the Court as a matter of law on summary judgment.  If, on the other hand, the question of whether the swaps were security-based is a factual question, then the defense is deemed to have admitted as much because Mr. Tourre's response to the SEC's Rule 56.1 statement contained no citations to record evidence (*see id.*) thereby raising a genuine issue of material fact on that issue.  *See T.Y. v. New York City Dept. of Educ.*, 584 F.3d 412, 417-18 (2d Cir. 2009) (uncontested assertions in Rule 56.1 statement are deemed admitted); *Feldman v. Sanders Legal Group*, No. 11 Civ. 0494(ER), 2012 WL 6625288, at *1, n.2 (S.D.N.Y. Dec. 19, 2012) (statements that are not disputed with citations to record evidence are deemed admitted).

## II.    The Statutory Definition of a "Security-Based Swap Agreement."

As noted above, Section 17(a) and Section 10(b) prohibit fraud in the offer or sale of "any securities or any security-based swap agreement."  15 U.S.C. §§ 77q(a), 78j(b) (2007).[4] The Securities Act and the Exchange Act both broadly define the term "security," but exempt from that definition a "security-based swap agreement."  *Id.* §§ 77b-1(b)(1), 78c-1(b)(1).

For purposes of both the Securities Act and the Exchange Act, a "security-based swap agreement" is defined by reference to Section 206B of the Gramm-Leach-Bliley Act.  15 U.S.C. §§ 77b-1(b)(1), 78c-1(b)(1).  Section 206B of the Gramm-Leach-Bliley Act in turn defines a "security-based swap agreement" as "a swap agreement (as defined in Section 206A) of which a material term is based on the price, yield, value or volatility of any security or any group or index of securities, or any interest therein."  15 U.S.C. § 78c note.  Section 206A of the Gramm-Leach-Bliley Act defines a "swap agreement" as "any agreement, contract, or transaction between eligible contract participants (as defined in . . . the Commodity Exchange Act . . . ), . . . the material terms of which . . . are subject to individual negotiation, and that . . . provides for any . . . payment . . . that is dependent on the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence . . . ."  *Id.*

The Commodity Exchange Act defines an "eligible contract participant" as, among other things, a "financial institution," "an insurance company that is regulated by a State," or an entity the obligations of which are guaranteed or otherwise supported by an agreement by a financial institution or state-regulated insurance company.  7 U.S.C. § 1a(12) (2007).  A "financial institution" is defined by the Commodity Exchange Act as, among other things, "a foreign bank

---

[4]     Citations throughout are to the versions of the Securities Act and Exchange Act in effect in 2007 when the events in question occurred.  Certain amendments were made to the relevant provisions in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Pub. L. 111-203, H.R. 4173).

or a branch of or agency of a foreign bank (each as defined in section 3101 of Title 12 [International Banking Act of 1978]).” 7 U.S.C. § 1a(15) (2007).  The International Banking Act of 1978 defines a “foreign bank” as, among other things, “any company organized under the laws of a foreign country . . . which engages in the business of banking.”  12 U.S.C. § 3101(7).

## III.   The Credit Default Swaps Between ACA LLC and ABN and Between ABN and GSI Each Satisfy the Statutory Definition of a “Security-Based Swap Agreement.”

The undisputed documentary evidence establishes that the two CDS at issue here were each a “security-based swap agreement” as defined in both the Securities Act and the Exchange Act, and are thus subject to Section 17(a) and Section 10(b).  Those swaps both meet all of the elements of the statutory definition of a “security-based swap agreement” set forth above.

### A.   The Swap Agreements Were Between “Eligible Contract Participants.”

As noted above, in order to be a covered “security-based swap agreement,” the swap agreement at issue must be between “eligible contract participants,” as that term is statutorily defined.  The three parties to the two swap agreements at issue here were all “eligible contract participants.”  “Eligible contract participants” include foreign banks, foreign regulated broker-dealers, and entities the obligations of which are insured by a state-regulated insurance company.  7 U.S.C. § 1a(12), (15) (2007).  The parties have stipulated that ABN was a foreign bank.  (Joint Pretrial Order at 5).  Similarly, the parties have stipulated that GSI was a UK broker-dealer (*id.* at 2), and the defense previously admitted that GSI was regulated by the UK's FSA (Tourre Rule 56.1 Stmt. (Dkt. No. 187), at ¶128).  Finally, the record evidence shows that the CDS obligation of ACA LLC was guaranteed by ACA FG (Martens Decl., Ex. 5), which the parties have

stipulated was a state-regulated insurance company (Joint Pretrial Order at 5).  Accordingly, each

of the swap parties was an "eligible contract participant."[5]

### B. The Credit Default Swap Agreements Here Were Each a "Swap Agreement" As Statutorily Defined.

As their name suggests, the credit default *swaps* between ACA LLC and ABN and

between ABN and GSI were each a "swap agreement" as defined in Section 206A of the

Gramm-Leach-Bliley Act.   That provision defines a "swap agreement" as "any agreement,

contract, or transaction . . . the material terms of which . . . are subject to individual negotiation,

and that . . . provides for any . . . payment . . . that is dependent on the occurrence, non-

occurrence, or the extent of the occurrence of an event or contingency associated with a potential

financial, economic, or commercial consequence . . . ."  15 U.S.C. § 78c note.

The credit default swaps here are obviously "agreements" or "contracts."   The swap

documentation here makes clear that the "material terms" of those CDS were "subject to

individual negotiation."   The "material terms" of a CDS are things such as "subject matter, price,

payment terms, quantity, timing, compensation, and duration."  *S.E.C. v. Rorech*, 720 F. Supp.

