**ALLEN & OVERY**

**BY HAND DELIVERY**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

RECEIVED
JUL 1 1 2013
KATHERINE B. FORREST
U.S. DISTRICT JUDGE
S.D.N.Y.

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

Tel       212 610 6300
Fax       212 610 6399
Direct line   212 756 1125
pamela.chepiga@allenovery.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 1 2 2013

July 11, 2013

Re:   **SEC v. Fabrice Tourre, Case No. 10-cv-3229 (KBF)**

Dear Judge Forrest:

Together with the Law Offices of John P. Coffey, we represent Defendant Fabrice Tourre in the above-referenced litigation. We write pursuant to Your Honor's direction at the pretrial conference held July 9, 2013 that the parties identify exhibits that they intend to use in their opening statement as to which objections have been raised and to demonstrate that, following Your Honor's rulings in the course of that conference, no basis of objection remains with respect to certain of the exhibits. We have separately provided the Court a list of exhibits we intend to use as to which the SEC's objections have not been resolved.

Among the exhibits we intend to use during the course of our opening statement are DX1801, DX1802 and DX1808, which are newspaper articles that were among the subjects of the SEC's motion in limine to exclude news reports. At the July 9, 2013 conference, Your Honor overruled the SEC's objections on the basis of relevance and hearsay, but directed that Mr. Tourre establish a foundation for the admission of news reports by showing that participants in the ABACUS 2007-AC1 ("AC1") transaction viewed the articles.

While we believe that the articles are self-authenticating under Federal Rule of Evidence 902(6) and were part of the total mix of information available to investors, we attach herewith documents produced in the course of discovery demonstrating that participants in the AC1 transaction, including those who will testify at trial, received these articles by email on the date of their publication. Specifically, employees of Paulson & Co. received the articles marked as DX1801 and DX1802 by email on the dates of publication. See SEC-08821687 (attached as Exhibit 1 hereto) (*New York Times* article marked as DX1801); SEC-08976581 (attached as Exhibit 2 hereto) (*Financial Times* article marked as DX1802).[1] An email produced by Goldman, Sachs & Co. shows that the *Wall Street Journal* article marked as DX1808 was emailed on the date of its publication to mailing lists for the CMBS, ABS and Mortgage Correlation desks. SEC-06186662 (attached as Exhibit 3 hereto). Mr. Tourre, Jonathan Egol and David Gerst, among other Goldman employees who will be witnesses at trial, were

---

[1] The date and time of publication given on the email version of the article is approximately five hours later than the version printed from the *Financial Times* website that is marked as DX1802. The text of the articles is identical, and we believe that the time discrepancy results from the use of domestic versus international versions of the paper.

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Dusseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

members of the Mortgage Correlation Desk mailing list. Unless Your Honor directs otherwise, we do not intend to offer the emails enclosed herewith as exhibits at trial.

Should we seek to offer at trial the other news articles that were the subject of the SEC's motion in limine, we will adduce a foundation through witness testimony.

Respectfully submitted,

*Pamela Rogers Chepiga*

Pamela Rogers Chepiga

Encl.

Copy via email:   John P. Coffey

Matthew Martens, SEC
Richard Simpson, SEC
Christian Schultz, SEC
Bridget Fitzpatrick, SEC

---

**ORDERED**

Post on Docket       7/11/13

K. B. Forrest

Katherine B. Forrest, USDJ

# Exhibit 1

essentially insurance against a default, so he would make money when subprime started to deteriorate.

Mr. Burry ultimately entered into eight credit derivative agreements that effectively shorted the riskiest parts of subprime mortgage pools issued in 2005. That investment, which looks smart today, hurt the performance of the overall fund as the subprime market continued to hum.

Through the first nine months of last year, Scion Value Fund and the Scion Qualified Value Fund were down 16.4 percent, with a big chunk of that loss coming from credit derivative positions, some tied to mortgages and others related to corporate bonds, according to a letter to investors. The fund ended the year down about 17 percent, most of which was attributed to the credit derivative positions.

Yet at the end of the third quarter, Mr. Burry still had faith in his trade.

"Never before have I been so optimistic about the portfolio for a reason that has nothing to do with stocks" he wrote in his third-quarter letter to investors, referring to the credit derivative positions. The letter was confident ? bordering on cocky ?suggesting that others players jumping into the market would pay for being late to the game.

"But man oh man are they the overconfident big boys diving head first into the shallow end of the pool," he wrote. "Despite our mark to market losses, we're short the mortgage portfolio everyone would want if they knew what they were doing."

But investors were wary. Rumors abounded that two significant investors wanted to pull their money because of the poor performance ? departures like that, if true, might have sparked a run. Scion, it seemed, might be dead before it had the chance to be right. Dan Nero, chief financial officer and chief operating officer of Scion, declined to comment on investors' perceptions.

Then Scion made a radical decision: It put the poorly performing credit derivative positions in a side pocket, essentially separating them from the main fund whose performance they were hurting.

Investors were required to enter into the side pocket, which locks up investor money until Scion decides to unwind it. Scion would not receive performance fees on the side pocket until it was liquidated.

