UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    x
                                                 :
SECURITIES AND EXCHANGE COMMISSION,              :
                                                 :      Civil Action
                      Plaintiff,                 :      No.: 10-cv-3229 (KBF)
                                                 :
            v.                                    :      ELECTRONICALLY FILED
                                                 :
FABRICE TOURRE,                                  :
                                                 :
                      Defendant.                 :
                                                 :
                                                 :
                                                 x

# MEMORANDUM OF LAW OF FABRICE TOURRE IN SUPPORT OF
## HIS MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL

Pamela Rogers Chepiga
Andrew Rhys Davies
Laura R. Hall
Brandon D. O'Neil
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

John P. Coffey
LAW OFFICE OF JOHN P. COFFEY
1350 Avenue of the Americas, 2nd Floor
New York, New York  10019
(646) 790-8988

*Attorneys for Fabrice Tourre*

Dated:   September 30, 2013
         New York, New York

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ................................................................... 1

STANDARD OF LAW................................................................................. 3

ARGUMENT ............................................................................................... 4

I.  MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR
A NEW TRIAL ON THE SECTION 17(a)(2) CLAIM BECAUSE THERE IS NO
EVIDENCE FROM WHICH THE JURY COULD HAVE FOUND THE
ELEMENTS OF THE CLAIM ............................................................... 4

A.  There Is No Evidence That Mr. Tourre Obtained Any Money Or Property By
Means Of The Alleged Fraud ............................................................... 4

B.  The SEC Failed to Prove Other Elements of the Rule 17(a)(2) Cause of Action............... 9

II.  MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR
A NEW TRIAL ON THE CLAIMS UNDER SECTION 17(a)(1) AND RULE
10b-5(a) AND (c) BECAUSE THERE IS NO EVIDENCE FROM WHICH THE
JURY COULD HAVE FOUND THE ELEMENTS OF THE ALLEGED
SCHEME TO MAKE MISSTATEMENTS TO ACA ....................................... 10

A.  The Jury Rejected Each of the Purported Misstatements Alleged to Have Been
Made to ACA by Mr. Tourre, Including the Two Misstatements That Formed the
Basis for the SEC's "Scheme" Theory in Counts 1, 4 and 6 ............................... 10

B.  In the Absence of Mr. Tourre's Alleged Misstatements, There is No Evidence that
Mr. Tourre Engaged in or Employed a Scheme to Defraud ACA.................................... 13

III.  MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR
A NEW TRIAL ON THE SECTION 17(a)(3) CLAIM BECAUSE THERE IS NO
EVIDENCE OF KEY ELEMENTS OF THE CLAIM.................................... 15

IV.  MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR
A NEW TRIAL ON THE SECTION 20(e) AIDING AND ABETTING CLAIM
BECAUSE THERE IS NO EVIDENCE OF A PRIMARY VIOLATION BY
ANYONE WHOSE SCIENTER AND ACTIONS COULD BE ATTRIBUTED
TO GOLDMAN.............................................................................. 15

V.      MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR
        A NEW TRIAL ON EACH SECTION 17(a) CLAIM  BECAUSE THE SEC
        FAILED TO PROVE THE EXISTENCE OF A DOMESTIC OFFER ...........................17

A.      There Was No Evidence of a Domestic Offer to Loreley or IKB ....................................18

B.      There Was No Evidence of a Domestic Offer to ABN...................................................18

C.      There Was No Evidence of Other Domestic Offers of Securities ....................................18

VI.     MR. TOURRE IS ENTITLED TO A NEW TRIAL BECAUSE THE EVIDENCE
        CONFIRMED THAT SUMMARY JUDGMENT ON THE QUESTION OF
        WHETHER THE ACA/ABN AND ABN/GSI SWAPS WERE SECURITY-
        BASED SWAPS WAS ERRONEOUS ............................................................................20

A.      The Court Applied an Incorrect Legal Standard in Resolving the Motion for
        Partial Summary Judgment ...................................................................................................22

B.      The Evidence Submitted in Connection with the Motion for Partial Summary
        Judgment and Adduced at Trial Confirmed that Summary Judgment Should Not
        Have Been Granted ................................................................................................................23

CONCLUSION...............................................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*,
  152 F.3d 17 (1st Cir. 1998)..................................................................................3

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................3

*Bevevino v. Saydjari*,
  574 F.2d 676 (2d Cir. 1978)............................................................................3, 4

*Boyce v. Soundview Tech. Group, Inc.*,
  464 F.3d 376 (2d Cir. 2006)..............................................................................8

*Colyer v. Consol. Rail Corp.*,
  114 F. App'x 473 (3d Cir. 2004)....................................................................21, 22

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998)..............................................................................4

*Fidelity & Guaranty Ins. Underwriters, Inc. v. Jasam Realty Corp.*,
  540 F.3d 133 (2d Cir. 2008)..............................................................................8

*Hiller v. Suffolk*,
  199 F.R.D. 101 (E.D.N.Y. 2001).........................................................................9

*In Re U.S. Fin. Secs. Litig.*,
  609 F.2d 411 (9th Cir. 1979).............................................................................21

*In Re Amaranth Natural Gas Commodities Litig.*,
  --- F.3d ----, 2013 WL 5302678 (2d Cir. 2013).....................................................16

*Lifetime Siding, Inc. v. United States*,
  359 F.2d 657 (2d Cir. 1966).............................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011)...................................................................................10

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010)...................................................................................17

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
  784 F.2d 127 (2d Cir. 1986)..............................................................................3

*Piesco v. Koch*,
   12 F.3d 332 (2d Cir. 1993)................................................................................3

*SEC v. Amerindo Inv. Advisors, Inc.*,
   No. 05 Civ. 5231(RJS), 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013) ...............................17

*SEC v. Apuzzo*,
   689 F.3d 204 (2d Cir. 2012)..........................................................................15, 16

*SEC v. DiBella*,
   587 F.3d 553 (2d Cir. 2009)..........................................................................16, 17

*SEC v. Rorech*,
   720 F. Supp. 2d 367 (S.D.N.Y. 2010) ...............................................................23

*SEC v. Tourre*,
   No. 10 Civ. 3229 (KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ...............................17

*SEC v. Wolfson*,
   539 F.3d 1249 (10th Cir. 2008) ......................................................................7

*Safeco Ins. Co. v. Burr*,
   551 U.S. 47 (2007).....................................................................................22

*Sharkey v. Lasmo (Aul Ltd.)*,
   55 F. Supp. 2d 279 (S.D.N.Y. 1999)...............................................................22

*Song v. Ives Labs., Inc.*,
   957 F.2d 1041 (2d Cir. 1992).........................................................................4

*Sorlucco v. New York City Police Dep't*,
   971 F.2d 864 (2d Cir. 1992)..........................................................................3

*U.S. v. Hoffer*,
   680 F. Supp. 673 (S.D.N.Y. 1988)................................................................8, 9

*U.S. v. McKye*,
   --- F.3d ----, 2013 WL 4419330 (10th Cir. 2013) ...............................................21

## STATUTES AND RULES

Fed. R. Civ. P. 50(a) ...........................................................................................................3

Fed. R. Civ. P. 50(b) ...........................................................................................................1

Fed. R. Civ. P. 59(a)(1) .......................................................................................................1

Gramm-Leach-Bliley Act, 15 U.S.C. § 78c note ...........................................................20

## LEGISLATIVE MATERIALS

December 15, 2000 Statement of Senator Gramm, 146 Cong. Rec. S11867 (2000)....................22

Defendant Fabrice Tourre respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rules of Civil Procedure 50(b) (as a renewal of Mr. Tourre's Rule 50(a) motion made at the close of the SEC's case and the close of the evidence) and 59(a)(1), for judgment as a matter of law dismissing each of the SEC's claims or, in the alternative, for a new trial with respect to those claims.  Mr. Tourre does not waive, and specifically reserves, all arguments with respect to the Court's rulings on pre-trial motions, motions for summary judgment, objections to argument, lines of questioning and evidence, jury instructions and responses to jury questions.

