UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 10 Civ. 3229 (KBF) |
| v. | : | |
| | : | ECF Case |
| FABRICE TOURRE, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**SEC'S MEMORANDUM IN OPPOSITION TO FABRICE TOURRE'S
MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL**

Bridget M. Fitzpatrick
Christian D. H. Schultz
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
(202) 772-9362 (facsimile)
fitzpatrickbr@sec.gov

Attorneys for Plaintiff

Dated: Washington, D.C.
       October 30, 2013

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STANDARD OF REVIEW .........................................................................................3

ARGUMENT ...............................................................................................................5

    I.   The SEC Introduced Substantial Evidence That Tourre Engaged In A Scheme To Defraud ..............................................................................................................5

        A.  The SEC Proved A Broad Scheme That Went Well Beyond The Two Misstatements Identified By Tourre ..........................................................5

            1.  GS&Co And Tourre Needed A Portfolio Selection Agent To Market AC1 To Potential Investors ..........................................................7

            2.  Tourre Deceived ACA ..........................................................................8

            3.  ACA And Paulson Picked The AC1 Portfolio Together .......................11

            4.  Tourre And GS&Co Prepared Marketing Materials For AC1 That Were Designed To Deceive Actual And Potential Long Investors ................12

            5.  Tourre And GS&Co Used Intermediation To Protect GS&Co from ACA's Long Investment ..................................................................................14

        B.  Tourre Waived Any Argument Of An Inconsistent Jury Verdict................16

    II.  Tourre Aided And Abetted Securities Fraud Violations By GS&Co ................18

    III. The SEC Introduced Sufficient Evidence That Tourre Obtained Money Or Property By Means Of A Fraud ..................................................................21

    IV. Tourre And GS&Co's Fraud Was Carried Out Through Domestic Offers .......25

    V.  The Credit Default Swaps Were Security Based ............................................29

    VI. The Remaining Elements Of Section 17(a) Were Satisfied.............................31

CONCLUSION..........................................................................................................32

i

# TABLE OF AUTHORITIES

<u>CASES</u>

*Cash v. County of Erie,*
    654 F.3d 324 (2d Cir. 2011)..................................................................4

*Concerned Area Residents for Env't v. Southview Farm,*
    34 F.3d 114 (2d Cir. 1994)..................................................................4

*Diskin v. Lomasney & Co.,*
    452 F.2d 871 (2d Cir. 1971)................................................................26

*DLC Mgmt. Corp. v. Town of Hyde Park,*
    163 F.3d 124 (2d Cir. 1998)..................................................................5

*Elyse v. Bridgeside Inc.,*
    367 Fed. Appx. 266 (2d Cir. 2010)........................................................4

*Fragin v. Mezei,* Case No.
    09-cv-10287(AJN), 2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012)................30

*Globus v. Law Research Serv., Inc.,*
    418 F.2d 1276 (2d Cir. 1969)..............................................................17

*Gordon v. N.Y.C. Bd. of Educ.,*
    232 F.3d 111 (2d Cir. 2000)................................................................22

*Harris v. Niagara Mohawk Power Corp.,*
    252 F.3d 592 (2d Cir. 2001)................................................................17

*Hathaway v. Coughlin,*
    99 F.3d 550 (2d Cir. 1996)................................................................22

*Heller v. Champion Int'l Corp.,*
    891 F.2d 432 (2d Cir. 1989)................................................................23

*In re Gupta Corp. Sec. Litig.,*
    900 F. Supp. 1217 (N.D. Cal. 1994)......................................................6

*In re The Reserve Fund Sec. & Derivative Litig.,*
    09 Civ. 4346(PGG), 2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013)..........16, 17

*In re Vivendi Universal S.A. Sec. Litig.,*
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................16, 17

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009)......................................................................30

*Jarvis v. Ford Motor Co.*,
  283 F.3d 33 (2d Cir. 2002).......................................................................16

*King v. Macri*,
  800 F. Supp. 1157 (S.D.N.Y. 1992)..........................................................26

*Kosmynka v. Polaris Indus., Inc.*,
  462 F.3d 74 (2d Cir. 2006).......................................................................16

*Marcoux v. Farm Serv. & Supplies, Inc.*,
  290 F. Supp. 2d 457 (S.D.N.Y. 2003).........................................................4

*McNabb v. S.E.C.*,
  298 F.3d 1126 (9th Cir. 2002) ..................................................................30

*Meadows v. S.E.C.*,
  119 F.3d 1219 (5th Cir. 1997) ..................................................................28

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000)....................................................................................4

*S.E.C. v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012)......................................................................18

*S.E.C. v. Cavanaugh*,
  155 F.3d 129 (2d Cir. 1998).................................................................26, 27

*S.E.C. v. Cohen*,
  No. 4:05CV371-DJS, 2006 WL 2225410 (E.D. Mo. Aug. 2, 2006) ...............19

*S.E.C. v. Delphi Corp.*,
  No. 06-14891, 2008 WL 4539519 (E.D. Mich. Oct. 8, 2008).........................25

*S.E.C. v. DiBella*,
  587 F.3d 553 (2d Cir. 2009)......................................................................18

*S.E.C. v. Glantz*,
  94 Civ. 5737(CSH), 1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) ................25

*S.E.C. v. Holschuh*,
  694 F.2d 130 (7th Cir. 1982) ....................................................................28

*S.E.C. v. Koenig*,
 No. 02 C 2180, 2007 WL 1074901 (N.D. Ill. Apr. 5, 2007)...............................................19

*S.E.C. v. Mudd*,
 885 F. Supp. 2d 654 (S.D.N.Y. 2012)...................................................................................25

*S.E.C. v. Rorech*,
 720 F. Supp. 2d 367 (S.D.N.Y. 2010)...................................................................................30

*S.E.C. v. Sells*,
 No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ..................................18

*S.E.C. v. Stoker*,
 865 F. Supp. 2d 457 (S.D.N.Y. 2012)...................................................................................25

*S.E.C. v. Syron*,
 934 F. Supp. 2d 609 (S.D.N.Y. 2013)..............................................................................18, 25

*S.E.C. v. Thompson*,
 Case No. 11-4182, 2013 WL 5498133 (10th Cir. Oct. 4, 2013)........................................30

*S.E.C. v. Tourre*,
 Case No. 10-cv-3229(KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013)...........25, 26, 28

*S.E.C. v. Universal Express, Inc.*,
 Case No. 04-cv-2322(GEL), 2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007) ...................27

*S.E.C. v. Wolfson*,
 539 F.3d 1249 (10th Cir. 2008) .......................................................................................22, 25

*S.E.C. v. Zandford*,
 535 U.S. 813 (2002)................................................................................................................6

*Sorlucco v. N.Y.C. Police Dep't*,
 971 F.2d 864 (2d Cir. 1992)....................................................................................................4

*Stoiber v. S.E.C.*,
 161 F.3d 745 (D.C. Cir. 1998)...............................................................................................30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
 531 F.3d 190 (2d Cir. 2008).......................................................................................18, 20, 21

*This Is Me, Inc. v. Taylor*,
 157 F.3d 139 (2d Cir. 1998)....................................................................................................4

*Tolbert v. Queens College*,
    242 F.3d 58 (2d Cir. 2001).........................................................................................16

*U.S. Football League v. Nat'l Football League*,
    644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) .......................17

*United States v. Naftalin*,
    441 U.S. 768 (1979)....................................................................................................26

*Welch v. United Parcel Serv., Inc.*,
    871 F. Supp. 2d 164 (E.D.N.Y. 2012) ...........................................................................4

*Zellner v. Sumerlin*,
    494 F.3d 344 (2d Cir. 2007)..........................................................................................4

## STATUTES AND RULES

Fed. R. Civ. P. 50...................................................................................................... *passim*

Fed. R. Civ. P. 59 ................................................................................................1, 4, 26

## OTHER AUTHORITIES

*Carl M. Loeb*, Exchange Act Release No. 5870, 38 S.E.C. 843 (Feb. 9, 1959)............................28

I Loss, Securities Regulation 243 (2d ed. 1961) ........................................................................27

Plaintiff, the Securities and Exchange Commission ("SEC"), states the following as its opposition to the Motion of Defendant Fabrice Tourre for Judgment as a Matter of Law and a New Trial.[1]

## PRELIMINARY STATEMENT

The jury in this case found Fabrice Tourre liable for securities fraud after hearing eleven days of testimony and reviewing hundreds of exhibits related to a fraud by Fabrice Tourre and his employer Goldman Sachs & Co. ("GS&Co") in connection with the offer and sale of securities and security-based swap agreements in the ABACUS 2007-AC1 ("AC1") transaction.[2] The jury found Tourre liable for violating Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5(a) and Rule 10b-5(c) thereunder, and Section 20(e) of the Securities Exchange Act, but did not find him liable with respect to Rule 10b-5(b).  (Dkt. 439).  Tourre now moves the Court to enter judgment as a matter of law in his favor under Federal Rule of Civil Procedure 50 ("Rule 50"), or, alternatively, for a new trial pursuant to Federal Rule of Civil Procedure 59 ("Rule 59").

