UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : 10 Civ. 3229 (KBF) |
| v. | : |
| | : ECF Case |
| FABRICE TOURRE, | : |
| | : |
| Defendant. | : |
| | : |

_____

**MEMORANDUM OF LAW IN SUPPORT OF SEC'S MOTION FOR
DISGORGEMENT, PRE-JUDGMENT INTEREST, CIVIL MONETARY PENALTIES
AND INJUNCTIVE RELIEF AGAINST DEFENDANT FABRICE TOURRE**

Bridget M. Fitzpatrick
Christian D. H. Schultz
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
(202) 772-9362 (facsimile)
fitzpatrickbr@sec.gov

Dated:  Washington, D.C.
        December 16, 2013          Attorneys for Plaintiff

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................2

    A.  Tourre Is Highly Educated And Has Been Highly Compensated..................2

    B.  Tourre Intentionally Deceived ACA And Other AC1 Long Investors .........3

    C.  The Jury Found Tourre Liable For Violating Multiple Provisions Of The
        Federal Securities Laws ...........................................................................7

ARGUMENT ..................................................................................................8

  I.  TOURRE SHOULD BE REQUIRED TO DISGORGE HIS ILL-GOTTEN
     GAINS AND PAY PRE-JUDGMENT INTEREST.......................................8

    A.  The Legal Standard For Disgorgement.....................................................8

    B.  Tourre Should Disgorge $175,463 Of His 2007 Performance Bonus As A
        Reasonable Approximation Of The Ill Gotten Gains From His Fraud .........9

    C.  Tourre Should Pay Pre-Judgment Interest ...............................................13

  II.  TOURRE SHOULD PAY SUBSTANTIAL PENALTIES...............................14

    A.  Tourre's Misconduct Warrants A Third-Tier Civil Penalty .......................14

    B.  The Court Should Impose A Penalty For Each Of Tourre's Fraudulent Offers
        And Sales ...............................................................................................15

    C.  The Court Should Impose A Substantial Penalty Given The Facts And
        Circumstances Of This Case ....................................................................18

        1.  Tourre's conduct was egregious .......................................................18

        2.  Tourre acted with scienter.................................................................19

        3.  Tourre's conduct created substantial losses.......................................20

4.   Tourre's conduct was not isolated ........................................................................20

5.   The penalty should not be reduced due to Tourre's financial condition................21

6.   Additional factors mandate a severe penalty ........................................................21

D.  Tourre Should Personally Pay Any Penalty Ordered By The Court .........................22

III. THE COURT SHOULD IMPOSE A PERMANENT INJUNCTION .............................23

CONCLUSION...........................................................................................................................25

**TABLE OF AUTHORITIES**

<u>CASES</u>

*S.E.C. v. Amerifirst Funding, Inc.*,
No. 3:07–CV–1188-D, 2008 WL 1959843 (N.D. Tex. May 5, 2008)..............................16

*S.E.C. v. Coates*,
137 F. Supp. 2d 413 (S.D.N.Y. 2001)..............................................................................16

*S.E.C. v. Colonial Inv. Mgmt. LLC*,
381 Fed. Appx. 27 (2d Cir. 2010)....................................................................................14

*S.E.C. v. Commonwealth Chemical Sec., Inc.*,
574 F.2d 90 (2d Cir. 1978)..................................................................................................8

*S.E.C. v. Constantin*,
No. 11 Cv. 4642(MHD), 2013 WL 1453792 (S.D.N.Y. Apr. 2, 2013) ...........................18

*S.E.C. v. Das*,
723 F.3d 943 (8th Cir. 2013) ...........................................................................................22

*S.E.C. v. Elliot*,
No.09 Civ. 7594(KBF), 2012 WL 2161647 (S.D.N.Y Jun. 12, 2012) ....................*passim*

*S.E.C. v. First Jersey Sec. Inc.*,
101 F.3d 1450 (2d Cir. 1996)....................................................................................*passim*

*S.E.C. v. Gupta*,
No. 11 Civ. 7566(JSR), 2013 WL 3784138 (S.D.N.Y. July 17, 2013) ...........................22

*S.E.C. v. Haligiannis*,
470 F. Supp. 2d 373 (S.D.N.Y. 2007)........................................................................14, 22

*S.E.C. v. Kenton Capital Ltd.*,
69 F. Supp. 2d 1 (D.D.C. 1998) .......................................................................................16

*S.E.C. v. Koenig*,
532 F. Supp. 2d 987 (N.D. Ill. 2007) .................................................................................3

*S.E.C. v. Lorin*,
877 F. Supp. 192 (S.D.N.Y. 1995) ...................................................................................13

*S.E.C. v. Lorin*,
76 F.3d 458 (2d Cir. 1996)......................................................................................8, 9, 24

*S.E.C. v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972)..............................................................................................8

*S.E.C. v. Milligan,*
    436 Fed. Appx. 1 (2d Cir. 2011) ........................................................................14

*S.E.C. v. Moran,*
    944 F. Supp. 286 (S.D.N.Y. 1996) ..............................................................14, 16

*S.E.C. v. Opulentica, LLC,*
    479 F. Supp. 2d 319 (S.D.N.Y. 2007)............................................14, 18, 21, 23

*S.E.C. v. Patel,*
    61 F.3d 137 (2d Cir. 1995)............................................................................8, 9

*S.E.C. v. Pattison,*
    No. C–08–4238 EMC, 2011 WL 723600 (N.D. Cal. Feb. 23, 2011) ...............16

*S.E.C. v. Pentagon Capital Management,*
    No. 08 Civ. 3324(RWS), 2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012) ............15, 18, 20

*S.E.C. v. Pentagon Capital Mgmt.,*
    725 F.3d 279 (2d Cir. 2013)............................................................................16

*S.E.C. v. Posner,*
    16 F.3d 520 (2d Cir. 1994)..............................................................................25

*S.E.C. v. Razmilovic,*
    No. 12-0357, 2013 WL 6172543 (2d Cir. 2013) ................................3, 9, 15, 16

*S.E.C. v. Resnick,*
    604 F. Supp. 2d 773 (D. Md. 2009) ................................................................13

*S.E.C. v. Rosenthal,*
    426 Fed. App'x 1 (2d Cir. 2011)......................................................................13

*S.E.C. v. Taber,*
    No. 13 Misc. 282(KBF), 2013 WL 6334375 (S.D.N.Y. Dec. 4, 2013) .............8

*S.E.C. v. Texas Gulf Sulphur Co.,*
    446 F.2d 1301 (2d Cir. 1971)............................................................................8

*S.E.C. v. Tourre,*
    Case No. 10-cv-3229(KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013)......17

*S.E.C. v. Wang,*
    944 F.2d 80 (2d Cir. 1991)................................................................................8

*S.E.C. v. Warde,*
    151 F.3d 42 (2d Cir. 1998)................................................................................9

STATUTES AND RULES

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)..........................................*passim*

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) .........................................*passim*

Rule 10b-5, 17 C.F.R. § 240.10b-5........................................................................*passim*

17 C.F.R. § 201.1003 ....................................................................................................15

OTHER AUTHORITIES

Tami Luhby, *What It Takes To be A One Percenter*, CNNMoney (Nov. 20, 2012) ....................21

