UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

SECURITIES AND EXCHANGE
COMMISSION,

                       Plaintiff,

          -v-

FABRICE TOURRE,

                    Defendant.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 0 7 2014

10 Civ. 3229 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On August 1, 2013, a jury returned a verdict against defendant Fabrice Tourre for violating a variety of provisions of the securities laws. The jury found Tourre liable of six of the seven of the SEC's claims against him; the jury found him to have violated Section 17(a)(1) of the Securities Act, Section 17(a)(2) of the Securities Act, Section 17(a)(3) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5(a), Section 10(b) of the Securities Exchange Act and Rule 10b-5(c), and Section 20(e) of the Securities Exchange Act. This verdict followed more than three years of litigation, and a trial comprised of eleven days of testimony in which Tourre declined to put on a case.

On September 30, 2013, Tourre moved, pursuant to Federal Rule of Civil Procedure 50(b) and 59(a)(1), for judgment as a matter of law or, in the alternative, for a new trial. (ECF No. 474.) In substance, Tourre raises the following sets of issues in support of his motion:

(1) That the jury returned verdicts based on insufficient evidence;

(2) That there was insufficient evidence for the jury to find that Tourre made any offer in the United States for purposes of the SEC's Section 17(a) claims, combined with what Tourre asserts was legal error by the Court in its instructions on the domesticity requirement of this statute;

(3) The Court erred in granting partial summary judgment on the issue of whether the swaps at issue were "security-based swap agreements";

(4) A catch-all argument that Tourre simply incorporates by reference that there was no evidence of any false statement or omission, no evidence that any such false statement or omission was material, no evidence that such a statement was made in connection with the offer, purchase or sale of a security-based swap agreement, and no evidence that Tourre acted with the requisite level of scienter; and

(5) That the finding of aiding and abetting pursuant to Section 20(e) was premised on a theory that Tourre's own conduct established the primary violation, and that there was an insufficiency of evidence of a primary violation by any other employee of Goldman Sachs.

For the reasons set forth below, none of these arguments has merit and Tourre's motions are DENIED.

I.    FACTS

This matter has been heavily litigated since the Securities and Exchange Commission ("SEC") first brought this case in April 2010.  There have been numerous decisions issued in this litigation and a trial record which sets forth in detail the facts, allegations, and defenses offered by the parties.

In light of the fully developed trial record and the submissions of the parties on these motions (particularly that of the SEC) which lay out facts adduced at trial, the Court will not here rehash the facts underlying its decision.  The Court assumes familiarity with its prior decisions and with the trial record.

II.    LEGAL STANDARD

Tourre's post-trial motions are brought pursuant to both Rule 50(b) and Rule 59(a)(1).  Different legal standards apply to each motion.

A.    Rule 50(b)

At the close of the SEC's case, Tourre's counsel made an oral motion for judgment as a matter of law pursuant to Rule 50(a), which the Court deferred argument on until the close of Tourre's case.  (Trial Tr. at 2429-30, 2435.)  Tourre's counsel argued the motion outside of the presence of the jury following the close of evidence (id. at 2439-59); counsel to the SEC responded to Tourre's motion and made its own Rule 50(a) motion as to the interstate commerce requirement for each of its claims against Tourre (id. at 2460-75).  The Court denied Tourre's motion and granted the SEC's motion on the record.  (Id. at 2476-82.)  The case then went to the jury, which returned a verdict of liable as to six of the seven counts and a verdict of

3

not liable as to Count 5—the alleged violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5(b).[1]

Rule 50(b) permits a party who has previously made a motion for judgment as a matter of law under Rule 50(a) to renew that motion following a jury verdict. Fed. R. Civ. P. 50(b). In reviewing such a motion, the Court must review the record as a whole and consider the evidence in the light most favorable to the non-moving party—here, the SEC. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000); see also Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007). As non-movant, the SEC is entitled as a matter of law to all reasonable inferences a jury might have drawn in its favor. See Zellner, 494 F.3d at 371.

