**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                    :
SECURITIES AND EXCHANGE             :
COMMISSION,                                    :        Civil Action
                                                    :        No.: 10-cv-3229 (KBF)
                    Plaintiff,                      :
                                                    :        ELECTRONICALLY FILED
          v.                                         :
                                                    :
FABRICE TOURRE,                             :
                                                    :
                    Defendant.                    :
———————————————————— x

**MEMORANDUM OF LAW OF FABRICE TOURRE IN OPPOSITION TO**
**THE SEC'S MOTION FOR DISGORGEMENT, PRE-JUDGMENT**
**INTEREST, CIVIL MONETARY PENALTIES**
**AND INJUNCTIVE RELIEF**

Pamela Rogers Chepiga
Andrew Rhys Davies
Laura R. Hall
Michael F. Westfal
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Attorneys for Fabrice Tourre*

Dated:  January 21, 2014
          New York, New York

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

STATEMENT OF FACTS ........................................................................................................ 1

ARGUMENT ............................................................................................................................ 2

I.   THERE IS NO BASIS FOR THE COURT TO ORDER SEVEN THIRD-TIER
     PENALTIES AT THE STATUTORY MAXIMUM ...................................................... 2

     A.   The Jury Did Not Find Mr. Tourre Liable For Seven Violations ............................ 2

     B.   The Verdict Does Not Support Third-Tier Penalties At The Statutory
          Maximum ............................................................................................................... 5

          1.   The Verdict Does Not Support A Third-Tier Penalty As To ACA ............ 5

          2.   The Verdict Does Not Support Tier-Three Penalties As To The
               Other Alleged "Victims" ........................................................................... 7

          3.   A Third-Tier Penalty At The Statutory Maximum Would Be
               Unwarranted And Unjust ........................................................................... 8

               a.   The Jury Did Not Find That Mr. Tourre's Conduct Was
                    Egregious, And It Was Not ........................................................... 8

               b.   The Jury Did Not Find That Mr. Tourre's Conduct Was
                    Recurrent, And It Was Not ........................................................... 9

               c.   The SEC's Other Arguments Do Not Support A Third-Tier
                    Penalty At The Statutory Maximum Either .................................. 10

     C.   The SEC Provides No Basis For A "No-Reimbursement" Order ......................... 11

II.  THERE IS NO BASIS FOR A PERMANENT "OBEY THE LAW"
     INJUNCTION ............................................................................................................. 12

     A.   An Injunction Is Unwarranted And Inappropriate In This Case .......................... 12

     B.   An "Obey The Law" Injunction Would Be Incomprehensible In This Case ........ 16

III. THERE IS NO BASIS FOR THE SEC'S REQUEST FOR DISGORGEMENT
     AND PRE-JUDGMENT INTEREST ......................................................................... 18

     A.   The SEC's Request For Disgorgement Represents Impermissible Double-
          Counting .............................................................................................................. 18

B.   The Disgorgement Request Should Also Be Denied Because Mr. Tourre Obtained No Profit From The AC1 Transaction....................................................19

C.   The SEC Is Not Entitled To Pre-Judgment Interest................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC*,
446 U.S. 680 (1980) ...............................................................................................12, 14

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................6

*SEC v. Absolutefuture.com*,
393 F.3d 94 (2d Cir. 2004)...........................................................................................19

*SEC v. Amerifirst Funding, Inc.*,
No. 3:07-CV-1188-D, 2008 WL 1959843 (N.D. Tex. May 5, 2008)...................................2

*SEC v. Bausch & Lomb, Inc.*,
565 F.2d 8 (2d Cir. 1977) .............................................................................................13

*SEC v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998)..........................................................................................15

*SEC v. Coates*,
137 F. Supp. 2d 413 (S.D.N.Y. 2001).............................................................................2

*SEC v. Coldicutt*,
258 F.3d 939 (9th Cir. 2001) ........................................................................................17

*SEC v. Commonwealth Chem. Secs., Inc.*,
574 F.2d 90 (2d Cir. 1978)..............................................................................13, 14, 16

*SEC v. Culpepper*,
270 F.2d 241 (2d Cir. 1959)..........................................................................................13

*SEC v. Credit Bancorp*,
No. 99 Civ. 11395 (RWS), 2002 WL 31422602 (S.D.N.Y. Aug. 2, 2002).........................11

*SEC v. Das*,
723 F.3d 943 (8th Cir. 2013) ........................................................................................12

*SEC v. Elliot*,
No. 09 Civ. 7594 (KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) ..............................2

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989)................................................................................14, 20

*SEC v. First Jersey Secs., Inc.,*
    101 F.3d 1450 (2d Cir. 1996).................................................................... passim

*SEC v. Geon Indus., Inc.,*
    531 F.2d 39 (2d Cir. 1976)..........................................................................16

*SEC v. Goble,*
    682 F.3d 934 (11th Cir. 2012) ....................................................................17

*SEC v. Haligiannis,*
    470 F. Supp. 2d 373 (S.D.N.Y. 2007)......................................................9, 13

*SEC v. Jasper,*
    883 F. Supp. 2d 915 (N.D. Cal. 2010) ........................................................10

*SEC v. Johnson,*
    No. 03 Civ. 177 (JFK), 2006 WL 2053379 (S.D.N.Y. July 24, 2006) ....................... passim

*SEC v. Jones,*
    476 F. Supp. 2d 374 (S.D.N.Y. 2007)....................................................... passim

*SEC v. Kenton Capital, Ltd.*
    69 F. Supp. 2d 1 (D.D.C. 1998) ....................................................................2

*SEC v. Kern,*
    425 F.3d 143 (2d Cir. 2005)....................................................................8, 11

*SEC v. Koenig,*
    532 F. Supp. 2d 987 (N.D. Ill. 2007) ...........................................................12

*SEC v. Lorin,*
    76 F.3d 458 (2d Cir. 1996).................................................................12, 15, 17

*SEC v. Lowe,*
    725 F.2d 892 (2d Cir. 1984), *rev'd on other grounds*, 472 U.S. 181 (1985).....................17

*SEC v. Manor Nursing Centers, Inc.,*
    458 F.2d 1082 (2d Cir. 1972).................................................................16, 18

*SEC v. Moran,*
    944 F. Supp. 286 (S.D.N.Y. 1996).................................................................8

*SEC v. Opulentica,*
    479 F. Supp. 2d 319 (S.D.N.Y. 2007)....................................................... passim

*SEC v. Pattison,*
    No. C-08-4238 EMC, 2011 WL 723600 (N.D. Cal. Feb. 23, 2011) .................................2, 6

*SEC v. Pentagon Capital Mgmt.,*
    No. 08 Civ. 3324 (RWS), 2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012), *rev'd on
    other grounds*, 725 F.3d 279 (2d Cir. 2013) ...............................................................2, 9, 11

*SEC v. Pros Int'l., Inc.,*
    994 F.2d 767 (10th Cir. 1993) .......................................................................................14

*SEC v. Razmilovic,*
    --- F.3d ----, 2013 WL 6172543 (2d Cir. 2013) .............................................................21

*SEC v. Savoy Indus.,*
    665 F.2d 1310 (D.C. Cir. 1981) .....................................................................................17

*SEC v. Solow,*
    554 F. Supp. 2d 1356 (S.D. Fla. 2008) .......................................................................3, 5

