UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
SECURITIES AND EXCHANGE                                       :
COMMISSION,                                                   :
                                                              :
                              Plaintiff,                      :
                                                              :
              -v-                                             :
                                                              :
FABRICE TOURRE,                                               :
                                                              :
                              Defendant.                      :
                                                              :
------------------------------------------------------------- X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____              │
│ DATE FILED: March 12, 2014           │
└─────────────────────────────────────┘
```

10 Civ. 3229 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On August 1, 2013, a jury returned a verdict against defendant Fabrice
Tourre for violating a variety of provisions of the securities laws. The jury found
Tourre liable on six out of seven of the SEC's claims against him; the jury found he
violated Section 17(a)(1) of the Securities Act, Section 17(a)(2) of the Securities Act,
Section 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rule
10b-5(a), Section 10(b) of the Exchange Act and Rule 10b-5(c), and Section 20(e) of
the Exchange Act.

On December 16, 2013, the SEC moved this Court for disgorgement and
prejudgment interest, civil monetary penalties, and injunctive relief against Tourre.
Tourre opposed the motion on January 21, 2014, and the motion became fully
briefed on January 31, 2014. The Court held argument on the motion on February
20, 2014.

The parties' disputes are focused on, inter alia, the following four issues:

1.     Can this Court order disgorgement of that portion of Tourre's 2007 bonus that is fairly attributable to his work on the ABACUS 2007-AC1 ("AC1") transaction,[1] when Goldman Sachs & Co. ("Goldman") has already disgorged $15 million, the amount of initial trading revenue it recognized from the transaction, in its settlement with the SEC?

2.     In light of the general verdict of liability as to Section 17(a)(1), can this Court impose third-tier civil penalties for offers as to which the jury did not find by special verdict were individually violative of the securities laws?

3.     Can this Court prohibit Tourre from being indemnified by Goldman for any civil penalties he is required to pay?

4.     Is injunctive relief appropriate when Tourre has represented that he is not now and does not currently intend to re-enter the securities industry?

---

[1] AC1 was a synthetic collateralized debt obligation ("CDO") with a static reference portfolio comprised of 90 Baa2 tranches of residential mortgage backed securities ("RMBS"). (Trial Tr. at 2423.) On April 26, 2007, Goldman sold $42 million of AC1 notes to Zenith Funding Limited, and $150 million of AC1 notes to Loreley Financing (Jersey) No.29 and Loreley Financing (Jersey) No.30 (collectively "Loreley"). (Id. at 2423-24.) On the same day, Goldman entered into a swap agreement with the Paulson & Co hedge fund ("Paulson") in which Paulson bought $192 million in protection on the AC1 reference portfolio. (Id. at 2432.) On May 31, 2007, Goldman entered into credit default swaps referencing the AC1 portfolio with both ABN Amro Bank NV ("ABN"), which took a long position, and Paulson, which took a short position. (Id. at 2432-33.) ABN, in turn, entered into a credit default swap with ACA Credit Products-ABN Amro LLC. (Id. at 2433-34.)

For the reasons set forth below, the Court finds as follows:

1.     Goldman and Tourre each received separate gains relating to the AC1 transaction.  Goldman received initial trading revenues of $15 million[2] and more than $1 billion in payments from long investors, which were then passed along to Paulson & Co. ("Paulson") through a series of credit default swaps.[3]  Tourre received a bonus that year from Goldman that was based in part on his personal performance, and his personal performance was based in part on his work on the AC1 transaction.  The Court agrees with the SEC's approximation of the portion of Tourre's bonus—$175,463—that is reasonably attributable to the AC1 transaction, and finds that Tourre has failed to rebut this presumption of validity.  The Court thus orders disgorgement of $175,463 from Tourre, plus prejudgment interest in an amount to be recalculated by the SEC at a rate of 3%.

2.     Courts assess civil penalties on a per-violation basis.  The term "violation" is based on various fraudulent acts or omissions; the term "violation" is not limited to its singular form merely because one scheme involved many acts.  The jury found Tourre liable for participating in a scheme to defraud ACA;[4] each of the seven offers listed by the SEC directly relied on that scheme the jury found to be

---

[2] This $15 million is not properly described as a "profit."  The parties stipulated that, while Goldman "initially recognized trading revenue of approximately $15 million in connection with AC1 and the swap transactions with Paulson," it "subsequently lost more than $90 million on its long position on the AC1 reference portfolio in connection with credit events affecting the AC1 reference portfolio." (Trial Tr. at 2434.)

[3] The parties stipulated that Goldman sold $192 million of AC1 notes to long investors (see Trial Tr. at 2423-24), and entered into a credit default swap with ABN "in the notional amount of $909 million referencing a portfolio of Baa2 rated RMBS that was the same as the AC1 reference portfolio with an attachment point of 50 percent and a detachment point of 100 percent" (see id. at 2432-34).  These payments, more than $1 billion, were ultimately passed along to Paulson. (See id. at 345-47, 610-11, 2432-34.)

[4] ACA Management LLC, together with its affiliates, is referred to in the Court's jury instructions and hereinafter in this decision as "ACA."

fraudulent.  In light of the evidence presented at trial, the Court imposes third-tier penalties of $130,000 for three of these offers—the offers to ACA, IKB, and ABN. Because the Court does not find that the remaining four offers directly or indirectly resulted in substantial losses, or created a significant risk of substantial losses to other persons, the Court imposes second-tier penalties of $65,000 for the offers to Calcyon, CIFG, BAWAG, and UBS.  In total, the Court imposes civil penalties in the amount of $650,000 against Tourre.

3.    The Court prohibits Tourre from seeking reimbursement for the payment of the $650,000 in civil penalties from Goldman, which the jury determined to be a co-violator of the securities laws with respect to ACA and, thus, necessarily, in the AC1 transaction.  The Court does not prohibit Tourre from seeking reimbursement from any other persons or entities.

4.    In light of Tourre's representations, injunctive relief is not appropriate at this time.  However, the Court shall retain jurisdiction over this matter for a period of three years from the date of this Opinion and, should Tourre become employed in any capacity in the securities industry during that period, the SEC may apply for appropriate injunctive relief at that time.[5]

Accordingly, the SEC's motion is GRANTED in part and DENIED in part.

---

[5] If the matter is on appeal at the time such application is made, the SEC must take appropriate steps to establish this Court's jurisdiction over this specific issue.

I.     BACKGROUND

The Court assumes familiarity with its prior decisions and with the factual record in this case. For context, the Court sets forth below the facts relevant to the instant motion.