2d 367, 408 (S.D.N.Y. 2010).   The swap confirmations for each of the transactions sets forth the

unique reference portfolio, the credit events giving rise to payment, the call period, the

compensation, and the contract term.   (*See generally* Martens Decl., Exs. 3, 7).   Tourre testified

that he "was part of the team that negotiated that swap" between GSI and ABN.   (Martens Decl.,

Ex. 8 (Dep. Tr. at 321:4-13)).   David Gerst also testified that he was involved in "negotiating

credit default swap confirmations" for the AC1 transaction.   (Martens Decl., Ex. 9 (Dep. Tr. at

47:1-9, 259:114-260:10); Ex. 10 (Inv. Tr. at 55:1-2, 58:21-59:9, 75:15-23)).

---

[5]        Based on discussions with defense counsel, it is the SEC's understanding that Mr. Tourre does not now contest that the parties to these swaps were "eligible contract participants."

Furthermore, the CDS here provide, by their terms, for payment that is "dependent on the occurrence . . . of an event . . . associated with a potential financial, economic, or commercial consequence."   The swap agreements provide for payment by the protection seller that is dependent on the occurrence of "credit events" – namely the failure to pay principal or a writedown with respect to one or more of the reference obligations – that are financial, economic or commercial consequences.   (Martens Decl., Ex. 13, at 25 (providing that the parties shall make payment "[u]pon the occurrence of a Credit Event"); Martens Decl., Ex. 3, at 11 (defining the "Credit Events" for purposes of the swap transaction); Ex. 7, at 11 (same)).

### C.   The Swap Agreements Were Each "Security-Based" As Statutorily Defined.

Finally, the CDS at issue here were each "security-based" swap agreements.   Under Section 206B of the Gramm-Leach-Bliley Act, a swap agreement is "security-based" if "*a*" material term of the swap agreement is "based on the price, yield, value or volatility of any security or any group . . . of securities."  15 U.S.C. § 78c note.   The trade confirmations for the CDSs here attach a list of the reference obligations consisting of RBMS (Martens Decl., Ex. 3, at 25-28; Ex. 7, at 26-29), which, as their name suggests, are "securities."   The swap agreements incorporate the ISDA Definitions by reference, and thus provide for the protection seller to make payment to the protection buyer upon the occurrence of a "credit event."   (Martens Decl., Ex. 13, at 25 (providing that the parties shall make payment "[u]pon the occurrence of a Credit Event")). Certainly, the circumstances under which the protection seller in a swap agreement must make payment is "a material term" of the CDS.   *See Rorech*, 720 F. Supp. 2d at 408 (defining a "material term" of a CDS).   The "credit events" that trigger the protection sellers' payment obligations under these particular CDS are "writedowns" in the value of the underlying portfolio of RMBS.   (Martens Decl., Ex. 3, at 11 (defining the "Credit Events" for purposes of the swap

transaction); Ex. 7, at 11 (same)).  "Writedowns" are defined in the trade confirmations as a "reduction in the Outstanding Principal Amount of such Reference Obligation" or a "reduction . . . of the current interest payable on such Reference Obligation."  (Martens Decl., Ex. 3, at 12 (defining "writedown"); Ex. 7, at 11 (same)).

Writedowns, defined as the reduction in either the principal or interest of the reference obligations (*i.e.*, RMBS), certainly amount to a change in the "value" of those reference obligations.  Indeed, Tourre testified that, with respect to the protection buyer (*i.e.*, short party) in a collateralized debt obligation, "the value of the protection buyer's economic position increases as the ***value*** of the reference portfolio declines."  (Martens Decl., Ex. 11 (Dep. Tr. at 28:25-29:11) (emphasis added)).  Further, as quoted above, the defense expressly stated in its summary judgment brief that, under the CDS here, "in the event of losses or default the long investor must pay the short investor an amount commensurate with the ***losses incurred by the reference portfolio assets***."  (Tourre SJ Mem. (Dkt. No. 185), at 7-8 (emphasis added)).  It is hard to imagine how a payment obligation on the part of the long party that is, in the words of the defense, based on "the losses incurred by the reference portfolio assets" is not based on the "value" of that portfolio of assets.

*     *     *

In short, every element of the statutory definition of a "security-based swap agreement" is present on the face of the CDS documentation at issue in this case.  The interpretation of these contractual documents is an issue of law for the court to decide.  There is no material factual issue for the jury to resolve.

10

## <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court grant summary judgment in the SEC's favor on the question of whether the CDS between ACA LLC and ABN and between ABN and GSI are "security-based swap agreements" for purposes of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.

Dated:  New York, N.Y.
         July 11, 2013

Respectfully submitted,

/s/ *Matthew T. Martens*
Matthew T. Martens
Richard E. Simpson
Christian D. H. Schultz
Bridget Fitzpatrick
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481 (Martens)
(202) 772-9292 (fax)
martensm@sec.gov

11

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 11, 2013, I directed the foregoing SEC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE "SECURITY-BASED SWAP AGREEMENT" ISSUE to be electronically filed using the CM/ECF system, which will send notification of such filing to the following email addresses:

Pamelachepiga@allenovery.com
Pamela Rogers Chepiga
Allen & Overy LLP
1221 Avenue of the Americas
New York, New York 10020

seancoffey78@gmail.com
John Patrick Coffey
Law Office of John P. Coffey
1350 Avenue of the Americas, 2d Floor
New York, New York 10019

Attorneys for defendant Fabrice Tourre

/s/ *Matthew T. Martens*
Matthew T. Martens

12