Some investors were furious, said one investor because they were locked into a poorly performing fund that they hoped to exit. In essence, Scion erected a steel gate as investors were trying to get out the door.

"We thought it was in the best interest of shareholder because of the illiquidity of the market," Mr. Nero said.

Then something funny happened: The subprime market imploded, and Scion's investment looked a whole lot better.

The market entered a tailspin. Investment banks that had been financing mortgage originators put back loans that were in early default or violated the bank's credit quality terms. Almost two dozen subprime originators declared bankruptcy.

When Mr. Burry first bet against the subprime market, few saw the carnage coming, and as a result the cost to insure subprime mortgage bonds did not reflect significant risk. According to research provider Markit, the cost to insure $10,000 worth of low-rated parts of subprime mortgage-backed securities in early August was only about $217.

But by the end of February, the cost to insure those subprime mortgage-backed

FOIA Confidential Treatment Requested by Paulson & Co.

PAULSON-ABACUS 0040090
SEC-08821688

# Exhibit 2

Lahde Capital Management returned 83.5 per cent in the first two months of this year by shorting the lowest-rated mortgage bonds in a special $5m fund for housing market bears.

"It will be another 12 to 18 months before we've squeezed everything out of this that we can," he said yesterday.

The big losers are likely to be clear long before that.

Investors in the sector say they expect the losses to appear over the next month or two, with some hedge funds joining long-only investors such as insurance companies and investment banks in the red.

"Undoubtably there will be some bodies floating to the surface," said one big hedge fund manager.

Hedge funds specialising in the sector expressed surprise that Goldman Sachs and Lehman did not report big losses on subprime when they reported results this week.

But several said they expected banks that had been structuring collateralised debt obligations (CDOs) based on subprime mortgages to be holding worthless equity in the CDOs - the so-called "toxic waste".

The losses on this may take time to materialise. Lehman, the second-biggest underwriter of mortgage-backed bonds, yesterdaysaid the risks were "well contained".

Losses on the bonds, or related securities, could be spread widely among investors, with Asian and US institutional investors said to be heavy buyers of mortgage-backed CDOs.

The problems at Caliber, which had half its $250m portfolio in US residential mortgage bonds, were shared by Cambridge Place, a London and Boston hedge fund which has told its investors it was down about 5 per cent in February.

It has not yet published final figures for its February performance.

Caliber reported yesterday that its net asset value fell to $6.80-$7.20 per share at the end of February, from $8.77 at the end of January.

Its shares plummeted just over 15 per cent to $6.45, down more than 40 per cent since last April.

Queen's Walk, a listed fund run by London hedge fund Cheyne Capital, which invests in the riskiest equity portions of mortgage CDOs, saw its shares hammered 11 per cent yesterday to EUR7.22.

But the fund has tried to reassure investors, saying it has only 12 per cent of its portfolio in the US and nothing from the US after January last year.

It has decided to buy back its own shares in an attempt to restore confidence.

Other hedge funds that have done badly include the $4bn Greenlight Capital, a US activist fund which held about 6 per cent of New Century Financial, the troubled mortgage lender whose shares were suspended by the New York Stock Exchange this week.

Greenlight - whose president, David Einhorn, successfully fought to get on to the New Century board last year but quit last week - saw its main fund drop 3.4 per cent in February, according to investors, before New Century revealed financing problems.

FOIA Confidential Treatment Requested by Paulson & Co.

PAULSON-ABACUS 0194984
SEC-08976582

# Exhibit 3

lending to people with shakier credit, while new insurance-like derivatives have helped them mitigate that risk. And robust demand from investors -- both in the U.S. and abroad -- has given banks a big incentive to lend, because they can easily turn around and resell the loans in the form of bonds, reaping a tidy profit.

As a result, both the volume and variety of subprime loans have boomed. Since the beginning of 2002, banks and specialized lenders such as ACC Capital Holdings Corp.'s Ameriquest Mortgage Co., New Century Financial Corp., and H&R Block Inc.'s Option One Mortgage Corp. have made some $2.2 trillion in loans. That is more than five times the amount in the preceding five-year period, and includes a growing share of "affordability" products such as "piggyback," "interest-only" and "no-doc" loans. These products, respectively, allow borrowers to avoid a down payment, make extra-low payments in a loan's early years, and state their income without supporting documentation. Subprime loans' actual interest rates are typically much higher than those on more traditional "prime" loans.

Big Role

Foreign investors have played a big role in making money available. Analyst Mike Youngblood at investment bank Friedman, Billings, Ramsey & Co. estimates foreigners snapped up about a third of the $2 trillion in subprime-backed bonds issued since the beginning of 2002, often through investment vehicles known as collateralized debt obligations, or CDOs. These divvy up pools of bonds into slices with different levels of risk and return.

Whatever the drivers, the subprime market's growth has brought significant political benefits by boosting the home-ownership rate -- an achievement that the administrations of President Bush and President Clinton have been quick to claim as their own. A recent study by two researchers at the Federal Reserve Bank of Chicago, Jonas Fisher and Saad Quayyum, suggests that subprime lending alone could account for close to half of the four-percentage-point rise in the ownership rate since 1995, almost as much as demographic changes, low interest rates and government programs combined. What's more, they surmise that the change could be long-lasting, because the technological innovations that enabled subprime lending are here to stay.