## PRELIMINARY STATEMENT

In the wake of the jury's across-the-board rejection of each of the five alleged misstatements at the heart of the SEC's Rule 10b-5 misstatement case, Fabrice Tourre brings this motion to seek judgment in his favor or a new trial on the remaining claims, which either lack evidentiary support or whose liability findings are seriously erroneous.  Indeed, the liability verdicts on the other counts are so contrary to the weight of the evidence that it would work a manifest injustice to Mr. Tourre if they were permitted to stand.

The jury found Mr. Tourre not liable on Count 5 -- the SEC's claim under Rule 10b-5(b) -- concluding that the SEC had failed to prove that Mr. Tourre had defrauded ACA by means of any of the alleged misstatements at issue in the trial.  Because the counts that accused Mr. Tourre of scheming to defraud ACA (Counts 1, 4 and 6) were explicitly premised on the existence of two of the very misstatements rejected by the jury in Count 5, those claims lack sufficient other evidence to survive scrutiny.

That the jury returned liability verdicts not based on the evidence is also shown by its verdict on Count 2, the Section 17(a)(2) claim which required finding that Mr. Tourre received money or property by means of an untrue statement.  The jury returned a liability

verdict despite the absence of any evidence whatsoever linking Mr. Tourre's compensation to either the alleged (and unproven) misstatements or the ABACUS 2007-AC1 ("AC1") transaction.

Mr. Tourre is also entitled to judgment or a new trial because the SEC failed to adduce evidence from which the jury could determine that Mr. Tourre made any offer in the United States for purposes of the Section 17(a) claims.  The Court erred by repositioning the standard for domesticity from one determining where the offer itself was made (as prescribed in the Court's summary judgment ruling) to one reviving the discredited "conduct" test of the pre-*Morrison* period.  And regardless of which standard was described for the jury, the SEC's eliciting of evidence that Mr. Tourre generally worked in New York during the relevant time period was insufficient to sustain the verdict.

Mr. Tourre is also entitled to a new trial with respect to every claim (save Count 5) because the Court erroneously withdrew from the jury the question of whether the swap agreements entered into by Goldman, ACA and ABN were security-based swaps.  The evidence at trial was sufficient to create a question of fact for the jury as to whether the parties based the material terms of the swap agreements on ACA's corporate credit risk and systemic risk in the RMBS market, neither of which satisfy the statutory definition of "security-based."

Finally, for the reasons laid out in Mr. Tourre's Rule 50 motion and argument during the trial and incorporated herein, there was no evidence of other elements of the Section 10 and 17 claims—no evidence of a false statement or omission, no evidence that any such statement or omission was material, no evidence that any such statement or omission was made in the offer of or in connection with the purchase or sale of securities or security-based swap agreements and no evidence that Mr. Tourre acted with scienter, recklessly or negligently.  And because the SEC's aiding and abetting claim under Section 20(e) was premised on the theory that Mr. Tourre's own conduct established the primary violation (and failed to argue, let alone adduce

any evidence of, a primary violation by any other Goldman employee), Mr. Tourre is entitled to judgment in his favor on that count as well.

## STANDARD OF LAW

A district court should grant a motion for judgment as a matter of law when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find for the opposing party.  Fed. R. Civ. P. 50(a)(1).  Motions for judgment as a matter of law under Rule 50 are governed by the same standards as those that govern motions for summary judgment. *See*, *e.g.*, *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993).  A court does "assume the veracity, however, of any admissions made and stipulations entered into by the party opposing the Rule 50 motion, as well as any evidence derived from disinterested witnesses that has not been contradicted or impeached."  *Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 23 (1st Cir. 1998) (citations omitted).  Thus, under Rule 50(a), "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Put differently, a Rule 50 motion for judgment as a matter of law must be granted where "(1) [t]here is such a complete absence of evidence supporting the verdict that the jury's findings could only [be] the result of sheer surmise and conjecture, or (2) [t]here is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 132 (2d Cir. 1986).

A Rule 59 motion permits the trial court to independently weigh the evidence presented at trial to determine whether the jury's verdict is "seriously erroneous" or resulted in a "miscarriage of justice."  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992).  On a Rule 59 motion, "the trial judge is free to weigh the evidence [her]self and need not view it in the light most favorable to the verdict winner."  *Bevevino v. Saydjari*, 574 F.2d 676,

684 (2d Cir. 1978); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998) (citing *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992)). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt.*, 163 F.3d at 134.

## ARGUMENT

I.   **MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON THE SECTION 17(a)(2) CLAIM BECAUSE THERE IS NO EVIDENCE FROM WHICH THE JURY COULD HAVE FOUND THE ELEMENTS OF THE CLAIM**

A.   **There Is No Evidence That Mr. Tourre Obtained Any Money Or Property By Means Of The Alleged Fraud**

Before deliberations began, the Court instructed the jury that, to prevail on its claim under Section 17(a)(2), the SEC had to prove that Mr. Tourre directly or indirectly obtained money or property by means of a material misstatement or omission.  July 31, 2013 Trial Tr. 2786-87.  Notwithstanding the absence of any evidence to support the "obtained money or property" element, the jury returned a verdict against Mr. Tourre.  Under these circumstances, Mr. Tourre is entitled to judgment as a matter of law on the Section 17(a)(2) claim.

The only evidence at trial regarding how Mr. Tourre "obtained" any money or property in 2007 related to his compensation from Goldman Sachs, which Mr. Tourre testified had two components: base salary and a bonus.  Tourre Trial Tr. 2221:3-12.  As for his base salary, the SEC adduced no evidence as to what that salary was or how it was set, let alone any link to the AC1 transaction.  Thus, the jury had no basis to determine that his base salary was obtained "by means of" the AC1 transaction.

The only evidence the SEC introduced as to Mr. Tourre's bonus was testimony from Mr. Tourre.  In questioning Mr. Tourre about an email in which he had referenced the "big P&L" the correlation trading desk might earn from the intermediation trade, the SEC asked

4

whether profits generated for the trading desk were "part of what went into consideration for [his] annual bonus." *See* Declaration of Pamela Rogers Chepiga dated Sept. 30, 2013 ("Chepiga Decl."), Ex. 9 (PX-300); Tourre Trial Tr. 2176:24-2177:20.  Mr. Tourre testified that he did not know how Goldman determined his compensation, although he understood that it was not "based off direct P&L on trades" executed by the desk.  Tourre Trial Tr. 2177:16-2178:1.  As this was the sum of the evidence concerning the composition of Mr. Tourre's 2007 bonus, the jury had no basis to determine that any of that bonus was obtained "by means of" the AC1 transaction.