As shown below, Tourre fails to meet the high legal burden for either type of relief. Indeed, Tourre identifies no actual legal error and has failed to demonstrate a complete absence

---

[1]    The Memorandum of Law of Fabrice Tourre in Support of his Motions for Judgment as a Matter of Law and a New Trial is referred to as "Mem." throughout this memorandum.  Plaintiff's exhibits are referred to as "PX" followed by the applicable number.  All relevant portions of the cited exhibits are attached, in numerical order, to the Declaration of Bridget M. Fitzpatrick in Support of the SEC's Opposition to Tourre's Motions for Judgment as a Matter of Law and a New Trial ("Fitzpatrick Dec."). Citations to the trial transcript are preceded by "Tr."  The transcript of the trial is consecutively paginated and appears as numbers 441-468 on the case docket.

[2]    AC1 was a synthetic collateralized debt obligation ("CDO") with a static reference portfolio comprised of 90 Baa2 tranches of residential mortgage backed securities ("RMBS").  (Tr. 2423).  On April 26, 2007, GS&Co sold $42 million of AC1 notes to Zenith Funding Limited, and $150 million of AC1 notes to Loreley Financing (Jersey) No.29 and Loreley Financing (Jersey) No.30 (collectively "Loreley").  (Tr. 2423-24).  On the same day, GS&Co entered into a swap agreement with the Paulson & Co hedge fund ("Paulson") in which Paulson bought $192 million in protection on the AC1 reference portfolio.  (Tr. 2432).  On May 31, 2007, GS&Co entered into credit default swaps referencing the AC1 portfolio with both ABN Amro Bank NV ("ABN"), which took a long position, and Paulson, which took a short position.  (Tr. 2432-33).  ABN, in turn, entered into a credit default swap with ACA Credit Products-ABN Amro LLC.  (Tr. 2433-34).

of evidence supporting the jury's verdict. The SEC adduced substantial evidence that Tourre and GS&Co engaged in a scheme to defraud by lying to ACA Management LLC (together with affiliates, "ACA"), a portfolio selection agent, so that ACA would work with a short investor, the Paulson & Co hedge fund ("Paulson"), to select the reference portfolio for AC1. This evidence included a false email that Tourre sent to ACA and a recorded telephone call in which a GS&Co employee who relied on Tourre for information told ACA that Paulson was buying 100 percent of the equity in AC1, a long investment, when in fact Paulson planned to be a purely short investor. Through these and other actions, Tourre and GS&Co hid Paulson's conflict of interest – its economic incentive to select assets more likely to decrease in value – from ACA. As a result, ACA worked with Paulson to select the AC1 portfolio, beginning with a list of reference obligations that Paulson provided, and allowed Paulson to veto any unwanted substitutions. Tourre and GS&Co then marketed AC1 to long investors by claiming that its portfolio was selected by ACA alone. Paulson's role in the process and its conflict of interest was never disclosed.

Tourre ignores the substantial evidence of this scheme and argues that the entire trial was limited to two misrepresentations that the jury allegedly rejected in finding Tourre not liable with respect to Rule 10b-5(b). This argument fails for many reasons, including (1) the false assumption that the jury's verdict was inconsistent when in fact the jury's findings with respect to all seven counts are logically consistent, (2) the vast evidence of a scheme beyond the misrepresentations that Tourre addresses in his Motion, (3) legal authority that purportedly inconsistent jury verdicts are not a basis for judgment as a matter of law, and (4) Tourre's agreement – without objection – to the dismissal of the jury, which constituted a waiver of any argument for a new trial based on inconsistent jury verdicts.

Tourre's other arguments are equally meritless.  First, the jury properly found that Tourre aided and abetted a primary violation of Rule 10b-5 by GS&Co (count 7) under well-established principles of *respondeat superior*.  A reasonable jury could find a primary violation of Rule 10b-5 by GS&Co based on the conduct of Tourre or other employees at GS&Co.  Second, the jury properly found that Tourre obtained money and property as a result of his fraud as required for liability under Section 17(a)(2) (count 2).  Tourre admitted earning a salary and bonus in 2007 and there was evidence directly and indirectly tying that money to his work on AC1.  Third, the evidence at trial established that the fraud was carried out through domestic offers as required by Section 17(a).  Tourre and his GS&Co colleagues repeatedly sent emails and made oral offers to investors from the United States that contained the false and misleading statement that ACA alone selected the AC1 portfolio.

Tourre raises other challenges to the jury's verdict by referring back to his prior Rule 50 motion without reference to additional evidence or legal authority.  He also challenges this Court's finding that some of the relevant swap agreements were security based as a matter of law.  Because Tourre mounts these challenges without reference to additional evidence or legal authority, he provides the Court no proper basis for reconsideration of its prior, correct rulings.

As set forth in more detail below, a wealth of evidence supports the jury's correct conclusion that Tourre violated the securities laws.  Tourre has identified no missing fact, legal flaw, or miscarriage of justice that would warrant the extraordinary relief he seeks, setting aside a jury's verdict.  Tourre's motion should therefore be denied.

## STANDARD OF REVIEW

The Second Circuit imposes an extremely high legal hurdle for a party to obtain judgment as a matter of law.  Rule 50 provides that a court may not grant such a motion unless "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would

not have a legally sufficient basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

The movant's burden "is particularly heavy where, as here, the jury has deliberated in the case

and actually returned its verdict." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). A

court may not override the jury unless "the evidence is such that, without weighing the

credibility of the witnesses or otherwise considering the weight of the evidence, there can be but

one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc.

v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998); *see also Concerned Area Residents for Env't v.

Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (requiring a "complete absence of evidence").

In evaluating a Rule 50 motion, a court must "consider the evidence in the light most favorable"

to the Commission, giving it "the benefit of all reasonable inferences that the jury might have

drawn" in its favor. *Zellner v. Sumerlin*, 494 F.3d 344, 371 (2d Cir. 2007). Although the Court

"should review the record as a whole, it must disregard all evidence favorable to the moving

party that the jury [was] not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530

U.S. 133, 151 (2000).

The Second Circuit maintains a similarly stringent standard for ordering new trials

pursuant to Rule 59, foreclosing such relief unless "the jury's verdict was 'seriously erroneous'

or 'a miscarriage of justice.'" *Elyse v. Bridgeside Inc.*, 367 Fed. Appx. 266, 268 (2d Cir. 2010)

(quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992)). *Accord Marcoux v.

Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 462 (S.D.N.Y. 2003) (the court should

"abstain from interfering with the verdict unless it is quite clear that the jury has reached a

seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of

justice"). As with a Rule 50 motion, ordering a new trial under Rule 59 is extraordinary relief,

which "is properly granted only upon a showing of exceptional circumstances." *Welch v. United*

*Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)).

## ARGUMENT

### I.     The SEC Introduced Substantial Evidence That Tourre Engaged In A Scheme To Defraud.

Tourre incorrectly contends there was no evidence from which the jury could have found a scheme and, therefore, the jury's finding of liability with respect to claims under Section 17(a)(1) and 17(a)(3) of the Securities Act, Rule 10b-5(a), and 10b-5(c) cannot stand.  Mem. at 10-14.  In making this argument, Tourre endeavors to limit artificially the SEC's evidence of a scheme to a single slide in the SEC's closing power point presentation.  Mem. at 11.  Tourre characterizes this slide as "two particular" misrepresentations and, ignoring eleven days of testimony and hundreds of exhibits, argues that: (1) there was no evidence of a scheme other than what was written in the slide; and (2) the jury found that Tourre did not make these statements.  *Id*.  As set forth in more detail below, both assertions are without merit.  And, in any event, Tourre has waived any argument based on inconsistent jury verdicts by failing to lodge his objection before the jury was dismissed.

### A. The SEC Proved A Broad Scheme That Went Well Beyond The Two Misstatements Identified By Tourre.

The Court instructed the jury that a scheme may involve all kinds of manipulative and deceptive acts, including "false or fraudulent pretenses, untrue statements or omissions of material facts [], [and] representations, promises and patterns of conduct calculated to deceive." (Tr. 2782-83).  The Court further elaborated that, a "material misstatement or omission can be part of a device, scheme or artifice to defraud."  (Tr. 2783).  Under the instruction given, the jury heard ample evidence that supported its finding of scheme liability at trial.

The two misstatements seized on by Tourre were merely two aspects of a far-ranging scheme that went on for months and involved multiple deceptive acts and participants.  The AC1

transaction was at the center of the scheme.  It was structured by GS&Co's mortgage correlation trading desk ("correlation desk").  (Tr. 660-61, 697-98).  Tourre was the deal captain, or the employee on the correlation desk with primary responsibility for AC1.  (Tr. 660-61, 698-99, 855-56, 2208).  The transaction was his idea.  (PX-192 ("my idea to broker the short" and "[m]y idea to discuss with ACA who could do the supersenior at the same time"), Tr. 1916, 2209).