Andrew Ross Sorkin, *Wall Street Debates Who Should Pay Legal Bills*, The New York
    Times (Aug. 12, 2013) ...........................................................................................21, 22

Nick Summers, *Sard Verbinnen, Wall Street's Go-To Crisis PR Firm*, Businessweek
    (Aug. 8, 2013) ...................................................................................................24

Plaintiff, the Securities and Exchange Commission ("SEC"), respectfully submits this memorandum of law in support of its post-trial motion for disgorgement, pre-judgment interest, civil monetary penalties and injunctive relief against defendant Fabrice Tourre.[1]

## PRELIMINARY STATEMENT

After hearing eleven days of testimony and receiving hundreds of trial exhibits, the nine-member jury unanimously found Fabrice Tourre liable for six counts of securities fraud in connection with the offer and sale of securities and security-based swap agreements of the ABACUS 2007-AC1 ("AC1") collateralized debt obligation ("CDO").[2] The SEC now seeks disgorgement of Tourre's ill-gotten gains in the amount of $175,463, pre-judgment interest in the amount of $62,858.03, a penalty of $910,000, and an injunction prohibiting future violations of the securities laws.[3]

These remedies are appropriate because the conduct that the SEC proved at trial was egregious. Tourre, a licensed securities professional, took the lead in structuring a financial product that was secretly designed to maximize its potential for failure. He used the global platform of his employer, Goldman Sachs & Co. ("GS&Co"), to market AC1 to as many investors as possible. In connection with the deal, he lied to ACA about the nature of the transaction and the economic interest of the party Tourre identified as the "transaction sponsor."

---

[1]     Plaintiff's exhibits are referred to as "PX" followed by the applicable number. All relevant portions of the cited exhibits are attached, in numerical order, to the Declaration of Bridget M. Fitzpatrick in Support of the SEC's Motion For Disgorgement, Pre-judgment Interest, Civil Monetary Penalties, And Injunctive Relief Against Defendant Fabrice Tourre. ("Fitzpatrick Dec."). Citations to the trial transcript are preceded by "Tr." The transcript of the trial is consecutively paginated and appears as numbers 441-468 on the case docket.

[2]     AC1 was a synthetic collateralized debt obligation ("CDO") with a static reference portfolio comprised of 90 Baa2 tranches of residential mortgage backed securities ("RMBS"). (Tr. 2423). On April 26, 2007, Goldman Sachs & Co ("GS&Co") sold $42 million of AC1 notes to Zenith Funding Limited, and $150 million of AC1 notes to Loreley Financing (Jersey) No.29 and Loreley Financing (Jersey) No.30 (collectively "Loreley"). (Tr. 2423-24). On the same day, GS&Co entered into a swap agreement with the Paulson & Co hedge fund ("Paulson") in which Paulson bought $192 million in protection on the AC1 reference portfolio. (Tr. 2432). On May 31, 2007, GS&Co entered into credit default swaps referencing the AC1 portfolio with both ABN Amro Bank NV ("ABN"), which took a long position, and Paulson, which took a short position. (Tr. 2432-33). ABN, in turn, entered into a credit default swap with ACA Credit Products-ABN Amro LLC. (Tr. 2433-34).

[3]     The SEC is filing a proposed final judgment simultaneously with this motion.

He did so to ensure that ACA would agree to participate in the deal and be identified in the offering documents as portfolio selection agent, and thereby conceal from other potential investors the key role that Paulson, a purely short investor, played in selecting AC1's collateral.

These lies mattered. Long investors in AC1 lost approximately $1 billion when the weak quality portfolio that Paulson secretly helped select cratered early in the financial crisis. And Paulson, the purely short investor whose role Tourre hid from investors and ACA, made approximately $1 billion. Tourre was rewarded handsomely for his work that year, receiving the largest bonus he had been paid in his time at GS&Co. It is critical that Tourre's conduct be addressed through significant disgorgement and penalties, to ensure that he is punished for his wrongdoing and that he and others are deterred from engaging in such conduct in the future. It is for these reasons and others, discussed in more detail below, that substantial remedies for Tourre's fraud are necessary and justified by the trial record.

## STATEMENT OF FACTS

### A. Tourre Is Highly Educated And Has Been Highly Compensated.

Tourre was raised in France where he graduated from Ecole Centrale Paris, the country's top engineering school. (Tr. 2217). He attended Stanford University on scholarship and obtained a master's degree in management science and engineering. (Tr. 2217-18). At Stanford, Tourre was recruited to GS&Co, one of the most prestigious investment banks on Wall Street. (Tr. 2218-19). He began working at GS&Co in 2001 and by December 2006 he had been promoted to vice president on the correlation desk. (Tr. 2220). In 2007, the year GS&Co booked the AC1 transaction, Tourre made $1.7 million. The vast majority -- $1,579,167 -- of his compensation was in the form of a performance bonus. (Tr. 2221, Fitzpatrick Dec., Ex. 1).[4]

---

[4]       Exhibit 1 contains bonus and compensation information that the SEC obtained from GS&Co. The SEC did not obtain this information until after trial because it did not intend to use the information in proving Tourre's liability. Tourre's counsel was copied on all of the correspondence from GS&Co transmitting the information. Case authority holds that the SEC is allowed to present additional evidence in the remedies phase of a civil enforcement

Tourre's 2007 bonus was the largest he had ever received at GS&Co.  (Fitzpatrick Dec., Ex. 1).  He subsequently elected to relocate to GS&Co's London office at an equivalent rank. (PX-369 at 19, Tr. 2220).    Working from London, Tourre earned total compensation of ███████ in 2008 and ██████████ in 2009 (with performance bonuses in the amount of ████████ and ████████, respectively).  (Fitzpatrick Dec., Ex. 1).  The 2009 bonus was paid after Tourre had been deposed in the SEC's investigation of this matter.  (Fitzpatrick Dec., Ex. 2, Tourre Inv. Tr. at 1).

Tourre was placed on paid leave after the SEC filed its complaint in this matter on April 16, 2010.  While Tourre was not paid a bonus in 2010 or 2011, GS&Co increased Tourre's "base salary" for each of those years by a factor of more than four, resulting in Tourre receiving ████████ during those two years.  (Fitzpatrick Dec., Ex. 1).  He is now in a Ph.D program at the University of Chicago.  (Tr. 2357-58).

### B.  Tourre Intentionally Deceived ACA And Other AC1 Long Investors.

The full scope of Tourre's scheme to defraud is set forth in detail in the SEC's Opposition to Tourre's Motions for Judgment as a Matter of Law and a New Trial, and is hereby incorporated by reference.  (Dkt. 483).   The jury found him liable for primary securities violations and for aiding and abetting GS&Co's violations of Section 10(b) and Rule 10b-5.  (Tr. 2807; Dkt. 439).   GS&Co entered into a pretrial settlement with the SEC in which it agreed to disgorgement of $15 million, a civil penalty of $535 million, and an injunction permanently restraining it from violating Section 17(a) of the Securities Act.  (Dkt. 25).  In the Consent filed with this Court as part of the settlement, GS&Co acknowledged that the marketing materials for

---

action.  *See, e.g.*, *S.E.C. v. Elliot*, No.09 Civ. 7594(KBF), 2012 WL 2161647 (S.D.N.Y Jun. 12, 2012) (court held hearing on defendant's scienter after summary judgment); *see also S.E.C. v. Razmilovic*, No. 12-0357, 2013 WL 6172543, at *12 (2d Cir. 2013) (affirming decision of trial court to permit SEC to reopen its case and present additional evidence of causation at remedies hearing); *S.E.C. v. Koenig*, 532 F. Supp. 2d 987, 992 (N.D. Ill. 2007) ("The following facts are taken from the hearing testimony and exhibits introduced into evidence during the bench trial on remedies.").  Depending on what evidentiary issues are raised in Tourre's opposition to this brief, the SEC reserves its right to request an evidentiary hearing at which it could compel the production of additional evidence and elicit relevant testimony.