The law is clear that once a jury has returned a verdict, a movant's burden on a motion for judgment as a matter of law pursuant to Rule 50 is a heavy one, "particularly heavy" where the jury has deliberated and returned a verdict in favor of the non-movant. Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). The Court must leave that verdict in place unless "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (citations omitted); see also Concerned Area Residents for Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994) (requiring complete absence of evidence supporting verdict for Rule 50(b) motion).

---

[1] Tourre has not moved as to Count 5.

"[A] Rule 50 motion may only be sustained based on insufficiency of evidence—not on an alleged inconsistency in the jury's verdict." In re The Reserve Fund Sec. & Derivative Litig., 09 Civ. 4346 (PGG), 2013 WL 5432334, at *7 (S.D.N.Y. Sept. 30, 2013); see also Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 87 (2d Cir. 2006); Tolbert v. Queens College, 242 F.3d 58, 74 (2d Cir. 2001); In re Vivendi Universal S.A. Sec. Litig., 765 F. Supp. 2d 512, 550 (S.D.N.Y. 2011).

B. Rule 59(a)(1)

Rule 59(a) permits a court, on motion to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed R. Civ. P. 59(a)(1)(A). Courts will typically only grant a motion for a new trial pursuant to Rule 59 if the jury's determination was seriously erroneous or represented a miscarriage of justice. Elyse v. Bridgeside, Inc., 367 F. App'x 266, 268 (2d Cir. 2010); Sorlucco v. N.Y.C. Police Dep't, 971 F. 2d 864, 875 (2d Cir. 1992). "The remedy for an inconsistent verdict is a new trial, not judgment as a matter of law." Reserve Fund, 2013 WL 5432334, at *7; see also Kosmynka, 462 F.3d at 87; Tolbert, 242 F.3d at 74; Vivendi, 765 F. Supp. 2d at 550.

"Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). Nevertheless, granting a new trial is extraordinary relief which is properly granted only when circumstances are exceptional. See Raedle v. Credit

Agricole Indosuez, 670 F.3d 411, 417-18 (2d Cir. 2012); DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998).

## III.   DISCUSSION

The Court discusses each of Tourre's arguments pursuant to Rules 50(b) and 59(a)(1) in the order in which he briefed them.

### A.  Obtaining Money or Property—Section 17(a)(2)

To find liability under Section 17(a)(2), the jury was instructed that it had to find that Tourre, directly or indirectly, obtained money or property by means of one or more material misstatements or omissions. (Trial Tr. at 2787-93.) No party objected to the form of this instruction following its original delivery to the jury. Tourre now argues that he is entitled to judgment as a matter of law under Rule 50(b) because there was no evidence adduced at trial that he obtained any money or property by means of the alleged fraud.[2] (Mem. at 4-6, ECF No. 475; Reply at 3-5, ECF No. 487.) He also argues that the Court's answer to one of the jury's questions about the elements of Section 17(a)(2) was prejudicial and entitles him to a new trial. (Mem. at 6-9; Reply at 5.) Neither argument has merit.

---

[2] In addition, Tourre argues that the SEC failed to prove the other elements of its Section 17(a)(2) claim by referencing (1) the oral Rule 50(a) motion his counsel made on the record on July 29, 2013 following the close of evidence (Trial Tr. at 2439-59); and (2) a written version of that Rule 50(a) motion, dated July 29, 2013, which is attached as an exhibit to the Declaration of Pamela Rogers Chepiga (Chepiga Decl. Ex. 1, ECF No. 476). (Mem. at 9-10.) For the reasons set forth in its oral ruling on Tourre's oral Rule 50(a) motion (see Trial Tr. at 2476-82), these arguments are rejected.

Additionally, and for the third time, the Court declines to accept the filing of Tourre's written Rule 50(a) motion. As set forth previously, both on the record (see Trial Tr. at 2429) and following trial (see 8/26/13 Order ¶ 3, ECF No. 470), the Court permitted Tourre's counsel to present this motion orally (and at length), permitted the SEC an opportunity to respond orally, and, after considering these arguments, denied the motion orally. The Court will not separately consider the July 29, 2013 written Rule 50(a) motion attached as Exhibit 1 to the Chepiga Declaration.