*SEC v. Steadman,*
    967 F.2d 636 (D.C. Cir. 1991) .......................................................................................12

*SEC v. Wash. Inv. Network,*
    475 F.3d 392 (D.C. Cir. 2007) .......................................................................................17

*Southern Union Co. v. United States,*
    132 S. Ct. 2344 (2012) ..............................................................................................2, 3, 5

*Tull v. United States,*
    481 U.S. 412 (1987) ...................................................................................................2, 3, 5

*United States v. Pfaff,*
    619 F.3d 172 (2d Cir. 2010) ..........................................................................................5

*United States v. Rutkoske,*
    506 F.3d 170 (2d Cir. 2007) ..........................................................................................6

## STATUTES AND RULES

15 U.S.C. 77q(a) ............................................................................................................ passim

15 U.S.C. § 77t(d)(2)(C) ..........................................................................................................5

15 U.S.C. § 78u(d)(3)(B)(iii) ....................................................................................................5

17 C.F.R. § 240.10b-5 ...................................................................................................... passim

Fed. R. Civ. P. 65(d) .........................................................................................................16, 17

Preserving all arguments as to the Court's prior rulings and as to the verdict, Fabrice Tourre respectfully submits this memorandum of law in opposition to the SEC's Motion for Disgorgement, Pre-Judgment Interest, Civil Monetary Penalties and Injunctive Relief ("Mem.").

## STATEMENT OF FACTS

Fabrice Tourre grew up in a small suburb of Paris. (Tr. 2252:1-7). In 1999, while in engineering school in France, he interned as an assembly line worker in Ohio to improve his English. (Tr. 2247:23-2248:25). He later entered a Master's program at Stanford, planning to become a production engineer. (Tr. 2249:6-19). Before entering Stanford, Mr. Tourre had never heard of Goldman Sachs & Co. (together with its affiliates, "Goldman"), but he took an on-campus interview with the firm, mostly to practice interviewing in English, and was offered a job. (Tr. 2250:5-23, 2251:13-14).

Mr. Tourre joined Goldman in an entry level position in July 2001. (Tr. 2252:19-24). In July 2004, he was promoted to associate and joined a new business group—the Structured Products Group's ABS correlation trading desk headed by Jonathan Egol—where he began working on synthetic CDO transactions. (Tr. 2253:13-2255:16). In December 2006, two months before turning 28, Mr. Tourre was promoted to be of thousands of vice presidents at Goldman. (Tr. 2256:7-16, 2270:16-21). Shortly afterward, he began working on what was to be called the ABACUS 2007-AC1 transaction ("AC1"). (Tr. 2270:16-19).

After the SEC filed this action in April 2010, Goldman placed Mr. Tourre on paid leave. His career in finance over, Mr. Tourre has striven to rebuild a life and career. (Tr. 2357:14-17, 2374:1-7). He volunteered with an NGO in Africa, and was later accepted into a Ph.D. program in economics at the University of Chicago. (Tr. 2357:12-22). When Mr. Tourre began school,

Goldman placed him on unpaid leave.  (Tr. 2374:4-5).  Since August 2011, Mr. Tourre has been

a full-time student and teaching assistant at the University of Chicago.  (Tr. 2357:20-2358:6).

 Shortly after the SEC filed this suit, Mr. Tourre, a French citizen then living in London,

voluntarily returned to the United States to testify before Congress.  (Tr. 2356:10-2357:4).  In

2011, he returned from Rwanda to sit for a two day deposition, and, at trial, he testified over

three days, and also presented testimony from several witnesses.  Following the trial, Mr. Tourre

returned to the University of Chicago.  After receiving his doctorate, Mr. Tourre plans to pursue

a career in academia.

## ARGUMENT

I.  **THERE IS NO BASIS FOR THE COURT TO ORDER SEVEN THIRD-TIER PENALTIES AT THE STATUTORY MAXIMUM**

### A.  The Jury Did Not Find Mr. Tourre Liable For Seven Violations

 The Court may only penalize Mr. Tourre for violations that were *necessarily* found by the

jury.  Any ambiguity must be resolved in Mr. Tourre's favor, as penalizing him for matters not

established by the jury would violate his Seventh Amendment rights.  *Tull v. United States*, 481

U.S. 412, 425 (1987).[1]  The verdict form provides no basis to conclude that the jury found any

more than one second-tier violation, authorizing a maximum penalty of $65,000.

 The Supreme Court has held that, in determining what a jury "necessarily found," a

district court is limited to and bound by the verdict form.  In *Southern Union Co. v. United*

---

[1] The cases cited by the SEC are wholly inapposite in the context of penalties imposed after a jury trial.  Five of the six cases were not even tried before a jury and therefore did not implicate the Seventh Amendment rights implicated by this case.  *See SEC v. Pentagon Capital Mgmt.*, No. 08 Civ. 3324 (RWS), 2012 WL 1036087, at *1 (S.D.N.Y. Mar. 28, 2012) (bench trial); *SEC v. Elliot*, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at *1 (S.D.N.Y. June 12, 2012) (summary judgment); *SEC v. Amerifirst Funding, Inc.*, No. 3:07-CV-1188-D, 2008 WL 1959843, at *1 (N.D. Tex. May 5, 2008) (default judgment); *SEC v. Coates*, 137 F. Supp. 2d 413, 422-24 (S.D.N.Y. 2001) (summary judgment); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 5 (D.D.C. 1998) (summary judgment).  And in the sixth case, *SEC v. Pattison*, No. C-08-4238 EMC, 2011 WL 723600 (N.D. Cal. Feb. 23, 2011), the district court imposed a single second-tier penalty of $50,000 following trial, rendering its statement that it could assess a penalty for each time the defendant falsified a record mere dicta.  *Id.* at *5-6.

*States*, 132 S. Ct. 2344 (2012), the Court held that the district court violated the defendant's Sixth Amendment rights by imposing a fine for a 762-day violation where it disregarded ambiguities in the verdict form and "concluded from the 'content and context of the verdict all together' that the jury found a 762-day violation." *Id.* at 2349, 2357.  As the verdict form only specified the approximate start date of the violation, the Supreme Court held that the jury only "necessarily found" a one-day violation, barring a penalty based on a longer violation.  *Id.*

The holding of *Southern Union* is equally applicable to the Seventh Amendment.  In *SEC v. Solow*, 554 F. Supp. 2d 1356 (S.D. Fla. 2008), the court correctly refused at the penalty stage to assume that the jury found facts that were not evident from the verdict form.  Although the SEC had alleged that the defendant engaged in two separate frauds, the verdict form reflected only that the defendant violated Rule 10b-5 and Section 17(a).  *Id.* at 1359-60.  As the court noted, the SEC's refusal to accept the more detailed verdict form that the defendant requested meant that "the fraud theory on which the jury found Mr. Solow liable was not explicitly stated on the verdict form."  *Id.* at 1366-67.  Recognizing the "concern about a district court theorizing about the jury's views when the jury returns a general verdict form" and the fact that "it was [the defendant's] constitutional right to have a jury determine his liability," the court refused to penalize the defendant more than once.  *Id.* at 1367 (citing *Tull*, 481 U.S. at 427).