A.     The Goldman Settlement and the Amended Complaint

The SEC originally filed this enforcement action related to the AC1 transaction on April 16, 2010, against both Goldman and Tourre. Just over three months later, on July 20, 2010, the Court entered a judgment on consent as to Goldman only. This judgment reflected the terms of Goldman's settlement with the SEC. Without admitting or denying the allegations in the complaint, Goldman agreed to, inter alia, (1) a permanent injunction from violating Section 17(a) of the Securities Act; (2) payment of $15,000,000 in "disgorgement"; (3) payment of a civil penalty of $535,000,000, for which Goldman agreed not to seek or accept reimbursement or indemnification; and (4) certain other undertakings relating to Goldman's internal controls. (See Goldman Consent Judgment, ECF No. 25.)

The SEC filed its amended complaint, against Tourre only, on November 22, 2010. In it, the SEC alleged violations by Tourre of all three subsections of Section 17(a) of the Securities Act, violation of Section 10(b) of the Exchange Act through each of the three subsections of Rule 10b-5 thereunder, and violation of Section 20(e) of the Exchange Act as a result of the violation of Section 10(b) of the Exchange Act and Rule 10b-5. (See Am. Compl. ¶¶ 74-83, ECF No. 44.)

5

B.  The Jury Charge and Verdict Form

At the close of trial, the Court instructed the jury as to seven separate alleged violations of the securities laws by Tourre.

The Court first instructed the jury as to the financial instruments that were included within the meaning of the terms "securities" and "security-based swap agreements." The Court explained for the jury that "the ABACUS 2007-AC1 notes that were created on April 26, 2007 are securities within the meaning of securities law," and that "the two security-based swap agreements at issue in this case – (1) the credit default swap transaction that Goldman Sachs International, sometimes referred to as GSI, entered into with ABN AMRO on May 31, 2007; and (2) the credit default swap transaction that ABN AMRO entered into with ACA Credit Products on May 31, 2007 – are security-based swap agreements within the meaning of the securities laws."[6] (Trial Tr. at 2779-80.)

The Court then described for the jury the particular conduct alleged by the SEC for each of the seven violations.

For Section 17(a)(1), the Court stated the SEC's allegation that Tourre "participated in a scheme to defraud ACA in the offer or sale of the ABACUS 2007-AC1 notes and the Goldman/ABN and ABN/ACA credit default swaps." (Trial Tr. at 2782.) For Section 17(a)(2), the Court stated the SEC's allegation that four misstatements or omissions were used: (1) "That the reference portfolio was

_____

[6] Though the parties stipulated prior to trial that the AC1 notes were "securities" within the meaning of the securities laws, the Court granted the SEC's motion for partial summary judgment as to the issue of whether the two related swap agreements were "security-based swap agreements" within the meaning of the securities laws. (See 7/15/13 Order at 3-5, ECF No. 407.)

'selected by ACA,' while omitting the fact that Paulson played a significant role in the portfolio selection"; (2) "That the equity tranche of the AC1 transaction was 'precommitted'"; (3) "That the 'incentives' of Paulson were 'aligned' in the AC1 transaction"; and (4) "That Paulson was the 'transaction sponsor' in the AC1 transaction or that Paulson was a long investor in the AC1 transaction." (Id. at 2789-90.)  For Section 17(a)(3), the Court stated the SEC's allegation that Tourre "engaged in a fraudulent transaction, practice or course of business in the offer or sale of the ABACUS 2007-AC1 notes and the Goldman/ABN and ABN/ACA credit default swaps." (Id. at 2795.)

While the Court instructed the jury "not to consider sales which occurred overseas (for instance, to Loreley/IKB[7] or ABN) for purposes of the 'sale' requirement" of Section 17(a), it instructed the jury that it "may consider those entities in relation to whether an 'offer' was made." (Id. at 2781.)

For the SEC's three Section 10(b) and Rule 10b-5 claims, the Court instructed the jury that these claims "apply only to the alleged fraud on ACA and other ACA-related entities," and that "there is no claim that Mr. Tourre violated Section 10(b) and Rule 10b-5 in connection with any other investor that you have heard about during the course of this trial." (Id. at 2797.)  Accordingly, the Court's description of the conduct alleged by the SEC for each of the three subsections of Rule 10b-5 (which mirror the subsections of Section 17(a) of the Securities Act) focuses only on

---

[7] The Loreley entities were affiliates of IKB, a German bank that was one of the correlation desk's top customers.  For the sake of simplicity, the Court hereinafter refers to both the Loreley entities and IKB in this Opinion as "IKB."

the ABACUS 2007-AC1 notes and the ABN/ACA swap agreement.  (See id. at 2801-2803.)

For the SEC's Section 20(e) claim, the Court instructed the jury that it required proof that Tourre aided and abetted a violation of Section 10(b) and Rule 10b-5 "by his employer, Goldman Sachs," which required proof of the existence of such a violation by Goldman.  (Id. at 2805-2806.)  The Court also instructed the jury that "[t]his claim applies only to the alleged fraud on ACA and ACA-related entities."  (Id. at 2805.)

The Court also explained the different intent requirements for each of the seven violations for the jury.  The Court instructed the jury that Section 17(a)(1) requires proof of intent to defraud or reckless disregard for the truth, but that Section 17(a)(2) and (3) may be satisfied by a showing of negligence.  (Id. at 2784-86, 2792-94, 2796.)  The Court instructed the jury that Section 10(b) and Rule 10b-5 require proof of intent to defraud or reckless disregard for the truth (and are not satisfied by proof of mere negligence).  (Id. at 2804-2805.)

After delivering the charge, the Court provided the jury with a general verdict form that asked for a finding of "liable" or "not liable" for each of the seven alleged violations.  This form was similar to the proposed verdict form submitted by the SEC prior to trial.  (See Chepiga Decl. Ex. 1 at 3-4, ECF No. 506.)  The proposed verdict form submitted by Tourre, 22 pages in total, would have required the jury to find each of the elements of each claim separately; it also would have required the jury to specify whether it found Tourre liable under Section 17(a)(2) or (3) with

respect to ACA, IKB, ABN, or other investors in AC1, and which of the alleged misstatements or omissions it found against him.  (See id. Ex. 1 at 6-20; 7/15/13 Letter at 6-13, ECF No. 409.)  The SEC objected to Tourre's proposed verdict form, and the Court agreed in light of the fact that the Court's charge (a copy of which was given to each juror) provided a detailed roadmap for the jurors through each of the elements of each claim and required unanimity as to each element.  (See Trial Tr. at 2486-89.)