"It's quite remarkable," says Mr. Quayyum of subprime's contribution to homeownership. "This could be a permanent boost."

That means the market for derivatives on subprime debt could be here to stay, too, along with all the other infrastructure that allows investors to parcel and trade the risk of lending to U.S. home buyers. Some believe this will make the economy more resilient to the current housing downturn by keeping the credit lines open. "You have given people better tools to manage the risks, and this gives you hope that the pendulum's not going to swing as far back as it has in the past," says Martin Mühleisen, an economist at the International Monetary Fund who has studied the mortgage market. "But this new financial world has yet to be tested."

Back in 2002, Mr. Spirou entered the new world of mortgage finance in more ways than one: He launched a career as a self-described "kick-ass mortgage broker," and he set his sights on a two-story Colonial-style house right next to his parents' place in Queens, a middle-class borough of New York.

At the age of 23, with only a few years of credit history, he might have had a hard time getting a traditional home loan. But he found an eager lender in Option One, which lent him $266,000 toward the $300,000 purchase price. The loan required an initial monthly payment of $2,200, which after two years would start floating with short-term interest rates. Option One says it has guidelines in place to make sure its borrowers are able to pay.

At the time, Mr. Spirou could easily afford the loan. He had seen his monthly income jump to more than $10,000 in the midst of the housing boom. Still, he says, he lived beyond his means, taking friends out to dinner at Ruth's Chris Steak House and buying new clothes for the brokers who worked under him. He also took on loans to buy two new cars -- a Pontiac Grand Prix for himself and a Pontiac Grand Am for his mother.

"I was young, naive," he says. "I had to look like a big shot."

In late 2003, with some $64,000 in auto and credit-card debts, Mr. Spirou again tapped the subprime market. The rising value of his house allowed him to take out a $360,000 loan from Long Beach Mortgage, a unit of Washington Mutual Inc., despite the fact that his growing debts had dinged his credit rating. After paying off the old loan and some $12,000 in credit-card bills, Mr. Spirou says, the new loan left him with about $65,000 in the bank. "I started using the ATM card like it was going out of style," he says.

A Washington Mutual spokesman declined to comment.

2

Confidential Treatment Requested by Goldman Sachs

GS MBS-E-009574341
SEC-06186663

That worry is reflected in the derivatives market. The annual cost of $1 million in insurance against moderately risky subprime-backed bonds has gone from a low of about $21,500 in early August to $25,000 Friday, and has spiked as high as $27,800. Market participants say big hedge funds increasingly are using the derivatives to make outright bets against U.S. homeowners. This summer, for example, New York hedge-fund manager Paulson & Co. launched a fund that has aimed specifically at profiting on subprime defaults.

"People are more nervous," says Greg Miller, a portfolio manager at Saye Capital, a Los Angeles-based hedge fund active in the subprime market. "It could get ugly. If there is a significant pickup in defaults there are going to be a lot of bad bonds out there, and CDOs could be in trouble."

Mr. Spirou's situation offers a glimpse into the difficulties many homeowners face. As the housing boom has faded, his income from the mortgage brokerage business has fallen to about $6,000 a month. As a result, he's gone into arrears on his own mortgage. To catch up, he must now make payments of about $3,200 a month, up from $2,600 when he took out the loan. His other payments on credit cards and auto loans add up to about $2,500. Meanwhile, he says, the interest rate on his loan is scheduled to reset in December.

"It's going to be a fight," he says. "I'm just waiting to see how these next couple months of business are going to be -- if I can get myself back on my feet." He says he's been considering selling his house, but so far hasn't found a buyer willing to pay the right price. He's also looking into ways to get another loan.

Write to Mark Whitehouse at mark.whitehouse@wsj.com

Goldman, Sachs & Co.
85 Broad Street | New York, NY 10004
Tel: 212-902-2927 | Fax: 212-902-1691 | Mob: 917-558-3500
e-mail: benjamin.solomon@gs.com

Goldman
Sachs

**Benjamin Solomon**
Fixed Income, Currency & Commodities

Disclaimer:

This material has been prepared specifically for you by the Goldman Sachs Fixed Income Commercial Mortgage Backed Securities (CMBS) Trading Desk and is not the product of Fixed Income Research. We are not soliciting any action based upon this material. Opinions expressed are our present opinions only. The material is based upon public information which we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such. Additionally, the material is based on certain factors and assumptions as the CMBS Trading Desk may in its absolute discretion have considered appropriate. There can be no assurance that these factors and assumptions are accurate or complete, that estimated returns or projections can be realized, or that actual returns or results will not be materially different than those presented. Certain transactions, including those involving CMBS, may give rise to substantial risk and are not suitable for all investors. The CMBS Trading Desk may have accumulated long or short positions in, and buy or sell, the securities that are the basis of this analysis. The CMBS Trading Desk does not undertake any obligation to update this material.

4

Confidential Treatment Requested by Goldman Sachs

GS MBS-E-009574343
SEC-06186665