        Indeed, the only logical inference from the evidence was that his bonus was likely lower as a result of the negative impact the AC1 transaction had on the correlation desk's profitability.  The SEC elicited evidence that the overall profitability of the trading desk might have been an element in determining the bonus of desk members.  *Id.* 2177:24-2178:1.  Jonathan Egol testified that the desk's profits in 2007 were decreased by $80-90 million as a result of its long position in the AC1 transaction.  Egol Trial Tr. 980:10-23.  Further, the parties stipulated that, although Goldman initially recognized trading revenue of approximately $15 million in connection with AC1 and the swap transactions with Paulson & Co. ("Paulson"), it lost more than $90 million on its long swap position.  Joint Pretrial Order, Section III ¶ 21; *see* July 29, 2013 Trial Tr. 2434:10-15 (stipulations as read to the jury).  The only possible conclusion from the evidence is that, to the extent the AC1 transaction had any impact on Mr. Tourre's 2007 bonus, it was a negative impact.  Thus, there is no evidence that Mr. Tourre's bonus was obtained "by means of" the AC1 transaction.

        The SEC also attempted to establish the money or property element by asking Mr. Egol about an email, *see* Chepiga Decl., Ex. 8 (PX-294), that contained a discussion about allocating "gross credits" for the AC1 transaction.  Egol Trial Tr. 868:4-869:24.  As Mr. Egol explained, however, the SEC misunderstood both the document and the concept of "gross

credits." *Id.*  Gross credits were not a means for Goldman to allocate profit from transactions among all employees who worked on them, but rather were a means to track the productivity of the multiple salespeople, like Gail Kreitman, working on the same transaction, for purposes of their year-end compensation and, even then, were "not necessarily tangibly related to the revenues on the transaction." *Id.* 868:4-23.  No comparable concept existed for people who, like Mr. Tourre, worked on the trading desk.  *Id.* 868:15-23.  Thus, even if AC1 had generated a notional "profit" for the desk, which it did not, there is no evidence that Mr. Tourre obtained anything by means of the AC1 transaction, and hence Mr. Tourre is entitled to judgment as a matter of law on the Section 17(a)(2) claim.

In the alternative, the Court should order a new trial because, for all the reasons set forth above, the jury's verdict is clearly against the weight of the evidence, and because the jury's consideration of this count was infected by a confusing and prejudicial response to its question as to whether Mr. Tourre's base salary could satisfy the "obtained money or property" element.

In a note submitted to the Court during deliberations, the jury asked two questions pertaining to the "obtained money or property" element:

1.  Does the <u>base salary</u> obtained by Fabrice Tourre during the time period in question satisfy the phrase "obtained money or property?"

2.  Also, does any money Mr. Tourre obtained on behalf of Goldman Sachs satisfy this phrase?

ECF No. 437 (CX-4) (emphasis in original).

The jury's question about base salary strongly suggests that it well understood that there was no evidence that any portion of Mr. Tourre's 2007 bonus was attributable to the AC1 transaction.  Further, as the Court correctly answered the jury's second question in the negative, Aug. 1, 2013 Trial Tr. 2840-41, the only logical inference is that the jury incorrectly

concluded that Mr. Tourre's base salary was sufficient to satisfy the "obtained money or property" requirement.  As explained below, the Court should enter judgment in Mr. Tourre's favor or, in the alternative, order a new trial because there was no sufficient evidentiary basis for any such conclusion and because the Court answered the jury's question about base salary in a prejudicially confusing manner.

Before answering the jury's questions, the Court heard argument from the parties. As to the first question, the SEC argued that Mr. Tourre's base salary was sufficient to satisfy the "money or property" requirement, contending that Goldman employed him to provide services, and that one of the services Mr. Tourre rendered was the making of the allegedly fraudulent statements at issue.  *Id.* at 2831-32.  According to the SEC, its argument was supported by the Tenth Circuit's decision in *SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008).  But Mr. Tourre showed that *Wolfson* did not support the SEC's argument.  Aug. 1, 2013 Trial Tr. at 2832-33.[1]

The Court rejected the SEC's argument, and said that it would not instruct the jury that simply being paid a salary was sufficient.  *Id.* at 2835-36.  However, the Court also rejected Mr. Tourre's request that, given the absence of any evidence linking his base salary to the AC1 transaction, the question should be answered with a simple "no"; the Court stated that "it is possible that one's base salary could be tied, directly or indirectly, to a material misstatement or omission."  *Id.* at 2837-38.  Even if that were possible in other cases, Mr. Tourre

---

[1]   The *Wolfson* court's very brief ruling on the "money or property" element in no way supports the SEC's argument that Mr. Tourre's receipt of a base salary could satisfy the "obtained money or property requirement."  In *Wolfson*, the individual defendant ("Marple"), a non-employee consultant of a public company ("F10"), was retained and compensated to prepare F10's fraudulent SEC filings at issue in the lawsuit, creating a direct connection between the fraud and his receipt of money or property.  *See* 539 F.3d at 1252, 1264.  Moreover, among various misstatements and omissions in F10's SEC filings, Marple mischaracterized the nature of certain transactions in which he had a financial interest and from which he derived a financial return—including the fact that a company he controlled ("Grateful") was being paid a "finder's fee" for introducing F10 to a boiler room operation that was selling F10's stock to investors.  *See id.* at 1253, 1264.  It is evident, therefore, that the *Wolfson* court correctly held that there was "no real question" that the defendant obtained money and property from the fraudulent acts.

argued, there was no evidence from which the jury in <u>this</u> case could properly determine that his

base salary (at Goldman Sachs) was obtained by means of the alleged fraud. *Id.* at 2838. The

Court responded that if the jury found against Mr. Tourre on this count, the matter could be

addressed through a motion for a new trial under Rule 59. *See id.* at 2838-39. The Court

ultimately answered the jury's first question as follows:

> As to the first one what I want to do is refer you folks back to page 24 of
> the jury instructions and there is the following instruction:
>
> If, for instance, you find that Mr. Tourre obtained compensation from
> Goldman --his employer -- that was connected, directly or indirectly to a
> material misstatement or omission, that would satisfy this element.
>
> Compensation can occur in many forms. One form is base salary, one
> form is bonus. But, you would need to find the other elements as well.
> All right?

*Id.* at 2840. The jury returned a verdict shortly after hearing the Court's response to its question

about base salary.