With AC1, GS&Co "effectively work[ed] an order for Paulson to buy protection on specific layers of the AC1 capital structure."  (PX-233).  In Tourre's words, GS&Co was "broker[ing] the short" for Paulson.  (PX-192).  The portfolio consisted of RMBS that Paulson had an "appetite to short."  (PX-11, Tr. 671, 2423).  The scheme centered on the actions that Tourre, others at GS&Co, and Paolo Pellegrini of Paulson undertook to ensure that the portfolio met Paulson's specified criteria – which were designed to identify the RMBS most likely to experience credit events – while hiding Paulson's influence on the portfolio from the market.[3] (PX-10, PX-11, Tr. 329, 388, 2105).  It encompassed multiple misrepresentations as well as the structure of the transaction itself.

---

[3]      Tourre also argues that "the SEC offered no argument or evidence at trial that anyone else at Goldman was party to the supposed scheme."  Mem. at 13.  First, Rule10b-5 and Section 17(a) do not require multiple participants for there to be a scheme.  *See In re Gupta Corp. Securities Litig.*, 900 F. Supp. 1217, 1244 (N.D. Cal. 1994) ("A scheme need not refer to a conspiracy, however.  One person can scheme alone to break all manner of laws, including federal securities laws. Indeed, the reference to 'any person' in the text of the rule suggests that Congress contemplated the possibility that one person would scheme to defraud the investing public.").  Courts uphold SEC scheme liability actions even though no more than a single person is party to the scheme.  *See, e.g.*, *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002) ("The SEC claims respondent engaged in a fraudulent scheme in which he made sales of his customer's securities for his own benefit").  Second, there was evidence from which a reasonable jury could conclude that Pellegrini was a participant in the scheme.  He met with ACA on at least three occasions – one of which Tourre described as "surreal."  (PX-43, PX-122, PX-144).  He testified that he "consistently had the same script for all the CDO managers [he] met with," and one of Pellegrini's emails revealed that script entailed "play[ing] the role of the potential equity investor."  (PX-132, Tr. 484).  His employer, Paulson, made more than $1 billion on the transaction, and Pellegrini personally made $20 million.  (Tr. 610-11).  Finally, for the reasons set forth in Section II, *infra*, a reasonable jury could find that Tourre's supervisor, Jonathan Egol, and his closest colleague on the AC1 transaction, David Gerst, were party to the scheme.

### 1. GS&Co And Tourre Needed A Portfolio Selection Agent To Market AC1 To Potential Investors.

GS&Co planned to make money on the AC1 transaction by selling Paulson protection at a higher price than the price at which it purchased protection from long investors in AC1. (PX-233, Tr. 773, 2057). However, it would be difficult to attract long investors to a CDO portfolio selected by a short investor with an economic interest in including the assets most likely to experience credit events. (Tr. 2105, Fitzpatrick Dec. at Ex. 1, Deposition Designations of Dean Atkins, p. 62-63, 69). Tourre and GS&Co knew of such investor concerns and planned to broaden the investor base for AC1 by using a portfolio selection agent, an expert who was supposed to work in the interests of long investors. (PX-233 at 2 ("we expect that the role of ACA as Portfolio Selection Agent will broaden the investor base for this and future ABACUS offerings"), Tr. 1932).

The need for a portfolio selection agent was particularly apparent with respect to IKB, a German Bank that was one of the correlation desk's top customers and a long investor in six prior ABACUS transactions.[4] (DX-1028, Tr. 898-900, 907). As early as October 2006, Tourre contemplated that IKB would be a long investor in AC1. (PX-11). However, by October 2006, the CDO market was deteriorating. (Tr. 2126, 2261). In November 2006, Tourre learned that IKB had vetoed a proposed ABACUS transaction with a portfolio of 2006 RMBS rated Baa2, the exact product Paulson wanted to short. (PX-13). Tourre found it "a little bit concerning" that the proposed portfolio did not "pass" IKB's credit analysis and learned that IKB was unlikely to do a transaction involving 2006 RMBS unless it was a "managed deal[]." (PX-13).

To execute the transaction, Tourre had to balance the desire of long investors to have a portfolio selected by an expert acting in their interest with Paulson's desire to short a portfolio that met its specified criteria. The first step of the scheme was to identify a portfolio selection

---

[4]     "ABACUS" refers to a series of note issuances for synthetic CDOs by GS&Co. (Tr. 668).

agent that would be "flexible" and ideally work from a list of names identified by Paulson.  (PX-19, Tr. 708-09, 1926-27).   Tourre knew that finding a portfolio selection agent willing to do this would be a difficult feat.  In debating which agents to approach, he expressed concerns that one candidate would "never agree to the type of names Paulson want[s] to use," and would not want to put their name "at risk for small economics on a weak quality portfolio whose bonds are distributed globally."  (PX-19 at 2, Tr. 712, 714).

As part of the scheme, Tourre and GS&Co set up meetings for Paulson with potential portfolio selection agents, including ACA.  (PX-31, Tr. 1962-63).  It was "protocol" for Tourre to communicate with ACA through Gail Kreitman, a GS&Co saleswoman who had a longstanding relationship with ACA.  (Tr. 1078, 1080, 1901).  On January 5, 2007, Kreitman contacted Laura Schwartz, the head of ACA's asset management business, about setting up a meeting to take place the following week at Paulson's offices.  (PX-37).  On January 8, 2007, Tourre attended a meeting between Pellegrini and Schwartz at Paulson's office in New York.  (PX-43, Tr. 1091-94, 1962-63).  Paulson's role as a purely short investor was not communicated to ACA at this meeting.  (Tr. 1882).  After the meeting, Schwartz wrote Kreitman an email stating, "I have no idea how it went … it didn't help that we didn't know exactly how they [Paulson] wanted to participate in the space.  Can you get us some feedback?"  (PX-47, Tr. 1094).  Kreitman forwarded Schwartz's email to Tourre, who responded and was thus aware of ACA's ignorance of Paulson's real financial interest in the transaction.  (PX-47).

### 2.  Tourre Deceived ACA.

On January 9, 2007, the day after the Paulson-ACA meeting and Schwartz's email expressing uncertainty about Paulson's role in the transaction, Tourre sent Kreitman an email with the subject line, "For ACA," which was copied to all of Tourre's colleagues and his direct supervisor on GS&Co's mortgage correlation desk.  (PX-51).   Kreitman was a funnel for

communications with her client, ACA, and she frequently copied information from Tourre into her emails to ACA. (Tr. 754, 1096-97, 1099). On January 10, 2007, Tourre sent a similar email directly to ACA, again copying Tourre's colleagues and boss on the correlation desk. (PX-61). Tourre's two emails "For ACA" contained the following, identical false or misleading statements:

- The emails identified Paulson as the "transaction sponsor," a term that Tourre's direct supervisor testified customarily referred to long investors, when in fact Paulson planned to take a short position in AC1. (PX-51, PX-61, Tr. 756, 760).

- The emails stated that the 0-9% portion of the contemplated capital structure was "pre-committed first loss," referencing the CDO's equity tranche, when in fact there was never a plan to issue equity. (PX-51, PX-61, Tr. 910, 1897, 1899).

- The emails stated that the compensation structure of the proposed transaction "aligns everyone's incentives: the Transaction Sponsor [Paulson], the Portfolio Selection Agent [ACA] and Goldman," when in fact Paulson had an economic incentive for the portfolio to experience credit events and ACA had an economic incentive for the portfolio to survive. (PX-51, PX-61, Tr. 1932, 1937-38).

Tourre admitted at trial that the email he sent to ACA "was not accurate." (Tr. 1898). Tourre's misrepresentations were designed to and did in fact create the misimpression that Paulson was an equity investor. (PX-150 (in response to a virtually identical email, Egol asked if "'pre-committed' FL" meant that TCW, identified as "the transaction sponsor," wrote GS&Co protection), Tr. 1908-13).

There was evidence adduced at trial that Tourre discussed his January 10 email with Schwartz. (PX-62, PX-72). Tourre subsequently learned that Schwartz believed Paulson was an equity investor, the essential falsehood embedded in the email. On January 16, 2007, Kreitman forwarded Tourre a three-sentence email from Schwartz with the subject line, "Call with Fabrice on Friday." (PX-72). In the email, Schwartz wrote, "I can understand Paulson's equity perspective." (PX-72). Tourre testified that the phrase "equity perspective" meant investing in the equity of a CDO, which is a long investment. (Tr. 1952, 1956). Tourre replied to the email,

thanking Kreitman for sending him Schwartz's email about Paulson's equity perspective, but he did not correct Schwartz's misimpression by stating that Paulson was not an equity investor but was, in fact, a purely short investor.  (PX-71, Tr. 1958-1958, 2057, 1084).  Critically, Tourre also forwarded the email to David Gerst, his closest colleague on the AC1 transaction, with the comments, "see below" and "[l]et's sit down and discuss."  (PX-72).  Tourre conceded that, if he read the equity perspective email, he should have advised Kreitman that Paulson did not have an equity perspective.  (Tr. 2054).  Yet he never advised Kreitman or Schwartz of that crucial fact. (Tr. 2071, 2046).  The jury could reasonably infer from these actions that Tourre read Schwartz's entire three-sentence email about "Paulson's equity perspective," instead of just the third sentence (the only sentence Tourre would admit to having read on the witness stand), and deliberately failed to correct the misimpression he had created.  (PX-71, PX-72, Tr. 1945-48).