AC1 contained incomplete information and that, in particular, it was a "mistake" for the GS&Co marketing materials to state the reference portfolio was "selected by" ACA without disclosing the role of Paulson in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.  (Dkt. 25 at ¶3).

Tourre was the deal captain of the AC1 transaction, and primarily responsible for the transaction, (Tr. 2208), which was his idea.  (PX-192 ("my idea to broker the short" and "[m]y idea to discuss with ACA who could do the supersenior at the same time"), Tr. 2209).  He described AC1 as "broker[ing] the short" for Paulson.  (PX-192, PX-233 (GS&Co "effectively work[ed] an order for Paulson to buy protection on specific layers of the AC1 capital structure")).  He achieved this position for Paulson by structuring a synthetic CDO with a portfolio that met Paulson's specified criteria – which were designed to identify the RMBS most likely to experience credit events – while hiding from investors Paulson's influence on the portfolio.  (PX-10, PX-11, Tr. 329, 2105).  Tourre and GS&Co marketed AC1 as being selected by ACA, which was supposed to work in the interests of long investors and had a history of success in doing so.

Paulson's role as a purely short investor was never communicated to ACA during the portfolio selection process.  (Tr. 1882-84).  To the contrary, Tourre misrepresented Paulson's role to ACA so it would agree to work with Paulson to select a portfolio.  Tourre learned, during the transaction, that Laura Schwartz, a high level executive at ACA, was unclear about Paulson's role in the transaction.  (PX-47).  Instead of clarifying Paulson's role as a pure short, Tourre sent Schwartz a false and misleading email about Paulson's role and sent an identical email to Gail Kreitman, the GS&Co sales executive who covered the ACA account and who was a funnel for communications with ACA.  The emails were false and misleading in that they:

- Identified Paulson as the "transaction sponsor," a term that Tourre's direct supervisor testified customarily referred to long investors, even though Paulson planned to take a purely short position. (PX-51, PX-61, Tr. 756, 760-61).

- Stated that the 0-9% portion of the contemplated capital structure – the CDO's equity or "first loss" tranche – was "pre-committed first loss," when in fact there was never even a plan to issue equity. (PX-51, PX-61, Tr. 1897).

- Stated that the compensation structure of AC1 "aligns everyone's incentives: the Transaction Sponsor [Paulson], the Portfolio Selection Agent [ACA] and Goldman," when in fact Paulson had an economic incentive for the portfolio to experience credit events and ACA had an economic incentive for the portfolio to perform well. (PX-51, PX-61, Tr. 1932-33).

Tourre admitted at trial that the email he sent to ACA "was not accurate." (Tr. 1898). Tourre's misrepresentations were designed to and did in fact create the misimpression that Paulson was an equity investor in AC1. (PX-150 (in response to a virtually identical email, Egol asked if "'pre-committed' FL" meant that TCW, identified as "the transaction sponsor," wrote GS&Co protection), Tr. 1908-13).

After sending the false email, Tourre learned that Schwartz believed Paulson was an equity investor in AC1. On January 16, 2007, Kreitman forwarded to Tourre a three-sentence email from Schwartz, in which Schwartz stated that "I can understand Paulson's equity perspective." (PX-72). Tourre testified that to him the phrase "equity perspective" meant investing in the equity of a CDO, which is a long investment. (Tr. 1956). He knew that Paulson had no such investment and was only interested in shorting the deal. Tourre replied to Kreitman, thanking her for forwarding Schwartz's email, and separately forwarded it to David Gerst, his closest colleague on AC1, with the comments, "see below" and "[l]et's sit down and discuss." (PX-71, PX-72). Yet he never disabused Schwartz of her misimpression of Paulson's role in the transaction, let alone clarified Paulson's true financial interest in AC1.[5] (Tr. 2071, 2046).

---

[5]     Schwartz believed that Paulson was buying equity in AC1 the entire time she worked on the transaction. (Tr. 1618). When the transaction priced in April 2007, Schwartz sent emails to her CDO team and her supervisor stating that Paulson invested in AC1's equity. (PX-280 ("a big hedge fund new to ACA [is] … investing in the 0-10% tranche"), PX-286 ("Paulson took down a proportionate amount of equity")). It was part of the scheme that

The day after Tourre learned that ACA believed Paulson to be an equity investor, he emailed Kreitman, "Let's try to close the loop with ACA this morning!"  (PX-82).  Later that day, Kreitman called Lucas Westreich, a trader in Schwartz's CDO group at ACA, and told him that Paulson was buying 100 percent of the equity in AC1.  (PX-87A (transcript of PX-87), Tr. 1105-07).  Kreitman believed that Paulson was a long investor from the time of the deal up to the time she prepared for her potential deposition in approximately 2010.  (Tr. 1104, 1205).  Tourre was Kreitman's primary source of information about the AC1 transaction, and the source for the information about Paulson's role which Kreitman passed on to ACA.  (Tr. 1100).

The lies had a purpose.  Tourre wanted to use ACA's name on the transaction to attract long investors, who would have been aware of ACA's reputation as a respected portfolio selection agent.  (PX-158 ("make sure ACA understands [] we want their name on this transaction" and "we can use ACA's branding to help distribute the bonds")).  In February 2007, Tourre drafted "marketing points" that touted ACA's role in selecting the portfolio but made no mention of Paulson.  (PX-170).  According to the deal approval memorandum submitted to the Mortgage Capital Credit Committee, GS&Co expected "to leverage ACA's credibility and franchise to help distribute this Transaction."  (PX-233 at 4).  Both Schwartz and ACA's CEO testified that ACA would not have agreed to serve as collateral manager for the AC1 engagement if it had known that Paulson was a purely short investor.  (Tr. 1370, 1468, 1593-1594).

Tourre's strategy worked.  Paulson made more than $1 billion on the transaction.  (Tr. 610-11).  GS&Co sold AC1 notes worth $192 million to ACA and the Loreley entities (which were affiliates of IKB, a German bank that was one of the correlation desk's top customers).  (Tr. 898-900, 2423-24).  ABN and ACA took long positions on AC1 through a series of credit default swaps, with ABN required to pay GS&Co $909 million if the assets in the AC1 portfolio

---

through months of emails, calls and meetings, Tourre, GS&Co, and Paulson never corrected Schwartz's misimpression despite having numerous opportunities to do so.  (Tr. 1943-44, 2057, 2070).

defaulted.  (Tr. 2432-33).  Tourre included misleading information in his descriptions of the transactions to all of these investors.  (PX-61 (ACA), PX-183, PX-261(IKB), PX-289, PX-290, PX-300 (ABN)).  He also tried to sell the CDO to other investors, hoping that it would eventually be a $2 billion deal.  (PX-11).  He personally offered AC1 to other potential investors, including UBS, Calyon, a French Bank, and CIFG, a financial guarantee company.  (PX-302, PX-354, PX-399).  He also had the GS&Co sales force market the CDO to other investors, confirming that AC1 was shown to BAWAG (an Austrian bank).  (PX-398).  Each of these other prospective investors similarly received misleading information which concealed Paulson's role in the selection of the portfolio.