During deliberations, the jury asked two questions about the Section 17(a)(2) requirement that Tourre obtain money or property:

> 1. Does <u>base salary</u> obtained by Fabrice Tourre during the time period in question satisfy the phrase "obtained money or property"?
>
> 2. Also, does any money Mr. Tourre obtained on behalf of Goldman Sachs satisfy this phrase?

(Court Ex. 4, ECF No. 437 (emphasis in original).)

The Court answered the second question with a simple "no"—this response had been agreed to by Tourre, over the SEC's objection, prior to bringing out the jury.[3] (Trial Tr. at 2830-37, 2840-41.)

The Court answered the first question by repeating the jury instruction the Court had originally given with respect to this element, and by explaining that one can receive compensation in many forms, including through the payment of base salary and bonus:

> As to the first one what I want to do is refer you folks back to page 24 of the jury instructions and there is the following instruction:
>
> If, for instance, you find that Mr. Tourre obtained compensation from Goldman -- his employer -- that was connected, directly or indirectly to a material misstatement or omission, that would satisfy this element.
>
> Compensation can occur in many forms. One form is base salary, one form is bonus. But, you would need to find the other elements as well. All right?

---

[3] The Court further notes that, at the request of Tourre, it removed language from the jury charge that would have permitted the jury to find this element satisfied if it found that Tourre had obtained money or property <u>either</u> for himself or for his employer, Goldman Sachs. (Trial Tr. at 1833-38, 2311-14, 2522-23.)

(Id. at 2840.) Tourre argues that this response was "confusing and prejudicial," and that, as a matter of evidence, there was an insufficient record upon which the jury could base a determination that Tourre obtained compensation in the form of base salary by means of material misstatements or omissions in connection with his work on the ABACUS 2007-1 AC1 ("AC1") transaction.[4]  (Mem. at 8.)

This is simply wrong.  Section 17(a)(2) does not require the SEC to show that a banker like Tourre received some sort of additional "fraud bonus" on top of his base salary in order to establish liability; as the statute clearly states, the SEC must prove that Tourre obtained money or property by means of a material misstatement or omission.  Tourre ignores the fact that the evidence adduced at trial showed that he was paid by Goldman Sachs for his work during the time period covering the AC1 transaction, and that Tourre's work on the AC1 transaction was within his job responsibilities.

There was no evidence at trial that Tourre would have been paid nothing—or even anything less—had he not engaged in the work he performed on the AC1 transaction.  Tourre chose not to put on a case.  He could have called a witness to testify that even in the absence of the AC1 transaction his compensation would have been the same.  He did not.  Under these circumstances, the jury was fully entitled to draw the reasonable inference that Tourre obtained base salary and bonus by means of material misstatements or omissions concerning the AC1

---

[4] The Court adopts the description of the AC1 transaction contained in the SEC's opposition brief. (Opp. at 1 n.2.)

transaction, in which he engaged as an employee of Goldman Sachs.  Indeed, a contrary inference would not be supported by the record.

In terms of the Court's instruction, it was simply a reiteration of the original instruction on this element—a correct statement of the law.  Though the Court also noted that one can receive compensation in many forms, including base salary and bonus, the Court tied the instruction back to the other elements of a Section 17(a)(2) violation (such as the "directly or indirectly" component of obtaining money or property).  According to Tourre, the Court should have answered the question with a simple "no."  (Trial Tr. at 2837.)  This would have been an incorrect statement of the law and is rejected.  Tourre is thus not entitled to judgment as a matter of law or a new trial on the basis of his Section 17(a)(2) arguments.