This case is no different.  The SEC argued to the jury that Mr. Tourre engaged in two schemes: "First, to deceive ACA into serving as portfolio selection agent by misleading ACA regarding whether Paulson was an equity investor.  And the second part was to mislead investors by telling them that the portfolio was selected only by ACA."  (Tr. 2603:24-2604:4).  The SEC also made clear to the jury that it "can find a scheme if you find one or both parts of the deception."  (Tr. 2604:4-5).  The verdict form did not require the jury to specify what conduct by

Mr. Tourre it found to violate Rule 10b-5 or Section 17(a).  (ECF No. 439).  Though the jury was instructed that the SEC's claims under Rule 10b-5 and Section 17(a)(1) applied only to its claims as to ACA, the jury received no such limiting instruction with respect to the claims under Sections 17(a)(2) and 17(a)(3), which applied to ACA and others.[2]  (Tr. 2797:15-19, 2782:15-18).  Thus, the verdict form provides a basis to conclude that the jury found Mr. Tourre liable as to ACA, as the Rule 10b-5(a) and (c) and Section 17(a)(1) claims only applied to ACA.  There is no basis, however, to conclude that the jury's liability verdict under Sections 17(a)(2) and (3) was based on a finding of wrongful conduct as to anyone other than ACA.

Mr. Tourre requested a verdict form that would have required the jury to specify whether it found him liable under Sections 17(a)(2) or 17(a)(3) with respect to ACA, Loreley, ABN or other investors in AC1.  (*See* Chepiga Declaration, Ex. 1, at 10-18; ECF No. 409, at 8-13.)  Mr. Tourre also requested interrogatories that would have required the jury to specify on which of the five alleged misstatements it found against him.  (Tr. 2489:4-8).  The SEC opposed Mr. Tourre's request, and the Court refused to propound the interrogatories or to use the detailed verdict form.  Mr. Tourre objected to the verdict form proposed and ultimately used by the Court, noting that it could render the basis for jury's verdict unclear.  (Tr. 2489:22-24).  The result is that the verdict form provides no basis for this Court to find that the jury determined that the six supposed offers sent to potential AC1 investors other than ACA constituted violations of the securities laws.  As the jury "necessarily found" only a single scheme to defraud ACA, the Court may impose no

---

[2] During deliberations, the jury specifically asked the Court whether Section 17(a)(3) required a finding "that he operated as a fraud or deceit for all three of [the AC1 notes, the Goldman/ABN credit default swap and the ABN/ACA credit default swap] or is any one of them sufficient to find liability on this charge?"  (ECF No. 436).  The Court instructed the jury "that *any one* would satisfy that charge . . . if you were to make such a determination."  (Tr. 2828:6-8) (emphasis added).

more than one penalty.  *Southern Union*¸ 132 S. Ct. at 2349, 2357; *Tull*, 481 U.S. at 425; *Solow*,

554 F. Supp. 2d at 1366-67.

**B.      The Verdict Does Not Support Third-Tier Penalties At The Statutory Maximum**

**1.      The Verdict Does Not Support A Third-Tier Penalty As To ACA**

To support a third-tier penalty, Mr. Tourre's violation would have to have "involved

fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" ***and***

to have "directly or indirectly resulted in substantial losses or created a significant risk of

substantial losses to other persons."  15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).[3]

The SEC did not seek to prove, and the jury did not find, that Mr. Tourre's conduct caused or

threatened any loss, so the Court may not impose a third-tier penalty.  *See United States v. Pfaff*,

619 F.3d 172, 174-75 (2d Cir. 2010) (because jury made no findings as to pecuniary gain or loss

caused by defendant's conduct, district court erred by calculating a fine "supported only by the

district court's own pecuniary loss finding").[4]  Indeed, as set forth above, the only violation that

the jury necessarily found was based on Mr. Tourre's conduct as to ACA, which clearly did not

result in or create a significant risk of substantial losses.  As the SEC made clear at trial, Mr.

Tourre's alleged scheme was to "deceive[] ACA into acting as portfolio selection agent."  (Tr.

2568:16-17).  ACA's service as portfolio selection agent did not cause ACA any loss; to the

contrary, ACA was remunerated for its work.  (Tr. 2273:11-19).

---

[3] Courts also consider these two statutory requirements as discretionary factors for determining an appropriate penalty.  (Mem. at 19-20.)  Mr. Tourre's response with respect to the statutory requirements for a third-tier penalty are equally applicable to the Court's analysis of such discretionary factors.  *See infra* Section I.B.3.

[4] The SEC now refers to ACA, IKB, and ABN as "victims" even though this Court ruled that the SEC could make no such argument at trial.  During a sidebar following Mr. Egol's testimony regarding the loss in value of the AC1 notes following the rating agency downgrades, the Court made clear that the SEC was "not saying that they're a victim."  (Tr. 874:8).

Moreover, the SEC did not prove, and the jury did not find, that ACA's losses from its subsequent investment, nor that the losses of any other investor, were caused by Mr. Tourre's conduct.  Indeed, the SEC references the "losses" of the long investors, but, as the SEC's own expert testified, synthetic CDOs are zero sum games where the gains for investors on one side of the deal come directly from the losses of the investors on the other side.  (Tr. 241:8-12).  Every sophisticated investor in the synthetic CDO market understood this.  (Tr. 241:13-15, 243:16-21, 1664:20-1665:22); *see SEC v. Johnson*, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *10 (S.D.N.Y. July 24, 2006) (refusing to impose a third-tier penalty in part because the potential victims were highly sophisticated investors).  Thus, "loss" by one side or the other is inherent in the nature of the transaction, not a basis to impose fraud penalties.  *See Pattison*, 2011 WL 723600, at *5 (refusing to order third-tier penalties because "SEC failed to prove any actual loss to other persons such as shareholders that were proximately caused by Defendant's violations").

Further, the SEC also did not prove, and the jury did not find, that the "losses" of ACA (nor of any other investor) resulted from Mr. Tourre's conduct.  Nor could it have.  AC1 referenced a static portfolio of RMBS whose composition and performance were disclosed, ECF No. 484-76, at 75-78 (PX-305), and there was no evidence, and no finding, that Mr. Tourre's conduct had any impact whatsoever on the economic performance of AC1 and on the investors who bought and sold exposure to its reference portfolio.[5]

To the contrary, Laura Schwartz could not have been clearer that ACA performed the same rigorous analysis of proposed bonds when selecting a reference portfolio regardless of where the bond had come from or who had recommended it.  (Tr. 1624:5-1626:6).  Further, the

---

[5] *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (loss causation requires "a causal connection between the material misrepresentation and the loss"); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (*Dura* "provides useful guidance" in determining investor losses in sentencing context).

uncontroverted evidence at trial was that the AC1 portfolio performed identically to other BBB

portfolios of comparable vintage, and that it was the rating agency downgrades in the summer of

2007 that caused the losses to AC1 investors. (Tr. 871:22-873:12, Egol Testimony).  Under these

circumstances, there is no basis to impose any more than a single second-tier penalty.

### 2.    The Verdict Does Not Support Third-Tier Penalties As To The Other Alleged "Victims"

For the reasons set forth above, there is no basis whatsoever to conclude that the jury

found Mr. Tourre liable for conduct as to anyone other than ACA.  *See* Section I.A, *supra*.  Thus,

contrary to the SEC's argument, no penalty can be imposed as to IKB, ABN, Calyon, CIFG,

BAWAG and UBS.[6]

Even if the Court were to disagree, however, there would be no basis for any more than a

first-tier penalty.  As explained in Section I.B.1, there was no finding that Mr. Tourre's conduct

caused or threatened any of those entities any loss, which precludes third-tier penalties.