The jury found Tourre liable for six of the seven alleged violations—it did not find Tourre to have violated Section 10(b) of the Exchange Act through the violation of Rule 10b-5(b) thereunder.

C.   Tourre's 2007 Bonus

Tourre received a bonus of $1,579,167 for 2007, the year during which the AC1 transaction was negotiated and closed, in January 2008.  (See Fitzpatrick Decl. Ex. 1, ECF No. 493.)  This was the largest bonus he ever received at Goldman.  (Id.)

The parties agree that there are subjective and qualitative components to bonus determinations at Goldman.  The SEC relies on the January 13, 2010 congressional testimony of Goldman CEO Lloyd C. Blankfein, in which he stated that compensation at Goldman is based on "(1) the performance of the firm; (2) the performance of the business unit; and (3) the performance of the individual."  (Id. Ex. 5 at 5.)  Tourre relies on a January 21, 2014 declaration from Daniel L. Sparks, the head of the Mortgage Department at Goldman in 2007, who supervised the employees of the Structured Product Group ("SPG") and helped develop and present

9

recommendations for bonus awards for these employees, including Tourre.  (Sparks Decl. ¶ 2.)  According to Sparks, "some of the primary factors in the bonus determination were the profitability of the firm, division, business unit and desk; the employee's seniority; his prior year's compensation; the qualitative view of the employee's contribution to the firm and it clients; the compensation opportunities that he might have at other firms; the compensation of similarly performing Goldman peers; and his expected future contribution to the firm."  (Id. ¶ 3.)

Both Goldman and the Fixed Income, Currency, and Commodities business segment within which Tourre worked reported record earnings in 2007, and the Mortgage Department had record profitability that year.  (See Fitzpatrick Decl. Ex. 4; Sparks Decl. ¶ 4.)

Though AC1 was one of six transactions with which Tourre had particular involvement during the 2007 fiscal year (see Fitzpatrick Decl. Exs. 6, 7), it represented a significant piece of Tourre's work during Goldman's 2007 fiscal year.[8] Tourre was the deal captain of AC1, and was the person primarily responsible for the transaction at Goldman.  (See Trial Tr. at 2208.)  It was his idea.  (See PX192[9]; Trial Tr. at 2209.)  Tourre described the AC1 transaction as a "huge focus" of his business and a "huge profit opportunity," and he worked on the transaction for approximately seven months (more than half the fiscal year).  (See PX11; PX352; PX398; Trial Tr. at 2200.)

---

[8] Goldman's 2007 fiscal year began on November 25, 2006 and ended on November 30, 2007.  (See Fitzpatrick Decl. Ex. 7.)
[9] "PX" exhibit references herein correspond to the numbers of exhibits offered by the SEC and admitted at trial.

During the transaction, Tourre used AC1 as a way to demonstrate to his superiors at Goldman his ability to structure transactions and generate profits. (See PX22; PX23; PX192; PX233 at 2; PX325; PX353; Trial Tr. at 685.) Following the transaction, Tourre continued to tout his work on AC1 in his self-evaluation for 2007, which was generated in September 2007. The first sentence of Tourre's self-evaluation reads: "Have showed creativity in creating for third party clients transactions that (a) address those clients' needs, (b) enabled Goldman to position risk appropriately, and (c) enabled Goldman to generate revenue through bid/offer on exotic derivatives trades." (PX369[10] at 19.) Tourre also cited his involvement in "developing a network of intermediation counterparties" that were "instrumental in allowing Goldman to trade very actively with all types of Monolines including CIFG, MBIA, [and] ACA." (Id.) These statements highlight two aspects of Tourre's work on AC1 in this brief description of his overall performance for the year.

In 2007, Tourre's performance was found to be in the top 25% of Goldman employees (see PX369 at 8; Fitzpatrick Decl. Ex. 5 at 3), and he received positive

---

[10] PX369 contains Tourre's self-evaluation and a compilation of the evaluations submitted by others for his performance in 2007. Though the Court excluded this document at trial as "not relevant to the core issues in this case" (Trial Tr. at 727), the Court finds that PX369 does contain relevant material for the purposes of determining the appropriate amount of disgorgement during the penalty phase. Once the jury has found an individual to have violated the federal securities laws, as it has in this case, the Court has "broad equitable power to fashion appropriate remedies," which includes "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996). In order to make this determine, courts are often required to engage in fact-finding. See SEC v. Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006). Tourre's objection to the Court's consideration of this evidence on the grounds that it "was not submitted to the jury" (Tourre Opp. at 21) is thus misplaced. In fact, the jury was specifically instructed that, if it found Tourre liable on the SEC's claims, it would be the Court's role to determine the appropriate remedy, and that "[t]he question of what remedy [the Court] might impose if you were to find Mr. Tourre liable should not in any way enter into or influence your deliberations." (Trial Tr. at 2770.)

reviews from the Goldman personnel with whom he worked on AC1. Some of these reviews specifically reference his work on AC1.[11]

- Gail Kreitman, Goldman's sales executive covering ACA, wrote that Tourre "has a nose for a trade and will not relent until he prints it;"

- Melanie Herald-Granoff, one of the Goldman sales personnel covering ACA, praised Tourre's ability to find an intermediary for the ACA trade;

- Michael Nartey, who worked with Tourre to secure the IKB and ABN investments in AC1, wrote that Tourre was "very innovative;"

- Charlie Remnant wrote, "On closing the ABN Amro / ACA Intermediation trade Fabrice worked extremely hard to create solutions for ABN's internal issues."

With respect to the other transactions Tourre worked on in 2007, there are fewer, and more negative, references in his performance reviews than those dealing with AC1. (See PX369 at 22, 25-26.)

According to Sparks, he has no recollection of a discussion of the AC1 transaction in connection with Tourre's bonus, and he states that it would not likely have been a focus of Tourre's bonus determination because of the small amount of profit it generated in relation to the Desk's overall profits. (Id. ¶ 6.)

D.   Tourre's Post-Complaint Conduct

After the SEC filed this action on April 16, 2010, Goldman placed Tourre on paid administrative leave. (Trial Tr. at 2373-74.) He has not worked in the securities industry since that time. During the year Tourre spent on paid leave, he

---

[11] The following reviews are contained PX369 at 20-23.

volunteered in East Africa and applied to graduate schools. (Id. at 2374, 2357.) In August 2011, Tourre started a Ph.D program in economics at the University of Chicago, where he has since been a full-time student and teaching assistant. (Id. at 2357-58.) According to representations by his counsel, Tourre is scheduled to complete this program in June 2016, and he plans to pursue a career in academia. (2/20/14 Tr. at 42, ECF No. 515; Tourre Opp. at 2, ECF No. 505.)