The Court's response was confusing and prejudicial and, because the only

instruction consistent with the evidentiary record was a simple "no," created the impression that

there somehow was evidence from which the jury could properly conclude that Mr. Tourre's

base salary was obtained by means of material misrepresentations and omissions. Under these

circumstances, if the Court does not grant judgment in favor of Mr. Tourre, it should at a

minimum grant a new trial on the Section 17(a)(2) claim. *See, e.g.*, *Fidelity & Guaranty Ins.*

*Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139-41 (2d Cir. 2008) (vacating

judgment and remanding for new trial due to trial court's failure to respond correctly to jury

question); *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 389-92 (2d Cir. 2006) (vacating

judgment and remanding for new trial due to incorrect and misleading jury instructions); *U.S. v.*

*Hoffer*, 680 F. Supp. 673, 676-79 (S.D.N.Y. 1988) (granting new trial in criminal case where

court acknowledged that charge was inapposite and potentially confusing, where jury's

confusion was evidenced by its submission of note requesting clarification, and where risk of prejudice was evidenced by fact that jury returned verdict shortly after court provided confusing response to jury's question); *Hiller v. Suffolk*, 199 F.R.D. 101, 106 (E.D.N.Y. 2001) (granting Rule 59 motion for new trial, based on acknowledgment that jury instructions were erroneous).

**B.    The SEC Failed to Prove Other Elements of the Rule 17(a)(2) Cause of Action**

The SEC identified five purported misrepresentations and omissions (the "Alleged Misstatements") at issue in the trial:

1.    that the reference portfolio was "selected by ACA," while omitting the fact that Paulson played a significant role in the portfolio selection;

2.    that the equity tranche of the AC1 CDO was "pre-committed;"

3.    that the "incentives" of Paulson and ACA were "aligned" in the AC1 transaction;

4.    that Paulson was the "Transaction Sponsor" in the AC1 transaction; and

5.    that Paulson was a long investor in the AC1 transaction.

ECF No. 428 (July 26, 2013 Letter from SEC to the Court), at 3.  These were the only five misrepresentations charged to the jury.   July 31, 2013 Trial Tr. at 2789:24-2790:10.  Mr. Tourre renews and incorporates by reference his motion for judgment as a matter of law pursuant to Rule 50 with respect to his arguments that:

- the SEC failed to adduce evidence that any of these statements either were made by Mr. Tourre or that they were misrepresentations or omissions[2] (July 29, 2013 Trial Tr. 2440:13-2442:3, 2442:25-2445:7, 2452:3-2453:6; *see also* Chepiga Decl. Ex. 1 (Mr. Tourre's Mem. of Law in Supp. of Mot. for Judgment as a Matter of Law) at 2-6, 20-22);

- the SEC failed to adduce evidence that the Alleged Misstatements occurred in the offer or sale of securities to ACA (July 29, 2013 Trial Tr. 2451:18-2452:2; *see also* Chepiga Decl. Ex. 1 at 19-20);

---

2    Mr. Tourre renews his objection to the presentation of evidence of a supposed misrepresentation to IKB where Mr. Tourre was denied a fair opportunity to obtain evidence from IKB relevant to showing that no material misrepresentation was made.

- the SEC failed to adduce evidence that the Alleged Misstatements were material (July 29, 2013 Trial Tr. 2445:23-2447:25, 2453:7-2454:21; *see also* Chepiga Decl. Ex. 1 at 7-12, 22-24); and

- the SEC failed to adduce evidence that Mr. Tourre acted with scienter, recklessly[3] or negligently, particularly as there was no evidence of the applicable standard of care against which Mr. Tourre's conduct should be judged (July 29, 2013 Trial Tr. 2448:1-14, 2456:5-15; *see also* Chepiga Decl. Ex. 1 at 12-14, 27-28).

Because there is no evidence from which the jury could have found that each of these elements of the Section 17(a)(2) claim were satisfied, Mr. Tourre is entitled to judgment as a matter of law or, in the alternative, a new trial.

## II. MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON THE CLAIMS UNDER SECTION 17(a)(1) AND RULE 10b-5(a) AND (c) BECAUSE THERE IS NO EVIDENCE FROM WHICH THE JURY COULD HAVE FOUND THE ELEMENTS OF THE ALLEGED SCHEME TO MAKE MISSTATEMENTS TO ACA

### A. The Jury Rejected Each of the Purported Misstatements Alleged to Have Been Made to ACA by Mr. Tourre, Including the Two Misstatements That Formed the Basis for the SEC's "Scheme" Theory in Counts 1, 4 and 6

The jury was instructed that the SEC had alleged that Mr. Tourre (1) "participated in a scheme to defraud ACA" in violation of Section 17(a)(1), July 31, 2013 Trial Tr. 2782:15-16 (discussing Count 1); (2) "employed a device, scheme or artifice to defraud" ACA in violation of Section 10(b) and Rule 10b-5(a), *id.* 2800:17-22 (discussing Count 4); and (3) "engaged in an act, practice, or course of business to defraud ACA" in violation of Section 10(b) and Rule 10b-5(c), *id.* 2803:15-17 (discussing Count 6).[4]  Notably, the scheme described by the SEC at trial was

---

[3]   Mr. Tourre reserves all appellate arguments as to whether recklessness is sufficient to demonstrate scienter.  *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323-24 (2011) ("We have not decided whether recklessness suffices to fulfil the scienter requirement.").

[4]   The Court denied Mr. Tourre's motion *in limine* to bar presentation of a scheme liability theory at trial.  *See* ECF Nos. 294-96 (Motion in Limine of Fabrice Tourre to Preclude Evidence and Argument in Reliance on an Unpleaded and Legally Unsustainable "Scheme" Theory of Liability); July 9, 2013 Hrg Tr. (attached at Chepiga Decl. Ex. 2) at 8-15.  As to that and other rulings related to scheme (including the rejection of Mr. Tourre's proposed jury instruction), Mr. Tourre does not waive, and

comprised of the first and fifth Alleged Misstatements specified in its July 26 letter to the Court. ECF No. 428 (letter dated July 26, 2013), at 3.

In a slide titled "Tourre's Fraud Scheme" shown to the jury during its opening statement, the SEC contended that Mr. Tourre had:

1.  Misled portfolio selection agent about Paulson being an equity (long) investor.

2.  Told long investors a half-truth about who selected the CDO portfolio.

*See* Slide 24 (attached at Chepiga Decl. Ex. 3). Consistent with its premise that the scheme was comprised of these two particular misrepresentations (the "Scheme Misstatements"), the evidence elicited by the SEC at trial focused exclusively on whether Mr. Tourre had made, or was primarily responsible for, these and other misstatements or omissions of material facts. No evidence of any deceptive or manipulative act apart from misstatements or omissions was introduced.

The issue of what would be required for the jury to find scheme liability was vigorously contested by the parties. Having portrayed the alleged scheme as one comprised of the two Scheme Misstatements, the SEC objected to the jury instruction proposed by Mr. Tourre, which would have required the jury to find the existence of some deceptive act separate and distinct from the alleged misstatements, tacitly conceding the absence of evidence of any such act. *See*, *e.g.*, July 24, 2013 Trial Tr. 1709:20-1711:12; July 25, 2013 Trial Tr. 2009:23-2011:4; July 29, 2013 Trial Tr. 2514:8-18; *see also* ECF No. 409 (letter and attachment dated July 15, 2013) (attached at Chepiga Decl. Ex. 4). The Court rejected Mr. Tourre's proposed instruction, and crafted language to reflect the Court's conclusion that a series of misstatements and omissions (that is, more than one, contrary to the SEC's argument) was sufficient to establish a

---

specifically reserves, all arguments with respect to these and other rulings linked to the decision to allow the SEC to proceed with a scheme theory at trial.

scheme. July 29, 2013 Trial Tr. 2515:5-16. Accordingly, when the Court defined scheme for the

jury for Counts 1, 4 and 6, it stated that a material misstatement or omission can be part of a

device, scheme or artifice to defraud, but that a single misstatement or omission standing alone

would be insufficient to form a scheme. *See id.* 2783:5-8 (regarding Section 17(a)(1) claim); *id.*

2800:23-2801:2 (regarding Rule 10b-5(a) claim); *id.* 2803:11-14 (regarding Rule 10b-5(c) claim).