Indeed, the lie about Paulson's equity perspective was never corrected, and Schwartz believed that Paulson was buying equity in AC1 the entire time she worked on the transaction. (Tr. 1618).  Months later, when the transaction was priced, Schwartz emailed her CDO team and supervisor that Paulson invested in AC1's equity.  (PX-280 ("a big hedge fund new to ACA [is] … investing in the 0-10% tranche"), PX-286 ("Paulson took down a proportionate amount of equity")).  It was part of the scheme that through months of emails, calls and meetings, Tourre, GS&Co, and Paulson never corrected Schwartz's misimpression despite having numerous opportunities to do so.  (Tr. 1943-44, 2057, 2070).

Notably, the day after Tourre learned that ACA believed Paulson was an equity investor, Tourre emailed Kreitman, "Let's try to close the loop with ACA this morning!"  (PX-82). Kreitman subsequently called Lucas Westreich, an employee in Schwartz's group at ACA, and unequivocally asserted that Paulson was buying 100 percent of the equity in AC1.  (PX-87A (transcript of PX-87), Tr. 1105-07).  Kreitman, who was the chief point of contact with ACA,

believed that Paulson was a long investor from the time of the deal up to the time she prepared for her deposition in approximately 2010.[5]  (Tr. 1225).  Tourre and GS&Co repeatedly conveyed to ACA that Paulson was choosing the portfolio selection agent, a representation that reinforced ACA's belief that its interests were aligned with Paulson's.  (PX-96, PX-98 ("Here is what I think could work for Paulson")).

ACA agreed to serve as the portfolio selection agent for AC1.  (PX-176).  The jury could reasonably conclude that ACA undertook this commitment under the false belief – perpetuated by Tourre – that Paulson was an equity investor and that it was Paulson's decision to select the portfolio selection agent.  (PX-167 at 2 ("This transaction was structured as a result of a 'beauty pageant' whereby [Paulson] selected us as the Portfolio Selection Agent" and "[t]he hedgefund is taking the 0-10% tranche")).  Both Schwartz and ACA's CEO testified that ACA would not have approved the AC1 engagement if they had known that Paulson was a purely short investor.  (Tr. 1593-1594, 1370, 1468).

### 3.   ACA And Paulson Picked The AC1 Portfolio Together.

Tourre's efforts to deceive ACA were key to the scheme's execution and success.  Tourre and others at GS&Co arranged for Paulson to meet directly with ACA and were go-betweens for emails between Paulson and ACA to select the AC1 portfolio.  Tourre understood that, as a pure short, Paulson would "benefit if losses on the portfolio occur."  (Tr. 1917-1918).  However, ACA believed it was working with Paulson as a long or equity investor.  (Tr. 1618, 1620).  Equity investors occasionally had input on ACA's portfolios because they were the first long investor to lose money if an asset in the portfolio failed.  (Tr. 1360-61).  But the trial testimony established that ACA would not have worked with Paulson to select a portfolio if it had known that Paulson

---

[5]   Kreitman testified that, in the course of her work on the AC1 transaction, she believed Paulson was a long investor.  (Tr. 1084, 1104, 1107).  Tourre was Kreitman's primary source of information about the AC1 transaction.  (Tr. 1085, 1100).

was a purely short investor.  (Tr. 1362).  Such a conflict of interest would have put ACA's "name at risk."  (PX-19, Tr. 1362).

Believing that Paulson was an equity investor, ACA worked with Paulson to select the AC1 portfolio.  (PX-104, PX-122, PX-205, PX-207, PX-240, PX-243, Tr. 2056-57).  ACA began its work on the portfolio by reviewing a list of 123 names that Paulson initially provided to GS&Co as a list of assets that Paulson wanted to short.  (PX-48, PX-49, PX-104).  Paulson exercised veto power over names that ACA proposed and directed ACA to find names to replace those to which ACA did not agree.  (PX-145 ("if you are absolutely adamant about excluding each of the bonds listed below, I hope that you will be able to come up with recent names that fit our criteria"), PX-149 ("I attach the portfolio you proposed with 8 deletions")).  Paulson approved every name that went into the portfolio.  (PX-305, PX-153, PX-205, PX-207, PX-240, PX-243).  Schwartz testified that the portfolio was selected by ACA *and Paulson.*  (Tr. 1620).

Finally, another aspect of the scheme was to make the portfolio static, which meant that it could not change over the life of the CDO.  (Tr. 695, 1030-31).  This was the first ABACUS transaction involving both a portfolio selection agent and a static portfolio.  (PX-233, Tr. 1034). In its other CDOs, ACA defensively managed portfolios to avoid downgrades.  (Tr. 1348-49). With a static portfolio, ACA had no ability to substitute new RMBS for those Paulson had approved if subsequent problems emerged.  (PX-167 at 2 ("no ability to defensively sell credit risk securities")).

### 4.  Tourre And GS&Co Prepared Marketing Materials For AC1 That Were Designed To Deceive Actual And Potential Long Investors.

Tourre and GS&Co hid Paulson's involvement in choosing ACA as the portfolio selection agent and in selecting the portfolio from actual and potential AC1 investors.  (Tr. 2103-10, 2115-16).  Tourre and GS&Co wanted to use ACA's name on the transaction to attract long investors.  (PX-158 ("make sure ACA understands [] we want their name on this transaction"

and "we can use ACA's branding to help distribute the bonds"), Tr. 2130).   But disclosing Paulson's role would have had the opposite impact.   (Fitzpatrick Dec. at Ex. 1, p. 62-63).   In February 2007, Tourre drafted "marketing points" that touted ACA's role in selecting the portfolio but made no mention of Paulson.   (PX-170).   This became the strategy for marketing AC1.   GS&Co expected "to leverage ACA's credibility and franchise to help distribute this Transaction."   (PX-233, Tr. 786).

The strategy was apparent in the offering documents, including the term sheet and flipbook, which were used to market AC1 to long investors.   (Tr. 792, 800).   Tourre had primary responsibility for both documents.   (Tr. 2114-15, 2210).   The term sheet stated that AC1's portfolio was "selected by ACA" with no reference to Paulson.   (PX-201, Tr. 798).   Similarly, the flipbook described the portfolio as "selected by ACA" with no reference to Paulson.   (PX-202, Tr. 801, 804).   It touted ACA's "alignment of economic interest" with long investors, and ACA's track record.   (PX-202 at 27, Tr. 806-07).

The strategy of focusing on ACA's role and concealing Paulson's was carried out by Tourre and GS&Co in other aspects of the AC1 offering.   Tourre prepared marketing points for GS&Co's sales force to sell AC1.   (PX-208, Tr. 2197-98).   The first point was that the portfolio was selected by ACA.   (PX-208).   The marketing points also highlighted that the fee structure aligned ACA's incentives with investors, but made no reference to Paulson's role in constructing the CDO.  (PX-208, Tr. 2199).

The offering circular, the formal document prepared for the purpose of offering AC1 securities to investors, identified ACA as the portfolio selection agent but made no reference to the role Paulson played in the selection of the reference portfolio.   (PX-305, Tr. 829, 831). Tourre reviewed portions of the offering circular.   (Tr. 2210).   The representation in all of the offering materials that the portfolio was selected by ACA alone was contradicted at trial by

Tourre's own description of the process when GS&Co considered whether to make its own investment in AC1.   In that context, Tourre described the portfolio as "selected by ACA/Paulson." (PX-326).

The AC1 flipbook, term sheet, and offering circular were sent to numerous potential investors.  (PX-238, PX-241, PX-302, PX-336, PX-397, PX-399).  They were also sent to IKB, which advised Loreley to purchase $150 million of AC1 notes.  (PX-183, PX-228, PX-246, PX-250, PX-261, PX-315, Tr. 903).  Tourre did not tell IKB or its sales coverage at GS&Co about Paulson's role in the portfolio selection process.   (Fitzpatrick Dec. at Ex. 2, Deposition Designations of Michael Nartey, p. 42, 113).  And ACA, which also invested in AC1, was not aware of Paulson's conflict of interest with respect to the portfolio.  (PX-280, PX-286, Tr. 1618).

## 5.   Tourre And GS&Co Used Intermediation To Protect GS&Co from ACA's Long Investment.

ACA's investment in AC1 took two forms.  ACA purchased notes on behalf of a CDO it managed and entered into a credit default swap referencing the super senior portion of the AC1 portfolio.  (Tr. 1609).  Because the super senior investment was made through a credit default swap, it was not funded in advance.  (Tr. 1375).

GS&Co's trading policies did not allow it to face ACA directly in a credit default swap, so it had to induce a financial institution to intermediate on behalf of ACA.  (Tr. 772, 2156).  The jury heard evidence that Tourre was concerned about ACA in the event of a default.  The day Tourre learned that ACA had approved the super senior investment, he emailed higher ups at GS&Co that they should take a short position on ACA in "as big a size as possible."   (PX-256, PX-257, Tr. 2205, 2207).