### C. The Jury Found Tourre Liable For Violating Multiple Provisions Of The Federal Securities Laws.

The jury found Tourre liable for violating Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5(a) and Rule 10b-5(c) thereunder, and Section 20(e) of the Exchange Act.  (Dkt. 439).  Specifically, the jury found that, in the offer or sale of a security or security-based swap agreement, Tourre employed a device, scheme, or artifice to defraud.  (Tr. 2780, 2800 (Section 17(a)(1) and Rule 10b-5(a), respectively)).  In finding Tourre liable for violation of Section 17(a)(2), the jury necessarily found that Tourre obtained money or property by means of materially false or misleading statements. (Tr. 2786 (Section 17(a)(2)). The jury also found that Tourre engaged in a fraudulent transaction, practice or course of business.  (Tr. 2794, 2803 (Section 17(a)(3) and Rule 10b-5(c), respectively)).  Finally, the jury found Tourre liable for violations which had as one of their elements that Tourre acted with the intent to defraud or in reckless disregard for the truth.  (Tr. 2780).

## ARGUMENT

I. **TOURRE SHOULD BE REQUIRED TO DISGORGE HIS ILL-GOTTEN GAINS AND PAY PRE-JUDGMENT INTEREST.**

### A. The Legal Standard For Disgorgement.

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (citing *S.E.C. v. Lorin*, 76 F.3d 458, 461–62 (2d Cir. 1996) (per curiam); *S.E.C. v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)). "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *First Jersey Sec.*, 101 F.3d at 1474 (citing *S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *S.E.C. v. Commonwealth Chemical Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)). "It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation." *S.E.C. v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971); *see also First Jersey Sec.*, 101 F.3d at 1474 ("The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.").

The district court has broad discretion in determining the amount of disgorgement. *First Jersey Sec.*, 101 F.3d at 1474-75 (citing *Lorin*, 76 F.3d at 462). "In calculating such amount, the court should include all gains flowing from illegal activities, plus prejudgment interest, and need only be a reasonable approximation of profits casually connected to the violation." *S.E.C. v. Taber*, No. 13 Misc. 282(KBF), 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) (quotations omitted). The reasonable approximation "does not require exactitude." *Id*. "[R]ather, so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer

whose illegal conduct created that uncertainty."[6]  *Id.* (quotations omitted).  "Once the SEC has met the burden of establishing a reasonable approximation of the profits casually related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"  *Razmilovic*, 2013 WL 6172543, at *14 (quoting *Lorin*, 76 F.3d at 462).

## B. Tourre Should Disgorge $175,463 Of His 2007 Performance Bonus As A Reasonable Approximation Of The Ill-Gotten Gains From His Fraud.

The Court should determine Tourre's ill-gotten gains, i.e., the amount of Tourre's bonus reasonably attributable to the AC1 transaction, to be $175,463.[7]

To begin with, the potential for a large bonus was one of the principal motivating factors for the fraud.  Tourre described the transaction as a "huge focus for my business and huge profit opportunity for us…."  (PX-398).  He wrote to his boss, Jonathan Egol, "Remember, we print $$$ per tranche placed..."  (PX- 166).  When it appeared that the intermediation deal with ABN was "dead," Tourre intervened and convinced ABN to do the transaction.  (PX-300 ("let's try to get on the phone ... i really want to insist"), PX-328 ("I had a long call with [ABN employee] Dean Atkins before ABN agreed to do the intermediation for ACA")).   The motive for AC1, in Tourre's own words, was that the transaction with ACA and ABN was "too big [a] P&L for [him] to give up."[8]  (PX-300).

In an email written the day after he attended a critical Paulson-ACA meeting, Tourre adapted a French song to the CDO world with these lyrics:

> In the trading rooms, a few of us were looking for glory.  Always we were sad to have an empty P&L, we could not help but keep on hoping.  And when a few

---

[6]      *See also First Jersey Sec.,* 101 F.3d at 1475 (risk of uncertainty falls on the wrongdoer); *Patel*, 61 F.3d at 140 (same); *S.E.C. v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (same).

[7]      Although Tourre's ill-gotten gain flows from all of his violations of the securities laws, the jury explicitly found that there was a direct or indirect nexus between Tourre's violation of Section 17(a)(2) and his compensation. (Tr. 2786-88 (reciting elements for Section 17(a)(2)).

[8]      P&L, short for "profit and loss," referred to the profitability of transactions structured by the correlation desk, which could have an impact on employee bonuses.  (Tr. 2177-78).

clients took a credit-linked note in exchange of a good fresh P&L, we narrated verses, gathered around the stove, forgetting about the crisis.

(PX-148, Tr. 2126-30).  In pursuit of this P&L, Tourre lied to ACA and spearheaded GS&Co's misleading marketing materials for AC1.

In the same year that Tourre engaged in this fraudulent conduct, GS&Co paid Tourre a $1,579,167 performance bonus, his largest bonus to date.  (Fitzpatrick Dec., Ex. 1).  The bonus was ███████ more than his bonus for the previous year and ███████ more than the bonus he received in 2008.  (*Id.*)

GS&Co's compensation system is based on three tangible factors: (1) the performance of the firm, (2) the performance of the business unit, and (3) the performance of the individual.  (Fitzpatrick Dec., Ex. 3, Jan. 13, 2010 Testimony of Lloyd C. Blankfein at 5).   GS&Co does not maintain any record showing how each of these factors impacted Tourre's bonus determination in 2007.  However, it is still possible to achieve a reasonable approximation of the impact that AC1 had on Tourre's bonus, as it is obvious from the record that the transaction played an important role in Tourre's performance for the year.

All three of the three tangible factors favorably impacted Tourre's bonus in 2007.  Both GS&Co and the Fixed Income, Currency, and Commodities business segment within which Tourre worked reported record earnings in 2007.  (Fitzpatrick Dec., Ex. 4, GS&Co Press Release (12/18/2007)).  Tourre's performance review also had a positive impact on his bonus because he was determined to be in the top 25% of Goldman employees.  (PX-369, Fitzpatrick Dec., Ex. 5, Lehman Depo. at 97).   Based on GS&Co's compensation policies, which set forth these three tangible factors as impacting the bonus determination, the SEC has conservatively attributed one-third of Tourre's total bonus, or $526,389, to his individual performance.

As explained below, given the prominence and importance of Tourre's work on AC1, and the extent to which he used AC1 to tout himself and his ideas to superiors within GS&Co,

$175,463 – or one-third of the $526,389 amount reasonably attributed to Tourre's individual performance – is a reasonable and conservative approximation of Tourre's ill-gotten gain from AC1.