B.  Scheme Liability—Section 17(a)(1), Section 17(a)(3), Rule 10b-5(a), and Rule 10b-5(c)

Prior to trial, Tourre moved in limine to preclude evidence as to "scheme liability," asserting that the SEC's case was based solely on alleged misstatements and not a fraudulent scheme.  (See ECF Nos. 294-96.)  The Court denied that motion on the record at the July 9, 2013 final pretrial conference.  (See 7/9/13 Conference Tr. at 15, ECF No. 400.)

In denying the motion, the Court cited, inter alia, the extensive pre-trial record supporting the SEC's assertion that it has always approached this case as one involving misstatements and omissions as well as a fraudulent scheme.  (Id. at 8-12.)  As the Court noted, the November 2010 amended complaint specifically pleads scheme liability by Tourre under Section 17(a) and Rule 10b-5.  (See id. at 8-

9

9; Am. Compl. ¶¶ 3-4, 27, 32-34, 45-47, 49, 76, 80, 83, ECF No. 44.)  The Court also noted that the SEC has argued that Tourre participated in a scheme to defraud in connection with the AC1 transaction in its opposition to Tourre's motion to dismiss in December 2011 (see 7/9/13 Conference Tr. at 11; MTD Opp. at 1, 11, 21, ECF No. 54) and its briefing in support of its request for partial relief from the Court's June 10, 2011 order (see 7/9/13 Conference Tr. at 11; Mem. at 8-9, ECF No. 144; Reply at 5 n.3, ECF No. 148, Supp. Mem. at 1-3, 6-8, ECF No. 162).

Tourre now argues that, despite the jury's verdict against him, he is entitled to judgment as a matter of law or, in the alternative, a new trial for the four scheme liability counts in the amended complaint under Section 17(a) and Rule 10b-5—Counts 1, 3, 4, and 6—because the jury rendered a verdict of not liable as to Count 5, for violation of Rule 10b-5(b).  (Mem. at 10-15; Reply at 5-12.)

Tourre's argument rests on the assertion that the SEC's scheme liability claims can be reduced to a demonstrative used by the SEC in its opening, in which it summarized Tourre's scheme as misleading the portfolio selection agent for the AC1 transaction, ACA Management LLC (together, with affiliates, "ACA") about the Paulson & Co. hedge fund ("Paulson") being an equity (long) investor and telling true long investors a half-truth as to who in fact selected the portfolio (e.g., by mentioning ACA and not Paulson, a short investor).  (Chepiga Decl. Ex. 3.)  Tourre refers to these two bullet points in his briefs as the "Scheme Misstatements" (Mem. at 11), which both alters and narrows the alleged conduct by Tourre to solely "misstatements."

10

In fact, the evidence subsequently adduced at trial was more than clear that the SEC alleged an array of supporting conduct by Tourre that was designed and geared in a myriad of ways to support (or not undercut) ACA's mistaken belief that Paulson was a long investor in the AC1 transaction. The SEC has laid this evidence out in its opposition to this motion (see Opp. at 5-15), and this Court shall not repeat it here. The bottom line is that Tourre and Goldman Sachs designed a transaction with Paulson to enable Paulson to short a weak quality portfolio of residential mortgaged-backed securities; in order to do that, they needed another party (ACA) to take the other side of the transaction. The record is replete with emails sent by Tourre and his colleagues, conversations which either happened or didn't happen, and meetings at which ambiguity was left ambiguous. The jury could reasonably infer from this record evidence that the entirety of Tourre's conduct in connection with the AC1 transaction constituted part of a scheme to support ACA's belief that Paulson was a long investor. Similarly, based on the proof at trial, a jury could reasonably infer that informing the long investors that ACA had selected the portfolio—while leaving out that Paulson was a short and had also selected the portfolio—was a necessary part of making the fraudulent scheme a success.

Tourre argues that the jury's determination that the SEC failed to meet its burden with respect to Count 5—the Rule 10b-5(b) misstatement or omission claim—means that the SEC also failed to meet its burden with respect to its four

scheme liability claims under Section 17(a) and Rule 10b-5. (Mem. at 12-14.) This is wrong both as a matter of fact and law.