Moreover, second-tier penalties are unavailable because the SEC did not prove, and the jury did

not find, that Mr. Tourre's conduct as to any of those entities "involved fraud, deceit,

manipulation, or deliberate or reckless disregard of a regulatory requirement."  There were no

regulations governing disclosure requirements for a synthetic CDO transaction in 2007.  Further,

the jury was explicitly instructed that the scienter-based claims only applied to ACA and not to

any other investors.  Thus, any potential violation as to other investors would necessarily fall

under either Section 17(a)(2) or Section 17(a)(3), which only require a showing of negligence,

and the Court refused Mr. Tourre's request for a verdict form that would have specified whether

---

[6] Very likely the jury did not consider the supposed offers to Calyon, CIFG, BAWAG, or UBS to violate the securities laws because the SEC presented no testimony from them at trial, nor was there any evidence that those parties ever opened the emails sent by Mr. Tourre or other Goldman employees or that those sophisticated foreign parties were in any way misled by the "selected by ACA" disclosure given industry practice in such transaction documents.  Nevertheless, any speculation one way or the other is inappropriate when considering the amount that Mr. Tourre should be penalized.

the verdict on these two counts was based on negligence or scienter.  *See Johnson*, 2006 WL

2053379, at *4; (Chepiga Decl., Ex. 1, at 10-18; ECF No. 409, at 8-13.)  As a result, any penalty

as to those entities would be capped at the first-tier limit of $6,500.  *See SEC v. Moran*, 944 F.

Supp. 286, 297 (S.D.N.Y. 1996) (imposing first-tier penalties and finding it "illogical to view

negligent actions in the same light as intentional wrongdoing"); *SEC v. Kern,* 425 F.3d 143, 153

(2d Cir. 2005) ("[a]ssuming without deciding that scienter is necessary to an imposition of Tier

III penalties").

### 3.     A Third-Tier Penalty At The Statutory Maximum Would Be Unwarranted And Unjust

#### a.     The Jury Did Not Find That Mr. Tourre's Conduct Was Egregious, And It Was Not

The SEC asserts that Mr. Tourre acted with a "high degree of scienter," Mem. at 24, but,

in accordance with Second Circuit precedent, the Court instructed the jury that recklessness

would satisfy the scienter requirement.  (Tr. 2784:15-19; 2804:19-2805:2).  Thus, the jury did

not find, and there would have been no basis for it to find, that Mr. Tourre acted in bad faith or

with intent to defraud.  Indeed, when the SEC argues that Mr. Tourre's conduct was egregious, it

relies solely on the very misstatements that, in rejecting the Rule 10b-5(b) count, the jury found

Mr. Tourre did *not* make with scienter.  (Mem. at 18.)

The novel case brought against Mr. Tourre also demonstrates that his conduct was not

egregious.  In *Johnson*, Judge Keenan agreed that the defendant should not be punished for

defending himself against "a 'first litigation' that sought to penalize [him] for conduct which the

then-applicable rules did not clearly prohibit."  2006 WL 2053379, at *6.  There appears to have

been no prior SEC enforcement action against a defendant for acting to "support (or not

undercut) [a potential portfolio selection agent's] mistaken belief that [a potential investor] was a

long investor in the [proposed] transaction."  (ECF No. 499 at 11.)  As a 28-year-old newly

appointed vice president, Mr. Tourre also received no guidance from the SEC, whether in the form of a rule, regulation or otherwise, as to the requirements for disclosing the involvement of a third party in the selection of a synthetic CDO reference portfolio.

The evidence also showed that Mr. Tourre consistently kept his superiors informed of the status of the transaction.  (*See, e.g.,* Fitzpatrick Exs. 21, 22, 44).  And Mr. Tourre testified that if anyone had informed him that any of his statements to ACA were not accurate, he would have corrected it immediately.  (Tr. 2281:21-2287:11).  In light of the jury's Rule 10b-5(b) verdict, the novelty of the charges brought against Mr. Tourre, as well as the fact that AC1 involved only highly sophisticated market participants, *see Johnson*, 2006 WL 2053379, at *10, there is no basis for the SEC's argument that Mr. Tourre's conduct was egregious.

> **b.      The Jury Did Not Find That Mr. Tourre's Conduct Was Recurrent, And It Was Not**

It is simply a fortuity that Mr. Tourre's conduct with respect to ACA covered a period of months.  Mr. Tourre has been accused of no wrongdoing other than with respect to AC1.  To the contrary, his otherwise immaculate nine-year career at Goldman and his efforts to rebuild his life and to start a new career over the last four years demonstrate the isolated nature of AC1.  In the seven years that have passed since AC1, Mr. Tourre has left Goldman and returned to school.  He is now working on a Ph.D. in economics from the University of Chicago and he plans to go into academia after graduation.  Mr. Tourre's conduct with respect to ACA does not even approach the recurrent conduct found by courts to support a third-tier penalty in the cases cited by the SEC.[7]

---

[7] *See, e.g., SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) ("The fraudulent conduct continued over a period of years, and involved hundreds of fraudulent quarterly statements in addition to numerous false newsletters and marketing materials."); *SEC v. Opulentica*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (noting that the judge at defendant's sentencing stated the "fraud here was blatant" and finding that defendant's behavior "represented a continuing course of wrongful conduct of more than eighteen months"); *Pentagon Capital*, 2012 WL 1036087, at *6

**c.      The SEC's Other Arguments Do Not Support A Third-Tier
Penalty At The Statutory Maximum Either**

The remaining factors that courts consider further demonstrate that a third-tier penalty is

not appropriate.  The SEC protests too much with its plea that "there is no serious argument that

Tourre is being unfairly singled out for his role on this deal."  Mem. at 20.  The SEC vigorously

opposed Mr. Tourre's every attempt to introduce evidence showing the context in which he

worked, including supervision and approval of AC1 by his superiors and the Goldman Risk,

Compliance and Legal Departments and the approval of the AC1 offering materials by legal

counsel for ACA and Paulson & Co.  (ECF Nos. 285, 314.)  This context is highly relevant to

weighing the culpability of a 28-year-old newly-promoted vice president working in an

essentially unregulated area of the financial sector.

Moreover, while the SEC asks this Court to punish Mr. Tourre for what it terms "the

brazen pursuit of profits at the expense of ethical conduct," it has failed to take enforcement

action against any of the other people whom the SEC has tactically labeled co-schemers.  In

particular, the evidence at trial established that Paolo Pellegrini, Mr. Tourre's alleged co-

schemer, personally gained $20 million in profits, while the Paulson firm made $1 billion.  (Tr.

610:24-611:25).  Neither has received so much as a Wells notice.  The fact that Mr. Tourre, in

stark contrast to Mr. Pellegrini, did not obtain any benefit from this transaction, *see infra* Section

III, further demonstrates the propriety of a maximum second-tier penalty.[8]

---

("Far from isolated, Defendant's late trading scheme persisted over approximately two and a half years, through
thousands of repeated and knowing violations.").

[8] *See SEC v. Jasper*, 883 F. Supp. 2d 915, 932 (N.D. Cal. 2010) ("However, since Defendant benefitted only
indirectly from the backdating scheme, the Court finds that imposing the maximum civil penalty would be
excessive."); *see also Opulentica*, 479 F. Supp. 2d at 332 (ordering first-tier penalty against defendant found to be "a
much smaller beneficiary of the fraudulent scheme").