II.    DISCUSSION

The SEC seeks three types of remedies from Tourre: (A) disgorgement of ill-gotten gains, along with prejudgment interest on those gains; (B) civil monetary penalties; and (C) injunctive relief. Different legal standards apply to each remedy, and the Court discusses them in turn.

A.    Disgorgement and Prejudgment Interest

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1474 (2d Cir. 1996) (citing cases). "Disgorgement is an equitable remedy, imposed to force a defendant to give up the amount by which he was unjustly enriched," SEC v. Contorinis, No. 12-1723-cv, 2014 WL 593484, at *2 (2d Cir. Feb. 18, 2014) (quoting FTC v. Bronson Partners, 654 F.3d 359, 372 (2d Cir. 2011)) (internal quotation marks omitted), "which has the effect of deterring subsequent fraud." SEC v. Cavanaugh, 445 F.3d 105, 117 (2d Cir. 2006). "Disgorgement thus should have the effect of returning a defendant to his status quo prior to the

13

wrongdoing." Contorinis, 2014 WL 593484, at *9 (Chin, J., dissenting) (citing SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987).

District courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." First Jersey, 101 F.3d at 1474-75 (citing SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996)). "[T]he measure of disgorgement need not be tied to the losses suffered by defrauded investors, and a district court may order disgorgement regardless of whether the disgorged funds will be paid to such investors as restitution." SEC v. Fischbach Corp., 133 F.3d 170, 176 (2d Cir. 2006) (citations omitted).

"[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude." SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." First Jersey, 101 F.3d at 1475 (citations and internal quotation marks omitted). "Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'" Razmilovic, 738 F.3d at 31 (quoting Lorin, 76 F.3d at 462).

Specific tracing of the funds in a defendant's possession that are properly subject to disgorgement is not required. Contorinis, 2014 WL 593484, at *4 n.3;

14

Bronson Partners, 654 F.3d at 373-74 (collecting cases).  "[T]he causal connection

required is between the amount by which the defendant was unjustly enriched and

the amount he can be required to disgorge."  SEC v. Banner Fund Int'l, 211 F.3d

602, 617 (D.C. Cir. 2000); see Contorinis, 2014 WL 593484, at *4 n.3 (citing Banner

Fund Int'l, 211 F.3d at 617; Bronson Partners, 654 F.3d at 374 (same).  Courts order

disgorgement of some or all of a defendant's bonus when it is reasonable to infer a

causal connection between such bonus and the defendant's fraudulent conduct.

Razmilovic, 738 F.3d at 32-33; SEC v. Mortenson, No. CV-04-2276 (SJF), 2013 WL

991334, at *6 (E.D.N.Y. Mar 11, 2013).

   The SEC seeks disgorgement of the portion of Tourre's 2007 bonus that is

reasonably attributable to his work on the AC1 transaction.  (See SEC Mem. of Law

at 9, ECF No. 492.)  The SEC estimates this amount at $175,463 in light of its

approximation of the impact Tourre's individual performance and the AC1

transaction specifically had on his total bonus that year.  (Id. at 10-13.)  The SEC

offers this approximation on the basis of "qualitative" factors—in particular,

Tourre's self-evaluation, the performance evaluations of Tourre by others, and

emails from Tourre that tout the importance of the AC1 transaction and Tourre's

role in the transaction.  (Id. at 11-13.)

   Tourre opposes the SEC's disgorgement request on two grounds.  First,

Tourre argues that disgorgement from Tourre related to the AC1 transaction

represents impermissible "double-counting" under Second Circuit law in light of

Goldman's $15 million "disgorgement" payment as part of its settlement with the

15

SEC in this action. (See Tourre Opp. at 18-19.) Second, Tourre argues that disgorgement is not appropriate because the SEC has failed to establish a causal connection between the AC1 transaction and Tourre's 2007 bonus, or a reasonable approximation of Tourre's profit. (See id. at 19-24.) Tourre's arguments lack merit. The Court finds that the SEC's approximation of the portion of Tourre's 2007 bonus attributable to AC1[12] is reasonable, and that he has failed to meet his burden of showing that his bonus was unaffected by his fraudulent conduct.

In arguing that further disgorgement from Tourre related to AC1 constitutes impermissible double-counting, Tourre relies on SEC v. AbsoluteFuture.com and its holding, which extends First Jersey, "that when the profits of multiple defendants are to be disgorged, the total disgorgement amount cannot exceed the combined profits of the defendants." SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004). Tourre seeks to apply AbsoluteFuture.com by arguing that the combined profits here, if any, total no more than the $15 million that Goldman initially recognized in trading revenue and which Goldman has already paid the SEC. (See Tourre Opp. at 19.)

The Court rejects the notion that the total permissible disgorgement flowing from the AC1 transaction, from both Tourre and Goldman, is the $15 million Goldman initially recognized in trading revenue. Goldman received more than $1 billion from long investors in AC1, though most of this money ultimately went to

---

[12] As is discussed in Section II.B.1, infra, the jury necessarily found Tourre liable for his fraudulent conduct in the AC1 transaction.

Paulson through a series of related credit default swaps.[13]  Using this much larger amount as the upward limit of disgorgement in this case is supported by substantial Second Circuit authority.  In the context of a fraudulent stock offering, the Second Circuit has upheld the disgorgement of the full amount of the "proceeds" received from investors as a proper exercise of the district court's equitable powers.  See SEC v. Manor Nursing Centers, 458 F.2d 1082, 1103-1104 (2d Cir. 1972).  The Second Circuit has upheld the disgorgement of all profits received, even though a portion of those profits were later transferred to another party, explicitly rejecting an "actual profits" approach.  See SEC v. AbsoluteFuture.com, 115 F. App'x 105, 106-107 (2d Cir. 2004); SEC v. Shapiro, 494 F.2d 1301, 1309 (2d Cir. 1974).  Additionally, in the insider trading context, the Second Circuit has routinely upheld disgorgement of gains to third parties that are attributable to the defendant's wrongful conduct.  See Contorinis, 2014 WL 593484, at *3; SEC v. Warde, 151 F.3d 42, 49 (2d Cir. 1998).  The Court thus finds that disgorgement from Tourre of the amount by which he was unjustly enriched as a result of the AC1 transaction is not impermissible double-counting.