In its closing argument, the SEC again explicitly described the scheme as one

comprised of the two Scheme Misstatements:

> Here, the scheme or the plan has the two parts that I've talked about. First,
> to deceive ACA into serving as portfolio agent <u>by misleading ACA</u>
> <u>regarding whether Paulson was an equity investor</u>. And the second part
> was <u>to mislead investors by telling them that the portfolio was selected</u>
> <u>only by ACA</u>.

July 30, 2013 Trial Tr. 2603:24-2604:4 (discussing scheme element of Section 17(a)(1) claim

(Count 1) (emphasis added)); *id.* 2618:22-2619:5 (likening Rule 10b-5 to Section 17, and

adopting earlier discussion of Section 17 as basis for liability on all claims under Section 10(b),

including scheme liability (Counts 4 & 6)).

Each of the Scheme Misstatements was also at issue in Count 5, the Rule 10b-5(b)

"misstatement" claim which alleged that Mr. Tourre had misled ACA. The jury rendered a

verdict of "not liable" on Count 5, rejecting the SEC's Rule 10b-5(b) misstatement claim as to

each of the five Alleged Misstatements Mr. Tourre was purported to have made to ACA—

including the two Scheme Misstatements. ECF No. 439 (Court Ex. 6), at 2; Aug. 1, 2013 Trial

Tr. 2845:24-2846:2. This verdict was correct. As shown in Mr. Tourre's initial Rule 50 motion

(renewed and incorporated by reference herein), there was no evidence that the Alleged

Misstatements were false, material, made in the offer or sale or in connection with the purchase

or sale of securities or security-based swaps or made with scienter. July 29, 2013 Trial Tr.

2440:13-2442:3, 2442:25-2448:9, 2451:18-2454:21, 2456:5-15; *see also* Chepiga Decl. Ex. 1 at 2-14, 19-24.

> **B.      In the Absence of Mr. Tourre's Alleged Misstatements, There is No Evidence that Mr. Tourre Engaged in or Employed a Scheme to Defraud ACA**

The SEC's scheme case was built entirely on the premise that it was Mr. Tourre, and Mr. Tourre alone, who made or was otherwise responsible for the Scheme Misstatements. The SEC pointedly labeled the scheme as "Tourre's Fraud Scheme" and repeatedly sought to place the Scheme Misstatements at Mr. Tourre's feet. *See*, *e.g.*, Chepiga Decl. Ex. 3 (emphasis added); July 30, 2013 Trial Tr. 2605:15 ("Mr. Tourre's fraud"). The trial focused almost exclusively on Mr. Tourre's emails and his role as the person with "primary responsibility" for the allegedly misleading marketing materials.

Consistent with its personalization of the alleged scheme as "Tourre's," the SEC offered no argument or evidence at trial that anyone else at Goldman was party to the supposed scheme. The SEC abandoned its eve-of-trial accusation that David Gerst was a co-schemer. It conceded before trial that former Goldman saleswoman Gail Kreitman lacked the scienter necessary to render her a co-schemer. And the SEC limited its criticism of Jonathan Egol to quibbles with some of his testimony regarding how the AC1 transaction was structured. Indeed, far from offering evidence of others at Goldman who might have been co-schemers, the SEC lobbied vigorously, and successfully, for an instruction that it would be sufficient to find Mr. Tourre liable for aiding and abetting a primary violation of Section 10(b) if the only Goldman employee to violate Section 10(b) was Mr. Tourre himself—an instruction that tracked the theory of "Tourre's" solitary fraud scheme that the SEC repeatedly argued to the jury.

To the extent the SEC looks to Paolo Pelligrini to fill the void created by the jury's verdict on Count 5, it will find the cupboard bare. There is no evidence that Mr. Pelligrini

made either of the Scheme Misstatements, let alone both as required by the Court's instructions. Ms. Schwartz could offer the jury no evidence as to what Mr. Pelligrini said at her first meeting with him on January 8, 2007.  *See* Schwartz Trial Tr. 1781:20-23; *id.* 1782:12-14.  During the SEC's direct examination, Mr. Pelligrini testified that he told Ms. Schwartz that Paulson was interested in shorting subprime RMBS CDOs, Pellegrini Trial Tr. 475:23-476:15, and during cross-examination, the jury heard excerpts from Mr. Pelligrini's 2008 investigative testimony making the same point, *id.* 619:10-18.  While the SEC sought to impeach Mr. Pelligrini with the part of his investigative testimony in which Mr. Pelligrini said he did not recall discussing Paulson's short strategy at the meeting, *id.* 486:17-489:7, that impeachment, even if fully credited, does no more than nullify Mr. Pelligrini's testimony that he had put ACA on notice of Paulson's short interest on January 8.  It does not, and could not, constitute evidence that Mr. Pelligrini had affirmatively made some <u>other</u> statement as to which there is no evidence whatsoever, namely, that Paulson was making an equity investment in AC1.  At this juncture, the SEC may be entitled to the benefit of the doubt, but it is not entitled to speculation.

The SEC's argument and evidence described a scheme comprised of two Scheme Misstatements it claimed were made by Mr. Tourre.  By its verdict on Count 5, the jury rejected the SEC's claim that Mr. Tourre misled ACA with either of the Scheme Misstatements.  The balance of evidence to support the supposed scheme to defraud ACA at issue in Counts 1, 4, and 6 is either non-existent or speculation.[5]  Accordingly, the Court should enter judgment in Mr. Tourre's favor on those counts or, in the alternative, order a new trial.

---

[5]   *See* July 29, 2013 Trial Tr. 2449:10-2450:4, 2458:9-2459:24; Chepiga Decl., Ex. 1, at 14-16, 30-31.

14

**III.   MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF
LAW OR A NEW TRIAL ON THE SECTION 17(a)(3) CLAIM
BECAUSE THERE IS NO EVIDENCE OF KEY ELEMENTS OF
THE CLAIM**

The SEC's Section 17(a)(3) claim, like its other "scheme" liability claims, was

premised solely on an alleged scheme to make misrepresentations.  *See, e.g.*, July 30, 2013 Trial

Tr. 2618:2-9.  Mr. Tourre is entitled to judgment as a matter of law or, in the alternative, a new

trial, with respect to that claim because, as shown above in Point I.B, there was no evidence from

which the jury could have found the existence of a material misrepresentation or omission, that

such misrepresentation or omission was made in the offer or sale of securities or security-based

swaps or that such misrepresentation or omission was made negligently, and the SEC presented

no evidence of any other deceptive act that could form the basis for liability under this claim.