Tourre considered ACA's super senior investment "too big [a] P&L for [him] to give up."[6]  (PX-300).  He convinced ABN to serve as an intermediary so the trade could be executed. As an intermediary, ABN stood between GS&Co and ACA. (Tr. 2157-58).  If credit events occurred, ABN was required to pay GS&Co regardless of whether ACA paid ABN.  (Tr. 2158). ABN thus had an interest in AC1 performing well.  When persuading ABN to intermediate between GS&Co and ACA, Tourre reiterated the half-truth that ACA alone selected the portfolio.  (PX-289, PX-290, Tr. 2174).  Tourre sent ABN emails and had a "long call" with ABN before they agreed to do the intermediation trade with ACA.  (PX-289, PX-290, PX-328, Tr. 2179).  He did not mention Paulson's role in selecting the portfolio, information which would have been important to ABN's analysis of the transaction.  (Fitzpatrick Dec. at Ex. 1, p. 62-63).

The swap agreements between GS&Co, ABN, and ACA closed on May 31, 2007.  (Tr. 2156, 2180).  Within two months, GS&Co was discussing the likelihood of AC1 being downgraded by the ratings agencies.  (PX-367 ("as expected, S&P is starting to review some of our ABACUS deals"), Tr. 2189-90).  Within a year, Tourre sent an email to others at GS&Co about unwinding ABN's position in AC1.  He noted that AC1 was "worse than the ABX.06-1 BBB and INDX," two indexes that tracked the RMBS market.  (PX-372).  Tourre also wrote that there was a "99.99% probability of full writedown within 2-3 yrs."  (PX-372, Tr. 2216-17). Paulson made more than $1 billion on the transaction.  (Tr. 610-11).  The majority of that money was paid by ABN.  (Tr. 2207-08).

***

In sum, the SEC introduced abundant evidence of a scheme in which Paulson shorted a portfolio of assets that it had assisted in selecting and GS&Co sold the CDO referencing that portfolio on the false and misleading basis that it had been "selected by ACA."  The

---

[6]     P&L, short for "profit and loss," referred to the profitability of transactions structured by the correlation desk, which could have an impact on employee bonuses.  (Tr. 2177-78).

misrepresentations seized on by Tourre were merely two actions of several taken in furtherance of this scheme. They were not the sum and substance of the scheme.

### B. Tourre Waived Any Argument Of An Inconsistent Jury Verdict.

Tourre ignores vast portions of the trial record in order to cabin artificially the SEC's evidence of a scheme to the misstatements that were at issue in count 5 (Rule 10b-5(b)), the lone count on which the jury found Tourre not liable. This argument not only mischaracterizes the breadth of the record supporting the jury's finding of liability on the scheme counts, it rests entirely on an impermissible ground for judgment as a matter of law. "[A] Rule 50 motion may only be sustained based on insufficiency of evidence – not on an alleged inconsistency in the jury's verdict." *In re The Reserve Fund Sec. & Derivative Litig.*, 09 Civ. 4346(PGG), 2013 WL 5432334, at *7 (S.D.N.Y. Sept. 30, 2013); *see also Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 87 (2d Cir. 2006); *Tolbert v. Queens College*, 242 F.3d 58, 74 (2d Cir. 2001); *In re Vivendi Universal S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 550 (S.D.N.Y. 2011). "The Court's task on a Rule 50 motion is not to examine different aspects of the jury's verdict to determine whether they can be logically reconciled with one another." *Vivendi,* 765 F. Supp. 2d at 546. A court "must look to all evidence in the record on which the jury could have based a finding of liability, rather than try to divine what the jury had in mind." *Reserve Fund*, 2013 WL 5432334, at *7. Here, the evidence of a scheme was substantial and compelling, and the jury based its finding of liability on that evidence. *See, supra*, Section I.

To the extent Tourre is seeking a new trial based on purported inconsistencies within the verdict, that argument has been waived. "It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka*, 462 F.3d at 83; *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56-57 (2d Cir. 2002) (party waived objection to inconsistency between two general verdicts by failing to object

to the jury instructions or verdict form before the jury retired).  Tourre permitted the jury to be excused without objecting to the verdict.  The Court asked, "Counsel, is there any reason why the Court should not dismiss the jury at this time?" (Tr. 2846).  Tourre's counsel replied, "No, your Honor."  (Tr. 2846).  This was a waiver.  Tourre cannot seek a new trial based on any purported inconsistencies with the verdict.  *See Reserve Fund*, 2013 WL 5432334, at *7 n.5 (defendants waived right to motion for a new trial when court asked if they had any applications with respect to the jury's verdict and defense counsel responded, "[n]ot at the moment your Honor"); *Vivendi*, 765 F. Supp. 2d at 550-51 (finding waiver where defendant failed to object prior to jury being discharged).

Regardless, Tourre's argument assumes an inconsistency where there was none.  The jury's finding of no liability with respect to count 5 could have been based on a legal issue unique to that count, namely, whether Tourre was "the person with ultimate authority over a false statement to ACA."  (Tr. 2802).  As set forth in more detail in Section II, *infra,* the jury heard evidence that could have led it to conclude Tourre's supervisor and others at the investment bank participated in the scheme.  Thus, the jury could have found that Tourre did not possess ultimate authority within GS&Co's hierarchy for certain of the misstatements, but also found that he engaged in the relevant conduct.  *See Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) (holding that "reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency" (citation omitted)).  Moreover, "consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment [in a civil action]." *See Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1290 n.17 (2d Cir. 1969); *see also U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1045-46 (S.D.N.Y. 1986) (observing that consistent verdicts in separate claims not required), *aff'd*, 842 F.2d 1335 (2d Cir. 1988).

## II.     Tourre Aided And Abetted Securities Fraud Violations By GS&Co.

Tourre challenges the jury's finding that he aided and abetted securities fraud (count 7) on the purported ground that – although he claims to have done nothing wrong – he acted alone and thus there was no securities violation by GS&Co to aid and abet.  Mem. 13-17.  Tourre's argument ignores both that GS&Co's liability may be premised on Tourre's own misconduct pursuant to the principles of *respondeat superior*, and the magnitude of the evidence from which a reasonable jury could have concluded that others at GS&Co participated in the scheme.

Liability for aiding and abetting required a finding that GS&Co violated Rule 10b-5.  (Tr. 2806).  As the Court instructed the jury:

> To determine whether Goldman Sachs committed a violation of Section 10(b) and the subpart of Rule 10b-5, you must determine whether any one or more of its employees or agents committed a violation of a subpart of Rule 10b-5(a), (b) or (c), while acting within the scope of his or her employment.  This includes Mr. Tourre as an employee of Goldman Sachs.  (Tr. 2806).

A reasonable jury could find that GS&Co violated Rule 10b-5 based on the substantial evidence, set forth above, that Tourre engaged in a scheme to defraud by misleading ACA into believing that Paulson was an equity investor, facilitating Paulson's participation in the portfolio selection process, and then concealing that participation from long investors through a series of false and misleading written and oral statements.  Because Tourre was acting within the scope of his employment at GS&Co when he undertook these actions, that conduct may be taken into account in determining whether there was a primary violation by GS&Co.[7]  *See Teamsters Local 445*

---

[7]     Tourre challenged the Court's instruction that his own conduct could be imputed to GS&Co for the purpose of determining whether there was a primary violation.  *See* Chepiga Dec., Ex. 5, p. 59-61 (citing *S.E.C. v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012); *S.E.C. v. DiBella*, 587 F.3d 553 (2d Cir. 2009); *S.E.C. v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013)).  However, the Court held that, under principles of *respondeat superior*, an individual violator can aid and abet his corporate employer and be liable for aiding and abetting so long as the elements of knowledge and substantial assistance are satisfied.  (Tr. 2544 ("In terms of aiding and abetting, again, . . . the Court has already made a determination that the *respondeat superior* principles will apply.")).  This ruling was correct.  *See S.E.C. v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (holding that individual defendant's conduct and intent may be attributed to the company in determining whether company committed a primary

*Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.").

 To the extent that participation by others is necessary to establish GS&Co's liability, there was also evidence from which a reasonable jury could find that Tourre's direct supervisor, Jonathan Egol, and a colleague on the correlation desk, David Gerst, participated in the fraudulent scheme.  Egol supervised Tourre's work on the correlation desk and the jury heard evidence that Egol was aware of:  Paulson's conflict of interest as a short investor, the communication to ACA that Paulson was an equity investor, Paulson's subsequent involvement in portfolio selection, and the concealment of that involvement from potential long investors. (Tr. 887-888).