GS&Co identified six transactions that Tourre was particularly involved in structuring or executing in 2007.  (Fitzpatrick Dec., Ex. 6, December 5, 2013 Letter, and Ex. 7, December 12, 2013 Email).  But there is strong evidence that Tourre's work on AC1 contributed extensively to his positive 2007 performance review.   The first sentence of Tourre's self-evaluation reads: "Have showed creativity in creating for third party clients transactions that (a) address those clients' needs, (b) enabled Goldman to position risk appropriately, and (c) enabled Goldman to generate revenue through bid/offer on exotic derivatives trades."  (PX-369 at 19).  Tourre cited his involvement in "developing a network of intermediation counterparties" that were "instrumental in allowing Goldman to trade very actively with all types of Monolines including CIFG, MBIA, [and] ACA."  (PX-369 at 19).  With these statements, Tourre sought to highlight two aspects of his work on AC1 in a brief description of his overall performance for the year.

During the transaction, Tourre used AC1 as a vehicle to demonstrate to GS&Co management his ability to develop innovative and profitable transactions.  For example, Tourre emailed David Lehman[9] and Egol that the agented trades in GS&Co's pipeline, such as the one he was structuring for Paulson, had "significant" profitability "for the low risks they involve." (PX-22, Tr. 685).   Copying Lehman, Egol responded that "these agented trades are a key competitive strength of our franchise."  (PX-22).  Tourre wrote to Lehman and Egol describing the AC1 transaction as "clean P&L trades."  (PX-23). Tourre subsequently emailed Lehman, Swenson, and Ostrem an update on AC1, describing it as his idea and claiming GS&Co could

---

[9]       Lehman, Josh Birnbaum and Michael Swenson supervised the correlation desk.  (Tr. 2275).  They reported to Dan Sparks, the head of the mortgage department.  (Tr. 890-91).  Peter Ostrem, the head of GS&Co's mortgage origination business, also supervised the correlation desk.  (Tr. 780-81).

make up to $19 million on the trade.  (PX-192).  In the formal memo to GS&Co's Mortgage Capital Committee, which was sent to Birnbaum, Lehman, Ostrem and Swenson, AC1 was billed as an "innovative, franchise-building transaction" that "will enhance Goldman's franchise as a leading firm in the synthetic structured product CDO sector."  (PX-233 at 2).    Tourre subsequently wrote to Lehman, Swenson, Egol and Birnbaum that AC1 was executed at a "VERY good level."  (PX-325).  When the trade was done, Swenson emailed Tourre, "congrats on this trade – I know you worked hard for this one."  (PX-353).

Tourre's emphasis on his creativity and the force with which he pushed AC1 paid off.  In his performance evaluation for 2007, he received very positive reviews from the GS&Co personnel who worked with him on AC1, including:

- Egol wrote that Tourre was "highly creative;"

- Lehman wrote that Tourre was "creative;"

- Gerst wrote that Tourre "thinks commercially and is good at developing new ideas and addressing client inquiries;"

- Melanie Herald-Granoff, one of the GS&Co sales personnel covering ACA, praised Tourre's ability to find an intermediary for the ACA trade;

- Kreitman wrote that Tourre "has a nose for a trade and will not relent until he prints it;"

- Cactus Raazi, GS&Co's sales coverage for Paulson, wrote, "As good as it gets – no need to belabor the point;"

- Michael Nartey, who worked with Tourre to secure the IKB and ABN investments in AC1, wrote that Tourre was "very innovative;"

- Charlie Remnant wrote, "On closing the ABN Amro / ACA Intermediation trade Fabrice worked extremely hard to create solutions for ABN's internal issues."[10]

Each of these positive reviews came from colleagues who worked with Tourre on AC1, and therefore are likely referring to his work on that transaction, and some of these reviews specifically referenced his work on AC1.   Tourre himself described AC1 as a "huge" focus of

---

[10]     These reviews are in pages 20 through 23 of PX-369.

his business, and he worked on the transaction from November 2011 through June 2012 – more than half the fiscal year.  (PX-11, PX-352, PX-398).

Placing significant weight on the AC1 transaction is also justified because there are only occasional references in Tourre's performance evaluation to other transactions on which he worked during 2007.  (PX-369).  Moreover, some of the comments about Tourre's role in those transactions have a more negative bent:

- Geoffrey Williams wrote that Tourre's work with respect to CPPI and CPDOs "fell on unlucky timing" (PX-369 at 22);

-  Nicolas Friedman wrote, "in rare occasions, Fabrice did not post us on fairly large transaction (eg super senior tranches with CIBC)" (PX-369 at 25);

- John Liu wrote that the desk sent out a new "ABX CPPP trade idea" before it was "fully developed," the trade performed very poorly, and "[t]his has some negative impact on the franchise" (PX-369 at 26).

Based on the prominent role that the AC1 transaction played in Tourre's review, and his own embrace of this transaction as successful and a huge focus during the year, attributing one-third of the portion of the bonus conservatively attributable to Tourre's personal performance amounts to a reasonable approximation of the ill-gotten gains from the unlawful conduct.  This evidence confirms that $175,463 is a reasonable approximation of Tourre's ill-gotten gain from AC1.[11]

### C.  Tourre Should Pay Pre-Judgment Interest.

Tourre received the entirety of his 2007 bonus in January 2008.  (Fitzpatrick Dec., Ex. 1, Declaration of Scott Mehling).  He has had unrestricted access to the money since that time.  The SEC therefore seeks pre-judgment interest of $62,858.[12]  Without pre-judgment interest, Tourre

---

[11]     Courts have awarded disgorgement of other defendants' bonuses based on similar approximations.  *See S.E.C. v. Lorin*, 877 F. Supp. 192, 201 (S.D.N.Y. 1995) (in the face of a vast number of trades that were made in furtherance of a manipulation of the market, court ordered disgorgement of all trading profits even if some of the profits may have been derived from lawful trades); *S.E.C. v. Resnick*, 604 F. Supp. 2d 773, 783 (D. Md. 2009) (ordering disgorgement of entire bonus, plus pre-judgment interest, based on assumption that defendant would not have been given a bonus but for unlawful inflation of company's earnings).

[12]     The SEC's pre-judgment interest figure is based upon the Internal Revenue Service rate of interest on tax underpayments and refunds.  *First Jersey Sec.*, 101 F.3d at 1476-77; *S.E.C. v. Rosenthal*, 426 Fed. App'x 1, 4 (2d

will have had for nearly six years "the benefit of what amounts to an interest free loan procured as a result of illegal activity." *S.E.C. v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Tourre should not "profit from his ill-gotten gains, including the time value of money," and the Court should award pre-judgment interest on the SEC's disgorgement figure. *Elliot*, 2012 WL 2161647, at *13; *see also First Jersey Sec.*, 101 F.3d at 1476 (affirming assessment of pre-judgment interest); *S.E.C. v. Milligan*, 436 Fed. Appx. 1, 2 (2d Cir. 2011) (same); *S.E.C. v. Colonial Inv. Mgmt. LLC*, 381 Fed. Appx. 27, 32 (2d Cir. 2010) (same); *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (same).

***

In sum, the SEC requests that Tourre be ordered to disgorge $175,463, plus pre-judgment interest of $62,858.03, for a total of $238,321.03.