As a matter of fact, as previously described above and in the SEC's opposition brief, there was sufficient evidence adduced at trial from which a jury could reasonably conclude that Tourre violated the scheme liability provisions of Section 17(a) and Rule 10b-5.

As a matter of law, the jury was properly instructed that, in order to find Tourre liable for a Rule 10b-5(b) misstatement claim, it was required to find that Tourre was the "maker" of the alleged misstatements at issue. (Trial Tr. at 2802.) The Court clearly explained this key difference in the elements from the SEC's Section 17(a)(2) misstatement claim, which it had previously described:

> I previously instructed you on misstatements, omissions and materiality when I spoke about 17(a)(2) and you should apply those instructions here with one important caveat. Okay, so listen to this important caveat:
>
> In order for you to find that Mr. Tourre violated Section 10(b) and Rule 10b-5(b), you must also find that he personally made a materially false statement to ACA, or that Mr. Tourre was the person with ultimate authority over a false statement to ACA including its contents and how to communicate it.
>
> One example that judges have used to describe this principle is to point to the relationship between a speech writer and a speaker. Even though the speech writer is the one who drafts a speech ahead of time, the person who delivers the speech -- the speaker -- is the one who has control over what is ultimately said. For the purposes of Rule 10b-5 then it is the speaker in that particular example that makes the statement.
>
> Therefore, for purposes of SEC's claim under Rule 10b-5(b) it is not sufficient for the SEC to prove that Mr. Tourre may have been

involved, even significantly involved, in the preparation of a document that may have contained a materially false statement.

(Trial Tr. 2801-2802.)

As discussed with the parties at the charging conferences, this instruction was based on the Court's reading of the Supreme Court's decision in <u>Janus Capital Group, Inc. v. First Derivative Traders</u>, 131 S. Ct. 2296 (2011); in fact, it used the same example (speech writer-speaker) to illustrate this principle as the Supreme Court used in <u>Janus</u>. <u>Id.</u> at 2302. Tourre's counsel did not object to this instruction. (Trial Tr. at 2019.) Consistent with current Supreme Court and Second Circuit precedent, this language was not included as part of the Court's instructions on the elements of Section 17(a)(2), or for any of the four scheme liability counts under Section 17(a) and Rule 10b-5.

The law is clear that this Court must accept a view of the case that resolves any seeming inconsistency. <u>Harris v. Niagara Mohawk Power Corp.</u>, 252 F.3d 592, 598 (2d Cir. 2001). In light of the Court's instructions, the jury had a sufficient legal basis to distinguish between the SEC's scheme liability claims and its Rule 10b-5(b) misstatement claim.[5] Tourre is thus not entitled to either judgment as a matter of law or a new trial as to the SEC's scheme liability claims under Section 17(a) or Rule 10b-5.

---

[5] The SEC also argues that, even if there was an inconsistency in the jury's verdict, Tourre waived this argument by not raising it prior to dismissal of the jury. (Opp. at 16-17; Trial Tr. at 2846.) As a matter of procedure, this is true. <u>See, e.g.</u>, <u>Kosmynka</u>, 462 F.3d at 83 ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."). Though the Court finds, for the reasons already discussed, that Tourre is not entitled to a new trial as to the SEC's scheme liability claims, his failure to raise this issue prior to dismissal of the jury constitutes an additional basis for denying a new trial on these claims.

C.  Aiding and Abetting—Section 20(e)

Tourre argues that the Court wrongly instructed the jury with respect to the conduct necessary to find aiding and abetting liability under Section 20(e). According to Tourre, the evidence adduced at trial only involved the alleged wrongdoing of Tourre, and Tourre cannot be found to have aided and abetted his own violation of Section 10(b) and Rule 10b-5.  (Mem. at 15-17.)  This argument, too, is wrong as a matter of fact and law.