There also is no basis for the SEC's unsupported suggestion that Mr. Tourre should be punished more severely because his trial was highly publicized, Mem. at 21, as a result of, among other things, the SEC's decision to file this action in a blaze of publicity without notice in the middle of a trading day, in violation of its own internal rules.  (ECF No. 534-14) (Inspector General Report).  The publicity that has attended this case has, to a large extent, served as a self-executing punishment for Mr. Tourre already.  It has realistically ended Mr. Tourre's prospects for a career in the financial sector, and it will likely make it more difficult for Mr. Tourre to obtain employment in any other field at anything close to his prior compensation level.

Further, numerous courts have held that the maximum penalty available should not exceed the disgorged amount.[9]  Yet despite arguing (incorrectly) that Mr. Tourre obtained approximately $175,000 from his misconduct, the SEC inappropriately requests seven third-tier penalties totaling $910,000.  A penalty in excess of five times the SEC's disgorgement calculation is unreasonably severe and should be rejected on this basis alone.

Finally, even if this Court were to determine that a third-tier penalty is permissible under the statute, the foregoing mitigating factors demonstrate that a penalty substantially less than the maximum would be appropriate.  *See Kern*, 425 F.3d at 153 ("The tier determines the maximum penalty, with the amount of the penalty left up to the discretion of the district court.").

### C.  The SEC Provides No Basis For A "No-Reimbursement" Order

The SEC's request for a vague and open-ended order that Mr. Tourre personally pay any penalty—something that he has every intention of doing—lacks any legal or factual basis.  In

---

[9] *See, e.g., Opulentica*, 479 F. Supp. 2d at 332 (maximum fine available to the SEC is "an amount equal to the disgorgement sum"); *SEC v. Credit Bancorp*, No. 99 Civ. 11395 (RWS), 2002 WL 31422602, at *2 (S.D.N.Y. Aug. 2, 2002) ("[T]he civil penalty may only be an amount up to the amount of gross pecuniary gain . . ."); *Pentagon Capital Mgmt.*, 2012 WL 1036087, at *8 (citing numerous S.D.N.Y. decisions imposing civil penalties equal to disgorgement), *rev'd on other grounds*, 725 F.3d 279 (2d Cir. 2013).

*SEC v. Das*, 723 F.3d 943, 948 (8th Cir. 2013), Mem. at 22, the court merely noted the no-reimbursement order without endorsing it, and ultimately vacated the penalty because the district court incorrectly took into account a factor not found by the jury. *See id*. at 957.[10]  Other courts have noted the lack of legal support for the SEC's request. *See SEC v. Koenig*, 532 F. Supp. 2d 987, 996 (N.D. Ill. 2007) ("The SEC's request for an indemnity bar is denied.  The SEC failed to cite to any case law to support its request.").  The request is also factually unsupported, relying, as it does, on an anonymous comment in a newspaper, Mem. at 22, which hardly suffices to overcome Goldman's unequivocal representation that there is no agreement or understanding with Mr. Tourre with respect to the reimbursement of any penalties ordered by this Court.  *Id.*

## II.   THERE IS NO BASIS FOR A PERMANENT "OBEY THE LAW" INJUNCTION

### A.   An Injunction Is Unwarranted And Inappropriate In This Case

A federal injunction is a "drastic remedy," *Aaron v. SEC*, 446 U.S. 680, 703 (1980) (Burger, C.J., concurring), which is, therefore, reserved for repeat offenders who—unlike Mr. Tourre—have engaged in a pattern of securities law violations or whose conduct is such that, unless enjoined, they present an ongoing threat to the investing public.  *See SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("We have noted that when the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct.") (citation and internal quotation omitted); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (affirming issuance of an injunction, discussing defendants' long history of regulatory violations).[11]

---

[10] The district court's judgment on remand contains no prohibition on reimbursement.  *See* Judgment on Remand as to Defendant Dean (ECF No. 291), *SEC v. Das*, No. 8:10-cv-102-LSC, (D. Neb. Oct. 28, 2013).

[11] *See also SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) ("Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public."); *SEC v. Jones*, 476 F. Supp. 2d 374, 384-85 (S.D.N.Y. 2007).

On no fair view of the evidence can Mr. Tourre be grouped with such offenders.  That is clear simply by comparing Mr. Tourre's conduct with the kind of conduct that supported injunctive relief in the cases that the SEC cites.[12]  In stark contrast to those defendants, Mr. Tourre's conduct involved one synthetic CDO that was structured and marketed within and under the supervision of his employer's institutional processes and in the absence of any regulatory guidance as to what disclosure was required.

Under Second Circuit law, a past violation does not authorize issuance of an injunction. Rather, the SEC must show "'a likelihood that, unless enjoined, the violations will continue.'" *First Jersey,* 101 F.3d at 1477 (citations omitted); *see also Johnson,* 2006 WL 2053379, at *4 (noting that "the Second Circuit has placed emphasis on the need of the SEC to prove more than the mere fact of past violations, but also a realistic likelihood of recurrence") (citing *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978)).[13]  The SEC simply cannot make the required showing.

The courts of this Circuit consider four factors to determine whether the SEC has established "positive proof of a reasonable likelihood that past wrong-doing will recur." *Commonwealth Chem.*, 574 F.2d at 100 (quoting *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977)).  Those are: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past conduct; (3) the defendant's recognition of his wrongful conduct; and (4) the

---

[12] *See Haligiannis*, 470 F. Supp. 2d at 384 (defendant engaged in "fraudulent conduct [that] continued over a period of years, and involved hundreds of fraudulent quarterly statements in addition to numerous false newsletters and marketing materials," where there was "no possibility whatsoever that Haligiannis believed his actions were within the bounds of the law," and where the defendant, who was a fugitive, "required jail time and a contempt proceeding before performing an accounting"); *Opulentica*, 479 F. Supp. 2d at 329 (defendant's behavior "represented a continuing course of wrongful conduct of more than eighteen months," and the court in defendant's parallel criminal case found that the "fraud here was blatant").

[13] *See also Jones*, 476 F. Supp. 2d at 384 ("Here, the Commission has adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation.'") (quoting *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959)).

defendant's opportunities to commit future violations.  *See Johnson*, 2006 WL 2053379, at *4

(citing *Commonwealth Chem*., 574 F.2d at 100); *SEC v. Opulentica*, 479 F. Supp. 2d 319, 329

(S.D.N.Y. 2007).  These factors neither require nor authorize the issuance of an injunction

against Mr. Tourre.

      *First*, as explained above, *see* Section I.B.3.a, there is no basis for the assertion that Mr.

Tourre acted with a "high degree of scienter."  Thus, an injunction would be unnecessary and

inappropriate.  *See SEC v. Pros Int'l., Inc.,* 994 F.2d 767, 769 (10th Cir. 1993) (affirming denial

of an injunction because, although defendant was "clearly negligent, and probably reckless, there

has been no showing that [he] intended to defraud investors"); *Aaron,* 446 U.S. at 703 ("An

injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one

acting in good faith.") (Burger, C.J., concurring).

      *Second*, as set forth in Section I.B.3.b and above, the "persistence" factor does not

support issuance of an injunction, as this is wholly unlike the kinds of cases in which injunctions

have been issued against long-term, recidivist fraudsters.