With respect to Tourre's second argument, the Court finds that it cannot be reasonably disputed that Tourre was unjustly enriched by the AC1 transaction.  As the evaluations and emails discussed supra show, and as Tourre himself admits, AC1 was a "huge focus" of his work in 2007, and was viewed as a success by his superiors at Goldman.  Tourre argues that any such impact AC1 transaction had on

---

[13] A more detailed discussion of the payments involved in the AC1 transaction is contained in Section II.B.1, infra.

his 2007 bonus is negligible, because AC1 generated less than 2% of the mortgage correlation desk's profit that year.  (See 2/20/14 Tr. at 52; Tourre Opp. at 24; Sparks Decl. ¶ 6.)  As the Sparks Declaration submitted by Tourre emphasizes, however, factors such as "the qualitative view of the employee's contribution to the firm and it clients" and the employee's "expected future contribution to the firm" are part of Goldman's bonus determination. (Sparks Decl. ¶ 3.)

 In its recent decision in SEC v. Contorinis, the Second Circuit made clear that the amount to be disgorged from a defendant may include "illicit benefits for the wrongdoer that are indirect or intangible." Contorinis, 2014 WL 593484, at *6 As the Contorinis court explains, "[b]ecause it would be difficult to quantify the advantages of an enhanced reputation or the psychic pleasures of enriching a family member, to require precise articulation of such rewards in calculating disgorgement amounts would allow the wrongdoer to benefit from such uncertainty." Id.  Citing First Jersey, the court emphasizes the fact that "the risk of uncertainty in the amount of disgorgement is not properly so allocated." Id.  Accordingly, the Court will not allow Tourre to similarly benefit from the risk of uncertainty that he attempts to create with respect to Goldman's bonus determinations.

 The SEC's approximation of the portion of Tourre's bonus that is attributable to AC1 explicitly seeks to separate that portion of his 2007 bonus that was attributable to the performance of both Goldman and Tourre's business unit that year.  Based on the congressional testimony of Goldman's CEO (see Fitzpatrick Decl. Ex. 5 at 5), the SEC estimates the impact of these two factors on Tourre's

bonus as one-third each.  With respect to the remaining one-third of Tourre's bonus, the portion the SEC estimates is attributable to his <u>individual</u> performance that year, the Court finds that the SEC's estimate that one-third was attributable to Tourre's work on AC1 is entirely reasonable.  The record evidence before the Court at the penalty stage shows that AC1 was one of, if not the most, significant transaction on which Tourre worked in 2007.  Accordingly, the Court holds that disgorgement from Tourre of $175,463—one-ninth (11%) of Tourre's total bonus that year—is warranted.

Whether to grant prejudgment interest, and the rate of any such interest, is left to the broad discretion of this Court.  See <u>SEC v. Contorinis</u>, 2014 WL 593484, at *8; <u>First Jersey</u>, 101 F.3d at 1476.  In deciding whether to award prejudgment interest, this Court considers (1) "the need to fully compensate the wronged party for actual damages suffered"; (2) "considerations of fairness and the relative equities of the award"; (3) "the remedial purpose of the statute involved"; and/or (4) "such other factors as are deemed relevant by the court."  <u>First Jersey</u>, 101 F.3d at 1476.  "In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance."  <u>Id.</u>  Along with disgorgement, prejudgment interest ensures that the "defendant does not profit" from his ill-gotten gains, including the time value of money.  <u>SEC v. World Info. Tech., Inc.</u>, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).

For the reasons set forth herein, the Court finds that the assessment of prejudgment interest is appropriate, running from February 1, 2008 (the beginning

of the first month following Tourre's receipt of his 2007 bonus) up through the end of 2013.  As for the rate of such interest, though other courts have endorsed the use of the Internal Revenue Service rate of interest on tax underpayments and refunds as a benchmark, see, e.g., First Jersey, 101 F.3d at 1476, the Court finds the use of such a rate during the full period (particularly in 2008) to be unreasonable in light of the financial and market conditions at the time.  Accordingly, the SEC is ordered to recalculate the amount of prejudgment interest using a rate of 3% for the entire period.

B.    Civil Monetary Penalties

Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties, in increasing severity, for statutory violations.  See 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  A first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty may be imposed when, in addition to meeting the second-tier requirements, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  Razmilovic, 738 F.3d at 38 (quoting 15 U.S.C. §§ 77t(d)(2)(A)-(C) and 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)).  Each tier provides that, for each violation, the amount of the penalty "shall not exceed the greater of" a specified monetary amount or the defendant's gross pecuniary gain.  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3) (same).  At the time Tourre committed his fraud, the statutory maximum penalties were $6,500 for a first-tier

penalty, $65,000 for a second-tier penalty, and $130,000 for a third-tier penalty.

See 17 C.F.R. § 201.1003.

The civil penalties statutes, enacted as part of the Securities Enforcement

Remedies and Penny Stock Reform Act of 1990, permit the imposition of penalties

"for each violation."  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  The Senate and

House committee reports issued prior to passage of the Act repeatedly describe the

conduct constituting a "violation" for the purposes of calculating a penalty as an "act

or omission," which must then be evaluated in order to determine its severity.  See

S. Rep. No. 101-337, at 12-13 (1990); H.R. Rep. No. 101-615, at 15-23 (1990).

Similarly, courts in this District have calculated the number of violations "based

upon the number of acts taken that violate the securities laws," and the Second

Circuit has endorsed that analysis.  See SEC v. Pentagon Capital Mgmt., No. 08

Civ. 3324 (RWS), 2012 WL 1036087, at *3 (S.D.N.Y. Mar. 28, 2012) (citing cases),

vacated on other grounds, SEC v. Pentagon Capital Mgmt., 725 F.3d 279, 288 n.7

(2d Cir. 2013) ("Although we vacate the civil penalty award, we find no error in the

district court's methodology for calculating the maximum penalty by counting each

late trade as a separate violation."); SEC v. Coates, 137 F. Supp. 2d 413, 428-30

(S.D.N.Y. 2001).  The concept of a "violation" is thus tied to some action (such as a

misstatement) or an omission by the defendant.  In the context of fraud, a violation

is tied to the act or omission that constitutes the fraud, or the subsequent

"peddling" of that fraud.

21

The SEC asks the Court to impose a separate third-tier penalty for each of seven listed violations:

> 1.  Tourre sent an email to ACA mentioning that the company could invest in AC1.  In the same email, Tourre falsely stated that the equity tranche was "pre-committed" and that Paulson's interests were aligned with those of ACA.