**IV.   MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF
LAW OR A NEW TRIAL ON THE SECTION 20(e) AIDING AND
ABETTING CLAIM BECAUSE THERE IS NO EVIDENCE OF A
PRIMARY VIOLATION BY ANYONE WHOSE SCIENTER AND
ACTIONS COULD BE ATTRIBUTED TO GOLDMAN**

The jury found that Mr. Tourre did not violate Rule 10b-5(b) and, as shown above,

the basis for the SEC's claims of scheme liability under Rule 10b-5(a) and (c) fall away as

unsupported.  There is, moreover, no evidence that anyone else whose conduct or scienter could

be imputed to Goldman committed a violation of Section 10(b), let alone that Mr. Tourre had

knowledge of and knowingly participated in such a violation; judgment must therefore be

entered in Mr. Tourre's favor or a new trial granted on the Section 20(e) claim.

The SEC did not provide the jury any evidence to warrant a finding that Goldman

committed a primary violation of Section 10(b) and Rule 10b-5 that Mr. Tourre could aid and

abet.  That is an essential element of an aiding and abetting claim.  *See SEC v. Apuzzo*, 689 F.3d

204, 206 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2855 (2013) (The first element of aiding and

abetting claim is "'the existence of a securities law violation by the primary (<u>as opposed to the</u>

aiding and abetting) party.'") (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009))

(emphasis added); *see also In re Amaranth Natural Gas Commodities Litig.*, --- F.3d ----, 2013

WL 5302678, at *10 (2d Cir. 2013) (In context of Commodities Exchange Act, "in order to

allege substantial assistance, the SEC must plead . . . that the defendant associated himself with a

violation of the Act.") (citing *Apuzzo*, 689 F.3d at 212).

   The SEC did not attempt to prove that anyone other than Mr. Tourre committed a

Section 10(b) violation that could be imputed to Goldman, and there was no evidence from

which the jury could conclude that any such violation took place.  The SEC admitted as much by

arguing strenuously that Mr. Tourre's purported violation of Section 10(b) could be imputed to

Goldman for purposes of establishing a primary violation that Mr. Tourre could aid and abet.

*See, e.g.*, July 25, 2013 Trial Tr. 2025:20-2027:21.  In addition to being legally erroneous,[6] the

SEC did not prove that Mr. Tourre violated Section 10(b).  As shown in Section II above and in

Mr. Tourre's Rule 50 motion (renewed and incorporated by reference herein), the jury rejected

each of the Alleged Misstatements and did so correctly because the SEC adduced no evidence

that the Alleged Misstatements were false, material, made in connection with the purchase or

sale of securities or made with scienter.  July 29, 2013 Trial Tr. 2440:13-2442:3, 2442:25-2449:9,

2452:3-2453:6; *see also* Chepiga Decl. Ex. 1 at 2-14.

   Nor has the SEC provided the jury any evidentiary basis to find that Mr. Tourre

had actual knowledge of any Section 10(b) violation by Goldman, nor that he associated himself

with Goldman's alleged fraud, participated in it as something that he wished to bring about, and

consciously assisted it in some active way.  *See Apuzzo*, 689 F.3d at 206, 212 n.8, 213 n.11;

---

[6] *See* Chepiga Decl., Ex. 5 (parties' Joint Requests to Charge, submitted to the Court July 1, 2013), at 59-61.

*DiBella*, 587 F.3d at 566.  Mr. Tourre is therefore entitled to judgment as a matter of law or, in the alternative, a new trial on the Section 20(e) claim.

## V.  MR. TOURRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON EACH SECTION 17(a) CLAIM BECAUSE THE SEC FAILED TO PROVE THE EXISTENCE OF A DOMESTIC OFFER

To find Mr. Tourre liable under Section 17(a) in respect of offers allegedly made to Loreley, ABN, and other potential investors, the SEC had to adduce evidence from which the jury could find that those offers were domestic.  *See SEC v. Amerindo Inv. Advisors, Inc.*, No. 05 Civ. 5231(RJS), 2013 WL 1385013, at *3 (S.D.N.Y. Mar. 11, 2013) (citing *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010)).  The SEC failed to do so.

In its summary judgment decision, the Court held that "[a]n offer is domestic if it is made in the United States."  *SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2013 WL 2407172, at *9 (S.D.N.Y. June 4, 2013).  Notwithstanding this ruling, at the charging conference the Court proposed that the jury be instructed that "[s]ome, but not all, of the alleged conduct constituting the offer must have occurred in the United States."  *See* ECF No. 433-2 (draft jury charge provided to parties on July 29, 2013), at 19.  Mr. Tourre objected, noting that this standard differed from the Court's summary judgment ruling (to which Mr. Tourre also objected), and arguing that the Court's proposed instruction would constitute a return to the "conduct and effects" standard that the Supreme Court definitively rejected in *Morrison*.  July 29, 2013 Trial Tr. 2508:12-23.  The Court overruled this objection, and instructed the jury that an "offer must involve some conduct in the United States," and that "[s]ome, but not all, of the alleged conduct constituting the offer must have occurred in the United States."  July 31, 2013 Trial Tr. 2781:5-14.

Reserving all appellate arguments as to the charge, Mr. Tourre is entitled to judgment as a matter of law or, in the alternative, a new trial, because the SEC failed to prove

that Mr. Tourre engaged in conduct in the United States which constituted an offer of securities or security-based swap agreements.

### A.   There Was No Evidence of a Domestic Offer to Loreley or IKB

Regarding the supposed offer made to Loreley, there is no evidence that Mr. Tourre or anyone else at Goldman ever communicated with anyone from Loreley.  Chepiga Decl., Ex. 22 (Hunter Dep. Tr.), at 18:14-25 (played to the jury on July 26, 2013).  Mr. Tourre did send a draft redlined offering circular to IKB, but only because IKB's London-based sales coverage was on vacation, and only after IKB acknowledged expressly that this email was, in IKB's view, not an offer.  *See* Chepiga Decl., Ex. 6 (PX-261); Chepiga Decl., Ex. 23 (Nartey Dep. Tr.), at 219-227 (played to jury on July 29, 2013).

### B.   There Was No Evidence of a Domestic Offer to ABN

As to Mr. Tourre's contact with ABN, the only evidence was that one call took place between Mr. Tourre and Dean Atkins, but Mr. Atkins has no recollection of anything that was said, let alone that an offer, or conduct constituting some part of an offer, was made or authorized.  *See* Chepiga Decl., Ex. 21 (Atkins Dep. Tr.), at 60:10-62:07 (played to jury on July 26, 2013).  Further, the SEC adduced evidence only that Mr. Tourre generally worked in New York at the time of the AC1 transaction.  *See*, *e.g.*, Tourre Trial Tr. 2174:4-6.

### C.   There Was No Evidence of Other Domestic Offers of Securities

As to the other potential investors, the SEC admitted PX-399, PX-302, PX-320, PX-322, PX-351, PX-352, PX-354, PX-359, PX-361 and PX-363, but those do not provide evidence that would support a finding of domestic offers.