 More specifically, Egol knew AC1 was created to accommodate Paulson's "appetite to short" 2006 RMBS, and he provided suggestions in response to Tourre's email about finding a portfolio selection agent that would be "flexible" with respect to names and "ideally" work from a list that met Paulson's criteria.  (PX-11, PX-19).  In the same email, Tourre referenced the desired "weak quality portfolio," which Egol understood to mean "residential mortgage backed securities obligations that might be more likely to suffer credit events than the average."  (Tr. 714).  Tourre copied Egol on the inaccurate January 10 email to ACA that described Paulson as the "transaction sponsor" and stated that AC1's first loss tranche was "pre-committed."[8]  (PX-61).  Egol testified that he would not have used the term "transaction sponsor" to describe

---

violation that the individual defendant aided and abetted); *S.E.C. v. Koenig*, No. 02 C 2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007) (same); *S.E.C. v. Cohen*, No. 4:05CV371-DJS, 2006 WL 2225410, at *4 (E.D. Mo. Aug. 2, 2006) (same).

[8] At trial, Egol did not recall reading Tourre's inaccurate January 10 email to ACA.  (Tr. 758).  However, a reasonable jury could find that he did in fact read the email that was sent to him about a transaction with the potential to earn "significant" revenue for the correlation desk.  (Tr. 704).

Paulson's role in AC1.  (PX-61, Tr. 673-74, 756, 765).  However, there was no evidence that Egol corrected Tourre's misstatement to ACA.  (Tr. 1618).

Egol knew that "Paulson suggested certain items" for inclusion in the reference portfolio. (Tr. 793, 847).  He was copied on an internal GS&Co email where Tourre accurately described the portfolio as "selected by ACA/Paulson."  (PX-326).  He was aware of Paulson's conflict of interest: its economic incentive for the AC1 reference portfolio to experience credit events.  (Tr. 848-49).  But he took no steps to ensure the disclosure of that conflict.  To the contrary, he was not aware of any disclosure of Paulson's interaction with ACA in the marketing documents for AC1.  (Tr. 850-51, 855).  He reviewed the flipbook and was copied on emails sending the offering circular and other marketing documents to IKB.  (PX-261, Tr. 2231).  Those documents contained no reference to Paulson.  (PX-202, PX-261, Tr. 804, 1051).  Because Egol was acting within the scope of his employment at GS&Co, the jury could impute all of this conduct to GS&Co for the purpose of finding a violation of Rule 10b-5.  *See Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195.

The conduct of David Gerst, a GS&Co vice president who worked on the correlation desk with Tourre, also supports the jury's finding that GS&Co violated of Rule 10b-5.  *Id.* Tourre testified that, "for this transaction, [he] always involve[d] David Gerst."  (Tr. 2036).  The jury saw numerous emails supporting this assertion, and from which they could reasonably infer that Gerst was aware of: Paulson's conflict of interest, Tourre's misstatements to ACA, Paulson's participation in the portfolio selection process, and the false and misleading statements in the AC1 offering materials.  (PX-10, PX-11, PX-61, PX-72, PX-104).

More specifically, Gerst helped form the initial strategy for the transaction, discussed the use of a portfolio selection agent with both Pellegrini and Tourre, and participated in the internal email exchanges about finding a portfolio selection agent that would be "flexible" with respect to

names.  (PX-11, PX-19, Tr. 678).  Gerst was copied on emails with ACA and Kreitman falsely

portraying Paulson as an equity investor.  (PX-51, PX-61, PX-72).  Tourre forwarded Schwartz's

email about "Paulson's equity perspective" to Gerst, stating, "David – see below.  Let's sit down

and discuss when you get a chance."  (PX-72).  There was no evidence that Gerst corrected that

false belief.  (Tr. 1104, 1618).  Gerst participated in communications between ACA and Paulson

about the portfolio and knew that Paulson both deleted names suggested by ACA and, ultimately,

approved all of the reference obligations that were chosen.  (PX-104, PX-106, PX-114, PX-122,

PX-135, PX-137, PX-138, PX-145, PX-149, PX-151, PX-153).  Gerst then worked to market the

transaction – sending the preliminary term sheet and other documents to a member of GS&Co's

sales team so they could be forwarded to IKB – and, in doing so, did not make any mention or

reference to the role Paulson played in the portfolio's selection.  (PX-181, PX-244, Tr. 797,

2134).  He also sent out AC1 marketing materials to other potential long investors that described

the portfolio as "selected by ACA" without reference to Paulson.  (PX-180).  Because Gerst was

acting within the scope of his employment at GS&Co, the jury could impute all of this conduct to

GS&Co for the purpose of finding a violation of Rule 10b-5.  *See Teamsters Local 445 Freight*

*Div. Pension Fund*, 531 F.3d at 195.

In sum, a reasonable jury could have found a violation of Rule 10b-5 by GS&Co based

on the conduct of Tourre, Egol, and/or Gerst.  The jury's verdict with respect to aiding and

abetting was therefore supported by sufficient and substantial evidence.

### III.  The SEC Introduced Sufficient Evidence That Tourre Obtained Money Or Property By Means Of A Fraud.

Tourre argues that he is entitled to judgment as a matter of law on count 2 (Section 17(a)(2)

of the Securities Act) because there was purportedly no evidence that he obtained money or

property by means of a material misstatement or omission.  Mem. at 4.  This argument ignores

record evidence supporting the jury's verdict and misconstrues the relevant case law.  The jury

focused on this exact issue, by asking in a note, "Does base salary obtained by Fabrice Tourre during the time period in question satisfy the phrase 'obtained money or property?'" (Dkt. 437). The Court instructed the jury that the element would be satisfied if Tourre obtained compensation from GS&Co that "was connected, directly or indirectly to a material misstatement or omission." (Tr. 2840). The Court cited base salary and bonus as forms of compensation.[9] (*Id*.) There is no reason, particularly in light of the standard applied to Rule 50 and 59 motions, to assume that the jury ignored the Court's instruction and rendered a verdict on count 2 that was not supported by a connection between Tourre's fraud and his compensation.

GS&Co paid Tourre a salary and a bonus in 2007 totaling approximately $1.7 million. (Tr. 2221). Tourre received a salary for services he provided to GS&Co, and one of those services was his work on AC1. The Court found that "it is possible that one's base salary could be tied, directly or indirectly, to a material misstatement or omission, but [the jury has] to make that factual determination." (Tr. 2837). In the present case, there was evidence that both Tourre and Egol believed the market in which they worked was "dead," and it was becoming increasingly difficult to execute any transactions. (PX-166 ("the cdo business is dead and we don't have a lot of time left"), PX-186 ("the mezz ABS CDO business is dead"), PX-232 ("that business is totally dead"), PX-232 ("I don't intend to wait for the sector to explode totally and witness the start of distressed trading"), Tr. 2143-44). A reasonable jury could find that Tourre's continued employment at GS&Co and attendant salary was tied to his ability to execute a transaction in a dying market. *Cf. S.E.C. v. Wolfson*, 539 F.3d 1249, 1264 (10th Cir. 2008)

---

[9]     Tourre seeks a new trial based on the Court's answer to the jury's question, claiming that it was "confusing" and "prejudicial." Mem. at 6.  However, the Court's answer was given in plain-spoken language and was not confusing.  Indeed, the jury, which sent several notes, indicated no additional confusion on this issue.  The Court should not order a new trial on this purported ground. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (requiring an actual error, and that such error may have influenced the jury's verdict); *see also Hathaway v. Coughlin*, 99 F.3d 550, 552–53 (2d Cir. 1996) (new trial not warranted for harmless error, and jury instructions are not erroneous if "taken as a whole and viewed in light of the evidence, [the charge] show[s] no tendency to confuse or mislead the jury as to principles of law which are applicable.").

(defendant obtained money or property where he was paid a consulting fee that covered several tasks including the preparation of the relevant filing).

A reasonable jury could find that AC1 was a contributing factor to Tourre's bonus, which was based, in part, on the profitability of the correlation desk.  (Tr. 2178).  The parties *stipulated* that GS&Co initially recognized trading revenue of approximately $15 million in connection with AC1.  (Tr. 2434).  Egol testified that the initial estimates of $15-19 million in profit for AC1 was significant revenue for the correlation desk.  (Tr. 704).  Tourre wrote that the super senior portion of AC1 was "too big a P&L" for him to give up, referring to profit for his desk. (PX-300, Tr. 2177).  He told a GS&Co salesperson that AC1 was a "huge focus for my business and a huge profit opportunity for us."  (PX-398, Tr. 2200).

Tourre attempts to sidestep this evidence by speculating that his bonus was likely lower as a result of AC1.  Mem. at 5.  He relies on Egol's testimony that the desk's profits in 2007 decreased by $80-90 million as a result of the long position in AC1.  Mem. at 5.  However, Egol was contradicted at trial by the following testimony from Tourre:

> Q:     So, doing that math, Goldman lost approximately $100 million on those swaps?
>
> A:     Yes.  We would have lost it over time.  It's not in May '08 or whenever the transaction was unwound that we lost that money.  We lost it, you know, continuously until – until that time.