## II.     TOURRE SHOULD PAY SUBSTANTIAL PENALTIES.

In addition to disgorgement, the Court should order Tourre to pay a $910,000 civil penalty. Given the severity of Tourre's violations, "[d]isgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows the violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught." *See S.E.C. v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331-32 (S.D.N.Y. 2007) (citation omitted). A $910,000 penalty represents a substantial penalty and, for the reasons set forth below, is an appropriate penalty in this case.

### A.  Tourre's Misconduct Warrants A Third-Tier Civil Penalty.

Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties in increasing severity for statutory violations. 15 U.S.C. §77t(d); 15 U.S.C. § 78u(d)(3). A first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the

---

Cir. 2011).  Attached as Exhibit 8 to the Fitzpatrick Declaration are the SEC's pre-judgment interest calculations updated through November 30, 2013 (partial months are not counted in this calculation).

violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and a third-tier penalty may be imposed when, in addition to meeting the second-tier requirements, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Razmilovic*, 2013 WL 6172543, at *21 (quoting 15 U.S.C. §§ 77t(d)(2)(A)-(C) and 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)).   Each tier provides that, for each violation, the amount of penalty "shall not exceed *the greater of*" a specified monetary amount or the defendant's gross pecuniary gain.   15 U.S.C. §77t(d) (emphasis added); 15 U.S. C. § 78u(d)(3) (same).   The statutory maximum penalty at the time Tourre committed his fraud was $130,000 per violation. *See* 17 C.F.R. § 201.1003.

Tourre's conduct easily meets the statutory requirements for a third-tier penalty.  Tourre violated Section 17(a)(1), Section 10(b), and Rule 10b-5(a) and (c), and did so knowingly or recklessly.  And Tourre's fraud resulted in substantial victim losses.  The victims of his scheme – IKB, ACA, and ABN – lost approximately $1 billion and Tourre tried to attract additional investors in AC1 for potential total losses of $2 billion.  *See, supra,* p.7.   The Court thus has the authority to impose a $130,000 penalty per violation.

**B.  The Court Should Impose A Penalty For Each Of Tourre's Fraudulent Offers And Sales.**

To determine the maximum penalty available in this matter, the Court should multiply $130,000 by the number of violations, specifically the fraudulent offers and sales that Tourre orchestrated.  This approach is consistent with that adopted by the court in *S.E.C. v. Pentagon Capital Management*, No. 08 Civ. 3324(RWS), 2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012).   In that case, the individual defendant was found liable for fraudulent market-timing and late trading in violation of Section 17(a), Section 10(b), and Rule 10b-5.  *Id*. at *3.  The court noted that it could impose a civil penalty for each of the defendant's trades as a separate violation of the securities laws.  *Id*.  The court calculated the maximum penalty to be $1.2 billion by multiplying

the statutory maximum by 10,052 trades. *Id*. at *3. This method of calculating the penalty was approved by the Second Circuit and has been followed in other cases. *See S.E.C. v. Pentagon Capital Mgmt.*, 725 F.3d 279, 299 n.7 (2d Cir. 2013) ("we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation"); *Elliot*, 2012 WL 2161647, at *11 (imposing a first tier penalty per transaction); *S.E.C. v. Pattison*, No. C–08–4238 EMC, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) ("The Court may assess a penalty for each distinct violation, e.g., each time Defendant falsified a record"); *S.E.C. v. Amerifirst Funding, Inc.*, No. 3:07–CV–1188-D, 2008 WL 1959843, at *9 (N.D. Tex. May 5, 2008) (determining that each investment defendants received from defrauded investors constituted a violation of the securities laws, and assessing a $2,000 penalty for each of 589 investments); *S.E.C. v. Coates*, 137 F. Supp. 2d 413, 428–30 (S.D.N.Y. 2001) (assessing a $10,000 penalty for each of four separate, misleading statements to investors); *S.E.C. v. Kenton Capital Ltd.*, 69 F. Supp. 2d 1, 17 & n.15 (D.D.C. 1998) (assessing a $1.2 million penalty calculated by "multiplying the maximum third tier penalty for natural persons ($100,000) by the number of investors who actually sent money to [defendant] (12)").[13]

Thus, given that each offer or sale of AC1 amounted to a separate violation, the case law supports determining the number of violations based on each instance in which Tourre completed either an offer or sale of AC1. Tourre made the following seven offers:

1. Tourre sent an email to ACA mentioning that the company could invest in AC1. (PX-61). In the same email, Tourre falsely stated that the equity tranche was "pre-committed" and that Paulson's interests were aligned with those of ACA. (PX-61).

2. Tourre discussed the trade with IKB, which was sent the misleading preliminary term sheet and flipbook, which Tourre had "primary responsibility" for preparing. (PX-183, PX-228, PX-246, PX-250, PX-261). Tourre did not tell IKB or its sales

---

[13]     There are several methods of calculating a civil penalty. *Compare Razmilovic*, 2013 WL 6172543, at * 21 (approving district court's imposition of a $20.9 billion penalty, which was equal to half of defendant's gross pecuniary gain), *with Moran*, 944 F. Supp. 286, 296 n.14 (S.D.N.Y. 1996) (finding six statutory violations and imposing one penalty per violation).

coverage at GS&Co about Paulson's role in the portfolio selection process, and IKB subsequently advised two affiliated companies to purchase $150 million in AC1 notes. (Tr. 903, Fitzpatrick Dec., Ex. 9, Michael Nartey Depo. at 42, 113).

3. Tourre persuaded ABN to intermediate one of the AC1 credit default swaps on behalf of ACA. As an intermediary, ABN stood between GS&Co and ACA. (Tr. 2157-58). In emails to ABN, Tourre reiterated the half-truth that ACA alone had selected the portfolio. (PX-289, PX-290). He had a "long call" with ABN before they agreed to do the intermediation trade. (PX-328). He did not mention Paulson's role in selecting the portfolio, information that would have been important to ABN's analysis of the transaction. (Fitzpatrick Dec., Ex. 10, Dean Atkins Depo. 62-63).

4. Tourre sent the term sheet and flipbook for AC1 to Calcyon, a French bank that was a potential investor. (PX-302, Tr. 2153-54). Both documents contained the half-truth that the portfolio was "selected by ACA." (PX-302).

5. Tourre sent an email to CIFG, a financial guarantee company, in an attempt to sell it the 45-50% tranche of AC1. (PX-354, Tr. 2183-84). Tourre wrote that the portfolio was "selected by ACA." (PX-354).

6. Tourre sent an email to a GS&Co salesperson with whom he was interacting in the marketing of AC1 notes. (PX-398, Tr. 2200). The email attached the flipbook and term sheet. The sales person confirmed to Tourre that AC1 was "[s]hown to BAWAG [an Austrian bank]."

7. Tourre sent UBS an email on March 7, 2007. (PX-399). He attached a copy of the term sheet and flipbook for AC1. The documents contained the misleading half-truth that the portfolio was "selected by ACA." (PX-399).

Tourre's conduct in each of these instances was an offer of a security, each offer was part of the fraudulent scheme, and each contained the core misrepresentation that the portfolio was selected by ACA.[14] *See S.E.C. v. Tourre*, Case No. 10-cv-3229(KBF), 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013) ("The Securities Act … defines 'offer' expansively to include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value."). It is therefore appropriate to determine the penalty based on each of the seven fraudulent offers Tourre initiated, for a total civil penalty of $910,000.