As a matter of fact, this argument ignores the evidence adduced at trial by the SEC that is fully supportive of the involvement of several other individuals in various aspects of the alleged unlawful conduct.  At Goldman Sachs, David Gerst worked on the correlation desk with Tourre and, according to Tourre, he "would always involve" Gerst on the AC1 transaction.  (Trial Tr. 2036; Fitzpatrick Decl. Exs. 3-4, 19, 22, 27, ECF No. 484.)  Additionally, Jonathan Egol supervised Tourre's work on the correlation desk.  The evidence adduced at trial could reasonably be interpreted by the jury to show that Egol was aware that Paulson was a short investor and thus had an interest in selecting a weak quality portfolio, that Paulson had suggested certain items for inclusion in the portfolio, and that Tourre had concealed this information from ACA and other potential investors.  (Opp. at 19-20; Trial Tr. at 673-74, 714, 756, 765, 793, 804, 848-855; Fitzpatrick Decl. Exs. 4, 6, 19, 51, 69, 82.)  In sum, there was a sufficient factual basis for the jury to conclude that Tourre was not acting alone.

14

Further, as a matter of law, the fact that Tourre was an employee of Goldman Sachs, acting within the scope of his employment in his work on the AC1 transaction, is sufficient to establish that he aided and abetted a fraud by Goldman Sachs provided his conduct meets the other elements of Section 20(e) liability.[6]  See SEC v. Sells, No. C 11-4941 CW, 2012 WL 3242551, at *8-9 (N.D. Cal. Aug. 10, 2012); SEC v. Koenig, No. 02 C 2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007); SEC v. Cohen, No. 4:05CV371-DJS, 2006 WL 2225410, at *4 (E.D. Mo. Aug. 2, 2006).  Put another way, Tourre was not acting in his personal capacity—all evidence was consistent with his acting for and on behalf of Goldman Sachs, the entity.  Based on the evidence that there was a fraudulent scheme to mislead investors, the jury could reasonably conclude that the scheme was executed by Goldman Sachs through its agents (of which Tourre was one), and that Tourre then aided and abetted that primary violation of Section 10(b) and Rule 10b-5.

D.  Domestic Offers for Section 17(a) Claims

Tourre next argues that he is entitled to judgment as a matter of law or a new trial on the SEC's Section 17(a) claims because the SEC failed to meet its burden of proving the existence of a domestic offer.  (Mem. at 17-20; Reply at 18-19.) This argument is also without merit.

---

[6] The primary case upon which Tourre relies for the proposition that Tourre cannot be found to have aided and abetted a primary violation of Section 10(b) and Rule 10b-5 by Goldman Sachs premised on his own conduct, SEC v. Apuzzo, 689 F.3d 204 (2d Cir. 2012), is inapposite.  In Apuzzo, the court stated that aiding and abetting under Section 20(e) requires proof of, inter alia, "the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party."  Id. at 206, 211 (citations omitted).  The primary violation in Apuzzo, however, was committed by another company (not Apuzzo's) and that company's chief financial officer.  Id. at 207, 211 n.7.  Apuzzo did not alter the long-established principle of respondeat superior, which recognizes that corporations may be held liable for the acts of their agents.  See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008).

With respect to the SEC's Section 17(a) claims, the Court instructed the jury as to the definition of an offer as follows:

> An "offer" is any attempt or offer to dispose of or sell, or solicitation of an offer to buy. In other words, an "offer" includes negotiations to sell, or attempts to produce the sale by urging or persuading another to act. Additionally, the offer must involve some conduct in the United States -- for instance, sending emails from the United States overseas, making telephone calls from the United States overseas or in other ways communicating from the United States. Some, but not all, of the alleged conduct constituting the offer must have occurred in the United States.

(Trial Tr. at 2781.)

This instruction was consistent with the Court's summary judgment ruling, in which the Court required that "the SEC must prove only that the offeror was in the United States at the time he or she made the relevant offer" (as opposed to a requirement that all conduct constituting the offer take place in the United States). See SEC v. Tourre, No. 10 Civ. 3229 (KBF), 2013 WL 2407172, at *10 (S.D.N.Y. June 4, 2013). As the Court described at the charging conference, an offer can be made in many ways and more than once (such as in the context of negotiations or emails); to be domestic, it must be made in the United States, though "it is possible that there could be multiple different steps and multiple different offers."[7] (Trial Tr. 2509.)