      *Third*, the SEC argues that Mr. Tourre "has exhibited no contrition or appreciation of his

misconduct," Mem. at 23, but the courts have rightly declined to enjoin defendants simply

because they elect to defend themselves.  *See Johnson*, 2006 WL 2053379, at *6 (agreeing with

defendant that "he should not be penalized for simply mounting a vigorous defense in both the

trial and injunctive relief stage of the proceedings against him"); *SEC v. First City Fin. Corp*.,

890 F.2d 1215, 1229 (D.C. Cir. 1989) ("The securities laws do not require defendants to behave

like Uriah Heep in order to avoid injunctions.  They are not to be punished because they

vigorously contest the government's accusations.  We think 'lack of remorse' is relevant only

where defendants have previously violated court orders, or otherwise indicate that they did not feel bound by the law.") (citations omitted).

It would be especially inappropriate to penalize Mr. Tourre for electing to litigate where the SEC conceded that there were triable issues by withdrawing its summary judgment motion, and where this novel case arose in the context of a lack of any regulation that would have informed participants in the synthetic CDO market in 2007 what disclosures were required or not required. *See Johnson*, 2006 WL 2053379, at *6 (agreeing with defendant that, as this was a "first litigation," the defendant had "every reason to mount a strong defense to those novel charges," and imposing a five-year limitation on the injunction).

*Fourth*, there is no basis for the SEC's claim that an injunction is required because there is "every indication that Tourre will continue to have opportunities in the financial sector and therefore have opportunities to commit future violations." Mem. at 24.  The SEC has not moved for a preliminary injunction in the seven years since the AC1 transaction took place or in the four years this case has been pending, showing clearly that the SEC understands that there is no real risk of future violations. *See Lorin*, 76 F.3d at 461 (affirming issuance of an injunction, but acknowledging that SEC's failure to move for preliminary injunction in seven-year interval between relevant conduct and trial may bear on appropriateness of a permanent injunction). Moreover, Mr. Tourre no longer works in the financial sector, further obviating the need for an injunction. *See SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir. 1998) (in determining whether to issue an injunction, the court considers "whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated"); *First Jersey*, 101 F.3d at 1478 (injunction warranted because defendant "has remained an active participant in the securities markets).

Nor do Mr. Tourre's efforts to rebuild his life by returning to school to pursue an alternative, academic career warrant issuance of an injunction.  In any rational, humane, analysis, those efforts would be commended, not censured.  Mr. Tourre has lived for several years under a media spotlight as a result of the manner in which this case was filed and pursued, a fact that warrants compassion, not additional punishment.  Moreover, the Court should reject the SEC's argument that an injunction should be granted to punish Mr. Tourre by hampering his future career opportunities.  Mem. at 24.  As the courts have recognized, the danger that an injunction will inflict collateral harm on a defendant by hampering his ability to make a living is a reason to *deny* injunctive relief, not to grant it.  *See, e.g., SEC v. Jones,* 476 F. Supp. 2d 374, 385 (S.D.N.Y. 2007) (declining to enter an injunction that would stigmatize defendant and impair his ability to pursue a career, noting that the "severity of these collateral consequences indicate that the requested injunction would carry with it the sting of punishment") (citing *Commonwealth Chem.*, 574 F.2d at 99; *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 55 (2d Cir. 1976)).  That concern is particularly acute in the case of someone as young as Mr. Tourre.

### B.      An "Obey The Law" Injunction Would Be Incomprehensible In This Case

The Court should also deny the SEC's request for an injunction because an "obey the law" injunction enjoining Mr. Tourre from violating SEC Rule 10b-5 (a) and (c) and Section 17(a) would not "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  The Second Circuit has held that in an appropriate case, such as where a defendant has been found liable for violating a specific, clear requirement of the securities laws and there is a likelihood of repetition, then an injunction may be framed "in terms of the specific statutory provision which the court concludes has been violated."  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) (enjoining future violations of the prospectus-delivery section of the 1933 Act, where defendants had previously violated that specific section); *accord*

*SEC v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2001) (declining to vacate an "obey the law" injunction, noting that defendant had violated a clear requirement of the securities laws—that stock offerings be registered—"as opposed to a technical violation in an esoteric area of the law") (citation and internal quotation omitted).

The Second Circuit has also recognized, however, that any such injunction must be framed so that the defendant "will know what the court intends to forbid."  *SEC v. Lowe*, 725 F.2d 892, 903 (2d Cir. 1984) (Van Graafeiland, J., concurring), *rev'd on other grounds*, 472 U.S. 181 (1985).  In *Lorin*, the Second Circuit vacated an injunction because it lacked the specificity required by Rule 65(d), and remanded so that the district court could "describe in reasonable detail the conduct enjoined."  76 F.3d at 461.  Consistent with the approach reflected in *Lowe* and in *Lorin*, the courts increasingly have recognized that "obey the law" injunctions, like that sought by the SEC, are impermissible.  *See, e.g., SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012) (an "obey the law" injunction to prohibit future violations of Section 10(b) or Rule 10b-5 would provide a defendant "little guidance on how to conform his conduct to the terms of the injunction"); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (vacating injunction that enjoined defendant from violating sections of Investment Advisors Act, holding that the injunction failed to clarify "'the act or acts sought to be restrained,'" and was overbroad because "it might subject defendants to contempt for activities having no resemblance to the activities that led to the injunction") (citing Fed. R. Civ. P. 65(d); *SEC v. Savoy Indus.*, 665 F.2d 1310, 1318-19 (D.C. Cir. 1981)).

Applying these principles, the Court should not issue an injunction barring Mr. Tourre from violating Section 17(a)(1) and Rule 10b-5(a) and (c).  Such an injunction would impermissibly extend far beyond the conduct underlying this case.  *See Wash. Inv. Network*, 475

F.3d at 407.  Moreover, unlike the conduct at issue in *Manor Nursing Centers* and *Coldicutt*, Mr. Tourre's conduct did not violate any specific regulatory requirement such that it might make sense to enjoin future violations of the relevant regulation.  Further, unlike the defendant at issue in *First Jersey*, who had a long history of regulatory infractions committed in the course of running a fraudulent boiler room operation, 101 F.3d at 1477, Mr. Tourre's was not the kind of blatant, persistent conduct that was clearly unlawful and that might, therefore, justify an injunction against the general antifraud sections.  To the contrary, in enjoining violations of Section 17(a)(2) and (3), the proposed injunction would reach negligent violations of the law.  It would also provide Mr. Tourre no guidance as to what conduct is enjoined, requiring, as it would a determination as to what conduct is prohibited by sub-parts (a) and (c) of Rule 10b-5, which would be enjoined, as distinct from sub-part (b), which would not.  That is an issue that was vigorously debated in this case and on which there is a good deal of divergent case law.  For all these reasons, in this case, an "obey the law" injunction would be unintelligible and unenforceable, as well as unnecessary.

## III.   THERE IS NO BASIS FOR THE SEC'S REQUEST FOR DISGORGEMENT AND PRE-JUDGMENT INTEREST

### A.   The SEC's Request For Disgorgement Represents Impermissible Double-Counting

The SEC asks this Court to disgorge a portion of Mr. Tourre's 2007 performance bonus, on the basis that it represents "ill-gotten gains" from AC1.  Mem. at 8-13.  The request should be denied because Goldman has already fully disgorged all the "ill-gotten gains" from AC1.