>
> 2.  Tourre discussed the trade with IKB, which was sent the misleading preliminary term sheet and flipbook, which Tourre had "primary responsibility" for preparing.  Tourre did not tell IKB or its sales coverage at [Goldman] about Paulson's role in the portfolio selection process, and IKB subsequently advised two affiliated companies to purchase $150 million in AC1 notes.
>
> 3.  Tourre persuaded ABN to intermediate one of the AC1 credit default swaps on behalf of ACA. As an intermediary, ABN stood between [Goldman] and ACA.  In emails to ABN, Tourre reiterated the half-truth that ACA alone had selected the portfolio.  He had a "long call" with ABN before they agreed to do the intermediation trade.  He did not mention Paulson's role in selecting the portfolio, information that would have been important to ABN's analysis of the transaction.
>
> 4.  Tourre sent the term sheet and flipbook for AC1 to Calcyon, a French bank that was a potential investor.  Both documents contained the half-truth that the portfolio was "selected by ACA."
>
> 5.  Tourre sent an email to CIFG, a financial guarantee company, in an attempt to sell it the 45-50% tranche of AC1.  Tourre wrote that the portfolio was "selected by ACA."
>
> 6.  Tourre sent an email to a [Goldman] salesperson with whom he was interacting in the marketing of AC1 notes.  The email attached the flipbook and term sheet. The sales person confirmed to Tourre that AC1 was "[s]hown to BAWAG [an Austrian bank]."
>
> 7.  Tourre sent UBS an email on March 7, 2007.  He attached a copy of the term sheet and flipbook for AC1. The documents contained the misleading half-truth that the portfolio was "selected by ACA."

(SEC Mem. of Law at 16-17 (citations omitted).)

The SEC argues that each of these violations was "an offer of a security, each offer was part of the fraudulent scheme, and each contained the core misrepresentation that the portfolio was selected by ACA."[14]  (Id. at 17.) Accordingly, the SEC seeks a total civil penalty of $910,000 from Tourre—$130,000 for each of the seven asserted violations.[15]  (Id. at 16-17.)

Tourre does not specifically contest the per-violation methodology; rather, he contests the number of violations necessarily found by the jury and the severity of those violations.  (See Tourre Opp. at 2-11.)  According to Tourre, because the jury only necessarily found a single scheme to defraud ACA, and did not specify which of the listed misstatements or omissions it found for purposes of Section 17(a)(2) (because of the general verdict form used by the Court), only a single second-tier penalty is warranted.  (Id. at 2-4.)

Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the district court.  SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005).  In exercising this discretion, courts weigh "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the

---

[14] The SEC does not seek to calculate Tourre's civil penalty on the basis of the number of statutory provisions that he was found by the jury to have violated.  (See SEC Mem. of Law at 17 n.14.) Though the Court notes that such a method of calculation has been viewed favorably by some courts, see Pentagon Capital Mgmt., 2012 WL 1036087, at *3; SEC v. Moran, 944 F. Supp. 286, 296 n.14 (S.D.N.Y. 1996), and is not otherwise barred by the plain language of the civil penalties statutes, the Court does not adopt such an approach here (and has not been asked to do so).

[15] The SEC does not seek an additional penalty for Tourre's substantial assistance of Goldman's violations of Section 10(b) and Rule 10b-5.  (SEC Mem. of Law. at 17 n.14.)

defendant's demonstrated current and future financial condition." <u>SEC v. Haligiannis</u>, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citing <u>Coates</u>, 137 F. Supp. 2d at 429).

After analyzing the seven alleged violations, the Court finds that the imposition of a civil penalty of $650,000 against Tourre is warranted—$130,000 in third-tier penalties for each of the violations respecting ACA, IKB, and ABN, and $65,000 in second-tier penalties for each of the violations respecting Calcyon, CIFG, BAWAG, and UBS.

1.   <u>Violations as to ACA, IKB, and ABN</u>

Tourre does not dispute that the verdict form used by the Court provides a "basis" for a second-tier penalty for the violation respecting ACA, in light of the jury's liability findings under Section 17(a)(1), Rule 10b-5(a), and Rule 10b-5(c). (<u>See</u> Tourre Opp. at 2-4.) Tourre argues, however, that the jury did not necessarily find violations respecting IKB or ABN (or any other potential investors in AC1) and, thus, the Court may not impose civil penalties for this conduct. (<u>See</u> <u>id.</u> at 4.) Tourre argues that, because the Court did not use a verdict form that required the jury to specify either the conduct underlying the scheme on ACA or which of the alleged misstatements it found against Tourre, it "provides no basis for this Court to find that the jury determined that the six supposed offers sent to potential AC1 investors other than ACA constituted violations of the securities laws." (<u>Id.</u> at 3-4.)

The Court disagrees. The evidence adduced at trial overwhelmingly showed that the scheme to defraud ACA was effectively the AC1 transaction itself—

24

defrauding ACA into serving as portfolio selection agent, so that Goldman could then peddle the AC1 transaction to unsuspecting long investors who believed ACA alone had selected the reference portfolio and were unaware of Paulson's role as a pure short investor. The six non-ACA fraudulent offers identified by the SEC— offers not only to IKB and ABN, but to Calcyon, CIFG, BAWAG, and UBS as well— all contain the same core half-truth: that the reference portfolio for the AC1 transaction was "selected by ACA," while failing to disclose Paulson's role in the portfolio selection process. (See SEC Mem. of Law at 16-17.) These offers all rely on the scheme to defraud ACA that was found by the jury as a violation of Section 17(a)(1),[16] with scienter.[17]

Tourre, the deal captain for AC1, described AC1 as "broker[ing] the short" for Paulson. (See PX192, PX233.) He accomplished this by structuring a synthetic CDO with a reference portfolio that met Paulson's specified criteria—the RMBS most likely to experience credit events. (See PX10; PX11; Trial Tr. at 329, 2105.) The evidence at trial showed that Tourre misrepresented Paulson's role in the AC1 transaction to ACA so that ACA would agree to work with Paulson to select a portfolio. Tourre learned that ACA executives were unclear about Paulson's role in

---

[16] Tourre relies heavily on SEC v. Solow, 554 F. Supp. 2d 1356 (S.D. Fla. 2008), in arguing that the Court should not determine the fraud theory upon which the jury found Tourre liable in light of its use of a general verdict form. (See Tourre Opp. at 3; 2/20/14 Tr. at 64, 60-62.) In Solow, however, the court notes Seventh Circuit authority that "appears to authorize" such a determination, but ultimately decides to resolve the uncertainty in that case in favor of the defendant. Solow, 554 F. Supp. 2d at 1367 (citing Miles v. Indiana, 387 F.3d 591, 598 (7th Cir. 2004) ("[W]hen several issues have been litigated, and the jury may have supported its verdict by finding in the plaintiff's favor on any one of the issues but which one is not clear, the court is free to determine the basis of the jury's verdict unless extrinsic evidence clearly resolves the issue.") In light of the way in which the factual record at trial evolved, as discussed herein, this Court does not have similar concerns as to the uncertainty for the basis of the jury's verdict that may have been present in Solow.