#### 1.   Internal Goldman Emails Are Not Offers to Investors

PX-320, PX-322, PX-351 and PX-352 are internal Goldman emails dated May 1, May 4, June 1, and June 4, 2007 respectively, in which Mr. Tourre emailed Goldman salespeople

in various parts of the world concerning the AC1 portfolio.  *See* Chepiga Decl., Exs. 11 (PX-320), 12 (PX-322), 14 (PX-351) and 15 (PX-352).  There is no evidence that any materials were ever sent on to any investor.  PX-359, PX-361 and PX-363 suggest only that David Gerst, not Mr. Tourre, was in contact with Goldman salespeople in various parts of the world, and, again, provide no evidence of any materials being sent to investors at all.  *See* Chepiga Decl., Exs. 17 (PX-359), 18 (PX-361) and 19 (PX-363); Tourre Trial Tr. 2185:6-2187:22.

### 2. Mr. Tourre's Emails Sent Outside of Goldman Are Not Offers

PX-399 is an email in which Mr. Tourre forwarded a communication from Goldman's syndicate desk to someone at UBS on March 7, 2007, but the only evidence adduced was that Mr. Tourre did not know whether UBS was a potential investor, and that he was, as a general matter, working in New York in March 2007.  Tourre Trial Tr. 2140:9-2141:6.  PX-399 states in plain language that it "shall not constitute an offer to sell or the solicitation of an offer to buy" and sets forth that "[n]o representation of accuracy/completeness is made."  Chepiga Decl., Ex. 20 (PX-399).

PX-302 is an April 24, 2007 email from Mr. Tourre to representatives of French bank Calyon, to which Mr. Tourre attached the AC1 reference portfolio, term sheet, and flip book.  The email states explicitly that Goldman is "not soliciting any action based upon this material," and, further, that "we do not represent that it is accurate or complete, and it should not be relied upon as such."  Chepiga Decl., Ex. 10 (PX-302).  As to domesticity, the only evidence adduced was that Mr. Tourre was generally working in New York in April of 2007.  Tourre Trial Tr. 2152:23-2154:5.

Similarly, PX-354 is an email that Mr. Tourre sent to someone at another French bank, CIFG, on June 4, 2007.  It also contains the same explicit statement as PX-302 that Goldman is "not soliciting any action based upon this material."  Chepiga Decl., Ex. 16 (PX-

354).  Again, the only evidence of domesticity is that Mr. Tourre was working in New York in June 2007.  Tourre Trial Tr. 2184:3-16.

       The evidence admitted at trial shows only that Mr. Tourre was, as a general matter, employed in New York in the first half of 2007, and that he corresponded with Goldman colleagues and externally about the AC1 transaction.  It does <u>not</u> show that he made any "offer" to anyone (nor that he was authorized to make offers, nor that the people with whom he corresponded were authorized to accept offers), much less that he made an offer in the United States (for purposes of the standard articulated in the Court's summary judgment ruling) or engaged in conduct in the United States that constituted all or some of the conduct constituting an offer (the standard charged to the jury).  Under the circumstances, Mr. Tourre is entitled to judgment as a matter of law or, in the alternative, a new trial on the Section 17(a) claims.

## VI.    MR. TOURRE IS ENTITLED TO A NEW TRIAL BECAUSE THE EVIDENCE CONFIRMED THAT SUMMARY JUDGMENT ON THE QUESTION OF WHETHER THE ACA/ABN AND ABN/GSI SWAPS WERE SECURITY-BASED SWAPS WAS ERRONEOUS

       For liability to attach to conduct in connection with the offer, purchase or sale of swap agreements under Section 17(a) or Section 10(b), the swaps must be "security-based." Section 206B of the Gramm-Leach-Bliley Act, 15 U.S.C. § 78c note.  Shortly before trial, the SEC moved *in limine* to preclude Mr. Tourre from arguing that the supersenior swaps between ACA and ABN (the "ACA/ABN swap") and between ABN and Goldman Sachs International (the "ABN/GSI swap") were not security-based swaps, contending that whether a swap is security-based was a question of law for the Court.  ECF No. 396 (SEC's Mem. of Law in Support of its Motion for Partial Summary Judgment on the "Security-Based Swap Agreement" Issue), at 5.

       At a hearing shortly before trial, the Court directed the parties to brief a motion for partial summary judgment as to whether, as a matter of law or a mixed question of law and

fact, the ACA/ABN and ABN/GSI swaps were security-based swaps.  Chepiga Decl., Ex. 2 (July 9, 2013 Hearing Tr.), at 25:6-25.  The Court stated that it would prefer not to submit the security-based swap question to the jury because "this is a complicated case enough" and the Court "d[id]n't think they need to hear words like security based swap agreement versus financial guarantee and have to make the choice."  *Id.* 26:14-18.

On the morning trial commenced, the Court granted partial summary judgment for the SEC, holding that "[n]o rational juror could determine the swaps here at issue are not securities-based."  ECF No. 407 (July 15, 2013 Order), at 5.  Mr. Tourre respectfully submits that the Court's decision was based on errors of law and fact and, further, that the evidence adduced at trial demonstrated the existence of a disputed question of material fact which should have been submitted to the jury.   Because the jury was not asked to find this element of each of the SEC's claims, Mr. Tourre is entitled to a new trial.  *See United States v. McKye*, --- F.3d ----, 2013 WL 4419330, at *4-6 (10th Cir. 2013) (reversing securities fraud conviction and remanding for new trial where instruction on meaning of "security" incorrectly withdrew from jury the responsibility for finding facts with respect to whether notes at issue were securities); *Colyer v. Consol. Rail Corp.*, 114 F. App'x 473, 481-85 (3d Cir. 2004) (remanding for new trial where

Mr. Tourre respectfully submits that the Court's desire to simplify the matters led it erroneously to take from the jury a question that the Seventh Amendment required the jury to determine.  *In re U.S. Fin. Secs. Litig.*, 609 F.2d 411, 413 (9th Cir. 1979) (no "'complexity' exception to the Seventh Amendment right to a jury trial in civil cases"); *Lifetime Siding, Inc. v. United States*, 359 F.2d 657, 662 (2d Cir. 1966) ("While we may question the wisdom as a matter of policy of claiming such a case for jury trial, raising judicial eyebrows is about all we can do.  Certainly it is not within our competence to question the right to jury trial granted by Congress . . . .").

21

district court erroneously granted judgment as a matter of law on an element of plaintiff's claim); *Sharkey v. Lasmo (Aul Ltd.)*, 55 F. Supp. 2d 279, 289 (S.D.N.Y.1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000) (A new trial may be granted where "a material issue was improperly submitted or withdrawn from a jury.").

> **A.   The Court Applied an Incorrect Legal Standard in Resolving the Motion for Partial Summary Judgment**

The Court held that because the swaps reference a portfolio of RMBS, that alone established that the swaps were security-based, and it declined to consider the economic reality of the parties' transactions.  ECF No. 407 (July 15, 2013 Order), at 3 (determining whether swap is "based" on one or more securities "is not the same question and does not require the same inquiry" as analysis of whether particular instrument is a security).  The Court suggested that all swaps are about shifting risk and therefore the type of risk the parties were concerned about was irrelevant to determining whether the swaps they engaged in are security-based.  *Id.* at 5.  This holding is legally erroneous and ignores the evidence submitted in opposition to the SEC's motion, which was further developed at trial.