(Tr. 2351-52).  The swap between GS&Co and Paulson was unwound at approximately the same time as the swap between GS&Co and ABN.  (Tr. 2351).  The terms for this transaction were still being discussed in April 2008.  (PX-372).  A reasonable jury could discredit Egol's testimony and conclude that the correlation desk recognized $15 million in revenue in 2007 based on the spread between the cost at which it bought and sold protection on AC1, and that the losses stemming from GS&Co's long position were not counted against the desk until the transaction was unwound in 2008.  *See Heller v. Champion Int'l Corp.*, 891 F.2d 432, 436 (2d

Cir. 1989) ("the jury was entitled to disregard [one witness'] testimony and believe other witnesses…. Credibility issues of that nature are for the jury not the court to resolve.").

Moreover, AC1 favorably impacted Tourre's standing within GS&Co and therefore contributed directly or indirectly to his bonus.[10]  The evidence showed that Tourre used AC1 to tout himself to his superiors, emailing David Lehman[11] and Egol that the agented trades in GS&Co's pipeline, such as the one he was structuring for Paulson, had "significant" profitability "for the low risks they involve."  (PX-22, Tr. 685).  Egol responded, copying Lehman, "these agented trades are a key competitive strength of our franchise."  (PX-22).  Tourre wrote to Lehman and Egol describing the AC1 transactions as "clean P&L trades."  (PX-23).

Tourre subsequently emailed Lehman, Swenson, and Ostrem an update on the Paulson transaction, including an assumption that GS&Co could make up to $19 million on the trade.  (PX-192).  Tourre portrayed AC1 as his idea in this email.  (PX-192).  In the formal memo to GS&Co's Mortgage Capital Committee, which was sent to Birnbaum, Lehman, Ostrem and Swenson, AC1 was billed as an "innovative, franchise-building transaction" that "will enhance Goldman's franchise as a leading firm in the synthetic structured product CDO sector."  (PX-233 at 2).  Tourre subsequently wrote to Lehman, Swenson, Egol and Birnbaum that the initial AC1 transactions were executed at a "VERY good level."  (PX-325).  A reasonable jury could conclude that AC1 enabled Tourre to portray himself as the structurer of "innovative" and franchise-building trades and that image, in turn, directly or indirectly contributed to his compensation.

---

[10]    The defense precluded the SEC from admitting Tourre's 2007 performance review into evidence, which included positive feedback from his GS&Co colleagues based on AC1.  (PX-369, Tr. 721, 726-27).

[11]    Lehman, Josh Birnbaum, and Michael Swenson supervised the correlation desk at the time.  (Tr. 2275).  They reported to Dan Sparks, the head of the mortgage department.  (Tr. 890-91).  Peter Ostrem, who was the head of GS&Co's mortgage origination business, also supervised the correlation desk.  (Tr. 780-81).

Thus, the SEC introduced sufficient evidence that Tourre directly or indirectly received money or property as a result of his fraud.[12]

## IV. Tourre And GS&Co's Fraud Was Carried Out Through Domestic Offers.

Tourre argues that the SEC failed to adduce evidence of domestic offers as required for liability under Section 17(a). Mem. at 17. This argument's weakness is demonstrated by the sheer number of offers Tourre has to go through factual and legal contortions to discount. Mem. at 17-20.

The Court has already decided the three legal issues that govern the analysis of domestic offers. First, "[t]he Securities Act … defines 'offer' expansively to include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." *S.E.C. v. Tourre*, Case No. 10-cv-3229(KBF), 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013) (citing 15 U.S.C. § 77b(a)(3)). Second, "defendants need not personally offer or sell securities to be liable." *Id.* at *11 (citing *Wolfson*, 539 F.3d at 1263-64). Third, "the SEC must

---

[12]   The Court's instruction to the jury on Section 17(a)(2) liability excluded money obtained directly or indirectly by GS&Co as a potential basis for Tourre's liability under Section 17(a)(2). (Tr. 2835, 2840). As the Court recognized at the charge conference, the case law applying Section 17(a)(2) is split on whether the word "obtain" encompasses property obtained for third parties. *Compare Syron*, 934 F. Supp. 2d at 640 (defendant must personally obtain money or property from the fraud); with *S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (it is sufficient that the defendant "obtained money or property for his employer while acting as its agent"). The manner in which the jury used "obtained" in its note, asking, "does any money Mr. Tourre obtained on behalf of Goldman Sachs satisfy this phrase," demonstrates that the word "obtain" is commonly used to refer to items obtained on behalf of third parties. As the SEC previously argued, the statute does not modify the word "obtain" with the word "personally," and "[i]t would be contrary to [the] language, and to the very purpose of Section 17(a), to allow a corporate employee who facilitated a fraud that netted his company millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself." *Stoker*, 865 F. Supp. 2d at 463. Tourre stipulated that GS&Co received $15 million and the documentation of the AC1 transaction was admitted without objection. (Tr. 2434). The undisputed evidence therefore established that GS&Co directly or indirectly obtained money and property as required by Section 17(a)(2). *See, e.g., S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 669-70 (S.D.N.Y. 2012) (it is sufficient if a defendant obtained money or property for his employer while acting as its agent); *Stoker*, 865 F. Supp. 2d at 463 (same); *S.E.C. v. Delphi Corp.*, No. 06-14891, 2008 WL 4539519, at *20 (E.D. Mich. Oct. 8, 2008) (same). This evidence cannot be nullified by the fact that GS&Co subsequently lost money on its long swap positions. *S.E.C. v. Glantz*, 94 Civ. 5737(CSH), 1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) ("The plain language of the statute specifically imposes liability on all those who 'obtain money or property' through fraud, not only on those who 'profit' from such activity.").

prove only that the offeror was in the United States at the time he or she made the relevant offer." *Id.* at *10.

The SEC introduced substantial evidence that Tourre and his GS&Co colleagues sent offers to invest in AC1 from the United States to ACA, IKB, ABN, and numerous other potential long investors located in the United States and in foreign countries. The SEC introduced evidence that Tourre was working in GS&Co's office in New York through the entire time from late 2006 through October 2007. (Tr. 2113, 2174). Tourre contends this is insufficient to establish that he "engaged in conduct in the United States that constituted some or all of the conduct constituting an offer." Mem. at 20. However, for the purposes of a Rule 50 or Rule 59 motion, the SEC is entitled to all reasonable inferences from the evidence. *King v. Macri*, 800 F. Supp. 1157, 1164 (S.D.N.Y. 1992) (court "simply does not have the power to substitute its view of the case for the inferences and conclusions reached by the jury"). This Court has already held that a reasonable jury could find domesticity based on evidence that Tourre worked in New York at all relevant times. *Tourre*, 2013 WL 2407172, at *10.

Tourre himself testified that he was working out of New York when he emailed a blackline and clean version of the AC1 offering circular to IKB in Germany. (PX-261, Tr. 2193). He now endeavors to exempt this conduct from Section 17(a) by relying on boilerplate language that the email did not constitute an "offer."[13] Mem. at 18. However, "[i]n the context of the Securities Act, 'offer' is not constrained to the 'the common law contract concept of an offer.'" *Tourre*, 2013 WL 2407172, at *11 (quoting *S.E.C. v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998)). *Accord United States v. Naftalin*, 441 U.S. 768, 773 (1979) ("Congress expressly intended to define [the statutory terms 'offer and 'sale'] broadly" and they "are expansive enough to encompass the entire selling process"); *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875

---

[13] Taking Tourre's argument to its illogical conclusion, the perpetrator of a securities fraud could avoid Section 17(a) liability by adding the language "this is not an offer" to any false and misleading statement he or she sent to the victims.

(2d Cir. 1971) ("The statutory language defining 'offer' in § 2(3) 'goes well beyond the common law concept of an offer'") (quoting I Loss, Securities Regulation 243, 181 (2d ed. 1961)); *S.E.C. v. Universal Express, Inc.*, Case No. 04-cv-2322(GEL), 2007 WL 2469452, at *5 (S.D.N.Y. Aug. 31, 2007).

The first page of the offering circular stated that the AC1 notes were being "offered" and contained the misleading and incomplete representation that ACA was the portfolio selection agent, as did the final offering circular, which Gerst sent to IKB's sales coverage to be forwarded to IKB.[14]  (PX-261, PX-315, PX-318).  This conduct satisfies the Securities Act's expansive definition of an "offer," which includes negotiations to sell securities.  *See Cavanaugh*, 155 F.3d at 135.  Prior to sending the offering circular, Tourre discussed AC1 with IKB, and a GS&Co salesperson asked IKB to let him know "what you need to get this done on your end."  (PX-183).

There also was evidence that Tourre was working in New York when he personally sent offers to the two other long investors in AC1.  Tourre personally negotiated with ABN to induce it to serve as the intermediation counterparty in the credit default swap between ACA and GS&Co.  (Tr. 2172-73).  He testified that he was in New York when he sent ABN emails outlining the AC1 transaction, which he agreed were "presenting the opportunity" to invest in AC1 to ABN, an admission that in and of itself satisfies the standard for an offer.  (PX-289, PX-290, Tr. 2172-73, 2175).  But the evidence of a domestic offer to ABN went much further.  Tourre had a call with ABN in which he "insist[ed]" that it intermediate the trade.  (PX-300 ("let's try to get on the phone with [ABN's] trader(s), I really want to insist since the risk is fairly priced")).  Tourre himself credited that call with ABN's decision to do the transaction.  (PX-328 ("I had a long call with [ABN employee] Dean Atkins before ABN agreed to do the intermediation for ACA").  Each one of these actions was an offer for purposes of Section 17(a).