---

[14]     Because the SEC recommends imposing a separate penalty based on each violative act by Tourre, as opposed to based on the number of statutory provisions that he violated, it is only requesting that one penalty be assessed for Tourre's violations of Section 17(a), Section 10(b) and Rule 10b-5 with respect to ACA. The SEC is not seeking an additional penalty for Tourre's substantial assistance of GS&Co's violations of Section 10(b) and Rule 10b-5 because the Court has indicated that it will not impose an additional penalty for that conduct. (Tr. 2026).

## C. The Court Should Impose A Substantial Penalty Given The Facts And Circumstances Of This Case.

For each violation, "the Court must determine 'in light of the facts and circumstances' the precise amount of civil penalty warranted to be paid by the persons who committed such violations." *Pentagon Capital Mgmt.*, 2012 WL 1036087, at *4 (quoting 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(1)). The amount of a civil penalty is subject to judicial discretion. *See S.E.C. v. Constantin*, No. 11 Cv. 4642(MHD), 2013 WL 1453792, at *18 (S.D.N.Y. Apr. 2, 2013) (framework for determining civil penalties is discretionary because each case has its unique facts and circumstances); *Opulentica*, 479 F. Supp. 2d at 331 (same). Courts frequently look to the following factors in determining the amount of a penalty: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the demonstrated current and future financial condition." *Id.*; *see also Elliot*, 2012 WL 2161647 at *11; *Pentagon Capital Mgmt.*, 2012 WL 1036087, at *2, 4-5. Here, all of these factors counsel in favor of imposing a $910,000 penalty, the maximum civil penalty under a reasonable reading of the tier maximums.

### 1. Tourre's conduct was egregious.

Tourre's misconduct was egregious. He lied to ACA to secure their commitment to the AC1 transaction. He created misleading marketing materials that he knew GS&Co distributed globally. He personally spoke with the long investors in AC1 – ACA, ABN and IKB. In these conversations, which occurred over several months, he lied about or concealed Paulson's role in the selection of the AC1 portfolio. Tourre did all of this as a licensed securities professional.

## 2. *Tourre acted with scienter.*

The jury found that Tourre "knowingly participated in a scheme to defraud with the intent to deceive, manipulate or defraud, or with reckless disregard for the truth." (Tr. 2784, 2799). The evidence of scienter was strong. Tourre's email correspondence reveals a sense of self grandeur and a callous disregard for the potentially severe financial repercussions of his conduct. In an email to Marine Serres, Tourre's girlfriend and a GS&Co employee, Tourre wrote:

> More and more leverage in the system, the whole building is about to collapse anytime now…the only potential survivor, the fabulous Fab …, standing in the middle of all these complex, highly levered, exotic trades he created without necessarily understanding all of those monstrosities!!!

(PX-112). The email went on to state that Tourre was "not feeling too guilty." (PX-112). He used a winking emoticon to put a sarcastic twist on his statement that there was a humble, noble and ethical purpose for his job. (PX-112). While at trial Tourre attempted to characterize this email as merely a romantic missive, its content and timing suggest strongly that Tourre was aware at the time of his fraudulent conduct that he and his bank were putting investors at severe financial risk. (Tr. 2062-69).

What is more, the potential victims of the financial system in which Tourre worked – at great profit – were a source of humor in his email correspondence. He wrote to Serres, "the poor subprime borrowers will not last for long!!!," and "I have just sold some abacus bonds to some widows and orphans that I met at the airport." (PX-232, PX-358). He forwarded disclosures that he "like[d]" for a different synthetic CDO to Serres, stating, "Sounds a lot like our traditional ABACUS risk factors." (PX-339). He then summed up the disclosures as having "a free option to ja**m investors." (PX-339). These emails reinforce the otherwise strong evidence of Tourre's scienter.

### 3. *Tourre's conduct created substantial losses.*

IKB lost $150 million on its purchase of AC1 notes, and ACA lost $42 million. Additionally, ACA went bankrupt and could not pay when its long exposure on the super-senior tranche came due. The Royal Bank of Scotland, which acquired ABN, had to pay most of the money owed as a result of ABN's intermediation of ACA's super-senior exposure – a loss of $890 million. (PX-372, Fitzpatrick Dec., Ex. 11, Egol Inv. Tr. at 238-39 (estimating profit of $30 million)). The losses incurred by any one of these victims far exceed the amounts that have been found substantial by courts in the past. *See, e.g., Pentagon Capital Mgmt.*, 2012 WL 1036087, at *6 (finding substantial losses in the "tens of millions of dollars"). And Tourre risked even more substantial losses in his efforts to push AC1 on additional investors.

### 4. *Tourre's conduct was not isolated.*

The fraud took place with respect to a single CDO. However, the misconduct in which Tourre engaged was not isolated. The evidence of fraud in this case was not limited to a single meeting, a single telephone call or a single document or email. Tourre attended meetings, spoke on the phone, and emailed with ACA for months after his admittedly false January 10, 2007 email. He never corrected the lie that Paulson, as transaction sponsor, was investing in the equity tranche of AC1, despite having numerous opportunities to do so. *See supra* n. 5. He had "primary responsibility" for the AC1 term sheet and flipbook, both of which contained the misleading half-truth that the portfolio was "selected by ACA." (Tr. 2114-15, 2210, PX-201, PX-202). On the record of this trial, there is no serious argument that Tourre is being unfairly singled out for his role on this deal. He prepared marketing points for GS&Co's sales force to sell AC1 on February 26, 2007. (PX-208, Tr. 2197-98). The first point was that the portfolio was selected by ACA. (PX-208). The marketing points highlighted that the fee structure aligned ACA's incentives with investors, but made no reference to Paulson's role in constructing

the CDO.  (PX-208, Tr. 2199).  Tourre repeatedly pushed GS&Co's sales teams to disseminate these materials to clients through June 2007.  (PX-263, PX-299, PX-320, PX-322, PX-351, PX-352).  The length and duration of Tourre's fraudulent scheme stands in contrast to cases where defendants exhibited a momentary lapse in judgment over a period of hours or days.

### 5.  *The penalty should not be reduced due to Tourre's financial condition.*

Tourre made $1.7 million in salary and performance bonus in 2007, and was paid substantial bonuses in other years.  (Fitzpatrick Dec., Ex. 12, Tourre Depo. at 338-39).  GS&Co paid Tourre compensation that placed him well above the threshold for the top one percent of all American earners through 2011.[15]  *Compare* Fitzpatrick Dec. Ex. 1 *with* Tami Luhby, *What It Takes To be A One Percenter*, CNNMoney (Nov. 20, 2012).  It also appears that GS&Co has paid all of Tourre's attorneys' fees, and therefore he did not need to pay out of pocket for his defense.  Andrew Ross Sorkin, *Wall Street Debates Who Should Pay Legal Bills*, The New York Times (Aug. 12, 2013) (noting that GS&Co "paid several millions of dollars to defend" Tourre, from whom it will not seek reimbursement, and that "the firm plans to pay for his appeal").  Therefore, nothing in the record suggests that Tourre is incapable of paying a large penalty.