---

[7] In its summary judgment decision, the Court rejected Tourre's prior argument under Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), that an offer is not actionable under Section 17(a) if it results in a consummated foreign sale. Tourre, 2013 WL 2407172, at *6-9. Now, Tourre offers a different argument under Morrison—that this instruction "constitute[s] a return to the 'conduct and effects' standard that the Supreme Court definitively rejected in Morrison." (Mem. at 17.) This is not the case. This instruction, when read as a whole, merely recognizes the fact that there can be multiple offers in the context of a transaction that can be effected in multiple ways. All that is required by Section 17(a) is fraudulent conduct "in" one such offer of securities.

Further, with respect to Tourre, the Court stated in its summary judgment decision that a reasonable jury could conclude that the offers at issue were domestic based on evidence that Tourre (1) worked in New York at all relevant times, and (2) emailed and called potential long investors in the AC1 transactions. Tourre, 2013 WL 2407172, at *10. Given the jury's verdict—liability on all three Section 17(a) counts—the SEC is entitled to the reasonable inference that this is precisely the conclusion the jury reached. See Zellner, 494 F.3d at 371. The SEC adduced at trial evidence that Tourre worked in New York at all relevant times, that he and his colleagues met with potential long investors regarding the AC1 transaction in the United States, and that he and his colleagues emailed and called potential long investors regarding investment in the AC1 transaction from the United States. (See Trial Tr. at 2113, 2139-40, 2172-75, 2179-84, 2192-96, 2200-2203; Fitzpatrick Decl. Exs. 16-19, 48, 69, 72-75, 77-78, 83, 89, 97.) The jury's conclusion that this evidence established a domestic offer or offers for purposes of Section 17(a) was thus entirely reasonable; Tourre's assertion that this evidence is somehow insufficient or incomplete is not, and is rejected.

### E. Summary Judgment on Security-Based Swap Agreements

Finally, Tourre argues that he is entitled to a new trial because the Court inappropriately took away from the jury the question of whether the ACA/ABN and GSI/ABN swap agreements (swaps that explicitly referenced the AC1 notes) were "security-based swap agreements" within the meaning of the securities laws. (See Mem. at 20-25, Reply at 15-18.) This argument ignores the history of this case and

17

the lopsided pre-trial record on this point. There was simply no reason for this Court to send to the jury a question as to which no rational juror could have come to a contrary conclusion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (citations and internal quotation marks omitted).

Because the parties stipulated that the AC1 notes were "securities" for the purposes of the securities laws and Tourre described the agreements as "swaps" in his briefs, the sole issue to be decided was whether the swaps were "security-based"—a material term based on price, yield, value or volatility of any security or group of securities. (7/15/13 Order at 3-4, ECF No. 407.) As set forth more fully in the Court's prior order, the trade confirmations for the swaps define all aspects of payment—including price and value—in terms of certain reference obligations which the parties agreed are securities, and Tourre has conceded as much in his prior submissions in this litigation. (Id. at 4-5.). The Court thus held that the ACA/ABN and GSI/ABN swap agreements were security-based swap agreements for the purposes of the securities laws. (Id. at 5.) Summary judgment on this issue was properly granted and the Court's decision to do so does not entitle Tourre to a new trial.

IV.    CONCLUSION

For the reasons set forth above, Tourre's motion for judgment as a matter of law pursuant to Rule 50(b) or, in the alternative, a new trial pursuant to Rule 59(a)(1) is DENIED.

The Clerk of Court is directed to close the motion at ECF No. 474.

SO ORDERED.

Dated:        New York, New York
              January ⎯, 2014

                                          KATHERINE B. FORREST
                                          United States District Judge

19