In opposition to Mr. Tourre's post-trial motion, the SEC noted that the parties stipulated that Goldman initially recognized trading revenue of $15 million from AC1, and the SEC argued that this revenue contributed to Mr. Tourre's 2007 bonus.  ECF No. 483, at 23-24.  Having taken that position, the SEC cannot now demand that Mr. Tourre disgorge whatever portion of the $15

million it asserts made its way into Mr. Tourre's bonus, because it has already obtained disgorgement of the entire $15 million from Mr. Tourre's former co-defendant, Goldman.  (ECF No. 25, Final Judgment as to Defendant Goldman, Sachs & Co. at 2) ("It is hereby further ordered, adjudged, and decreed that Defendant is liable for disgorgement of $15,000,000.").

Obtaining more disgorgement from Mr. Tourre would be impermissible double-counting.  In *SEC v. Absolutefuture.com*, 393 F.3d 94, 96 (2d Cir. 2004), one defendant obtained $150,000 in profits, which he transferred to a co-defendant.  The Second Circuit held that the total disgorgement award against both defendants could not exceed $150,000, and reversed an order that required each of them to disgorge $150,000, as this would constitute "impermissible double-counting."  *See id*.  Similarly, in *First Jersey*, affirming an order that made First Jersey Securities and its sole owner jointly and severally liable for an award of disgorgement, the Court of Appeals held: "No more than the total amount of First Jersey's unlawful profits, plus interest on those amounts, is to be disgorged."  101 F.3d at 1476.

### B.   The Disgorgement Request Should Also Be Denied Because Mr. Tourre Obtained No Profit From The AC1 Transaction

The SEC's disgorgement request should also be denied because the SEC fails to establish a causal connection between AC1 and Mr. Tourre's 2007 bonus, or to provide any reasonable approximation of Mr. Tourre's alleged profit.  The SEC cannot carry that burden because there was, in fact, no such connection, as the evidence submitted herewith demonstrates.

*First*, the SEC has not established a causal connection between AC1 and Mr. Tourre's 2007 bonus.  The rule that the SEC need establish only a "reasonable approximation" of the quantum of the profit sought to be disgorged, *First Jersey*, 101 F.3d at 1475, does not excuse the SEC from proving that there was, in fact, a causal connection between the violation and the alleged profit—something the SEC cannot do.

It is clear that a court's authority to order disgorgement extends only to profits that are, in fact, causally connected to the violation.  *See First City Fin. Corp.*, 890 F.2d at 1231 ("[T]he Court may exercise its equitable power only over property causally related to the wrongdoing."). Mr. Tourre has no burden on this motion unless the SEC meets its initial burden of establishing a causal connection between Mr. Tourre's gain and a violation.  Thus, in *Johnson*, the court denied a request for disgorgement, holding that, although "any uncertainty in calculating disgorgement is supposed to fall on the wrongdoer," "in this case the Court finds that the SEC has not met its initial burden of persuading the Court that its approximation reflects the amount by which Johnson was unjustly enriched."  2006 WL 2053379, at *9.

The sum of the evidence at trial concerning Mr. Tourre's bonus was that Mr. Tourre understood that his bonus was "based, in part, on the profitability of [the mortgage correlation trading] desk," but that it was *not* "based off direct P&L on trades" executed by the desk."  Tr. 2177:16-2178:1.  Thus, the evidence at trial fell far short of establishing a causal connection between the AC1 transaction and Mr. Tourre's 2007 bonus.

The SEC's motion papers equally fail to establish any causal connection between the AC1 transaction and Mr. Tourre's 2007 bonus.  The SEC references emails that surely demonstrate that Mr. Tourre sought to make money for his employer, Mem. at 9, but that establish no link between AC1 and Mr. Tourre's bonus.   Moreover, even if the SEC could establish that as a general matter Goldman employees' bonuses were influenced by individual transactions (and it cannot), a transaction that, like AC1, loses money during the relevant year clearly cannot make a positive contribution to the employee's bonus.  Tr. at 980:10-23.

*Second*, even if the SEC had established the required causal connection between AC1 and Mr. Tourre's bonus, which it has not, it utterly fails to substantiate its position that $175,463 is a

reasonable approximation of Mr. Tourre's gain.  Although the SEC is required to provide only a

"reasonable approximation," no case authorizes the kind of speculation on which the SEC's

motion rests, which amounts to little more than arbitrarily plucking numbers from thin air.  To

the contrary, as the Court of Appeals recently held, "the party seeking disgorgement must

distinguish between the legally and illegally derived profits . . . so that disgorgement is ordered

only with respect to those that were illegally derived."  *SEC v. Razmilovic*, --- F.3d ----, 2013

WL 6172543, at *13 (2d Cir. 2013) (quotations omitted).

At the first stage of its argument, the SEC invites the Court to assume that one-third of

Mr. Tourre's gross 2007 bonus, *i.e.*, $526,389, was attributable to his personal performance,

based only on Goldman's CEO's testimony in another proceeding where Mr. Tourre was not

represented that three "tangible" factors informed Goldman's compensation system.  Mem. at 10.

For the reasons set forth in Section I.A above, Mr. Tourre objects to this Court's consideration of

"evidence" that was not submitted to the jury, including Mr. Blankfein's testimony, Fitzpatrick

Ex. 3, the rank hearsay performance evaluation that the Court specifically excluded from

evidence, Fitzpatrick Ex. 63; Tr. 727:5-8, and Goldman's counsel's post-trial unsworn letters and

emails to the SEC, Fitzpatrick Exs. 6 and 7.

Even if that evidence were properly before the Court, which it is not, it does not support

the SEC's argument.  Mr. Blankfein's testimony itself shows that, contrary to the SEC's

assumption, the three factors he references did not have equal weight, as, in 2008, when

Goldman's revenues were down, discretionary compensation fell on average by 65 percent.

Fitzpatrick Ex. 3 at 6.  The SEC concedes that Goldman "does not maintain any record showing

how each of the factors impacted Tourre's bonus determination in 2007," Mem. at 10, but the

Court should not allow the SEC to fill that evidentiary gap with pure speculation.

At the second stage of its argument, the SEC requests that the Court allocate one-third of the $526,389, *i.e.*, $175,463, to AC1, relying principally on the SEC's own selective interpretation of Goldman's counsel's post-trial correspondence.  Among the key defects in the SEC's arguments are the following:  *First*, without any basis, the SEC assigns no value to the trading activity for which Mr. Tourre was responsible in 2007, Fitzpatrick Ex. 6, at 1, instead assuming, counterfactually, that, if his bonus had been tied to particular transactions, only new offerings would have been recognized.  *Second*, the SEC states that Mr. Tourre worked on six offerings in 2007 only by ignoring the portion of counsel's email that specified that work on new offerings issues in 2006 might continue into 2007 and that work on offerings completed in 2008 might have begun in 2007.  Fitzpatrick Ex. 7.  *Third*, the SEC argues that the Court should allocate one-third, rather than one-sixth or some much smaller percentage of the $526,389 to the AC1 transaction by seeking to downplay his performance on other transactions through quoting snippets from hearsay comments in performance reviews that the Court correctly excluded from evidence,[14] even though there is no evidence that any of these comments, or any of the other documents cited by the SEC, which include documents going back as far as October 2006 (PX-11), was actually considered in setting Mr. Tourre's 2007 bonus.