[17] The jury was instructed that a violation of Section 17(a)(1) required a finding that Tourre acted with scienter—either intent to defraud or reckless disregard for the truth. (Trial Tr. at 2784-86.)

the transaction (see PX47), but instead of clarifying their role, Tourre sent false and misleading emails about Paulson's role in the transaction to ACA and to Goldman's sales executive who covered the ACA account. (See PX51; PX61, Trial Tr. 756, 760-61, 1897, 1932-33.) Tourre admitted at trial that the email he sent to ACA "was not accurate." (Trial Tr. 1898).

After sending the false email, Tourre learned that ACA believed Paulson to be an equity investor in AC1, even though he knew that Paulson had made no such investment and was only interested in shorting the deal. (See PX72; Trial Tr. at 1956.) Tourre never corrected ACA's misimpression of Paulson's role in the transaction or clarified Paulson's true financial interest in AC1. (Trial Tr. at 2046, 2071.) At the same time, Tourre wanted to use ACA's name on the transaction to attract long investors, who would have been aware of ACA's reputation as a respected portfolio selection agent. (See PX158; PX170, PX233 at 4.) ACA witnesses testified that they would never have agreed to serve as the collateral manager for AC1 if they had known Paulson was a purely short investor. (Trial Tr. at 1370, 1381, 1468, 1593-94, 1884).

The evidence admitted at trial clearly showed that Tourre participated in a scheme to defraud ACA into serving as portfolio selection manager (while failing to mention Paulson's role) so that Goldman could market the AC1 transaction to long investors as having a portfolio that was "selected by ACA." The fraud on ACA was critical to making the transaction work; without ACA as portfolio selection agent, Goldman would not have been able to convince others to invest in the equity of the

transaction. Without the fraud on ACA, there may have never been an AC1
transaction. The six non-ACA offers the SEC identifies in its motion each flow from
and embody the fraud on ACA, and were thus necessarily found by the jury in its
finding of liability as to Section 17(a)(1). The deception of ACA thus produced the
half-truth included in the offers identified by the SEC—that the portfolio was
"selected by ACA" while leaving out any mention of Paulson.

Additionally, the Court finds that Tourre's conduct with respect to ACA, IKB,
and ABN directly or indirectly resulted in substantial losses or created a significant
risk of substantial losses to other persons. It is undisputed that Goldman sold AC1
notes worth $42 million to ACA and $150 million to IKB. (Id. at 898-900, 2423-24.)
It is also undisputed that ABN and ACA took long positions on AC1 through a
series of credit default swaps with a notional amount of $909 million, with ABN
required to pay Goldman $909 million if the assets in the AC1 portfolio defaulted.
(Id. at 2432-34.) Paulson ultimately made more than $1 billion on the transaction,
while these long investors lost more than $1 billion combined.

Tourre argues that there was no proof, and the jury did not find, that these
losses resulted from his conduct. (See Tourre Opp. at 6.) This argument does not
correctly state the standard for third-tier penalties[18] and is otherwise rejected. For
the reasons described above, Tourre's fraudulent conduct involving ACA plainly
satisfies the loss requirements for third-tier penalties for ACA, IKB, and ABN.

---

[18] For a third-tier penalty, the statutes require that the violation "directly or indirectly" resulted in
substantial losses or "created a significant risk of substantial losses to other persons." 15 U.S.C. §
77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

Finally, the Court finds that third-tier penalties for each entity of the maximum of $130,000 are warranted.  As described above, Tourre concealed Paulson's role in the AC1 transaction in order to secure ACA's commitment as portfolio selection agent.  He authored false emails and misleading marketing materials that were distributed to potential investors.  He personally spoke with the long investors who ultimately lost hundreds of millions of dollars on the transactions—ACA, ABN, and IKB.  Tourre's conduct spanned seven months, and involved many emails, meetings, and calls.  He has shown no remorse or contrition.  The Court finds that the maximum third-tier penalty of $130,000 is thus appropriate for the violations respecting each of these three entities.

2.   <u>Violations as to Calcyon, CIFG, BAWAG, and UBS</u>

As set forth above, because the remaining four fraudulent offers identified by the SEC—offers to Calcyon, CIFG, BAWAG, and UBS—all contain the same core half-truth regarding ACA's and Paulson's roles in selecting the AC1 reference portfolio, which was produced by the scheme to defraud ACA, the imposition of at least second-tier penalties for each such violation is warranted by the jury's finding of liability as to Section 17(a)(1).

The Court finds, however, that third-tier penalties are not warranted for these four violations because the evidence in the record does not satisfy the loss requirement for a third-tier penalty under the statutes.  For a third-tier penalty, both statutes require that the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C.

28

§ 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).  None of these four offers resulted in substantial losses, either directly or indirectly, because none of these entities ultimately invested in the AC1 transaction.  The SEC has also failed to show that any of these four offers created a <u>significant</u> risk of substantial losses.

The SEC argues that the significance of the risks here comes from the fact that these offers were "specifically tailored" to "large institutional buyers of these types of products, sophisticated institutions who are clients of Goldman Sachs and being selected by a very sophisticated investment bank to be shown this product through their sales force."  (2/20/14 Tr. at 38-40.)  The Court is not persuaded given the factual record developed at trial.  At most, the emails reflecting the offers identified by the SEC (and the corresponding testimony by Tourre) suggest that either a Goldman salesperson or Tourre spoke to the individual at the institution being solicited about AC1.[19]  (See PX302; PX354; PX398; Trial Tr. at 2153-54, 2183-84, 2200.)  The SEC points to no evidence that any of these banks had meaningful interest in AC1, considered these offers to invest in AC1 in any serious way, or engaged in further discussions with Tourre or Goldman following receipt of these offers.  As counsel to Tourre notes, no witness from any of these four entities was called to testify at trial.  The SEC may not now seek to prove one or more of these facts, by inference, based solely on the reputation of Goldman in the investment banking community.

---

[19] The Court notes that the offer to UBS, PX399, appears to be little more than an email forwarded by Tourre to an individual at UBS without comment.