No other court has held that the term "based on" can be satisfied by the appearance of the purported basis somewhere in the parties' agreement, and such a standard does not comport with the legislative purpose of the Gramm-Leach-Bliley amendment, which conferred limited SEC jurisdiction over a narrow set of instruments.  *See* December 15, 2000 Statement of Senator Gramm, 146 Cong. Rec. S11867 (2000) ("Banks are already heavily regulated institutions. . . . [and f]urther regulatory burden, rather than discouraging wrongdoing, would be more likely to discourage development and innovation, driving business overseas instead.").  An appropriate standard, therefore, may be found in *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 63-64 (2007), which held that "based on," in the context of the Fair Credit Reporting Act, required a "'but-for causal relationship and thus a necessary logical condition'" standard.

The *Safeco* standard was rejected by Judge Koeltl in *SEC v. Rorech*, 720 F. Supp. 2d 367 (S.D.N.Y. 2010), in favor of a looser standard that nonetheless required an analysis of the economic reality of the transaction to determine what in fact determined its material elements. *Rorech*, 720 F. Supp. 2d at 403, 405 (declining to limit analysis to contractual language).   In *Rorech*, the trade confirmations, like the confirmations for the swaps at issue in this case, described the reference obligations and the triggering credit events.  Judge Koeltl based his ruling on extensive evidence about what the parties contemporaneously viewed the contract terms to be "based on," as well as market and expert evidence as to whether the market contemporaneously understood the terms to be "based on" the price, value, yield or volatility of the referenced securities.  *Id.* at 400-03.

The Court's holding that the mere presence of a portfolio of reference obligations satisfied the "based on" requirement, without inquiry into the facts and circumstances of the parties' dealings, was premised on the incorrect legal standard, and Mr. Tourre is therefore entitled to a new trial on this issue so that the relevant evidence can be fully developed and submitted to the jury as finder of fact.

**B.    The Evidence Submitted in Connection with the Motion for Partial Summary Judgment and Adduced at Trial Confirmed that Summary Judgment Should Not Have Been Granted**

The Court erroneously found that the swaps referenced the AC1 notes, leading it to conclude that the swaps were "security-based" because Mr. Tourre conceded that the AC1 notes were securities.  ECF No. 407 (July 15 Order), at 3; *see also id.* at 4 ("The Reference Obligations are referred to collectively as the Reference Portfolio and attached to the swap agreement.  Those are the AC1 securities.").  In fact, the swap transactions exist entirely independently of the issuance of AC1 notes and relate to a portion of the capital structure for which no notes were issued.  Egol Trial Tr. 1057:25-1058:14.

The Court also failed to give due weight to the evidence presented by Mr. Tourre in opposition to the SEC's motion, and did not have the benefit of evidence adduced at trial that at a minimum established the existence of a disputed issue of fact over what factors determined the price and value of the ACA/ABN and ABN/GSI swaps.[7]  That evidence reflects that ABN was "primarily" focused on the credit risk presented by ACA, and only secondarily concerned with the composition of the reference portfolio, and that ACA was focused on questions of systemic risk, as reflected in its focus on correlation issues.

As former ABN employee Dean Atkins testified, when determining whether to enter into an intermediation trade with a monoline insurer like ACA, ABN "[p]rincipally" considered the availability of a credit line for that insurer, and the economics of the proposed trade, meaning the spread ABN would be paid for taking that credit risk.  Chepiga Decl., Ex. 21 (Atkins Dep. Tr.), at 19-20 (played for jury on July 26, 2013); *see also id.* 17:23-18:07 ("[B]usiness rationale" for intermediation was "monetizing your appetite [] for credit risk to a counterparty."); *id.* 18:13-22 ("[W]e were determining what was [] the best spread we could get for the [] risk we were taking to face those entities.").  In correspondence with ABN, Mr. Tourre described the pricing of the swaps as including "7 - 9 [basis points] of intermediation spread as compensation for the ACA counterparty credit risk," and in response to questioning by the SEC, Mr. Atkins reaffirmed that, in entering into intermediation transactions with monoline insurers like ACA, its "principal concern was the creditworthiness of the counterparty."  *See* Chepiga Decl., Exs. 7 (PX-289) and 21 (Atkins Dep. Tr.), at 54.  Thus, it was ACA's ability to meet its obligations under the insurance policy, and not the likelihood of those obligations being triggered

---

[7]   Additional evidence could have been adduced through the testimony of, *inter alia*, Ms. Schwartz, Mr. Roseman and Mr. Tourre had the Court not granted partial summary judgment.

by write-downs of the referenced securities, that drove ABN's entry into the supersenior transactions.

ABN's focus on ACA credit risk is apparent as well from its requirement that Goldman sell it protection on ACA corporate credit in an amount directly proportionate to the size of the potential amount due under the ABN/GSI swap.  Tourre Trial Tr. 2348:9-11 ("ABN Amro had requested us to sell them protection on ACA with a notional amount of three percent of the super senior swap."); *see also id.* 2346:1-2348:22.

ACA's committee approval documents also raise genuine fact questions about what factors ACA thought the transaction was "based on."  They show that ACA's pricing decisions rested not on the price, yield, value or volatility of the reference portfolio, but on anticipated correlation factors.  *See* Chepiga Decl., Ex. 13 (PX-332), at ACA-ABACUS-0000063474, ACA-ABACUS-0000063492.  Correlation—the extent to which securities are projected to perform uniformly—is essentially a measure of systemic risk, meaning that ACA's premium calculations were very heavily influenced by its projections of how the subprime sector as a whole would perform.  In fact, ACA did not believe it faced any market risk on the transaction.  *See* Roseman Trial Tr. 1432:24-1433:9 ("At no time were we looking at transactions or would we look at a transaction if there was any indication that we would be subjected to a real dollar loss payment during the term.").

Because the Court's resolution of the motion for partial summary judgment took from the jury the factual question of whether one of the elements of each of the causes of action was met, notwithstanding the existence of evidence at least sufficient to withstand a motion for directed verdict under the proper legal test, Mr. Tourre is entitled to a new trial on each cause of action to the extent judgment is not entered in his favor on those claims.

## **CONCLUSION**

For all the foregoing reasons, Fabrice Tourre respectfully requests that this Court enter judgment as a matter of law dismissing each of the SEC's claims or, in the alternative, order a new trial.

Dated: September 30, 2013
       New York, New York

Respectfully submitted,


/s/ Pamela Rogers Chepiga
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
Andrew Rhys Davies
(andrew.rhys.davies@allenovery.com)
Laura R. Hall
(laura.hall@allenovery.com)
Brandon D. O'Neil
(brandon.o'neil@allenovery.com)

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300


/s/ John P. Coffey
John P. Coffey
(seancoffey78@gmail.com)

LAW OFFICE OF JOHN P. COFFEY
1350 Avenue of the Americas, 2nd Floor
New York, New York  10019
(646) 790-8988

*Attorneys for Fabrice Tourre*