---

[14]    The final offering circular stated the GS&Co was offering the AC1 notes in the United States. (PX-305, PX-307).

*See* 15 U.S.C. § 77b(a)(3) ("The term … 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or an interest in a security, for value.").

With respect to ACA, Tourre's inaccurate January 10 email noted that the portfolio selection agent "would have the option to buy CDO notes/unfunded swaps that will be distributed in the market." (PX-61). This statement satisfies Section 17(a)'s requirement of a domestic offer. *See Meadows v. S.E.C.*, 119 F.3d 1219, 1225 (5th Cir. 1997) (offer includes "urging or persuading another to act"); *Carl M. Loeb*, Exchange Act Release No. 5870, 38 S.E.C. 843 (Feb. 9, 1959) (offer includes efforts to 'stimulate … investor interest in security"). Moreover, the jury saw evidence that Tourre had calls with ACA and Paulson on January 10, 2007, without reference to being out of the country, bolstering the inference that he was working from New York when he sent the email. (PX-53, PX-56, PX-57).

Section 17(a)'s proscription of fraudulent conduct extends "beyond consummated transactions." *Tourre*, 2013 WL 2407172, at *6. Tourre sent emails, occasionally attaching the misleading flipbook and term sheet, to numerous potential long investors while he was working in New York. (PX-302 (sent Calcyon email attaching term sheet and flipbook while working in New York (Tr. 2153-54) and writing "[p]lease let us know when you have some time for us to walk you through this transaction"), PX-354 (sent email from New York (Tr. 2183-84) describing AC1 as "selected by ACA," and writing, "I would think that this might be something interesting to you"), PX-399 (sent email attaching flipbook while working in New York (Tr. 2139-40)). These emails constitute domestic offers under Section 17(a).

Moreover, a reasonable jury could also find Tourre liable for the domestic offers made by Kreitman, Gerst, and the GS&Co sales force. *See Tourre*, 2013 WL 2407172, at *11 (reasonable jury could find Tourre liable for others sending out documents he had primary responsibility for preparing); *S.E.C. v. Holschuh*, 694 F.2d 130, 139 (7th Cir. 1982) (defendant does not have to

personally make offer).  Tourre had primary responsibility for the term sheet and flipbook.  (Tr. 2114-15, 2210).  Gerst and Kreitman both sent emails attaching the false and misleading offering materials to potential investors while they were working in New York.  (PX-241 (sending flipbook and term sheet), PX-397 (same), PX-336 ("We would like to offer the following to Scotiabank"), Tr. 797, 1079).  The preliminary term sheet was also emailed by GS&Co's syndicate desk as an attachment to the AC1 new issue announcement to the GS&Co sales force worldwide to market the transaction.[15]  (PX-213, Tr. 2113-18). These emails constitute a basis for a reasonable jury to find a domestic offer under Section 17(a).

Under these circumstances, a reasonable jury could reach no conclusion other than that Tourre perpetrated his fraud through the domestic offer or sale of a security as required by Section 17(a).

## V.      The Credit Default Swaps Were Security Based.

Even as he urges the Court to overturn the jury's verdict, Tourre complains that the Court decided as a matter of law on summary judgment that the ABN-ACA and ABN-GS&Co credit-default swap agreements were security-based.  Mem. at 20-25.  The SEC hereby incorporates by reference the arguments set forth in its Memorandum of Law in Support of its Motion for Partial Summary Judgment on the "Security Based Swap Agreement" issue.  (Dkt. 396).  Tourre comes forward with no new evidence or argument on this issue.  Mem. at 20-25.  Nor could he.  As the Court noted, Tourre previously conceded the point at issue.  (Dkt. 407 at 5).  The relevant agreements were admitted without objection at trial.  (PX- 346(a), PX-347).  Whether those agreements constitute security-based swap agreements within the meaning of Section 17(a) and

---

[15]      Tourre followed up with emails to particular members of the sales force informing them that GS&Co was looking for long investors.  (PX-320, PX-322, PX-351, PX-352, PX-361, PX-363, PX-398).

Section 10(b) is a question of law for the Court.[16]  This Court properly decided that the swaps were based on securities because material terms of the agreement were based on price, yield, value or volatility of a group of securities, *i.e.* the AC1 securities.  Indeed, "[a]ll aspects of payment – including price and value – are defined in relation to the Reference Obligations." (Dkt. 407 at 4).

Because there was no factual dispute about what the contractual documents said, and the terms of those documents were unambiguous, it was appropriate for the Court to decide this issue at summary judgment.  *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.")  Tourre now tries to turn a legal issue into a factual dispute by arguing that whether the material term is of an agreement is "based on" the "price, yield, value or volatility of any security … or group of securities," turns on the subjective intent of the parties.[17]  Mem. 22-24.  Tourre's argument contradicts the well-established rule that contract interpretation is a question of law when the terms of the contract are, as here, unambiguous.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("[i]f the contract is unambiguous, its meaning is likewise a question of law for the court to decide").  Accordingly, any testimony about the parties' motivations for entering into the swap, or what they thought the transaction was based on, is irrelevant.

---

[16]     *See Fragin v. Mezei*, Case No. 09-cv-10287(AJN), 2012 WL 3613813, at *8 n.3 (S.D.N.Y. Aug. 22, 2012).  *Accord McNabb v. S.E.C.*, 298 F.3d 1126, 1130 (9th Cir. 2002) ("[w]hether a note is a security under the 1934 Act is a question of law"); *S.E.C. v. Thompson*, Case No. 11-4182, 2013 WL 5498133, at *7 (10th Cir. Oct. 4, 2013) ("in the context of a civil case where the 'security' status of a 'note' is disputed, the ultimate determination of whether the note is a security is one of law"); *Stoiber v. S.E.C.*, 161 F.3d 745, 749 (D.C. Cir. 1998) (same).

[17]     Under Tourre's argument, the SEC's statutory jurisdiction to regulate markets and remedy frauds would vary according to the subjective intents of parties entering into identical swap transactions.  The primary case on which Tourre relies for this principle, *S.E.C. v. Rorech*, 720 F. Supp. 2d 367 (S.D.N.Y. 2010), rejected an interpretation of "based on" that would allow "traders to escape the ambit of [federal securities laws] through clever drafting."  *Id.* at 407.  Thus, the Court in *Rorech* only embraced looking at the intent of the parties when it was not clear from the four corners of an agreement that it was security based and subject to SEC jurisdiction.  *Id.*

This was an issue of law for the Court to decide.  There was no material issue of fact for the jury.  Partial summary judgment was warranted, and the Court's Order provides no basis for another the trial.

## VI.     The Remaining Elements Of Section 17(a) Were Satisfied.

In addition to the arguments addressed above, Tourre challenges the sufficiency of the SEC's evidence with respect to every element of Section 17(a)(2) and Section 17(a)(3).  *See* Mem. at 9, 15.  He mounts this challenge by referring to arguments in his previous motion for judgment as a matter of law.[18]  *Id.*  The SEC hereby incorporates the arguments it made in Court in opposition to Tourre's prior motion by reference as if fully set forth herein.  (Tr. 2460-75).  The Court previously ruled that the record did not support entry of judgment as a matter of law on these issues.  (Tr. 2476-82).  Tourre has come forward with no new evidence or argument relating to these issues and thus there is no reason to revisit the Court's earlier, correct ruling.

---

[18]     The SEC hereby moves to strike exhibit 1 to the Declaration of Pamela Rogers Chepiga.  (Dkt. 476).  On August 26, 2013, this Court ruled that it would not "separately docket the written memorandum" for Tourre's previous Rule 50 motion.  (Dkt. 470).

## **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court deny Tourre's

Motions for judgment as a matter of law and for a new trial.


Dated:  Washington, D.C.                                    Respectfully submitted,
             October 30, 2013

                                                                         /s/ *Bridget M. Fitzpatrick*
                                                                         Bridget Fitzpatrick
                                                                         Christian D. H. Schultz
                                                                         Attorneys for Plaintiff
                                                                         Securities and Exchange Commission
                                                                         100 F Street, N.E.
                                                                         Washington, D.C. 20549
                                                                         (202) 551-4678 (Fitzpatrick)
                                                                         (202) 772-9292 (fax)
                                                                         fitzpatrickbr@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 30, 2013, I directed the foregoing SEC'S OPPOSITION TO FABRICE TOURRE'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL to be electronically filed using the CM/ECF system, which will send notification of such filing to the following email addresses:

Pamelachepiga@allenovery.com
Pamela Rogers Chepiga
Allen & Overy LLP
1221 Avenue of the Americas
New York, New York 10020

seancoffey78@gmail.com
John Patrick Coffey
Law Office of John P. Coffey
1350 Avenue of the Americas, 2d Floor
New York, New York 10019

Attorneys for defendant Fabrice Tourre

/s/ *Bridget M. Fitzpatrick*
Bridget M. Fitzpatrick