### 6.  *Additional factors mandate a severe penalty.*

All of the traditional factors weigh in favor of imposing a substantial penalty.  One additional factor weighing in favor of a substantial penalty is the deterrent impact of this case.  *See Opulentica*, 479 F. Supp. 2d at 331 ("Civil penalties are designed to punish the individual violator and deter future violations of the securities laws.").  The trial was highly publicized, in large part because the conduct occurred in the context of the financial crisis.  It involved the conduct of an employee of a financial firm engaging in fraud in connection with the sale of a

---

[15]     After the jury verdict, the SEC raised with defense counsel the need to take additional discovery of Tourre's current financial condition.  Defense counsel stated that it was for the defense, not the SEC, to raise any inability to pay.  The SEC reserves the right to seek additional discovery of Tourre's current financial condition if he asserts his inability to pay as a basis for lowering the penalty.

complex financial instrument.  And it represented the brazen pursuit of profits at the expense of ethical conduct.  This case thus presents a unique opportunity to send a deterrent message to Wall Street that financial professionals at every level will be held accountable for their conduct, and will suffer severe consequences if they engage in fraud.

**D.  Tourre Should Personally Pay Any Penalty Ordered By The Court.**

Tourre – not GS&Co – should pay any penalty the Court imposes in this case.  It has been reported that GS&Co "has privately indicated it might even pay whatever money [Tourre] could ultimately be fined."  Sorkin, *Wall Street Debates Who Should Pay Legal Bills*, The New York Times (Aug. 12, 2013).  In correspondence with the SEC, counsel for GS&Co stated that no agreement or informal understanding existed with respect to the reimbursement of any penalties ordered by this Court. (Fitzpatrick Dec., Ex. 13, November 7, 2013 letter).  The proposed final judgment nevertheless has language prohibiting Tourre from accepting reimbursement for the penalty imposed.

It is well-recognized that the civil penalties provisions of the securities laws are "designed both to 'punish the individual violator and deter future violations of the securities laws.'"  *S.E.C. v. Gupta*, No. 11 Civ. 7566(JSR), 2013 WL 3784138, at *1 (S.D.N.Y. July 17, 2013) (quoting *Haligiannis*, 470 F. Supp. 2d at 386).  Allowing Tourre to be reimbursed for the penalty would improperly dilute the punitive and the deterrent purposes of the penalty provisions in the securities laws.  *See S.E.C. v. Das*, 723 F.3d 943, 948 (8th Cir. 2013) (acknowledging district court's decision to "bar Dean 'from seeking payment, reimbursement, or indemnification from any third party, including Info, for the civil penalties ordered herein'").

Accordingly, the SEC requests that the Final Judgment include an order requiring Tourre to pay civil penalties personally and barring him from accepting reimbursement  from any person or entity, including GS&Co.  This request is consistent with language in the standard consent

entered into by parties reaching settlements with the SEC, including GS&Co's Consent entered in this case.  (Dkt. 25 at ¶5).  The deterrent impact of this case will be undermined if GS&Co is permitted to pay the penalty on Tourre's behalf.

### III.    THE COURT SHOULD IMPOSE A PERMANENT INJUNCTION.

The Court should permanently enjoin Tourre against future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 20(e) of the Exchange Act.  The Securities Act and the Exchange Act provide for the issuance of permanent injunctive relief in the face of a violation of any of their provisions.  15 U.S.C. §77t(b); 15 U.S.C. §§ 78u(d)(e), 78u-1.  "To award such relief, a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence, but fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *Opulentica*, 479 F. Supp. 2d at 329.

Courts look to the following factors in determining whether there is a reasonable likelihood that a defendant will violate the securities laws in the future: (1) the degree of scienter; (2) the isolated or persistent nature of the past fraudulent conduct; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations.  *Id*.  The first two factors are discussed in Section II C above and weigh heavily in favor of injunctive relief.

The third factor is Tourre's appreciation of his wrongdoing.  Tourre has exhibited no contrition or appreciation of his misconduct.  To the contrary, Tourre testified before the U.S. Congress that he never told ACA that Paulson was taking a long position in AC1 and that he told ACA that Paulson was going to be a short investor.  (Fitzpatrick Dec., Ex. 14, Congressional Tr. 17).  He maintained these positions through his investigative testimony, during his deposition and at trial.  But after a two-week trial that included lengthy testimony by Tourre, a nine-person

jury rejected Tourre's exculpatory explanations, and found him liable of six of seven fraud claims.  As the Second Circuit has noted, "persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction."  *Lorin*, 76 F.3d at 461 (internal quotation marks omitted); *Elliot*, 2012 WL 2161647, at * 9 ("the Court's view of continued protestations of innocence may be relevant to whether a defendant is likely to repeat prior conduct").

The fourth factor also weighs in favor of injunctive relief.  There is every indication that Tourre will continue to have opportunities in the financial sector and therefore have opportunities to commit future violations.  The initial Complaint in this case was filed on April 16, 2010.  Tourre remained a paid employee of GS&Co for approximately two more years.[16]  He earned approximately $700,000 per year during this period.  (Fitzpatrick Dec., Ex. 1; Tr. 2373-74).  At GS&Co's expense, Tourre retained Sard Verbinnen, one of the preeminent PR agencies on Wall Street, to rehabilitate his public image.  Nick Summers, *Sard Verbinnen, Wall Street's Go-To Crisis PR Firm*, Businessweek (Aug. 8, 2013).

Tourre now stands poised to capitalize on a doctorate in Economics from the University of Chicago, which *US News & World Report* ranked number one among Economics Ph.D programs in the country.  (Tr. at 2357-58).  Notable alumni of the program include David Rockefeller, the former chairman and chief executive officer of Chase Manhattan Bank. Graduates frequently obtain positions at universities, investment firms, corporations, or prestigious institutions.  (Fitzpatrick Dec., Ex. 15, University of Chicago Website).  Tourre's future career opportunities are strong, and absent injunctive relief the market will have no protection from a defendant who violated the securities laws with a high degree of scienter and has failed to provide any assurances that future violations are unlikely to occur.  *See S.E.C. v.*

---

[16]    At trial Tourre estimated that he was on paid leave for a year.  (Tr. 273-74).  However, the amount of money GS&Co paid Tourre in 2011 suggests that he was on paid leave for a longer period.  Fitzpatrick Dec., Ex. 1.

*Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (an injunction was warranted where defendants violated securities laws with a "high degree of scienter" and failed to assure the court that future violations were not likely to recur).

## CONCLUSION

Tourre's conduct helped cause more than one billion dollars in losses.  He was rewarded with the largest bonus he had ever received.  GS&Co paid him for two years while he was on administrative leave, and appears to have paid and to continue to pay his attorneys' fees, legal expenses, and public relations bills.  He is now enrolled in an elite Ph.D program.  But severe misconduct must have consequences, particularly when the consequent financial loss is of such great magnitude.  The SEC respectfully requests that the Court grant the SEC's Motion For Disgorgement, Pre-judgment Interest, Civil Monetary Penalties And Injunctive Relief Against Defendant Fabrice Tourre.


Dated:  Washington, D.C.
          December 16, 2013

Respectfully submitted,

/s/ *Bridget M. Fitzpatrick*
Bridget Fitzpatrick
Christian D. H. Schultz
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
(202) 772-9292 (fax)
fitzpatrickbr@sec.gov