The SEC's evidentiary showing is so lacking that it simply has not met its burden to show any entitlement to an award of disgorgement.  In *Jones*, the court denied a request for disgorgement, holding that the SEC had failed to meet its burden of establishing a causal

---

[14] For example, the SEC quotes Geoffrey Williams' comment that Mr. Tourre's work on one transaction "fell on unlucky timing," but it *omits* the immediately following comment that "***I think he did a great job on this project***." Fitzpatrick Ex. 63, at 22 (emphasis added).  Similarly, the SEC quotes Nicolas Friedman's comment that "in rare occasions, Fabrice did not post us on fairly large transaction (eg super senior tranches with CIBC)," while *omitting* Mr. Friedman's further comment that "this represents ***more an exception than the rule***," that "posting Credit is responsibility of Sales, not trading," and that Mr. Tourre "should continue to play this critical role of coordination in any large or complex transactions because ***he adds terrific value and control*** to this process."  *Id*. at 25 (emphasis added).

connection between the profits and the fraud, because it offered only "statements from [the defendant's] supervisors that his compensation was based on how he performed on significant projects, that the transfer agent initiative was a large project, and that his compensation in 1999 might have been affected by the initiative." 476 F. Supp. 2d at 386. The SEC has done considerably less here. The disgorgement request should, therefore, be denied.

Mr. Tourre objects to the SEC's speculative approach and its use of new "evidence" on this motion, but if the Court is prepared to consider that material, it should also consider the declaration of Daniel L. Sparks ("Sparks Decl."). In 2007, as head of the Mortgage Department at Goldman, Mr. Sparks participated in discussions concerning Mr. Tourre's 2007 bonus. Sparks Decl. ¶¶ 1, 2. Mr. Sparks shows that the SEC's disgorgement argument wholly misunderstands and mischaracterizes the process by which Goldman calculated and awarded bonuses, and that, contrary to the SEC's theory, no portion of Mr. Tourre's 2007 bonus can be attributed to AC1.

Contrary to the SEC's mathematical (but arbitrary and ill-founded) approach, Mr. Sparks explains that the setting of bonuses at Goldman was a subjective process. Sparks Decl. ¶ 3. As the Mortgage Department earned record profits in 2007, Mr. Sparks explains that the setting of bonuses that year was even "more arbitrary than in prior years." *Id.* ¶ 5. Moreover, Mr. Sparks explains that there was *no* "specific mathematical relationship between Mr. Tourre's compensation and the Desk's profitability." *Id.*

Mr. Sparks also shows that the SEC's assertion that one-third of Mr. Tourre's bonus should be allocated to his personal performance is utterly unconnected to how the process actually worked. Mr. Sparks explains that some of the primary factors in awarding bonuses were the profitability of the firm, division, business unit and desk, the employee's seniority, his prior year's compensation, the qualitative view of the employee's contribution to the firm and its

clients, the compensation opportunities that he might have at other firms, the compensation of similarly performing Goldman peers and his expected future contribution to the firm.  *Id*. ¶ 3. The SEC notes the increase in Mr. Tourre's bonus from 2006 to 2007, Mem. at 10, but, as Mr. Sparks points out, Goldman, the Mortgage Department, and the Desk all experienced very strong profitability in 2007, with the Desk's profitability increasing very dramatically from $█ million in 2006 to $███ million in 2007, an increase of some 1,200 percent, accounting for compensation being higher than in 2006.  *Id*. ¶ 4.  Moreover, Mr. Tourre was promoted to Vice President in December of 2006, Tr. 888:20-24, a more senior position that satisfied another criterion for a higher bonus.  Sparks Decl. ¶ 3.

 *Finally*, Mr. Sparks  recalls no discussion of AC1 in connection with Mr. Tourre's 2007 bonus.  *Id*. ¶ 6.  He further explains that no transaction impacted an employee's bonus unless it had a material impact on the desk's profitability or otherwise resulted in a unique qualitative benefit to the firm.  *Id*.  As Mr. Sparks notes, the $15 million in revenue that the desk initially recognized from AC1 in 2007 represented just ██% of the correlation desk's $███ million profits in 2007 and less than 1% of the Structured Products Group's $█████ in profits, which would not represent a material impact on profitability and would not likely have been a factor in bonus discussions (even leaving aside that the $15 million, and much more, had been lost before the end of the year as a result of AC1).  *Id*. ¶ 6.

 As Mr. Sparks' evidence establishes that there was no connection between AC1 and Mr. Tourre's 2007 bonus, the SEC's request for disgorgement should be denied.

  **C.**  <u>**The SEC Is Not Entitled To Pre-Judgment Interest**</u>

 *First*, pre-judgment interest should be denied as the SEC only seeks interest on its disgorgement claim, *see* Mem. at 13-14, and, for the reasons set forth above, no disgorgement is due.

*Second*, the SEC fails to address the factors the courts of this Circuit consider when determining whether to award pre-judgment interest: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey*, 101 F.3d at 1476.  These factors weigh heavily against an award of interest.  There are no uncompensated victims, as the SEC conceded when it escheated to the United States Treasury $300 million of the $550 million that Goldman paid to resolve this matter, finding no further "victims" who might be entitled to fair funds.  ECF No. 25, at 2-4.  Moreover, the SEC has failed to take any action against Mr. Tourre's purported co-schemers, leaving Mr. Pellegrini to enjoy the $20 million he made from AC1.  At a minimum, considerations of "fairness and relative equities" bar the imposition of pre-judgment interest.

Finally, interest should be denied because the SEC's interest claim is riddled with factual and arithmetical errors.[15]  Clearly, contrary to the SEC's mistaken assertion, Mr. Tourre has absolutely not had "unrestricted access to" the gross sum referenced in the SEC's papers since January 2008, or, indeed, at all.

## CONCLUSION

For all the foregoing reasons, Fabrice Tourre respectfully requests that the Court deny the SEC's Motion For Disgorgement, Pre-Judgment Interest, Civil Monetary Penalties and Injunctive Relief and order Mr. Tourre to pay no more than a single second-tier penalty.

---

[15] The SEC asserts that Mr. Tourre "received the entirety of his 2007 bonus in January 2008," Mem. at 13, yet inexplicably seeks interest starting a year earlier.  Fitzpatrick Ex. 8.  Further, the SEC's claim that Mr. Tourre "has had unrestricted access" to the entirety of his 2007 bonus since January 2008 is clearly not correct.   The SEC fails to realize either that the $1,579,167 is a *gross* number, not disposable income, or that, as the SEC's evidence shows, a substantial portion of the bonus award was in the form of restricted stock, awarded when Goldman's share price was near its all-time high, so that Mr. Tourre actually received a smaller benefit, at a later time.

Dated: January 21, 2014                    Respectfully submitted,
       New York, New York


                       /s/ Pamela Rogers Chepiga
                       Pamela Rogers Chepiga
                       (pamela.chepiga@allenovery.com)
                       Andrew Rhys Davies
                       (andrew.rhys.davies@allenovery.com)
                       Laura R. Hall
                       (laura.hall@allenovery.com)
                       Michael F. Westfal
                       (michael.westfal@allenovery.com

                       ALLEN & OVERY LLP
                       1221 Avenue of the Americas
                       New York, New York  10020
                       (212) 610-6300


                       *Attorneys for Fabrice Tourre*