For the reasons set forth above concerning the nature of Tourre's fraudulent conduct in connection with the AC1 transaction (which includes the attempts to obtain investments by Calcyon, CIFG, BAWAG, and UBS reflected in the offers identified by the SEC), the Court finds that second-tier penalties of the maximum $65,000 are warranted for each of these four offers.

### 3. No-reimbursement order

Finally, the SEC asks the Court to prohibit Tourre from accepting reimbursement for any civil penalties he is required to pay. (See SEC Mem. of Law at 22-23.) In support of this request, the SEC cites news reports from August 2013 that state Goldman "has privately indicated it might even pay whatever money [Tourre] could ultimately be fined," though the SEC also notes that counsel to Goldman has stated in correspondence with the SEC that no agreement or informal understanding as to reimbursement existed as of November 2013. (Id. at 22; Fitzpatrick Decl. Ex. 13.)

The dual purposes of civil penalties are to punish the individual violator and to deter future violations. See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006); SEC v. Gupta, No. 11 Civ. 7566 (JSR), 2013 WL 3784138, at *1 (S.D.N.Y. July 17, 2013). Consistent with these purposes, the civil penalties statutes describe separate maximum penalties for "natural persons" and "any other person." 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). At the time of Tourre's conduct, the maximum penalties for "any other person" were five times the maximum penalties for "natural persons" for both second-tier and

30

third-tier penalties. See 17 C.F.R. § 201.1003. The civil penalties statutes also state that courts "shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 77t(d)(1) (emphasis added); 15 U.S.C. § 78u(d)(3)(A) (emphasis added).

The Court grants the SEC's application in part—the Court prohibits Tourre from accepting reimbursement for the payment of these civil penalties from Goldman only. The Court does not prohibit Tourre from accepting reimbursement from any non-Goldman sources. In finding Tourre liable under Section 20(e) of the Exchange Act, the jury necessarily found Tourre to have aided and abetted a violation of Section 10(b) and Rule 10b-5 by Goldman. (See Trial Tr. at 2805-2806.) To permit Tourre to obtain reimbursement from Goldman, which the jury in this case found to be a co-violator of the securities laws, would undermine the purposes of the civil penalty statutes—to punish the individual violator and to deter future violations.[20]

The Court emphasizes that its holding here is highly dependent on the facts of this case and the specific statutory provisions under which the jury found Tourre liable. Such a no-reimbursement provision thus falls within the Court's "broad

---

[20] Tourre is correct that the only case to which the SEC cites in support of its request for a no-reimbursement order is SEC v. Das, 723 F.3d 943 (8th Cir. 2013). (See Tourre Opp. at 12; SEC Mem. of Law at 22.) Contrary to Tourre's characterization, however, the Eighth Circuit did not "vacate" the penalty originally imposed in SEC v. Das (which included a "no-reimbursement order"). Rather, after vacating the district court's "conclusion that [defendant] violated section 13(b)(5) of the Exchange Act" and its "finding that [defendant] acted in bad faith," the Eighth Circuit decided to "remand for reconsideration the civil penalties imposed." Id. at 957. The Eighth Circuit also described its holding as to the district court's penalties determination as "leav[ing] it to the discretion of the district court to retain the civil penalties already imposed or reconsider the penalties in light of this decision." Id. at 956. Though it is true that the district court's amended judgment did not contain a no-reimbursement provision, see SEC v. Das, No. 8:10-cv-102-LSC (D. Neb. Oct. 28, 2013), the case does not stand for the proposition that a district court (including the Das district court) lacks the authority to include such a no-reimbursement provision in a judgment.

equitable power to fashion appropriate remedies" once the Court (and the jury) have found violations of the federal securities laws. See First Jersey, 101 F.3d at 1474. It is not clear from the evidence in the record whether this prohibition on reimbursement will ever require enforcement—after all, Tourre states that he "has every intention" of paying any penalty personally (see Tourre Opp. at 11), and there is no evidence of any current plan or agreement to reimburse Tourre by Goldman. Nevertheless, the Court finds that such a provision is appropriate in light of the purposes of the civil penalties statutes and the jury's verdict in this case.

     C.    Injunctive Relief

Both the Securities Act and the Exchange Act also permit a court to order injunctive relief in the face of a violation of any of their provisions. 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d)(e), 78u-1. "An injunction prohibiting a party from violating statutory provisions is appropriate where there is a likelihood that, unless enjoined, the violations will continue." First Jersey, 101 F.3d at 1477 (citations and internal quotation marks omitted). "Such an injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction." Id. (citations and internal quotation marks omitted).

SEC seeks an order permanently enjoining Tourre against future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 20(e) of the Exchange Act. (SEC Mem. of Law at 23.)

As an initial matter, the Court is skeptical of the utility of this kind of "obey-the-law" injunction—after all, everyone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual "little guidance on how to conform his conduct to the terms of the injunction." See SEC v. Goble, 682 F.3d 934, 949-52 (11th Cir. 2012). Additionally, as the SEC concedes, these injunctions are rarely if ever enforced through contempt proceedings against an individual whose conduct giving rise to the injunction took place while he or she was at an investment bank. (See 2/20/14 Tr. at 44-46.)

The Court denies the SEC's request for injunctive relief at this time, because there is insufficient evidence in the record to demonstrate a reasonable likelihood of future violations by Tourre. There is no evidence that Tourre has any intention of returning to the securities industry following the expected completion of his studies in June 2016. In fact, the evidence is and has been consistently to the contrary—Tourre has not worked in the securities industry since being placed on paid administrative leave by Goldman nearly four years ago in April 2010, and is in the middle of a six-year Ph.D program in economics at the University of Chicago.

Nevertheless, the Court will keep jurisdiction over this case and, if facts develop that suggest Tourre does intend to return to the securities industry within three years of the date of this Opinion, the Court will entertain an appropriate

33

application for injunctive relief from the SEC at that time. As Tourre's counsel conceded at oral argument, such an approach "seems to be a very good way to balance the legal requirements of risk of repetition and the realities of life." (2/20/14 Tr. at 43-44.)

III.    CONCLUSION

For the reasons set forth above, the SEC's motion for disgorgement and prejudgment interest, civil monetary penalties, and injunctive relief is GRANTED in part and DENIED in part. The parties are directed to submit a joint proposed form of judgment within **14 days** of the date of this Opinion.

The Clerk of Court is directed to close the motion at ECF No. 491.

SO ORDERED.

Dated:      New York, New York
            March 12, 2014

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge

34